## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| ANNE BRUMBAUGH, GARY L. HARMON and RANDY K. GRIFFIN, | ) ) ) | No. 04-30022-MAP |
| | ) | |
| Plaintiffs, | ) ) | <u>CLASS ACTION</u> |
| | ) | **CONSOLIDATED AMENDED CLASS** |
| v. | ) ) | **ACTION COMPLAINT FOR** |
| | ) | **VIOLATIONS** |
| WAVE SYSTEMS CORPORATION, JOHN E. BAGALAY, JR., STEVEN K. SPRAGUE, and GERARD T. FEENEY | ) ) ) | **OF THE FEDERAL SECURITIES LAWS** |
| | ) | |
| | ) | <u>DEMAND FOR JURY TRIAL</u> |
| Defendants. | | |

**PART 1 OF 2 (PAGES 1 - 21)**

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ANNE BRUMBAUGH, GARY L. HARMON and RANDY K. GRIFFIN,<br><br>Plaintiffs,<br><br>v.<br><br>WAVE SYSTEMS CORPORATION, JOHN E. BAGALAY, JR., STEVEN K. SPRAGUE, and GERARD T. FEENEY<br><br>Defendants. | ) No. 04-30022-MAP<br>)<br>) <u>CLASS ACTION</u><br>)<br>) **CONSOLIDATED AMENDED CLASS**<br>) **ACTION COMPLAINT FOR**<br>) **VIOLATIONS**<br>) **OF THE FEDERAL SECURITIES**<br>) **LAWS**<br>)<br>) <u>DEMAND FOR JURY TRIAL</u> |

Lead Plaintiffs, Anne Brumbaugh, Gary L. Harmon, and Randy K. Griffin ("Plaintiffs"), individually and on behalf of all other persons similarly situated, allege the following based upon personal knowledge as to themselves and their purchases of Wave Systems Corp. ("Wave," or the "Company") securities, and upon information and belief derived from the investigation of their counsel as to all other matters. The investigation of counsel included, among other things, a review of the public filings by Wave with the United States Securities and Exchange Commission ("SEC"), press releases and other public statements published by and regarding Wave, reports by securities analysts, rating agencies, and news services about Wave, and interviews with former Wave employees. Plaintiffs believe that the ongoing investigations of their counsel and the SEC will yield further information in support of the claims alleged herein.

## **NATURE OF THE ACTION**

1.      This is a federal securities class action brought by Plaintiffs on behalf all persons

who purchased or otherwise acquired the common stock of Wave between July 31, 2003 and

December 18, 2003, inclusive (the "Class Period"), seeking to recover damages caused by

Defendants' violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the

"Exchange Act") and Rule 10b-5 promulgated thereunder.  Defendants are Wave, its President

and Chief Executive Officer, Steven K. Sprague ("Sprague"), and its Senior Vice President,

Chief Financial Officer and Secretary, Gerard T. Feeney ("Feeney," and together with Sprague,

the "Individual Defendants"), in their capacity as officers and directors of Wave.

2.      During the Class Period, Wave, represented itself as a developer, producer and

marketer of hardware and software based digital security products for the Internet-- a highly

competitive, evolving and yet to be defined marketplace.  Despite its more than 16 years in

business, Wave described itself as a "development stage company" and has yet to successfully

complete commercial marketing of any products its business model relies upon.  Since its

inception in 1988, Wave has not realized any significant revenues, with its largest development

contract cancelled in  2002.  For fiscal years ended December 31, 2002, 2001 and 2000, Wave

incurred loses of approximately $43,467,000, $48,701,000, and $47,656,000, respectively.

3.      As reported in the Company's filings with the SEC, as of December 31, 2002,

Wave had an accumulated deficit of approximately $233,092,000 and working capital of only

$8.8 million, requiring an additional $11 million in cash to keep its doors open through the end

of December 31, 2003.

4.      Desperate for funds and with no significant revenue stream in sight, on April 30, 2003 the Company closed a private placement of Series H Stock and Warrants ("Series H Placement" or "Placement") for gross proceeds of $5,485,000, netting the Company additional funds of $4,465,571, after agreeing to pay $1,020,429, or 19% of the total proceeds, in fees and commissions. Out of this desperation, the Company also agreed to pay the preferred shareholders dividends at an annual rate of 10% in 2003, increasing to 12% on April 30, 2004. Significantly, the Placement terms also greatly limited Wave's ability to raise additional funds through equity offerings, by giving the Series H shareholders a right of first refusal.

5.      Without the financial wherewithal to pay the dividends due, or to redeem the preferred stock, Wave had agreed to terms that tied the Company's hands financially. Wave's only escape route was to trigger the automatic conversion of the preferred shares to the Company's Class A Common Stock, under the terms of the Placement, by causing Wave stock to trade above $1.90 per share for 15 of 20 consecutive trading days.

6.      As of June 30, 2003, even with the additional funding in place, the Company had an accumulated deficit of $245.8 million and working capital of only $2.6 million– not enough to keep Wave's doors open through the end of 2003.

7.      Teetering on the brink, with the final blow embodied in the onerous terms of the Placement, Defendants devised a plan to artificially and materially inflate the Company's stock price in the short term in order to convert the Series H Stock to non-dividend paying common stock.

8.      To this end, Defendants primed the market to expect a major development in the Company's 16 year history– a significant revenue stream. Specifically, one month prior to the

start of the Class Period, on June 30, 2003 the Company reported the following in its Form 10-

K/A for fiscal year ended December 31, 2002 under "Recent Developments":

> During 2002, several manufacturers of semiconductors for the PC
> industry announced products that have the capability to function as
> TPM's (Trusted Platform Modules) that meet the TCPA []standard
> for trusted computing. (Compaq Computer, Hewlett-Packard,
> IBM, Intel and Microsoft established the TCPA in an effort to
> define and promote trusted computing. . . . ) The offering of these
> products by major suppliers of semiconductors to the PC market is
> an important development in the creation of the market for
> hardware based trusted computing. **As a result of this**
> **development, Wave has begun executing a strategy to leverage**
> **the work it has done in developing a hardware trusted**
> **computing platform toward becoming a major developer of**
> **services to this market, the development of which is beginning**
> **to be driven by some of the major suppliers of semiconductors**
> **to the PC industry. Wave is actively pursuing business**
> **relationships with these companies in an effort to become a**
> **developer of applications that will be essential to the**
> **deployment of these new products, thereby creating a**
> **substantial new revenue opportunity for Wave.** (Emphasis
> added.)

9.    In the same filing, Defendants forecast significant revenue growth from deals in

the Company's pipeline. As the Company stated in the Form 10-K/A, under "Results of

Operations":

> Revenue and gross margins during the year ended December 31,
> 2002, versus the same period in 2001 is indicative of a downward
> trend, with neither period showing significant revenues. The
> amount of revenues in both years has not reached a level that
> would contribute significantly to Wave's operations and has been
> sporadic. Wave does not foresee that it will achieve significant
> revenues at least until the latter part of 2003. **Our sales forecast**
> **for the year ended December 31, 2003 approximates $5 million**
> **in gross margin contribution. However, this forecast is not**
> **supported by a backlog of orders at this time, but rather the**
> **anticipation that various deals that we are currently pursuing**
> **will close.** Wave continues to work toward solidifying strategic

alliances with the major personal computer manufacturers to force
collaborative efforts to distribute its products to consumers . . .
(Emphasis added.)

10.     In apparent fulfillment of Defendants' touted anticipation of revenue growth, at

the start of the Class Period on July 31, 2003, Wave announced a purported licensing agreement

with Intel Corporation, followed soon thereafter by an announcement on August 4, 2003 that

Wave had entered into a purported partnership arrangement with IBM.

11.     Against the backdrop of the Company's forecast for $5 million in revenue growth,

the combined announcements caused Wave's stock to skyrocket.  On July 31, 2003, following

the Company's Intel announcement,  Wave's common stock closed at $2.25 per share, up from

the prior day's close of $0.84 per share, representing a 168% one day gain on extremely heavy

volume of 19 million shares traded.  On August 4, 2003, following the Company's IBM

announcement, Wave's share price rose 21%, or $0.77 per share, to close at $4.42 per share, on

very heavy volume of over 45 million shares traded.  However, the full terms and true nature of

the purported Intel and IBM deals were not disclosed, which would have revealed to the market

their unlikely prospects for generating anything close to the Company's forecasted revenue

growth.

12.     In this regard, a former Wave employee stated that he was involved with the Intel

deal, which his contacts at Intel considered to be "a small deal" and not a lucrative arrangement

for Wave.  Nevertheless, Defendants pumped up the value of the Company's stock through

materially false and misleading statements concerning expected revenues from  Wave's

purported relationships with Intel and major PC manufacturers, which were misrepresented to the

investing public.  Defendants richly profited by their misrepresentations that caused a dramatic

increase in the price of Wave's stock — the Company avoided having to close its doors, and the Individual Defendants unloaded 20% and 50% of their personally held Wave stock, receiving total proceeds of nearly $1 million within days of the misleading deal announcements.

13.    The Class Period ends on December 18, 2003 when Defendants reported that the SEC had begun a formal investigation relating to the Defendants' public statements concerning Wave's business during and around August 2003, as well as insider trading in Wave securities which occurred in and around that time. News of the investigation shocked the market, with shares falling 17.13%, or $0.31 per share, to close at $1.50 per share on extremely high volume on December 19, 2003. Plaintiffs suffered damages as a result of Defendants' misconduct.

## JURISDICTION AND VENUE

14.    Lead Plaintiffs bring this action pursuant to §§10(b) and 20(a) of the Exchange Act as amended (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

15.    This Court has jurisdiction over the subject matter of this action pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1331.

16.    Venue is proper in this District pursuant to §27 of the 1934 Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b). Wave maintains its principal executive offices at 480 Pleasant Street, Lee, Massachusetts, and many of the acts complained of, including the dissemination to the investing public of materially misleading information, occurred within this District.

17.    In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce.

## THE PARTIES

18.     By order dated September 3, 2004, this Court appointed Plaintiffs to serve as lead plaintiffs in this action.  Plaintiffs purchased Wave common stock during the Class Period, as set forth in their certifications previously filed with the Court and incorporated by reference, and have suffered damages as a result of the wrongful acts of Defendants.

19.     Defendant Wave is a publically held corporation organized and existing under the laws of the State of Delaware, with its principal offices at 480 Pleasant Street, Lee, Massachusetts.  The Company was formed in August 1988 and had its initial public offering in 1999.  At all relevant times, the shares of Wave traded on NASDAQ under the symbol "WAVX." On September 14, 2004, Wave announced that it had been notified by NASDAQ that for the last 30 consecutive business days, the bid price of Wave's common stock  closed below the minimum $1.00 per share, a requirement for continued listing on the NASDAQ.  Wave has until March 14, 2005 to have its shares close above $1.00 for a minimum of 10 consecutive trading days, or the stock will be delisted or moved to the NASDAQ SmallCap Market.

20.     Defendant Sprague served as the Company's President and Chief Executive Officer at all relevant times.  During the Class Period, defendant Sprague sold 150,000 shares of his personally held Wave stock at prices ranging from $3.14-3.47 per share for proceeds of $492,636, reducing his overall share ownership by 20%.

21.     Defendant Feeney served as the Company's Chief Financial Officer at all relevant times.   During the Class Period, defendant Feeney sold 100,000 shares of his personally held Wave stock at $5.00 per share for proceeds of $500,000, cutting his overall share ownership by 50%.

22.    During the Class Period, each of the Individual Defendants, as senior executive officers of Wave Systems, was privy to non-public information concerning its business, finances, products, markets and present and future business prospects via access to internal corporate documents, conversations with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.  Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

23.    Each of the Individual Defendants is liable as a direct participant with respect to the wrongs complained of herein.  In addition, the Individual Defendants, by reason of their status as senior executive officers and directors were each a "controlling person" within the meaning of Section 20 of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.  Because of their position of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of Wave's business and the content of its public disclosures.

24.    The Individual Defendants, because of their positions with the Company, were provided with copies of the Company's reports and press releases alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

25.    The Individual Defendants are liable, jointly and severally, as direct participants in the wrongs complained of herein.

00003557.WPD ; 1                          8

## SUBSTANTIVE ALLEGATIONS
### Pre-Class Period Statements and Events

26.    In a press release issued by Defendants on May 15, 2003 reporting on the Series H

Placement, defendant Sprague made the following comments concerning the "expected reality"

of imminent revenues:

> We are pleased to have successfully completed the private
> placement in the face of extremely challenging conditions in the
> economy and capital markets.  We believe our ability to complete
> this transaction provides recognition of our industry position and
> the central role Wave can play in the rapidly emerging trusted
> computing marketplace.  Wave has staked out a unique position
> with trusted computing services and infrastructure that seamlessly
> operate with the leading industry platforms.  **Recent interactions
> at several industry events suggest that key industry
> participants are finally beginning to recognize the value Wave
> can add and are evaluating ways that they can work with us to
> benefit from our position.**
>
> During 2003 we expect to receive trusted computing-oriented
> license revenue relating to our agreement with National
> Semiconductor as they begin to address the emerging trusted
> computing enterprise market.  It is also our goal to generate
> services revenues this year associated with the other chip vendors
> that are also addressing this opportunity.  **This is an exciting time
> for us, as we begin to see our long-held vision of revenue-
> producing trusted computing services become an expected
> reality.**  (Emphasis added.)

27.    Within one month of the start of the Class Period, Wave reported its financial

results for its fourth quarter ("4Q02") and fiscal year ended December 31, 2002 in its Form 10-

K/A filed with the SEC on June 30, 2003 ("2002 10-K/A").  The filing was signed by the

Individual Defendants.

28.    The filing contained a report from Wave's independent auditor, KPMG, LLP, indicating that "the Company has suffered recurring losses from operations and has an accumulated deficit that raises substantial doubt about its ability to continue as a going concern" beyond the second quarter of 2003.

29.    Defendants also disclosed in the 2002 10-K/A that the Company had successfully raised $5,487,000 through a private placement of Series H Stock and Warrants which closed on April 30, 2003.  Without any significant revenue during its history, the Company raised the majority of its funding through equity offerings.

30.    However, the funds obtained through the Placement came at great expense to the Company.  Wave paid 19% or $1,020,429 in commissions and fees, and obligated itself to pay dividends on the preferred stock, accruing  "on the initial liquidation preference amount of each share ($10,000) at an annual rate of 10%, increasing to 12% on April 30, 2004."  No other class of Company stock paid a dividend.

31.    In addition, the terms of the Placement were highly restrictive concerning the Company's ability to raise additional funds through future equity offerings.  Under the terms of the Placement, for a period of two years from April 30, 2003, the holders of the Series H Stock had the right of first refusal with respect to any financing arrangements contemplated by the Company, whereby they could opt to exchange their Series H stock for any new equity securities offered by the Company--- essentially restricting Wave from raising funds on more favorable terms than those offered to the Series H holders.

32.    The highly restrictive Series H Placement obligated the Company to terms it could not perform – payment of the 10 and 12% dividend – and restricted its ability to seek additional

funding. Moreover, Wave did not have the resources to redeem the preferred shares and escape the terms it could not perform.

33.    However, the preferred stock was convertible to Class A Common Stock at the option of the shareholder at an initial conversion price of $0.76 per share on the first trading day following Wave's annual stockholders' meeting, which at the start of the Class Period was scheduled to be held on August 4, 2003. More importantly, the Series H Stock carried a mandatory conversion provision whereby if the closing bid on Wave's Class A Common Stock exceeded $1.90 for 15 of 20 consecutive trading days, the Series H Stock and any dividends accrued thereon, would automatically convert into Class A Common Stock at the conversion price. In addition, 100% of the Series H Warrants, at an initial exercise price of $1.13 per share, were callable by the Company if the market value of its Class A Common Stock exceeded 250% of $1.13 for a minimum of 15 business days during any twenty consecutive business day period. If exercised in full, the Series H Warrants would generate up to an additional $4,077,671 for the Company.

34.    In the Form 10-K/A filed on June 30, 2003, Defendants expanded on their comments made in the May 15th press release concerning the fruition of Wave's "long-held vision of revenue-producing trusted computing services" and made the following forecast for revenue growth in fiscal 2003:

> Revenue and gross margins during the year ended December 31, 2002, versus the same period in 2001 is indicative of a downward trend, with neither period showing significant revenues. The amount of revenues in both years has not reached a level that would contribute significantly to Wave's operations and has been sporadic. **Wave does not foresee that it will achieve significant revenues at least until the latter part of 2003. Our sales forecast for the year ended December 31, 2003 approximates $5 million in gross margin contribution.**

**However, this forecast is not supported by a backlog of orders at this time, but rather the anticipation that various deals that we are currently pursuing will close.**  Wave continues to work towards solidifying strategic alliances with the major personal computer manufacturers to force collaborative efforts to distribute its products to consumers . . . (Emphasis added.)

35.    It is against this backdrop that Defendants' Class Period statements and conduct must be viewed.  Desperate for funds and bound to a restrictive and costly Placement agreement, Defendants materially misled the market to artificially inflate the Company's stock.

### Defendants' Materially Misleading Statements During The Class Period

36.    With the market primed by Defendants' statements concerning an anticipated revenue stream, on July 31, 2003, the start of the Class Period, Defendants issued a press release announcing an "agreement" with Intel Corporation, which purportedly "enabl[ed] Intel to bundle Wave's software and services with a future Intel desktop motherboard, targeted for trusted computing platforms."  A senior vice president, Global Business Development, at Wave stated: "Wave has been working closely with Intel on the development of application and service solutions.  Both companies believe that in order to accelerate adoption in the marketplace, it is critical to identify and offer an attractive introductory set of services and high value applications. We are delighted to be working with Intel by providing solutions for this emerging market."  In the press release, the Company also repeated that it had recently announced a licensing agreement with National Semiconductor.[1]

---

[1]  On March 28, 2003, Wave announced a licensing agreement with National Semiconductor to bundle the Company's applications and services with National Semiconductor's SafeKeeper platform.  To this day, the licensing agreement with National Semiconductor has not produced a significant revenue stream for the Company.

37.     The market exploded on the news of the purported Intel deal.  At the close of the market on Thursday, July 31, 2004, Wave's stock increased from its previous day's close of $0.84 per share to $2.25 per share, realizing  a gain of 168%.  Volume on that day was approximately 19 million shares traded, as compared to Wave's average daily volume of only 199,136 shares.

38.     Demand for Wave shares continued the day following the announcement.  As reported by *CBS MarketWatch*, on Friday, August 1, 2003:

> Demand for Wave Systems' shares soared again Friday, a day after the developer of computer security technology more than doubled on **news of an important partnership with chip heavyweight Intel.**
>
> The stock (WAVX) jumped 98 cents, or 43.1 percent to $3.23, in morning dealings.  Volume climbed above 22.1 million, good for the third slot on the Nasdaq's most-active chart.
>
> On Thursday, shares rose to $2.25 from 84 cents on volume of 19 million.
>
> **Financial terms of the partnership weren't disclosed.**
> (Emphasis added.)

39.     The Company's share price continued to climb during the morning of the third day of trading following Defendants' announcement of the Intel deal.  As reported by *Midnight Trader* on August 4, 2003, "Wave Systems (WAVX) is up 14.4% on 275,000 Island [sic] shares this morning as traders look to push the column for the third consecutive day.  The stock has been rocketing higher since Thursday when the company announced a supply and services contract with Intel (INTC)."

40.     According to a confidential witness ("CW1"), who worked as an engineer in Wave's California office from 2000 through August 2003, and had also worked as an engineer at Intel before joining Wave, the Intel deal was considered by his contacts at Intel to be "a small deal."  CW1's job at Wave was to establish business relationships or "strategic alliances"

between Wave and larger companies. He worked on the Intel deal because of his previous employment and connections there. CW1's contacts at Intel viewed the deal with Wave as "kind of a joke," and were "very surprised" at the attention the announcement received. CW1 reported that Intel viewed the deal as not a lucrative one for Wave.

41.    Defendants' statements contained in paragraph 36 above were materially false and misleading, as the statements were incomplete. By the time the Intel announcement was made, Defendants had forecast Wave's receiving a significant revenue stream in 2003 from "various deals that we are currently pursuing." Having thus primed the market, Defendants knew, or recklessly disregarded the fact that the investing public would be misled by the omission of the specific terms of the Intel agreement, which terms merely provided Intel with non-exclusive licensing rights to use Wave's products, without any minimum licensing requirement. Intel could choose to use, or not use this licensing right. Thus, Intel was not obligated, and had not decided, to give Wave its business. If the truth concerning the Intel "agreement" had been disclosed by Defendants, investors would have learned that the purported deal with Intel was not likely to be a component of the anticipated "$5 million in gross margin contribution" that Defendants had announced just before the start of the Class Period. Indeed, the Intel announcement was merely a skillfully timed hoax.

42.    Further priming the artificial inflation in Wave's stock price, Defendants announced on August 4, 2003 that Wave had a "partnership" with computer giant IBM. In the release, Defendants further stated that Wave's new security software applications were compatible with IBM's Embedded Security Subsystem available on select ThinkPad notebooks and ThinkCentre desktops. The compatibility was the result of Wave's participation in IBM's

Independent Software Vendor program. An executive vice president of Wave commented on the announcement, "Wave's partnership with IBM will significantly help us in our objective to deliver open and interoperable solutions to business customers as trusted computing continues to evolve."

43.    The news was widely reported in the marketplace as a deal between Wave and IBM where IBM would use the Company's software in certain IBM products. As reported by *CBS MarketWatch* on August 4, 2003, "[s]hares of Wave Systems are trading among the leading Nasdaq percentage gainers, up $1.03, or 28 percent, at $4.68. The security hardware and software firm announced a deal with IBM to use its software in certain IBM products."

44.    In response to what was presented as another timely deal for Wave, Wave common stock closed at $4.42 per share on August 4, 2004, up $0.77 per share, or 21%, from its closing price of $3.65 per share on the previous trading day, August 1, 2004. The volume of Wave shares traded on that day was also extremely high at over 40 million shares.

45.    On August 5, 2003, a Wave spokesperson confirmed and furthered the market's perception of the Company's materially misleading August 4th announcement: that the IBM deal meant Wave's product would be bundled with IBM computers. As reported in *The New York Times*, Wave represented the deal with IBM as follows:

> **The Wave Systems Corporation said yesterday that it had agreed to a deal with IBM to embed its security software inside selected IBM notebook and desktop computers, in the latest in a string of deals for Wave Systems.** The company, based in Lee, Mass., said its software would be available on selected ThinkPad notebooks and ThinkCenter desktops that include IBM's digital security subsystem.

Shares of Wave Systems rose 21.4 percent, or 77 cents to close at $4.42. Shares of the previously thinly traded stock have risen sharply in the last three days, since Wave announced a deal with Intel to embed its software inside some internal computer chassis built by Intel. **Terms of the latest deal were not disclosed. But a Wave spokesman, John Callahan, said IBM computers with built-in Wave security would be available in the fourth quarter of this year.** (Emphasis added.)

46.    Defendants' misrepresentation that IBM had agreed to include Wave's software in

IBM computers was also reported by *Financial Wire* on August 5, 2003 as follows:

Okay, forget the fact that Wave Systems Corp. is working off a net loss in 2002 of $43.5 million on revenue of $447,000, that it has been a long-time thinly traded stock or anything else we've noted. Traders obviously don't care, and **Wave Systems just keeps on dropping names, the latest being IBM Corp., to go with Intel Corp. and National Semiconductor Corp. After the shares of Wave Systems Corp. exploded Thursday for a 167.86% gain, it soared still another 62% on 63.7 million shares on Friday, and Monday just kept going, up another 21.10% to $4.42 on 45.8 million shares traded. This all from a standing-still start after trading no shares and languishing under $1 four trading days ago. Yesterday the company fueled the fire with an announcement it had agreed with IBM to offer Wave's security software as an option for IBM notebook and desktop computers. The company is up over five times its starting price, and the volume is some 100 times the average, which was close to zero.** Once again, terms were not disclosed, so traders remain in the dark as to the value of the deals to the company, and there is no analyst coverage to interpret the data. IBM did say that its security chips add $25 to the cost of a computer, but there is no information as to how much Wave might see of that. (Emphasis added.)

47.    The market rewarded the Company's apparent fulfillment of its expectation for

significant revenue growth with the Intel and IBM deal announcements. Earlier in the trading

session on August 5, 2003, Wave's stock hit a 52-week high of $5.24 per share, closing at $4.53

per share that day on heavy volume, with more than 40 million shares changing hands. In less than a week, Wave's common stock had increased in price by more than 400%.

48.    However, Defendants' representations concerning the IBM deal were materially false and misleading, as Defendants knew, at the time the statements were made, that Wave had merely established that its products were compatible, or would run on IBM's computers, **not** that IBM had partnered with Wave and would be bundling Wave's products with computers IBM shipped to its customers.

49.    Personally profiting from Defendants' material misrepresentations, on August 5, 2003, defendant Feeney sold 100,000 shares of Wave stock at $5.00 per share for proceeds of $500,000, cutting his overall share ownership by 50%.

50.    Feeney was not alone in increasing his net worth at the expense of the investing public. On August 6, 2003, defendant Sprague sold 150,000 shares of Wave stock at prices ranging from $3.14-3.47 per share for proceeds of $492,636, reducing his overall share ownership by 20%.

51.    In addition to the Individual Defendants, the Company also benefitted from the spectacular rise of Wave's share price, which enabled the Company to continue its operations and keep its doors open.

52.    On August 7, 2003, the Company announced that it expected to receive $2.6 million in proceeds from recent employee and ex-employee stock option exercises and $1 million from the repayment of a former officer's loan, which resulted from Wave's substantial increase in share price.

53.    However, Defendants' scheme to avoid the oppressive terms of the Series H Placement through the conversion of the preferred stock to Class A Common Stock was stalled. On August 7, 2003, *Financial Wire* reported that the SEC had "put the brakes on the company's proposal to ask for shareholders to authorize an increase of the company's float from 75 million shares to 120 million shares, necessary to keep it in business until the new promises can come to fruition." The shareholders vote had been scheduled for August 4, 2003. A shareholder vote was necessary to authorize the Company's issuance of additional shares of Class A Common Stock, above its current float, that would be required in the event the Series H shares became convertible to Class A Common Stock. Shareholder authorization was required under NASDAQ rules because the number of additional shares needed exceeded 19.99% of shares outstanding ("ShareCap") prior to the April 30, 2003 close of the Placement. Without the shareholders approval, Wave would have been obligated to redeem the Class A Common Stock issuable upon conversion or exercise of the Series H securities in excess of 10,355,865 shares, to comply with NASDAQ listing requirements.

54.    In the Company's Definitive Proxy Statement filed on August 8, 2003, the annual shareholders meeting was rescheduled to August 27, 2003. According to a report by the *Financial Times* on August 11, 2003, the shareholder vote on the proposed increase in its float from 75 million shares to 120 million shares has been reset by Wave following a SEC review that a Company spokesperson said was mistakenly thought by some to have been an investigation.

55.    On August 11, 2003, Defendants filed a Form S-3/A with the SEC relating to the

registration of 1,700,000 shares of Class A Common Stock.  In the Form S-3/A, Defendants

made the following representations under "Material Changes":

> On July 31, 2003, Wave announced an agreement with Intel
> Corporation that will help enable both companies to accelerate the
> development and deployment of trusted applications and services
> for safer computing on personal computer platforms.  The
> agreement will enable Intel to bundle Wave's software and services
> with a future Intel desktop motherboard, targeted for trusted
> computing platforms.  Similar in nature to a previously announced
> March 2003 licensing agreement between Wave and National
> Semiconductor, Intel will pay a royalty fee to Wave for each unit
> shipped.  Intel plans to introduce the new motherboard in the fourth
> quarter of 2003.
>
> On August 4, 2003, Wave announced that it has partnered with
> IBM's Independent Software Vendor (ISV) Program.  Wave's new
> Document Manager Vault and Smart Signature security software
> applications in Wave's EMBASSY Trust Suite client software
> family now work with the IBM Embedded Security subsystem, a
> hardware and software-based security solution available on select
> ThinkPad notebooks and ThinkCentre desktops.  Wave's
> partnership with IBM enables Wave in its objective to sell and
> deliver open and interoperable solutions to business customers as
> trusted computing continues to evolve.  Wave will try to interest
> other security chipmakers and motherboard suppliers in its product
> in the coming months.

56.    Defendants statements contained in the Company's SEC filing described above

were materially false and misleading at the time they were made.  Defendants knew that the Intel

deal would not generate the revenue stream forecast by the Company at any time in the

foreseeable future, if ever, and that the IBM relationship was not fee producing.  Contrary to

Defendants representations, the purported Intel and IBM deals were not "material changes."

57.     On August 14, 2003, Defendants issued a press release highlighting the

Company's performance in the second quarter of 2003 ("2Q03"), and for the six month period

ending June 30, 2003.  Wave reported a net loss to stockholders for the quarter of $6,274,000, or

$0.12 per share.

58.     In the Company's earnings conference call with analysts to discuss the 2Q03

results, conducted on August 14, 2003, defendant Sprague for the first time described the Intel

deal as a non-exclusive licensing agreement, with no minimum or maximum licensing

requirements, "[t]hey can use it as broadly as they want or as little as they want."  In addition,

Sprague stated that while the Company's products were compatible with IBM computer

platforms, Wave did not have a licensing arrangement with IBM.  Despite this partial disclosure,

the impact of the statements on the market for Wave's shares was diluted if not totally eclipsed

by Sprague's simultaneous reinforcement of Defendants' earlier stated expectation for imminent,

significant revenue growth.  Defendant Sprague forecast revenue breakeven on the Company's

predicted revenue stream:

> **From a business perspective, we believe the market will start
> generating revenue for us really the end of this year in fourth-
> quarter, although I think the bulk of that revenue won't really
> be realized till a quarter after because it takes some time for
> those numbers to be reported back to us** that this revenue is
> based primarily on the applications that are bundled with the
> platform, very much around a relationship that we've announced
> with Intel and the business model that was articulated in the press
> release.
>
>       *            *            *
>
> **We think the long-term scope in that business is tremendous
> and on a short-term basis we think we can reach the point
> where the company gets to cash flow breakeven sometime in
> 2004. . . .** So the company has now access to the resources that we