# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **ANNE BRUMBAUGH, GARY L. HARMON and RANDY K. GRIFFIN,**<br><br>        **Plaintiffs,**<br><br>     **v.**<br><br>**WAVE SYSTEMS CORPORATION, JOHN E. BAGALAY, JR., STEVEN K. SPRAGUE and GERARD T. FEENEY,**<br><br>        **Defendants.** | **CIVIL ACTION NO. 04-30022-MAP** |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

**WAVE SYSTEMS CORPORATION, JOHN E. BAGALAY, JR., STEVEN K. SPRAGUE and GERARD T. FEENEY,**

By their attorneys,

Robert A. Buhlman, BBO #554393
Eunice E. Lee, BBO #639856
Raquel J. Webster, BBO #658796
BINGHAM MCCUTCHEN LLP
150 Federal Street
Boston, MA 02110-1726
(617) 951-8000

## <u>TABLE OF CONTENTS</u>

THE ALLEGED CLAIMS ................................................................................. 1

MOTION TO DISMISS FACTS ..................................................................... 2

    A. Wave Corporation ................................................................................ 2

    B. Wave's Disclosures Regarding its Financial Situation ............................ 3

    C. Wave's Announcement About Intel ...................................................... 4

    D. Wave's Announcement About IBM ...................................................... 6

SUMMARY OF LEGAL STANDARDS ............................................................ 7

    I. Plaintiffs Must Plead the Elements of Their Claims ......................... 8

    II. Plaintiffs Must Meet Strict Pleading Requirements ...................... 9

        1. The First Circuit Applies Rule 9(b) Strictly to Claims
           of Securities Fraud .................................................................. 8

        2. The PSLRA Sets Strict Pleading Requirements ................. 10

ARGUMENT ................................................................................................ 12

    I. THE AMENDED COMPLAINT MUST BE DISMISSED BECAUSE
       THE STATEMENTS ALLEGED TO BE FALSE AND
       MISLEADING ARE NOT ACTIONABLE AS A MATTER OF LAW ....... 12

        A. Wave's Statements Do Not Actually Say What
          Plaintiffs Are Claiming They Say ................................... 13

        B. Wave's Statements Were Forward-Looking
          Statements And Are Therefore Not Actionable. ............. 14

        C. Any Alleged Omission Of Additional Detail About
          Intel and IBM Is Not Actionable .................................... 18

        D. Wave's Statements of Corporate Optimism are Not
          Actionable ....................................................................... 20

    II. THE AMENDED COMPLAINT MUST BE DISMISSED
       BECAUSE IT FAILS TO ALLEGE FALSITY WITH THE
       PARTICULARITY NECESSITATED BY BOTH THE
       PSLRA AND FED. R. CIV. P. 9(B) ........................................................ 24

        A. Plaintiffs Fail to Allege With Particularity How
          and Why Wave's Statements In Its Press Releases
          Were False or Misleading ................................................ 27

         B. Plaintiffs Fail to Allege With Particularity the
          Reasons Why Sprague's Statements in the
          August 14, 2003 Conference Call Were False or
          Misleading ....................................................................... 29

        C. Plaintiffs Fail to Allege With Particularity How
          and Why Wave's Statements In Its SEC Filings
          Were False or Misleading ................................................ 31

III.   THE AMENDED COMPLAINT MUST BE DISMISSED
       BECAUSE PLAINTIFFS FAIL TO PLEAD FACTS CREATING
       A STRONG INFERENCE THAT DEFENDANTS ACTED WITH
       SCIENTER ................................................................................................ 34

       A.    Plaintiffs' Scienter Allegations Fail to Plead the Requisite
             Strong Inference of Scienter as to Each Defendant .................. 35

       B.    Trading by Insiders In and of Itself is Insufficient to
             Create a Strong Inference of Scienter ....................................... 38

       C.    Plaintiffs Fail to Allege Any Inference of Scienter For
             Individual Defendants Bagalay and Feeney ............................. 40

IV.    THE AMENDED COMPLAINT FAILS TO PROPERLY PLEAD
       A SECTION 20(a) CLAIM AND THEREFORE FAILS TO
       STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED ...... 41

CONCLUSION ......................................................................................................... 43

## TABLE OF AUTHORITIES

### FEDERAL CASES

*ABC Arbitrage v. Tchuruk*, 291 F.3d 336 (5th Cir. 2002) ............................................26, 27

*In re Advanta Corp. Sec. Litig.*, 180 F.3d 525 (3d Cir. 1999) ....................................22, 39

*In re Allaire Corp. Sec. Litig.*, 224 F. Supp. 2d 319 (D. Mass. 2002)..............................10

*Backman v. Polaroid*, 910 F.2d 10 (1st Cir. 1990)............................................................18

*Basic Inc. v. Levinson*, 485 U.S. 224 (1988)................................................................8, 41

*In re Boston Tech. Sec. Litig.*, 8 F. Supp. 2d 43 (D. Mass. 1998) ....................................18

*In re Cabletron Systems, Inc.*, 311 F.3d 11 (1st Cir. 2002) ..................................11, 19, 26

*Carney v. Cambridge Tech. Partners, Inc.*, 135 F. Supp. 2d 235 (D. Mass. 2001)...........38

*Coates v. Heartland Wireless Communications, Inc.*, 26 F. Supp. 2d 910
(N.D. Tex. 1998)........................................................................................29, 37, 40, 41

*Colby v. Hologic, Inc.*, 817 F. Supp. 204 (D. Mass. 1993)..........................................17, 27

*In re Criimi Mae Inc. Sec. Litig.*, 94 F. Supp. 2d 652 (D. Md. 2000)...............................37

*Ernst & Ernst v. Hochfelder*, 425 U.S. 185 (1976)................................................10, 11, 34

*In re Fidelity/Apple Sec. Litig.*, 986 F. Supp. 42 (D. Mass. 1997) ...................................42

*Fitzer v. Sec. Dynamics Techs., Inc.*, 199 F. Supp. 2d 12 (D. Mass. 2000) .........10, 16, 22,
.....................................................................................................23, 26, 34, 38, 39

*In re Focus Enhancements, Inc. Sec. Litig.*, 309 F. Supp. 2d 134
(D. Mass. 2001)..........................................................................................................38, 40

*Friedberg v. Discreet Logic*, 959 F. Supp. 42 (D. Mass. 1997) ..................................11, 35

*In re Galileo Corp. Shareholders Litig.*, 127 F. Supp. 2d 251
(D. Mass. 2001)..................................................................10, 11, 12, 20,23, 34, 35, 37

*Greebel v. FTP Software Inc.*, 194 F.3d 185 (1st Cir. 1999).................9, 11, 16, 35, 37, 38

*Greenstone v. Cambex Corp.*, 975 F.2d 22 (1st Cir. 1992) .................................................9

*Gross v. Summa Four, Inc.*, 93 F.3d 987 (1st Cir. 1996)....................................................8

*Harris v. Ivax Corp.*, 182 F.3d 799 (11th Cir. 1999)........................................................16

*In re Humphrey Hospitality Trust, Inc. Sec. Litig.*, 219 F. Supp. 2d 675

(D. Md. 2002) ...................................................................................................15, 19, 22, 24

*Lirette v. Shiva Corp.*, 27 F. Supp. 2d 268 (D. Mass. 1998)................10, 11, 34, 35, 37 39

*Loan v. Federal Deposit Insurance Corp.*, 717 F. Supp. 964 (D. Mass. 1989)................37

*Maldonado v. Dominguez*, 137 F.3d 1 (1st Cir. 1998) ................................................34, 35

*McCall v. Scott*, 239 F.3d 808 (6th Cir. 2001)...................................................................38

*In re Medimmune Inc. Sec. Litig.*, 873 F. Supp. 953 (D. Md. 1995) ...............................29

*In re Microstrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620 (E.D. Va. 2000).....................37

*Novak v. Kasaks*, 216 F.3d 300 (2nd Cir. 2000) ...............................................................26

*In re Parametric Technology Corp.*, 300 F. Supp. 2d 206 (D. Mass. 2001) ....................42

*Parnes v. Gateway 2000, Inc.*, 122 F.3d 539 (8th Cir. 1997) .....................................11, 19

*In re Party City Sec. Litig.*, 147 F. Supp. 2d 282 (D.N.J. 2001)...........................38, 39, 40

*In re Peritus Software Services Inc. Sec. Litig.*, 52 F. Supp. 2d 211
(D. Mass. 1999)........................................................................................................35, 37, 39

*Raab v. General Physics Corp.*, 4 F.3d 286 (4th Cir. 1993).............................................22

*Romani v. Shearson Lehman Hutton*, 929 F.2d 875 (1st Cir. 1991)..................................10

*Rombach v. Chang*, 355 F.3d 164 (2nd Cir. 2004) .....................................................10, 20

*San Leandro Emergency Medical Group Profit*, 75 F.3d 801 (2nd Cir. 1996) ................39

*In re Biogen Sec. Litig.*, 179 F.R.D. 37 (D. Mass. 1997)..................................................18

*Serabian v. Amoskeag Bank Shares*, 24 F.3d 357 (1st Cir. 1994) .................................9, 24

*Shaw v. Digital Equipment Corp.*, 82 F.3d 1194 (1st Cir. 1996) .............2, 3, 7, 16, 20, 38

*In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970 (9th Cir. 1999).........................38, 39

*In re Sun Healthcare Group Inc. Sec. Litig.*, 181 F. Supp. 2d 1283
(D.N.M. 2002)......................................................................................................................12

*Suna v. Bailey Corp.*, 107 F.3d 64 (1st Cir. 1997)............................................9, 19, 24, 42

## STATE CASES

*In re Amdocs Ltd. Sec. Litig.*, 2004 WL 2735330 (8th Cir. 2004)...................10, 18, 19, 21

*In re Foundry Networks, Inc. Sec. Litig.*, 2003 WL 22077729 (N.D. Cal. 2003)..............42

*Guerra v. Teradyne, Inc.*, 2004 WL 1467065 (D. Mass. 2004).........................................19

*In re Hall, Kinion & Associates Inc. Sec. Litig.*, 2000 WL 1639503 (N.D. Cal. 2000) ..................................................................................................................27

*Jackson National Life Insurance Co. v. Merrill Lynch & Co., Inc.*, 1993 WL 464730 (S.D.N.Y. 1993) .........................................................................................42

*Malozzi v. Zoll Medical Corp.*, 1996 WL 392146 (D. Mass. 1996) ...................................18

*Nolte v. Capital One Financial Corp.*, 2004 WL 2749867 (4th Cir. 2004) 8, 21, 24, 26, 34

*In Re PEC Solutions Sec. Litig.*, 2004 WL 1854202 (E.D. Va. 2004).............15, 19, 22, 24

*Wilkes v. Heritage Bancorp, Inc.*, 1990 WL 263612 (D. Mass. 1990)................8, 9, 20, 21

## FEDERAL STATUTES

15 U.S.C. § 78u .................................................................................1, 9, 10, 11, 12, 15, 16

15 U.S.C.A. § 78t...............................................................................................................41

15U.S.C. § 78j...................................................................................................................8

## FEDERAL REGULATIONS

17 C.F.R. § 240.10b-5…………...............…………………………………………………8

## FEDERAL RULES OF CIVIL PROCEDURE

Fed. R. Civ. P. 9(b) .............................................................1, 8, 9, 10, 11, 21, 24, 34, 40, 41

Fed. R. Civ. P. 12(b)(6)....................................................................................................1, 7

Defendants Wave Systems Corporation ("Wave" or the "Company"), John E. Bagalay, Jr., Steven K. Sprague and Gerard T. Feeney (collectively, the "Defendants" or Messrs. Bagalay, Sprague and Feeney as the "Individual Defendants") submit this Memorandum in Support of their Motion to Dismiss Plaintiffs' Consolidated Amended Class Action Complaint (the "Amended Complaint" or "A.C.").[1]  Defendants move to dismiss the Amended Complaint on the following grounds:

1.    The Amended Complaint fails to allege the elements of or to plead properly a Section 10(b) claim and, therefore, fails to state a claim upon which relief can be granted because:

- the statements alleged to be false and misleading are not actionable as a matter of law;

- the Amended Complaint fails to allege falsity with the particularity necessitated by the strict pleading requirements of both the Private Securities Litigation Reform Act of 1995 ("PSLRA"), Securities and Exchange Act of 1934 ("Exchange Act") § 21D and 15 U.S.C. § 78u-4, and Fed. R. Civ. P. 9(b); and

- Plaintiffs' "scienter allegations" do not remotely raise a strong inference of scienter as to any of the Defendants.

2.    The Amended Complaint fails to plead properly a Section 20(a) claim and, therefore, fails to state a claim upon which relief can be granted.

The Amended Complaint should be dismissed in its entirety pursuant to Fed. R. Civ. P. 12(b)(6).

## THE ALLEGED CLAIMS

This is a purported securities class action on behalf of the purchasers of the common stock of Wave during the period July 31, 2003 through December 18, 2003.  Plaintiffs claim that Wave misrepresented its business relationships with Intel Corporation ("Intel") and International

---

[1] Although John Bagalay is named as a Defendant in the caption of the Amended Complaint, Plaintiffs omit him from their description of the "Defendants" and "The Parties" in the Amended Complaint.  (*See e.g.* A.C. ¶¶ 1, 18-21).  In fact, Plaintiffs fail to make any reference to Mr. Bagalay anywhere else in the Amended Complaint.  Because of this failure to provide even an iota of specificity as to Mr. Bagalay, the claims against him should be dismissed.

Business Machines Corp. ("IBM") in two press releases dated July 31 and August 4, 2003, respectively.   The remainder of the allegations are window dressing because if their core contentions about the press releases fail (as they must as a matter of law) the entire Complaint should be dismissed.   The allegations about misleading statements in SEC filings in August 2003, a conference call on August 14, 2003 and a later press release in November 2003 are repetitive of the allegations about the two press releases, with the same legal flaws.

The reason the claims fail is that the press releases did *not* state that the Intel agreement or the IBM functional compatibility described in the releases would generate revenue.  Plaintiffs' theory (that the market was "misled" into thinking the relationships provided for revenue) is not based on a statement in the releases.   What the Company did say in those releases was (1) accurate; (2) forward-looking and (3) business optimism.  None of the statements is actionable.

In addition, plaintiffs have entirely failed to plead fraud under the heightened pleading burdens that apply.  Accordingly, their claims fail for this additional, independent reason.

## MOTION TO DISMISS FACTS[2]

### A.    Wave Corporation

Wave Systems Corporation, founded in 1988 in Lee, Massachusetts, is a development stage company that develops, produces and markets hardware and software-based digital security products for the internet and e-commerce.  (Form 10-K/A for the fiscal year ended Dec. 31, 2002, dated June 30, 2003, Appendix Exhibit 1 at 2, (hereafter "App. Exh.")).   Wave's technology involves the use of encryption, which is the process of making data indecipherable.

---

[2] The documents referred to in the Amended Complaint are included in Defendants' Appendix of Documents and may be considered in support of this Motion.  The facts set forth herein originate from the Amended Complaint, documents referenced therein or documents which otherwise may be considered on a motion to dismiss.  *See, e.g., Shaw v. Digital Equipment Corp.*, 82 F.3d 1194, 1220 (1st Cir. 1996) ("In deciding a motion to dismiss a securities action, a court may properly consider the relevant entirety of a document integral to or explicitly relied upon in the Amended Complaint, even though not attached to the Amended Complaint, without converting the motion into one for summary judgment").

*Id.* The EMBASSY (Embedded Application Security System) Trust System ("ETS") is the core of Wave's technology. *Id.* The ETS is a combination of client hardware and software and a back-office infrastructure that manages its security functions. *Id.* The EMBASSY security chip embedded in user devices is used to store securely the user's personal information such as usernames, passwords, personal identification numbers, credit card information and personal information such as social security number, name and address. *Id.*

Through the period at issue, Wave's operations consisted primarily of product development, performance under contract to develop products and preliminary marketing. *Id.* Due to the highly complex nature of the technology that Wave worked to develop and the early stage nature of the market for Wave's products and services using this technology, Wave had not successfully completed commercial marketing of the products upon which its business model relied or realized any significant revenues. (*See* Form S-3/A, filed Aug. 11, 2003, App. Exh. 2 at 2; App. Exh. 1 at 1).

      **B.**     <u>**Wave's Disclosures Regarding its Financial Situation**</u>

During the purported Class Period, Wave disclosed to the public its financial status and concerns regarding its long-term financial viability. Many of these disclosures were clearly identified as "Risk Factors." For example:

- Form S-3/A, filed Aug. 11, 2003, App. Exh. 2 at 3

  We have experienced net loss and negative cash flows from operations since our inception. We have not realized a net operating profit in any quarter since we began our operations, nor have we generated any significant operating revenue, as our products have not yet attained commercial acceptance. This is due primarily to the early stage nature of the digital security industry in which we operate. As of March 2003, we had a deficit accumulated during the development of our products and services, there is little basis for evaluating the financial viability of our business and our long-term prospects. (*See also* Form S-3 filed Aug. 20, 2003, App. Exh. 3 at 3).

- Form S-3/A, filed Aug. 11, 2003, App. Exh. 2 at 3

  In order to fund our business beyond the fourth quarter of 2003, it will be necessary for us to raise additional capital. Wave is uncertain as to the availability of financing from other sources to fund any cash deficiencies.

<div align="center">3</div>

Even if we are successful in raising additional capital, uncertainty with respect to Wave's viability will continue until we are successful in achieving our objectives. Furthermore, although we may be successful in achieving our business objectives, a positive cash flow from operations may not be ultimately realized unless we are able to sell our products and services at a profit.

- Prospectus filed Aug. 22, 2003, App. Exh. 4 at 3

Given the lack of significant sales of our products and services, there is little basis for evaluating the financial viability of our business and our long-term prospects. **You should consider our prospects in light of the risks, expenses and difficulties that companies in their earlier stages of development encounter, particularly companies in new and rapidly evolving markets, such as digital security and online commerce** (emphasis added).

### C.    <u>Wave's Announcement About Intel</u>

In a press release dated July 31, 2003, Wave announced an agreement with Intel that would "enable Intel to bundle Wave's software and services with a future Intel desktop motherboard, targeted for trusted computing platforms." (*See* press release dated July 31, 2003, App. Exh. 5 at 1). The press release further stated:

*       *       *

"Wave has been working closely with Intel on the development of application and service solutions," said Brian Berger, senior vice president, Global Business Development, Wave Systems. "Both companies believe that in order to accelerate adoption in the marketplace, it is crucial to identify and offer an attractive introductory set of services and high value applications. We are delighted to be working with Intel by providing solutions for this emerging market."

"Wave believes that a portfolio of services will make trusted computing an important part of the personal computing market going forward. It is our job, to work with industry leaders like Intel, to help identify and develop those services that will bring the most value to the enterprise – as trusted hardware is deployed and a more secure computing environment becomes a reality," Berger said.

The July 31, 2003 press release also contained a disclaimer that the release contained forward-looking statements, subject to the statutory Safe Harbor provisions. Wave disclosed the general nature of its agreement with Intel and did *not* make any statements at all regarding expected revenue from this agreement. Indeed, even the third-party press coverage of the

announcement recognized that financial details of the agreement were *not* provided. *See* A.C.
¶38 (quoting CBS Market Watch on Friday August 1, 2003 "Financial terms of the partnership
weren't disclosed").

Furthermore, Wave later made additional statements about the Intel relationship. Wave
explicitly disclosed, *inter alia*, that the Intel licensing agreement was non-exclusive:

- Aug. 14, 2003 conference call transcript, App. Exh. 6 at 7

  Defendant Sprague: So, Intel hasn't been specific about what their
  volumes are in the market. I'll let Intel answer ultimately that volume
  question. We receive a fee on a per motherboard basis. **There are no
  minimums in the contract, and there are no maximums in the
  contract.** They decide what products they put it on, and how many
  products they put it on. And we ultimately believe that trusted computing
  is a very important space for them and for others. So, so long as we do a
  good job, and we deliver our product and it works, and it's a quality
  product delivered on time…this could be broadened out across their
  platform.

  Defendant Sprague: No, its not an exclusive with Intel. We are a supplier
  to them. It's a very standard PC OEM industry contract. We built
  something that they think is currently cool. **They can replace it when
  they decide they want to replace it with something else. They can use
  it as broadly as they want, or as little as they want** (emphasis added).

- Form S-3 filed August 20, 2003, App. Exh. 3 at 18

  On July 31, 2003, Wave announced an agreement with Intel Corporation
  that will help enable both companies to accelerate the development and
  deployment of trusted applications and services for safer computing on
  personal computer platforms. This agreement will enable Intel to bundle
  Wave's software and services with a future Intel desktop motherboard,
  targeted for trusted computing platforms. Similar in nature to a previously
  announced March 2003 licensing agreement between Wave and National
  Semiconductor, Intel will pay a royalty fee to Wave for each unit shipped.
  **This licensing agreement is non-exclusive and there are no minimum
  licensing requirements on the part of Intel pursuant to the agreement.**
  Intel plans to introduce the new motherboard in the fourth quarter of 2003.
  (emphasis added).

*See also* Prospectus filed Aug. 22, 2003, App. Exh. 4 at 18, containing identical language.

Notably, Wave did not state that the Intel agreement would produce certain revenue for the

Company.  On the contrary, Wave expressly stated that the licensing agreement contained no minimum licensing requirements and that Intel could use or not use Wave's products.

### D.    Wave's Announcement About IBM

In a press release dated August 4, 2003, Wave announced that its software was compatible with certain of IBM's hardware and software, stating in part "that the new Document Manager Vault and SmartSignature security software applications in Wave's EMBASSY® Trust Suite Client software work with the IBM Embedded Security Subsystem, a hardware and software-based security solution available on select ThinkPad notebooks and ThinkCentre desktops…" (Aug. 4, 2003 press release, App. Exh. 7 at 1).  The press release further stated:

> The compatibility of Wave's security software applications with IBM's hardware and software security solution is a result of Wave's successful participation in IBM's Independent Software Vendor Program.  This partnership is another example of IBM's commitment to help independent software vendors use IBM's hardware and software-based security system to make computing as secure as possible for the end-user.
>
> *          *          *
>
> "…Wave's partnership with IBM will significantly help us in our objective to deliver open and interoperable solutions to business customers as trusted computing continues to evolve."  Leveraging the IBM security chip for personal computers, the Wave EMBASSY Trust Suite Client Business Edition includes the first of many new applications aimed at business users:  Wave's Document Manager Vault and SmartSignature.

The August 4, 2003 press release also stated that it contained forward-looking statements, subject to the statutory Safe Harbor.  These statements in the August 4 press release were accurate and did not even state (let alone guarantee) that there was an agreement that was fee-producing under its terms.  The third-party press recognized right away as follows:

> Once again, terms were not disclosed, so traders remain in the dark as to the value of the deals to the company, and there is no analyst coverage to interpret the data. IBM did say that its security chips add $25 to the cost of the computer, but there is no information as to how much Wave might see of that.

A.C. ¶46 (quoting *Financial Wire*, August 5, 2003).

After the August 4, 2003 press release, Wave accurately disclosed additional information and, again, did *not* represent that the IBM relationship was fee-producing:

- Aug. 14, 2003 conference call transcript, App. Exh. 6 at 8

  Defendant Sprague:  In the case of IBM, it's an independent software vendor program where what we have done is certified-they've taken our software; tested it; said 'yep, this does what it says it does.  It uses a TPM properly.  It works with the IBM platform.'-so we can then go offer it as an "approved supplier to IBM" to customers who purchase TPM platforms, both IBM platforms although ultimately this will work on any of the TPM platforms.

- Form S-3 filed Aug. 20, 2003, App. Exh. 3 at 18

  On August 4, 2003, Wave announced that it has partnered with IBM's Independent Software Vendor (ISV) Program.  Wave's new Document Manager Vault and Smart Signature security software applications in Wave's EMBASSY Trust Suite client software family now work with the IBM Embedded Security subsystem, a hardware and software-based security solution available on select ThinkPad notebooks and ThinkCentre desktops.  Wave's partnership with IBM enables Wave in its objective to sell and deliver open and interoperable solutions to business customers as trusted computing continues to evolve.  **This licensing agreement is non-exclusive and there are no minimum licensing requirements on the part of IBM pursuant to the agreement.**  Wave will try to interest other security chipmakers and motherboard suppliers in its product in the coming months (emphasis added).  *See also* Prospectus filed Aug. 22, 2003, App. Exh. 4 at 18, which contained identical language.

In sum, Plaintiffs' core contention, that the Intel and IBM press releases were false and misleading, is wrong because those press releases (1) accurately described the agreement with Intel and the functional partnership with IBM; and (2) did not state that the relationships would generate guaranteed revenue under their terms.  In both the Intel and IBM cases, if traders *speculated* about the Intel and IBM press releases and thereby increased Wave's share price, Wave is not liable for that speculation.

## SUMMARY OF LEGAL STANDARDS

Defendants are entitled to challenge the legal sufficiency of a complaint under Fed. R. Civ. P. 12(b)(6).  If the complaint fails to state a claim, it must be dismissed.  In determining a motion to dismiss, a court will consider only those facts that are well-pleaded; the court "need not credit a complaint's 'bald assertions' or legal conclusions."  *Shaw*, 82 F.3d at 1217.

There are two relevant legal standards to this motion.  First, plaintiffs must allege each element of their purported claims; in this case, claims under Section 10(b) and 20(a) of the 1934 Act.  Second, plaintiffs must meet the heightened pleading requirements of Rule 9(b) and the PSLRA.

### I.     PLAINTIFFS MUST PLEAD THE ELEMENTS OF THEIR CLAIMS

Section 10(b) of the Exchange Act of 1934, 15 U.S.C. § 78j(b), makes it unlawful to employ, in connection with the purchase or sale of securities, any "manipulative or deceptive device or contrivance."  15 U.S.C. §78j(b).  Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated pursuant to Section 10(b), prohibits the use of "any device, scheme or artifice to defraud" or "any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person."  17 C.F.R. § 240.10b-5.  To establish liability under Section 10(b) and Rule 10b-5, plaintiffs must allege "*with sufficient particularity*" that: (1) defendants made a false statement or omission of *material* fact; (2) with scienter; (3) upon which plaintiffs justifiably relied; and (4) the misrepresentation or omission proximately caused plaintiffs' damages.  *See Gross v. Summa Four, Inc.*, 93 F.3d 987, 992 (1st Cir. 1996) (emphasis added).  *See also Wilkes v. Heritage Bancorp, Inc.*, 1990 WL 263612 at *3 (D. Mass. 1990) (Ponsor, J.); *Nolte v. Capital One Financial Corp.*, 2004 WL 2749867 at *3 (4th Cir. 2004).

A court will consider a misrepresentation or omission "material" *only* if a reasonable investor would have viewed the misrepresentation or omission as "having significantly altered the total mix of information made available."  *Basic Inc. v. Levinson*, 485 U.S. 224, 232 (1988).  *See also Nolte*, 2004 WL 2749867 at *3 ("A fact is material if there is a substantial likelihood that it would have assumed actual significance in the deliberations of a reasonable investor…").  Notably, Rule 10b-5 does not create an affirmative duty to disclose and a defendant does not

commit securities fraud by merely failing to disclose all nonpublic material information in its possession. *See Gross*, 93 F.3d at 992. Instead, the defendant must "first have a duty to disclose the nonpublic material information before the potential for any liability under the securities laws emerges." *Id*.

## II.    PLAINTIFFS MUST MEET STRICT PLEADING REQUIREMENTS.

### 1.    The First Circuit Applies Rule 9(b) Strictly to Claims of Securities Fraud.

The First Circuit has been notably strict and rigorous in applying the fraud pleading standards of Fed. R. Civ. P. 9(b) in securities actions -- "congruent and consistent" with the PSLRA, 15 U.S.C. § 78u-4(b)(2). *Greebel v. FTP Software Inc.,* 194 F.3d 185, 193 (1st Cir. 1999). *See also Wilkes,* 1990 WL 263612 at *6 (quoting *Wayne Investment v. Gulf Oil Corp.*, 739 F.2d 11, 13 (1984)) ("[I]n the context of securities litigation, Rule 9(b) not only provides defendants with proper notice but also operates to diminish the possibility that a plaintiff with a largely groundless claim will be able to simply take up the time of a number of other people by extensive discovery, with the right to do so representing an in *terrorem* increment of the settlement value, rather than a reasonably founded hope that the process will reveal relevant evidence…") (internal quotes omitted). Under Rule 9(b), a complaint claiming fraud must:

1.    specify the content of each statement alleged to be fraudulent, identify the speaker and describe where and when it was made;

2.    set forth facts indicating that the statements were false when made; and

3.    set forth facts giving rise to a strong inference that a defendant acted with scienter, that is, an intent to deceive.[3]

---

[3] *See, e.g.*, *Suna v. Bailey Corp.*, 107 F.3d 64, 68-71 (1st Cir. 1997) (affirming dismissal where plaintiffs "fail[ed], on every allegation of fraud, to explain why the statements were fraudulent"); *Serabian v. Amoskeag Bank Shares*, 24 F.3d 357, 361 (1st Cir. 1994) (stating that complaint must "set forth specific facts that make it reasonable to believe that defendant[s] knew that a statement was materially false or misleading"); *Greenstone v. Cambex Corp.*, 975 F.2d 22, 25 (1st Cir. 1992) ("Courts have uniformly held inadequate a complaint's general averment of the defendant's 'knowledge' of

To survive a motion to dismiss, Plaintiffs must demonstrate that the allegations rest on more than mere "information and belief." *In re Allaire Corp. Sec. Litig.*, 224 F. Supp. 2d 319, 325 (D. Mass. 2002). If the Amended Complaint is plead on "information and belief," it must also set forth all facts that underlie the basis of the claim. *Romani v. Shearson Lehman Hutton,* 929 F.2d 875, 878 (1st Cir. 1991) (allegations plead on information and belief "do not satisfy the particularity requirement unless the Amended Complaint sets forth the facts on which the belief is founded"). Courts of this Circuit "have been especially rigorous in demanding such factual support in the securities context." *Id.*

2.    **The PSLRA Sets Strict Pleading Requirements.**

In 1995, concerned about abusive securities class action litigation and so-called "strike suits," Congress enacted the PSLRA, which amended the Securities Act of 1933 and the Securities and Exchange Act of 1934. *See In re Galileo Corp. Shareholders Litig.*, 127 F. Supp. 2d 251, 260 (D. Mass. 2001). The PSLRA sought to curtail abusive litigation at the pleading stage by establishing uniform and stringent pleading requirements and by providing added protection for "forward-looking" or predictive statements. *See id.* Hence, the PSLRA makes the pleading standard in securities fraud cases even more rigorous than Rule 9(b) traditionally has required. *Fitzer v. Security Dynamics Technologies, Inc.,* 119 F. Supp. 2d 12, 17-18 (D. Mass. 2000); *Lirette v. Shiva Corp.*, 27 F. Supp. 2d 268, 274 (D. Mass. 1998).

Under the PSLRA, a complaint alleging that a statement or omission is misleading must specify each statement alleged to have been misleading and the reasons why the statement is misleading. Exchange Act § 21D(b)(1)(B); 15 U.S.C. § 78u-4(b)(1). *See also Rombach v. Chang*, 355 F.3d 164, 170 (2nd Cir. 2004). In addition, since recovery under § 10(b) of the Exchange Act requires proof of scienter, *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12

---

material falsity unless the complaint also sets forth specific facts that make it reasonable to believe that defendant knew that a statement was false or misleading"). Such a particularity of pleading is required "even when the fraud relates to matters peculiarly within the knowledge of the opposing party." *Id.*

(1976), the PSLRA also requires that the Amended Complaint state with particularity facts giving rise to a *strong inference* that the defendant acted with scienter, an "intent to defraud, manipulate or deceive." *See* Exchange Act § 21D(b)(2), 15 U.S.C. § 78u-4(b)(2) (emphasis added); *see also In re Amdocs Ltd. Sec. Litig.*, 2004 WL 2735530 at *3 (8th Cir. 2004) ("[E]ven though the plaintiff is entitled to all reasonable inferences, the [PSLRA] requires a securities fraud claim to plead allegations that collectively add up to a strong inference of scienter").

Furthermore, as is the case under the Rule 9(b) standard, if an allegation regarding the statement or omission is made on information and belief, the Amended Complaint must state with particularity all facts on which that belief is formed. Exchange Act § 21D(b)(1)(B); 15 U.S.C. § 78u-4(b)(1). This requirement assures that the court is provided with both specific facts and the source of the asserted fact to consider in determining whether there exists a strong inference of fraud. Failure to provide the source of information renders a complaint subject to dismissal for lack of particularity of pleading. *See, e.g., Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 550 (8th Cir. 1997) ("Although the plaintiffs declare that a total of $10,000,000 in goods and services were bought and sold, the plaintiffs fail to provide the source for the gross amounts they allege").

The scienter required by the PSLRA is a "mental state embracing intent to deceive, manipulate, or defraud" or a showing of conduct that amounts to recklessness, defined as:

> a highly unreasonable omission, involving not merely simple, or even inexcusable, negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious the actor must have been aware of it.

*In re Galileo*, 127 F. Supp. 2d at 261 (citing *Ernst & Ernst*, 425 U.S. at 193 n. 12; *Greebel*, 194 F.3d at 198)). Facts showing "motive" and "opportunity" to commit fraud are not sufficient in the First Circuit. Rather, the PSLRA requires pleading of either facts showing directly that a defendant made a statement with knowledge that it was false or misleading, or circumstances that strongly suggest that defendant acted with scienter. *See Lirette*, 27 F. Supp. 2d at 281 (motive and opportunity are inadequate method for pleading scienter in securities fraud case

11

under PSLRA); *accord, Friedberg v. Discreet Logic,* 959 F. Supp. 42, 49-50 (D. Mass. 1997). Likewise, a mere reasonable inference of scienter is insufficient to survive a motion to dismiss. *In re Cabletron Systems, Inc.*, 311 F.3d 11, 38 (1st Cir. 2002) (citing *Greebel*, 194 F.3d at 195-196). Rather, "[t]o survive a motion to dismiss, the inference of scienter must be both reasonable *and strong.*"  *In re Galileo*, 127 F. Supp. 2d at 261 (emphasis added).  Even if a plaintiff attempts to prove scienter by recklessness, he must still allege "with sufficient particularity, that the defendants had full knowledge of the dangers of their course of action and chose not to disclose those dangers to investors."  Id. (citing *Maldonado v. Dominguez*, 137 F.3d 1, 9 n.4 (1st Cir. 1998)).

For forward-looking statements, the PSLRA raises the requisite state of mind from recklessness to actual knowledge.  See 15 U.S.C. § 78u-5(c)(1)(A)(i)-(B);  *In re Sun Healthcare Group Inc. Sec. Litig.*, 181 F. Supp. 2d 1283, 1289 (D.N.M. 2002) ("'Actual knowledge' is a higher level of scienter than the 'recklessness' required by the pleading standards of the PSLRA").

## ARGUMENT

## I.    THE AMENDED COMPLAINT MUST BE DISMISSED BECAUSE THE STATEMENTS ALLEGED TO BE FALSE AND MISLEADING ARE NOT ACTIONABLE AS A MATTER OF LAW.

Plaintiffs challenge three categories of statements to be false and misleading:  (1) the press releases dated July 31, 2003, August 4, 2003 and November 13, 2003; (2) statements made by Defendant Sprague during an August 14, 2003 conference call; and (3) statements made in various SEC filings including an August 18, 2003 Prospectus, an August 20, 2003 Form S-3 Registration Statement, and an August 22, 2003 Prospectus.[4]   Section II below, argues why plaintiffs have not adequately pleaded fraud as to any of these statements.  This Section I argues

---

[4] While earlier statements are alleged in the Amended Complaint (*See*, pp. 2-5, 10-13), they are not alleged to be actionable.

why, as alleged, plaintiffs claims fail to meet one or more of the required elements of their fraud claims and must be dismissed.

**A.     Wave's Statements Do Not Actually Say What Plaintiffs Are Claiming They Say.**

Plaintiffs core contention is that the Intel and IBM press releases misled the market to believe that the relationships would generate specific revenue for Wave.  The fundamental problem with that contention is that the press releases did not say that.  Nowhere in either press release did Wave make any representation --or even a projection-- about expected revenue from the arrangements.

In the July 31 press release about Intel, Wave announced that the agreement "enabled" Intel to bundle Wave's software and services with a "future Intel desktop motherboard."  An Intel representative was quoted, stating Intel's belief that Wave's software provided "good value for [Intel's] customers looking for trusted computing applications."  The remainder of the release describes Wave's work with Intel (generically) and Wave's goals (also generically).  There is not a wiff of a statement guaranteeing or projecting revenue.

In the August 4 press release about IBM, Wave announced that its new software would "work with the IBM Embedded Security Subsystem…."  This was an announcement of functional compatibility, resulting from Wave's participation in an IBM vendor program.  There is no statement about revenue.

Later statements echoed the press releases.  In fact, in the August 14, 2003 conference call, (App. Exh. 6), Defendant Sprague stated that the Intel agreement was a **"non-exclusive licensing agreement"** and that Intel could use the agreement **"as broadly…or as little as they want."**  *Id.* at 7.  These terms were also disclosed in the Form S-3 filed August 20, 2003:

> On July 31, 2003, Wave announced an agreement with Intel Corporation that will help enable both companies to accelerate the development and deployment of trusted applications and services for safer computing on personal computer platforms.  The agreement will enable Intel to bundle Wave's software and services with a future Intel desktop motherboard, targeted for trusted computing platforms.  Similar in nature to a previously announced Semiconductor, Intel will

pay a royalty fee to Wave for each unit shipped. **This licensing agreement is non-exclusive and there are no minimum licensing requirements on the part of Intel pursuant to the agreement.** Intel plans to introduce the new motherboard in the fourth quarter of 2003. (App. Exh. 3 at 17) (emphasis added).

In the August 14, 2003 conference call, Sprague described the IBM relationship in very colloquial, plain terms: "[IBM has] taken our software; tested it; said 'yep, this does what is says it does.'"

Plaintiffs cannot claim the press releases about Intel or IBM or the statements made after were actionable under Section 10(b) on the grounds that they materially misled investors about the revenue to be earned, when the statements did *not* state that revenue would be generated. The market price did rise following the press releases. However, that price increase does not demonstrate fraud. Plaintiffs cannot assert a fraud claim because the market price of the stock rose due to *positive speculation* about what the Intel agreement or the IBM compatibility *might* mean for Wave's future.

## B.    Wave's Statements Were Forward-Looking And Therefore Are Not Actionable.

All three categories of documents challenged by Plaintiffs contained express statements that they were forward-looking and subject to Safe Harbor protection. These statements are not actionable as a matter of law.

For example, the July 31 press release stated:

- the agreement with Intel *will* enable both companies to *accelerate development*. The agreement *will* enable Intel to bundle Wave's software and services *with a future Intel desktop* motherboard …

- Both companies *believe* that in order to accentuate adoption in the market place [a quote by Intel, not by Wave]…

The press release contained the Safe Harbor statement that except for statements of historical fact, all of the information was forward-looking. (See press release dated July 31, 2003, App.

Exh. 5 at 2). The only statement of fact here was that there was an agreement with Intel permitting Intel to bundle Wave's product. Plaintiffs have not and cannot claim that was untrue. All of the other statements are protected by the Safe Harbor.

Similarly, the August 4 press release stated:

- Certain Wave products were compatible with IBM's products……

- Wave's partnership with IBM *will* significantly help us in our *objective* to deliver open and interoperable solutions to business customers as trusted computing continues *to evolve*.

The press release again stated that these statements were forward-looking and protected by the Safe Harbor provisions. (*See* Aug. 4, 2003 press release, App. Exh. 7 at 1). The only stated fact in the release was the compatibility of the products, something Plaintiffs do not challenge.

In the conference call and the August SEC filings, similar disclaimers were made. (*See* Aug. 14, 2003 conference call transcript, App. Exh. 6 at 13; Form S-3/A filed Aug. 11, 2003, App. Exh. 2 at 14; Form S-3 Filed Aug. 20, 2003, App. Exh. 3 at 19; Prospectus filed Aug. 18, 2003, App. Exh. 9 at 14; Prospectus filed Aug. 22, 2003, App. Exh. 4 at 19). Accordingly, the non-specific statements of optimism for future prospects in those communications are also non-actionable, forward-looking misstatements.

*First*, forward-looking statements, such as projections of revenues, income and earnings, statements of management's plans and objectives for future operations (including plans or objectives relating to products of the issuer), statements about future economic performance and disclosure of the issuer's assumptions underlying the foregoing, are not actionable. *See* 15 U.S.C. § 78u-5(i)(1); *see also In Re PEC Solutions Sec. Litig.*, 2004 WL 1854202 at *8 (E.D. Va. 2004) (granting defendants' motion to dismiss plaintiffs' class action complaint and holding in part that defendants' statements regarding expected revenue growth and expected earnings per share were non-actionable, forward-looking statements because they "involve[d] financial projections that [would] not be determined to be true or false until some point in the future"); *In re Humphrey Hospitality Trust, Inc. Sec. Litig.*, 219 F. Supp. 2d 675 (D. Md. 2002) (granting

defendants' motion to dismiss class action complaint and holding in part that defendants' forward-looking statements projecting corporation's future performance were not actionable).

*Second*, forward-looking statements are protected under the PSLRA "Safe Harbor" provision and by the "bespeaks caution" doctrine. When assessing claims of fraudulent statements in securities cases, a court will consider a statement or omission in context. *See Shaw*, 82 F.3d at 1213. When making this assessment, courts protect from liability forward-looking statements that are protected by the Safe Harbor provision of the PSLRA. Under the Safe Harbor provision, a forward-looking statement is nonactionable if:

   (i)     it is identified as forward-looking and is "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement;"

   (ii)    it is "immaterial;" *or*

   (iii)   plaintiff does not plead (and prove) that the statement was made "with actual knowledge . . . that the statement was false or misleading."

15 U.S.C. § 78u-5(c)(1)(A)(i)-(B).

Importantly, the statute is *disjunctive*; therefore, meeting any one of the three criteria is sufficient to merit safe harbor treatment. *See* 15 U.S.C. § 78u-5(c); *Greebel*, 194 F.3d at 201 (describing safe harbor prongs as "alternative inlets"). Thus, if a forward-looking statement is accompanied by meaningful cautionary language, "the defendants' state of mind is irrelevant," because the statement is not material as a matter of law. *Harris v. Ivax Corp.*, 182 F.3d 799, 803 (11th Cir. 1999). *See also Fitzer,* 119 F. Supp. 2d at 31 (citing *Shaw*, 82 F.3d at 1213):

   The bespeaks caution doctrine stands for the principle that when statements such as forecasts, estimates, opinions, or projections are accompanied by cautionary disclosures that adequately warn of the possibility that actual results or events may turn out differently, these so-called "soft" statements may not be materially misleading under the securities laws.

Here, all of the challenged statements were accompanied by the express disclaimers entitling Wave and the Individual Defendants to Safe Harbor protection and to dismissal. Each of the press releases in question and the conference call included the following statement:

> Except for the statements of historical fact, the information presented herein constitutes forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. Such forward-looking statements involve known and unknown risks, uncertainties and other factors which may cause the actual results, performance or achievements of the company to be materially different from any future results, performance or achievements expressed or implied by such forward-looking statements…Such factors include general economic and business conditions, the ability to fund operations, the ability to forge partnerships required for deployment, changes in consumer and corporate buying habits, chip development and production, the rapid pace of change in the technology industry and other factors over which Wave Systems Corp. has little or no control. Wave Systems assumes no obligation to publicly update or revise any forward-looking statements.

The SEC filings also contained a similar disclaimer:

> In addition to historical information, this prospectus and the registration statement contain forward-looking statements. These statements and projections about the future involve risks and uncertainties. As a result, we may not be able to accurately predict the future and our actual results may turn out to be materially different from what we anticipate and discuss in this prospectus. In addition, we operate in an industry segment where securities prices may fluctuate dramatically and may be influenced by regulatory and other factors beyond our control. We discuss the factors which we believe to be important in the cautionary statements that accompany the forward-looking statements and in the risk factors section of this prospectus. Whenever you assess a forward-looking statement in this prospectus, we urge you to read carefully all of the risk factors and cautionary statements in this prospectus, as well as those in our other filings with the Securities and Exchange Commission.

*See Colby v. Hologic, Inc.*, 817 F. Supp. 204, 211 (D. Mass. 1993) ("There is good reason for the courts to discourage complaints based on allegedly misleading generalized forecasts. Such forecasts are inherently difficult and unreliable,…and are not likely to be 'material' to investors. The Securities Exchange Commission recognized this in adopting the "Safe Harbor Rule," which provides that projections filed with the Commission do not violate federal securities law unless it is shown that they were made without a 'reasonable basis' or were not made in 'good faith'").[5]

---

[5] Plaintiffs have *not* alleged any facts to show Defendants acted without any basis or that the statements were not believed when they were made.

As a result of these express disclaimers, the forward-looking statements challenged by Plaintiffs are not actionable.

      **C.    Any Alleged Omission Of Additional Detail About Intel And IBM Is Not Actionable.**

      Plaintiffs allege that Defendants' statements, by what they *did not* say, led investors to mistakenly believe that its agreement with Intel and compatibility with IBM would generate specific revenue. They allege that Defendants failed to disclose that the Intel deal "was not likely to be" a component of the revenue stream forecasted by the Company and that the IBM relationship was not fee-producing. (*See* A.C. ¶¶ 41 and 56).

      Defendants' descriptive statements concerning Intel and IBM were accurate. Defendants were under no obligation to disclose any further information concerning Wave's agreement with Intel or its compatibility with IBM. As a general matter, the federal securities laws do not require issuers to disclose all nonpublic material information, or even all such information bearing on a particular subject discussed in a public statement. *See Backman v. Polaroid*, 910 F.2d 10, 16 (1st Cir. 1990) (disclosing that product was being sold below cost did not require disclosure of how much below cost). Therefore, any omissions of information concerning the Intel and IBM agreements from its disclosures are not actionable because there was no duty to disclose. *See In re Boston Tech. Sec. Litig.*, 8 F. Supp. 2d 43 (D. Mass. 1998) (dismissing challenges to statements where there was no duty to disclose omitted information). *See also In re Biogen Sec. Litig.*, 179 F.R.D. 37 (D. Mass. 1997) (same).

      In addition, there was nothing material omitted. Plaintiffs are arguing that Wave should have made statements about what the Intel agreement did *not* say or what the compatibility with IBM did *not* mean. Such a hypothetical omission is not material. "A misrepresentation is 'material' to a claim of securities fraud only if the misstated or omitted fact was one likely to be viewed by the reasonable investor as significantly altering the *total mix* of available information." *Malozzi v. Zoll Medical Corp.*, 1996 WL 392146 at *7 (citing *TSC Industries, Inc.*

*v. Northway, Inc.*, 426 U.S. 438, 449 (1976) (emphasis added)).  Wave had ample disclosures about the financial uncertainty facing the Company since its inception.  *Another* statement of revenue uncertainty was neither required as a matter of law nor is its alleged omission material.  *See In re Amdocs*, 2004 WL 2735330 at *3 (citations omitted) (*"A complaint that alleges only immaterial misrepresentations presents an 'insuperable bar to relief' and is properly dismissed.  While materiality is generally a question of fact reserved for the jury, alleged misrepresentations are immaterial as a matter of law where a court determines that no reasonable investor could have been swayed by the alleged misrepresentation"*) (emphasis added).[6]

In addition, the types of general, forward-looking statements challenged by plaintiffs are not material as a matter of law.  Courts in the First Circuit have generally declined to impose liability for optimistic, forward-looking statements as unlikely, as a matter of law, to be material to a reasonable investor.  *Guerra v. Teradyne, Inc.*, 2004 WL 1467065 at *10 (D. Mass. 2004).[7]

---

[6] The court in *In re Amdocs* further stated: "Alleged misrepresentations can be immaterial as a matter of law if they: (1) are of such common knowledge that a reasonable investor can be presumed to understand them; (2) present or conceal such insignificant data that, in the total mix of information, it simply would not matter; (3) are so vague and of such obvious hyperbole that no reasonable investor would rely upon them; or (4) are accompanied by sufficient cautionary statements."  *In re Amdocs*, 2004 WL 2735530 at *4 (citing *Parnes*, 122 F.3d at 546-548).

[7] Plaintiffs rely on statements made by reporters in the New York Times and Financial Wire to support their allegations that Wave's August 4, 2003 Press release misled the public to believe that its agreement with IBM meant that Wave's product would be bundled with IBM computers.  (*See* A.C. ¶¶ 45 and 46).  Contrary to Plaintiffs' assertions, however, in its August 4, 2003 Press release, Wave did not state that its product would be bundled with IBM computers.  Moreover, Plaintiffs fail to plead with particularity facts showing that Wave sufficiently "entangled" itself with the journalists who issued the statements.  Accordingly, these statements cannot be attributed to Wave or any of the Individual Defendants.  *See In re Cabletron*, 311 F.3d at 37.  The First Circuit has adopted the majority approach and uses the "entanglement" test under which a company may be held liable only if it has sufficiently entangled itself with the analyst, journalist or other outsider who made the challenged statements.  *See id.* at 37-38.  Under the "entanglement test," "liability may attach to an analyst's statements where the defendants have expressly or impliedly adopted the statements, placed their imprimatur on the statements, or have otherwise entangled themselves with the analysts to a significant degree[.]"  *Id.*  A court will reject an entanglement claim if it "merely suggests or assumes that company insiders provided the information on which analysts or other outsiders based their reports." *Id*. (citing *Suna*, 107 F.3d at 73-74).  Plaintiffs fail to plead any allegations of entanglement whatsoever and thus, the Amended Complaint fails to satisfy the requirements of Rule 9(b).  Merely pointing out statements made by reporters in

*See In re PEC Solutions*, 2004 WL 1854202 at *9-*10) (statements containing financial projections lack materiality because "the market price of a share is not inflated by vague statements predicting growth"); *In re Humphrey Hospitality Trust,* 219 F. Supp. 2d at 683 (citations omitted) ("'[s]oft,' 'puffing' statements ... generally lack materiality because the market price of a share is not inflated by vague statements predicting growth").

### D.    Wave's Statements of Corporate Optimism are Not Actionable.

To the extent any of the Defendants discussed the agreement with Intel and the functional compatibility with IBM in a hopeful manner, they cannot be held liable for optimistic statements regarding the potential corporate benefits. *See In re Galileo*, 127 F. Supp. 2d at 267 (holding that defendants' optimistic statements regarding expected revenue from its agreement with another company were not actionable); *Rombach*, 355 F.3d 164, 174-175 ("[C]ompanies must be permitted to operate with a hopeful outlook: [p]eople in charge of an enterprise are not required to take a gloomy, fearful or defeatist view of the future; subject to what current data indicates, they can be expected to be confident about their stewardship and the prospects of the business that they manage…[P]uffery or misguided optimism is not actionable as fraud"); *Shaw*, 82 F.3d at 1217 (courts have found immaterial as a matter of law "rosy affirmation[s] commonly heard from corporate managers and … loosely optimistic statements that are so vague, so lacking in specificity or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available").

In fact, this Court has held nonactionable a set of optimistic statements very similar to the ones challenged by Plaintiffs here.  In *Wilkes v. Heritage Bancorp. Inc.*, 1990 WL 263612 at *2 (D. Mass 1990) (Ponsor, J.), plaintiffs claimed that prior to and during the class period, defendants conspired to inflate the price of the Bank's stock to artificially high levels by

---

independent newspapers that were not made by any of the Defendants cannot satisfy the pleading requirements.

deliberately making a series of false and misleading statements regarding the bank's financial condition and future prospects. "In essence, the plaintiffs accused the defendants of deliberately painting an overly optimistic picture of the Bank's profitability despite ever-deteriorating business circumstances, as part of a scheme to mislead and manipulate investors." *Id.* Specifically, plaintiffs alleged that despite the poor working conditions of the bank's loan portfolio during the class period, defendants "continually and consistently" made public statements which touted the defendants' banking expertise and conservative prudent lending policies and practices and minimized the bank's potential exposure to possible loan losses or underestimated the severity of such losses. *Id.* at *2.

Although the *Wilkes* decision pre-dates the PSLRA, its reasoning is directly on point. Rejecting plaintiffs' allegations of falsity and noting the significance of pleading fraud with particularity, this Court granted defendants' motion to dismiss the class action complaint, stating that "the allegations of fraud were so generic that the complaint could have been drafted by any competent practitioner generally familiar with securities fraud case law, without any independent knowledge of defendants' conduct." *Id.* at *4. This Court further stated that "merely pointing to the precipitous drop in the market value of [the defendant's] common stock and quoting from a series of *overly-optimistic* statements issued during the Class Period fails to satisfy the pleading requirements of [Rule 9(b)]." Id. at *7.

Very recently, courts in other circuits have also dismissed securities class action complaints for failure to plead falsity with particularity and held that optimistic statements are not actionable. *See Nolte*, 2004 WL 2749867 (holding that plaintiffs failed to adequately allege that defendants did not believe its stated opinions about sufficiency of company's reserves and computer infrastructure and that plaintiffs could not rely on defendants' memorandum of understanding with federal regulators (requiring defendants to make prospective changes to its business) to establish that company's past practices were deficient); *In re Amdocs*, 2004 WL 2735530 (holding that the "bespeaks caution" doctrine rendered defendant's optimistic

statements and predictions about its customer demand and business prospects immaterial as a matter of law because statements were accompanied by cautionary warnings of market erosion and other business risks).

In addition, courts have held that that the following optimistic statements are not actionable:

- "[R]evenue is expected to be between $48 to $49 million for the first quarter 2003, and diluted EPS should be between 17 and 18 cents for the quarter. Guidance for 2003 is for revenue to grow between 30 percent and 40 percent, resulting in revenue between $240 to $255 million. EPS is estimated to be between 85 to 92 cents for the full year 2003."  *In Re PEC Solutions*, 2004 WL 1854202 at *9.

- "This new lease structure should improve monthly cash flow."  *In re Humphrey Hospitality Trust,* 219 F. Supp. 2d at 684.

- "The management team now has the experience to take a company from where we are to $0.50 billion to $1 billion in revenue." *Id.*

- "Over the next six months Advanta will experience a large increase in revenues as it converts more than $5 billion in accounts that are now at teaser rates of about 7% to its normal interest rates of about 17%."  *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 528 (3d Cir. 1999).

- "[T]he DOE Services Group is poised to carry the growth and success of 1991 well into the future."  *Raab v. General Physics Corp.*, 4 F.3d 286, 290 (4th Cir. 1993).

- "Amdocs continues to demonstrate excellence in its growth…Management believes that the changing needs of communications providers are creating additional demand for Amdocs' market-leading customer care and billing solutions.  This growing demand is manifest in all segments--mobile, wireless and IP--and in all regions."  *In re Amdocs*, 2004 Wl 2735530 at *2.

- "Even in today's environment we are experiencing a strong demand for our offerings.  Our ability to achieve stability and growth in the current business environment is based on our long-term relationships with the market leaders, which generate a solid, constantly expanding flow of recurring revenues." *Id.* at *3.

Indeed, these inactionable statements are more specific and optimistic than the statements Plaintiffs are challenging here.  These cases are solid precedent for dismissing this Complaint.

A few other decisions on this point also warrant attention.  In *Fitzer*, 119 F. Supp. 2d 12, 23 (D. Mass. 2002), the plaintiff claimed that the defendant falsely represented that it was "well-

positioned" to succeed in the competitive market. This Court rejected this argument, stating that the defendant's statements were mere "puffing:"

> The fact that [Defendant] ran into management and technology difficulties that ultimately prevented it from succeeding during the Class Period represents an unfortunate loss of opportunity, but that is precisely the risk that every investor takes when investing in a high-technology company whose new products may not succeed. *Any statements made by the Defendants relating to whether [the Defendants were] well positioned are ultimately no more than nonactionable puffing*.

*Fitzer*, 119 F. Supp. 2d at 23 (emphasis added).

In *In re Galileo*, 127 F. Supp. 2d 251, this Court held non-actionable similar statements to the ones challenged by Plaintiffs. Plaintiffs in that case challenged defendants' statements in a press release, which described its distribution agreement with another company. *Id.* at 256. Defendants described the agreement as a major source of revenue by stating that it included "purchase requirements to retain exclusivity to certain…products over $150 million for five years with a first year minimum requirement of $5 million." *Id.* Plaintiffs claimed that this statement was misleading because there was no reasonable prospect that $25 million in products would be sold in the first year of the agreement or that $150 million would be sold in five years. *Id.* at 257. The Court rejected this argument, stating that "all the press release did was…describe--…perhaps with some enthusiasm and optimism--revenue goals that defendants hoped to achieve from its agreement with [the company]." *Id.* at 267. The Court further stated that no reasonable investor would have seen the press release as a *promise* of sales at specific levels. *Id.* Here, Defendants state much *less* because there were not revenue goals even stated in the releases. Because the *Galileo* defendants were entitled to dismissal, clearly Defendants here are entitled to dismissal.

In *In re Humphrey Hospitality Trust*, the court explained the reasons behind the well-known principle that projections of future performance *not worded as guarantees* are generally not actionable under the federal securities laws:

> Predictions of future growth …will almost always prove to be wrong in hindsight. If a company predicts twenty-five percent growth, that is simply the company's

best guess as to how the future will play out. As a statistical matter, twenty percent and thirty percent growth are both nearly as likely as twenty-five. If growth proves less than predicted, buyers will sue; if growth proves greater, sellers will sue. Imposing liability would put companies in a whipsaw, with a lawsuit almost a certainty. Such liability would deter companies from discussing their prospects, and the securities markets would be deprived of the information those predictions offer. We believe that this is contrary to the goal of full disclosure underlying the securities laws, and we decline to endorse it.

*In re Humphrey Hospitality Trust*, 219 F. Supp. 2d at 683 (citations omitted). *See also In Re PEC Solutions*, 2004 WL 1854202 at *9-*10 (stating that statements containing financial projections lack materiality because "the market price of a share is not inflated by vague statements predicting growth").

These cases are directly on point and demonstrate that here too, Wave's statements regarding its business development expectations are non-actionable puffery and expressions of corporate optimism—not promises or guarantees of revenue.

## II. THE AMENDED COMPLAINT MUST BE DISMISSED BECAUSE IT FAILS TO ALLEGE FALSITY WITH THE PARTICULARITY NECESSITATED BY BOTH THE PSLRA AND FED. R. CIV. P. 9(B).

Plaintiffs challenge statements quoted in the following nine paragraphs of the Amended Complaint: ¶¶ 36, 42, 55, 58, 59, 61, 62, 63 and 68.

Plaintiffs' allegations of falsity are inadequate for the following reasons:

*First*, Plaintiffs have failed to allege sufficient particularized facts indicating that the Defendants' statements were *false when made* and how they were false. *See* Fed. R. Civ. P. 9(b); *Suna*, 107 F.3d at 69; *Serabian*, 24 F.3d at 361; *see also Nolte*, 2004 WL 2749867 at *3 (internal quotes omitted) ("To allege a false statement or omission of material fact, plaintiffs must point to a factual statement or omission--that is--one that is demonstrable as being true or false. To form the basis of a cause of action, the statement must be false, or the omission must render public statements misleading"). Plaintiffs' oft-repeated assertion that Wave's statements about its relationships with Intel and IBM were materially false and misleading fails to state a claim because as established above, the statements Wave made were accurate. Plaintiffs have not

pointed to a *fact* that was untrue in the releases. Their case is no more than a claim about the *speculation* in the market after the releases. Plaintiffs cannot blame the Company or the Individual Defendants for market speculation. These arguments are elaborated more specifically in the charts below.

*Second,* Plaintiffs have failed to "set forth specific facts that make it reasonable to believe" that Defendants *knew* that their statements were materially false or misleading. *See Serabian,* 24 F.3d at 361. There is not an iota of fact to support the conclusion that Wave or the Individual Defendants did not actually believe the content of the press releases or the later statements.

*Third,* Plaintiffs' reliance on a confidential witness is insufficient to plead falsity under the PSLRA. To support its allegations that Defendants made false and misleading statements concerning its expected revenues and the Intel agreement, Plaintiffs rely in part on the statements of a confidential witness. (*See* A.C. ¶¶ 12, 40). This confidential witness, who Plaintiffs only describe as a former engineer at Wave and Intel who was responsible for establishing business relationships between Wave and larger companies, is alleged to have represented that his contacts at Intel considered Intel's agreement with Wave a "small deal" and "not lucrative." (*See* A.C. ¶¶ 12, 40). Most importantly, even if true, *this contention does not make any statement Defendants made false.* Defendants did not state that *Intel* and *IBM* -- two of the largest technology companies in the world -- considered their respective relationships with Wave to be significant or major. Whether Intel considered the Agreement with Wave "small" or not does not make any statement Wave made in its July 31 press release or after false. Also, there is no allegation that Wave or the Individual Defendants *knew* about these alleged comments.

Although the First Circuit does not require a party to name confidential sources, allegations based on unidentified confidential sources must still plead with particularity sufficient facts to support the statements of the confidential sources. Adopting the Second

Circuit's approach ("Novak Test"), the First Circuit uses the following guidelines for evaluating whether confidential source material satisfies the PSLRA particularity requirement:

> Where Plaintiffs rely on confidential personal sources but also on other facts, they need not name their sources as long as the latter facts provide an adequate basis for believing that the defendants' statements were false.  Moreover, even if personal sources must be identified, there is no requirement that they be named, *provided they are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged.  In both of these situations, the plaintiffs will have pleaded enough facts to support their belief, even though some arguably relevant facts have been left out.*

*In re Cabletron*, 311 F.3d at 29 (emphasis added) (citing *Novak v. Kasaks*, 216 F.3d 300, 314 (2nd Cir. 2000)).  *See also Fitzer*, 199 F. Supp. 2d 12, 21-22 (following *Novak* Test).

Plaintiffs have utterly failed to plead facts that provide an adequate basis for believing that Wave's statements were false.  Therefore, without additional facts to support their allegations of falsity, Plaintiffs' reliance on the confidential witness amounts to a conclusory allegation that the unidentified witness supports the complaint's allegations.  Such allegations do not past muster under the PSLRA.[8]

> Under [the *Novak*] test, some allegations based on anonymous sources will not, on their face, be adequate…Many securities fraud complaints rely on unnamed sources accompanied only by the vaguest detail.  For example, a complaint may include a boilerplate paragraph at its beginning or end stating that its allegations as a whole are supported by investigation of counsel, sometimes including interviews with unnamed sources such as former employees…*A general statement that unspecified sources support the complaint's allegations as a whole usually will not suffice.*

---

[8] Notably, in *Nolte*, 2004 WL 2749867 at *4, plaintiffs claimed that unnamed former employees of the defendants believed that the defendant's computer system was incapable of meeting the company's projected growth and performance.  The Court noted that the plaintiffs did *not* allege that the defendants were ever informed of these concerns or that they had any reason to doubt the computer system's reliability.  *Id.*  Likewise, Plaintiffs here have not alleged that Wave was informed of the opinions of the confidential witness' contacts at Intel.  Besides the decline in stock value, Plaintiffs have also failed to allege facts showing why Defendants should have had reason to doubt or disbelieve their optimistic statements projecting revenue.

In re *Cabletron*, 311 F.3d at 29 (emphasis added).[9] Accordingly, Plaintiffs' reliance on the confidential witness should not carry any weight with this Court since Plaintiffs' descriptions of the confidential witness are not "sufficiently particular to support the probability that a person in the position occupied by the [witness] would possess the information pleaded to support the allegations of false or misleading statements…" *ABC Arbitrage,* 291 F.3d at 353.

### A.    Plaintiffs Fail to Allege With Particularity How and Why Wave's Statements In Its Press Releases Were False or Misleading.

Plaintiffs have failed to allege facts to show that Defendants did not believe the general statements about future prospects for the two relationships at the time of the statements.  *See Colby*, 817 F. Supp. at 211 (dismissing challenge to projection where defendant had basis for it); *In re Hall, Kinion & Assocs. Inc. Sec. Litig.*, 2000 WL 1639503 at *2 (N.D. Cal. 2000) ("Actual knowledge of falsity could be shown only if the internal circumstances were so gloomy that it was unlikely that managers in the shoes of defendants could have reasonably believed the

---

[9] *See also ABC Arbitrage v. Tchuruk*, 291 F.3d 336, 353-354 (5th Cir. 2002) (adopting Novak Test*)* (emphasis added) :

(1) if plaintiffs rely on confidential personal sources and other facts, their sources need not be named in the complaint so long as the other facts, i.e., documentary evidence, provide an adequate basis for believing that the defendant's statements were false or misleading.

(2) if the other facts, i.e., documentary evidence, do not provide an adequate basis for believing that the defendants' statements or omissions were false, the complaint need not name the personal sources so long as they are identified through general descriptions in the complaint **with sufficient particularity to support the probability that a person in the position occupied by the source as described would possess the information pleaded to support the allegations of false or misleading statements made on information and belief.;**

(3) if the other facts, i.e., documentary evidence, do not provide an adequate basis for believing that the defendants' statements or omissions were false and the descriptions of the personal sources are not sufficiently particular to support the probability that a person in the position occupied by the source would possess the information pleaded to support the allegations of false or misleading statements made on information and belief, the complaint must name the personal sources.

**Accordingly, in some circumstances, pleading allegations on information and belief sufficient to satisfy [the PSLRA's] may require the naming of confidential sources.**

external projections"). Plaintiffs have failed to offer facts that internal circumstances at Wave were "so gloomy" that the Defendants had "actual knowledge" that the general statements were untrue. Furthermore, Wave cannot be held liable for making optimistic projections about its expected revenue growth.

| Alleged False and Misleading Statement | Reasons Not Actionable |
|---|---|
| *July 31, 2003 press release*<br><br>36. The agreement will enable Intel to bundle Wave's software and services with a future Intel desktop motherboard, targeted for trusted computing platforms.<br>Wave has been working closely with Intel on the development of application and service solutions. Both companies believe that in order to accelerate adoption in the marketplace, it is critical to identify and offer an attractive introductory set of services and high value applications. We are delighted to be working with Intel by providing solutions for this emerging market.<br><br>We recently announced a licensing agreement with National Semiconductor to bundle Wave's EMBASSSY® Trust Suite with National's PC21100 SafeKeeper™ trusted platform modules. | • Plaintiffs fail to specifically allege what is false about these statements and why the statements are false.<br>• These are accurate statements of fact. It cannot be disputed that Wave entered into an agreement with Intel that enabled Intel to bundle Wave's software and services with an Intel motherboard.[10]<br>• These are also non-actionable statements of corporate optimism.<br>• These statements do not contain any guarantees or promises of revenue.<br>• It cannot be disputed that Wave had a licensing agreement with National Semiconductor. |
| *August 4, 2003 press release*<br><br>42. The compatibility of Wave's security software applications with IBM's hardware and software security solution is a result of Wave's successful participation in IBM's Independent Software Vendor Program. This partnership is another example of IBM's commitment to help independent software vendors use IBM's hardware and software-based security system to make computing as | • This is an accurate fact about functional compatibility. It cannot be disputed that certain specific Wave software has been deemed to be compatible with certain IBM systems, and that IBM reached this determination as a result of Wave's participation in IBM's Independent Software Vendor program.<br>• This statement is an expression of Wave's optimism about its relationship with IBM |

---

[10] In fact, Wave disclosed that in October 2003, Wave's EMBASSY® Trust Suite Professional Edition bundle began shipping with the Intel enterprise desktop motherboard (D865GRH). (*See* Press release dated November 13, 2003, App. Exh. 8 at 2).

| Alleged False and Misleading Statement | Reasons Not Actionable |
|---|---|
| secure as possible for the end-user.<br><br>Wave's partnership with IBM will significantly help us in our objective to deliver open and interoperable solutions to business customers as trusted computing continues to evolve. | and is not actionable. Plaintiffs have failed to allege facts showing that Wave had no reasonable basis for making this statement. |
| *November 13, 2003 press release*<br><br>68.  We can now clearly see the **growing momentum for trusted computing in the marketplace, and we expect substantial growth in volumes over the course of the next four quarters** (emphasis added by Plaintiffs). | • This statement is an expression of Wave's optimism and is not actionable. Plaintiffs have failed to allege facts showing that Wave had no reasonable basis for making this statement. |

**B.    Plaintiffs Fail to Allege With Particularity the Reasons Why Sprague's Statements in the August 14, 2003 Conference Call Were False or Misleading.**

In paragraphs 58 and 59 of the Amended Complaint, Plaintiffs describe alleged false and misleading statements made by Defendant Sprague in the Company's August 14, 2003 earnings conference call with analysts.  Although Plaintiffs state that these challenged statements were made by Sprague, Plaintiffs attribute the statements to all the Defendants.  (See A.C. ¶ 60).  Since Defendant Sprague made the challenged statements, **none of these statements is properly attributable to either Defendant Bagalay or Feeney.**  *See, e.g., In re Medimmune Inc. Sec. Litig.*, 873 F. Supp. 953, 960 (D. Md. 1995) ("Specific statements must be attributed to specific defendants").  *See also Coates v. Heartland Wireless Communications, Inc.*, 26 F. Supp. 2d 910, 915 (N.D. Tex. 1998) (citations omitted) ("A plaintiff must plead with sufficient particularity attribution of the alleged misrepresentations or omissions to each defendant; the plaintiff is obligated to 'distinguish among those they sue and enlighten each defendant as to his or her part in the alleged fraud'").  Accordingly, Plaintiffs certainly cannot sustain any claims as to Defendants Bagalay and Feeney.

Moreover, none of the statements during the conference call was false.

| Alleged False and Misleading Statement | Reasons Not Actionable |
|---|---|
| *August 14, 2003 Conference Call*<br><br>58 & 59. From a business perspective, we believe the market will start generating revenue for us really the end of this year in fourth-quarter, although I think the bulk of that revenue won't really be realized till a quarter after because it takes some time for those numbers to be reported back to us that this revenue is based primarily on the applications that are bundled with the platform, very much around a relationship that we've announced with Intel and the business model that was articulated in the press release.<br><center>* * *</center>*We think the long-term scope in that business is tremendous and on a short-term basis we think we can reach the point where the company gets to cash flow breakeven sometime in 2004*….So the company has now access to the resources that we need in order to operate, the recent exercise of options which brought in additional cash was something that really helped to strengthen the overall company, and the ultimate way to do that is to drive the revenue base so this company reaches a cash flow breakeven position and *we think that's very achievable in 2004.* (emphasis added by Plaintiffs).<br><center>* * *</center>Q. (John Stuart, National Media) So my | • Plaintiffs fail to allege what is false or misleading about these statements and why.[11]<br>• These are statements of forward-looking, corporate belief.<br>• Sprague did not guarantee that the Intel and IBM deals would generate revenue.<br>• Plaintiffs have failed to allege facts showing that Sprague knew that his statements were false when made or that Sprague had no reason to believe his optimistic statements.<br><center>* * *</center>• Plaintiffs fail to allege what is false or misleading about these statements.<br>• These are statements of corporate belief.<br>• Plaintiffs have not alleged that the Company did not have access to the resources it needed in order to operate or that the recent exercise of options did not help to strengthen the company.<br><center>* * *</center>• Sprague cannot be held liable for being optimistic about the Company's future.<br>• Sprague's answer to this question is a non-actionable statement of corporate optimism.<br>• Plaintiffs have failed to allege any fact to show that Sprague did not believe those statements when he made them. |

---

[11] Plaintiffs claim that the Defendants' forecasted revenue stream was "a fabrication, pulled out of the air and created to mislead the investing public and artificially inflate the Company's stock." (A.C. ¶ 60). Plaintiffs further claim that Defendants' "knew that the Intel deal would not generate the revenue stream forecast by the Company at any time in the foreseeable future,… and that the IBM relationship was not fee producing." *Id.* These allegations of falsity categorically fail to state a claim of securities fraud. Defendant Sprague did not guarantee that the Intel or IBM deals would produce revenue and as stated by Plaintiffs, Sprague made it explicitly clear that Intel could use the agreement "as broadly as they want, or as little as they want." (*See* August 14, 2003 conference call transcript, App. Exh. 6 at 7; A.C. ¶ 58). Sprague also clearly disclosed the terms of the IBM agreement and did not state that the relationship was fee-producing. (*See* App. Exh. 6 at 8).

| Alleged False and Misleading Statement | Reasons Not Actionable |
|---|---|
| infamous question is of leaving the lights on till all this happens, you feel like you're well- you're much more comfortable now than you were, say four months ago? That we're going to have the resources and the wherewithal to keep the lights on until this unfolds?<br><br>A. (Sprague) Very much so.  The real challenge in this market has been when are the first units going to ship with scope and volume, and I think that we're beginning to be able to show that in the marketplace.  *We certainly had a clearer view in it for the last couple of quarters, so we've been much more comfortable than perhaps our shareholders can be because it's hard to see the data that we have.  But we're very comfortable. (emphasis added by Plaintiffs).* | |

C.    **Plaintiffs fail to Allege With Particularity How and Why Wave's Statements In Its SEC Filings Were False or Misleading.**

| Alleged False and Misleading Statement | Reasons Not Actionable |
|---|---|
| *Form S-3/A filed August 11, 2003*<br><br>55 & 61.  *Material Changes*<br>On July 31, 2003, Wave announced an agreement with Intel Corporation that will help enable both companies to accelerate the development and deployment of trusted applications and services for safer computing on personal computer platforms.    The agreement will enable Intel to bundle Wave's software and services with a future Intel desktop motherboard, targeted for trusted | • Plaintiffs fail to adequately allege what is false and misleading about these statements.[12]<br>• These are statements of accurate historical fact and forward-looking statements.<br>• It cannot be disputed that Wave had an agreement with Intel to bundle Wave's software and services with an Intel desktop motherboard.<br>• It cannot be disputed that Intel planned to sell a motherboard containing Wave's |

---

[12] Plaintiffs claim that these statements were false and misleading because "Defendants knew that the Intel deal would not generate the revenue stream forecast by the Company at any time in the foreseeable future, if ever, and that the IBM relationship was not fee producing."  Plaintiffs further claim that "[c]ontrary to Defendants representations" the Intel and IBM deals were not "material changes." (A.C. ¶ 56).  As explained above, Plaintiffs allegations of falsity do not hold water.  Plaintiffs cannot point to any language in these statements "guaranteeing" that the Intel and IBM relationships would produce the revenue forecasted by the Company.

| Alleged False and Misleading Statement | Reasons Not Actionable |
|---|---|
| computing platforms. Similar in nature to a previously announced Semiconductor, Intel will pay a royalty fee to Wave for each unit shipped. Intel plans to introduce the new motherboard in the fourth quarter of 2003.<br><br>On August 4, 2003, Wave announced that it has partnered with IBM's Independent Software Vendor (ISV) Program. Wave's new Document Manager Vault and Smart Signature security software applications in Wave's EMBASSY Trust Suite client software family now work with the IBM Embedded Security subsystem, a hardware and software-based security solution available on select ThinkPad notebooks and ThinkCentre desktops. Wave's partnership with IBM enables Wave in its objective to sell and deliver open and interoperable solutions to business customers as trusted computing continues to evolve. Wave will try to interest other security chipmakers and motherboard suppliers in its | software.<br>• Wave does not guarantee revenue from the agreement.<br>• Wave does not represent that Intel is required by the agreement to sell motherboards containing Wave's software.<br>• It cannot be disputed that certain Wave software has been deemed to be compatible with certain IBM systems.<br>• Wave does not guarantee revenue from IBM.<br>• Wave did not represent that IBM was required to enter into any transactions with Wave.<br>• Plaintiffs have failed to allege facts giving rise to a strong inference that Defendants had *actual knowledge* of the falsity of these statements. Indeed, they cannot since none of these statements are inaccurate.<br>• Read in context, these statements were accurate and no reasonable investor would |

[13] The Form S-3/A which contained these statements contained the following caveat: "The following is a summary, and should be read as such. This summary is qualified by more detailed information appearing in other sections of the prospectus and the documents incorporated herein by reference in this prospectus. Wave Systems Corp. is a development stage company. **We have not realized any significant revenues in any quarter since we began our operations in 1988. We do not expect to realize significant revenues for at least the next two fiscal quarters, or until we are successful with our strategy which is to achieve broad market acceptance of our technology as a standard platform for the secure delivery of electronic content, and security services and to build a network of services for this platform. Revenues have been nominal in relation to our expenditures due to the highly complex nature of the technology that we are developing and the early stage nature of the market for products that utilize this technology. As a result, we have experienced a slow pattern of corporate development.** You should carefully consider the factors set forth under the caption 'Risk Factors.'" (Form S-3/A filed Aug. 11, 2003, App. Exh. 2 at 1) (emphasis added).

The risk factors included in part: *(1) We have a history of net losses and expect net losses will continue. If we continue to operate at a loss, our business will not be financially viable; (2) We may not be able to fund our operations and continue as a going concern; (3) Our market is in the early stage of development so we are unable to accurately ascertain the size and growth potential for revenue is [sic] such a market; (4) Wave is not established in the industry so we may not be accepted as a supplier or service provider to the market; (5) Our products have not been accepted as industry standards which may slow their sales growth.* (Id. *at* 2-3).

| Alleged False and Misleading Statement | Reasons Not Actionable |
|---|---|
| products in the coming months. | have interpreted them as guarantees of Wave's revenue growth.[13] |
| *Form S-3 Filed August, 20, 2003 (App. Exh. 3); Prospectus filed August 22, 2003, (App. Exh. 4)*<br><br>62 & 63. On July 31, 2003, Wave announced an agreement with Intel Corporation that will help enable both companies to accelerate the development and deployment of trusted applications and services for safer computing on personal computer platforms. The agreement will enable Intel to bundle Wave's software and services with a future Intel desktop motherboard, targeted for trusted computing platforms. Similar in nature to a previously announced Semiconductor, Intel will pay a royalty fee to Wave for each unit shipped. **This licensing agreement is non-exclusive and there are no minimum licensing requirements on the part of Intel pursuant to the agreement.** Intel plans to introduce the new motherboard in the fourth quarter of 2003. (emphasis added by Defendants)<br><br>On August 4, 2003, Wave announced that it has partnered with IBM's Independent Software Vendor (ISV) Program. Wave's new Document Manager Vault and Smart Signature security software applications in Wave's EMBASSY Trust Suite client software family now work with the IBM Embedded Security subsystem, a hardware and software-based security solution available on select ThinkPad notebooks and ThinkCentre desktops. Wave's partnership with IBM enables Wave in its objective to sell and deliver open and interoperable solutions to business customers as trusted computing continues to evolve. *This* | • For the same reasons discussed above, these statements are accurate and do not contain any material misrepresentations or omissions.<br>• Plaintiffs cannot dispute that Wave's licensing agreement with Intel was non-exclusive and that there were no minimum licensing requirements.[14]<br>• Wave stated that Wave's partnership with IBM also did not have any minimum licensing requirements. |

---

[14] In fact, Plaintiffs erroneously claim that Defendants omitted this very same specific term of the Intel agreement from its disclosures to the public. (*See* A.C. ¶ 41).

| Alleged False and Misleading Statement | Reasons Not Actionable |
|---|---|
| *licensing agreement is non-exclusive and there are no minimum licensing requirements on the part of IBM pursuant to the agreement.* Wave will try to interest other security chipmakers and motherboard suppliers in its product in the coming months (emphasis added by Plaintiffs). | |

### III.    THE AMENDED COMPLAINT MUST BE DISMISSED BECAUSE PLAINTIFFS FAIL TO PLEAD FACTS CREATING A STRONG INFERENCE THAT DEFENDANTS ACTED WITH SCIENTER.

Not only have Plaintiffs utterly failed to plead false or misleading statements with particularity, but they also have not raised a strong inference of scienter for each Defendant, as required. *See Fitzer*, 119 F. Supp. 2d at 19. The scienter required by the PSLRA is a "mental state embracing intent to deceive, manipulate, or defraud." *In re Galileo,* 127 F. Supp. 2d at 261. There must be an actual intent to deceive or, at a minimum, there must be recklessness. *Maldonado v. Dominguez,* 137 F.3d 1, 9 n. 4 (1st Cir. 1998) ("Even if plaintiffs wish to prove scienter by 'recklessness,' they still must allege, with sufficient particularity, that defendants had full knowledge of the dangers of their course of action and chose not to disclose those dangers to investors"). As explained in section (A)(2) *infra* at 12, the recklessness required to satisfy the scienter pleading requisite must be "extreme." *See In re Galileo at* 261 (citing *Ernst & Ernst*, 425 U.S. at 193 n.12; *Greebel*, 194 F.3d at 198). Each Individual Defendant is entitled to have this test applied to him. Each Individual Defendant urges that the claim as to him be dismissed because there are insufficient allegations as to each to satisfy the PSLRA or Rule 9(b). Indeed, since Plaintiffs have failed to plead falsity, it is unnecessary for this Court to determine whether they adequately alleged scienter. *See Nolte*, 2004 WL 2749867 at *5 (refusing to decide whether plaintiffs adequately plead scienter since plaintiffs failed to plead falsity with particularity).

In the First Circuit, a plaintiff alleging fraud must show more than "motive" and "opportunity" to commit fraud. The PSLRA requires pleading of either *facts* showing directly that a defendant made a statement with knowledge that it was false or misleading, or *circumstances that strongly suggest that **each** defendant* acted with scienter. *See Lirette*, 27 F.

Supp. 2d at 281 (motive and opportunity are inadequate methods for pleading scienter in securities fraud cases under PSLRA); *accord, Friedberg*, 959 F. Supp. at 49-50. A mere reasonable inference of scienter is insufficient to survive a motion to dismiss. *Greebel*, 194 F.3d at 196-97. Rather, "[t]o survive a motion to dismiss, the inference of scienter must be both *reasonable and strong*." *In re Galileo*, 127 F. Supp. 2d at 261 (emphasis added). In accordance with the above principles, all of the following have been held to be an *insufficient* pleading of scienter:

(1) "a general averment that the defendants knew earlier what later turned out badly," *In re Galileo*, 127 F. Supp. 2d at 261 *(citing In re Peritus Software Servs. Inc. Sec. Litig.*, 52 F. Supp. 2d 211, 223 (D. Mass. 1999));

(2) an allegation that a defendant "must have had knowledge of the facts," *In re Galileo,* 127 F. Supp. 2d at 261; *Maldonado,* 137 F.3d at 9-10;

(3) an allegation that the defendants must have known the facts solely by virtue of their positions with the issuer of the securities, *In re Galileo,* 127 F. Supp. 2d at 261; *see also In re Peritus*, 52 F. Supp. 2d at 227-28; *Lirette,* 27 F. Supp. 2d at 283;

(4) an allegation that the defendants must have known the facts because they were privy to internal corporate information not specified in the Amended Complaint, *see In re Galileo,* 127 F. Supp. 2d at 261 (citing *In re Peritus,* 52 F. Supp. 2d at 227-28; *Lirette,* 27 F. Supp. 2d at 283);

(5) "catch-all" allegations that defendants stood to benefit from wrongdoing and had the opportunity to implement a fraudulent scheme," *Greebel*, 194 F.3d at 197 (citations omitted); and

(6) non-specific allegations concerning a defendant's state of mind. *In re Galileo*, 127 F. Supp. 2d at 262.

The Amended Complaint fails to withstand scrutiny under these requirements.

## A. Plaintiffs' Scienter Allegations Fail to Plead the Requisite Strong Inference of Scienter as to Each Defendant.

Plaintiffs plead several highly generalized purported indications of scienter, addressed generically to all of the Defendants. (*See* A.C. ¶¶ 74-76). None holds water. In fact, Plaintiffs entirely fail to plead *specific* allegations demonstrating the scienter of any of the Defendants.

The Amended Complaint utterly fails to suggest any inference of scienter, let alone the strong inference required by the PSLRA, and must therefore, be dismissed.[15]

>    i.    Defendants knew that the public documents and statements, issued or disseminated by or in the name of the Company were materially false and misleading, knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public, and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violators of the federal securities laws. (A.C. ¶ 74).

There are no facts whatsoever alleged in this paragraph. This is merely a conclusion.

>    ii.    Defendants knew or recklessly disregarded that, based on their knowledge of the terms of the Intel licensing agreement and the absence of any partnership or licensing agreement with IBM, despite Defendants' representations to the contrary, that their representations and forecasts for significant revenue growth and reaching breakeven in 2004 were materially false and misleading and lacked any reasonable basis for belief. (A.C. ¶ 74)

This allegation is also insufficient to plead scienter as to Wave or the Individual Defendants. Plaintiffs have failed to allege sufficient particularized facts indicating that the Defendants' disclosures about the Intel agreement and the IBM compatibility were *false when made* and how they were false. Since Defendants' optimistic predictions about revenue growth and reaching breakeven are not actionable under the PSLRA, Plaintiffs cannot rely on these statements to establish scienter as to any of the Defendants. As such, such conclusory statements about the Defendants' state of mind wholly fail to establish a strong inference of scienter.

>    iii.    [D]efendants, by virtue of their receipt of information reflecting the true facts regarding Wave and its business practices, their control over and/or receipt of Wave's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Wave were active and culpable participants in the fraudulent scheme alleged herein. (A.C. ¶ 74).

---

[15] Plaintiffs' scienter allegations also fall short of pleading scienter by "recklessness." *See* section III infra at 20.

Allegations that Defendants must have known the facts because they were privy to internal corporate information not specified in the Amended Complaint are inadequate methods of pleading scienter. *In re Galileo*, 127 F. Supp. 2d at 261 (citing *In re Peritus*, 52 F. Supp. 2d at 227-28); *Lirette,* 27 F. Supp. 2d at 283 ("General allusions to unspecified internal corporate information are insufficient to withstand a motion to dismiss"). What confidential proprietary information are Plaintiffs referring to? What information reflected the "true facts" regarding Wave and its business practices? Furthermore, allegations of an individual's position and control within the Company are insufficient to plead scienter. *Coates*, 26 F. Supp. 2d at 916. *See also In re Criimi Mae Inc. Sec. Litig.*, 94 F. Supp. 2d 652, 661 (D. Md. 2000) (holding that fact that defendants held positions of control, were involved in company's day-to-day activities and signed company's public filings with SEC, standing alone, were not sufficient to raise a strong inference of scienter: "If they were, every corporate executive who participates in the day-to-day management of his company would be exposed to liability for securities fraud"); *Loan v. Federal Deposit Ins. Corp.*, 717 F. Supp. 964,968 (D. Mass. 1989) (holding that defendants' status as officers and directors was not sufficient basis to impose liability pursuant to § 10(b)).

     iv.    [T]he individual Defendants personally profited from their knowledge of the falsity of the statements they provided to the investing public concerning Wave's purported deals and partnerships and the revenue expected from such arrangements. (A.C. ¶ 75).

These allegations fail to establish a strong inference of scienter. The First Circuit has held that an alleged motive and opportunity, without more, cannot establish a strong inference of scienter. *Greebel*, 194 F.3d at 197. Other courts have agreed that generic motives to raise capital and ensure corporate success, which could be imputed to officials of a publicly-owned enterprise, do not raise a strong inference of scienter. *See e.g. In re Microstrategy, Inc. Sec. Litig.,* 115 F. Supp. 2d 620, 647-48 (E.D. Va. 2000).

### B.    Trading by Insiders In and of Itself is Insufficient to Create a Strong Inference of Scienter.

Plaintiffs allege that Defendants Feeney and Sprague sold stock during the class period and while in possession of material, non-public information.[16]   These allegations fail to adequately plead scienter.  *First,* trading by insiders, by itself, is not probative of scienter.  *See In re Focus Enhancements, Inc. Sec. Litig.*, 309 F. Supp. 2d 134, 162 (D. Mass. 2001).  ("[W]hen directors and officers own stock or receive compensation in stock, they should be expected to trade those securities in the normal course of events."  *McCall v. Scott,* 239 F.3d 808, 825 (6th Cir. 2001), *decision amended on other grounds by,* 250 F.3d 997 (6th Cir. 2001).  *See also Shaw,* 82 F.3d at 1224 ("the mere fact that insider stock sales occurred does not suffice to establish scienter").

*Second,* when examining such insider-trading allegations, courts consider the totality of the circumstances including volume, timing and prior trading history, in determining whether stock sales support a strong inference of scienter.  *See Greebel,* 194 F.3d at 206-07 (examining context of trading by insiders, including timing and amount, and holding that trading did not support a strong inference of scienter even *though the total sum involved was large); Fitzer,* 119 F. Supp. 2d at 25 (considering prior trading practices as well as timing and amount).  Thus, Plaintiffs must plead facts which would warrant a finding that there was a suspiciously abnormal amount and/or unusual pattern of trading.  *See e.g. Carney v. Cambridge Tech. Partners, Inc.*, 135 F. Supp. 2d 235, 256 (D. Mass. 2001); *Greebel,* 194 F.3d at 198 (stating that defendants' trading must be "unusual" and "well-beyond [their] normal patterns of trading").

*Third,* the analysis of the sales should be in the *aggregate* among defendants and not defendant-by-defendant.  *See e.g., In re Party Cit Sec. Litig.,* 147 F. Supp. 2d 282, 313 (D.N.J. 2001) ("Low aggregate sales and large retained aggregate holdings rebut an inference of motive,

---

[16] There is no allegation of insider trading by Defendant Bagalay.

*even where some defendants have sold significant percentages*") (emphasis added); *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 987 (9th Cir. 1999) (considering aggregate sales and retention in deciding that particular defendant's high sales were not probative of scienter).

Measured against these criteria, the sales by Defendants Feeney and Sprague are not probative of scienter. During the Class Period, Defendant Feeney sold 100,000 shares, reducing his share ownership by 50%. Defendant Sprague sold 150,000 shares, reducing his ownership by 20%. (*See* Form 4 for Gerard Feeney, dated Aug. 5, 2003, App. Exh. 10; Form 4 for Steven Sprague, Aug. 6, 2003, App. Exh. 11; A.C. ¶ 75). Even though Feeney reduced his share ownership by 50%, the total aggregate of Feeney and Sprague's sales and holdings rebut an inference of motive. *In re Party City*, 147 F. Supp. 2d at 313. *See also In re Advanta Corp.*, 180 F.3d at 541 ("Far from supporting a 'strong inference' that defendants had a motive to capitalize on artificially inflated stock prices, [retained holdings] suggest [that] they had every incentive to keep Advanta profitable"); *In re Silicon Graphics*, 183 F.3d at 987-988 (where collective retention by all defendants aggregated 90%, no motive stated by individual's sales of 43.6%); *San Leandro Emergency Medical Group Profit,* 75 F.3d 801, 813-14 (2nd Cir. 1996) (where insiders retained holdings, sales did not constitute scienter).

Moreover, Plaintiffs have failed to allege any irregularities in Feeney and Sprague's selling in terms of timing or pattern. This defect is fatal to Plaintiffs' insider trading allegations. *See Fitzer*, 119 F. Supp. 2d 12 (dismissing claims against several defendants where plaintiffs' insider trading allegations failed to present information about defendants' pre-Class Period trading practices and stating that plaintiffs failed to allege a strong inference of scienter). *See also In re Peritus*, 52 F. Supp. 2d at 225 (stating that one fact necessary to a showing of unusualness is the amount of trading that insider conducted before or after class period); *Lirette*, 27 F. Supp. 2d at 283 (holding that plaintiff's insider trading allegations failed to establish a strong inference of scienter since plaintiff failed to present facts showing that defendant's trading was unusual in amount or kind).

Feeney and Sprague's sales occurred on August 5, 2003 and August 6, 2003, respectively-- *after* the market had received and absorbed the information in the IBM Press release. On August, 4, 2003, one day prior to either Defendant's sale, Wave's stock traded at a high of $4.96 and over 40 million shares were traded. (See A.C. ¶ 44). This negates an inference that Feeney and Sprague sold their shares while in the possession of material non-public information because "trading following public announcements simply evidences compliance with the securities laws." *In re Party City,* 147 F. Supp. 2d at 312 (quoting *Deutschman v. Beneficial Corp.*, 841 F.2d 502, 506 (3d Cir. 1988)). *See also In re Focus Enhancements*, 309 F. Supp. 2d at 163-64 (holding that since the vast majority of sales occurred *after* a public announcement that caused stock prices to rise, it was impossible to draw a strong inference of scienter, despite the unusual amounts of stock traded ["37% of holdings, 83% of holdings, and 100% of shares"]). The court in *In re Party City* observed: "The First Circuit has stated that context, including timing, should be examined first, indicating presumably that timing is more important than the amount of sales in determining whether a strong inference of scienter is created by insider trading." *Id.* at 163-64.

Accordingly, absent allegations of unusual timing and/or pattern of sales, Plaintiffs' allegations of insider selling establish nothing.

**C.     Plaintiffs Fail to Allege Any Inference of Scienter For Individual Defendants Bagalay, Feeney and Sprague.**

Not a ***single*** allegation is made in the Amended Complaint that attributes a false or misleading statement to Defendants Bagalay and Feeney, despite the fact that both the PSLRA and Rule 9(b) require Plaintiffs to "distinguish among those they sue and ***enlighten each defendant as to his or her part in the alleged fraud.***" *Coates*, 26 F. Supp. 2d at 914 (emphasis added). Having failed to adequately plead falsity, scienter becomes irrelevant. Furthermore even if scienter were relevant, Plaintiffs fail to allege any details of these individuals' knowledge, responsibilities or alleged participation in the purported fraud. Allegations of Feeney's position within the Company (as made by Plaintiffs in introductory paragraphs 1 and

40

21 of the Amended Complaint) are insufficient to prove scienter.  *See In re Ciimi Mae Inc. Sec. Litig.*, 94 F. Supp. 2d 652, 661 (D. Md. 2000); *Coates*, 26 F. Supp. 2d at 916.  No allegations of control are made as to Defendant Bagalay whatsoever.

In short, no information is offered as to how Defendants Bagalay and Feeney were involved in making any allegedly false or misleading statement.  Thus, Plaintiffs have wholly and completely failed to meet the pleading requirements of the PSLRA and Rule 9(b) as to Defendants Bagalay and Feeney.  Accordingly, the claims against Defendants Bagalay and Feeney must be dismissed.

As to Sprague, the only statements attributed to him are those in the conference call.  Those statements are not actionable for all of the reasons set forth above.  In addition, Plaintiffs have not alleged sufficient facts to show scienter by Sprague (i.e. that he did not actually believe what he was saying).

## IV. THE AMENDED COMPLAINT FAILS TO PROPERLY PLEAD A SECTION 20(a) CLAIM AND THEREFORE FAILS TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED.

Section 20(a) of the Securities Exchange Act of 1934, codified as 15 U.S.C.A. § 78t-1, provides a cause of action against any person "who violates any provision of [the 1934 Exchange Act] or the rules and regulations thereunder while in the possession of material, nonpublic information…"  15 U.S.C.A. § 78t-1(a).  Plaintiffs have failed to plead an actionable claim against Defendants Bagalay, Sprague and Feeney for violations of Section 10(b) of the Securities Exchange Act and Rule 10b-5 promulgated thereunder.  As such, Plaintiffs have no actionable claim against Bagalay, Sprague or Feeney for alleged violations of Section 20(a).[17]  *See e.g.,*

---

[17] Moreover, Plaintiffs cannot rely on the "fraud-on-the-market" theory since Plaintiffs have failed to prove that Defendants made any public misrepresentations.  *See Basic*, 485 U.S. at 248, n. 27: "[I]n order to invoke the [fraud-on-the-market] presumption, a plaintiff must allege and prove: (1) that the defendant made public misrepresentations; (2) that the misrepresentations were material; (3) that the shares were traded on an efficient market; (4) that the misrepresentations would induce a reasonable, relying investor to misjudge the value of the shares; and (5) that the plaintiff traded the shares between the

*Jackson Nat. Life Ins. Co. v. Merrill Lynch & Co., Inc.*, 1993 WL 464730 at \*5 (S.D.N.Y. 1993) (citations omitted) ("A defendant is liable under section 20(a) only where an independent violation of the 1934 Securities Exchange Act or the rules and regulations promulgated thereunder has occurred") *aff'd*, 32 F.3d 697, 703 (2nd Cir. 1994); *In re Foundry Networks, Inc. Sec. Litig.*, 2003 WL 22077729 (N.D. Cal. 2003) (dismissing plaintiffs' section 20(a) claim where plaintiffs failed to plead a viable claim for securities fraud under § 10(b) of the Exchange Act and Rule 10b-5); *In re Parametric Technology Corp.*, 300 F. Supp. 2d 206 (D. Mass. 2001) (same); see also, *Suna*, 107 F.3d at 72; *In re Fidelity/Apple Sec. Litig.*, 986 F. Supp. 42, 48 (D. Mass. 1997).

---

time the misrepresentations were made and the time the truth was revealed."  It is important to note that these requirements are not disjunctive.  Therefore, Plaintiffs must meet all five of these requirements.

**CONCLUSION**

For the foregoing reasons, Defendants respectfully request that this Court dismiss Plaintiffs' Consolidated Amended Complaint in its entirety.

**WAVE SYSTEMS CORPORATION, JOHN E. BAGALAY, JR., STEVEN K. SPRAGUE and GERARD T. FEENEY,**

By their attorneys,

/s/ Raquel J. Webster
Robert A. Buhlman, BBO #554393
Eunice E. Lee, BBO #639856
Raquel J. Webster, BBO #658796
**BINGHAM McCUTCHEN LLP**
150 Federal Street
Boston, MA 02110
617-951-8000

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the above pleading was electronically served upon the attorneys of record for all parties on December 14, 2004.

/s/ Raquel J. Webster
Raquel J. Webster

43