UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| ANNE BRUMBAUGH, GARY L. HARMON AND RANDY K. GRIFFIN, on behalf of themselves and all others similarly situated, | ) ) ) ) | Civil Action No. 3:04-CV-30022 (MAP) |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| WAVE SYSTEMS CORPORATION, STEVEN K. SPRAGUE, and GERARD T. FEENEY, | ) ) ) | |
| Defendants. | ) | |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**

David Pastor (BBO #391000)
GILMAN AND PASTOR, LLP
Stonehill Corporate Center
999 Broadway, Suite 500
Saugus, Massachusetts 01906
Telephone: 781/231-7850
781/231-7840 (fax)

Plaintiffs' Liaison Counsel

Marc I. Willner
Karen E. Reilly
Todd M. Mosser
SCHIFFRIN & BARROWAY, LLP
280 King of Prussia Road
Radnor, PA 19087
Telephone: 610/667-7706
610/667-7056 (fax)

Plaintiffs' Lead Counsel

DATED:  March 4, 2005

## TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    A.    Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    B.    Pre-Class Period Statements – Setting The Stage . . . . . . . . . . . . . . . . . . . 7

    C.    Defendants' Fraudulent Statements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

I.     STANDARDS OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    A.    Standard Of Review On A Motion To Dismiss . . . . . . . . . . . . . . . . . . . . . 12

    B.    Standards For Section 10(b) And Rule 10b-5
         Liability And The PSLRA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

II.    DEFENDANTS' MISREPRESENTATIONS AND
      OMISSIONS OF MATERIAL FACT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    A.    Defendants' Materially False And Misleading
         Statements Are Actionable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    B.    Defendants' Failure To Disclose The Material Terms . . . . . . . . . . . . . . . . . 16

    C.    The Defendants' Statements Were More Than Mere "Puffery" . . . . . . . . . . 18

III.   PLAINTIFFS PLEAD AN OVERWHELMING
      INFERENCE OF SCIENTER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

    A.    Plaintiffs Plead Defendants' Direct Knowledge . . . . . . . . . . . . . . . . . . . . 24

    B.    Plaintiffs' Motive And Opportunity Allegations
         Add To The Strong Inference Of Scienter . . . . . . . . . . . . . . . . . . . . . . . . . 26

i

IV.  NEITHER THE PLSRA SAFE HARBOR PROVISIONS NOR THE
     BESPEAKS CAUTION DOCTRINE IMMUNIZE DEFENDANTS'
     MATERIALLY MISLEADING STATEMENTS ........................... 28

     B.   Any Alleged Misrepresentations That Could Be Construed
          As Forward-Looking Are, Nonetheless, Not Protected By
          The PSLRA's Safe Harbor Provisions ................................. 30

          1.   Defendants' Boilerplate Risk Factors Failed To
               Disclose The Negative Existing Facts Concerning
               Wave's Relationships With Intel And IBM ....................... 30

          2.   Defendants' Statements Concerning Intel And IBM
               Agreements And Prospects Of Revenue Stream Were
               Made Actual Knowledge Of The Undisclosed Adverse
               Facts .................................................................. 32

V.   THE COMPLAINT SUFFICIENTLY PLEADS
     CONTROL PERSON LIABILITY ....................................... 33

CONCLUSION ..................................................................... 34

## TABLE OF AUTHORITIES

**FEDERAL CASES**

Aldridge v. A.T. Cross Corp.,
    284 F.3d 72 (1st Cir. 2002) ................................................................. passim

In re Allaire Corp. Secs. Litig.,
    224 F. Supp. 2d 319 (D. Mass. 2002) ........................................... 21,22,28,32

In re Amylin Pharms., Inc. Secs. Litig.,
    2003 U.S. Dist. LEXIS 7667 (S.D. Cal. May 1, 2003) ........................... 30, 32

Ansin v. River Oaks Furniture,
    105 F.3d 745 (1st Cir. 1997), 522 U.S. 818 (1997) ........................... 16,17,18

In re Azurix Corp. Sec. Litig.,
    198 F. Supp. 2d 862 (S.D. Tex. 2002), aff'd., 332 F.3d 854 (5th Cir. 2003) ............... 19

Backman v. Polaroid Corp.,
    910 F.2d 10 (1st Cir. 1990) ............................................................. 16

Basic, Inc. v. Levinson,
    485 U.S. 224 (1988) .................................................................. 16,17

In re Biogen Sec. Litig.,
    179 F.R.D. 25 (D. Mass. 11997) ..................................................... 16,28

In re Boeing Sec. Litig.,
    40 F. Supp. 2d 1160 (W.D. Wash. 1998) ................................................. 29

In re Cabletron Systems, Inc.,
    311 F.3d 11 (1st Cir. 2002) ........................................................... passim

In re Cendant Corp. Sec. Litigation,
    76 F. Supp. 2d 531 (D.N.J. 1999) ......................................................... 26

In re Compaq Sec. Litig.,
    848 F. Supp. 1307 (S.D. Tex. 1993) ....................................................... 23

Crowell v. Ionics, Inc.,
    343 F. Supp. 2d 1 (D. Mass. 2004) ..................................................... 26,27

Danis v. USN Communs., Inc.,

73 F. Supp. 2d 923 (N.D. Ill. 1999) ........................................................ 32

In re Donald J. Trump Casino Sec. Litig.,
   7 F.3d 357 (3d Cir. 1993) ................................................................. 30

Elkind v. Liggett & Myers,
   635 F.2d 156 (2d Cir. 1980) ............................................................. 21

Fecht v. Price Co.,
   70 F.3d 1078 (9th Cir. 1995),cert. denied,517 U.S. 1136 (1996) ............ 16, 31

Fitzer v. Sec. Dynamics Techs., Inc.,
   119 F. Supp. 2d 12 (D. Mass. 2000), ................................................... 21

Freedman v. Value Health, Inc.,
   958 F. Supp. 745 (D. Conn. 1997) ...................................................... 22

Friedberg v. Discreet Logic,
   959 F. Supp. 42 (D. Mass. 1997) ....................................................... 27

Gabriel Capital, L.P. v. NationalWest Finance, Inc.,
   122 F. Supp. 2d 407 (S.D.N.Y. 2000) ................................................. 33

In re Galileo Corp. Shareholders Litig.,
   127 F. Supp. 2d 251 (D. Mass 2001) .............................................. 20, 21

Gelfer v. Pegasystems, Inc.,
   96 F. Supp. 2d 10 (D. Mass. 2000) ..................................................... 25

In re Globalstar Secs. Litig.,
   2003 U.S. Dist. LEXIS 22496 (S.D.N.Y. Dec. 12, 2003) ........................... 18

Greebel v. FTP Software, Inc.,
   194 F.3d 185 (1st Cir. 1999) ...................................................... 23,26, 27

Gross v. Summa Four,
   93 F.3d 987 (1st Cir. 1996) .............................................................. 16

Helwig v. Vencor, Inc.,
   251 F.3d 540 (6th Cir. 2001) ............................................................ 32

In re Humphrey Hospitality Trust, Inc. Secs. Litig.,
   219 F. Supp. 2d 675 (D. Md. 2002) ..................................................... 21

In re Indep. Energy Holdings PLC Sec. Litig.,

iv

154 F. Supp. 2d 741, 755 ................................................................. 32

Irvine v. ImClone Sys.,
    2003 U.S. Dist. LEXIS 9342, at *3-4 (S.D.N.Y. June 3, 2003) ................................. 30

In re Lotus Development Corp. Sec. Litig.,
    875 F. Supp. 48 (D. Mass. 1995) ................................................................. 14

Lucia v. Prospect St. High Income Portfolio,
    36 F.3d 170 (1st Cir. 1994) ................................................................. 16

In re MicroStrategy, Inc. Secs. Litig.,
    115 F. Supp. 2d 620 (E.D. Va. 2000) ................................................................. 26

In re Mobile Media Sec. Litig.,
    28 F. Supp. 2d 901 (D.N.J. 1998) ................................................................. 22, 29

No. 84 Employer-Teamster Joint Council Pension Trust
Fund v. Am. West Holding Corp.,
    320 F.3d 920 (9th Cir. 2003), cert. denied, 540 U.S. 966 (2003) ................................. 12, 33

In re Nortel Networks Corp. Sec. Litig.,
    238 F. Supp. 2d 613 (S.D.N.Y. 2003) ................................................................. 29

Novak v. Kasaks,
    216 F.3d 300 (2d Cir. 2000), cert. denied, 531 U.S. 1012 (2000) ................................. 22

In re Number Nine Visual Tech. Corp. Secs. Litig.,
    51 F. Supp. 2d 1 (D. Mass. 1999) ................................................................. 18, 29

In re PLC System, Inc. Sec. Litig.,
    41 F. Supp. 2d 106 (D. Mass. 1999) ................................................................. 16

In re PerkinElmer, Inc. Sec. Litig.,
    286 F. Supp. 2d 46 (D. Mass. 2003) ................................................................. 25

Roeder v. Alpha Industrial, Inc.,
    814 F.2d 22 (1st Cir. 1987) ................................................................. 12, 16

Rubinstein v. Collins,
    20 F.3d 160 (5th Cir. 1994) ................................................................. 31

Schlagel v. Learning Tree Int'l.,
    1998 U.S. Dist. LEXIS 20306 (C.D. Cal. Dec. 23, 1998) ................................. 28

In re Sci. Atlanta, Inc.,
    239 F. Supp. 2d 1351 (N.D. Ga. 2002), aff'd 374 F.3d 1015
    (11ᵗʰ Cir. 2004) ................................................................................ 19

Scritchfield v. Paolo,
    274 F. Supp. 2d 163 (D.R.I. 2003) ............................................... 23

In re Secure Computing Corp.,
    184 F. Supp. 2d 980 (N.D. Cal. 2001) ......................................... 27

Shapiro v. UJB Fin. Corp.,
    964 F.2d 272 (3d. Cir. 1992) ........................................................ 22

Shaw v. Digital Equipment Corp.,
    82 F.3d 1194 (1st Cir. 1996) ................................... 13,14,28,29,30

In re Sirrom Capital Corp. Secs. Litig.,
    84 F. Supp. 2d 933 (M.D. Tenn. 1999) ....................................... 22

In re SmarTalk Teleservices, Inc. Sec. Litig.,
    124 F. Supp. 2d 527 (S.D. Ohio 2000) ........................................ 28

Stevelman v. Alias Research Inc.,
    174 F.3d 79 (2d Cir. 1999) ........................................................... 28

In re Transkaryotic Therapies, Inc. Secs. Litig.,
    319 F. Supp. 2d 152 (D. Mass. 2004) ..................................... 19, 25

In re Terayon Communs. System,
    2002 U.S. Dist. LEXIS 5502 (N.D. Cal. Mar. 29, 2002) ............. 27

In re V-Mark Software, Sec. Litig.,
    928 F. Supp. 122 (D. Mass. 1996) ............................................... 22

Vartanian v. Monsanto Co.,
    14 F.3d 697 (1st Cir. 1994) .......................................................... 12

Virginia Bankshares, Inc. v. Sandberg,
    501 U.S. 1083 (1991) ............................................................. 22, 31

In re Viropharma, Inc. Sec. Litig.,
    2003 U.S. Dist. LEXIS 5623 (E.D. Pa Apr. 3, 2003) ............... 31, 32

In re Vivendi Universal, S.A. Sec. Litig.,
    2003 U.S. Dist. LEXIS 19431 (S.D.N.Y. Nov. 4, 2003) ............. 18

Warshaw v. Xoma Corp.,
    74 F.3d 955 (9th Cir. 1996) ........................................................................ 16

Wilkes v. Heritage Bancorp,
    1990 WL 263612 (D. Mass. 1990) ............................................................ 21

## FEDERAL STATUTES

15 U.S.C. §§77z-2(c)(1), 78u-5(c)(1) .................................................................... 30

15 U.S.C. § 78t(a) ................................................................................................... 33

15 U.S.C. §78u-4(b)(1) ........................................................................................... 13

15 U.S.C. §78u-4(b)(3)(A) ...................................................................................... 23

Fed. R. Civ. P. 15(a) ............................................................................................... 34

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ANNE BRUMBAUGH, GARY L. HARMON          )
AND RANDY K. GRIFFIN, on behalf of      )
themselves and all others similarly situated,   )    Civil Action No. 3:04-CV-30022 (MAP)
                                        )
                Plaintiffs,             )
        v.                              )
                                        )
WAVE SYSTEMS CORPORATION, STEVEN )
K. SPRAGUE, and GERARD T. FEENEY,       )
                                        )
                Defendants.             )

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**

Lead Plaintiffs, Anne Brumbaugh, Gary L. Harmon, and Randy K. Griffin ("Plaintiffs"),

respectfully submit this memorandum in opposition to the motion to dismiss Plaintiffs'

Consolidated Amended Class Action Complaint (the "Complaint') by defendants Wave Systems

Corporation ("Wave" or the "Company"), Steven Prague ("Sprague") and Gerard T. Feeney

("Feeney") (collectively the "Individual Defendants," and together with Wave, "Defendants").[1]

**PRELIMINARY STATEMENT**

Plaintiffs have been substantially damaged by their purchase of Wave common stock at

prices that were artificially inflated by Defendants' misrepresentation of Wave's business

relationship and purported "agreements" with two significant PC industry leaders, Intel and IBM.

During the class period, which begins on July 31, 2003 and extends through December 18, 2003

(the "Class Period"), Plaintiffs purchased Wave common stock under the pretense that the

---

[1] Plaintiffs do not assert a claim against John E. Bagalay, Jr.

00004323.WPD ; 1

Company, after 16 years of mounting losses was finally on the verge of earning significant revenue, based on its development of relationships with leaders in the PC industry, who were purportedly considering bundling Wave's security software applications with their computers. With the market primed to expect imminent contracts, Defendants announced "agreements" with Intel and IBM to bundle Wave's software with the PC makers' computers. Based on these materially misleading announcements which misrepresented the true nature of the Company's relationships with Intel and IBM, the price of the Company's stock went from $0.84 per share, prior to the announcements, to close at $4.42 on August 4, 2003.

These well-crafted and carefully timed disclosures of "agreements" with giants Intel and IBM were integral to Defendants' scheme to artificially inflate Wave's common stock price to bail the Company out of a high cost, "kiss of death" private equity placement, which closed on April 30, 2003. Specifically, with Wave's stock price artificially inflated by the misleading disclosures, the Company was able to avoid paying hefty dividends on preferred stock which the Company could not afford to pay, and obtain additional funding through employees' exercises of stock options. In addition to saving the Company from a fatal cash shortfall and thereby keeping their jobs, the Individual Defendants richly profited by their fraud, netting approximately $1 million dollars in proceeds from sales of their personally held Wave shares – sales made within days of the announced "agreements" with Intel and IBM.

However, Defendants' scheme was halted and Wave's inflated stock price collapsed at the close of the Class Period with Company's announcement on December 18, 2003 that it was under formal investigation by the United States Securities and Exchange Commission ("SEC"),

relating to public statements made by Wave during and around August 2003, as well as trading in Wave's securities during that time.

Incredibly, Defendants argue that the press releases issued concerning Intel and IBM were technically "true" and therefore not actionable as a matter of law. However, Defendants' self serving, myopic view is fatally flawed as it ignores Plaintiffs' well pled allegation that material omissions concerning the true nature of the relationships between the companies rendered these statements – and others made by Defendants, materially false and misleading when made. In addition, Defendants' arguments in support of their motion: (1) ignore the statements made by the Company forecasting a significant revenue stream for Wave for the first time in its 16 year history; (2) ignore the context in which the Company's materially misleading statements concerning its "relationships" with Intel and IBM were made and their falsity; (3) misstate Plaintiffs' allegations in the Complaint; and (4) misinterpret the relevant case law. For the reasons set forth herein, Defendants' motion should be denied in its entirety.

## STATEMENT OF FACTS

### A.    Background

Wave develops, produces and markets hardware and software-based digital security products for the Internet -- a highly competitive, evolving and yet to be defined marketplace. ¶ 2.[2] Despite its more than 16 years in business, Wave has not yet successfully marketed any of the products its business model relies upon. Id. Nor has Wave realized any significant revenues, incurring losses for fiscal years ended December 31, 2002, 2001 and 2000, of approximately

---

[2] All references to "¶__" are to paragraphs of the Complaint, references to "Def. Br. at __" are to Defendants' brief in support of their Motion to Dismiss.

$43,467,000, $48,701,000, and $47,656,000, respectively. Id. As of December 31, 2002, Wave had accumulated an enormous deficit of approximately $233,092,000 and working capital of only $8.8 million, requiring an additional $11 million in cash to keep its doors open through the end of December 31, 2003. ¶ 3.

Desperate for funds to stay in business, on April 30, 2003, Wave closed a private placement of Series H Stock and Warrants ("Series H Placement" or "Placement") for gross proceeds of $5,485,000, netting the Company additional funds of $4,465,571 – less than half the working capital needed to continue operations through year end. ¶¶ 3, 4, 29. Not surprisingly, the funds obtained through the Placement came at great expense to the Company. With apparently no other options, Wave paid an exorbitant 19% or $1,020,429 in commissions and fees, and obligated itself to pay substantial dividends on the preferred stock, at a time when no other class of Company stock paid a dividend. ¶¶ 4, 30. Wave agreed to a dividend "on the initial liquidation preference amount of each share ($10,000) at an annual rate of 10%, increasing to 12% on April 30, 2004." Id. Lacking the funds to continue operations through year end, let alone pay the high dividends due, Wave had placed itself into an untenable position to meet short term cash requirements.

Significantly, Wave's ability to raise additional funding through equity offerings was severely restricted under the terms of the Placement, by granting the Series H Shareholders a right of first refusal on any future equity offers. ¶ 4. For a period of two years from April 30, 2003, the holders of the Series H Stock had the right of first refusal for any future equity and/or equity linked securities issued by the Company. ¶ 31. Essentially, Wave could not offer any investor a deal better than that offered to the Series H Shareholders. Without a revenue stream,

this restriction severely limited Wave's ability to raise additional funds needed to continue operations, and pay the substantial dividends due the Series H Shareholders. ¶¶ 4, 31. Likewise, Wave lacked the financial resources to buy out the Series H Shareholders.

As of June 30, 2003, even with the additional funding in place, the Company had an accumulated deficit of $245.8 million and working capital of only $2.6 million. ¶ 6. With the Company's hands now tied financially and obligated to terms it could not perform, Wave was a company teetering on the brink of collapse.

Wave's only escape route under the terms of the Placement was to trigger the automatic conversion of the preferred Series H Stock to the Company's Class A Common Stock, by causing Wave stock to trade above $1.90 per share for 15 of 20 consecutive trading days.[3] ¶ 5. In addition, 100% of the Series H Warrants, at an initial exercise price of $1.13 per share, were callable by the Company if the market value of its Class A Common Stock exceeded 250% of $1.13 for a minimum of 15 business days during any twenty consecutive business day period. ¶ 33. If exercised in full, the Series H Warrants would generate up to an additional $4,077,671 for the Company. Id.

Faced with Wave's impending demise, Defendants devised a plan to artificially and materially inflate the Company's stock price in the short term to force the conversion of the Series H securities to non-dividend paying common stock, and release the Company from the Placement's constraints on further funding through equity based offerings. ¶ 7. Priming the market with the promise that the Company would soon earn a significant revenue stream –

---

[3] The Series H shares were also convertible at the option of the shareholder at an initial conversion price of $0.76 per share on the first trading day following Wave's annual stockholders' meeting, which at the start of the Class Period was scheduled to be held on August 4, 2003. ¶ 33.

forecasting $5 million in revenue growth as set forth in the Company's Form 10-K/A filed June

30, 2003 (¶ 9), Defendants soon thereafter announced "agreements" with Intel and IBM on July

31, 2003 and August 4, 2003 respectively.  ¶ 10.  The market's response was positive, and

Wave's stock price exploded following the twin announcements.  On July 31, 2003, Wave's

common stock closed at $2.25 per share, up from the prior day's close of $0.84 per share,

representing a 168% one day gain on extremely heavy volume of 19 million shares traded, as

compared to Wave's average daily volume of only 199,136 shares. Id., ¶ 37.  On August 4, 2003,

following the Company's IBM announcement, Wave's share price rose 21%, or $0.77 per share,

to close at $4.42 per share, on very heavy volume of over 45 million shares traded.  Id.

Defendants richly profited by their materially false and misleading statements, which

caused a dramatic increase in the price of Wave's stock.  In August 2003, the Company received

$2.6 million in proceeds from employee and ex-employee stock option exercises and $1 million

from the repayment of a former officer's loan, made possible by the substantial increase in

Wave's share price.  ¶ 52.  More importantly, the Company kept its doors open by successfully

renegotiating the Placement, converting the Series H Stock to non-dividend paying common

stock, and with the inflated share price, the Series H Warrants were exercised yielding additional

net proceeds of $2,323,445.  ¶¶ 65, 66.  With the Placement renegotiated, Wave was then able to

complete a new private placement,  raising an additional $7.1 million.  ¶ 69.

Defendants Feeney and Sprague also richly profited from their artificial inflation of

Wave's common stock price, dumping a large percentage of their personal Wave holdings within

days of their materially false and misleading representations.  Specifically, Defendant Feeney

sold 100,000 shares of Wave common stock at $5.00 per share for proceeds of $500,000 on

August 5, 2003 – cutting his overall share ownership by 50%, and defendant Sprague, on August

6, 2003, sold 150,000 shares at prices ranging from $3.14-3.47 per share for proceeds of

$492,636, reducing his overall share ownership by 20%. ¶¶ 49, 50.

**B.      Pre-Class Period Statements - Setting The Stage**

Defendants set about their plan to artificially inflate Wave's stock price by priming the

market to expect a major shift in the Company's 16 year history – an impending significant

revenue stream.  To this end, immediately prior to the start of the Class Period, Defendants made

several statements, all indicating that the Company was on the verge of earning significant

revenues.  For example, in a press release issued by Defendants on May 15, 2003, reporting on

the Series H Placement, defendant Sprague made the following comments on the "expected

reality" of imminent revenues:

> Wave has staked out a unique position with trusted computing services and
> infrastructure that seamlessly operate with the leading industry platforms.  **Recent
> interactions at several industry events suggest that key industry participants
> are finally beginning to recognize the value Wave can add and are evaluating
> ways that they can work with us to benefit from our position.**
>
> During 2003 we expect to receive trusted computing-oriented license revenue
> relating to our agreement with National Semiconductor as they begin to address
> the emerging trusted computing enterprise market.  It is also our goal to generate
> services revenues this year associated with the other chip vendors that are also
> addressing this opportunity.  **This is an exciting time for us, as we begin to see
> our long-held vision of revenue-producing trusted computing services
> become an expected reality.**  (Emphasis added.)

¶ 26. Further, on June 30, 2003, the Company reported in its Form 10-K/A for fiscal year ended

December 31, 2002 under "Recent Developments" that:

> ... Wave has begun executing a strategy to leverage the work it has done in
> developing a hardware trusted computing platform toward becoming a major
> developer of services to this market, **the development of which is beginning to**

**be driven by some of the major suppliers of semiconductors to the PC industry. Wave is actively pursuing business relationships with these companies . . . thereby creating a substantial new revenue opportunity for Wave.** (Emphasis added.)

¶ 8.  In the same filing, Defendants specifically represented that "various deals" were in the

works, which would supply a significant revenue stream to Wave.  As stated under "Results of

Operations":

> **Wave does not foresee that it will achieve significant revenues at least until the latter part of 2003. Our sales forecast for the year ended December 31, 2003 approximates $5 million in gross margin contribution. However, this forecast is not supported by a backlog of orders at this time, <u>but rather the anticipation that various deals that we are currently pursuing will close</u>.** Wave continues to work towards solidifying strategic alliances with the major personal computer manufacturers to force collaborative efforts to distribute its products to consumers . . .    (Emphasis added.)

¶¶ 9, 34.  It is against this backdrop of Defendants' promise of revenue producing deals that

Defendants' Class Period statements must be viewed.

     C.     <u>Defendants' Fraudulent Statements</u>

     At the start of the Class Period, in apparent fulfillment of Defendants' touted anticipation

of revenue growth, and the fruition of the "various deals" the Company was pursuing, Wave

announced a licensing agreement with Intel Corporation which purportedly "enabl[ed] Intel to

bundle Wave's software and services with a future Intel desktop motherboard, targeted for

trusted computing platforms." ¶ 36.  A senior vice president, Global Business Development at

Wave stated: "Wave has been working closely with Intel on the development of application and

service solutions. . . .  We are delighted to be working with Intel by providing solutions for this

emerging market."  <u>Id.</u>  The Intel announcement was followed soon thereafter by an

announcement on August 4, 2003 that Wave had entered into a purported partnership with IBM.

¶¶ 10, 36, 42. The timing of these statements is significant, as both statements were made prior to Wave's scheduled August 4, 2003 shareholders meeting, in which shareholders were to vote on allowing the float of additional shares to cover any conversion of the Series H Stock to the Company's common shares.[4]  In addition, the preferred stock was convertible to Class A Common Stock at the option of the shareholder at an initial conversion price of $0.76 per share on the first trading day following Wave's annual stockholders' meeting. ¶ 33.

Defendants continued to mislead the market concerning the true nature of Wave's business relationships with Intel and IBM following the July 31st and August 4th announcements.  On August 5, 2003, as reported in the *New York Times,* John Callahan, a Wave spokesman, said IBM computers with built-in Wave security would be available in the fourth quarter of this year. ¶ 45. Also on August 5, 2003, *Financial Wire* reported "Yesterday the company fueled the fire with an announcement it had agreed with IBM to offer Wave's security software as an option for IBM notebook and desktop computers.  The company is up over five times its starting price, and the volume is some 100 times the average, which was close to zero."

---

[4]  However, Defendants' scheme to avoid the oppressive terms of the Series H Placement through the conversion of the preferred stock to Class A Common Stock was stalled by the SEC. On August 7, 2003, *Financial Wire* reported that the SEC had "put the brakes on the company's proposal to ask for shareholders to authorize an increase of the company's float from 75 million shares to 120 million shares, necessary to keep it in business until the new promises can come to fruition." The shareholders vote had been scheduled for August 4, 2003. ¶ 53. A shareholder vote was necessary to authorize the Company's issuance of additional shares of Class A Common Stock, above its current float, that would be required in the event the Series H shares became convertible to Class A Common Stock. Id. Shareholder authorization was required under NASDAQ rules because the number of additional shares needed exceeded 19.99% of shares outstanding ("ShareCap") prior to the April 30, 2003 close of the Placement. Id. Without the shareholders approval, Wave would have been obligated to redeem the Class A Common Stock issuable upon conversion or exercise of the Series H securities in excess of 10,355,865 shares, to comply with NASDAQ listing requirements. Id.

¶ 46.  Earlier in the trading session on August 5, 2003, Wave's stock hit a 52-week high of $5.24 per share, closing at $4.53 per share that day on heavy volume, with more than 40 million shares changing hands.  ¶ 47.  In less than a week, Wave's common stock had increased in price by more than 400%.  Id.

Further, on August 11, 2003, in the Company's Form S-3/A filed with the SEC relating to the registration of 1,700,000 shares of Class A Common Stock, Defendants continued to conceal the true nature of its business relationships with Intel and IBM, representing under "Material Changes" that it had an agreement with Intel, where "... Intel will pay a royalty fee to Wave for each unit shipped.  Intel plans to introduce the new motherboard in the fourth quarter of 2003." ¶ 55.  However, having primed the market, Defendants once again omitted the specific terms of the Intel agreement, which terms merely provided Intel with non-exclusive licensing rights to use Wave's products, without any minimum licensing requirement – Intel could choose to use or not use this licensing right.  If the truth concerning the Intel "agreement" had been disclosed by Defendants, investors would have learned that the Intel arrangement was not likely to be a component of the touted "$5 million in gross margin contribution" which Defendants announced immediately prior to the start of the Class Period.  As to IBM, in the same SEC filing, Wave reported its "partnership" with IBM as enabling the Company to "sell and deliver open and interoperable solutions to business customers. . ." Id.  However, contrary to Defendants' representations, the purported Intel and IBM deals were not "material changes" as Defendants knew that the Intel "agreement" would not generate the revenue stream forecast by the Company at any time in the foreseeable future, if ever, and that the IBM relationship was not fee producing.

Even the partial disclosure of the terms of the Intel deal – that it was a non-exclusive licensing agreement with no minimum licensing requirements – by defendant Sprague on an August 14, 2003 conference call did not diffuse, but rather compounded, the initial misrepresentations made by Defendants. During the call, Sprague stated "the market will start generating revenue for us really [at] the end of this year in fourth quarter. . . that this revenue is based primarily on the applications that are bundled with the platform, very much around a relationship that we've announced with Intel and the business model that was articulated in the press release." ¶ 58. Defendant Sprague further represented that on this basis, Wave would reach "cash flow breakeven sometime in 2004," ( ¶ 58), indicating he was comfortable with this statement, and "much more comfortable than perhaps our shareholders can be because it's hard to see the data that we have." ¶ 59. Likewise, any purported clarification of the IBM relationship made by defendant Sprague during the conference call was completely nullified by Defendants' statements made in the Company's August 20, 2003 Form S-3 Registration Statement, under "Material Changes," which not only continued to describe its relationship with IBM as a "partnering" but also claimed it had a non-exclusive "licensing agreement" with IBM. ¶ 63. The same misrepresentations were also made in the Company's August 22, 2003 Prospectus filed with the SEC. ¶ 63.

Throughout the Class Period, Defendants continued to mislead the market by their misrepresentations and omissions concerning the Company's dealings with Intel and IBM ("we expect substantial growth in volumes over the next four quarters" (¶ 68), until their scheme unraveled at the close of the Class Period on December 18, 2003. On that date, the Company shocked the market by announcing that the SEC had begun a formal investigation of Wave

relating to statements made in and around August 2003, and trading in the Company's stock which occurred around that time. News of the investigation caused Wave's stock price to drop, falling 17.13%, or $0.31 per share, to close at $1.50 per share on extremely high volume on December 19, 2003.

## ARGUMENT

### I.    STANDARDS OF REVIEW

#### A.    Standard Of Review On A Motion To Dismiss

On a motion to dismiss, the court "must accept the allegations of the complaint as true," Vartanian v. Monsanto Co., 14 F.3d 697, 700 (1st Cir. 1994), and "must draw all reasonable inferences from the particular allegations in the plaintiff's favor." Aldridge v. A.T. Cross Corp., 284 F.3d 72, 78 (1st Cir. 2002). A court may grant dismissal only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Roeder v. Alpha Industries., Inc., 814 F.2d 22, 25 (1st Cir. 1987). The proper standard is whether "the complaint as a whole is sufficiently particular" to pass muster. In re Cabletron Systems, Inc., 311 F.3d 11, 32 (1st Cir. 2002).[5]

#### B.    Standards For Section 10(b) And Rule 10b-5 Liability And The PSLRA

---

[5] As emphasized by the Ninth Circuit in No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. West Holding Corp., 320 F.3d 920, 946 (9th Cir. 2003), cert. denied, 540 U.S. 966 (2003):

> In this era of corporate scandal, when insiders manipulate the market with the complicity of lawyers and accountants, we are cautious to raise the bar of the PSLRA any higher than that which is required under its mandates. The District Court's failure to accept plaintiffs' allegations as true and construe them in the light most favorable to plaintiffs does just that.

To state a claim under §10(b) and SEC Rule 10b-5, plaintiffs must show that defendants (1) made a materially false or misleading statement or omitted to state a material fact necessary to make a statement not misleading; (2) with scienter; (3) that either plaintiffs or the market relied on the misrepresentation or omission; and (4) resultant injury. Shaw v. Digital Equip. Corp., 82 F.3d 1194 at 1216-17 (1st Cir. 1996).

Under Fed. R. Civ. P. 9(b) and the Private Securities Litigation Reform Act ("PSLRA"), plaintiffs must identify "each statement alleged to have been misleading," "the reason or reasons why the statement is misleading," and state "with particularity all facts on which [plaintiffs' information and belief] is based." 15 U.S.C. §78u-4(b)(1)(B); see Aldridge v. A.T. Cross Corp., 284 F.3d 72, 78 (1st Cir. 2002) (plaintiff must set forth "each allegedly misleading statement or omission, including its time, place and content", and facts to show why the statements and omissions were misleading) (citation and internal quotations omitted). In addition, plaintiffs must allege sufficient facts to show that the inferences of scienter "are both reasonable and strong." Aldridge, 284 F.3d at 78 (citation omitted).[6] The Complaint clearly satisfies these standards.

## II. DEFENDANTS' MISREPRESENTATIONS AND OMISSIONS OF MATERIAL FACT

As detailed in the well-pled allegations of the Complaint, Plaintiffs have set forth the Defendants' fraudulent scheme in detail, e.g., describing how, with the survival of the Company

---

[6] The First Circuit has emphasized that the PSLRA requirements "do not change the standard of review for a motion to dismiss," as "[e]ven under the PSLRA, the district court, on a motion to dismiss, must draw all reasonable inferences from the particular allegations in the plaintiff's favor, while at the same time requiring the plaintiff to show a strong inference of scienter." Aldridge, 284 F.3d at 78.

in the balance, Defendants primed the market to anticipate a significant revenue stream from its
developing relationships with leading PC manufacturers (¶¶ 8, 9, 26, 34), and how Defendants –
with full knowledge of the context in which such announcements would be understood by
investors – announced that Wave had "agreements" with Intel and IBM but failed to disclose the
full terms of these arrangements. ¶¶ 36, 42.  The Complaint sets forth the statements from
Wave's press releases and SEC filings alleged to be false and misleading (¶¶ 36, 42, 45, 55, 59,
61, 62, 63, 68), when and where each statement was made (Id.), and the identity of the speaker
wherever applicable. ¶¶ 26, 36, 58, 59.[7]  As required by Rule 9(b) and the PSLRA, detailed
paragraphs set forth the specific reasons each statement alleged is false and misleading.  ¶¶ 40,
41, 48, 56, 60, 64, 68.

Nothing more is required under Rule 9(b) and the PSLRA, especially before discovery
has commenced.  See Cabletron, 311 F.3d at 33 (noting that a pre-discovery motion to dismiss
should be scrutinized less stringently than a post-discovery motion); see also Shaw, 82 F.3d at
1225 (1st Cir. 1996) (plaintiffs are not required "to plead fraud with complete insight").  The
primary purpose of the particularity pleading requirements is to put defendants sufficiently on
notice of the allegations against them.  See, e.g., In re Lotus Dev. Corp. Sec. Litig., 875 F. Supp.
48, 51 (D. Mass. 1995) (holding that the purpose of Rule 9(b)'s pleading requirements are to
place defendant on notice and safeguard defendants from unfounded claims and strike suits).
Here, Defendants are sufficiently on notice of the gravamen of Plaintiffs' claims and the

---

[7]   Additionally, defendants Sprague and Feeney signed many of the Company's SEC filings.
Specifically, both Individual Defendants signed the following filings: Form 10-K/A  filed 6/30/03
(¶ 8); Form  S-3/A filed 8/11/03 (¶ 55; Def. App. Exh. 2); and Form S-3, filed 8/20/03 (¶ 62; Def.
App. Exh. 3).   Defendant Sprague signed Wave's Form 8-K filed 9/16/03 (¶ 65), and defendant
Feeney signed the Company's Definitive Proxy Statement filed 8/8/03.  ¶ 54.

particular allegations that support those claims, as evidenced by their ability to file detailed responses addressing each of the allegations in the Complaint.

### A.    Defendants' Materially False And Misleading Statements Are Actionable

As set forth in the Statement of Facts, <u>supra</u>, the Complaint alleges that Defendants issued a number of materially false and misleading statements regarding the Company's business relationships with PC industry giants Intel and IBM, which purposefully precluded an investor's clear understanding of the potential revenue stream these purported relationships would generate for the flagging Company.  Each of these challenged statements is actionable under Section 10(b) of the Exchange Act and Rule 10b-5.

In the face of the Complaint's clear allegations regarding Defendants' false and misleading statements, Defendants contend that their statements contained in the July 31, 2003 and August 4, 2003 press releases[8] announcing the Intel and IBM agreements were "accurate," and did not represent specifically that the deals would produce revenue for the Company, and that Defendants cannot be held liable for investor speculation as to the value of these agreements. Def. Br. at 2, 7, 13, 14.[9]  However, for Defendants to prevail on their arguments, this Court

---

[8] Defendants attempt, without authority, to narrow the Court's inquiry by focusing on the July 31st and August 4th press releases.  Def. Br. at 2.  However, as detailed in the Complaint, Plaintiffs' claims are not limited to these misrepresentations.

[9] Interestingly, Defendants cite the Company's August 20, 2003 Form S-3 as support for the proposition that no misleading information was provided concerning IBM.  Def. Br. at 7.  However, it is in this filing that the Defendants make the most blatant misrepresentation, describing Wave's relationship with IBM as a non-exclusive "license agreement."  <u>Id.</u>

00004323.WPD ; 1                    15

would be required to view their misleading statements in a vacuum, contrary to settled precedent of this Circuit. Notably, Defendants do not contest Plaintiffs' allegations that material terms to the Intel and IBM deals were omitted from the July 31st and August 4th press releases, nor do they refute that they issued pre-Class Period statements projecting a revenue stream of "$5 million" by the end of 2003.

### B.   Defendants' Failure To Disclose The Material Terms

"When a corporation does make a disclosure – whether it be voluntary or required – there is a duty to make it complete and accurate." Roeder, 814 F.2d at 26; accord Gross v. Summa Four, 93 F.3d 987, 992 (1st Cir. 1996); In re Biogen Sec. Litig., 179 F.R.D. 25, 34 (D. Mass. 1997). Although the duty to disclose does not require the disclosure of all other facts "that, too, would be interesting, market-wise," the duty does require the disclosure of facts "that are needed so that what was revealed would not be 'so incomplete as to mislead.'" Backman v. Polaroid Corp., 910 F.2d 10, 16 (1st Cir. 1990); accord Gross, 93 F.3d at 992.

Because some statements, "although literally accurate, can become, through their context and manner of presentation, devices which mislead investors," "the disclosure required by securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers." Lucia v. Prospect St. High Income Portfolio, 36 F.3d 170, 175 (1st Cir. 1994); accord Biogen, 179 F.R.D. at 34-35.[10] A fact is material if it is

---

[10]   Moreover, "[w]hether a statement is misleading and whether adverse facts are adequately disclosed are generally questions that should be left to the trier of fact." In re PLC Sys., Inc. Sec. Litig., 41 F. Supp. 2d 106, 116 (D. Mass. 1999) (citing Fecht v. Price Co., 70 F.3d 1078, 1081 (9th Cir. 1995), cert. denied, 517 U.S. 1136 (1996)). "Only if 'reasonable minds' could not disagree that the challenged statements were not misleading should the district court dismiss under 12(b)(6)." PLC, 41 F. Supp. 2d at 116 (quoting Warshaw v. Xoma Corp., 74 F.3d 955, 959 (9th Cir. 1996)).

substantially likely "that the disclosure of the omitted fact would have been viewed by the

reasonable investor as having significantly altered the 'total mix' of information made available."

Basic Inc. v. Levinson, 485 U.S. 224, 231-32 (1988) on remand, 871 F.2d 562 (6th Cir. 1989);

see also Ansin v. River Oaks Furniture, 105 F.3d 745, 754 (1st Cir. 1997), cert. denied, 522 U.S.

818 (1997) (information is material if "there is a reasonable likelihood that a reasonable investor

would consider it important").

Drawing all reasonable inferences from the particular allegations in Plaintiffs' favor,

Aldridge, 284 F.3d at 78,  it is substantially likely that the reasonable investor would view the

omitted terms to the announced Intel and IBM "agreements" – that the Intel agreement was a

non-exclusive licensing agreement, with no minimum licensing requirement, and that the IBM

"partnership" (which was later described by Defendants as a "licensing" agreement (¶ 62,63))

was in reality not a partnership at all, but rather merely an acknowledgment by IBM that Wave's

software worked on IBM's products – as having altered the "total mix of information" made

available to investors about Wave. Basic, 485 U.S. at 231-32. Indeed, analysts and investors

reasonably viewed the purported deals as the breakthrough revenue earning engines that

Defendants so highly touted immediately prior to the start of the Class Period. ¶¶ 8, 9, 26, 34.

Disclosure of the truth regarding the Company's arrangements with Intel and IBM would

have revealed that the purported deals were not likely to be a component of the anticipated "$5

million in gross margin contribution" that Defendants announced just before the start of the Class

Period, and clearly would have "assumed actual significance in the deliberations of a reasonable

shareholder." Cabletron, 311 F.3d at 34. Through Defendants' omissions, as well as the timing

of the misrepresentations made, Defendants implied that Wave was fulfilling its forecast for an imminent significant revenue stream.

### C.    The Defendants' Statements Were More than Mere "Puffery."

Defendants argue that their statements challenged in the Complaint constitute nothing more than inactionable "puffery," which no reasonable investor would consider in making an investment decision. However, the statements made by the Defendants are not mere "puffery," and had a real and significant impact on the market, and Wave's share price.

In In re Number Nine Visual Tech. Corp. Secs. Litig., 51 F. Supp. 2d 1 (D. Mass. 1999), the Court applied a useful two-step test to determine whether or not a statement is puffery: "first, the court should evaluate whether the statement is so vague, so general, or so loosely optimistic that a reasonable investor would find it unimportant to the total mix of information; second, the court should ask whether the statement was also considered unimportant to the total mix of information by the market as a whole." Id. at 20.[11] If the answer to either of the two questions posed above is negative, the puffery defense should not apply. Id.

Thus, contrary to Defendants' argument, a court should not deem statements to be inactionable puffery solely because it finds such statements to be vague, general, or loosely optimistic. See Def. Br. at 21-23. Rather, as a function of deciding whether the statements *are* too vague or loosely optimistic, the court should *also* inquire as to whether the statement would have been important to a reasonable investor, or to the market as a whole. Here, there is strong

---

[11] Since an evaluation of the defense of "puffing" necessarily turns on whether the statements made were material, such a question should not be judicially answered at this early stage in the proceedings. See Ansin, 105 F.3d at 757. See also In re Vivendi Universal, S.A. Secs. Litig., 2003 U.S. Dist. LEXIS 19431, at **63-64 (S.D.N.Y. Nov. 3, 2003); In re Globalstar Secs. Litig. 2003 U.S. Dist. LEXIS 22496, at **23-24 (S.D.N.Y. December 12, 2003) (same).

evidence that the market did consider Defendants' statements to have altered the total mix of information. Each of Defendants' statements that Plaintiffs identify in the Complaint elicited definite reactions from the marketplace.

For example, after Defendants announced an "agreement" with Intel, and that they were "delighted to be working with Intel," (¶ 36) Wave's stock price rocketed from its previous day close of $0.84 to $2.25 per share, a one day increase of 168%. ¶ 37. Nineteen million shares of Wave's stock were traded after Defendants made this announcement, though Wave's average daily volume to that point was only 199,316 shares. Id. A similar market reaction occurred three days later when Defendants announced Wave's "partnership" with IBM that would "significantly help us in our objective." ¶ 42. After this announcement was made, Wave's share price climbed another $0.77 per share, or 21%, to close at $4.42 on August 4, 2003. ¶¶ 43, 44. The market's response to these statements clearly indicates that these announcements altered the total mix of information, so much so that the value of the stock increased nearly *200%*. See In re Transkaryotic Therapies, Inc. Secs. Litig., 319 F. Supp. 2d 152, 160 (D. Mass. 2004) (that analysts favored defendant's stock over competitor's in middle of race to obtain drug patent was evidence that company's statements altered the total mix of information); accord In re Azurix Corp. Secs. Litig., 198 F. Supp. 2d 862, 886 (S.D. Tex. 2002), aff'd., 332 F.3d 854 (5th Cir. 2003) (where plaintiffs failed to allege that company's optimistic statements caused an increase in the stock value, and where in fact the value decreased, plaintiffs could not show materiality), see also In re Sci. Atlanta, Inc., 239 F. Supp. 2d 1351, 1361 n.6 (N.D. Ga. 2002), aff'd, 374 F.3d 1015 (11th Cir. Ga. 2004) (analyst's reaction to company's statement underscored materiality of statement).

The significance of the omitted terms to the Company's announcements regarding its arrangements with Intel and IBM is not discounted by the fact that Wave's share price did not collapse after the Company's August 14, 2003 conference call. During that conference call, Defendants disclosed for the first time that the "agreement" with Intel was a non-exclusive, no minimum requirement licensing agreement and that the IBM agreement was nothing more than a comment as to Wave software's compatibility with IBM's PC. ¶ 58. However, these partial disclosures did not have a material "corrective effect" on the market, due to the additional misleading statements made by defendant Sprague during the same conference call. Specifically, Sprague stated that the Company would reach revenue breakeven, and that "the market will start generating revenue for us really [at] the end of this year in fourth quarter ... that this revenue is based primarily on the applications that are bundled with the platform, very much around the relationship that we've announced with Intel..." ¶ 58. Sprague further assured that he was comfortable with his forecast, "... much more comfortable, than perhaps our shareholders can be because it's hard to see the data that we have." ¶ 59. Thus, Defendants' concurrent statements negated any impact these partial disclosures could have had, and continued Defendants' misrepresentations as to the significance of the deals, and any imminent revenue stream.

Moreover, the cases Defendants rely on in support of their "puffery" argument are factually distinguishable from the instant matter. For example, in In re Galileo Corp. Shareholders Litig., 127 F. Supp. 2d 251 (D. Mass. 2001), the plaintiffs challenged the defendants' announcement of a distribution agreement with another company. However, the defendants in that case, unlike Defendants here, simultaneously provided detailed terms of the agreement. As the court noted, "The press release was a plain statement of what the Physician

Sales agreement actually provided: the distribution of Leisegang products over five years, with minimum purchase requirements as a condition of Physician Sales' retention of the exclusive right to distribute those products." Id. at 256. As the Company accurately and completely described the agreement, the court found the statement was not actionable. Id. at 267.[12]

In the instant matter, even Defendants concede that the statements they issued contained "much less" detail. See Def. Br. at 23. Indeed, by refusing to disclose that the Intel agreement was a non-exclusive licensing agreement, and that the "partnership" with IBM was nothing more than an assessment of Wave's software compatibility, Defendants' statements omitted crucial details. Unlike in Galileo, investors were not fully informed, and as such, were incapable of recognizing Defendants' statements that Wave would be "providing interoperable solutions to business customers," (¶¶ 55, 61, 62, 63) and that its arrangements with IBM and Intel were "material changes," (Id.) as mere puffery. Thus, Defendants' reliance on Galileo for the proposition that they are shielded from liability by virtue of having made incomplete and vague statements is misplaced. Elkind v. Liggett & Myers, Inc., 635 F.2d 156, 164 (2d Cir. 1980) ("the misleading character of a statement is not changed by its vagueness or ambiguity").

Indeed, courts have found statements that are very similar to the those detailed in the Complaint actionable under the federal securities laws. For example, in In re Allaire Corp. Secs.

---

[12] Defendants fare no better with their other cited authorities. "For example, in Wilkes v. Heritage Bancorp, 1990 WL 263612 (D.Mass. 1990), this Court held that the defendant's general, loosely optimistic statements were not actionable. This holding was particularly sound because, unlike in the instant matter, there was no indication that the company's stock skyrocketed after the vague statements at issue. Thus, there was no objective evidence that anything that the defendants said was considered "important" by reasonable investors or the marketplace. The holdings in Fitzer v. Sec. Dynamics Techs., Inc., 119 F. Supp. 2d 12 (D. Mass. 2000), and In re Humphrey Hospitality Trust Inc. Secs. Litig., 219 F. Supp. 2d 675 (D. Md. 2002), also relied on by Defendants, are distinguishable on the same grounds."

Litig., 224 F. Supp. 2d 319 (D. Mass. 2002), the court reasoned that a defendant's representation that a new product was "fueling growth" was actionable because it was "a precise statement as to the basis for profit growth." Id. at 331-332. The same reasoning applies to Sprague's November 13, 2003 statement that "[w]e can now clearly see the **growing momentum for trusted computing in the marketplace, and we expect substantial growth in volumes over the course of the next four quarters.**"(Emphasis added). ¶ 68. As in Allaire, Sprague's statement is actionable because it was a precise statement as to the basis for Wave's alleged profit growth. Cf. In re V-Mark Software, Sec. Litig., 928 F. Supp. 122 (D. Mass. 1996) (defendants' statements that they would meet analysts' revenue projections, which would have represented the most profitable quarter in the history of the company, were actionable, non-puffery.)

Defendants in the instant matter primed the market by projecting a $5 million gross margin contribution, which would have been the first time in Wave's history that it experienced any substantial revenue; and then insisted throughout the Class Period that they were confident that Wave would meet this projection because of its deals with Intel and IBM.[13]

---

[13] See Virginia Bankshares, Inc. v. Sandberg, 501 U.S. 1083, 1093 (1991) (sustaining actionability of statement that proposed merger was "fair," explaining that "such conclusory terms in a commercial context are reasonably understood to rest on a factual basis that justifies them as accurate, the absence of which renders them misleading"); Novak v. Kasaks, 216 F.3d 300, 315 (2d Cir. 2000), cert. denied, 531 U.S. 1012 (2000) (sustaining actionability of statements that inventory situation was "in good shape" or "under control"); Shapiro v. UJB Fin. Corp., 964 F.2d 272, 281, 282 (3d Cir. 1992) (sustaining actionability of representations that loan portfolio was of "high quality," and that loan loss reserves were "adequate," "conservative," "cautious," "adequately maintained," "strong" and "solid"); In re Sirrom Capital Corp. Secs. Litig., 84 F. Supp. 2d 933, 943 (M.D. Tenn. 1999) (sustaining actionability of statements that "company was well-positioned to produce at least 25% annual growth," "that the balance sheet was as healthy as it had ever been," and "that capital gains would remain more than enough to offset credit losses"); In re MobileMedia Secs. Litig., 28 F. Supp. 2d 901, 927 (D.N.J. 1998) (sustaining actionability of statement that "acquisition will enhance [defendants'] competitive position"); Freedman v. Value Health, Inc., 958 F. Supp. 745, 760 (D. Conn. 1997) (sustaining actionability of statement that company is "thriving business");

As such, it can be inferred that each of Defendants' statements, considered in their proper context, altered the total mix of information that the market relied on in assessing the value of the Company. See Scritchfield v. Paolo, 274 F. Supp. 2d 163, 174 (D.R.I. 2003) ("statements are properly interpreted only by reference to the relevant circumstances that underlie their meaning"). Thus, the Defendants cannot escape liability by claiming that their public statements were mere "puffery."

### III.    PLAINTIFFS PLEAD AN OVERWHELMING INFERENCE OF SCIENTER

The PSLRA requires that plaintiffs in a §10(b) case "state with particularity facts giving rise to a strong inference" of scienter. 15 U.S.C. §78u-4(b)(3)(A); see also Greebel v. FTP Software, Inc., 194 F.3d 185, 195-96 (1st Cir. 1999). Scienter may be demonstrated by "indirect and circumstantial evidence." Id. at 195-97; Cabletron, 311 F.3d at 38. In the First Circuit, scienter may be pled by showing (i) that defendants acted knowingly or with a "high degree of recklessness," Aldridge, 284 F.3d at 82; Cabletron, 311 F.3d at 38-39; or (ii) in the appropriate case, alleging defendants' motive and opportunity to defraud may also suffice. Id. at 39.[14] The First Circuit "has rejected any rigid formula for pleading scienter, preferring to rely on a 'fact-specific approach' that proceeds case by case." Id. Scienter is to be determined by the totality of the circumstances. Id.

---

In re Compaq Sec. Litig., 848 F. Supp. 1307, 1318 (S.D. Tex. 1993) (sustaining actionability of statements that the company was "optimistic" and "believe[s] that 1991 will be another good year").

[14] "The inference of scienter must be reasonable and strong, but need not be irrefutable." Cabletron, 311 F.3d at 38. "Plaintiffs need not foreclose all other characterizations of fact, as the task of weighing contrary accounts is reserved for the fact finder.... The plaintiff must show that his characterization of the events and circumstances as showing scienter is highly likely." Aldridge, 284 F.3d at 82.

Plaintiffs have alleged many facts that, taken individually or together, create an overwhelming inference that Defendants acted knowingly or recklessly in making material misrepresentations and omissions.

### A.    Plaintiffs Plead Defendants' Direct Knowledge

This is the unusual case where Defendants do not, and cannot, contest that they lacked actual knowledge of the undisclosed material facts alleged in the Complaint.  As alleged in the Complaint, Defendants primed the market immediately prior to the statements at issue, by stating that Wave would experience significant revenue growth, based on the completion of anticipated deals that the Company was pursuing.  ¶¶ 26, 34.  Then, on July 31, 2003 and again on August 4, 2003, Defendants announced their highly touted "agreements" with Intel and IBM. ¶¶ 36, 42.  But, Defendants knew full well that these "agreements" did not provide any assurance that IBM and Intel would even use Wave's products, let alone lead to significant revenue for Wave.

Defendants were obviously aware of this information, as evidenced by their partial disclosure of the omitted terms weeks later during the August 14th conference call (¶¶ 58, 59), after Wave's stock price had already skyrocketed and defendants Sprague and Feeney had sold 50% and 20% of their Wave holdings, respectively.  Thus, having known that the "agreements" were not really "agreements" at all, Defendants knowingly issued misleadingly incomplete statements when they made the Intel and IBM announcements -- and again when they portrayed these "agreements" as "material changes" in the Form S-3/A, filed August 11, 2003. ¶ 55.  See, Aldridge, 284 F.3d at 83 ("the fact that the defendants published statements when they knew facts suggesting that the statements were inaccurate or misleadingly incomplete is classic

evidence of scienter"); <u>Transkaryotic</u>, 319 F. Supp. 2d at 162 (that defendants made incomplete

statements with direct knowledge established strong inference of scienter).

Nonetheless, at a minimum, Defendants' failure to inform the market of the true nature of

Wave's relationships with Intel and IBM constituted extreme recklessness. <u>See</u>, <u>e.g.</u>, <u>Gelfer v.

Pegasystems, Inc.</u>, 96 F. Supp. 2d 10, 13 (D. Mass. 2000) (extreme recklessness is defined as an

unreasonable omission, which presents a danger of misleading buyers or sellers, that is either

known to the Defendant or is so obvious the actor must have been aware of it). It should have

been obvious to Defendants that their name-dropping, without telling the whole truth, presented a

danger of misleading the market. The same can be said of Defendants' statements made during

the August 14th conference call (such as "we've been much more comfortable than perhaps our

shareholders can be, because it's hard to see the data we have, but we're very comfortable"

(¶ 59)), in which Defendants recklessly continued to insist that the purported Intel and IBM deals

would allow Wave to meet its income projections.[15]

---

[15] Defendants argue that Plaintiffs have not sufficiently asserted specific allegations of scienter against each Individual Defendant. This is wrong. As explained in the Complaint, at all relevant times, Sprague was Wave's CEO and Feeney was Wave's CFO, and thus, each had immediate access to the information concerning the true nature of Wave's relationships with Intel and IBM. <u>See</u>, <u>e.g.</u> <u>In re: PerkinElmer, Inc. Sec. Litig</u>, 286 F. Supp. 2d 46, 54-55 (D. Mass. 2003)(sufficient allegations of scienter as to CEO and CFO where complaint alleged that both individuals had access to details about company's deals, made misleading statements, or signed financial filings and reports in which misleading statements were contained); <u>see also</u> <u>Cabletron</u>, 311 F.3d 11 at 41 (same).

**B.    Plaintiffs' Motive and Opportunity Allegations Add
To the Strong Inference of Scienter**

Plaintiffs also plead compelling evidence of motive.[16] As noted, Wave was a 16 year old

self-described "development stage company" that had no revenue stream which forced the

Company to raise the majority of its funding through equity offerings. ¶¶ 2, 29.  Immediately

prior to the start of the Class Period, Wave entered into an onerous private equity placement that

provided for dividend payments that Wave could not possibly make, and severely restricted

Wave's ability to raise additional funding through future equity offerings. ¶¶ 30, 31.  As a result,

Wave's very survival, and hence the Individual Defendants' jobs, were dependent on inflating the

Company's common stock price to above $1.90 per share to escape the crippling terms of the

Placement. ¶¶ 5, 32.  See Cabletron, 311 F.3d at 21 (holding that the plaintiffs' motive

allegations constituted "more than the usual concern by executives to improve financial results;

the executives' careers and the very survival of the company were on the line.").  See also

Greebel, 194 F.3d at 196 (holding that court's may consider "motivation of defendants in the

form of saving their salaries or jobs"); Crowell v. Ionics, 343 F. Supp. 2d 1 (D. Mass.

2004)(strong inference of scienter where "potential" motives included increasing price of

company's stock and company's profits, which in turn "presumably" extended individual

defendants' employment").[17]

---

[16] Where, as here, there is strong evidence of Defendants' actual knowledge or reckless misconduct,
separate proof of motive is not even necessary to demonstrate scienter. See, e.g., In re Cendant Corp.
Sec. Litig., 76 F. Supp. 2d 531, 538 (D.N.J. 1999).

[17] Defendants' reliance on In re MicroStrategy Inc. Secs. Litig., 115 F. Supp. 2d 620 (E.D. Va. 2000)
for the proposition that "generic motives to raise capital and ensure corporate success do not raise
a strong inference of scienter," (Def. Br. at 37) is misplaced.  As pled in great detail, Plaintiffs have
alleged Defendants were not merely motivated to raise capital to ensure Wave's success, but, rather,

In addition, Plaintiffs' allegations concerning Sprague and Feeney's sales of approximately $1 million in Wave common stock in the days immediately following the second of the Company's twin announcements (¶¶ 49, 50), at a minimum, add to the already strong inference of scienter.[18] This Circuit does not apply a bright line test defining how many shares must be sold, when they must be sold, or in what pattern they must be sold in to find an inference of scienter. Rather, "Stock sales by insiders can supply evidence of scienter. The vitality of the inference to be drawn depends on the facts, and can range from marginal to strong." Cabletron, 311 F.3d at 39-40.

Courts often look for evidence of "unusual trading or trading at suspicious times or in suspicious amounts" in determining whether insider sales provide an inference of scienter. Greebel, 194 F.3d at 197. Here, both the timing and amount of the stock sold by defendants Feeney and Sprague raise suspicions and, thus, together with Plaintiffs' other scienter allegations, support a strong inference of scienter. See Friedberg v. Discreet Logic, 959 F. Supp. 42, 51 (D. Mass. 1997)(insiders' sales of shares immediately prior to release of negative information, selling 33% and 50% of their respective holdings is strong circumstantial evidence of scienter); In re Terayon Communs. Sys., 2002 U.S. Dist. LEXIS 5502, at *40 (N.D. Cal. Mar. 29, 2002)(stock sales on heels of false statement contributed to finding of scienter); In re Secure Computing Corp., 184 F. Supp. 2d 980, 989-90 (N.D. Cal. 2001)(holding sales by individual defendants

---

were motivated to artificially inflate the Company's share price to ensure the Company's very survival.

[18]  Insider sales, upon which Defendants focus much of their scienter argument, are not even necessary to plead motive, much less scienter. See Aldridge, 284 F.3d at 84 (motive and scienter established where no insider trading occurred); see also Crowell, 343 F. Supp. 2d at 15 (same).

were suspicious because they occurred on same days and almost immediately after defendants'

statements that Secure was on track to meet its financial goals and several weeks prior to end-of-

Class Period disclosure of failure to meet those goals).[19]

## IV.    NEITHER THE PSLRA SAFE HARBOR PROVISIONS NOR THE BESPEAKS CAUTION DOCTRINE IMMUNIZE DEFENDANTS' MATERIALLY MISLEADING STATEMENTS

Defendants argue that statements made in Wave's press releases, investor conference

calls and SEC filings regarding the Company's business relationships with Intel and IBM as well

as expected revenues, which Plaintiffs allege were materially false and misleading when made,

are protected by the "safe harbor" provisions of the PSLRA. Def. Br. at 14-18. The PSLRA

provides that a "forward-looking statement," when identified as such, may be non-actionable if

accompanied by "meaningful cautionary statements identifying important factors that could cause

actual results to differ materially from those in the forward-looking statement," or if plaintiff fails

to plead it was made with "actual knowledge ... that the statement was false and misleading." 15

U.S.C. §§77z-2(c)(1), 78u-5(c)(1).  Contrary to Defendants' argument, the alleged

misrepresentations and omissions (i) were not forward-looking statements, (ii) were not

accompanied by sufficient cautionary language for "safe harbor" protection, and (iii) were

---

[19]  See also Shaw, 82 F.3d at 1224 (insiders' sales of 68% and 20% percent of their  respective holdings provided evidentiary support for plaintiff's claim); Schlagel v. Learning Tree Int'l., 1998 U.S. Dist. LEXIS 20306 at *32 (C.D. Cal. Dec. 23, 1998)("where stock sales occurred on the heels of optimistic statements, this constitutes circumstantial evidence that statements were fraudulent when made"); Stevelman v. Alias Research Inc., 174 F.3d 79, 85 (2d Cir. Conn. 1999)(where one insider sold 40% of his shares, and others sold similarly significant blocks of shares on heels of optimistic statements, insider trading was considered unusual); In re SmarTalk Teleservices, Inc. Sec. Litig., 124 F. Supp. 2d 527, 543 (S.D. Ohio 2000)(insiders who sold 40%, 37%, 27% and 11% of their shares sold significant enough amounts of shares to be considered unusual).

disseminated by defendants with actual knowledge that the statements and omissions were false or misleading when made.

Simply because a statement touches upon a company's future performance does not make it a forward-looking statement under the PSLRA. See In re Boeing Sec. Litig., 40 F. Supp. 2d 1160, 1169 (W.D. Wash. 1998). The "safe harbor" defense is unavailable where, as here, "the plaintiffs challenge the truthfulness of a claim regarding present facts as opposed to forward-looking statements." Number Nine, 51 F. Supp. 2d at 19; Shaw, 82 F.3d at 1210; Allaire, 224 F. Supp. 2d at 336 (statement that "sales were expected to continue to grow earnings throughout the year [was] allegedly false because the Defendants already knew that Spectra demand had significantly fallen off because of the product's defects," and "is the classic type of statement that requires full disclosure to avoid being misleading."); In re MobileMedia Secs. Litig., 28 F. Supp. 2d 901, 930 (D.N.J. 1998) ("Allegations based upon omissions of existing facts or circumstances do not constitute forward looking statements protected by the safe harbor"); In re Nortel Networks Corp. Sec. Litig., 238 F. Supp. 2d 613, 627-29 (S.D.N.Y. 2003) ("No degree of cautionary language will protect material misrepresentations or missions where defendants knew their statements were false when made.") (citation omitted).

As noted, Plaintiffs allege that Defendants misrepresented the Company's "agreements" with Intel and IBM, omitting material, key facts as to the terms of the purported agreements. Specifically, the omitted facts would have revealed to the investing public that Intel's non-exclusive, no minimum licensing requirement agreement did not demonstrate that Intel had decided to do business with Wave, which was implicit in Defendants' statements. Moreover, as Wave's announced "partnership" with IBM was nothing more than a comment on the Company's

software compatibility, Defendants completely misled the market as to the true non-revenue

producing nature of Wave's relationship with IBM.  Thus, these statements were false or

misleading <u>when made</u>.  Because they omitted then-existing, material facts, under the above-

cited cases, they are not protected by the safe harbor.  <u>See also</u> <u>Irvine v. ImClone Sys.</u>, 2003 U.S.

Dist. LEXIS 9342, at *3-4 (S.D.N.Y. June 3, 2003) (holding that defendants' alleged

misrepresentations concerning the current status of clinical studies and the FDA approval process

were not forward-looking statements).

> **B.     Any Alleged Misrepresentations That Could be Construed As Forward-Looking Are, Nonetheless, Not Protected By The <u>PSLRA's Safe Harbor Provisions</u>**

To the extent any of the omissions or misstatements can be deemed forward-looking, they

do not qualify for the safe harbor since such omissions and statements lacked meaningful

cautionary language, and were made with actual knowledge.  15 U.S.C. §§77z-2(c)(1), 78u-

5(c)(1).

> **1.     Defendants' Boilerplate Risk Factors Failed To Disclose The Negative <u>Existing Facts Concerning Wave's Relationships With Intel And IBM</u>**

Defendants' reliance on boilerplate cautionary statements in their SEC filings, press

releases and conference calls, is insufficient.  As the Court stated in <u>In re Amylin Pharms., Inc.</u>

<u>Sec. Litig.</u>, 2003 U.S. Dist. LEXIS 7667, at *20 (S.D. Cal. May 1, 2003) <u>quoting</u> <u>In re Donald J.</u>

<u>Trump Casino Sec. Litig.</u>, 7 F.3d 357, 371-72 (3d Cir. 1993), <u>cert.</u> <u>denied</u>, 510 U.S. 1178 (1994),

"[v]ague or boilerplate disclaimers are insufficient to invoke safe harbor protection....  Rather,

cautionary statements must be 'substantive and tailored to the specific future projections,

estimates or opinions ... which the plaintiffs challenge.'" <u>See</u> <u>Shaw</u>, 82 F.3d at 1214 (rejecting

"bespeaks caution" argument, citing <u>Fecht</u>, 70 F.3d at 1082 (doctrine applicable "only when

[defendants] include enough cautionary language or risk disclosure ... that 'reasonable minds'

could not disagree that the challenged statements were not misleading.")); <u>In re Viropharma, Inc.</u>

<u>Sec. Litig.</u>, 2003 U.S. Dist. LEXIS 5623 at *27-28 (E.D. Pa. Apr. 3, 2003) ("Meaningful

cautionary language must be substantive and tailored to the specific predictions made in the

allegedly misleading statement"); <u>Rubinstein v. Collins</u>, 20 F.3d 160, 167-68 ("[C]autionary

language is not necessarily sufficient, in and of itself, to render predictive statements immaterial

as a matter of law.... The appropriate inquiry is whether, under all the circumstances, the omitted

fact or the prediction without a reasonable basis 'is one [that] a reasonable investor would

consider significant in [making] the decision to invest, such that it alters the total mix of

information available about the proposed investment.'... [C]autionary language as such is not per

se dispositive of this inquiry."). Cautionary language must truthfully address specific risks, must

exhaust the capacity of the positive false statements to mislead investors, *and* must disclose, as

defendants failed to do here, then-existing adverse facts. <u>See</u> <u>Virginia Bankshares, Inc. v.</u>

<u>Sandberg</u>, 501 U.S. 1083, 1097 (1991) (cautionary statement must discredit alleged

misrepresentations to such an extent that "the risk of real deception drops to nil.").

The "cautionary statements" in Wave's SEC filings, similar to the cautionary statements

included with the Company's press releases and conference calls (Def. Br. at 16-17), consist of

only generic statements such as: "These statements and projections about the future involve risks

and uncertainties. As a result, we may not be able to accurately predict the future and our actual

results may turn out to be materially different from what we anticipate and discuss in this

prospectus. In addition, we operate in an industry segment where securities prices may fluctuate

dramatically and may be influenced by regulatory and other factors beyond our control." Def. Br. at 17. Even if Defendants' alleged misrepresentations could be characterized as forward-looking, these generalized, boilerplate statements of possible risks, which would apply to any company, failed to inform the market about the significant, specific risk that the Intel and IBM arrangements would not produce any revenues for the Company, evident by the terms of the Intel agreement, and the lack of any true agreement regarding IBM. Defendants' bland cautionary statements were meaningless, in light of the undisclosed terms of the arrangements with Intel and IBM.[20]

### 2. Defendants' Statements Concerning Intel and IBM Agreements and Prospects for Revenue Stream Were Made With Actual Knowledge of the Undisclosed Adverse Facts

Even assuming that any of the statements challenged by Plaintiffs were forward-looking, they are not protected from liability as Defendants made them with actual knowledge of the alleged undisclosed facts. See Helwig, 251 F.3d at 556-68; Amylin II, at *23 n.3 ("If a defendant states that it believes or expects that the FDA will approve its drug but has information tending to seriously undermine the accuracy of its statement, the statement is actionable"); Viropharma, at *27-28 n.14; see also Allaire, 224 F. Supp. 2d at 335-36 (predictive statement about growth,

---

[20] See Helwig v. Vencor, Inc., 251 F.3d 540, 561-62 (6th Cir. 2001) (cautionary statements that defendants could not predict the effect of any proposed legislation held insufficient to warn investors about the consequences of Balanced Budget Act, then pending before Congress, on Vencor's business); In re Indep. Energy Holdings PLC Sec. Litig., 154 F. Supp. 2d 741, 755 ("the cautionary language [must] 'warn investors of exactly the risk that plaintiffs claim was not disclosed.' ... '[W]arnings of specific risks ... do not shelter defendants from liability if they fail to disclose hard facts critical to appreciating the magnitude of the risks described.'") (citations omitted); Danis v. USN Communs. Inc., 73 F. Supp. 2d 923, 934 (N.D. Ill. 1999) ("[t]he language cited by defendants may have cautioned against potential risks ... [h]owever, these are simply not the problems alleged").

where defendants alleged to have already known demand had decreased, was "classic" actionable statement).

## V.     THE COMPLAINT SUFFICIENTLY PLEADS CONTROL PERSON LIABILITY

Section 20(a) of the Exchange Act provides that "every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person." 15 U.S.C. § 78t(a). Having sufficiently alleged primary violations of Section 10(b) against Wave and the Individual Defendants, the Individual Defendants as control persons of Wave are also liable under Section 20(a). The First Circuit does not require that Plaintiffs establish that the control person culpably participated in the misconduct alleged, only that the defendant exercised control over the company. Aldridge, 284 F.3d at 85. Ultimately the issue of control is a question of fact not ordinarily ripe for resolution at the pleading stage. Cabletron, 311 F.3d at 41. See also America West Holding Corp., 320 F.3d at 945 (holding that whether or not a person is a control person is an intensely factual question). "To survive a motion to dismiss, a plaintiff need only plead facts supporting a reasonable inference of control." Gabriel Capital, L.P. v. NatWest Fin., Inc., 122 F. Supp. 2d 407, 426 (S.D.N.Y. 2000).

Clearly, the allegations regarding defendants Sprague and Feeney's senior management positions at the Company (¶¶ 20, 21), their signatures on the Company's SEC filings (i.e.,¶ 27), and their statements on behalf of the Company in Wave's press releases (¶¶ 58, 59, 68), sufficiently demonstrate that these individual defendants had the ability to and did exercise control over Wave.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss should be denied in its entirety, or in the event the Court identifies any pleading deficiencies in the Complaint, Plaintiffs should be granted leave to amend pursuant to Fed. R. Civ. P. 15(a).

DATED: March 4, 2005                          Respectfully submitted,

                                              /s/David Pastor
                                              David Pastor (BBO #391000)
                                              GILMAN AND PASTOR, LLP
                                              Stonehill Corporate Center
                                              999 Broadway, Suite 500
                                              Saugus, Massachusetts 01906
                                              Telephone: 781/231-7850
                                              781/231-7840 (fax)

                                              Plaintiffs' Liaison Counsel

                                              Marc I. Willner
                                              Karen E. Reilly
                                              Todd M. Mosser
                                              SCHIFFRIN & BARROWAY, LLP
                                              280 King of Prussia Road
                                              Radnor, PA 19087
                                              Telephone: 610/667-7706
                                              610/667-7056 (fax)

                                              Plaintiffs' Lead Counsel

00004323.WPD ; 1                          34