## UNITED STATES DISTRICT COURT
### DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| ANNE BRUMBAUGH, GARY L. HARMON and RANDY K. GRIFFIN,<br><br>Plaintiffs,<br><br>v.<br><br>WAVE SYSTEMS CORPORATION, JOHN E. BAGALAY, JR., STEVEN K. SPRAGUE and GERARD T. FEENEY,<br><br>Defendants. | CIVIL ACTION<br>NO. 04-30022-MAP |

## DEFENDANTS' *UNOPPOSED* MOTION
## FOR LEAVE TO FILE SUPPLEMENTAL AUTHORITY

Pursuant to Local Rule 7.1(b)(3), Defendants Wave Systems Corporation, John E. Bagalay, Jr., Steven K. Sprague and Gerard T. Feeney (collectively, the "Defendants") respectfully submit this Motion For Leave To File Supplemental Authority ("Motion"). The Plaintiffs do not oppose the filing of this Motion and Defendants do not oppose the Plaintiffs' having opportunity to respond limited to the issues raised herein. Plaintiffs' counsel has indicated an intent to file a timely response. As grounds for this Motion, the Defendants state as follows:

1.      The Court heard oral argument on Defendants' Motion To Dismiss on March 30, 2005.

2.      Following oral argument, the United States District Court for the District of Massachusetts, O'Toole, J., issued a written decision dismissing a securities class action in the

case *In re Credit Suisse First Boston Corp.*, Civ. A. No. 02-12056-GAO, Slip op. March 31, 2005 ("*Credit Suisse*"). A copy of the opinion is attached hereto as Exhibit A.

3.      In *Credit Suisse*, the Court held that certain statements were not actionable because the Plaintiffs "have not adequately pled either that the [statements] were material in the necessary sense -- that they 'significantly altered the 'total mix' of information available to the market . . . or that the [statements] actually caused the price of Agilent stock to be artificially inflated." Slip op. at 17. The Court's decision rested on the fact that "the allegations of the consolidated amended complaint do not sufficiently allege facts to support an inference that the misleading [statements] had any effect on the price of Agilent stock" because after the statements were made, the stock price did not inflate in price. Slip op. at 16.

4.      This holding is further grounds for dismissal of Plaintiffs' claims in this case:

- First, it further supports the conclusion that the alleged omissions concerning the Intel and IBM business developments were not material, because the market price did not decline after the information that Plaintiffs claim was omitted was in fact disclosed on August 14, 2003.

- Second, it is particularly instructive on why Plaintiffs' claims about the August 20 reference to an IBM "licensing agreement" should be dismissed. That reference was not material in the "total mix" of information and Plaintiffs have failed to allege that the reference significantly altered the total mix of information -- following the August 4 press release itself and Mr. Sprague's statements on August 14. *See* August 4, 2003 Release ("Wave Systems Corp. today announced that the new Document Manager Vault and SmartSignature security software applications in Wave's EMBASSY® Trust

Suite client software family **work with** the IBM Embedded Security

Subsystem"); August 4, 2003 Release ("**The compatibility** of Wave's

security software applications with IBM's hardware and software …");

August 14, 2003 Investor Call ("In the case of IBM, it's an Independent

Software Vendor program where what we have done is certify. They've taken

our software, tested it, said **yes, this does what it says it does**. It uses a TPM

property. **It works with the IBM platform**.")

*Moreover, after the August 20, 2003 "licensing agreement" reference, Wave's*

*stock price did not increase.* It declined. *See* Defendants' Appendix of

Exhibits cited in Defendants' Reply Memorandum, Tab 2. Wave's stock price

closed at $3.17 (8/19), $3.06 (8/20) and $2.85 (8/21). For the rest of the

month, it fluctuated between $2.88 and $3.06. It did *not* rise after the

"licensing agreement" reference and the reference cannot be material as a

matter of law.

5.    In light of the stock price *decline* following, as in *Credit Suisse*, the Plaintiffs here

"have failed to allege inflation causation" and the claims should be dismissed. Slip. op. at 16.

**WHEREFORE**, Defendants request that their Motion For Leave To File Supplemental

Authority be granted.

Respectfully submitted,

**JOHN E. BAGALAY, JR., STEVEN SPRAGUE, GERALD T. FEENEY, AND DEFENDANT WAVE SYSTEMS CORP.**

By its attorneys,

/s/ Michael D. Blanchard
Robert A. Buhlman, BBO #554393
Michael D. Blanchard, BBO #636860
BINGHAM McCUTCHEN LLP
150 Federal Street
Boston, MA 02110

Dated: April 5, 2005

## RULE 7.1(a)(2) CERTIFICATION

I, Michael D. Blanchard, hereby certify that counsel for Defendants conferred with counsel for Plaintiffs in good faith to resolve or narrow the issues presented in this motion, and the Plaintiffs' counsel do not oppose the filing of this motion.

/s/ Michael D. Blanchard
Michael D. Blanchard

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon each attorney of record electronically on April 5, 2005.

/s/ Michael D. Blanchard
Michael D. Blanchard

# EXHIBIT A

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 02-12056-GAO

IN RE CREDIT SUISSE FIRST BOSTON CORP.
(AGILENT TECHNOLOGIES, INC.)
ANALYST REPORTS SECURITIES LITIGATION

MEMORANDUM AND ORDER
March 31, 2005

O'TOOLE, D.J.

This is a putative class action for violations of sections 10(b) and 20(a) of the Securities

Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10b-5,

17 C.F.R. 240.10b-5, brought against Credit Suisse First Boston LLC ("CSFB") and former CSFB

employees Elliott Rogers and Frank Quattrone on behalf of persons who purchased stock in Agilent

Technologies, Inc. ("Agilent") during the period December 13, 1999 through February 20, 2001.

CSFB and Rogers move to dismiss the consolidated amended complaint on four grounds: (1) failure

to sufficiently allege any false or misleading statements; (2) failure to sufficiently allege scienter;

(3) failure to commence the action timely; and (4) failure to allege loss causation. Quattrone

separately moves to dismiss the consolidated amended complaint against him for these same reasons

and also for failure to state a claim for "control person" liability under section 20(a) of the Exchange

Act. As the plaintiffs have done in their opposition brief, I will treat the two motions together.

I.     **Summary of Alleged Facts**

The consolidated amended complaint alleges the following facts, assumed to be true for present purposes:

CSFB is a global investment bank whose business includes securities underwriting, sales and trading, investment banking, private equity, financial advisory services, investment research, and asset management.  Elliot Rogers was an analyst in CSFB's Global Technology Group who covered Agilent during most of the class period.  Frank P. Quattrone, an investment banker, served as head of the Global Technology Group from the summer of 1998 until February 2003.  CSFB's Global Technology Group was very successful.  In 1999, CSFB managed more U.S. initial public offerings than any other firm, and in 2000 the Global Technology Group accounted for nearly 50% of CSFB's fee revenue from U.S. equity investment banking, or approximately $1 billion.

As head of the Global Technology Group, Quattrone was given complete control over the group's research analysts, including their compensation and in some cases their employment status. Quattrone viewed the relationship between research and banking at CSFB as a partnership where everyone was on "the same team."  Consol. Am. Compl. ¶ 48.  Quattrone used his influence over analysts as a marketing tool to generate investment banking business by assuring clients and potential clients that if they conducted investment banking business with CSFB  he would ensure positive reports from his research analysts.  Analysts who issued negative reports on clients were reprimanded and prevented from working on good assignments.  Quattrone also required each analyst to detail their involvement in banking deals to assist in determining the analyst's compensation.

Agilent was incorporated in May, 1999, as a "spin-off" from Hewlett-Packard Co. Agilent provides enabling solutions to markets within the communications, electronics, life sciences, and chemical analysis industries and consists of three primary businesses: Test and Measurement, Semiconductor Products, and Life Sciences and Chemical Analysis. On November 18, 1999, CSFB helped take Agilent public in what was referred to at the time as "the largest IPO ever to come out of Silicon Valley." Id. ¶ 66. For its role as co-managing underwriters of the IPO, CSFB and CSFB (Europe) Limited were allotted 4,880,000 and 801,600 shares, respectively, out of a total 72 million shares, and received $7,254,240 in underwriting fees from Agilent. On the first day of trading, Agilent stock rose from an initial price of $30 per share to close at $44 per share.

On December 13, 1999, the beginning of the class period, CSFB initiated research coverage of Agilent in a report authored by analysts Elliot Rogers, Shameel Arafin, and Kathryn Buergert that recommended Agilent stock as a "Buy."[1] The report set a twelve-month target price of $55. That day the price of Agilent stock closed at $45.50, up from $44.75 the day before.

---

[1] CSFB maintained a four-tier stock rating system for analyst reports:

> "SB" (strong buy) - Stock is expected to outperform the market significantly over the next 6-12 months and should be bought today;
> "B" (buy) - A good "story"; needs some time to develop but should outperform. Those institutions that require time to build a position should buy the stock today;
> "H" (hold) - Would not buy the stock. Events may not yet be apparent that would make it either a Buy or a Sell; and
> "S" (sell) - Would not buy if not owned and would use as a source of funds if owned; there is nothing to make the stock outperform. If an institution wanted to stay in the same industry group, it would swap out of the stock. Potential negatives are not yet reflected in the stock - if you own it, sell it.

Consol. Am. Compl. ¶ 37. In practice, however, the rating system was a de-facto three-tier system because CSFB would rarely issue "Sell" ratings, especially for current or potential banking clients. "Furthermore, the 'Buy' rating was reserved for banking clients. If a client company was truly a good company it would receive a 'STRONG BUY' instead." Id. ¶ 39.

On February 18, 2000, CSFB issued a second analyst report, drafted by Rogers, Arafin and Buergert, which maintained a "Buy" rating for Agilent. Four days later, on February 22, 2000, Rogers sent an email to Terry Hilliard, Director of Investor Relations at Agilent, in which he stated the following:

> TMO order growth was 6%. Communications test and semi test were highlighted as key growth drivers. One would expect communications to test growth to top 10% (vs. Q4:99). Growth in Teradyne's Q4:99 orders was above 40% sequentially, Credence's Jan:01 orders were up over that amount. Yet Agilent's TMO business only grew 6%, despite two seemingly hot markets. What retarded your growth, or were Communications and Semi test less hot than you let on?

Id. ¶ 75.

Throughout the summer of 2000, CSFB maintained a "Buy" rating on Agilent in analyst reports dated May 19, 2000, July 21, 2000, and August 18, 2000. On August 12, 2000, Rogers received an email from a customer asking him the following question: "What is your latest position on this [Agilent] stock that is now down to original spin-off lows?" Id., Ex. 24. Rogers responded by saying: "Let's see what they announce thurs pm. Hopefully some meaningful restructuring of the two problem divisions. Absent that would not be aggresive [sic] despite the price pullback." Id. That Thursday, August 17, 2000, after the market closed, Agilent reported its third quarter earnings and the next day CSFB issued a report on the stock, drafted by Rogers, which maintained the "Buy" rating. On August 18, 2000, the stock rose to close at $56.375 per share, up from $55.75 the day before. Id. ¶ 82.[2]

CSFB reiterated its "Buy" rating on Agilent in analyst reports dated September 29, 2000, November 21, 2000, and December 6, 2000. The plaintiffs allege that had the market known that

---

[2] So the consolidated amended complaint alleges. Other information in the record suggests that the stock closed at $46.50 the day before. Portnoy Decl., Ex. 10.

4

CSFB's recommendations were not based upon objective analysis, but were inflated in an attempt to gain investment banking business from Agilent, the public's perception of Agilent would have been negatively impacted. In October, 2000, CSFB analyst Tim Mahon described the practice in an email to analyst Bhavin Shah, and copied to Rogers, as follows: "Suggest you ask Elliott about the 'Agilent Two-Step.' That's where in writing you have a buy rating (like we do on CHRT, and thank God it's not a Strong Buy) but verbally everyone knows your position." Id. ¶ 70.

When Agilent revealed on February 21, 2001 that it was reducing its second quarter profit forecast, CSFB issued a report reducing its rating from "Buy" to "Hold." That day, the price of Agilent stock dropped to close at $40.20, down from $44 the day before.

## II.    Liability Under Section 10(b) and Rule 10b-5

### A.    Pleading Standards

The Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4, prescribes the standards for pleading violations of section 10(b) and Rule 10b-5. A plaintiff alleging that a defendant made an untrue statement of material fact, or omitted to state a material fact necessary in order to make the statements made not misleading in the light of the circumstances in which they were made, must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1); see also Aldridge v. A.T. Cross Corp., 284 F.3d 72, 78 (1st Cir. 2002) (The plaintiff "must specify each allegedly misleading statement or omission including its time, place and content . . . [and] must provide factual support for the claim that the statements or omissions were fraudulent, that is, facts that show exactly why the statements or omissions were misleading.") (citations and internal quotations omitted). A particular fact is considered material "if

it is substantially likely that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." In re Cabletron Sys., Inc., 311 F.3d 11, 34 (1st Cir. 2002) (quoting Basic, Inc. v. Levinson, 485 U.S. 224, 231-32 (1988)) (internal citations and quotation marks omitted). The question of the materiality of a statement or omission "should normally be left to a jury rather than resolved by the court on a motion to dismiss." Id.

The PSLRA also requires plaintiffs to state with particularity facts sufficient to raise a "strong" inference of scienter. 15 U.S.C. § 78u-4(b)(2); Greebel v. FTP Software, Inc., 194 F.3d 185, 196 (1st Cir. 1999). Scienter is "a mental state embracing intent to deceive, manipulate, or defraud." Greebel, 194 F.3d at 194 (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n.12 (1976)). Merely pleading motive and opportunity is not sufficient, but with additional factual support, evidence of motive and opportunity may establish a strong inference of scienter. Aldridge, 284 F.3d at 82. "Scienter may be demonstrated by indirect evidence and may extend to a form of extreme recklessness that is closer to a lesser form of intent." In re Cabletron, 311 F.3d at 38 (citations and internal quotations omitted). On a motion to dismiss, the court must draw all reasonable inferences from the allegations in the plaintiffs' favor. Aldridge, 284 F.3d at 78.

B.    The Section 10(b) and Rule 10b-5 Claims Against CSFB and Rogers

In their consolidated amended complaint, the plaintiffs specify the allegedly misleading statements to be the "Buy" ratings CSFB issued in eight research analyst reports on Agilent dated December 13, 1999, February 18, 2000, May 19, 2000, July 21, 2000, August 18, 2000, September 29, 2000, November 21, 2000, and December 6, 2000, five of which were drafted, at least in part, by Rogers. Consolidated Am. Compl. ¶ 89. The plaintiffs allege that all of these analyst reports are misleading because the defendants failed to disclose conflicts of interest which tainted the

"Buy" ratings. Specifically, the defendants did not disclose that the investment bankers at CSFB exercised such influence over the research analysts that the analysts' ratings given to the publicly traded stock of banking clients were purposely inflated to keep the clients happy and did not represent the analysts' true assessments of the companies. Id.

Rating a particular stock as a "Buy" might be a statement of fact if it implicitly conveyed some objective information. Such would be the case, for example, if in order for a stock to earn a "Buy" rating some objectively measurable fact had to be true, such as that the price/earnings ratio was less than 10. The one-word rating could then be understood as simply a shorthand way of stating the underlying proposition. "Buy," translated, would mean, "The price/earnings ratio of this stock is less than 10."

The plaintiffs do not allege that to have been the case here. Rather, they acknowledge that the "Buy" rating was meant as a recommendation, purportedly based on some evaluation by the analysts. It was, in substance, an expression of opinion.

It was a very general and consequently inherently ambiguous opinion, however. The simple word "Buy" taken by itself does not supply much substantive content. Buy at what price? Buy in pursuit of what investment strategy? Buy in combination with what other portfolio holdings?

In the reports in question, "Buy" was the headline, but the story – the bulk of the report – carried more detailed information to assist the reader to an understanding of, and an evaluation of the soundness of, the analysts' recommendation. The initial analyst report, dated December 13, 1999, may be used to illustrate this. In addition to presenting both historical and estimated future financial data, the report summarized Agilent's business divisions and offered an assessment of each,

as well as Agilent as a whole.  As to Agilent's Test and Measurement Organization ("TMO"), the

report said the following:

> **Secular and Cyclical Tailwinds Buttress TMO Outlook** – Broad
> participation in rapid growth communications test, together with
> cyclical rebound in Asia (geographic) and semi test (product), points
> to firming TMO prospects.

As to the Semiconductor Products Group ("SPG") the report said:

> **SPG Enjoying Beneficial Makeover** – Shedding losing product lines
> and excess facilities boosts bottom line, while focus on ASICs and
> communications ICs could add to top line growth going forward.

The report was less positive about the Chemical Analysis Group ("CAG") and the Healthcare

Solutions Group ("HSG"):

> **CAG and HSG: Less Dynamic, With Vibrant Niches** – Both core
> businesses have low growth prospects with new ventures as key
> upside drivers.  Synergies with SPG and TMO are limited.

Broadening the focus to the whole company, the report went on:

> **Spinoff Costs Peak This Fiscal Year** – Estimated at $0.35-0.40 per
> share in F00, costs will begin to abate next year. Together with
> targeted cost-cutting and strong SPG and TMO growth prospects,
> EPS in F01 could prove to be very resilient.

> **Longer Term Valuation Keyed to Management's Initiatives** –
> Steady state management of the business could yield EPS of $1.65 in
> F01. Aggressive portfolio management could accelerate both top and
> bottom line growth, leading to a sharply higher valuation.

The other reports issued in the putative class period were similarly presented, with figures,

projections, and commentary set forth in some detail.  The reports did not give an unelaborated,

black-and-white opinion; there was some color in the palette.  To be sure, the predominant hue was

rosy, but it can hardly be debated that the market of the period in question had gotten quite accustomed to outlooks as seen through a rose-colored lens.

The plaintiffs argue that the full reports should not be the focus of attention, but only the "Buy" rating, because the rating was widely disseminated, whereas the body of the report was available only to those who paid for it. It is an unpersuasive argument. The plaintiffs' theory is "fraud on the market," and it is wholly irrelevant whether any given purchaser of Agilent stock did or did not have access to the full reports, as opposed to the rating only. What matters is the information available to the impersonal "market," which information the market is presumed to have absorbed. Basic, 485 U.S. at 246 ("[T]he market price of shares traded on well-developed markets reflects all publicly available information."); Ockerman v. May Zima & Co., 27 F.3d 1151, 1158 (6th Cir. 1994) ("[I]n a developed market, sophisticated financial professionals can generally be expected to read the publicly available information about a security."). There is no doubt that the full reports were available to the market.

The plaintiffs do not say that the financial information in any of the reports was itself affirmatively false or misleading. Rather, they say that the positive "Buy" ratings were not honestly rendered because the analysts were anxious to give positive ratings so as to please the company and therefore the investment bankers who had some say over the analysts' compensation. In other words, they say that the analysts made a misrepresentation by indicating that a "Buy" rating represented their true opinion, when in fact it did not.

A statement of an opinion may, in some circumstances, be actionable as a misrepresentation under the Exchange Act, including section 10(b), if it can be proved as a fact that the opinion was

not actually held by the person expressing it. See <u>Virginia Bankshares, Inc. v. Sandberg</u>, 501 U.S. 1083, 1095-96 (1991) (applying § 14(a) of the Exchange Act). But the plaintiff in such an action must prove more than simply that the person expressing the opinion did not believe it or that the speaker had an undisclosed motivation to express an opinion not honestly held. <u>Id.</u> at 1096 ("[D]isbelief or undisclosed motivation, standing alone, [is] insufficient to satisfy the element of fact that must be established under § 14(a)."). The stated opinion must not only be subjectively false – the speaker did not believe it – but also objectively false as well – that is, there existed provable facts that conflicted with or contradicted the opinion. In <u>Virginia Bankshares</u>, for example, the directors' opinion that a merger price of $42 was "high" and "fair" was undercut by evidence that the acquired bank's "going concern" valuation exceeded $60 per share. <u>Id.</u> at 1094. The Court noted that "whether $42 was 'high,' and the proposal 'fair' to the minority shareholders, depended on whether provable facts about the Bank's assets, and about actual and potential levels of operation, substantiated a value that was above, below, or more or less at the $42 figure, when assessed in accordance with recognized methods of valuation." <u>Id.</u>

 In this case, the plaintiffs stress the fact, assumed for these purposes to be provable, that the defendants failed to disclose that CSFB analysts, particularly those following Agilent, had a conflict of interest because of their relationship with the investment bankers.[3] But this would simply prove an "undisclosed motivation" to mislead by the ratings, and under <u>Virginia Bankshares</u> that is not enough. What is lacking here are specific allegations of "provable facts" that would support

---

[3] The analyst reports did contain a perfunctory notice that CSFB "may have, within the last three years, served as a manager or co-manager of a public offering of securities for or makes a primary market in issues of any or all of the companies mentioned." For present purposes it is sufficient to say in the plaintiffs' favor that a fact finder could conclude that such a statement did not adequately disclose the real and present conflict as alleged.

10

the twin inferences required: (1) that the analysts did not believe that Agilent merited a "Buy" rating and (2) that the "Buy" rating was objectively unsupportable.

Missing from the consolidated amended complaint are allegations of specific facts from which a reasonable inference could be drawn that the challenged "Buy" ratings were not actually held beliefs. "[G]eneralized allegations about conflicts of interest, incentives to increase compensation, or internal pressure on analysts that is not tied to the particular stock at issue are not sufficient, standing alone, to satisfy the particularity requirements." In re Salomon Analyst Level 3 Litig., 350 F. Supp.2d 477, 492 (S.D.N.Y. 2004). The plaintiffs speculate that the challenged Agilent analyst reports were infected by the practice referred to as the "Agilent Two-Step," and that as a result, the reports did not represent the analysts' true opinions of the stock. "But speculation about the potential for compromised objectivity is a significant step away from deliberate lies." Id. There are no specific allegations that either Rogers or other CSFB analysts performed the "Two-Step" with respect to any particular Agilent report. Even if it can reasonably be inferred that the "Two-Step" was practiced on some occasion(s) – that Rogers or other Agilent analysts wrote one thing for the market's general consumption, and privately expressed their different, "true" belief to some favored few – that would only help establish the subjective aspect of the Virginia Bankshares cause of action. It would tend to prove that on some occasions (which occasions not being specified) the analysts did not actually believe what they said to the market. These allegations still would provide no basis for a fact finder's conclusion with regard to the objective aspect of the cause of action that the "Buy" rating was unjustified by provable objective facts.

The plaintiffs identify specific statements (besides the "Buy" ratings) in only two of the analyst reports that they contend were objectively false or misleading when made. Those statements

appear in the February 18, 2000 and August 18, 2000 reports. <u>See</u> Pls.' Opp'n to Mot. to Dismiss,

at 12-13.

1. *The February 18, 2000 Report*

The February 18, 2000 analyst report included the following statements:

> "Up 6% sequentially, to $2.5BB, Agilent's bookings growth was paced by very
> strong SPG orders (up 27% vs. Q4, when SPG orders dropped below Q3's pace) and
> reasonable gains in Test & Measurement (TMO, up 6% sequentially). . . . We suspect
> that semiconductor test did not post the 30-50%-type gains achieved by the industry
> in Q4:C99 . . . ."

Portnoy Decl., Ex. 3, at 2. The plaintiffs argue that the report's characterization of the 6% order

growth in Agilent's TMO division as "reasonable" was false and misleading because Rogers noted

in an email to Terry Hilliard at Agilent on February 22, 2000 that a competitor's order growth was

above 40% and Agilent's growth was "retarded."

Like the "Buy" ratings, Rogers's characterization of the 6% gain as "reasonable" is also a

statement of subjective belief or opinion. Their allegation that Rogers "expected a 40% growth rate"

in Agilent's TMO orders, <u>see</u> Consol. Am. Compl. ¶ 75, is a wishful misinterpretation of what the

document in question actually said. Rogers noted that other competitors in the market segment had

achieved a 40% growth rate, and that Agilent had not. The plaintiffs' argument is that Rogers's

knowledge of the difference means that his expressed opinion that Agilent's growth was "reasonable"

was not his true opinion. What the word "reasonable" is meant to convey must be understood in

context. The report also said that order growth numbers for Agilent were "good . . . but not

explosive." Portnoy Decl., Ex. 3, at 2. In any event, the plaintiffs again leave unaddressed the

objective side of the proposition. They do not allege that the objective factual data in the February

18, 2000 report were inaccurate, or that data relevant to a determination of reasonableness (such as

competitors' growth figures) were not disclosed. In short, the plaintiffs have not alleged provable

12

facts that would support an inference that Rogers's characterization of Agilent's 6% TMO order growth as "reasonable" was either objectively or subjectively false.

    2.   *The August 18, 2000 Report*

The August 18, 2000 analyst report stated the following, in pertinent part:

> Agilent remains rated a Buy. We are more or less reverting to our pre-July 20 estimates of $1.30 this fiscal year and $2.00 next. While the Communications and Semi Test businesses, as well as IC demand, remains strong, HSG is a problem, not repaired by a minor restructuring, while CAG prospects are, at best, tepid. Disturbingly, the July 20 pre-announcement, mostly a false alarm, highlights internal control issues that leave our EPS projections at best a guess.

Portnoy Decl., Ex. 6, at 2. The plaintiffs allege that the "Buy" rating in this report is misleading because it does not reflect Rogers's true opinion of the stock as privately expressed to a customer on August 12, 2000. They allege that Rogers told a customer who was inquiring about Agilent to "not be aggressive" in the absence of a "meaningful restructuring," but that six days later he told the public that Agilent remained a "Buy." From this the plaintiffs say they are entitled to the inference that Rogers did not truly believe in the "Buy" rating.

    The issue is whether counsel to avoid being aggressive is so inconsistent with a "Buy" rating that it may be inferred that the rating must have been intentionally deceptive. Once again, as with what is "reasonable," what is "aggressive" is also necessarily subjective. Being "aggressive" may mean, in some circumstances, purchasing any shares at all of a particular stock, or in others it may mean accumulating large numbers of shares rather than a more conservative lesser holding. To refrain from being aggressive is not necessarily to avoid buying altogether, so advice not to be aggressive is not invariably inconsistent with a "Buy" rating, especially in light of the CSFB standard for a "Buy": "A good 'story'; needs some time to develop but should outperform. Those institutions that require time to build a position should buy the stock today." See note 1, supra, at 4. There are no

13

allegations from which it could be inferred what Rogers considered "aggressive" in the context in which he used the word and thus to conclude that his August 18 statements were inconsistent with his August 12 statements or with CSFB's standard for a "Buy."

Context also requires acknowledgment of the fact, apparent from the record, that after Rogers's advice not to be aggressive, Agilent reported earnings results that were better than anticipated. To support an inference that the "Buy" recommendation issued on August 18 was objectively and subjectively false, the plaintiffs would have to explain why a different inference – that the earnings information altered either the factual base for the opinion or the subjective opinion itself – was not of equal or greater likelihood.

In sum, the consolidated amended complaint does not allege provable facts sufficient to make the plaintiffs' desired inferences reasonable ones. As far as they go, the allegations are not sufficient to sustain a reasonable inference that the "Buy" opinions expressed in the various analyst reports were both subjectively and objectively false and misleading.

C.    Scienter

For many of the same reasons, the plaintiffs have not adequately alleged facts sufficient to support a strong inference of scienter. Obviously, if the facts alleged are insufficient to support an inference of subjective disbelief in the opinions expressed, they are likewise insufficient to support any inference of scienter, let alone a strong one. It bears repeating that simply establishing a motivation to make false and misleading statements, regardless of the strength of the inferences to be drawn, is not enough to establish scienter. See Greebel, 194 F.3d at 197 ("[W]e caution that 'catch-all allegations that defendants stood to benefit from wrongdoing and had the opportunity to implement a fraudulent scheme are [not] sufficient.'") (quoting In re Advanta Corp. Sec. Litig., 180 F.3d 525, 535 (3d Cir. 1999)).

D.    The Section 10(b) and Rule 10b-5 Claim Against Quattrone

At oral argument on the present motions, the plaintiffs indicated their willingness to dismiss the section 10(b) claim against Quattrone and proceed solely on their section 20(a) claim against him. I agree that the section 10(b) claim against Quattrone should be dismissed because the complaint fails to connect him specifically to any of the alleged materially misleading statements, or to allege that he personally participated in the production of any of the challenged reports concerning Agilent. See In re Cabletron, 311 F.3d at 41; Swack v. Credit Suisse First Boston, No. 02-11943-DPW, 2004 WL 2203482, at *9 (D. Mass. Sept. 21, 2004).

E.    Causation

The defendants contend that the plaintiffs have failed to adequately plead causation. As to loss causation, there is currently a split among the circuits as to the precise pleading standard for loss causation in a fraud-on-the-market case such as this. Some courts have held that the plaintiff need only prove that the stock price on the date of purchase was inflated because of the defendant's misrepresentation or omission, see, e.g., Broudo v. Dura Pharm., Inc., 339 F.3d 933, 938 (9th Cir. 2003), while others have held that there must be proof of a causal connection between the alleged misrepresentation or omission and the investment's subsequent decline in value. See, e.g., Semerenko v. Cendant Corp., 223 F.3d 165, 185 (3d Cir. 2000); Robbins v. Koger Properties, Inc., 116 F.3d 1441, 1447-48 (11th Cir. 1997). The First Circuit has not directly addressed the question.

15

The Supreme Court granted certiorari in <u>Broudo</u> to address this dispute, <u>Dura Pharm., Inc. v.</u> <u>Broudo</u>, __ U.S. __, 124 S. Ct. 2904 (2004), and oral arguments were heard on January 12, 2005.

It is not necessary at this point to resolve the question of the proper loss causation standard or to consider how that standard would apply to the present complaint, for two reasons. First, as discussed above, the plaintiffs have failed to adequately plead falsity and scienter, and so the plaintiffs have failed to allege wrongful conduct that could be the subject of a causation analysis. Second, apart from loss causation specifically, the allegations of the consolidated amended complaint do not sufficiently allege facts to support an inference that misleading ratings had <u>any</u> effect on the price of Agilent stock. In other words, the plaintiffs have not only failed to allege loss causation, they have failed to allege inflation causation.

As the defendants point out, the objective data do not support the conclusion that the market was influenced to go either up or down with respect to Agilent stock as a result of the CSFB "Buy" ratings. Immediately after the eight "Buy" reports were issued, the stock traded up four times and down four times. Perhaps, then, it is possible to say the market was paying attention half the time. More importantly, the CSFB "Buy" was not the only information the market was getting about Agilent. The market was absorbing information from the company itself, as well as from other analysts. For example, the market price of Agilent stock went up about ten points on August 18, 2000, the day CSFB issued an analyst report that maintained the previous "Buy" rating. After the close of business on August 17, the company announced surprisingly positive earnings for the previous quarter. Here is the crucial multiple choice question: Was the jump in the price on the 18th caused by (A) the release of the company's unexpectedly positive earnings figures, (B) CSFB's "Buy" recommendation, (C) both, or (D) can't tell from the data provided. The best answer is probably either (A) or (D), but in any event it is up to the plaintiffs to allege facts that would lead one to

16

choose either (B) or (C), and they have not done so. Their reasoning is an illustration of the classic logical fallacy post hoc, ergo propter hoc. Is it necessary to say that an inference that is justified only by a logical fallacy is not a reasonable inference?

So, even if the plaintiffs had adequately pled false and misleading statements and scienter, they have not adequately pled either that the "Buy" ratings were material in the necessary sense – that they "significantly altered the 'total mix' of information" available to the market, see Basic, 485 U.S. at 232; Cooperman v. Individual, Inc., 171 F.3d 43, 49 (1st Cir. 1999) – or that the ratings actually caused the price of Agilent stock to be artificially inflated.

**III.    Control Person Liability Against CSFB and Quattrone**

The section 20(a) "control person" claims against CSFB and Quattrone also fail as a result of the plaintiffs' failure to allege an underlying violation of the securities laws. Longman v. Food Lion, Inc., 197 F.3d 675, 686 (4th Cir. 1999); Suna v. Bailey Corp., 107 F.3d 64, 72 (1st Cir. 1997). If the complaint had adequately alleged an underlying violation, however, the "control person" allegations as to both CSFB and Quattrone, though general, are probably sufficient to survive a motion to dismiss.

**IV.    Statute of Limitations**

The plaintiffs contend that because this action was filed after the passage of the Sarbanes-Oxley Act, that statute's two-year limitations period applies. See Pub. L. No. 107-204, 116 Stat. 801 (codified as amended at 28 U.S.C. § 1658) (requiring that securities fraud actions be brought within two years after the discovery of the facts constituting the violation, or five years after such violation, whichever is earlier). The defendants argue, and a number of courts have concluded, that

the Sarbanes-Oxley Act does not revive securities fraud claims that were time barred prior to its passage. See Swack, 2004 WL 2203482, at *5 n.10 (collecting cases). The question need not be resolved because I conclude that the plaintiffs have commenced this action "within one year after the discovery of the facts constituting the violation and within three years after such violation." Lampf, Pleva, Lipkind, Prupis, & Petigrow v. Gilbertson, 501 U.S. 350, 364 (1991).

The central question is whether there were sufficient "storm warnings" of fraud such that the plaintiffs, in the exercise of reasonable diligence, discovered or should have discovered the alleged fraud. Young v. Lepone, 305 F.3d 1, 8 (1st Cir. 2002). The limitations period begins to accrue at the point where the securities violation reasonably could have been discovered. Id. at 9. The original complaint in the lead case in this consolidated action was filed on October 21, 2002. The defendants argue that the plaintiffs were on inquiry notice of the alleged fraud in September 2000. At that point, the defendants' say, the plaintiffs could see that CSFB continued to maintain a "Buy" rating on Agilent in the face of a decline in the share price from $159 to $46 and in the light of substantial commentary in the financial and general press concerning the potential for conflict of interest where analysts were too much influenced by investment bankers. At the latest, the defendants say, the plaintiffs' claims accrued no later than the end of the class period on February 21, 2001.

The plaintiffs counter that they were not on inquiry notice of the alleged fraud until regulators began to reveal the results of their investigations into the conflicts at CSFB in particular. See In re Salomon Analyst Level 3 Litig., 350 F. Supp.2d 455, 474-77 (S.D.N.Y. 2004); Swack, 2004 WL 2203482, at *5-7. This was, at the earliest, September 12, 2002 when media reports appeared revealing that securities regulators were investigating whether CSFB research analysts' reports specifically had been tainted by the firm's desire to win investment banking business. Therefore, September 12, 2002 was the earliest date upon which the plaintiffs could have reasonably discovered

18

the factual data they rely on to support their claims, and the filing of the original complaint on October 21, 2002 was timely as against CSFB and Rogers. Likewise, the consolidated amended class action complaint, which was filed on August 25, 2003 and added Quattrone as a party, was also timely.

The limitations issue may remain one to be resolved at trial. It is sufficient for present purposes that the plaintiffs have alleged facts which, if found by a fact finder at trial, would defeat the limitations defense.

## V.    Conclusion

For all the foregoing reasons, CSFB and Rogers's motion to dismiss (Docket No. 39) is GRANTED. Quattrone's motion to dismiss (Docket No. 35) is also GRANTED. The consolidated amended class action complaint is dismissed with prejudice.

It is SO ORDERED.


March 31, 2005                           \s\ George A. O'Toole, Jr.
DATE                                     DISTRICT JUDGE


19