UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ANNE BRUMBAUGH, GARY L. HARMON and RANDY K. GRIFFIN,<br><br>                      Plaintiffs,<br><br>v.<br><br>WAVE SYSTEMS CORPORATION, JOHN E. BAGALAY, JR., STEVEN K. SPRAGUE and GERARD T. FEENEY,<br><br>                      Defendants. | CIVIL ACTION<br>NO. 04-30022-MAP |

**DEFENDANTS' MOTION FOR LEAVE TO SUPPLEMENT
THE RECORD IN RESPONSE TO NEWLY RAISED ISSUES
AND ERRONEOUS STATEMENTS OF FACT DURING ORAL ARGUMENT**

Pursuant to Local Rule 7.1(b)(3), Defendants Wave Systems Corporation, Steven K. Sprague and Gerard T. Feeney (collectively, the "Defendants") respectfully submit this Motion For Leave To Supplement The Record In Response To Newly Raised Issues And Erroneous Statements Of Fact During Oral Argument ("Motion").[1] As grounds for this Motion, the Defendants state as follows:

    1.    The Court heard oral argument on Defendants' Motion To Dismiss on March 30, 2005. During oral argument, the Plaintiffs argued that a press release by Wave regarding an agreement with National Semiconductor issued on March 28, 2003, was evidence of *scienter*, as

---

[1] Defendants submit this motion at this time based on confirmation of statements made during the March 30, 2005 hearing on Defendants' motion to dismiss, confirmed by the transcript of the hearing released yesterday, April 7, 2005.

further explained below. While the press release is referred to in the Plaintiffs' complaint (*see* A.C. at page 13, n.1) the complaint includes no allegation regarding the March 28, 2003 press release as evidence of *scienter*. Further, the Plaintiffs made no argument in their Opposition to Defendants' Motion to Dismiss regarding the press release as evidence of *scienter*.[2] Accordingly, the March 28, 2003 press release had not been materially at issue and had not been previously submitted as part of the record.

2. During oral argument, however, counsel for the Plaintiffs made arguments regarding the March 28, 2003 press release as evidence of *scienter*. Specifically, the Plaintiffs argued in effect that the Defendants' *scienter* could be inferred from the fact that the National Semiconductor press release disclosed that Wave's agreement with National Semiconductor was non-exclusive, and because Wave's stock price went unaffected, the Defendants knew that they had to omit the same detail from their July 31, 2003 press release announcing an agreement with Intel:

> They know that Semiconductor who just announced you have a nonexclusive licensing arrangement, the stock isn't going to do anything and that only happened in March of 2003. Here we are three or four months later, they should have been making a similar announcement with Intel. They don't. They consciously omit the fact that it's a nonexclusive licensing agreement.

*See* Excerpts of Transcript, March 30, 2005 Oral Argument (Ex. A) (pages 15-16).

4. In further assistance to the Court, Defendants seek leave to supplement their Appendices filed in conjunction with their motion to dismiss, and provide the Court with the actual March 28, 2003 press release regarding National Semiconductor. **The March 28, 2003**

---

[2] For these reasons alone, the press release concerning National Semiconductor should not be considered in any respect with regard to whether the Plaintiffs have adequately alleged a strong inference of *scienter*. 15 U.S.C.A. § 78u-4(b); ("*the complaint shall*, with respect to each act or omission alleged to violate this chapter, *state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.*") (emphasis added).

**press release makes no mention of whether the agreement with National Semiconductor is exclusive or non-exclusive**. The press release is attached as Exhibit B.

     5.     Otherwise, the March 28, 2003 press release is very similar to the July 31, 2003 press release concerning Intel:

| National Semiconductor Announcement | Intel Agreement Announcement |
|---|---|
| Wave Systems Corp. (NASDAQ:WAVX), a leader in delivering trusted computing applications and services with advanced products, infrastructure and solutions across multiple trusted platforms, today announced **a licensing agreement** with National Semiconductor (NYSE:NSM), *to bundle Wave's EMBASSY® Trust Suite of applications and services with National's PC21100 SafeKeeper™ trusted platform modules.*<br><br>Wave's solution, when combined with National's SafeKeeper technology, provides PC platforms with a suite of secure services and applications. This suite adds value and new revenue opportunities to the PC platform, while providing enhanced security and privacy options.<br><br>The solution, available in May, will be bundled with a Document Manager capability, for securing files and folders, and a digital signature capability for secure electronic contracts. In the future, IT administrators and end users will also be able to upgrade the EMBASSY Trust Suite to the industry's most comprehensive portfolio of secure services, applications and utilities, from backup and migration of critical security data to identity services.<br><br>"The personal computing industry is now committed to a historic transition to trusted computing," said Steven Sprague, Wave's president and CEO. "Today's inherently insecure PC is morphing to tomorrow's secure PC which will offer a range of productive services for users. *Our continued partnership with National Semiconductor marks the beginning a milestone launch cycle for the industry and we are delighted to be working with them to make these capabilities available for this expected huge market."* | Portland, OR – July 31, 2003 – Wave Systems Corp. (NASDAQ: WAVX – www.wave.com) announced *an agreement* today with Intel Corporation that will help enable both companies to accelerate the development and deployment of trusted applications and services for safer computing on personal computer platforms.<br><br>The agreement will enable Intel *to bundle Wave's software and services with a future Intel desktop motherboard, targeted for trusted computing platforms.*<br><br>"Wave helps fill a critical requirement for trusted computing services," said Michelle Johnston, acting director of marketing for Intel Desktop Board Operations. "We believe the EMBASSY® Trust Suite software will provide good value for our customers looking for trusted computing applications."<br><br>"Wave has been working closely with Intel on the development of application and service solutions," said Brian Berger, senior vice president, Global Business Development, Wave Systems. "Both companies believe that in order to accelerate adoption in the marketplace, it is critical to identify and offer an attractive introductory set of services and high value applications. We are delighted to be working with Intel by providing solutions for this emerging market.<br><br>"Wave believes that a portfolio of services will make trusted computing an important part of the personal computing market going forward. It is our job, to work with industry leaders like Intel, to help identify and develop those services that will bring the most value to the enterprise - as trusted hardware is deployed and a more secure computing environment becomes a reality." Berger said. |

"Market data shows that PCs offering secure services and applications are more valuable to users and more profitable for the PC industry," said Brian Berger, senior vice president, global business development, Wave Systems. "With this agreement Wave is offering Trusted Computing Platform Alliance-enabled solutions that we expect will add both significant value to National's SafeKeeper technology and enable out-of-the-box functionality for the end-user."

"Trusted PCs will become an essential ingredient in enterprise environments," said Zeev Heller, director of National's Notebook & Security business unit. "Wave Systems' suite of applications and services provide a useful toolset for trusted PCs protected by National Semiconductor Safekeeper technology."

The TCPA-compliant solution and EMBASSY Trust Suite will be demonstrated in conjunction with the RSA Security trade show at Wave Booth 1612 at the Moscone Center North, San Francisco, April 14-17. Customer appointments may be made by contacting Wave at bberger@wavesys.com.

National Semiconductor's SafeKeeper technology provides the highest level of trustworthiness for PC platforms. With a SafeKeeper device, PC platforms are much more secure from attacks than platforms protected only by security software.

Wave Systems' EMBASSY Trust Suite adds to the hardened security of a PC21100 enabled PC platform by adding a suite of enhanced applications for trusted digital signatures, secure document storage, secure document management and powerful privacy options. Bundled together, National's SafeKeeper technology and Wave's EMBASSY services provide a cost effective solution with services that will generate new revenue opportunities for PC makers and resellers, while forming the basis of trust necessary for a thriving e-commerce infrastructure in the future. Further information on National Semiconductor's SafeKeeper PC21100 TPM is posted at http://www.national.com/see/safekeeper.

The Trusted Computing Group (TCG) is a new industry organization dedicated to embedding trust and security more broadly into computing platforms and devices. The TCG has defined a semiconductor device known as the Trusted Platform Module (TPM) to serve as a root of trust for protected activities on enabled platforms. TPMs provide the trusted hardware resources used by Wave services to extend trusted functions within a PC.

Through acceleration of the design, use, management and adoption of trusted systems for a variety of computing platforms, the TCG is helping enterprise computer users realize increased security through open standards. Earlier this year, Wave was among the initial industry leaders promoting the TCG to develop, define, and promote hardware-enabled trusted computing and security technologies, including related hardware building blocks and software interfaces, across multiple platforms, peripherals and devices.

Wave recently announced a licensing agreement with National Semiconductor to bundle Wave's EMBASSY® Trust Suite with National's PC21100 SafeKeeper™ trusted platform modules. At Comdex in November 2002 it was announced that Wave's solutions have been enabled on the Infineon Technologies TPM to make a secure computing platform, complete with an out-of the-box suite of secure and trusted services, available to personal computer manufacturers.

6.     The *similarities* between the press releases actually undercut Plaintiffs' assertion of *scienter*. If the stock price did not move following the National Semiconductor announcement, and the Intel announcement is so similar, how can Plaintiffs use it to show an intent to increase the stock price?

**WHEREFORE**, Defendants request that their Motion For Leave To Supplement The Record In Response To Newly Raised Issues And Erroneous Statements Of Fact During Oral Argument be granted.

Respectfully submitted,

**JOHN E. BAGALAY, JR., STEVEN SPRAGUE, GERALD T. FEENEY, AND DEFENDANT WAVE SYSTEMS CORP.**

By their attorneys,

/s/ Michael D. Blanchard
Robert A. Buhlman, BBO #554393
Michael D. Blanchard, BBO #636860
BINGHAM McCUTCHEN LLP
150 Federal Street
Boston, MA 02110

Dated: April 8, 2005

### RULE 7.1(a)(2) CERTIFICATION

I, Michael D. Blanchard, hereby certify that counsel for Defendants attempted to confer with liaison counsel for Plaintiffs in good faith to resolve or narrow the issues presented in this motion, but as of the time of filing, Plaintiffs' liaison counsel could not be reached.

/s/ Michael D. Blanchard
Michael D. Blanchard

CTDOCS/1623888.3

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon each attorney of record electronically on April 8, 2005.

/s/ Michael D. Blanchard
Michael D. Blanchard

# EXHIBIT A

```
                                                                   1

 1                    UNITED STATES DISTRICT COURT
                       DISTRICT OF MASSACHUSETTS
 2                         WESTERN SECTION
 3
 4
 5    ANNE BRUMBAUGH, et al    .   Docket No. CA 04-30022-MAP
                                .
 6           v.                 .   Springfield, MA
                                .
 7    WAVE SYSTEMS, et al       .   March 30, 2005
      .........................    2:44 p.m.
 8
 9
10            TRANSCRIPT OF HEARING HELD BEFORE
11            THE HONORABLE MICHAEL A. PONSOR,
12         UNITED STATES DISTRICT COURT JUDGE.
13
14
      APPEARANCES:
15
16    For the plaintiff:  David Pastor, 999 Broadway, Suite
                          500, Saugus, MA 01906.
17
                          Karen Reilly, Three Bala Plaza East,
18                        Suite 400, Bala Cynwyd, PA 19004.
19
      For the defendant:  Robert Buhlman and Michael Blanchard,
20                        150 Federal Street, Boston, MA 02110.
21
22              Alice Moran, CSR, RPR, RMR
                Official Federal Court Reporter
23              1550 Main Street, Room 536
                Springfield, MA 01103
24          Tel: 413-731-0086   Fax: 413-737-7333
25
26
```

1   true, it's now false and misleading for purposes of the
2   securities laws.
3       And as we've laid out I hope for the Court and for
4   defendants so that they have notice of our claims, the
5   statements that were made by defendants immediately prior
6   to their announcement of the Intel relationship did not
7   say things like we're looking forward to earning revenues
8   this year.
9       They made statements to the extent that we are
10  speaking with the leading PC manufacturers in our
11  industry.  We are working on closing deals.  We are
12  projecting $5 million in revenues when, as Your Honor
13  noted, this company since its inception basically didn't
14  earn a dime and was keeping its doors open for a
15  relatively long period of time on equity offerings.
16      To say within a month of the Intel announcement we
17  are projecting $5 million in gross margin contributions
18  not based on what we have as back orders but based on
19  deals that we are working on to close and then the
20  company pops up with an announcement within 30 days which
21  they give great fanfare to, we have an agreement with
22  Intel, that's on the 31st of July.  Within a week we have
23  a deal -- we have a partnership arrangement with IBM.
24  The stock goes crazy.
25      And also for Your Honor, just as a point of
26

1    reference, on March 28th of 2003, which I think we note
2    in a footnote, Wave announced an arrangement with
3    Semiconductor which was similar to the licensing
4    arrangement that they later disclosed the details to with
5    Intel.
6        When Wave came out with the announcement of the
7    Semiconductor relationship, the stock did basically
8    nothing.  And plaintiffs propose that's because there
9    wasn't the great pump that is present with our facts that
10   show that the defendants had the scienter and the desire
11   to manipulate the market that we have demonstrated in our
12   complaint.  Nothing happened with Semiconductor.
13       The defendants indicate their awareness of the
14   Semiconductor relationship as far as a nonexclusive
15   licensing arrangement as being similar to Intel when they
16   do come out on the 14th and say it's similar to what we
17   had in the past.  It's similar to Semiconductor.
18       We propose that if the market had known the details
19   of the Intel relationship, that there was a nonexclusive
20   licensing arrangement, perhaps then Wave and its
21   insiders would not have seen the benefit of the huge
22   boost in its stock that it got from making the Intel
23   disclosure that was not -- I'm sorry -- the Intel
24   announcement that we contend was not a full and fair
25   statement of the real relationship between the companies.
26

1    They wouldn't have had the benefit of the boost that they
2    got.
3        They were aware of this because of historically what
4    they saw happen with Semiconductor; basically nothing
5    happened with their stock.  But with the priming of the
6    market with stating that we are presently in
7    negotiations, we are working on closing deals, they pop
8    up with an Intel announcement and do not say, guys, it's
9    just like Semiconductor.  It's not an exclusive licensing
10   arrangement.  The market would have reacted differently
11   and I think the defendants knew this.
12           THE COURT:  Let me insert a question.  I was
13   looking through the complaint and it's probably here and
14   I think I may have just missed it.
15       What was it exactly that Wave said on July 31, 2003
16   that you say was misleading?  I know that it's somewhere
17   around page 36, but I was looking for a quote of exactly
18   what you say.  And is it there in the beginning of
19   paragraph 36?
20           MS. REILLY:  I think, Your Honor, that in
21   paragraph 36 we provide what the company stated as to
22   Intel.  But I think that -- and please excuse me if this
23   is presumptuous or whatever, the defendant would like the
24   Court to view this statement in the light that you're
25   seeming to propose, which is I'm going to look at the
26

1     four corners of this statement and I'm going to look for
2     what's false and misleading by virtue of the words that
3     are in print on that page and on that basis alone I'm
4     going to decide whether or not there's been a securities
5     act violation.  That's not what we are proposing.
6          We're proposing that the words are here but there
7     are words missing, and by virtue of the missing words
8     there's been a securities act violation.  And I think
9     that based on what plaintiffs have alleged as far as the
10    motivation and scienter aspects, I realize that at the
11    same time the analyses are separate, they also overlap
12    and contribute to each other as far as what statements
13    are being made at what times to develop scienter and to
14    show in the context of these statements the defendants'
15    intention.
16         We've shown and we've demonstrated or we've pled,
17    Your Honor -- this is a motion to dismiss and not a
18    summary judgment -- we have pled that the company was up
19    against the wall.  That they entered into a very
20    restrictive private placement which they paid 19 percent
21    in commissions and fees --
22             THE COURT:  Over a million dollars.
23             MS. REILLY:  -- that Your Honor is aware of, and
24    also that there is an escape valve essentially to get out
25    from under the burden of that placement which was to get
26

1    the mandatory conversion of those preferred shares to
2    become common stock and not pay the dividends.
3         In light of their financial situation, which was
4    basically if nothing changed and the status quo
5    continued, they were going to be closing their doors
6    before December 31, 2003.  They were not going to be able
7    to continue.  They were restricted as far as any other
8    equity placements or raising because of the right of
9    first refusal that these security holders had.
10        Based on that, the timing of that April 30th is when
11   they closed on the private placement.  May 15th is when
12   they announced that they secured the private placement.
13   Within that May 15th announcement Sprague is talking
14   about we're getting ramped, we have business
15   opportunities, and they're talking in the context of a
16   company that basically didn't even have a developed
17   market for their product and here they're announcing now
18   we have a market.  It's going to be with the big players;
19   it's going to be with the PC giants in the industry,
20   watch what's going to come out soon, and they're priming
21   the market because they knew their stock would go nuts.
22        They know that Semiconductor who just announced you
23   have a nonexclusive licensing arrangement, the stock
24   isn't going to do anything and that only happened in
25   March of 2003.  Here we are three or four months later,
26

1   they should have been making a similar announcement with
2   Intel.  They don't.  They consciously omit the fact that
3   it's a nonexclusive licensing agreement.
4           THE COURT:  Let me just insert a question
5   because I see you coming back around to that argument and
6   it's certainly one that I'm going to consider.
7       I'm looking at paragraph 36.  It says, "With the
8   market primed by defendants' statements concerning an
9   anticipated revenue stream" -- and that refers to the
10  statements that you've already mentioned -- "on July 31,
11  2003, the start of the class period, defendants issued a
12  press release announcing an 'agreement'" -- now
13  presumably that press release had the word agreement in
14  it -- "with Intel Corporation, which purportedly
15  'enabled' Intel to bundle Wave's software and services
16  with a future Intel desktop motherboard, targeted for
17  trusted computing platforms."
18      And then the senior vice president at Wave said,
19  "Wave has been working closely with Intel on the
20  development of application and service solutions.  Both
21  companies believe that in order to accelerate adoption in
22  the marketplace, it is critical to identify and offer an
23  attractive introductory set of services and high value
24  applications.  We are delighted to be working with Intel
25  by providing solutions for this emerging market."
26

1    And you're saying that what should also have been
2    included in that statement is something along the lines
3    of this is particularly satisfying to us because it is an
4    almost exact duplicate of the relationship we entered
5    into with -- I forget the name.
6          MS. REILLY:  International Semiconductor.
7          THE COURT:  -- International Semiconductor a
8    few months ago and we want everyone to understand that
9    our arrangement with IBM is not exclusive and there is no
10   minimum purchase requirements that would generate
11   revenue?
12         If something like along those lines had been said,
13   you think it would have cleared the fence and it was the
14   absence of those things that made this misleading?
15         MS. REILLY:  The statement that the Court just
16   made would be fine, but --
17         THE COURT:  I'm good.  They should probably
18   hire me.
19         MS. REILLY:  The plaintiffs are not saying that
20   they had to go that far.  If they had said that this is a
21   nonexclusive licensing agreement, I think that the market
22   would have been better informed, and not just better
23   informed but fairly informed, and also however the
24   defendants I think would not have gotten the benefit of
25   their scheme which was to boost the stock price.
26

1       And also, Your Honor, within that statement that the
2  defendants made on the 31st of July, they also repeated
3  that we had an agreement with National Semiconductor.
4  And at the same time they're making that statement about
5  National Semiconductor, yet in the same paragraph,
6  they're not disclosing that Intel is nonexclusive.
7       And our position is that in the context of where the
8  company was at the time, how bound they were by this
9  private placement and basically facing becoming a
10 nonexistent entity, that that omission is highly suspect
11 and it also misinformed -- it actively misinformed the
12 investing public.
13          THE COURT:  Well, I guess I wonder how much --
14 I guess I have two questions.  I wonder how much I'm
15 supposed to take context into consideration.  In other
16 words, it seems to me I should focus on the misleading
17 quality of the statement or the non-misleading quality of
18 the statement.
19      If they said we're so excited, we're going to paint
20 our headquarters pink because we're really looking
21 forward to the next little while and we're feeling really
22 optimistic, obviously that's not going to get you
23 anywhere even if the stock price goes through the roof
24 and even if they're hoping that the stock price will go
25 through the roof because they're in this terrible

26

```
1    UNITED STATES OF AMERICA
     DISTRICT OF MASSACHUSETTS
2    CITY OF SPRINGFIELD

3

4

5           I, Alice Moran, do hereby certify that the
6    foregoing is a true and accurate transcription of my
7    stenographic notes to the best of my knowledge and
8    ability.
9           Certified on April 7, 2005.
10

11

12                          _____

                            Alice Moran, CSR, RPR, RMR
13                          Official Federal Court Reporter
14

15

16

17

18

19

20

21

22

23

24

25
```

# EXHIBIT B



# Wave Systems and National Semiconductor Approve Licensing Agreement on Hardware and Software Solution for Trusted Computing Platforms

*Wave's EMBASSY® Trust Suite Services Will Be Bundled With National's SafeKeeper™ Technology*

**Lee, MA - March 28, 2003** - Wave Systems Corp. (NASDAQ:WAVX), a leader in delivering trusted computing applications and services with advanced products, infrastructure and solutions across multiple trusted platforms, today announced a licensing agreement with National Semiconductor (NYSE:NSM), to bundle Wave's EMBASSY® Trust Suite of applications and services with National's PC21100 SafeKeeper™ trusted platform modules.

Wave's solution, when combined with National's SafeKeeper technology, provides PC platforms with a suite of secure services and applications. This suite adds value and new revenue opportunities to the PC platform, while providing enhanced security and privacy options.

The solution, available in May, will be bundled with a Document Manager capability, for securing files and folders, and a digital signature capability for secure electronic contracts. In the future, IT administrators and end users will also be able to upgrade the EMBASSY Trust Suite to the industry's most comprehensive portfolio of secure services, applications and utilities, from backup and migration of critical security data to identity services.

"The personal computing industry is now committed to a historic transition to trusted computing," said Steven Sprague, Wave's president and CEO. "Today's inherently insecure PC is morphing to tomorrow's secure PC which will offer a range of productive services for users. Our continued partnership with National Semiconductor marks the beginning a milestone launch cycle for the industry and we are delighted to be working with them to make these capabilities available for this expected huge market."

"Market data shows that PCs offering secure services and applications are more valuable to users and more profitable for the PC industry," said Brian Berger, senior vice president, global business development, Wave Systems. "With this agreement Wave is offering Trusted Computing Platform Alliance-enabled solutions that we expect will add both significant value to National's SafeKeeper technology and enable out-of-the-box functionality for the end-user."

"Trusted PCs will become an essential ingredient in enterprise environments," said Zeev Heller, director of National's Notebook & Security business unit. "Wave Systems' suite of applications and services provide a useful toolset for trusted PCs protected by National Semiconductor Safekeeper technology."

The TCPA-compliant solution and EMBASSY Trust Suite will be demonstrated in conjunction with the RSA Security trade show at Wave Booth 1612 at the Moscone Center North, San Francisco, April 14-17. Customer appointments may be made by contacting Wave at bberger@wavesys.com.

National Semiconductor's SafeKeeper technology provides the highest level of trustworthiness for PC platforms. With a SafeKeeper device, PC platforms are much more secure from attacks than platforms protected only by security software.

Wave Systems' EMBASSY Trust Suite adds to the hardened security of a PC21100 enabled PC platform by adding a suite of enhanced applications for trusted digital signatures, secure document storage, secure document management and powerful privacy options. Bundled together, National's SafeKeeper technology and Wave's EMBASSY services provide a cost effective solution with

services that will generate new revenue opportunities for PC makers and resellers, while forming the basis of trust necessary for a thriving e-commerce infrastructure in the future. Further information on National Semiconductor's SafeKeeper PC21100 TPM is posted at http://www.national.com/see/safekeeper.

More information on Wave Systems' suite of EMBASSY services is available at www.wave.com.



**About Wave Systems Corp.**

Consumers and businesses are demanding a computing environment that is more trusted, private, safe and secure. Wave is the leader in delivering trusted computing applications and services with advanced products, infrastructure and solutions across multiple trusted platforms from a variety of vendors. Wave holds a portfolio of significant fundamental patents in security and e-commerce applications and employs some of the world's leading security systems architects and engineers. For more information about Wave, visit http://www.wave.com.

**Safe Harbor for Forward Looking Statements**
Except for the statements of historical fact, the information presented herein constitutes forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. Such forward-looking statements involve known and unknown risks, uncertainties and other factors which may cause the actual results, performance or achievements of the company to be materially different from any future results, performance or achievements expressed or implied by such forward-looking statements. . Such factors include general economic and business conditions, the ability to fund operations, the ability to forge partnerships required for deployment, changes in consumer and corporate buying habits, chip development and production, the rapid pace of change in the technology industry and other factors over which Wave Systems Corp. has little or no control. Wave Systems assumes no obligation to publicly update or revise any forward-looking statements.

*All brands are the property of their respective owners*

For more information please contact:

| **Media** | **Investor Relations** |
|---|---|
| Wave Systems Corp. | Jaffoni & Collins |
| John Callahan | David Collins, Richard Land |
| 413-243-7029 | 212-835-8500 |
| jcallahan@wavesys.com | wavx@jcir.com |

Stay up-to-date on news relating to Wave. Join our email list by putting your email address in the space below.



**Close this window**