UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


ANNE BRUMBAUGH, ET AL,          )
              Plaintiffs        )
                                )
              v.                )  CIVIL ACTION NO. 04-30022-MAP
                                )
WAVE SYSTEMS CORPORATION,       )
ET AL.,                         )
              Defendants        )


MEMORANDUM AND ORDER REGARDING
DEFENDANTS' MOTION TO DISMISS
(Docket No. 58)

January 11, 2006

PONSOR, D.J.


I. INTRODUCTION

This is a class action brought by Plaintiffs on behalf
of all persons who acquired the common stock of Wave Systems
Corporation ("Wave" or "the Company") between July 31, 2003
and December 18, 2003, allegedly misled by nine
misrepresentations that violated Sections 10(b) and 20(a) of
the Securities and Exchange Act of 1934 and Rule 10b-5.[1]
Defendants are Wave, its President and Chief Executive
Officer, Steven K. Sprague, and its Senior Vice President,

_____

[1] No motion for class certification has yet been filed, and
no class has yet been certified. When such a motion is filed,
the parties will need to address the issues raised in two
recent First Circuit decisions: In re PolyMedica Corp. Sec.
Litig., No. 05-1220, 2005 WL 3384083 (1st Cir. Dec. 13, 2005),
and In re Xcelera.com Sec. Litig., 430 F.3d 503 (2005).

Chief Financial Officer and Secretary, Gerard K. Feeney;[2]
they have moved to dismiss the consolidated amended
complaint on numerous grounds.  In particular, Defendants
maintain that: (1) the allegedly misleading statements are
not actionable as a matter of law; (2) the facts pled do not
give rise to a strong inference that Defendants acted with
the requisite scienter; and (3) the complaint fails to
allege a causal connection between the alleged
misrepresentations and the stock's subsequent depreciation.
For the reasons set forth below, the court will allow
Defendants' Motion to Dismiss as to two of the statements
challenged and deny the motion as to the other seven.

## II. FACTUAL AND PROCEDURAL BACKGROUND

"Where the dismissal is grounded in Rule 12(b)(6), the
facts pled in the complaint are taken in the light most
favorable to the plaintiff."  In re Cabletron Sys., Inc.,
311 F.3d 11, 22 (1st Cir. 2002).  The following is a summary
of the facts presented in this light.[3]

---

[2] Plaintiffs concede that John E. Bagalay, Jr. was not
properly named as a defendant.  To make sure the record is
clear, the court hereby dismisses all claims against John E.
Bagalay, Jr.

[3] Many of the facts will be taken verbatim from Sachs v.
Sprague, No. CIV. A. 04-30032-MAP, 2005 WL 3116592 (D. Mass.
Nov. 22, 2005).  Because identical allegations sit at the core
of the two cases, there is no need to alter significantly the
factual recitation.

Since its inception in 1988, Wave, a self-described "development stage company," had never managed to market any of its digital security services or technologies successfully. (Dkt. No. 55, Consolidated Am. Compl. ¶ 2.)) By December 31, 2002, the Company found itself over $230 million in debt and in need of $11 million in cash to continue operations in 2003.

With no major revenue source in sight, the Company was forced to close a private placement of Series H Stock on April 30, 2003. (Id. at ¶ 4.)  Although this private investment in the publicly held Company resulted in net proceeds of $4,465,571, the placement terms, from Wave's perspective, were quite onerous.  (Id.)  Not only did they restrict the Company's capacity to generate additional funds through future equity offerings by giving the Series H shareholders a right of first refusal, they also required Wave to pay significant dividends to these preferred shareholders.  (Id.)  Because the Company lacked the resources to redeem the preferred stock or pay the dividends, Wave's status as a going concern seemed to rest on the automatic conversion of these preferred shares to Class A Common Stock.  Under the terms of the placement,

such a conversion could only occur if the closing bid on Wave's stock exceeded $1.90 for fifteen of twenty consecutive trading days. (Id. at ¶ 5.) With the stock consistently trading at under $1.00 per share in the Spring of 2003, it appeared unlikely this condition would be met.

On May 15, 2003, the Company issued a press release in which Sprague stated that "key industry participants are finally beginning to recognize the value Wave can add and are evaluating ways that they can work with us to benefit from our position." (Id. at ¶ 26; see also id. ("This is an exciting time for us, as we begin to see our long-held vision of revenue-producing trusted computing services become an expected reality.")

In its Form 10-K/A filed with the Securities and Exchange Commission ("SEC") on June 30, 2003, Wave expanded on Sprague's optimistic assessment by forecasting $5 million in sales based upon "the anticipation that various deals we are working on will close." (Id. at ¶ 34 (noting the Company's continuing efforts to "solidify[] strategic alliances with the major personal computer manufacturers to force collaborative efforts to distribute its products to consumers").)

-4-

On July 31, 2003, with the market primed to expect a substantial revenue stream, the Company issued a press release, announcing an agreement with Intel Corporation that would "enable Intel to bundle Wave's software and services with a future Intel desktop motherboard." (<u>Id.</u> at ¶ 36.) Although the terms of the deal were not disclosed (<u>id.</u> at ¶ 38 (citation omitted)), Wave's stock soared and closed that day at $2.25 per share, a gain of 168% from the day before (<u>id.</u> at ¶ 37).

The Company's stock was still on the rise when, on August 4, 2003, Wave announced a partnership with IBM destined to "significantly help us in our objective to deliver open and interoperable solutions to business customers." (<u>Id.</u> at ¶ 42.) Once again, despite the fact that the deal's terms were undisclosed (<u>id.</u> at ¶ 46 (citation omitted)), the market reacted positively, and Wave's stock closed at $4.42 per share, up $.77 per share from its previous closing price (<u>id.</u> at ¶ 44).[4]

On August 11, 2003, Wave filed the first of four filings

---

[4] On August 5, 2003, a Company spokesperson told the <u>New York Times</u> that "IBM computers with built-in Wave security would be available in the fourth quarter of this year." (<u>Id.</u> at ¶ 45 (citation omitted).)

with the SEC in which the Company characterized its recent deals with Intel and IBM as "Material Changes."  (<u>Id.</u> at ¶¶ 55, 61-63.)  Three days later, during a conference call with analysts, Sprague finally revealed that the Intel deal was a non-exclusive licensing agreement with no minimum licensing requirements. (<u>Id.</u> at ¶ 58.)  Sprague also admitted that although the Company's products were compatible with IBM's, Wave did not have a licensing agreement with the computer giant.  (<u>Id.</u>)

Despite these revelations, Wave's CEO stood by the Company's earlier predictions of significant revenue growth. (<u>Id.</u>)  Pressed to indicate the source of his sanguinity, Sprague conveyed his belief that the "relationship . . . with Intel and the business model that was articulated in the press release" would be the primary basis for revenue Wave would see by the end of the fourth quarter.  (<u>Id.</u>) When asked whether Wave could "keep the lights on until this unfolds," Sprague stated that "we've been much more comfortable than perhaps our shareholders can be because it's hard to see the data that we have.  But we're very comfortable."  (<u>Id.</u> at ¶ 59.)

In the meantime, on August 5, 2003, Feeney sold 100,000

shares of the Company's stock for $500,000, reducing his overall share ownership by 50%.  (<u>Id.</u> at ¶ 49.)  The next day, Sprague himself sold 150,000 Wave shares for $533,841, cutting his overall share ownership by 20%.  (<u>Id.</u> at ¶ 50.) These sales caught the spike in Wave's stock value at $3.14-$5.00 per share.  (<u>Id.</u> at ¶ 75.)

On August 20, 2003, in a Form S-3 Registration Statement, Wave characterized its "partnership" with IBM as a "licensing agreement."  (<u>Id.</u> at ¶ 62.)  Two days later, on August 22, 2003, the Company again described its relationship with IBM as a "licensing agreement" in a prospectus filed with the SEC.  (<u>Id.</u> at ¶ 63.)

On September 16, 2003, Wave disclosed that it had successfully modified the conditions of the April Series H Placement.  (<u>Id.</u> at ¶ 65.)  Among other concessions, the Series H holders agreed to curtail significantly their right of first refusal, increasing the Company's capacity to generate additional funds through future equity offerings. (<u>Id.</u>)

In a press release dated November 13, 2003, Sprague stated: "We can now clearly see the growing momentum for trusted computing in the marketplace, and we expect

substantial growth in volumes over the course of the next four quarters." (<u>Id.</u> at ¶ 68.) Six days later, Wave announced that it had secured $7.1 million from a private placement financing. (<u>Id.</u> at ¶ 69.)

In December 2003, the SEC commenced an investigation relating to "certain public statements made by Wave during and around August 2003, as well as certain trading in Wave's securities during such time." (<u>Id.</u> at ¶ 70.) After Defendants disclosed this news in a press release dated December 18, 2003,[5] the Company's shares fell 17%, closing at $1.50 the following day. (<u>Id.</u> at ¶ 72.)

In February 2004, eight individual Plaintiffs filed putative class actions.[6] Based on counsel's representations, this court ordered the eight cases consolidated on September 3, 2004.[7] Plaintiffs subsequently filed their two-count

---

[5] This disclosure came after the close of the market.

[6] A ninth case, <u>Trebitsch v. Wave Systems Corp.</u>, 04-266-JCL, was originally filed in the District of New Jersey before being transferred to this court.

[7] The seven other cases are: <u>Streicher v. Wave Systems Corp.</u>, C.A. 04-30026-MAP; <u>Dawod v. Wave Systems Corp.</u>, C.A. 04-30029-MAP; <u>Chess v. Wave Systems Corp.</u>, C.A. 04-30037-MAP; <u>Vicker v. Wave Systems Corp.</u>, C.A. 04-30040-MAP; <u>Boham v. Wave Systems Corp.</u>, C.A. 04-30041-MAP; <u>Suo v. Wave Systems Corp.</u>, C.A. 04-30042-MAP; and <u>Schulman v. Wave Systems Corp.</u>, C.A. 04-30043-MAP.

amended complaint, alleging violations of: "Section 10(b) of
the Exchange Act and Rule 10b-5 Promulgated Thereunder" by
"All Defendants" (Count I); and "Section 20(a) of the
Exchange Act" by "the Individual Defendants" (Count II).

The crux of Plaintiffs' complaint is that Defendants'
efforts to inflate the Company's stock artificially caused
them harm.  They allege that as Wave stood on the brink of
extinction, Defendants made a series of misrepresentations
that led reasonable investors to believe the Company was
poised to fulfill its recent predictions of unprecedented
revenue growth.  In short, Plaintiffs submit that by
concealing the true nature of the purported Intel and IBM
deals, Defendants perpetrated a fraud on the market.

### III. DISCUSSION

Section 10(b) of the Securities Exchange Act of 1934
prohibits the use of "any manipulative or deceptive device
or contrivance" in connection with the purchase or sale of
securities.  15 U.S.C. § 78j(b) (2005).  Rule 10b-5,
promulgated by the SEC pursuant to Section 10(b), "forbids,
among other things, the making of any 'untrue statement of
material fact' or the omission of any material fact
'necessary in order to make the statements made . . . not
misleading.'"  Dura Pharm., Inc. v. Broudo, 125 S.Ct. 1627,

-9-

1631 (2005) (citing 17 C.F.R. § 240.10b-5 (2004)).  Although

the statute does not expressly allow for private claims,

Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson, 501

U.S. 350, 358 (1991), superseded on other grounds by

statute, Federal Deposit Insurance Corporation Improvement

Act of 1991, Pub. L. No. 102-242, § 476, 105 Stat. 2236,

2387, as recognized in Cooperativa De Ahorro Y Credito

Aguada v. Kidder, Peabody & Co., 129 F.3d 222, 224 (1st Cir.

1997), the private cause of action has become an "essential

tool for enforcement of the 1934 Act's requirements," Basic

Inc. v. Levinson, 485 U.S. 224, 231 (1988).

        In order to state a 10b-5 claim, a plaintiff must allege

a (1) false statement or omission of material fact, (2) with

scienter, (3) upon which plaintiff relied, and (4) which

caused plaintiff's injury.  See Gross v. Summa Four Inc., 93

F.3d 987, 992 (1st Cir. 1996), superseded on other grounds

by statute, Private Securities Litigation Reform Act of

1995, Pub. L. No. 104-67, 109 Stat. 737, as recognized in

Greebel v. FTP Software, Inc., 194 F.3d 185, 197 (1st Cir.

1999).

        In addition to pleading these basic elements, a

plaintiff must also comply with the standards of the Private

Securities Litigation Reform Act of 1995 ("PSLRA"), 15

U.S.C. § 78u-4 (2005).  Among other things, the PSLRA

requires a plaintiff to identify each allegedly misleading statement and explain why it is misleading.  15 U.S.C. § 78u-4(b)(1).  The PSLRA also provides that a plaintiff must allege facts "giving rise to a <u>strong</u> <u>inference</u> that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2) (emphasis added).[8]

"This last requirement alters the usual contours of a Rule 12(b)(6) ruling because, while a court continues to give all reasonable inferences to plaintiffs, those inferences supporting scienter must be strong ones." <u>Cabletron</u>, 311 F.3d at 28; <u>see also</u> <u>Aldridge v. A.T. Cross Corp.</u>, 284 F.3d 72, 78 (1st. Cir. 2002) ("Even under the PSLRA, the district court, on a motion to dismiss, must draw all reasonable inferences from the particular allegations in the plaintiff's favor, while at the same time requiring the plaintiff to show a strong inference of scienter.").

A.    <u>Specific Misrepresentations and/or Omissions.</u>

---

[8] While the First Circuit's application of Fed. R. Civ. P. 9(b) in pre-PSLRA securities actions was "congruent and consistent" with the standards set forth in § 78u-4(b)(1), <u>Greebel v. FTP Software, Inc.</u>, 194 F.3d 185, 193 (1st Cir. 1999), "pre-Act case law" in this Circuit "had used both the language of 'strong' inference and of 'reasonable' inference," <u>id.</u> at 197 (noting the use of "reasonable inference" language in <u>Gross v. Summa Four Inc.</u>, 93 F.3d 987, 996 (1st Cir. 1996); <u>Shaw v. Digital Equip. Corp.</u>, 82 F.3d 1194, 1224 (1st Cir. 1996); <u>Serabian v. Amoskeag Bank Shares, Inc.</u>, 24 F.3d 357, 368 (1994); <u>Greenstone v. Cambex Corp.</u>, 975 F.2d 22, 25 (1st Cir. 1992); and <u>Romani v. Shearson Lehman Hutton</u>, 929 F.2d 875, 878 (1st Cir. 1991)).

Cognizant of the strictures of the PSLRA and Fed. R. Civ. P. 9(b), Plaintiffs allege that Defendants made nine specific misrepresentations in press releases, a conference call, an interview, and filings with the SEC.

1.  <u>Press Release of July 31, 2003.</u>

The complaint avers that a Wave press release dated July 31, 2003, announced an agreement between the Company and Intel that would "enable Intel to bundle Wave's software and services with a future Intel desktop motherboard." (Am. Compl. ¶ 36.) Obviously, this allegation satisfies the "who, what, and where" mandates of the PSLRA and Rule 9(b). <u>See</u> <u>Fitzer v. Sec. Dynamics Tech., Inc.</u>, 119 F. Supp. 2d 12, 18 (D. Mass. 2000). Close analysis also reveals that a factfinder could conclude that this allegation satisfies all four elements of 10b-5 claim: material omission, scienter, reliance, and causation.[9]

a.  <u>Omission of a Material Fact.</u>

Plaintiffs contend that this press release was "materially false and misleading" in light of information it

---

[9] Detailed discussion of the four elements as regards the July 26, 2003 press release will permit a shorter analysis of the other eight alleged misrepresentations.

failed to disclose.  (Am. Compl. ¶ 41.)[10]  To fulfill the
materiality requirement there must be "a reasonable
likelihood that a reasonable investor would consider [the
information omitted] important."  Glassman v. Computervision
Corp., 90 F.3d 617, 632 (1st Cir. 1996) (citations omitted).

    If, as Plaintiffs allege, the press release came on the
heels of previous disseminations by Defendants forecasting
unprecedented sales -- in "anticipation that various deals
that we are currently pursuing will close" -- the terms of
the Intel agreement "would have assumed actual significance
in the deliberations of a reasonable shareholder," TSC
Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976),
and "significantly altered the 'total mix' of information
made available," Basic, 485 U.S. at 231-32 (citing TSC

---

    [10] Defendants' preliminary argument that the press release
was literally accurate overlooks the fact that literal accuracy
"does not preclude liability under federal securities laws."
Lucia v. Prospect St. High Income Portfolio, Inc., 36 F.3d 170,
175 (1st Cir. 1994).  As the First Circuit recognized in Lucia:

        Some statements, although literally accurate, can
        become, through their context and manner of
        presentation, devices which mislead investors.  For
        that reason, the disclosure required by the
        securities laws is measured not by literal truth, but
        by the ability of the material to accurately inform
        rather than mislead prospective buyers.

Id. (quoting McMahan v. Wherehouse Entm't, Inc., 900 F.2d 576,
579 (2nd Cir. 1990)).

Indus., 426 U.S. at 449).

The argument that Defendants had no affirmative duty to disclose the terms of the Intel agreement lacks merit.  By volunteering "relevant, material information" regarding the lucrative nature of impending agreements, Defendants assumed an obligation, in announcing Wave's new relationship with Intel, to convey "the whole truth." Roeder v. Alpha Indus., Inc., 814 F.2d 22, 26 (1st Cir. 1987); see also Gross, 93 F.3d at 992 (While "a corporation does not commit securities fraud merely by failing to disclose all nonpublic material information in its possession," a duty to disclose "may arise if, inter alia, a corporation has previously made a statement of material fact that is . . . incomplete . . . or misleading in light of the undisclosed information."); In re Allaire Corp. Sec. Litig., 224 F. Supp. 2d 319, 327 (D. Mass. 2002) ("[H]aving elected to comment on financial and product sales performance, [the company] was required to make full and accurate disclosures.").

Equally unpersuasive is Defendants' contention that they cannot be held liable for statements merely of corporate optimism.  "The corporate puffery rule applies to loose optimism about both a company's current state of affairs and its future prospects." Fitzer, 119 F. Supp. 2d at 23. While courts continue "to find immaterial as a matter of law

-14-

a certain kind of rosy affirmation commonly heard from corporate managers and numbingly familiar to the marketplace," <u>Shaw v. Digital Equip. Corp.</u>, 82 F.3d 1194, 1217 (1st Cir. 1996), <u>superseded on other grounds by statute as recognized in</u> <u>Greebel</u>, 194 F.3d at 197, the recent trend is to consider expressions of corporate optimism carefully.[11]

<u>In re No. Nine Visual Tech. Corp. Sec. Litig.</u>, 51 F. Supp. 2d 1 (D. Mass. 1999), adopted the following analytical approach to claims of puffery. First, the court

> consider[s] whether the statement is so vague, so general, or so loosely optimistic that a reasonable investor would find it unimportant to the total mix of information; second, the court . . . ask[s] whether the statement was also considered unimportant to the total mix of information by the market as a whole.

<u>Id.</u> at 20 (citations omitted).

Applying <u>No. Nine</u>'s test, this court finds that: (1) a reasonable investor, cognizant of Defendants' recent prophecy of "strategic [and profitable] alliances with the major personal computer manufacturers," would not have

---

[11] "[I]t has been said that the 'puffing' concept in the securities context has all but gone the way of the dodo." 69A Am. Jur. 2d <u>Securities Regulation—Federal</u> § 1118 (2005) (citation omitted). This observation may be somewhat hyperbolic. <u>See</u> <u>Orton v. Parametric Tech. Corp.</u>, 344 F. Supp. 2d 290, 301 (D. Mass. 2004) (finding comment that company was "position[ed] . . . for long-term growth" a "classic example of non-actionable corporate puffery"). Still, dismissals on this ground are increasingly rare.

-15-

considered the announcement of one such alliance to be so vague, so general, or so loosely optimistic as to be unimportant to the total mix of information; on the contrary, a reasonable investor would have seen an "agreement" enabling "Intel to bundle Wave's software and service with a future Intel desktop motherboard" as a major source of Wave's previously projected revenue; and (2) the market as a whole considered the Intel announcement quite important to the total mix of information.  See Am. Compl. ¶ 37 (noting that on July 31, 2003, the volume for Wave's stock was "approximately 19 million shares traded, as compared to Wave's average daily volume of only 199,136 shares").)

     Defendants next argue that the Intel press release was "forward-looking" and therefore subject to the "Safe Harbor" clause of the PSLRA.  Under that provision, a "forward-looking" statement is not actionable if: (1) the statement is "identified as . . . forward-looking . . . and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially . . . ; or" (2) it is "immaterial; or" (3) "the plaintiff fails to [plead] that the forward-looking statement . . . was made with actual knowledge . . . that the statement was false or misleading."  15 U.S.C. § 78u-

5(c)(1)(A)-(B); see also Greebel, 194 F.3d at 201
(recognizing that the statute is disjunctive, providing
"safe harbor" via "alternative inlets").

    There are several problems with this contention.  First,
"the subject matter of the alleged misrepresentation[]" --
the terms of the Intel agreement -- "was a matter of fact
rather than conjecture by the time the statement[] w[as]
made.  Thus, the statement[] cannot be characterized as
forward-looking, and the safe harbor provision of the PSLRA
does not apply."  In re Sepracor, Inc. Sec. Litig., 308 F.
Supp. 2d 20, 28 (D. Mass. 2004).

    Assuming arguendo that the statement in question was
"forward-looking," Defendants "boilerplate" disclaimer at
the close of the press release was "not sufficiently
detailed to fall within the protections of the 'bespeaks
caution' doctrine."  In re Focus Enhancements, Inc. Sec.
Litig., 309 F. Supp. 2d 134, 162 (D. Mass. 2001).

    In their disclaimer, Defendants noted that the following
factors could cause the Company's performance "to be
materially different" from that "implied" by the press
release: (1) "general economic and business conditions," (2)
"the ability to fund operations," (3) "the ability to forge
partnerships required for deployment," (4) "changes in
consumer and corporate buying habits," (5) "chip development

-17-

and production," (6) "the rapid pace of change in the
technology industry," and (7) "other factors over which Wave
Systems Corp. has little or no control."[12]

Among these factors, only the second and third -- the
ability to "fund operations" and "forge partnerships
required for deployment -- relate even tangentially to the
subject matter of the press release. While one could
conclude that these factors put prospective investors on
notice that the announced partnership with Intel might not
lead to the deployment of Wave products, this court must
draw its inferences in Plaintiffs' favor. <u>In re Credit
Suisse First Boston Corp.</u>, 431 F.3d 36, 45 (1st Cir. 2005)
(citing <u>In re Colonial Mortgage Bankers Corp.</u>, 324 F.3d 12,
15 (1st Cir. 2003)).

In drawing such inferences, the most the court can
conclude is that the cautionary language warned that Wave's
agreement with Intel was not exclusive. It did not counter
sufficiently the strong implication that the Intel
partnership would lead to substantial deployment and thus, a
significant revenue stream. <u>See Shaw</u> 82 F.3d at 1213

---

[12] (Dkt. No. 72, App. Supp. Defs.' Mot. Dismiss, Ex. 5.)
Defendants have submitted copies of the relevant press
releases, conference call transcript, and SEC filings in
conjunction with their motion to dismiss. Because Plaintiffs
have admitted the authenticity of these documents, this court
may consider them in ruling on Defendants' 12(b)(6) motion.
<u>See</u> <u>Watterson v. Page</u>, 987 F.2d 1, 4 (1st Cir. 1993).

(noting how the "surrounding context" failed to caution "against such an implication with sufficient clarity to be thought to bespeak caution").

Ultimately, because "reasonable minds could . . . disagree as to whether the mix of information in the [allegedly actionable] document is misleading," the first prong of the statutory safe harbor provision cannot "provide[] basis for dismissal as matter of law." Id. at 1214 (citation omitted).

As for the third prong,[13] Defendants note that the "actual knowledge" required is a higher level of scienter than the "recklessness" required by the PSLRA, see Greebel, 194 F.3d at 201; thus, they contend that allegations that satisfy 15 U.S.C. § 78u-4(b)(2) do not, ex proprio vigore, satisfy 15 U.S.C. § 78u-5(c)(1)(B).

The problem with this argument is that it fails to account for the different procedural stages the respective provisions were designed to address. Whereas Section 78u-4(b)(2) specifies the requirements for a "complaint," Section 78u-5(c)(1)(B) states what a plaintiff must "prove"

---

[13] Defendants wisely concede the inapplicability of the second prong -- the materiality of the press release (see Dkt. No. 70, Defs.' Reply Mem. Supp. Mot. Dismiss 3) -- for it would strain credulity to suggest that investors who flocked to Wave's stock in the wake of the Intel press release did not consider the information it conveyed significant to the total mix.

in order for a defendant to be found "liable."

Mindful of the First Circuit's consistent position "that the rigorous standards for pleading securities fraud do not require a plaintiff to plead evidence," Cabletron, 311 F.3d at 33; see also In re Credit Suisse First Boston Corp., 431 F.3d at 46 ("[A] pleading setting forth a section 10(b) claim need not . . . elaborate upon every jot and tittle of evidentiary detail."); Maldonado v. Dominguez, 137 F.3d 1, 9 (1st Cir. 1998) ("[W]e . . . cannot expect plaintiffs to plead 'fraud with complete insight' before discovery is complete."), the court must conclude that Plaintiffs' allegations of "actual knowledge" are sufficient to preclude safe harbor access via this final "alternative inlet."

        b.   Scienter.

Having established that the Intel press release omitted a material fact, the court must now consider the question of scienter.  "In order to prevail in a 10b-5 action, a plaintiff must show that defendants had . . . the 'intent to deceive, manipulate, or defraud.'" Geffon v. Micrion Corp., 249 F.3d 29, 35 (1st Cir. 2001) (citing Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n.12 (1976)).  Scienter, in this case, may be established by showing that Defendants knowingly or recklessly issued the materially misleading press release.  See Aldrige, 284 F.3d at 82; see also

-20-

Greebel, 194 F.3d at 198 (defining the recklessness required
as "a highly unreasonable omission, involving . . . an
extreme departure from the standards of ordinary care, and
which presents a danger of misleading buyers or sellers that
is . . . so obvious the actor must have been aware of it").

    In making the scienter determination, a court must
evaluate "the totality of the circumstances." Crowell v.
Ionics, Inc., 343 F. Supp. 2d 1, 13 (D. Mass. 2004) (citing
Cabletron, 311 F.3d at 40).  The First Circuit has
"considered many different types of evidence as relevant to
show scienter," Greebel, 194 F.3d at 196 (citations
omitted), and has permitted plaintiffs to "combine various
facts and circumstances indicating fraudulent intent,"
Aldridge, 284 F.3d at 82; see also Cabletron, 331 F.3d at 40
(noting that while "[e]ach individual fact about scienter
may provide only a brushstroke," the "resulting portrait"
can meet the "strong inference" requirement).

    Ultimately, "[i]nferences must be reasonable and strong
-- but not irrefutable. . . . Plaintiffs need not foreclose
all other characterizations of fact, as the task of weighing
contrary accounts is reserved for the fact finder."
Aldridge, 284 F.3d at 82 (citing Helwig v. Vencor, Inc., 251
F.3d 540, 553 (6th Cir. 2001)).

    In light of these standards, the facts pled clearly give

-21-

rise to a strong inference that Defendants intended to perpetrate a fraud on the market when they issued the Intel press release.  In support of this conclusion, two factors are particularly significant: (1) Defendants' "motive and opportunity" to inflate Wave's stock artificially; and (2) Sprague and Feeney's insider sales.

Defendants assert that <u>Greebel</u> established a rule in this circuit "that an alleged motive and opportunity, without more, cannot establish a strong inference of scienter."[14]  In fact, <u>Greebel</u> explicitly rejected the argument that "facts showing motive and opportunity can never be enough to permit the drawing of a strong inference of scienter" -- a determination recognized and reiterated by subsequent First Circuit opinions. <u>See, e.g.</u>, <u>Cabletron</u>, 311 F.3d at 39 (citing <u>Greebel</u>, 194 F.3d at 197).

While <u>Greebel</u> did make clear the insufficiency of "catch-all allegations that defendants stood to benefit from wrongdoing and had the opportunity to implement a fraudulent scheme," 194 F.3d at 197 (citation omitted), this is not a case where Defendants merely had the common motive to promote corporate success "possessed, to a certain degree,

---

[14] (<u>See</u> Dkt. No. 59, Defs.' Mem. Supp. Mot. Dismiss 37 (citing <u>Greebel</u>, 194 F.3d at 197); Dkt. No. 70, Defs.' Reply Mem. Supp. Mot. Dismiss 20 ("Allegations of motive and opportunity . . . are <u>never enough</u> by themselves to create a strong inference of scienter.").)

by every corporate officer," In re Stratosphere Corp. Sec.
Litig., 1 F. Supp. 2d 1096, 1116 (D. Nev. 1998).  On the
contrary, the complaint paints the picture of a company
nearly a quarter billion dollars in debt and so desperate
for cash it would agree to private placement terms onerous
enough to bring it to the proverbial brink.  (See Am. Compl.
¶¶ 3-7.)

In short, Defendants had "more than the usual concern by
executives" to increase the value of Wave's stock; "the
executives' careers and the very survival of the company
were on the line." Cabletron, F.3d at 39; see also
Aldridge, 284 F.3d at 83 ("When financial incentives to
exaggerate earnings go far beyond the usual arrangements of
compensation based on the company's earnings, they may be
considered among other facts to show scienter."); Greebel,
194 F.3d at 196 (citation omitted) (recognizing the
relevance of "the self-interested motivation of defendants
in the form of saving their salaries or jobs").

Even where dire circumstances alone might fall short of
what the PSLRA and Rule 9(b) require, allegations of insider
trading "provide additional ballast to [Plaintiffs']
argument for scienter." Cabletron, 311 F.3d at 40.  Here,
Defendants aver that under Greebel, "mere pleading of
insider trading . . . is not enough." 194 F.3d at 198

(citation omitted).  They maintain that allegations of insider sales by Sprague and Feeney are inconsequential in light of Plaintiffs' failure to illustrate how such sales were "unusual, well beyond the normal patterns of trading by those defendants."  Id.

If Plaintiffs, in seeking to establish scienter, relied solely upon the insider sales in question, their failure to illustrate how such sales were inconsistent with past trading practices might be fatal.  See Focus Enhancements, 309 F. Supp. 2d at 162 (citation omitted).  However, as previously discussed, Plaintiffs' allegations of insider trading are ancillary in nature.  They buttress allegations concerning Defendants' motive and opportunity, and Plaintiffs' "case becomes . . . stronger . . . when the allegations are considered together."  Crowell, 343 F. Supp. 2d at 16 ("The way in which the allegedly fraudulent acts fit together and reinforce one another strongly suggests a conscious course of conduct.").

In Greebel, the court began by examining the context of the alleged insider sales.  Because none of the "key players" sold stock "at the high points of the stock price," but instead "waited to sell until after . . . an announcement which caused the price of the stock to fall," the Greebel court determined that the timing of the sales in

-24-

question was not suspicious.  194 F.3d at 206.

In contrast, Sprague and Feeney's sales occurred after an announcement that caused the price of the stock to rise and came at a time when they possessed material non-public information.  Consequently, the timing of such sales might be viewed as quite suspicious.

Defendants maintain that the Wave stock Sprague and Feeney did not sell rebuts any inference that they were out to capitalize on an inflated price.  They cite In re Advanta Corp. Sec. Litig., 180 F.3d 525 (3rd Cir. 1999), a case where the Third Circuit found that holdings retained by inside sellers suggested "they had every incentive to keep [the company] profitable." Id. at 541.  Unfortunately for Defendants, the holdings retained by Sprague and Feeney -- 80% and 50%, respectively -- pale in comparison to those retained by the Advanta insiders.  See id. at 540 (noting insiders retained 95% and 93%, respectively, of their total holdings).

Accordingly, this court concludes that Plaintiffs have satisfied the PSLRA's scienter requirement.

c.  Reliance.

As the First Circuit recently observed, "[r]equiring proof of individualized reliance . . . would effectively preclude securities fraud class actions." In re Xcelera.com

-25-

Sec. Litig., 430 F.3d 503, No. 05-1221, 2005 WL 3384684, at
*3 (1st Cir. 2005).

> To avoid this result, the Supreme Court has
> recognized the fraud-on-the-market theory, which
> relieves the plaintiff of the burden of proving
> individualized reliance on a defendant's
> misstatement, by permitting a rebuttable
> presumption that the plaintiff relied on the
> "integrity of the market price" which reflected
> that misstatement.

In re PolyMedica Corp. Sec. Litig., No. 05-1220, 2005 WL
3384083, at *5 (1st Cir. Dec. 13, 2005).

Defendants argue that the market price for Wave's stock
did not reflect any alleged misstatements.  They point out
that when Sprague told analysts that the Intel deal was a
non-exclusive licencing agreement, "the market's reaction,
as reflected by Wave's stock price, was virtually non-
existent."  (Dkt. No. 70, Defs.' Reply Mem. Supp. Mot.
Dismiss 1 (noting "a mere two cent (0.6%) difference from
the day prior to the disclosure to the day after").)  Since
"the concept of materiality translates into information that
alters the price of the firm's stock," In re Burlington Coat
Factory Sec. Litig., 114 F.3d 1410, 1425 (3rd Cir. 1997),
cited with approval in PolyMedica, 2005 WL 3384083, at *10,
Defendants maintain that the terms of the Intel agreement
were immaterial as a matter of law.  Consequently, their
argument runs, Plaintiffs are not entitled to the
presumption of reliance the "fraud on the market" theory

affords.  See Basic, 485 U.S. at 248 n.27 (finding that "in order to invoke the presumption, a plaintiff must allege" among other things, "that [Defendants'] misrepresentations were material").

The flaw in this argument is that it focuses on Sprague's "disclosure" in isolation.  During the conference call with analysts, Sprague did acknowledge that neither of the Company's new partners was obligated to purchase or use any Wave products or services.  However, Sprague subsequently predicted that Wave's relationship with Intel would soon be a significant revenue source and indicated that Wave insiders were "very comfortable" about the Wave's capacity to continue operations until significant revenue arrived.[15]

Drawing "all reasonable inferences from the particular allegations in [Plaintiffs'] favor," Aldridge, 284 F.3d at

---

[15] Defendants stress that the comfort Sprague expressed did not concern "any forecast regarding revenue or Intel. . . . Rather, the quoted comments were simply about whether the Company would be able to stay in business to see any potential benefits from recent developments in the market."  (Dkt. No. 70, Defs.' Reply Mem. Supp. Mot. Dismiss 7-8.)  Defendants may ultimately persuade the factfinder that this interpretation is more compelling, but a finding could as easily be made that the comments regarding "recent developments" were themselves materially misleading.  Cf. Swack v. Credit Suisse First Boston, 383 F. Supp. 2d 223, 240 (D. Mass. 2004) (refusing to dismiss in light of finding that "Defendants' conduct could have tempered a drop in price that would otherwise have occurred").

-27-

78, this court must conclude that Sprague's "disclosure" came in the midst of additional misrepresentations designed to maintain the Company's artificially inflated value. Consequently, the market's quiescence following the August 14th conference call does not preclude a presumption of reliance.[16]

     d.  <u>Loss Causation.</u>

Recently, the Supreme Court established that defrauded investors must do more than allege that "the price of the security on the date of purchase was inflated because of [a] misrepresentation." <u>Dura</u>, 125 S.Ct. at 1629 (citation omitted). To withstand a motion to dismiss, they must also plead actual economic loss and proximate causation.

Defendants contend that these plaintiffs, like those in <u>Dura</u>, have not done so. Once more, their argument is unavailing.

In <u>Dura</u>, the Court found that the complaint alleged

> the following (and nothing significantly more than
> the following) about economic losses attributable
> to [Defendants'] misstatement: "In reliance on the
> integrity of the market, [Plaintiffs] . . . paid
> artificially inflated prices for [Defendants']
> securities" and . . . suffered "damage[s]" thereby.

<u>Id.</u> at 1630.

---

    [16] Defendants may seek to rebut this presumption at the class certification stage where the dictates of <u>Polymedica</u> and <u>Xcelera.com</u> will control.

Here, Plaintiffs claim that Defendants artificially inflated Wave's stock during the class period by: (1) failing to disclose material information about the Company's relationship with Intel; and (2) making numerous misrepresentations regarding the likelihood that this relationship would fulfill Defendants' earlier predictions of a significant revenue stream.  (Am. Compl. ¶ 11-12 (alleging "Defendants pumped up the value of the Company's stock though materially false and misleading statements," which "caused Wave's stock to skyrocket" from "$0.84 per share" to "$4.42 per share").)

Next, Plaintiffs allege that news of an SEC investigation relating to Defendants' misleading statements "shocked the market, with shares falling 17.13%, or $0.31 per share, to close at $1.50 per share . . . on December 19, 2003."  (Id. at ¶ 13.)

The complaint thus "contains the very allegations regarding share price decrease and public exposure to the truth the Supreme Court found lacking in the Dura complaint."  In re Immune Response Sec. Litig., 375 F. Supp. 2d 983, 1025 (S.D. Cal. 2005).

Defendants contend that Wave's disclosure of the SEC investigation was not an admission that earlier statements

-29-

were materially misleading.[17]  While this may be so, <u>Dura</u>
does not require that a corrective disclosure precede a
stock's decline.  125 S.Ct. at 1631, 1632 (discussing the
implications of stock's initial inflation "before the
relevant truth begins to <u>leak out</u>" and "after the truth
<u>makes its way into the market place</u>") (emphasis added).[18]

Ultimately, the duration of the class period may make it
difficult for Plaintiffs to <u>prove</u> that Defendants'
misrepresentations caused their economic loss.  See <u>id.</u> at
1632 ("[T]he longer the time between purchase and sale, the
more likely . . . [it is] that other factors caused the

_____

[17]    (Dkt. No. 79, Defs.' Mot. Supplemental Authority 4.)
Defendants also submit that, during oral argument, "this court
recognized the absence of any necessary casual link between any
allegedly misleading statements and Wave's drop in stock price
following the announcement of the SEC investigation in
December, 2003."  (<u>Id.</u> at 3 n.1 (citing Dkt. No. 75, Tr. Hr'g
24).)
     It should come as no surprise that "[m]any judges use oral
argument as an opportunity . . . to focus the argument, or to
test the extreme implications of a litigants position.  A court
speaks authoritatively, however, only in its opinions, orders,
and judgments."  <u>Mgmt Inv. Funding Ltd. v. Merrill Lynch,
Pierce</u>, 2000 WL 145461, at *5 n.6 (S.D.N.Y. 2000), <u>rev'd on
other grounds by</u> 232 F.3d 153 (2nd Cir. 2000); <u>see also</u> <u>Graphic
Arts Intern. Union, Local 97-B v. Haddon</u>, 489 F. Supp. 1088,
1094 (D.C. Pa. 1979) ("Assuming a devil's advocate role is a
familiar ploy of the neutral decision-maker.").

[18]    <u>See also</u> Evan R. Chesler & J. Stephen Beke, <u>Loss
Causation Post-Dura</u>, 1517 Practicing L. Inst. Corp. L. & Prac.
Handbook Series 1277, 1282 (2005) ("<u>Dura</u> . . . did not purport
to address whether plaintiffs in misrepresentation and omission
cases . . . need explicitly allege that the subject matter of
the alleged misrepresentations or omissions was revealed to the
market by way of some 'corrective disclosure' . . . .").

loss."). However, in light of <u>Dura</u>'s acknowledgment that
Fed. R. Civ. P. 8(a)(2) applies to the pleading of economic
loss and proximate causation, this court must conclude that
Plaintiffs have furnished Defendants "with some indication
of [their] loss and the causal connection that [they have]
in mind." <u>Id.</u> at 1634.

    2.    <u>August 4, 2003, IBM Press Release.</u>

    In a press release issued on August 4, 2003, Wave stated
that its "partnership with IBM will significantly help us in
our objective to deliver open and interoperable solutions to
business customers." (Am. Compl. ¶ 42.) This statement is
actionable for it has "an aspect that encompasses a
representation of present fact." <u>Shaw</u>, 82 F.3d at 1213; <u>see
also</u> <u>No. Nine</u>, 51 F. Supp. 2d at 19 (holding that when
Plaintiffs "challenge the truthfulness of a claim regarding
<u>present facts</u>" the "'bespeaks caution' defense is
inapplicable"). It is also materially misleading in that it
failed to disclose facts that "would have been viewed by the
reasonable investor as having significantly altered the
'total mix' of information made available." <u>Basic</u>, 485 U.S.
at 231-32 (citing <u>TSC Indus.</u>, 426 U.S. at 449).

    3.    <u>August 5, 2003, New York Times Article.</u>

    On August 5, 2003, Plaintiffs allege that "a Wave

-31-

spokesperson confirmed and furthered the market's perception
of the Company's materially misleading August 4th
announcement" by informing the New York Times that "IBM
computers with built-in Wave security would be available in
the fourth quarter of [2003]." (Am. Compl. ¶ 45.)

     Defendants maintain that they cannot be held liable for
a statement made by a reporter in an independent newspaper.
In Cabletron, however, the First Circuit determined that

     [L]iability may attach to an analyst's statements
     where the defendants have expressly or impliedly
     adopted the statements, placed their imprimatur on
     the statements, or have otherwise entangled
     themselves with the analysts to a significant
     degree.

311 F.3d at 37-38 (citing Schaffer v. Timberland Co., 924 F.
Supp. 1298, 1310 (D.N.H. 1996)).  The Cabletron court
subsequently provided the following example of an allegation
that satisfied "the entanglement test":

     the complaint alleges that an analyst report . . .
     stated, on the basis of information from [an
     individual defendant] and other [company]
     executives, that the [product] would "ship in
     volume in the second week of April."

Id. at 38.  Due to the high degree of similarity between
this allegation and the one in question, the court concludes
that statements made in the New York Times article are

-32-

actionable.

    4.   <u>August 11, 2003, Form S-3/A.</u>

    Plaintiffs allege that statements in the Company's Form S-3/A dated August 11, 2003, describing Wave's purported deals with Intel and IBM as "material changes" were materially false and misleading.  (Am. Compl. ¶ 56.)  In response, Defendants point to express disclaimers that accompanied these statements, entitling them to safe harbor protection.  (<u>See</u> Dkt. No. 59, Defs.' Mem. Supp. Mot. Dismiss 17; Dkt. No. 70, Defs.' Reply Mem. 16.)  The problem with this contention has already been noted: because the terms of the Intel and IBM deals were matters of historical fact by the time Form S-3/A was filed, the statements in question cannot be construed as forward-looking, and the PSLRA's safe harbor provision does not apply. <u>See</u> <u>In re Stone & Webster, Inc., Sec. Litig.</u>, 414 F.3d 187, 213 (1st Cir. 2005), <u>reh'g denied by</u> 424 F.3d 24 ("The mere fact that a statement contains some reference to a projection of future events cannot sensibly bring the statement within the safe harbor if the allegation of falsehood relates to non-forward-looking aspects of the statement."). Thus, the court concludes the challenged statements are actionable.

    5.   <u>August 14, 2003, Conference Call.</u>

As previously discussed, the court deems actionable comments made by Sprague during the conference call with analysts concerning the likelihood that Wave's relationship with Intel would soon be a significant revenue source and the comfort level of Wave insiders as to the Company's capacity to continue operations until significant revenue arrived.  Cf. Sepracor, 308 F. Supp. 2d at 34 (finding statements could not be "deemed mere puffery" when allegations raised "strong inference that Defendants were aware of, or recklessly disregarded, undisclosed facts tending to seriously undermine the accuracy of any predictions").

6.  August 18, 2003, Prospectus.

On August 18, 2003, Defendants again characterized the Intel and IBM deals as "material changes" in a prospectus filed with the SEC.  This characterization, Plaintiffs maintain, was materially false and misleading.  (Am. Compl. ¶ 64.)  The court disagrees and concludes the statements in question are not actionable.  By August 18, 2003, the market was aware that Wave's Intel agreement lacked a minimum licensing requirement, and its IBM deal was not fee producing.  Consequently, a reasonable investor would not

have placed any significance on the allegedly "withheld or misrepresented information."  <u>Basic</u>, 485 U.S. at 240.

    7.  <u>August 20, 2003, Form S-3 Registration Statement.</u>

    Plaintiffs challenge a statement in the Form S-3 Registration Statement filed by the Company on August 20, 2003, characterizing the IBM "partnership" as a "licensing agreement."  (Am. Compl. ¶ 62.)  This allegation stands in contrast to previous ones in that Plaintiffs claim the statement is not merely incomplete but false.  (<u>Id.</u> at ¶ 64.)

    At first blush, this allegation appears "more quibble than material."  <u>In re PLC Systems, Inc. Sec. Litig.</u>, 41 F. Supp. 2d 106, 119 (D. Mass. 1999).  It is difficult to discern how a reasonable investor might differentiate news of a non-exclusive licensing agreement with no minimum licensing requirements from an announcement of product compatibility.  That being said, "[t]he materiality of a given statement" is generally regarded in this circuit as "'a question of fact that should . . . be left to a jury rather than resolved by the court on a motion to dismiss.'"  <u>In re PerkinElmer, Inc. Sec. Litig.</u>, 286 F. Supp. 2d 46, 52 (D. Mass. 2003) (citing <u>Cabletron</u>, 311 F.3d at 34).  The

court thus concludes that this statement, as part of the
basis for Plaintiffs' claims, is sufficient to survive the
motion to dismiss.

    8.   <u>August 22, 2003, Prospectus.</u>

    Similarly actionable is Defendants' alleged
representation of the IBM compatibility as a "licensing
agreement" in a prospectus filed by the Company on August
22, 2003.

    9.   <u>November 13, 2003, Press Release</u>.

    Finally, Plaintiffs contend that statements made by the
Company in a press release issued November 13, 2003,
purporting to "clearly see the growing momentum for trusted
computing in the marketplace" and conveying expectations of
"substantial growth"

> were materially false and misleading at the time
> they were made.  Defendants knew that the Company's
> prospects for growth were no more clear than they
> were at the onset of the Class Period.

(Am. Compl. ¶ 68.)  The November press release is a clear
case of puffery.  The statements in question are "so vague
[and] so lacking in specificity . . . that no reasonable
investor could find them important to the total mix of
information available."  <u>Shaw</u>, 82 F.3d at 1217.

Accordingly, the November 13, 2003 press release cannot provide the basis of any claim.

B.  <u>Pleading of Individual Defendants' Liability.</u>

Since a majority of the actionable statements were issued by Wave, Plaintiffs have clearly set forth a claim against the Company that satisfies the dictates of Rule 9(b) and the PSLRA.  <u>See</u> <u>Cabletron</u>, 311 F.3d at 40 ("The scienter alleged against the company's agents is enough to plead scienter for the company.")

As for Sprague and Feeney, the complaint alleges that each "held positions that would have given them not only access to, but close familiarity with, the details of [Wave's] affairs."  <u>PerkinElmer</u>, 286 F. Supp. 2d at 54-55. At all relevant times, Sprague served as the Company's President and Chief Executive Officer, and Feeney as Wave's Chief Financial Officer.  (Am. Compl. ¶¶ 20, 21.)

Plaintiffs also contend that Sprague himself made several statements deemed actionable, and that both individuals sold significant amounts of Wave stock while in possession of material non-public information.  Finally, both Sprague and Feeney signed SEC filings containing statements deemed to be actionable.  <u>See</u> <u>Cabletron</u>, 311 F.3d

-37-

at 41.[19]  Based on the foregoing, the court finds that the
complaint adequately states a claim of securities fraud
against the individual defendants.

C.    Rule 20(a).

Section 20(a) of the Securities Exchange Act of 1934
provides:

> Every person who, directly or indirectly, controls
> any person liable under any provision of this
> chapter or of any rule or regulation thereunder
> shall also be liable jointly and severally with and
> to the same extent as such controlled person to any
> person to whom such controlled person is liable,
> unless the controlling person acted in good faith
> and did not directly or indirectly induce the act
> or acts constituting the violation or cause of
> action.

In re Stone & Webster, Inc., Sec. Litig., 424 F.3d 24, 26
n.1 (1st Cir. 2005) (quoting 15 U.S.C. § 78t-1(a)).  Having
determined that Plaintiffs have sufficiently pled a
violation of Rule 10b-5, the court must now ask whether
Sprague and Feeney "actually exercise[d] control over the
company."  Aldridge, 284 F.3d at 85

Ordinarily, "[c]ontrol is a question of fact" not to be

---

[19]  The complaint alleges that Sprague and Feeney signed
Wave's Form 10-K/A filed with the SEC on June 30, 2003, but
does not explicitly allege that the individual defendants
signed any other SEC filings.    "A court may, however, in
evaluating . . . allegations [in a complaint,] look to
documents the authenticity of which are not disputed by the
parties, to documents that are central to the plaintiff's
claim, and to documents that are referenced in the complaint."
Garvey v. Arkoosh, 354 F. Supp. 2d 73, 79 (D. Mass. 2005)
(citing Watterson, 987 F.2d at 3).

"resolved summarily at the pleading stage." <u>Cabletron</u>, 311
F.3d at 41 (citation omitted).  The present case affords no
reason to deviate from this standard practice as Defendants'
entire Rule 20(a) argument rests upon the premise that
Plaintiffs inadequately pled an underlying predicate
violation.  Because Defendants' motion to dismiss the Rule
10b-5 claim will be denied, at least in part, Plaintiffs'
cause of action against Sprague and Feeney for control
person liability remains viable.  <u>Stumpf v. Garvey</u>, No. 03-
cv-1352-PB, 02-MDL-1335-PB, 2005 WL 2127674, at *13 n.16
(D.N.H. Sept. 2, 2005).

IV. <u>CONCLUSION</u>

For the reasons set forth above, Defendants' Motion to
Dismiss is hereby ALLOWED as to Statements 6 and 9 and
DENIED as to Statements 1-5 and 7-8.

Of course, finding allegations sufficient to withstand a
motion to dismiss is far cry from finding Defendants liable.
<u>See</u> <u>Serabian v. Amoskeag Bank Shares, Inc.</u>, 24 F.3d 357,
365-66 (1994), <u>superseded on other grounds by statute</u> <u>as
recognized in</u> <u>Greebel</u>, 194 F.3d at 197 ("Despite our
conclusion that certain allegations survive threshold
consideration, we note that plaintiffs remain a great
distance from actually proving securities fraud.").  This
court's conclusion that Plaintiffs' Rule 10b-5 and Section

20(a) "claim[s] survive[] a motion to dismiss is only that. The defendants may yet prevail once the facts of the case are further developed." <u>Aldridge</u>, 284 F.3d at 84.

The clerk will set the case for a Rule 16 conference to establish a schedule for completion of all pre-trial proceedings.

<u>/s/ Michael A. Ponsor</u>
MICHAEL A. PONSOR
U. S. District Judge