# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| ANNE BRUMBAUGH, GARY L. HARMON and RANDY K. GRIFFIN,<br>　　　　　　　　　Plaintiffs,<br><br>　　　v.<br><br>WAVE SYSTEMS CORPORATION, STEVEN K. SPRAGUE and GERARD T. FEENEY,<br>　　　　　　　　　Defendants. | CIVIL ACTION<br>NO. 04-30022-MAP |

## DEFENDANTS' MEMORANDUM OF LAW
## IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

WAVE SYSTEMS CORPORATION, STEVEN K. SPRAGUE and GERARD T. FEENEY,

By their attorneys

Robert A. Buhlman, BBO #554393
Michael D. Blanchard, BBO #636860
Sara A. Martin, BBO #645002
Robert B. Baker, BBO #654023
BINGHAM MCCUTCHEN LLP
150 Federal Street
Boston, MA 02110-1726
(617) 951-8000

June 6, 2006

TABLE OF CONTENTS

|  |  |  | Page |
|---|---|---|---|
| I. | INDIVIDUAL ISSUES OF LOSS CAUSATION WILL PREDOMINATE OVER ANY COMMON ISSUES | | 4 |
|  | A. | Plaintiffs Must – But Cannot – Identify A Common Methodology For Determining Loss Causation On A Class-Wide Basis | 6 |
|  | B. | Plaintiffs Identify No Corrective Disclosures That Caused Wave's Stock Price To Decline, Nor Can They | 7 |
|  |  | 1. Plaintiffs Have Failed To Identify Any Corrective Disclosure For Statements Made Prior To August 14, 2003 | 8 |
|  |  | 2. Plaintiffs Have Failed To Identify Any Loss Caused By Any Statements On Or Following August 14, 2003 | 12 |
|  |  | 3. Wave's December 18, 2003 Disclosure That It Was The Subject Of A Formal SEC Investigation Did Not Correct Any Of The Allegedly Misleading Statements | 14 |
| II. | THE PROPOSED CLASS REPRESENTATIVES ARE NEITHER TYPICAL NOR ADEQUATE | | 18 |
|  | A. | The Proposed Class Representatives Are Inadequate And Atypical Because The Class They Seek To Represent Is Comprised Of "In-And-Out" Traders With Individualized And Competing Interests | 19 |
|  |  | 1. No Plaintiff Could Represent The Proposed Class, 60-80% of Whom Are "In-And-Out" Traders, Each With Uniquely Individual And Conflicting Interests | 19 |
|  |  | 2. The Lead Plaintiffs Themselves Have Interests Antagonistic To Each Other, Illustrating The Impossibility Of A "Similarly Situated" Class | 23 |
|  | B. | Lead Plaintiffs Have Vested Counsel With Unfettered Control Of This Litigation And Are Accordingly Inadequate As A Matter Of Law | 25 |
|  |  | 1. Plaintiffs' Attorneys Are Pursuing This Litigation Through The Class Members -- Not The Other Way Around As Intended By Rule 23 | 26 |
|  |  | 2. Lead Plaintiffs Have Already Failed The Class By Failing To Negotiate A Fee Agreement With Counsel | 27 |
|  |  | 3. Lead Plaintiffs Have Not Taken An Active Role In The Litigation | 28 |

# **TABLE OF AUTHORITIES**

## **FEDERAL CASES**

In re Acterna Corp. Sec. Litig., 378 F. Supp. 2d 561 (D. Md. 2005) ................................17

In re Alamosa Holdings Inc., Sec. Litig., 382 F. Supp. 2d 832 (N.D. Tex. 2005) ............15

In re America Med. Sys., 75 F.3d 1069 (6th Cir. 1996) .......................................................4

Amchem Prod., Inc. v. Windsor, 521 U.S. 591 (1997).........................................................5

Avista Corp. Sec. Litig., 415 F. Supp. 2d 1214 (E.D. Wash. 2005)...................................15

In re Bally Total Fitness Sec. Litig., No. 04C3530, 2005 WL 627960
(N.D. Ill. Mar. 15, 2005)....................................................................................................24

In re Bank of Boston Corp. Sec. Litig., 762 F. Supp. 1525 (D. Mass. 1991) .....................18

Barr v. Matria Healtchare, Inc., 324 F. Supp. 2d 1369 (N.D. Ga. 2004)...........................15

Berger v. Compaq Comp. Corp., 257 F.3d 475 (5th Cir. 2001) ........................4, 18, 26, 29

Binder v. Gillespie, 184 F.3d 1059 (9th Cir. 1999),
cert. denied, 528 U.S. 1154 (2000) .....................................................................................5

Blades v. Monsanto Co., 400 F.3d 562 (8th Cir. 2004)...................................................4, 5

In re Carbon Black Antitrust Litig., *No. Civ. A. 03-10191-DPW*, 2005 WL 102966
(D. Mass. Jan. 18, 2005) .....................................................................................................4

In re Cendant Corp. Litig., 264 F.3d 201 (3d Cir. 2001) ..................................................27

In re Clearly Canadian Sec. Litig., 875 F. Supp. 1410 (N.D. Cal. 1995) ...................22, 25

In re Compuware Sec. Litig., 386 F. Supp. 2d 913 (E.D. Mich. 2005) ........................14, 24

In re Credit Suisse First Boston Corp. Analyst Reports Sec. Litig., No. Civ.A.02
12056-GAO, 2005 WL 852455 (D. Mass. Mar. 31, 2005).................................................14

D. E. & J Ltd. P'Ship v. Conaway, 284 F. Supp. 2d 719 (E.D. Mich. 2003),
aff'd, 133 Fed. Appx. 994 (6th Cir. June 10, 2005) ..........................................................11

Davidco Investors, LLC v. Anchor Glass Container Corp., No. 8:04CV2561T
24EAJ, 2006 WL 547989 (M.D. Fla. Mar. 6, 2006).........................................................24

Dura Pharm., Inc. v. Broudo, 125 S. Ct. 1627 (2005) ...................................................6, 15

In re Fidelity/Apple Sec. Litig., 986 F. Supp. 42 (D. Mass. 1997)...................................14

Fogarazzao v. Lehman Brothers, Inc., 232 F.R.D. 176 (S.D.N.Y. 2005)..........................5

Gariety v. Grant Thornton, LLP, 368 F.3d 356 (4th Cir. 2004) ........................................4

Grandon v. Merrill Lynch & Co., No. 95 Civ. 10742 (SWK), 2003 WL 22118979
(S.D.N.Y. Sept. 11, 2003)..................................................................................................6

In re Initial Public Offering Sec. Litig., 227 F.R.D. 65 (S.D.N.Y. 2004)..............5, 6, 7, 13

Johnston v. HBO Film Mgmt., Inc., 265 F.3d 178 (3d Cir. 2001) .....................................4

Kase v. Salomon Smith Barney, Inc., 218 F.R.D. 149 (S.D. Tex. 2003) .........................32

Key v. Gillette Co., 782 F.2d 5 (1st Cir. 1986)................................................................18

Lentell v. Merrill Lynch & Co., 396 F.3d 161 (2d Cir. 2005).....................................11, 14

Leykin v. AT&T Corp., et al., 423 F. Supp. 2d 229 (S.D.N.Y. 2006)...............................15

In re Lucent Tech., Inc. Sec. Litig., 194 F.R.D. 138 (D.N.J. 2000).................................27

In re Merrill Lynch Tyco Research Sec. Litig., 03 CV 4080 (MP), 2004 U.S. Dist.
LEXIS 2247 (S.D.N.Y. Feb. 18, 2004)............................................................................15

In re Microstrategy Inc. Sec. Litig., 110 F. Supp. 2d 427 (E.D. Va. 2000)......................24

In re Milestone Sci. Sec. Litig., 187 F.R.D. 165 (D.N.J. 1999).................................26, 28

Newton v. Merrill, Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154
(3d Cir. 2001)..................................................................................................................4, 5

O'Neil v. Appel, 165 F.R.D. 479 (W.D. Mich. 1996)........................................................22

In re Polymedica Corp. Sec. Litig., 432 F.3d 1 (1st Cir. 2005) .........................................3

In re Quintus Sec. Litig., 201 F.R.D. 475 (N.D. Cal. 2001) ............................................28

Robbins v. Koger Props., Inc., 116 F.3d 1441 (11th Cir. 1997).......................................11

Rolex Employees Ret. Trust v. Mentor Graphics Corp., 136 F.R.D. 658
(D. Or. 1991)..............................................................................................................12, 31

In re Safeguard Scientifics, 216 F.R.D. 577 (E.D. Pa. 2003) ..................................12, 24

In re Seagate Tech. II Sec. Litig., 843 F. Supp. 1341 (N.D. Cal. 1994) ......................22, 25

Shaw v. Digital Equip. Corp., 82 F.3d 1194 (1st Cir. 1996) .............................................13

Smilow v. Southwestern Bell Mobile Sys., Inc., 323 F.3d 32 (1st Cir. 2003) ................3, 4

Smyth v. Carter, 168 F.R.D. 28 (W.D. Va. 1996) ............................................................31

Solomon v. Peat, Marwick, Main & Co., No. 91-55453, 1992 WL 231098
(9th Cir. Sept. 21, 1992)................................................................................................24

In re Sonus Networks Sec. Litig., 229 F.R.D. 339 (D. Mass. 2005) ...........................24, 26

Szabo v. Bridgeport Machs., Inc., 249 F.3d 672 (7th Cir. 2001),
cert. denied, 534 U.S. 951 (2001) ..................................................................................4

Tardiff v. Knox County, 365 F.3d 1 (1st Cir. 2004)............................................................3

Teco Energy, Inc. Sec. Litig., No. 8:04-C 2006 WL 845161
(M.D. Fla. Mar. 30, 2006)..........................................................................................6, 14

In re Tellium Inc. Sec Litig., *No. Civ. A. 02CV5878FLW*, 2005 WL 2090254
    (D.N.J. Aug. 26, 20-05) ............................................................................................15

Unger v. Amedisys, Inc., 401 F.3d 316 (5th Cir. 2005) ......................................................4

Waste Mgmt. Holdings, Inc. v. Mowbray, 208 F.3d 288 (1st Cir. 2000)............................3

West v. Prudential Secs., Inc., 282 F.3d 935 (7th Cir. 2002) .............................................5

Ziemack v. Centel Corp., 163 F.R.D. 530 (N.D. Ill. 1995) ........................................22, 23

**FEDERAL STATUTES**

Fed. R. Civ. P. 23(a) ...............................................................................................18, 19, 31

Fed. R. Civ. P. 23(b) .....................................................................................................5, 6

**MISCELLANEOUS**

7A C. Wright & A. Miller, Federal Practice & Procedure § 1765 at 321
(3d ed. 2005) ................................................................................................................. 26

# **PRELIMINARY STATEMENT**[1]

In this lawsuit, Lead Plaintiffs Anne Brumbaugh ("Ms. Brumbaugh"), Gary L. Harmon ("Mr. Harmon"), and Randy K. Griffin ("Mr. Griffin") (collectively, the "Lead Plaintiffs" or "Plaintiffs"), allege that Wave made misleading statements concerning the nature of its business relationships with Intel Corporation ("Intel") and International Business Machines Corp. ("IBM"). Plaintiffs allege that the "true facts" about Intel and IBM were revealed on December 18, 2003, the end of the proposed Class Period, when Wave disclosed that the Securities Exchange Commission ("SEC") had begun a formal investigation.[2] Lead Plaintiffs identify no other event during the Class Period that revealed to the market any of the "true facts" that they claim were omitted from the Intel and IBM disclosures.

This Court has acknowledged, however, that during a conference call with investors shortly after the trading day ended on August 14, 2003, Wave's CEO, Mr. Steven Sprague, disclosed the alleged "true nature" of Wave's business relationships with Intel and IBM. As Defendants' expert, Dr. Christopher James, has concluded, Wave's stock price reaction to that event was statistically insignificant. Accordingly, Plaintiffs cannot -- as they must -- demonstrate a common methodology for determining loss causation for the Class with respect to statements made prior to August 14, 2003. Conversely, the Plaintiffs are also unable to demonstrate a method for proving loss causation for statements made after August 14, 2003,

---

[1] Defendants Wave Systems Corporation ("Wave"), Steven K. Sprague and Gerard T. Feeney (collectively, the "Defendants") submit this memorandum of law in opposition to Lead Plaintiffs' Motion for Class Certification (the "Certification Motion").

[2] Memorandum of Law in Support of Certification Motion at p. 1 (the proposed class consists of "all persons or entities who purchased the common stock of [Wave] on the open market during the period from July 31, 2003 through December 18, 2003, inclusive"). The proposed class excludes "defendants, immediate families, any subsidiary, affiliate, or control person of any such person or entity, the offers of Wave and the legal representatives, heirs, successors or assigns of any such excluded party." Id.

because (i) none of the post-August 14 statements caused any price inflation in Wave's stock, and (ii) in any event, Plaintiffs fail to identify any corrective disclosures concerning these statements.

The foregoing is dispositive. But even if it were not, the Lead Plaintiffs are inadequate and atypical of the class they purport to represent and accordingly cannot serve as class representatives under Rule 23. What is not alleged in the Amended Complaint, but is established by the Affidavit of Dr. Christopher James ("James Aff.") after reviewing trading data from NASDAQ[3], is that <u>60 to 80 %</u> of the trading volume in the first several days of the Class Period (which period accounts for the majority of the total trading volume during the entire Class Period) was associated with either market makers or short sellers.[4] To obtain a recovery, these purported class members (<u>i.e.</u> a majority of the Class) must pursue individualized theories of liability that directly conflict with: the allegations in the Amended Complaint; the interests of other Class members who held their Wave stock until the end of the Class Period; and even the interests of other short sellers and market makers. Litigating this case as a class action will require virtually as many mini-trials as there are short seller and market maker class members. Therefore, as courts have found in similar circumstances, <u>no plaintiff</u> could satisfy the typicality and adequacy requirements to serve as a representative of the purported Class, as courts have held in similar circumstances.

Finally, even if any coherent, similarly situated class could be certified (and one cannot), the Lead Plaintiffs have failed to qualify themselves as adequate representatives. As courts have widely acknowledged, securities litigation should be pursued by allegedly injured investors

---

[3] Dr. James' Affidavit and its corresponding exhibits have been filed separately.

[4] James Aff. at ¶¶ 24-28.

through class counsel -- not the other way around. But here, Lead Plaintiffs, who were recruited by class counsel to sue Wave, have effectively given free reign to their attorneys. Their deposition testimony demonstrates a lack of participation in this litigation on their behalf, a lack of understanding of what the claims are, and, in general, a failure to protect the interests of the Class they seek to represent. Indeed, even at this late juncture, the Lead Plaintiffs have failed to take the first important step (and as courts have recognized, the litmus test for determining adequacy) of negotiating a fee agreement -- <u>any</u> fee agreement -- with counsel. In sum, this is lawyer driven litigation, antithetical to the spirit of the Private Securities Litigation Reform Act ("PSLRA") and Rule 23.

The Plaintiffs' motion for class certification should be denied.

## STANDARD FOR CLASS CERTIFICATION

In deciding whether to certify a class, "[a] district court must conduct a rigorous analysis of the prerequisites established by Rule 23." <u>Smilow v. Southwestern Bell Mobile Sys., Inc.</u>, 323 F.3d 32, 38 (1st Cir. 2003). This Court is <u>not</u> required to accept the Amended Complaint's allegations as true, as Plaintiffs mistakenly contend. <u>See</u> Moving Brief at 8. Rather, the First Circuit has stated that, at the class certification stage, the "court has the power to test disputed premises," and should "proceed based on its reasonable best guess as to what will happen." <u>Tardiff v. Knox County</u>, 365 F.3d 1, 4, 6 (1st Cir. 2004). <u>See also</u>, <u>In re Polymedica Corp. Sec. Litig.</u>, 432 F.3d 1, 6 (1st Cir. 2005) ("in light of our prior precedent, we conclude that the district court was entitled to look beyond the pleadings in its evaluation of the applicability of the fraud-on-the-market presumption of reliance, and its resolution of the class-certification question").[5]

---

[5] <u>See also</u> <u>Waste Mgmt. Holdings, Inc. v. Mowbray</u>, 208 F.3d 288, 297-98 (1st Cir. 2000) ("it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question… a district court must formulate some prediction as to how specific issues will play out in order to determine whether common

3

Indeed, the majority of Circuits to address the issue hold that simply accepting the plaintiffs' allegations as true is reversible error.[6]

<u>Plaintiffs bear the burden of proof for all elements of Rule 23</u>. Smilow, 323 F.3d at 38 (citing Amchem Prod., Inc. v. Windsor, 521 U.S. 591, 614 (1997)). Accordingly, failure to proffer proof for the any of the requisites of Rule 23 may be fatal to Plaintiffs' motion for class certification.[7] As demonstrated herein, the Plaintiffs have not even addressed the central issues to their class certification motion, and otherwise have failed to meet their burden.

## **ARGUMENT**

---

or individual issues predominate in a given case"); Unger v. Amedisys Inc., 401 F.3d 316, 322 (5th Cir. 2005) (Because [the market efficiency determination, which is an essential element of the fraud on the market theory,] can prove decisive for class certification, and because, given the realities of litigation costs, certification can compel settlements without trial, courts have frequently applied rigorous, though preliminary, standards of proof to the market efficiency determination"); Blades v. Monsanto Co., 400 F.3d 562, 575 (8th Cir. 2004) ("in ruling on class certification, a court may be required to resolve disputes concerning the factual setting of the case"); Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154, 167-68 (3d Cir. 2001) ("Irrespective of the merits, certification decisions may have a decisive effect on litigation… [G]ranting certification may generate unwarranted pressure to settle nonmeriorius or marginal claims… In reviewing a motion for class certification, a preliminary inquiry into the merits is sometimes necessary to determine whether the alleged claims can be properly resolved as a class action. This is such and instance. We must probe beyond the surface of plaintiffs' allegations in performing our review to assess whether plaintiffs' securities claims satisfy Fed. R. Civ. P. 23's requirements."); In re Carbon Black Antitrust Litig., No. Civ. A. 03-10191-DPW, 2005 WL 102966, at *9 n.10 (D. Mass. Jan. 18, 2005) (court may assess the entire record when ruling on a class certification motion). All unreported authorities cited herein are located in the Defendants' Compendium of Unreported Authorities In Support of The Defendants' Opposition To Plaintiffs' Motion For Class Certification.

[6] See Gariety v. Grant Thornton, LLP, 368 F.3d 356, 365 (4th Cir. 2004); Johnston v. HBO Film Mgmt., Inc., 265 F.3d 178, 186-89 (3d Cir. 2001); Szabo v. Bridgeport Machs., Inc., 249 F.3d 672, 675-76 (7th Cir. 2001), cert. denied, 534 U.S. 951 (2001).

[7] See, e.g., Berger v. Compaq Comp. Corp., 257 F.3d 475, 479 (5th Cir. 2001) (overturning the district court's decision to grant class certification because the district court improperly presumed the adequacy of the proposed class representatives and "[a]n action may proceed as a class action only if the party seeking certification demonstrates that all four of the familiar requirements of rule 23(a) are satisfied"); In re America Med. Sys., 75 F.3d 1069, 1086 (6th Cir. 1996) (overturning the district court's decision to grant class certification because "the practical effect of the proceeding below was to place the burden on defendants to disprove plaintiffs' 'entitlement' to class certification.").

4

LITDOCS/643093.1

**I. INDIVIDUAL ISSUES OF LOSS CAUSATION WILL PREDOMINATE OVER ANY COMMON ISSUES.**

To certify a class, Lead Plaintiffs must establish that "questions of law or fact common to the members of the class <u>predominate</u> over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3) (emphasis added). The mere existence of some common issues is insufficient -- predominance is required.[8] On class certification, securities plaintiffs alleging violations of Section 10(b) of the 1934 Act must establish the predominance of common issues concerning, among other things, loss causation. See, e.g., <u>Newton v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.</u>, 259 F.3d 154, 189 (3d Cir. 2001) (affirming denial of certification of a Section 10(b) class where determining the existence of loss would require individual analysis of each investor's trades, and, therefore, "[t]he individual questions… are overpowering."); <u>Fogarazzao v. Lehman Bros., Inc.</u> 232 F.R.D. 176, 187 (S.D.N.Y. 2005) ("Under Rule 23(b)(3), plaintiffs must make some showing that common questions will predominate over individual questions. Because individual adjudication of loss causation would cause individual issues to predominate, plaintiffs in securities fraud actions 'must present a methodology for determining loss causation that may be commonly applied to all members of the class.'") (quoting <u>In re Initial Public Offering Sec. Litig.</u>, 227 F.R.D. 65, 111 (S.D.N.Y. 2004) (the "<u>IPO Allocation Cases</u>")).[9] The Plaintiffs have not met their burden, nor can they.

---

[8] See <u>Amchem Prods.</u>, 521 U.S. at 623-24 ("Even if Rule 23(a)'s commonality requirement may be satisfied…, the predominance criterion is far more demanding."); <u>Blades</u>, 400 F.3d at 566 (8th Cir. 2004) ("If, to make a prima facie showing on a given question, the members of a proposed class will need to present evidence that varies from member to member, then it is an individual question. If the same evidence will suffice for each member to make a prima facie showing, then it becomes a common question.") (citing <u>In re Visa Check/MasterMoney Antitrust Litig.</u>, 280 F.3d 124, 136-40 (2d Cir. 2001), <u>cert. denied,</u> 536 U.S. 917 (2002)).

[9] <u>See also</u>, <u>West v. Prudential Secs., Inc.</u>, 282 F.3d 935, 938-40 (7th Cir. 2002) (reversing certification because plaintiffs' expert failed to "exclude other potential sources of price movement"); <u>Blades</u>, 400 F.3d at 575 (8th Cir. 2005) (affirming denial of class certification where plaintiffs failed to demonstrate they could "prove classwide injury with common evidence"); <u>Binder v. Gillespie</u>, 184 F.3d 1059, 1066 (9th Cir. 1999), <u>cert. denied,</u>

5

### A. Plaintiffs Must – But Cannot – Identify A Common Methodology For Determining Loss Causation On A Class-Wide Basis.

Loss causation is an affirmative element of the Plaintiffs' Section 10(b) claims, as the Supreme Court has held that plaintiffs must plead and prove that "the defendant's misrepresentations 'caused the loss for which the plaintiff seeks to recover,'" and not "changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events…." Dura Pharm., Inc. v. Broudo, 125 S. Ct. 1627, 1632 (2005) (citation omitted). To satisfy loss causation requirements, the Plaintiffs must identify "corrective disclosures" where information previously omitted is revealed, causing the price of the stock to decline.[10] Where the alleged artificial inflation dissipated over time, "Plaintiffs must provide a mechanism for proving that inflation dissipation occurred throughout the Class Period." Id. at 112. As the court in the IPO Allocation Cases explained:

> Otherwise, investors who purchased after all artificial inflation created by the alleged scheme had dissipated would be differently situated (i.e., they would be forced to prove loss causation individually using alternatives to the class method of proof), and individual questions would dominate the loss causation inquiry.

227 F.R.D. at 112.

The issue of loss causation is an essential component of the class certification calculus, and "[u]nder Rule 23(b)(3), plaintiffs must present a methodology for determining loss causation

---

528 U.S. 1154 (2000) (affirming decertification of class where, inter alia, plaintiffs failed to make showing of loss causation); Grandon v. Merrill Lynch & Co., No. 95 Civ. 10742 (SWK), 2003 WL 22118979, * 4 - *9 (S.D.N.Y. Sept. 11, 2003) (denying class certification in Section 10(b) case where proof of injury "requires an individualized assessment of each [securities] purchase").

[10] See, e.g.,Teco Energy, Inc. Sec. Litig., No. 8:04-CV-1948-T-27EAJ, 2006 WL 845161, *2 (M.D. Fla. Mar. 30 2006) (granting defendants' motion to dismiss for failure to plead loss causation and noting the standard for pleading loss causation under the PSLRA and Dura: "Pursuant to the PSLRA, a plaintiff has the burden of proving that each alleged misrepresentation or omission proximately caused the plaintiff's economic loss… [T]o sufficiently plead loss causation, a plaintiff must allege a disclosure or revelation of truth about a defendant's prior misstatement or omission that is in some way connected with a stock price drop.").

that may be commonly applied to all members of the class." IPO Allocation Cases, 227 F.R.D. at 111.[11] Lead Plaintiffs fail to identify a single viable corrective disclosure, and similarly fail to identify a mechanism for determining inflation dissipation through the Class Period. Both failures preclude class certification here.

### B. Plaintiffs Identify No Corrective Disclosures That Caused Wave's Stock Price To Decline, Nor Can They.

The Plaintiffs identify no viable corrective disclosure for proving loss causation in this case. Plaintiffs purport to identify only one corrective disclosure -- the December 18, 2003 press release announcing that Wave was under SEC investigation.[12] Plaintiffs cannot obtain class certification based on the December 18th press release, however, for the following reasons:

- With respect to the alleged omissions in statements made by Wave prior to August 14, 2003, as acknowledged by this Court, the alleged "true facts" concerning these omissions were known to the marketplace no later than August 14, 2003[13] -- long before the December 18th press release, which in any event mentions nothing about the allegedly

---

[11] To satisfy this requirement, plaintiffs may, and often do, submit expert evidence at the class certification stage on loss causation, and the question for the court is "whether plaintiffs' expert evidence is sufficient to demonstrate common questions of fact warranting certification of the proposed class…" Id.

[12] Amended Complaint at ¶¶ 70-73 (the Plaintiffs allege that "news of the [SEC's] investigation" relating "to certain public statements made by Wave during and around August 2003, as well as certain trading in Wave's securities during such time" "shocked the market, with shares falling 17.13% or $0.31 per share, to close at $1.50 per share on extremely high volume on December 19, 2003.").

[13] As acknowledged by the Court, "[b]y August 18, 2003, the market was aware that Wave's Intel agreement lacked a minimum licensing requirement, and its IBM deal was not fee producing." January 11, 2006 Memorandum And Order Regarding Defendants' Motion to Dismiss at page 34. See also, Harmon Dep. at 129-32; James Aff. at ¶14.

Defendants do not agree that they made corrective disclosures during the conference call because they had nothing to correct. Concerning Wave's relationship with Intel, Dr. James concluded that:

> I have seen no evidence that the relationship with Intel and the potential for revenues were misconstrued or misunderstood by the market. In fact, the press release, the reporting in the public press that followed the press release, as well as postings on Internet message boards in early August by investors following Wave Systems, all cited that financial terms of the Intel relationship were not disclosed.

James Aff. at ¶12.

7

omitted information in these omissions. Wave's stock price change following the August 14, 2003 disclosures was not statistically significant -- <u>i.e.</u> it did not react for loss causation purposes -- and accordingly the Plaintiffs can show <u>no</u> loss that was caused by these statements.

- None of the alleged misrepresentations made on or after August 14, 2003 can be tied to the inflation of Wave's stock price because Wave's share price did not increase in response to these alleged misrepresentations. Moreover, Plaintiffs do not allege a corrective disclosure concerning these statements. The December 18, 2003 press release communicates <u>no new information</u> (other than the fact of an investigation), and accordingly cannot serve as a corrective disclosure for these statements as a matter of law.

For these reasons, as explained further below, class certification should be denied.

### 1. Plaintiffs Have Failed To Identify Any Corrective Disclosure For Statements Made Prior To August 14, 2003.

The information allegedly omitted from Wave's statements prior to August 14, 2003 was revealed to the market long before December 18, 2003, the date that Wave announced it was under a formal SEC investigation. Notably, during the August 14, 2003 conference call with investors, Mr. Sprague disclosed all of the alleged "true facts" concerning the alleged omissions made by Wave prior to August 14th:

| **Alleged Omissions** | **August 14, 2003 Disclosures[14]** |
|---|---|
| *Wave's August 4, 2003 Press Release*<br>*Concerning Wave's Relationship With Intel* | *Mr. Sprague's Statements*<br>*Concerning Wave's Relationship With Intel* |
| • Plaintiffs allege that Wave's July 31, 2003 press release announcing that an agreement between Wave and Intel would "enable Intel to bundle Wave's software and services with a future Intel desktop motherboard," contained a material omission because it <u>did not disclose that the agreement "merely</u> | • Mr. Sprague stated that the Intel agreement <u>did not guarantee any revenues</u> and the <u>revenues from the deal would depend on the volume of orders from Intel,</u> which was strictly within Intel's discretion.<br>• Specifically, he said: "Intel hasn't been |

---

[14] A copy of the transcript of Wave's August 14, 2003 conference call with investors concerning Wave's second quarter 2003 results is located in the Appendix of Exhibits to Defendants' Memorandum of Law In Opposition To Plaintiffs' Motion For Class Certification (hereafter "App. Exh.") at App. Exh. 6.

[15] <u>See also</u>, Amended Complaint at ¶¶ 11-12. A copy of Wave's July 31, 2003 press release concerning Wave's relationship with Intel is located at App. Exh. 1.

8

| Alleged Omissions | August 14, 2003 Disclosures[14] |
|---|---|
| provided Intel with non-exclusive licensing rights to use Wave's products, without any minimum licensing requirement." Amended Complaint at ¶ 41.<br><br>• In addition, Plaintiffs allege that "[i]f the truth concerning the Intel 'agreement' had been disclosed by Defendants, investors, would have learned that the purported deal with Intel was not likely to be a component of the anticipated '$5 million in gross margin contribution' that Defendants had announced just before the start of the Class Period." Id.[15] | specific about what their volumes are in the market and I'll let Intel answer ultimately that volume question. We receive a fee on a per motherboard basis. There are no minimums in the contract and there are no maximums in the contract. They decide what products they put it on and how many products they put it on… [I]t's not an exclusive with Intel… They can use it as broadly as they want or as little as they want. |
| *Wave's August 4, 2003 Press Release Concerning Wave's Relationship With IBM*<br><br>• Plaintiffs allege that the following statement from Wave's August 4, 2003 press release is misleading: "Wave's partnership with IBM will significantly help us in our objective to deliver open and interoperable solutions to business customers as trusted computing continues to evolve."[16]<br><br>*August 5, 2003 New York Times Article Concerning Wave's Relationship With IBM*<br><br>• In the Amended Complaint, Plaintiffs allege that "On August 5, 2003, a Wave spokesperson confirmed and furthered the market's perception of the Company's materially misleading August 4th announcement: that the IBM deal meant Wave's product would be bundled with IBM computers."[17] | *Mr. Sprague's Statements Concerning Wave's Relationship With IBM*<br><br>• In describing the nature of Wave's relationship with IBM, Mr. Sprague stated that the IBM relationship was not the same as the Intel relationship because: it was not even a licensing agreement giving IBM a right to bundle Wave's product on IBM's computers, it only allowed Wave, as an Independent Software Vendor, to offer its products to IBM's customers with TPM platforms, and it was not fee producing.<br><br>• Specifically, Mr. Sprague stated: "In some ways [the IBM relationship] is very different [from the Intel relationship]. Intel is a customer who has purchased a license to certain software that they have the right to bundle, and they can decide what |

---

[16] See Amended Complaint at ¶¶ 11-12 and 42. A copy of Wave's August 4, 2003 press release concerning Wave's relationship with IBM is located at App. Exh. 2.

[17] Amended Complaint at ¶ 45. A copy of the New York Times article concerning Wave's relationship with IBM is located at App. Exh. 3.

| **Alleged Omissions** | **August 14, 2003 Disclosures**[14] |
|---|---|
| *Wave's August 11, 2003, SEC Form S-3/A Concerning The IBM And Intel Relationships*<br><br>• Similarly, in the Amended Complaint, Plaintiffs allege that "Defendants['] statements contained in the Company's [August 11, 2003 SEC Form S-3/A] filing described above were materially false and misleading at the time they were made. <u>Defendants knew that the Intel deal would not generate the revenue steam forecast by the Company at any time in the foreseeable future</u>, if ever, and that the <u>IBM relationship was not fee producing</u>. Contrary to Defendants representations, the purported Intel and IBM deals were not 'material changes.'"[18] | platforms it goes on and what specific services they want to bundle or not bundle. In the case of IBM, <u>it's an Independent Software Vendor program where what we have done is certify</u>. They've taken our software; tested it; said yes, this does what it says it does. It uses a TPM properly. It works with the IBM platform. So <u>we can then go offer it as an [ap]proved supplier to IBM to customers who purchase TPM platforms,</u> both IBM platforms, although ultimately this will work on any of the TPM platforms." |

As Dr. James concluded: "Given the explanations offered by the Company during the second quarter earnings conference call, it is evident that by August 14, 2003 market participants were aware of all relevant information composing the basis of the Plaintiffs' allegations."[19] Even Lead Plaintiff Mr. Harmon acknowledged that Wave's disclosures during the August 14th conference call clarified the true facts concerning the nature of Wave's relationships with Intel and IBM.[20] And this Court has already ruled on the issue: "By August 18, 2003, the market

---

[18] Amended Complaint at ¶¶ 55-56. A copy of Wave's August 11, 2003, SEC Form S-3/A concerning Wave's relationship with Intel and IBM is located at App. Exh. 4.

[19] James Aff. at ¶ 14.

[20] In his deposition, Mr. Harmon was asked whether it was clear from Mr. Sprague's comments on the August 14, 2003 conference call that Wave's relationship with Intel was not exclusive and that Intel was not required to purchase anything from Wave:

> Question: Is it clear from Mr. Sprague's response that Wave did not have an exclusive deal with Intel?
> Answer: That's clear.
> Question: Okay. Is it clear from Mr. Sprague's response that Intel was not required to bundle any services on Intel motherboards, any particular number of Wave products on Intel motherboards?
> Answer That is too -- that too is clear.

10

was aware that Wave's Intel agreement lacked a minimum licensing requirement, and its IBM deal was not fee producing." January 11, 2006 Memorandum And Order Regarding Defendants' Motion to Dismiss at page 34. Accordingly, the allegedly omitted information from the first four allegedly misleading statements was revealed no later than August 14, 2003, and, in response, Wave's stock price remained virtually unchanged.[21]

The August 14, 2003 disclosures and failure of the market to react to the same effectively eliminates any theory of loss causation concerning the alleged pre-August 14th omissions. Purchasers of Wave's stock before August 14th cannot claim a "loss" based on pre-August 14th statements because the purported "corrective disclosure" did not cause a statistically significant decline in Wave's stock price.[22] Nor can investors who purchased Wave stock after August 14, 2003 claim any loss based on pre-August 14th statements because the market was already aware

---

Harmon Dep. at 129  Mr. Harmon also testified that Mr. Sprague made it clear that, pursuant to Wave's relationship with IBM, Wave was not guaranteed any business from the relationship:

> Question: Is it clear from Mr. Sprague's response that Wave didn't have a contract with IBM that required IBM to bundle any of its services?
>
> Answer: Well, they have the right to bundle. That's all it says there. They can decide -- IBM can decide what they bundle or not.

Harmon Dep. at 131-32.  Transcripts of Lead Plaintiffs' deposition testimony are attached at App. Exhs 5,7 and 8.

[21] Wave's August 14, 2003 conference call with analysts concerning Wave's second quarter 2003 results occurred in the afternoon after the trading day ended on August 14, 2003. On August 15, 2003, Wave's stock opened at $3.11, closed at $3.20 and traded at an intraday high of $3.39, exactly the same price it closed at on August 14, 2003, shortly before the conference call began. This and other data concerning Wave's price history demonstrates that Wave's stock price reaction to the August 14, 2003 conference call was statistically insignificant. James Aff. at ¶ 15. Accordingly, the alleged omission of the information concerning the details of the IBM and Intel relationships caused no loss as a matter of law. See Lentell v. Merrill Lynch & Co., 396 F.3d 161 (2d Cir. 2005) ("[T]o establish loss causation, "a plaintiff must allege . . . that the subject of the fraudulent statement or omission was the cause of the actual loss suffered," i.e., that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security."); Robbins v. Koger Props., Inc., 116 F.3d 1441 (11th Cir. 1997) (reversing $81 million jury verdict on loss causation grounds because $100 million in GAAP violations were not revealed to the market until after stock drop about which plaintiffs complained).

[22] D. E. & J Ltd. P'Ship v. Conaway, 284 F. Supp. 2d 719, 749 n.26 (E.D. Mich. 2003), aff'd, 133 Fed. Appx. 994 (6th Cir. June 10, 2005) (granting motion to dismiss for failure to adequately plead loss causation and finding that "[i]t is noteworthy that, in contrast to the substantial decline in share price that occurred on or before January 22, 2002, the date of Kmart's bankruptcy filing--from $9.09 on March 13, 2001 to $0.70 on January 22, 2002, with a $1.04 overnight drop from $1.74 to $0.70 on the actual date of bankruptcy filing--Kmart stock dropped only $.05--from $1.22 to $1.17--on May 15, 2002, when the corrective disclosure was allegedly made").

of the alleged "true facts" concerning Wave's relationships with Intel and IBM. Indeed, Lead Plaintiff Mr. Griffin represents this very problem, as he continued to purchase Wave's stock after August 14, 2003.[23]

### 2. Plaintiffs Have Failed To Identify Any Loss Caused By Any Statements On Or Following August 14, 2003.

With respect to the allegedly misleading statements made on and after August 14, 2003, Plaintiffs simply cannot sustain their burden of demonstrating a common methodology for proving loss causation because none of these alleged misrepresentations caused Wave's stock price to be artificially inflated. Wave's stock price did not increase as a result of the actionable statements made on or after August 14, 2003:

| Allegedly Misleading Statements Made On Or After August 14, 2003 | No Artificial Price Inflation |
| --- | --- |
| • Mr. Sprague's statements concerning future revenues and Wave's capacity to continue operations during Wave's August 14, 2003 conference call with investors concerning Wave's second | • Wave's August 14, 2003 conference call with analysts concerning Wave's second quarter 2003 results occurred in the afternoon after the trading day ended on August 14, 2003. |

---

[23] Having purchased Wave shares long after the allegedly misleading information was corrected, Mr. Griffin is subject to the unique defense that he did not rely on the integrity of the market, and therefore fails the typicality requirement of Rule 23 addressed in Part II. See, e.g., In re Safeguard Scientifics, 216 F.R.D. 577, 582 (E.D. Pa. 2003) (on a class certification motions, proposed lead plaintiff deemed subject to unique defense, and therefore atypical and inadequate, where he "increased his holdings in Safeguard stock even after public disclosure of the alleged fraud"); Rolex Employees Ret. Trust v. Mentor Graphics Corp., 136 F.R.D. 658, 664 (D. Or. 1991) (refusing to certify lead plaintiff as class representative because "[t]he fact that [lead plaintiff] continued to trade in the stock in Mentor Graphics after he learned of the alleged misrepresentations of defendants severs the link between the alleged misrepresentations of defendants and the stock purchases made by [lead plaintiff] and acts to rebut the presumption that [lead plaintiff] relied on the alleged misrepresentations in making his purchases.").

[24] See Amended Complaint at ¶¶ 58-60. A copy of the transcript of Wave's August 14, 2003 conference call with investors concerning Wave's second quarter 2003 results is located at App. Exh. 6.

[25] James Aff. at 15 ("Notably, the information released in the conference call did not affect Wave's stock price. Using the standard event study methodology, I analyzed whether the price change on August 15th was statistically significant…The model demonstrates that the change in Wave's stock price on August 15th was not statistically significant. Therefore, the decline from August 14th to August 15th is attributable to the normal variation in Wave's stock price and not to any information communicated by the Company during the August 14th conference call.").

| | |
|---|---|
| quarter 2003 results.[24] | • On August 15, 2003, Wave's stock opened at $3.11, closed at $3.20 and traded an intraday high of $3.39, exactly the same price it closed at on August 14, 2003, shortly before the conference call began.<br><br>• As Dr. James has explained, this and other data concerning Wave's price history demonstrates that Wave's stock price reaction to the August 14, 2003 conference call was statistically insignificant.[25] |
| • Wave's August 20, 2003, SEC Form S-3 Registration Statement characterizing Wave's relationship with IBM as a non-exclusive licensing agreement.[26]<br><br>• Wave's August 22, 2003, Prospectus concerning the registration of Class A common stock that characterized Wave's relationship with IBM as a non-exclusive licensing agreement.[27] | • Wave's stock closed at $3.15 on August 18, 2003, $3.17 on August 19, 2003, $3.06 on August 20, 2003, $2.85 on August 21, 2003, and $2.92 on August 22, 2003.<br><br>• Therefore, the August 20th and August 22nd statements did not cause any inflation in the Wave's common stock price.[28] |

Plaintiffs simply cannot demonstrate a methodology for proving that the actionable statements made on or after August 14, 2003 "caused an increase in price," much less that the artificially inflated price decreased upon Wave's disclosure of the alleged misrepresentations. IPO Allocation Cases, 227 F.R.D. at 111-12. The market -- "by reference to whom materiality is gauged" (Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1218 (1st Cir. 1996)) -- did not have a

---

[26] See Amended Complaint at ¶¶ 62, 64. A copy of Wave's August 20, 2003, SEC Form S-3 Registration Statement is located at App. Exh. 9.

[27] See Amended Complaint at ¶¶ 63-64. A copy of Wave's August 22, 2003, SEC Form 424(b)(1) concerning the registration of Class A common stock is located at App. Exh. 10.

[28] James Aff. at ¶ 16 ("Moreover, Plaintiffs fail to show that Wave's stock price became artificially inflated by misleading statements made after the August 14th conference call. Plaintiffs identify the filing of an S-3 registration statement on August 20, 2003 and the filing of a prospectus on August 22, 2003 as misleading the market. However, Wave's stock price fell on both days, declining from $3.17 on August 19, 2003 to $2.88 on August 25. Thus, these actions by the Company did not cause any inflation in the Wave's common stock.")

13

statistically significant reaction to the August 14th statements, and only declined following the remaining allegedly misleading statements. Therefore, Plaintiffs cannot prove price inflation causation (much less loss causation) on a class wide basis.[29]

### 3. Wave's December 18, 2003 Disclosure That It Was The Subject Of A Formal SEC Investigation Did Not Correct Any Of The Allegedly Misleading Statements.

The Plaintiffs' sole identified "corrective disclosure" for the statements made on or after August 14, 2003 cannot satisfy loss causation requirements because the disclosure corrected nothing. On December 18, 2003, Wave revealed, simply, that the SEC had:

> commenced a formal investigation into certain matters relating to Wave. The SEC's investigative order, received by Wave on December 17, 2003, relates to certain public statements made by Wave during and around August 2003, as well as certain trading in Wave's securities during such time.[30]

The announcement of the SEC's formal investigation did not even identify the "public statements" that were being investigated and contained no information pertinent to the alleged misrepresentations made on or after August 14, 2003. As a matter of law, the disclosure "corrected" nothing, and cannot serve to establish loss causation.[31] Concomitantly, if the market

---

[29] See, e.g., In re Credit Suisse First Boston Corp. Analyst Reports Sec. Litig., No. Civ.A.02-12056-GAO, 2005 WL 852455, *9 (D. Mass. Mar. 31, 2005) (dismissing securities fraud complaint and finding that "apart from loss causation specifically, the allegations of the consolidated amended complaint do not sufficiently allege facts to support an inference that misleading rating had *any* effect on the price of Agilent stock. In other words, the plaintiffs have not only failed to allege loss causation, they have failed to allege inflation causation.") (emphasis added); In re Fidelity/Apple Sec. Litig., 986 F. Supp. 42, 48 (D. Mass. 1997) (holding that individual's allegedly misleading statements were immaterial as a matter of law because, in part, there was "no significant rise (or fall) in the price of Apple shares [] precipitated by the publication of Lange's statements").

[30] Amended Complaint at ¶ 70.

[31] See, e.g., Lentell, 396 F.3d 161 at 175, n.4 (explaining that defendant Merrill Lynch's downgrades in its stock recommendations--from "accumulate" to "neutral" and from "buy" to "accumulate"--did "not amount to a corrective disclosure… because they do not reveal to the market the falsity of the prior recommendations'""); Teco Energy, Inc. Sec. Litig., 2006 WL 845161, *4-5 ("Although the 'revelations' referenced by Plaintiffs suggest that analysts were pessimistic regarding TECO's future, the information contained in the purported revelations does not identify, reveal or correct any prior misstatement, omission, or improper accounting practice by Defendants [and] does not specifically relate to the issues involved in the alleged fraudulent scheme") (emphasis added); In re Compuware Sec. Litig., 386 F. Supp. 2d 913, 919 (E.D. Mich. 2005) (granting motion to dismiss for failure to

14

did not become aware of the allegedly misleading statements until after the Class Period, then there is also no loss causation.[32]

Moreover, as the Court held in Dura, it is the Plaintiffs' burden to show that a decline in price resulted from a corrective disclosure of information previously omitted, and <u>not other extraneous factors</u> that might result in the decline in price. Dura, 125 S. Ct. at 1633-34. See also Avista Corp. Sec. Litig., 415 F. Supp. 2d 1214, 1220 (E.D. Wash. 2005) (granting motion to dismiss for failure to adequately plead loss causation and finding "Plaintiffs fail to allege loss causation because the two FERC orders [announcing a possible enforcement action against Avista] do not contain factual information that reveals any of these misrepresentations or reveals any fraud by Avista") (emphasis added). While true that Wave's stock dropped $0.31 cents following the December 18, 2003 announcement, the Plaintiffs offer nothing to prove that the drop resulted from the disclosure of the allegedly omitted "true facts," and not other factors which affect the price -- <u>i.e.</u> the news of the investigation itself. While it is not the Defendants'

---

adequately plead loss causation: "Defendants' Press Release was not a corrective disclosure because it did not assert that the competition with IBM led to the company taking the goodwill impairment"); In re Tellium Inc. Sec Litig., No. Civ. A. 02CV5878FLW, 2005 WL 2090254, at *4 (D.N.J. Aug. 26, 20-05) (granting motion to dismiss for failure to adequately plead loss causation : "*Dura* itself makes clear that loss causation is not pled upon allegations of drops in stock price following an announcement of bad news that does not disclose the fraud"); Barr v. Matria Healthcare, Inc., 324 F. Supp. 2d 1369, 1380 (N.D. Ga. 2004) (granting motion to dismiss for failure to adequately plead loss causation and finding that in order to satisfy loss causation the disclosure of the prior misrepresentation must discuss the subject matter of the alleged fraud); In re Merrill Lynch Tyco Research Sec. Litig., 03 CV 4080 (MP), 2004 U.S. Dist. LEXIS 2247, *8 (S.D.N.Y. Feb. 18, 2004) (granting motion to dismiss for failure to adequately plead loss causation and finding "Because the June 6 research report did not discuss the subject matter of the alleged fraud, as a matter of law, the decline in Tyco's trading price on that date cannot be considered a reaction to the disclosure of the alleged "fraud.**"**) (emphasis added).

[32] See, Leykin v. AT&T Corp., et al., 423 F. Supp. 2d 229, 244 (S.D.N.Y. 2006) (granting motion to dismiss for failure to adequately plead loss causation and finding that the amended complaint did "not allege that a corrective disclosure caused At Home's stock price to decline" because it did not allege facts showing that the market became aware of the alleged misrepresentation during the Class Period); In re Alamosa Holdings Inc., Sec. Litig., 382 F.Supp.2d 832, 862-63 (N.D. Tex. 2005) (granting motion to dismiss for failure to adequately plead loss causation and finding that "[b]ecause none of the other alleged misrepresentations or omissions beyond the May 1, 2002 subscriber number projections were the subject of a corrective disclosure followed by a drop in stock price, there can be no finding that such misrepresentations or omissions caused Plaintiffs' losses".)

15