burden to disprove a connection between the disclosure and stock price decline, Dr. James nonetheless concluded:

> [T]he decline in Wave's stock price following the December 18, 2003 disclosure is consistent with market reactions to the announcement of SEC investigations, and can not be claimed by Plaintiffs to be caused by a corrective disclosure. Evidence from academic research indicates that the announcement of an SEC investigation has a negative effect on a company's stock price. For example, a recent paper indicates that stock prices of small capitalization firms such as Wave, decline by an average of 8% to 12% following the disclosure of an SEC investigation. Thus, the decline in Wave's stock price at the end of the Class Period can be attributed to the announcement of the SEC investigation of Wave, supported by the fact that the limitations of the Intel and IBM relationships were known to the market months earlier.

James Aff. at ¶ 17 (citing McDowell, John, "A Look at the Market's Reaction to the Announcements of SEC Investigations," The Leonard N. Stern School of Business, Glucksman Institute for Research in Securities Markets, April 1, 2005). [33]

Moreover, the performance of Wave's stock soon after the announcement of the SEC's investigation is consistent with the conclusion that the announcement was not a corrective disclosure. Wave's stock declined $0.31 following the December 18, 2003 announcement, but within two weeks the stock was back to its December 17, 2003 level (on January 6, 2004, Wave's stock closed at $1.79). One week later, on January 14, 2004, Wave's stock closed at

---

[33] For a small company like Wave that could have limited ability to shoulder the expenses of a formal SEC investigation or even a potential fine or other penalty, one would expect that news of a formal SEC investigation would cause a stock price decline. As Mr. McDowell concluded:

> Large market capitalization companies have a smaller decline in value [as a result of the announcement of informal and formal SEC investigations] than smaller capitalization companies. The market believes that the risk and expenses associated with a SEC investigation can be better absorbed by large capitalization companies. Large capitalization companies are more deeply covered by analysts. Investors may believe that they better understand the risk associated with large capitalization stocks, so there is less of a reaction to the investigation announcements.

Id. at 9-10 (emphasis added). At the time of the announcement of the SEC's formal investigation, Wave's stock price was particularly susceptible to the negative news because it had a market capitalization of approximately $100 million and was not covered by any industry analysts.

$2.18 -- <u>higher</u> than it was trading the day before the proposed end of the Class Period.  In such cases, courts recognize that loss causation has not been pled or proven.  In <u>In re Acterna Corp. Sec. Litig.</u>, 378 F. Supp. 2d 561, 588 (D. Md. 2005), for instance, Acterna's stock similarly declined significantly during the Class Period, which ended on October 29, 2002, the day before the company announced a goodwill impairment.  Upon reviewing the stock's history following the announcement of the goodwill impairment, the court disagreed with the Plaintiffs' contention that the announcement of the goodwill impairment constituted a viable corrective disclosure because the price of Acterna's shares only dropped one cent on the day of the announcement and the stock actually increased in value in the week following the announcement:

> [T]he fact that when the alleged "truth" was revealed, or, put another way, when a corrective disclosure was made, the share price only dropped from $.33 to $.32, coupled with the fact that nearly a week later, on November 4, 2002, Acterna's stock closed at $.37, or $.04 *higher* than it did the day before the announced impairment, strongly suggests that any decline in Acterna's share price after October 30, 2002 was not a result of the alleged fraud being revealed, but rather a continuation of the rapid decline that began due to the economic slowdown commencing in 2001.

<u>Id.</u> at 589.

In sum, the December 18, 2003 disclosure of the SEC investigation revealed no corrective information, precipitated a decline in stock price consistent with a market reaction to an announcement of an SEC investigation (<u>i.e.</u> not corrective information), and was followed by a rise in Wave's stock price.  In addition, the August 14th disclosure of information that corrected all of the alleged misleading statements made prior to that date did not cause a statistically significant price decline and Plaintiffs have failed to identify any "correction" to any allegedly false or misleading statement from August 14th onward.  Under these circumstances, Plaintiffs have failed to present a theory of loss causation, and the class should not be certified.

17

## II.    THE PROPOSED CLASS REPRESENTATIVES ARE NEITHER TYPICAL NOR ADEQUATE

Under Rule 23, class representatives must be both "adequate" and "typical." Fed. R. Civ. P. 23(a). To certify a class under Rule 23(a)(4)'s adequacy requirement, "[t]he court must determine, first whether any potential conflicts exists between named plaintiffs and the prospective class members and, second, whether the named plaintiffs and their counsel will prosecute the case vigorously." In re Bank of Boston Corp. Sec. Litig., 762 F. Supp. 1525, 1534 (D. Mass. 1991). The adequacy inquiry is one of the most important requirements of Rule 23(a) because, once the court certifies the class, lead plaintiffs will represent not only their own interests, but the interests of absent class members.[34] In addition, to certify a class under Rule 23(a)(3), this Court must find that the claims or defenses of the representative parties are "typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "[W]here a named plaintiff may be subject to unique defenses that would divert attention from the common claims of the class, that plaintiff cannot be considered typical of the class." In re Bank of Boston Corp. Sec. Litig., 762 F. Supp. at 1532 (citation omitted). As with the other requirements of Rule 23(a), it is the Lead Plaintiffs' burden to prove that Rule 23(a)'s requirements are satisfied.[35] As demonstrated below, Lead Plaintiffs cannot do so here.

---

[34] See Key v. Gillette Co., 782 F.2d 5, 7 (1st Cir. 1986) ("One of the most important of [the Rule 23(a)] requirements is that the representative party fairly and adequately represent the interests of the class. This requirement is particularly important because the due process rights of absentee class members may be implicated if they are bound by a final judgment in a suit where they were inadequately represented by the named plaintiff.") (citation omitted).

[35] See, e.g., Berger, 257 F.3d at 481 ("Adequacy is for the plaintiffs to demonstrate; it is not up to defendants to disprove the presumption of adequacy"); 35A C.J.S. Federal Civil Procedure §99 (2005) ("The adequacy of putative class representatives, and of such representatives' counsel, is not presumed in the absence of specific proof to the contrary. Rather, the party seeking class certification bears the burden of establishing that all the requirements for certification, including the adequacy requirement, have been satisfied.").

LITDOCS/643093.1

### A.    The Proposed Class Representatives Are Inadequate And Atypical Because The Class They Seek To Represent Is Comprised Of "In-And-Out" Traders With Individualized And Competing Interests.

The Class is not certifiable because the Lead Plaintiffs' interests are antagonistic to both each other and the Class members they seek to represent, who are predominantly "in-and-out" short sellers and market makers, <u>each</u> with unique and conflicting interests in this litigation.[36] Just as Lead Plaintiffs have the burden of proving all of the Rule 23(a) requirements, Lead Plaintiffs also have the burden of proving that these conflicts do not render them inadequate or atypical. The Lead Plaintiffs fail to meet that burden.

### 1.    *No Plaintiff* Could Represent The Proposed Class, 60-80% of Whom Are "In-And-Out" Traders, Each With Uniquely Individual And Conflicting Interests.

As explained below, 60-80% of the proposed class is comprised of "in-and-out" traders of Wave stock, each of whom will potentially have conflicting incentives regarding which alleged statements they will seek to demonstrate are misleading or corrective (and which are not), along with whether such alleged misstatements caused artificial inflation or dissipation. In effect, the "Class" in this litigation potentially represents as many different theories of liability and damages as there are in-and-out class members.

As established by the expert opinion of Dr. James, in-and-out traders overwhelmingly predominate the class. Based on Dr. James' review of Wave common stock trading data for the period July 1, 2003 to August 31, 2003, short sellers and market makers accounted for <u>60% to 80%</u> of the total trading volume in Wave stock during the first two weeks of the Class Period.[37]

---

[36] An in-and-out plaintiff is a plaintiff who sold some or all of his shares during the class period.

[37] James Aff. at ¶¶ 24-28.  Short selling is defined as "a strategy whereby investors sell shares without owning the stock, in hopes of a decline in the stock price.  To sell short, an investor must first 'borrow' the shares he wishes to sell.  The 'lender' of the shares retains legal ownership of the shares, and can require the short seller to deliver the shares back at any time."  James Aff. at ¶ 21, n. 15.

This period was when the heaviest trading volume during the Class Period occurred.[38]  To the extent these short sellers and market makers could demonstrate that they were somehow damaged at all[39], they would need to prove a very different and contradictory set of facts than those alleged in the Amended Complaint.  In-and-out plaintiffs will have to demonstrate artificial inflation and then dissipation during the various periods of their trading, as opposed to the theory of a one-time December 18th corrective disclosure as alleged in the Amended Complaint.[40]  If the Plaintiffs are able to prove their case as alleged in the Amended Complaint, then the in-and-out class members (the majority of the Class) cannot recover.

This core conflict between retention plaintiffs and in-and-out plaintiffs is only exacerbated to the extent Plaintiffs claim there were partial corrective disclosures during the class period.[41]  This is because <u>each</u> of the in-and-out plaintiffs have an interest in maximizing

---

[38]  According to Bloomberg, 372,185,000 shares of Wave were traded during the 99 day Class Period. However, 69.44% of these shares (258,460,200 shares) were traded during the first 12 days of the Class Period from July 31 - August 15, 2003.

[39]  Because these investors both bought <u>and</u> sold at allegedly equally inflated prices, they were likely not damaged as result of any alleged fraud.  <u>See generally,</u> James Aff. at ¶ 28 ("any market makers and short sellers who bought and sold during the class period would not have been affected by any alleged securities fraud and will not be able to claim damages because of Wave's actions").  Short sellers "primarily believe that the stock price is overvalued and predict that the stock price will decline."  <u>Id.</u> at ¶ 21.  Contrary to purchasers who rely on the integrity of a stock's market price and the belief that a stock will continue to rise in value, short sellers do not trade based on information concerning a stock's fundamental value.  <u>Id.</u> at ¶ 22.  Moreover, Wave's trading data during the first two weeks of the Class Period indicates the short sellers generally purchased and sold Wave's shares simultaneously, and therefore cannot be damaged as a result of securities fraud because they both bought <u>and</u> sold at allegedly inflated prices.  <u>Id.</u> at 20-22.  Similarly, market makers are in-and-out traders who generally cannot show any damages because they buy and sell approximately the same amount of shares each day in order to maintain a level inventory position.  <u>Id.</u> at ¶ 20 ("Market makers provide liquidity to the market, and are required to trade whenever typical investors enter the market.  In practice, market makers prefer to maintain a level inventory position, and hence usually buy and sell approximately the same amount of shares each day.").

[40]  Amended Complaint at ¶¶ 70-73.

[41]  As this Court acknowledged to be the case in its January 11, 2006 Memorandum And Order Regarding Defendants' Motion to Dismiss at page 34: "By August 18, 2003, the market was aware that Wave's Intel agreement lacked a minimum licensing requirement , and its IBM deal was not fee producing."  <u>See also,</u> Harmon Dep. at 129-32; James Aff. at ¶ 14.

LITDOCS/643093.1

the significance of disclosures that occurred after their purchase and prior to their sale (thus
hindering the interests of any plaintiff who sold prior to or purchased after the same disclosure).
Moreover, in light of the data reviewed by Dr. James demonstrating that many of the short sellers
were simultaneously buying and selling Wave stock, repeatedly, in the same days, (James Aff. ¶¶
22-24), the Plaintiffs' case for liability proliferates into a virtually endless series of mini-trials,
each with competing and conflicting interests.  Dr. James explained how each of these in-and-out
plaintiffs' interests directly conflict with the rest of the class:

> For example, a market maker who purchases in the morning of a particular day
> and sells at the end of that trading day would need to point to a corrective
> disclosure occurring during the day, after his purchase but prior to his sale.  His
> efforts to point to this type of interim corrective disclosure would run counter to
> the claims of other potential class members who might have sold prior to or
> purchased after the supposed corrective disclosure.

James Aff. at ¶ 18, n. 12 (emphasis added).  Under these circumstances, none of the in-and-out
class members -- 60-80% of the Class -- are similarly situated, and no plaintiff could be typical
of or adequately represent them all.

In Seagate, the court concluded that, in a partial corrective disclosure case, a class made
up of a significant percentage of "in-and-out" traders cannot be certified because of the in-and-
out traders conflicting interests in demonstrating the significance (or insignificance) of both the
allegedly misleading statements and the alleged corrective disclosures:

> The court concludes that in order to obtain class certification, the plaintiffs in a
> partial curative disclosure case must demonstrate that the putative class is not so
> filled with in/out traders so as to render the resulting conflicting interests
> problematic.  Only if plaintiffs are able to establish that a significant majority of
> the plaintiff class consists of retention plaintiffs can the court be assured that the
> antagonism in the class is not so severe as to make representation inadequate.  In
> other words, plaintiffs must establish the retention plaintiffs in the class will, to
> borrow a phrase "predominate" over in/out plaintiffs.

21

<u>In re Seagate Tech. II Sec. Litig.</u>, 843 F. Supp. 1341, 1365 (N.D. Cal. 1994) (emphasis added). In <u>Seagate</u>, the court considered the potentially antagonistic interests between, among other things, class members who sold some or all of their stock before the end of the class period and class members who continued to hold their stock at the end of the class period. Noting that "[t]he adequacy of representation requirement" depends on a showing that, among other things, "there is an absence of antagonism between the named plaintiff and the other class members," <u>id.</u> at 1346, the court refused to grant certification on the record before it and ordered an evidentiary hearing to assess the adequacy of the proposed class representatives.[42]

The reasons for denying class certification in such circumstances were explained further in <u>Ziemack v. Centel Corp.</u>, 163 F.R.D. 530, 540 (N.D. Ill. 1995), with reasoning that is instructive for the circumstances in this case, whether or not the Plaintiffs proceed on the theory of a single corrective disclosure as alleged in the Amended Complaint or adopt a theory of partial corrective disclosures:

> If the Plaintiffs claim the <u>artificial inflation level was a fixed amount [during the whole Class Period], then the Defendants say class purchasers who also sold all their purchased Central shares during the Class Period could prove no damages</u> and thus would have no standing. Alternatively, <u>if the Plaintiffs claim the artificial inflation level fluctuated, then as to any particular day of the Class Period, an in-out class member who sold that day would have an incentive to minimize the level of artificial inflation asserted by the class.</u> To recover a greater amount under the out of pocket damages rule, that class member would overemphasize the degree of liability arising from some statements and omissions

---

[42] <u>See also</u>, <u>O'Neil v. Appel</u>, 165 F.R.D. 479, 494-95 (W.D. Mich. 1996) (denying motion for class certification and finding that "[t]he <u>Seagate</u> court identified two major conflicts of interest that could serve to make class representatives inadequate… Plaintiffs in the present case have completely glossed over this troubling issue. The complaint itself is inadequate to determine whether and to what extent such a conflict exists, as it does not allege whether some or all of the class representatives sold stock during the Class Period… At this point, they have not met their burden of showing adequacy of representation."); <u>In re Clearly Canadian Sec. Litig.</u>, 875 F. Supp. 1410, 1422 (N.D. Cal. 1995) (" In [<u>Seagate</u>], the court required plaintiffs seeking class certification in a fraud-on–the-market securities action to provide evidence on the extent of seller-purchaser and equity conflicts. The court believes that such information is necessary to determine the adequacy of representation in fraud-on-the-market cases, as the court must do under Rule 23) (citation omitted).

and underemphasize the degree of liability arising from other statements and omissions. <u>By contrast, retention Plaintiffs have an incentive to establish the greatest degree of liability possible in every statement or omission of the Class Period.</u> Therefore, the class as currently defined contains <u>in-out plaintiffs who have interests antagonistic both to retention plaintiffs and possibly to each other</u>.

<u>Id.</u> at 540.

As in <u>Seagate</u> and <u>Ziemack</u>, so too here, the in-and-out class members comprising 60-80% of the purported Class "have interests antagonistic both to retention plaintiffs and possibly to each other." <u>Id.</u> No class may be certified in these circumstances.

### 2. The Lead Plaintiffs Themselves Have Interests Antagonistic To Each Other, Illustrating The Impossibility Of A "Similarly Situated" Class.

The individualized conflicts that are rampant among the class members as explained above are best illustrated by the conflicting interests of the Lead Plaintiffs themselves. Indeed, the Lead Plaintiffs cannot even agree about such fundamental Class-wide issues as whether Wave's announcement that it was the subject of a SEC investigation was a corrective disclosure. Ms. Brumbaugh, who sold all of her Wave holdings after the Class Period ended[43], testified that she did not learn that information provided about Wave's relationships with Intel and IBM was allegedly misleading until after the announcement of the SEC investigation.[44] In direct conflict, Mr. Griffin, who was in-and-out of Wave stock several times during the Class Period and did not retain any Wave shares at the end of the Class Period,[45] testified that <u>none</u> of his Wave losses

---

[43] Brumbaugh Dep. at 90.

[44] <u>Id.</u> at 89-90, 97-98.

[45] Mr. Griffin sold 10,000 shares of Wave stock, *for a profit*, on August 4, 2003. Mr. Griffin had purchased these shares on August 1, 2003. Then, on August 5, 2003, Mr. Griffin purchased 20,000 shares of Wave stock and sold these shares on September 4, 2003, long before the Plaintiffs' alleged corrective disclosure. Next, Mr. Griffin day traded Wave's stock on September 17, 2003, again for a profit. By November 25, 2003, Mr. Griffin had purchased and sold another 23,000 shares of Wave stock, and by December 18, 2003, the date of the Plaintiffs' alleged corrective disclosure, Mr. Griffin held no shares of Wave. Unsurprisingly, Mr. Griffin testified in his deposition that he was damaged by the sale of stock that occurred <u>prior</u> to the announcements of the SEC investigation. Griffin Dep. at 66.

were caused by a drop in Wave's stock price following Wave's December 18th announcement,
but rather that he was damaged by his sales of stock before December 18, 2003.[46]    Accordingly,
under Ms. Brumbaugh's (and Plaintiffs' alleged theory of loss causation), Mr. Griffin cannot
recover because he sold all his shares before the artificially inflated price allegedly began to
dissipate.[47]    In short, if proven, Ms. Brumbaugh's theory takes the damages from Mr. Griffin's
pocket and deposits them into her own.[48]

---

[46] Griffin Dep. at 66, 80.  Mr. Griffin's trading pattern in Wave also makes him subject to unique defenses concerning reliance because he "day traded" Wave stock during the class period based on technical price fluctuation, not the integrity of Wave's market price.  As Mr. Griffin testified, his trading, including his trading of Wave stock, was motivated by technical price fluctuations, as opposed to the integrity of a stock's market price: Griffin Dep. at 27-28, 62-63, 66, 69, 72, and 76.  Day traders like Mr. Griffin are subject to unique defenses concerning reliance because their trading strategy demonstrates that they would have invested regardless of the integrity of the market price.  See, e.g., In re Sonus Networks Sec. Litig., 229 F.R.D. 339, 342, (D. Mass. 2005) (acknowledging that a proposed class representative's "day trading" patterns could render him an improper class representative, rendering him atypical of the putative class in that he did not "rely on the integrity of the market" making him "vulnerable to defenses that made his claim atypical and his representation of the class possibly inadequate"); In re Safeguard Scientifics, 216 F.R.D. at 582-83 (on a class certification motion, proposed lead plaintiff deemed subject to unique defenses, and therefore atypical and inadequate, where the court found that "[i]n light of Lead Plaintiff Adal's employment as a day trader (or 'position trader') who typically focuses on technical price movements rather than price, we find that even under a fraud-on-the-market theory, Defendants have presented compelling reason to rebut the reliance presumption.").

[47] In In re Compuware Sec. Litig., 386 F. Supp. 2d at 920, the court granted the summary judgment motion on the grounds that the Plaintiffs could not prove loss causation because, in light of the Supreme Court's decision in Dura, lead plaintiffs sold their shares before the alleged artificial price inflation began to leak out.  See also, Solomon v. Peat, Marwick, Main & Co., No. 91-55453, 1992 WL 231098, at *5 (9th Cir. Sept. 21, 1992) (Solomon is an "in-and-out trader", one who purchased after the alleged misrepresentation but sold before the corrective disclosure… Because Solomon has failed to offer evidence of a link between the fraud and his loss, summary judgment in favor of PMM and against Solomon was proper."); Davidco Investors, LLC v. Anchor Glass Container Corp., No. 8:04CV2561T-24EAJ, 2006 WL 547989, at *10 (M.D. Fla. Mar. 6, 2006) ("Since these plaintiffs sold all of their stock before the corrective disclosure was made, these plaintiffs have failed to adequately allege that their losses resulted from the cash flow misstatements… Accordingly, to the extent that Bellefeuille and Steamfitters' Section 10(b) and Rule 10b-5 Claim is based on cash flow misstatements, their claim is dismissed for failing to plead loss causation.") (citing Dura); In re Microstrategy Inc. Sec. Litig., 110 F. Supp. 2d 427, 437 n.23 (E.D. Va. 2000) (lead plaintiff subject to unique defense where "most of its losses occurred *before* defendants issued the first correction on March 20, 2000.  The average member of the class, on the other hand, bought the stock before the correction was announced, when the market was allegedly relying on false information, and sold it after the announcement, after the market had allegedly taken the correction into account.  Accordingly, [lead plaintiff] may be subject to unique defenses based on the timing of its loss.").

[48] Even, assuming *arguendo*, that Mr. Griffin could still somehow prove that the Defendants' allegedly misleading statements caused his losses, his trading record is sufficient to rebut his presumptive status as a lead plaintiff because he is subject to unique defenses regarding loss causation.  As the court found in In re Bally Total Fitness Sec. Litig., No. 04C3530, 2005 WL 627960, at *6 (N.D. Ill. Mar. 15, 2005), "in-and-out" traders that can prove loss causation are still subject to unique defenses that render them atypical and inadequate to serve as Lead Plaintiffs.

On the other hand, Mr. Harmon's interests are antagonistic to other proposed class members because, as a current holder of all of his Wave stock, Mr. Harmon has an incentive to minimize the overall liability of Wave.[49]  Indeed, Mr. Harmon, who continues to hold all 13,000 of the Wave shares he purchased during the Class Period[50], testified that he hopes that Wave's stock does not decline in value and that he is hopeful it will increase in value.[51]  In contrast, plaintiffs who no longer hold Wave stock have no incentive to limit Wave's liability. Accordingly, Mr. Griffin testified that he does not care if the value of Wave's stock declines as a result of the lawsuit.[52]  Therefore, Mr. Harmon is an inadequate representative because his interests are antagonistic to those members of the class who do not currently own Wave stock. Seagate, 843 F. Supp. at 1362.

---

[49] In Seagate, the court explained that class members who continue to hold stock, just as Mr. Harmon continues to hold Wave today, have interests that are antagonistic to other class members because they have an incentive to ensure that their current investment does not lose value as a result of the litigation (or at least that the loss in value as a result of the litigation does not exceed their recovery):

> The second form of conflict likely to arise in corporate dissemination cases stems from the dual interests held by some members of the plaintiff class.  Specifically, those plaintiffs who still own shares of the relevant security at the date of suit have divided loyalties: on the one hand they hope for recovery for themselves; as equity holders in the relevant issuer, however, they also wish to minimize the overall liability of the company.

843 F. Supp. at 1362.  It is unclear how may other class members, if any, still hold Wave stock.  For this reason alone, the Plaintiffs' Certification Motion should be denied.  See In re Clearly Canadian Sec. Litig., 875 F. Supp. at 1422 (denying motion for class certification because Plaintiffs failed to present any evidence to address the court's concern that "seller-purchaser conflicts and conflicts between equity-holding and non-equity-holding class members raise serious questions about the adequacy of representation of all would-be class members.").

[50] Harmon Dep. at 101.

[51] Id. at 101-03.

[52] Griffin Dep. at 80.

**B.    Lead Plaintiffs Have Vested Counsel With Unfettered Control Of
This Litigation And Are Accordingly Inadequate As A Matter Of Law**

Even if Plaintiffs could overcome the above (which they cannot), these Lead Plaintiffs
are inadequate to represent the purported Class given their complete abdication of their
responsibilities to direct and control this litigation to their counsel.  The "PSLRA[] mandate[s]
that class representatives, and not lawyers, must direct and control the litigation." In re Sonus
Networks, Inc. Securities Litigation, 229 F.R.D. 339, 342 (D. Mass. 2005) (quoting Berger v.
Compaq Comp. Corp., 257 F.3d 475, 481 (5th Cir. 2001)).[53]  As the Fifth Circuit recognized in
Berger, while the PSLRA has not changed the elements of Rule 23, nonetheless "[c]lass action
lawsuits are intended to serve as a vehicle for capable, committed advocates to pursue the goals
of the class members through counsel, not for capable, committed counsel to pursue their own
goals through those class members." 257 F.3d at 484.

In this case, the Lead Plaintiffs serve as nothing more than pawns through which class
counsel pursue the litigation.

**1.    Plaintiffs' Attorneys Are Pursuing This Litigation Through The Class
Members -- Not The Other Way Around As Intended By Rule 23**

Indeed, from the start, this litigation was precipitated by counsel.  Ms. Brumbaugh
testified that she decided to be a plaintiff in the action only when she received an e-mail from
Darren Check of Schiffrin & Barroway, asking if she would "consider being one of the lead

---

[53] See also, 7A C. Wright & A. Miller, Federal Practice & Procedure § 1765 at 321 (3d ed. 2005) ("In
contrast to the requirements applicable to class actions generally, the [PSLRA] requires that the court identify and
designate a lead plaintiff who is determined to be the best representative of the class").   In re Milestone Sci. Sec.
Litig., 187 F.R.D. 165, 177 (D.N.J. 1999) ("the PSLRA was designed, in part, to effectuate the transfer of control of
securities class actions from the lawyers to investors").

plaintiffs."[54]  Prior to hearing from Schiffrin & Barroway, she had not thought about suing Wave.[55]  Similarly, Mr. Harmon testified that he first considered bringing a lawsuit against Wave when he received an email from Mr. Check, he never considered another firm to represent him, and he had only met with class counsel on one occasion – the day before his deposition to prepare for his deposition.[56]  Likewise, Mr. Griffin testified that he first considered bringing a lawsuit after he was contacted by Mr. Check, he had never considered retaining any other firm to represent him, and he had only met with class counsel on one occasion – once again, the afternoon before his deposition.[57]

2. **Lead Plaintiffs Have Already Failed The Class
By Failing To Negotiate A Fee Agreement With Counsel.**

Indeed, even at this late juncture, the Lead Plaintiffs have failed to take the first important step of negotiating a fee agreement -- any fee agreement -- with counsel.  "[O]ne of the best ways for a court to ensure that [a class representative] will fairly and adequately represent the interest of the class is to inquire whether the [lead plaintiff] has demonstrated a willingness and ability to select competent class counsel and to negotiate a reasonable retainer agreement with that counsel."  In re Cendant Corp. Litig., 264 F.3d 201, 265-66 (3d Cir. 2001) (citations omitted) (emphasis added).[58]  But here, the Lead Plaintiffs have given class counsel free reign:

---

[54] Brumbaugh Dep. at 107.

[55] Brumbaugh Dep. at 119.

[56] Harmon Dep. at 26-31 and 106.

[57] Griffin Dep. at 82 and 102-04.

[58] See also, e.g., In re Lucent Tech., Inc. Sec. Litig., 194 F.R.D. 138, 156 (D.N.J. 2000) (After noting that a "lead plaintiff owes a fiduciary duty to obtain the highest quality representation at the lowest price," the court found that "In the instant matter, Proposed Lead Plaintiffs have provided no evidence or indication of the proposed fee arrangement, its terms, or discussions or proposals leading up to it.  They have provided no indication as to how the

27

- There is no written fee agreement.[59]

- There is no oral fee agreement.[60]

- In fact, except for the understanding that class counsel will get paid on contingency (at an unknown percentage of any hoped for recovery) there is no agreement about class counsel's compensation at all.[61]

In In re Quintus Sec. Litig., 201 F.R.D. 475, 482 (N.D. Cal. 2001), the court held that a proposed class representative was inadequate because he failed to negotiate a fee agreement with class counsel:

> Almost certainly, the best way for the court to assess a potential lead plaintiff's adequacy is to consider the manner in which he has retained counsel and negotiated an attorney's fee for the class. . . . **a purported lead plaintiff that does not negotiate a reasonable fee arrangement with counsel cannot be deemed an adequate representative**.

Id. (citations omitted) (emphasis added). So too here, the Lead Plaintiffs have exerted no control whatsoever over their counsel's compensation, other than knowing it will be deducted from any recovery in this action.

### 3. Lead Plaintiffs Have Not Taken An Active Role In The Litigation.

In vacating a district court order certifying a plaintiff class and appointing class

---

selection of Proposed Lead Counsel was arrived at nor what considerations went into the decision. Significantly, there is no indication of whether other counsel were interviewed or even considered. This is troubling."); In re Milestone Scientific Sec. Litig., 187 F.R.D. at 178 ("Not only should the proposed counsel fees be the result of hard-bargaining, but the initial selection of counsel should also be the result of independent decision-making by the lead plaintiff.").

[59] In response to the Defendants' document request number 8, Plaintiffs stated "that there is no written fee agreement between Plaintiffs[] and counsel."

[60] Lead Plaintiffs testified at deposition that they had yet to have discussions with counsel concerning fees (Brumbaugh Dep. at 111), there had been no discussion on the percentage of the contingency (Harmon Dep. at 39), to the extent their was an understanding of how class counsel would be paid, there had been no negotiation of the payment arrangement (Harmon Dep. at 39), they had not agreed to pay any costs of bringing this action (Brumbaugh Dep. at 113), and they would not agree to pay "any costs" for bringing the action. Griffin Dep. at 106.

[61] Lead Plaintiffs expect that class counsel would be compensated on a contingency basis, but that is all. Brumbaugh Dep. at 111, Harmon Dep. at 39, Griffin Dep. at 106.

28

representatives, the court in <u>Berger</u>, 257 F.3d at 479, noted that "[t]he adequacy requirement mandates an inquiry into… the willingness and ability of the representative[s] to take an active role in and control the litigation and to protect the interests of absentees."  The court further noted that the PSLRA "mandate[s] that class representatives, and not lawyers, must direct and control litigation[,]" and "require[s] that securities class actions be managed by active, able class representatives who are informed and can demonstrate they are directing the litigation."  <u>Id</u>. at 483.  The Lead Plaintiffs fail this requirement.

In their deposition testimony, the Lead Plaintiffs made it clear that, rather than taking an active role in the litigation, they have left and would continue to leave the most important litigation decisions exclusively in the hands of class counsel, abdicating their responsibility to monitor class counsel and to actively participate in the litigation.  For example, Mr. Griffin testified that his only responsibilities as a class representative are to retain counsel (who actually recruited him as a class representative and gave him the idea of suing Wave) and attend a trial if there is one:

> Question: Okay.  Are you familiar with the requirements for bringing a suit as a class action?
>
> Answer: The only responsibility I know is that I retained Schiffrin & Barroway as my counsel to represent me in all matters with this.
>
> Question:  Okay.  Other than your reliance on counsel, are you aware of any responsibilities or obligations that you have in connection with this lawsuit?
>
> Answer:  The only -- if I have to go to a jury trial, that I will have to be there in Springfield, Massachusetts.
>
> Question:  Okay.  Other than retaining counsel and attending a possible trial, is there anything else?
>
> Answer:  Not as I recall.

Griffin Dep. at 105.

In fact, Mr. Griffin demonstrated that he <u>could</u> <u>not</u> competently monitor the decisions of class counsel because, among other reasons, he showed an utter lack of knowledge regarding the nature of the wrongdoing alleged by the Plaintiffs in this case.  For example, Mr. Griffin testified

LITDOCS/643093.1

(mistakenly) that the fraud allegations in the Amended Complaint related to the fact that the

Defendants had said they developed a product that they had not yet developed (a theory not

advanced in the Amended Complaint):

> Question: Can you describe to me the misrepresentations and omissions that you're alleging that the Defendants made?
>
> Answer: Yes.
>
> Question: Okay. And what are those?
>
> Answer: Based on the information I received and, again, e-mail from whatever source it was, that there was no product at the time that was going to be bundled with Intel's platforms or whom's ever -- whoever's. And so it was -- false information was being given out.
>
> Question: Okay. So let me make sure I understand what you're saying. Are you saying that -- that the company Wave said that they had a product that could be bundled?
>
> Answer: Yes.
>
> Question: And that that product did not, in fact, exist?
>
> Answer: It either did not exist or at the time was not ready to be put to market with Intel or whomever.
>
> Question: Okay. So the gist of the alleged misrepresentation or omission is that the product was not actually ready or did not exist –
>
> Answer: Yes.
>
> Question: And could not be bundled; is that correct?
>
> Answer: That's correct.
>
> Question: Okay. And what do you base this understanding on?
>
> Answer: I base it on what has happened to Wave since 2003. In other words, this lawsuit that has forth come because of that, that there was no product or services that was ever marketed to Intel or anyone else.
>
> Question: Okay. Other than the omissions and misrepresentations that you've just identified for me, are there any others that you understand or are alleging in this case?
>
> Answer: No.

30

Griffin Dep. at 87-89.[62]   Indeed, Mr. Griffin was never able to articulate <u>any</u> of the misrepresentations or omissions actually alleged in the Amended Complaint.[63]

Similarly, Ms. Brumbaugh and Mr. Harmon testified that their involvement in the development of the claims here was after-the-fact.  Ms. Brumbaugh testified that "if" she received a copy of the complaint, she "would have" read it, and agreed with its contents.[64] Similarly, Mr. Harmon testified that he did not in any way participate in the preparation of the of the Amended Complaint.[65]

In <u>Rolex Employees Ret. Trust v. Mentor Graphics Corp.</u> 136 F.R.D. 658, 666 (D. Or. 1991), the court denied a motion for class certification where it found that the proposed lead plaintiff was "unfamiliar with basic elements of the case, including what the allegations of the complaint are and which allegations of the complaint pertain to which defendants."  The court also noted that the proposed lead plaintiff, just like the Lead Plaintiffs here, "did not become involved in the case until after the basic groundwork had been laid.  He contributed nothing to the drafting of the complaint."  <u>Id.</u>  On the basis of these and other facts, the court denied the lead plaintiff's motion for class certification and found that "[t]o satisfy Rule 23(a)(4), the named representative of a class must be in a position to 'check the otherwise unfettered discretion of counsel in prosecuting the suit,' not only with respect to the facts of the case but also with

---

[62] Likewise, when confronted with the very documents that Plaintiffs' allege contain material misrepresentations or omissions, Mr. Griffin consistently testified either that the misrepresentation was leaving the investor with the understanding that Wave had developed a product it had not, or, alternatively, that he would have to "rely on counsel for the research."  Griffin Dep. at 92-100.

[63] As a further demonstration of his inability to serve as an adequate class representative, Mr. Griffin was unable to identify <u>any</u> corrective disclosures in his deposition.

[64] Brumbaugh Dep. at 128.

[65] Harmon Dep. at 110-11.

respect to the economic consequences of the suit." <u>Id.</u> (quoting <u>Weisman v. Darneille</u>, 78 F.R.D. 669, 671 (S.D.N.Y. 1978)).[66]

Similarly, in <u>Kase v. Salomon Smith Barney, Inc.</u>, 218 F.R.D. 149 (S.D. Tex. 2003), the court denied a motion by investors to certify a class because, among other reasons, the investors had failed to demonstrate that they would actively monitor the decision of class counsel:

> Walter Kase understands the nature of this lawsuit and his claims against SSB. However, Walter Kase also testified that he has not participated in many of the key strategic decisions that have been made in this case. He also stated that he would permit class counsel to pursue this lawsuit as they saw fit… Although a class representative may, and should, rely on the professional judgment of qualified class counsel, Walter Kase has not shown an inclination to take the active role in monitoring class counsel's activities that is required of a class representative.

<u>Id.</u> at 159.

## CONCLUSION

For these reasons, Defendants Wave, Steven K. Sprague and Gerard T. Feeney respectfully request that the Court deny Plaintiffs' Certification Motion.

**WAVE SYSTEMS CORPORATION, STEVEN K. SPRAGUE and GERARD T. FEENEY,**

By their attorneys,

/s/ Michael D. Blanchard
Robert A. Buhlman, BBO #554393
Michael D. Blanchard, BBO #636860
Sara A. Martin, BBO #645002
Robert B. Baker, BBO #654023
BINGHAM MCCUTCHEN LLP
150 Federal Street
Boston, MA 02110-1726
Dated: June 6, 2006                     (617) 951-8000

---

[66] <u>See also</u>, <u>Smyth v. Carter</u>, 168 F.R.D. 28, 33 (W.D. Va. 1996) (denying motion for class certification where there was "some evidence of a lack of understanding of this case on the part of plaintiffs that cannot be compensated by the enthusiasm of their lawyers.").

LITDOCS/643093.1

CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was electronically served upon the attorney of record for each party on June 6, 2006.

/s/ Michael D. Blanchard
Michael D. Blanchard

33

LITDOCS/643093.1