Jay E. Suddreth & Associates, Inc.
Registered Professional Reporters

Page 1

```
 1           IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF MASSACHUSETTS
 2

 3   ANNE BRUMBAUGH,              )
     GARY L. HARMON and           )
 4   RANDY K. GRIFFIN,            )
                                  )
 5             Plaintiffs,        )
                                  )
 6        vs.                     )  Civil Action
                                  )  No. 04-30022-MAP
 7   WAVE SYSTEMS                 )
     CORPORATION,                 )
 8   JOHN E. BAGALAY, JR.,        )
     STEVEN K. SPRAGUE and        )
 9   GERARD T. FEENEY,            )
                                  )
10             Defendants.        )
11
12
          REALTIME DEPOSITION OF ANNE BRUMBAUGH,
13
14   produced, sworn, and examined on  Friday, the 5th
     day of May, 2006, between the hours of 8:00 o'clock
15   in the forenoon and 6:00 o'clock in the afternoon of
     that day at the Double Hotel, Suite 720, 10100
16   College Boulevard, in the City of Overland Park,
     County of Johnson, State of Kansas, before:
17
18            PEGGY E. CORBETT, RDR-CCR-CSR
                Registered Diplomate Reporter
19                            of
              JAY E. SUDDRETH & ASSOCIATES, INC.
20                       Suite 100
                   10104 West 105th Street
21            Overland Park, Kansas 66212-5746
22   a Certified Shorthand Reporter for the State of
     Kansas.
23
     Taken on behalf of Defendant Wave Systems
24   Corporation pursuant to Notice to Take Deposition.
25
```

Jay E. Suddreth & Associates, Inc.
Registered Professional Reporters

Page 2

```
 1            APPEARANCES
 2  For the Plaintiffs:
 3     SCHIFFRIN & BARROWAY, LLP
        Attorneys at Law
 4      280 King of Prussia Road
        Radnor, PA 19087
 5     BY: MR. TODD M. MOSSER
            MS. KAREN E. REILLY
 6
    For the Defendant Wave Systems Corporation:
 7
       BINGHAM MCCUTCHEN LLP
 8      Attorneys at Law
        150 Federal Street
 9      Boston, MA 02110-1726
       BY: MR. MICHAEL D. BLANCHARD
10
11              INDEX
12
13  ANNE BRUMBAUGH                  PAGE
14  Examination by Mr. Blanchard      4
15  Signature:                      134
16  Certificate:                    135
17
18  Livenotes Token License Number: #05673-5050
19
20              EXHIBITS
    EXHIBIT                          PAGE
21  NUMBER    DESCRIPTION         REFERENCED
22  1    T.D. Waterhouse Account Statement,  25
23       6/30/03, BRUM0006-9
24  2    T.D. Waterhouse Account Statement,  27
25       7/31/03, BRUM0023-26
```

Page 3

```
 1  3    T.D. Waterhouse Account Statement,  27
 2       8/29/03, BRUM0027-30
 3  4    Scottrade Account Statement, 7/31/03  27
 4       BRUM0020-22
 5  5    T.D. Waterhouse Account Statement,  27
 6       8/29/03BRUM0010-17
 7  6    Scottrade Account Statement, 7/31/03  27
 8       BRUM0018-19
 9  7    Certification of Names Plaintiff    46
10       Anne Brumbaugh, B
11  8    Wave Systems Announcement, 7/31/03   62
12  9    Wave Systems Makes Enterprise       68
13       Applications More Secure Than Ever
14       8/4/03
15  10   New York Times Article From         81
16       August 5th, 2003
17  11   Form S-3/A, 8/12/03                 83
18  12   Transcript Of A Wave Systems        84
19       Corporation Earnings Conference
20       Call Dated August 14th, 2003
21  13   T.D. Waterhouse Account Statement,  90
22       2/27/04 for Anne K. Brumbaugh
23  14   T.D. Waterhouse Account Statement,  90
24       2/27/04 for Anne K. Brumbaugh and
25       Holly A. Brumbaugh
```

Page 4

```
 1  15   T.D. Waterhouse Account Statement,  90
 2       2/27/04, for Anne K. Brumbaugh
 3       and Kathryn R. Brumbaugh
 4  16   T.D. Waterhouse Account Statement,  90
 5       3/31/04, for Anne K. Brumbaugh
 6       and William K. Brumbaugh
 7  17   Form 424B1, 8/18/03                 91
 8  18   Form S-3/A, 8/20/03                 93
 9  19   Form 424B1, 8/22/03                 93
10  20   Wave Systems Provides Update on     94
11       Corporate Progress and Reviews
12       Q3/Nine Months Results
13  21   Wave Systems Notified of SEC        95
14       Investigation
15  22   Plaintiffs' Response To Defendants' 101
16       First Set of Interrogatories
17  23   Letter, 4/19/06, Mosser to          101
18       Blanchard
19  24   Consolidated Amended Class Action   127
20       Complaint for Violations of the
21       Federal Securities Laws
22
23
24
25
```

Page 5

```
 1              ANNE BRUMBAUGH,
 2  of lawful age, having been first duly sworn to tell
 3  the truth, the whole truth, and nothing but the
 4  truth, testified as follows:
 5              EXAMINATION
 6  BY MR. BLANCHARD:
 7     Q.   For the record we have here -- counsel,
 8  would you like to identify yourselves?
 9          MS. REILLY: Karen Reilly for
10  plaintiffs, and also Todd Mosser for plaintiffs.
11          MR. BLANCHARD: And my name is Michael
12  Blanchard with Bingham McCutchen, and I represent
13  the defendants in this action.
14     Q.   (BY MR. BLANCHARD) Ma'am, could you state
15  your name for the record, please?
16     A.   Anne Brumbaugh.
17     Q.   And are you a plaintiff in a lawsuit
18  currently?
19     A.   Yes.
20     Q.   And what is that lawsuit?
21     A.   Well, it's purchasers of Wave Systems
22  between the time frame of July 31st and February,
23  '03, but I'm not sure, and Wave Systems, and Steven
24  Sprague and Feeney, Gerard Feeney, I think, or
25  Gerard Feeney.
```

Specializing in Complex Litigation Worldwide
Toll Free: (800) 466-2580   Local: (913) 492-0111 or (816) 471-2211

Jay E. Suddreth & Associates, Inc.
Registered Professional Reporters

Page 6
Q. And who are those persons?
A. Sprague is the CEO and Feeney is the CFO.
Q. Are they parties to the lawsuit?
A. Yes.
MR. BLANCHARD: Just preliminarily, can we agree that we will reserve all objections except for the form of the question until the time of trial?
MS. REILLY: That's in accordance with the Federal Rules, so yes. And also for the record, as you know, Counsel, we have filed a Motion for Protective Order concerning documents received by your firm in response to third-party subpoenas directed to the lead plaintiffs' brokers in this action, and any questions concerning the documents that have been produced in response to those subpoenas, we object to their use in line with the arguments that we have made to the court in our Motions For Protective Order.
So we do preserve those objections as stated in the motion.
MR. BLANCHARD: Okay. Will the witness be reading and signing the deposition?
MS. REILLY: Yes.
MR. BLANCHARD: How long will the

Page 7
witness take to read and sign? Is 30 days sufficient?
MS. REILLY: Whatever is provided for.
MR. BLANCHARD: Can we agree to -- I think we're going to expedite this transcript. Can we agree to something a little earlier, given the classification briefing schedule?
MS. REILLY: I'll speak with the plaintiff after the deposition to see what her timetable can be, given her schedule.
MR. BLANCHARD: Okay.
Q. (BY MR. BLANCHARD) Ms. Brumbaugh, what's your current residential address?
A. 5410 West 139th Street, Overland Park.
Q. Have you ever had your deposition taken before?
A. No.
Q. In a deposition I'm going to be -- in this deposition I'm going to be asking you questions and you'll be providing answers. It's important that your answers be oral answers, verbal responses. A nod of the head cannot be transcribed by the court reporter.
If you just, you know, say something other than "yes" or "no" to a question, that can't be

Page 8
transcribed, and the record won't be clear as to what your response, was even though it may be clear to us in this room.
A. Okay.
Q. If you could, wait until the question is finished before answering the question. That will also provide for a clearer record.
A. Okay.
Q. If you need to take a break at any time, let me know, and we can take a break. Okay?
A. Okay.
Q. And if you need to speak to your attorney at any time, let me know, you're free to do so. What I would ask is that if there's a question pending, you answer the question before you speak with your attorney and take that break. Okay?
A. Okay.
Q. When were you born?
A. August 15th, 1955.
Q. Are you married?
A. No.
Q. Were you ever married?
A. Yes.
Q. Do you have children?
A. Yes.

Page 9
Q. How many children do you have?
A. Three.
Q. What are their names?
A. Holly, Kathryn and Bill.
Q. Are you in good health?
A. Yes.
Q. Are you taking -- this question isn't meant to be prying. I want to be certain that you can provide answers today that are not impaired by any medications you might be taking.
Are you taking any medications that could affect your memory or your ability to answer questions truthfully today?
A. No.
Q. Again, not to pry, but when were you divorced?
A. 1996.
Q. Are any of your children involved in the securities industry?
A. No.
Q. Is your ex-husband involved in the securities industry?
A. No.
Q. None of them are stock brokers?
A. No.

3 (Pages 6 to 9)

Specializing in Complex Litigation Worldwide
Toll Free: (800) 466-2580 Local: (913) 492-0111 or (816) 471-2211

Jay E. Suddreth & Associates, Inc.
Registered Professional Reporters

Page 10

1  Q. Analysts, anything like that?
2  A. No.
3  Q. What do your children do?
4  A. My oldest daughter, she's a graphic
5  designer, and my son is a college student, and my
6  youngest daughter is a high school student.
7  Q. Are you related in any way to any of the
8  lawyers involved in this action?
9  A. No.
10 Q. Are you employed?
11 A. Yes.
12 Q. What is your occupation?
13 A. Real estate agent.
14 Q. How long have you been doing that for?
15 A. A little over two years.
16 Q. What did you do prior to being a real
17 estate agent?
18 A. Well, I've worked in the banking industry.
19 This is going back. For a few years I was just a
20 homemaker, and then I've worked in compliance at
21 First National Bank of Olathe.
22 Q. Why don't we, just so I don't have to ask
23 you these questions all over again, why don't you
24 just run me through what you did sequentially going
25 back.

Page 11

1       So you've been a real estate for two
2  years?
3  A. Okay, let's say since January of '05, and
4  then I was a home maker from 2001 to 2005. I worked
5  in compliance for three months, or from September to
6  December of '01 in compliance at the First National
7  Bank of Olathe.
8       I worked at the Post Office for five years
9  prior to that, from '95 to 2001, and I worked for
10 the State of Kansas part-time from probably '94 to
11 '99 probably, and then I was a homemaker and a piano
12 teacher for probably ten years prior to that, and
13 then I was a trust operations supervisor in Tulsa
14 from, let's see, 1980 to 1983, then I was an auditor
15 at Cloud County Bank in Concordia from 1973 to
16 2000 -- or 1980, sorry.
17      I wasn't an auditor that whole time. I
18 was a bookkeeper for awhile, and head bookkeeper,
19 and then auditor for probably the last five or six
20 years.
21 Q. Going back, what did you do for the State
22 of Kansas?
23 A. Office assistant for the Highway
24 Department.
25 Q. The compliance position you had at First

Page 12

1  National Bank, what were your duties?
2  A. I was an assistant to the compliance
3  officer so I would update compliance manuals, do --
4  check for compliance within the bank, kind of
5  auditing.
6  Q. What form of compliance was it that you
7  were working on?
8  A. Federal regulations about what, you know,
9  the bank has two different things that you have to
10 have out for public display, different procedures,
11 just policies and procedures.
12 Q. Would it be fair to say that your role is
13 in making sure the bank was compliant with some
14 Federal regulations?
15 A. Uh-huh, yes.
16 Q. The trust operations supervisor position,
17 who was that for again?
18 A. Utica National Bank in Tulsa.
19 Q. What were your responsibilities as trust
20 operations supervisor?
21 A. Well, to oversee the whole department,
22 reconcile our brokerage accounts with various
23 brokers that we did trades through.
24      Our department would implement the trades
25 that the administrators would make. They would come

Page 13

1  back to our department, and then we would enter them
2  onto the computer, and sometimes I would make the
3  calls to the brokers, kind of in the later stages.
4  Q. When you say "make the calls to the
5  brokers," what did that involve? I mean what was
6  the point of the call?
7  A. I can't even remember now.
8  Q. Were you placing trades?
9  A. You know, I'm not sure. I remember
10 talking to several different brokers, and sometimes
11 it would have to do with the accounts. You know, I
12 couldn't say with any certainty because it's been so
13 long ago.
14 Q. Actually, and that raises another point.
15 I should have told you earlier that if you can't
16 recall something, just let me know that you can't
17 recall.
18 A. Uh-huh.
19 Q. You're not required to guess or invent a
20 memory.
21 A. I can't recall with any certainty.
22 Q. Okay. Do you recall whether you gained
23 experience in the securities industry through that
24 position?
25 A. I gained some familiarity.

Specializing in Complex Litigation Worldwide
Toll Free: (800) 466-2580  Local: (913) 492-0111 or (816) 471-2211

Jay E. Suddreth & Associates, Inc.
Registered Professional Reporters

Page 14

1   Q.   Uh-huh. Do you recall what sorts of
2   things securities-related you did?
3   A.   Now I don't specifically.
4   Q.   When you were an auditor at the bank what
5   were your responsibilities in that position?
6   A.   Again, it's kind of a compliance position,
7   so there are certain checks that the bank has to do
8   internally to meet with the Federal guidelines and
9   so I would go in and on a periodic basis -- you
10  know, time frames, and just check like with a loan
11  to make sure, you know, that the collateral was
12  adequate for the loan or that, you know, officers
13  followed this procedure that they were supposed to
14  follow.
15        The same way with the Trust Department. I
16  can't -- this is like another lifetime ago. So just
17  the various departments had certain checks and
18  balances that the bank was supposed to adhere to,
19  and I would go in and see that they had been.
20  Q.   I'll ask you a few questions about your
21  educational background.
22  A.   Okay.
23  Q.   Starting from graduation from high school,
24  did you attend college?
25  A.   Not initially.

Page 15

1   Q.   When?
2   A.   Probably when I was like a young mother I
3   started taking some evening classes at an outreach
4   junior college that came to the town where I was
5   living, and so I have, over the years, I have my
6   Associate's Degree.
7   Q.   What is your Associate's Degree in?
8   A.   What is it? I think it's like science, or
9   you know, like what do they call it, Associate's Of
10  Science or Arts. I think mine is the science.
11  Q.   Did you have a major?
12  A.   It's not -- no.
13  Q.   There was no major?
14  A.   Well, no, not with two years. You just
15  get your Associate's Degree, and it was just -- I
16  mean it wasn't like I was going a specific
17  direction.
18        It was just taking advantage of the
19  opportunity at the time, and then I'd be ready to
20  jump into something else, if and when that
21  opportunity presented itself.
22  Q.   Did you receive any further degrees
23  following your Associate's Degree?
24  A.   No.
25  Q.   Do you recall any of the courses you took

Page 16

1   earning your Associate's Degree?
2   A.   Yes.
3   Q.   What were those courses in?
4   A.   Biology, government, history, math,
5   psychology. That's all that comes to mind right
6   now.
7   Q.   Economics?
8   A.   Yes.
9   Q.   Finance?
10  A.   No; small business management.
11  Q.   Have you ever taught any courses?
12  A.   No.
13  Q.   Have you received any training
14  following -- well, when did you receive your
15  Associate's Degree?
16  A.   I probably actually got that about the
17  time I moved, so let's say probably 2000.
18  Q.   Did you receive any training after your
19  Associate's Degree, on-the-job training, seminars,
20  anything of that nature?
21  A.   Well, my real estate, you know, licensing,
22  I took training for that.
23  Q.   You're a licensed real estate agent?
24  A.   Yes.
25  Q.   And when did you receive your real estate

Page 17

1   license?
2   A.   Well, you get your temporary license, so I
3   would have gotten that in probably February or
4   March of '04 or '05. I'm not sure. '04, it would
5   have been.
6   Q.   Uh-huh.
7   A.   And then like within six months is when
8   you get your actual license.
9   Q.   Uh-huh.
10  A.   So it would have been six months after
11  that. It was August of '04.
12  Q.   I'm sorry, I didn't mean to --
13  A.   And I think I told you '05 before, maybe
14  on some dates, but it should have been '04.
15  Q.   Okay. Did you have to attend any
16  education to obtain your real estate license?
17  A.   Uh-huh. You go for a 30-hour
18  pre-licensing class and then you have a 30-hour
19  post-licensing class, and then you take continuing
20  education classes.
21  Q.   What's the nature of the continuing
22  education you received?
23  A.   Some of them is "Real Estate And The Tax
24  Laws," some of them might be "Caught On Camera,"
25  it's like an ethics class. They do have a "Code of

Specializing in Complex Litigation Worldwide
Toll Free: (800) 466-2580   Local: (913) 492-0111 or (816) 471-2211

Jay E. Suddreth & Associates, Inc.
Registered Professional Reporters

Page 18

1  Ethics" class that we do have to take every period
2  that we have to renew, so --
3     Q.   What area of real estate do you sell? Is
4  it mainly residential or commercial, as well?
5     A.   I sell residential.
6     Q.   Uh-huh. Have you ever been a plaintiff in
7  another lawsuit?
8     A.   No.
9     Q.   Ever been a defendant?
10    A.   No. I mean a divorce, but not really --
11    Q.   Other than your divorce, yes.
12    A.   Okay, no.
13    Q.   Have you ever been a witness in a lawsuit?
14    A.   No.
15    Q.   Have you ever testified before?
16    A.   No.
17    Q.   And you've never had your deposition taken
18 before?
19    A.   No.
20    Q.   Have you ever otherwise been involved in
21 any way in any civil action?
22    A.   No.
23    Q.   Any criminal action?
24    A.   No.
25    Q.   Have you ever been the target of an

Page 19

1  investigation by a Grand Jury?
2     A.   No.
3     Q.   The Securities & Exchange Commission?
4     A.   No.
5     Q.   Any other agency?
6     A.   No.
7     Q.   Have you ever been arrested or charged
8  criminally?
9     A.   No.
10    Q.   Have you ever been the subject of an
11 investigation or disciplinary proceeding by a State
12 Licensing Board?
13    A.   No.
14    Q.   When did you begin investing in
15 securities?
16    A.   1985.
17    Q.   Do you recall why you started investing in
18 securities?
19    A.   Uh-huh. I had inherited some stocks from
20 a great aunt that had passed away, and so I
21 deposited those into a self-traded account, or you
22 know, like -- whatever they are, and self-directed,
23 and so that's when I started.
24    Q.   So you had discretionary authority over
25 your own account?

Page 20

1     A.   Yes.
2     Q.   You didn't have a broker making trades on
3  your behalf?
4     A.   No. I mean I would call and instigate the
5  trade.
6     Q.   So at your direction the broker would do
7  trades?
8     A.   Yes.
9     Q.   And have you continued that practice until
10 today?
11    A.   Yes.
12    Q.   Do you have any accounts where brokers
13 have discretion to trade on your behalf?
14    A.   No.
15    Q.   Have you ever had any such accounts?
16    A.   Yes.
17    Q.   When did you have those accounts?
18    A.   I think it was in 1999 and 2000.
19    Q.   What were the brokerages that --
20    A.   It was a Charles Schwab Institutional
21 Account it was called Black Capital Investments that
22 was out of here in Kansas City, and he would call
23 and discuss different stock trades with me and kind
24 of help, you know, make decisions about what to buy
25 and stuff.

Page 21

1     Q.   Did that account -- did any of your
2  trading in Wave securities arise from your Schwab
3  account?
4     A.   No.
5     Q.   Is that the only discretionary account
6  you've had?
7        MS. REILLY:  Objection.
8     Q.   (BY MR. BLANCHARD) You can answer the
9  question.
10    A.   Well, no.
11       MS. REILLY:  Objection. I don't know
12 if you realize that you asked her if that was the
13 only discretionary account she had.
14    Q.   (BY MR. BLANCHARD) Oh. Was that the only
15 account you had, that you allowed, you know, a
16 broker to make trades on your behalf?
17    A.   Oh, yes, yes.
18    Q.   When you started trading back in 1985 do
19 you recall what sorts of securities you invested in?
20    A.   Yes. Do you want names or times?
21    Q.   Sure. Well, first of all, were they
22 equity securities? Were they bonds? Do you recall?
23    A.   No, they were stocks.
24    Q.   They were stocks.
25    A.   Kraft, Hillenbrand Industries, I think

Specializing in Complex Litigation Worldwide
Toll Free:  (800) 466-2580   Local:  (913) 492-0111 or (816) 471-2211

Jay E. Suddreth & Associates, Inc.
Registered Professional Reporters

Page 22

1  Ralston Purina. A lot of them were consumer goods.
2      Q.    Did you research those companies before
3  you invested in them?
4      A.    Yes.
5      Q.    What did you do to research them?
6      A.    Oh, back then, Standard & Poor's was kind
7  of one resource place you could get kind of a report
8  from them, that, and just on my own, I guess,
9  consumer appeal using my judgment on what products I
10 liked and what I, you know, saw as successful.
11     Q.    As of today, could you estimate how many
12 times you've bought and sold securities?
13     A.    Like how many different securities I've
14 bought and sold?
15     Q.    Sure.
16     A.    I mean I'm not sure. Is that what you're
17 asking?
18     Q.    Well, we'll refine the question that you
19 posed, to be probably clearer. Do you recall how
20 many companies you've invested in?
21     A.    Oh, I could guess, and maybe I would be
22 within 20. I guess -- I don't know. I would say --
23           MS. REILLY: It's best not to guess.
24     Q.    (BY MR. BLANCHARD) Yeah, you don't have
25 to guess, but a rough estimate, and if it's an

Page 23

1  estimate that you're telling me is within 20, 30,
2  whatever, I'm just getting a sense --
3      A.    I'll say 40.
4      Q.    How many stocks do you hold at the
5  present? Actually, how many different companies
6  have you invested in?
7      A.    20.
8      Q.    And for these 20 or so stocks, do you do
9  your own research?
10     A.    Yes.
11     Q.    How do you do your research on stocks?
12     A.    Well, now I do it on-line. Usually my
13 favorite sites have been Morningstar.com, Quicken,
14 and Smart Money, and then I also access information
15 from T. D. Waterhouse's website.
16     Q.    What do you read when you go to these
17 websites?
18     A.    Oh, I usually go in and get, you know,
19 like they do a broad overview of the company, and
20 then I'll go into their news releases, because I
21 believe that's the most up-to-date information.
22     Q.    You read the company news releases?
23     A.    The one that is -- whatever is posted on
24 those websites. They can come from any source, any
25 source that's a public publication.

Page 24

1      Q.    Uh-huh.
2      A.    And then just go through and look at --
3  you know, try to do an overview of that account from
4  that.
5      Q.    Do you read any documents that the
6  companies file with the Securities And Exchange
7  Commission?
8      A.    I'm not sure.
9      Q.    Do you know whether you -- was it your
10 practice to read prospectuses?
11     A.    No; you know, to obtain one before I
12 purchased, no.
13     Q.    How much time do you spend on a monthly
14 basis managing your portfolio?
15     A.    It varies. I mean it can totally vary.
16 Some months I may not spend any, and some months I
17 may spend 10, 15 hours. I'm a single mother with
18 three kids, and there's times I just don't have time
19 to even think about it.
20     Q.    Uh-huh. How many brokerage accounts do
21 you currently hold?
22     A.    Including IRA?
23     Q.    Yes.
24     A.    Five.
25     Q.    Are all of those individual accounts?

Page 25

1      A.    No.
2      Q.    Are some of them joint accounts?
3      A.    One.
4      Q.    Who is the joint account with?
5      A.    My fiancee.
6      Q.    And what is his name?
7      A.    James Williams.
8      Q.    Does he participate in decision-making
9  over that account?
10     A.    No.
11     Q.    Sorry. There was the roll of your eyes
12 there.
13           Who are the other accounts -- are there
14 other individuals named on any of the other
15 accounts?
16     A.    No.
17     Q.    Let's see. Do you have IRA accounts with
18 others as beneficiaries?
19     A.    It --
20           MS. REILLY: Objection to form. I'm
21 not clear as to who you're asking as the
22 beneficiary.
23           MR. BLANCHARD: Let's just quit
24 messing around.
25 (Whereupon, Deposition Exhibit Number 1 was marked

Specializing in Complex Litigation Worldwide
Toll Free: (800) 466-2580   Local: (913) 492-0111 or (816) 471-2211

Jay E. Suddreth & Associates, Inc.
Registered Professional Reporters

Page 26

1  by the reporter for identification.)
2  Q. (BY MR. BLANCHARD) Let the record reflect
3  that this is a document that was produced by the
4  plaintiff, and it bears the Bates label, and for
5  your information, ma'am, the Bates label is that
6  little "BRUM" with numbers at the bottom right-hand
7  corner, Bates labels 0006 through 0009.
8  A. Uh-huh.
9  Q. Do you recognize this document?
10  A. Yes.
11  Q. Could you tell me what it is?
12      MS. REILLY: Okay, and just for the
13  record this is a document that was produced pursuant
14  to third-party subpoenas, I believe, directed to
15  T.D. Waterhouse. Is that correct?
16      MR. BLANCHARD: That's not correct.
17  This is a document that was produced by the
18  plaintiff, and it's redacted.
19      MS. REILLY: Okay.
20  A. It's my daughter's IRA.
21  Q. (BY MR. BLANCHARD) Okay, this is an IRA
22  for your daughter?
23  A. Uh-huh.
24  Q. And your daughter is Holly Brumbaugh?
25  A. Yes.

Page 27

1  Q. Why don't we just stop a second and I'll
2  have you mark a bunch.
3  (Whereupon, Deposition Exhibit Numbers 2 through 6
4  were marked by the reporter for identification.)
5  Q. (BY MR. BLANCHARD) Ms. Brumbaugh, you
6  have a number of exhibits before you; is that
7  correct?
8  A. Yes.
9  Q. Am I pronouncing your name correct, by the
10  way?
11  A. Brumbaugh.
12  Q. Brumbaugh, great. Exhibit Number 2 is
13  Bates-labeled beginning 0023. Do you recognize that
14  document?
15  A. Uh-huh. It's my daughter's account.
16  Q. It's an account statement from T.D.
17  Waterhouse, correct?
18  A. Yes.
19  Q. And it reflects an account with your name
20  as custodian?
21  A. Yes.
22  Q. And Kathryn R. Brumbaugh?
23  A. Yes.
24  Q. And what's her role in that account?
25  A. She's a minor.

Page 28

1  Q. Do you continue to hold this account?
2  A. Yes.
3  Q. Do you see Exhibit 3 before you?
4  A. Yes.
5  Q. Do you recognize that document?
6  A. It's my son's IRA.
7  Q. It bears the Bates label beginning 0027
8  through 0030, correct?
9  A. Yes.
10  Q. And this is an account statement from T.D.
11  Waterhouse?
12  A. Yes.
13  Q. It lists your name as guardian, correct?
14  A. Yes.
15  Q. And William K. Brumbaugh, Roth IRA,
16  correct?
17  A. Correct.
18  Q. Do you have Exhibit 4 before you?
19  A. Yes.
20  Q. And that exhibit bears the Bates label
21  0020 through 0022, correct?
22  A. Yes.
23  Q. This is a Scottrade account statement?
24  A. Yes.
25  Q. The names on this account are James

Page 29

1  Williams and Anne Brumbaugh, correct?
2  A. Correct.
3  Q. Do you recognize this document?
4  A. Yes.
5  Q. And this reflects the account with your
6  fiancee?
7  A. Yes.
8  Q. And James Williams is your fiancee?
9  A. Yes.
10  Q. Do you have Exhibit 5 before you bearing
11  the Bates labels 0010 through 0017?
12  A. Yes.
13  Q. This is a T.D. Waterhouse account
14  statement?
15  A. Yes.
16  Q. And this one only has your name, correct?
17  A. Correct.
18  Q. Do you recognize the document?
19  A. Yes.
20  Q. And Exhibit Number 6? Do you see Exhibit
21  Number 6?
22  A. Yes.
23  Q. It bears the Bates label 0018 through
24  0019. It's that there.
25  A. Okay.

Specializing in Complex Litigation Worldwide
Toll Free: (800) 466-2580  Local: (913) 492-0111 or (816) 471-2211

Jay E. Suddreth & Associates, Inc.
Registered Professional Reporters

Page 30

1  Q. Correct?
2  A. Correct.
3  Q. This is a Scottrade account statement?
4  A. Yes.
5  Q. And it has only your name on it, correct?
6  It's a Roth IRA?
7  A. Yes.
8  Q. During the period January, 2003 through
9  January, 2004, did you have accounts other than the
10 accounts reflected by these documents, "these
11 documents" meaning Exhibits 1 through 6?
12 A. These are the only accounts that I traded
13 Wave stock in.
14 Q. Did you have accounts that you traded
15 other stocks in?
16 A. Yes.
17 Q. Do you know how many?
18 A. Two.
19 Q. Do you recall who the brokers were for
20 those accounts?
21 A. Charles Schwab, and the other, my Schwab
22 IRA account.
23 Q. And that Charles Schwab account, is that
24 an account that you were allowing your broker to
25 make trades on your behalf?

Page 31

1  A. No.
2  Q. It was a non-discretionary account?
3  A. Which means?
4  Q. Which means that the broker could not make
5  a trade unless you directed him to make a trade?
6  A. Correct.
7  Q. All right. The same with the other Schwab
8  account, correct?
9  A. Correct.
10 Q. Were there any other accounts at the time?
11 A. No.
12 Q. Have you ever invested in commodities?
13 A. No.
14 Q. Mutual funds?
15 A. I don't think so. I have a thrift plan
16 through my work at the Post Office that might be
17 like a mutual fund, but I don't, you know, the money
18 just goes in, and I decide whether it goes in the C
19 Fund or the F Fund, or you know, so I don't know if
20 technically that's a mutual fund.
21 Q. Uh-huh.
22 A. And when my great aunt passed away there
23 were two mutual fund holdings in that, that I
24 probably sold at the end of the '90s.
25 Q. Uh-huh.

Page 32

1  A. So that's my only experience with mutual
2  funds.
3  Q. Limited partnerships? Have you ever
4  invested in limited partnerships?
5  A. No.
6  Q. Have you ever invested in mortgage-backed
7  securities?
8  A. No.
9  Q. Do you invest in debt securities?
10 A. No.
11 Q. Bonds?
12 A. No.
13 Q. No debentures?
14 A. (Witness shaking head negatively). Now
15 there may have been spin-offs in my past, or
16 something, that could have gone to debentures. I
17 don't know.
18 Q. What do you mean by spin-offs?
19 A. Oh, there used to be a company
20 Freeport-McMoRan that was one of the holdings for my
21 aunt, and it seems like it had a lot of weird
22 spin-offs that eventually, you know, sold off. I
23 don't know what they were.
24 Q. What do you mean by a spin-off? The
25 company sold a subsidiary?

Page 33

1  A. No. They either break apart their company
2  into little smaller ventures, or something.
3  Q. Uh-huh. So they restructure the company?
4  A. Yeah.
5  Q. But do you recall whether you invested in
6  debt securities as a result of those --
7  A. I've never purchased anything, no.
8  Q. Currently is all of your investment in
9  stocks?
10 A. Yes.
11 Q. Have you ever purchased options?
12 A. No.
13 Q. I'll back up. At the time you were
14 investing in Wave, was all of your investment in
15 stocks?
16 A. Yes.
17 Q. Have you ever purchased futures?
18 A. No.
19 Q. Have you ever done puts?
20 A. No.
21 Q. Calls?
22 A. No.
23 Q. Short sales?
24 A. No.
25 Q. Margin purchases?

Specializing in Complex Litigation Worldwide
Toll Free: (800) 466-2580   Local: (913) 492-0111 or (816) 471-2211

Jay E. Suddreth & Associates, Inc.
Registered Professional Reporters

Page 34

1  A. No.
2  Q. What's the current value of your
3  investment portfolio?
4      MS. REILLY: If you know.
5  A. I don't know.
6  Q. (BY MR. BLANCHARD) Do you recall what the
7  value of your portfolio was in 2003?
8  A. No. And 2003, I mean it changes every
9  month. No, I don't know. I have no idea.
10 Q. Do you recall the high and the low in
11 2003?
12 A. No.
13 Q. Do you recall either of them?
14 A. No.
15 Q. Do you know how much your portfolio has
16 fluctuated in value over the past five years?
17 A. No, because there's been, you know, the
18 fluctuation, plus putting in, so just to know how
19 much the price is fluctuating, you don't.
20 Q. Uh-huh. Do you day trade?
21 A. No.
22 Q. Are your investments long-term positions?
23 A. I go in with that intent, yes.
24 Q. Do you ever go in with a different intent?
25 A. No. Usually I mean I like to see -- I

Page 35

1  would like to hold on and see appreciation for at
2  least a year, because you have, you know, your tax
3  consequences are greater --
4  Q. Uh-huh.
5  A. -- on a short-term.
6  Q. Uh-huh. When you buy a stock, do you
7  generally buy a particular number of shares?
8  A. No.
9  Q. Do you buy in increments?
10 A. What do you mean?
11 Q. Typically?
12 A. You mean buying some, and then buying more
13 later?
14 Q. Yeah.
15 A. Sometimes; not necessarily. I have this
16 long-range plan to buy in increments, but if, you
17 know, I buy a stock that I feel is good, and that
18 reduces, you know, sometimes you might buy more.
19     Or sometimes, you know, I might buy half
20 of what I'm going to buy, to see, you know, how the
21 stock does, and then make a decision to buy more,
22 but not -- I don't purposely set out as a habit
23 thinking, "Okay, I'm going to buy so much every so
24 often."
25 Q. Would it be fair to say that every stock

Page 36

1  is different?
2  A. Yes.
3  Q. How you purchase it?
4  A. Yes.
5  Q. What's the single largest value of any one
6  stock issue you owned in 2003?
7  A. Now what is what?
8  Q. What is the largest -- do you recall what
9  else you were invested in in 2003, at the time you
10 held Wave stock?
11 A. I thought you asked me what would be the
12 largest value.
13 Q. I did.
14 A. Okay.
15 Q. I'm trying to back up and ask a clearer
16 question. I'm sorry.
17 A. Okay.
18 Q. Do you recall how many stocks you owned
19 along with Wave during 2003?
20 A. Probably 15 to 20.
21 Q. Do you recall what your largest position
22 in any one company was?
23 A. Probably Sprint or V. F. Corporation.
24 Q. Do you recall the value of either of those
25 during that time frame?

Page 37

1  A. Probably around -- I'm just guessing, 25
2  or 30.
3  Q. 25 or 30 what?
4  A. Thousand.
5  Q. Do you recognize that investments in
6  stocks involve risks?
7  A. Yes.
8  Q. Do you believe that all company ventures
9  are equally risky?
10 A. No.
11 Q. What causes the variation in risks?
12 A. Well, I feel like things are cyclical, I
13 think company management, I think just the demand
14 for whatever product the company has. Well, I mean
15 there's a lot of things.
16 Q. Do you believe companies in certain
17 markets are riskier than other markets?
18 A. Define "market."
19 Q. Well, for instance, companies within the
20 tech industry or tech stocks. Are tech stocks
21 riskier than large cap companies?
22 A. I think you have to look at each one
23 individually to determine risks.
24 Q. What industry was Wave in at the time you
25 purchased?

Specializing in Complex Litigation Worldwide
Toll Free: (800) 466-2580  Local: (913) 492-0111 or (816) 471-2211

Jay E. Suddreth & Associates, Inc.
Registered Professional Reporters

Page 38

1  A.  Well, I would consider them a software
2  company.
3  Q.  Do you view companies like Wave to be
4  riskier investments?
5      MS. REILLY:  Objection to form.
6  A.  You'd have to look at each company.  I
7  don't think you can make a general --
8  Q.  (BY MR. BLANCHARD) Did you view Wave as a
9  risky investment at the time?
10 A.  I view every stock purchase as somewhat of
11 a risk.
12 Q.  But did you view Wave risky at the time?
13 A.  As much as anyone else.
14 Q.  Any more than any other?
15 A.  Well, it's a general rule that
16 smaller-valued stocks can be a higher risk, but --
17 Q.  And Wave was a smaller valued stock?
18 A.  Well, a smaller priced stock.  Some of the
19 investment people have made that determination, the
20 smaller price of stock.
21 Q.  When you make your investments do you rely
22 on other individuals at all?
23 A.  No.  Let me back up, because you asked me
24 if I considered Wave to be more of a risk, and I
25 guess to look at it, I mean I guess I didn't think

Page 39

1  of it at the time as any more of a risk than any
2  other stock that I purchased.
3  Q.  Do you have a particular investment
4  strategy or goal?
5  A.  Well, to increase capital.  Is that what
6  you mean?
7  Q.  And I think you said that you tend to be
8  in companies for the long-term.
9  A.  I like to be.  I mean, yes.
10 Q.  Do you avoid certain types of investments?
11 A.  Well, obviously, I've avoided mutual
12 funds, and bonds, and commodities.
13 Q.  Do you avoid any particular types of
14 companies to invest in?
15 A.  No.
16 Q.  What proportion of your annual income is
17 derived from earnings on investments in securities?
18 A.  Would you repeat that?
19 Q.  What portion of your annual income -- I'll
20 back up.
21 A.  Zero.
22 Q.  Zero proportion of your annual income is
23 derived from your investments in securities?
24 A.  Yes.  I've had a loss.
25 Q.  When was that?

Page 40

1  A.  Huh?
2  Q.  When was that?
3  A.  I've had a loss.  There is no income.
4  Q.  For every year?
5  A.  For -- up until -- let's see, not every
6  year.  I mean the past years, the past few years, I
7  have.
8  Q.  You've only incurred losses in the past
9  few years?
10 A.  Yes.
11 Q.  Do you remember the last year that you
12 made a profit?
13 A.  2001, I believe, or 2.  I'm not sure.
14 Q.  Have you ever bought or sold a security to
15 achieve tax benefits?
16 A.  No, I mean not for that reason.  I mean
17 you do receive tax benefits if you sell a stock for
18 a loss before the end of the year, but as far as
19 just selling it to have the loss, no.
20 Q.  I think you mentioned a few sources of
21 information you use when you make decisions on
22 investment purchases before.
23     I'll just ask you a few others.  Do you
24 read the Wall Street Journal?
25 A.  I have, but I don't read it regularly.

Page 41

1  Q.  The New York Times Business Section?
2  A.  No.
3  Q.  Baron's?
4  A.  I mean I've read it once or twice, but I
5  don't read it regularly.
6  Q.  Fortune?
7  A.  No.
8  Q.  Business Week?
9  A.  No.  I have, but I don't.
10 Q.  Forbes?
11 A.  No.  I have, but I don't.
12 Q.  Any other financial press you read?
13 A.  I have a subscription or have in the past
14 to Smart Money magazine.
15 Q.  Is that the only one?
16 A.  Oh, in the past there was another one I
17 had.  I don't remember what it is now.  That was
18 Kiplinger's, I think is the one that I've had
19 before.
20 Q.  When did you first start using the
21 internet to research investments on-line?
22 A.  Probably 1999 or 2000.
23 Q.  I think you said you used Quicken,
24 correct?
25 A.  Uh-huh.

Specializing in Complex Litigation Worldwide
Toll Free:  (800) 466-2580   Local:  (913) 492-0111 or (816) 471-2211

Jay E. Suddreth & Associates, Inc.
Registered Professional Reporters

Page 42

1  Q.  And Smart Money?
2  A.  And Morningstar.
3  Q.  And Morningstar. Are there any others?
4  A.  T.D. Waterhouse website, Schwab website,
5  and Scottrade has a website.
6  Q.  Do you watch financial programs on T.V.?
7  A.  Not really.
8  Q.  Do you watch Wall Street Week?
9  A.  No.
10 Q.  Financial News Network?
11 A.  No.
12 Q.  CNBC?
13 A.  No.
14 Q.  Bloomberg News?
15 A.  No.
16 Q.  Where do you get stock price information?
17 A.  Same place. Either within the account I'm
18 trading, or Morningstar, or Smart Money, or Quicken,
19 but the up-to-date prices are with the accounts that
20 I own, that I have accounts with, I mean the firms.
21     Either Schwab or Scottrade or T.D.
22 Waterhouse have the up-to-date prices.
23 Q.  Do you maintain any files on the companies
24 you invest in?
25 A.  No.

Page 43

1  Q.  Do you maintain any computer files in
2  electronic format?
3  A.  On the companies?
4  Q.  Yes.
5  A.  No. I read whatever information as it
6  comes, and then I disburse it.
7  Q.  Do you ever discuss your securities
8  purchases with other people?
9  A.  No.
10 Q.  Have you ever talked to officials at
11 companies before investing in them?
12 A.  No.
13 Q.  Do you ever listen to investor conference
14 calls?
15 A.  I haven't.
16 Q.  Do you, or have you ever, currently
17 belonged to an investment club?
18 A.  Yes.
19 Q.  What's the name of that club?
20 A.  Purchasing Partners.
21 Q.  Could you describe the nature of that
22 club?
23 A.  Well, right now it's a group of about ten
24 people that initially put in $200, and then they pay
25 $20 a month, and they get together and discuss

Page 44

1  different stocks that they think would be a good
2  investment, and then make decisions as a group to
3  invest the money that they've pooled.
4  Q.  So you've put your $200 into that group?
5  A.  Yes.
6  Q.  And you pay your $20 bucks a month?
7  A.  Yes.
8  Q.  Do you participate in their discussions?
9  A.  I haven't since I moved in 2001.
10 Q.  Prior to 2001 you did?
11 A.  Yes.
12 Q.  Did you learn about investing through that
13 group?
14 A.  Somewhat.
15 Q.  Were any of the individuals in that group
16 involved in the securities industry, other than
17 their participation in the group?
18 A.  No, and that's what it is, it's a learning
19 group. I mean that's what it's geared for, to help
20 individuals learn.
21 Q.  Has that group made a profit?
22 A.  Yes.
23 Q.  Do you remember the last year that group
24 made a profit?
25 A.  Well, what do you consider making a

Page 45

1  profit; when you actually trade a security and show
2  a profit on it, or just that your portfolio is
3  increasing?
4  Q.  I guess just the portfolio is increasing.
5  A.  I think it's made somewhat of a profit
6  every year; nothing significant.
7  Q.  Does everyone in the entire group, you
8  know, come to an agreement on particular
9  investments?
10 A.  No. I mean it goes on a -- I think it has
11 to have a two-thirds -- you have to have a quorum
12 before you can even make any type of investment
13 decision, so I'm sure there's some decisions that
14 other people maybe would have made, but you have to
15 go with the consensus of the group.
16 Q.  Is that group incorporated in any way?
17 A.  I'm not sure.
18 Q.  Do you know whether they're an L.L.C. or
19 some other entity?
20 A.  I should know because, you know, I get a
21 form from them at the end of the year for income tax
22 purposes.
23 Q.  Uh-huh.
24 A.  But I'm not sure how it's set up.
25 Q.  Did that group have any investment in

Specializing in Complex Litigation Worldwide
Toll Free: (800) 466-2580   Local: (913) 492-0111 or (816) 471-2211

Page 46

1  Wave?
2  A.  No.
3  Q.  And you haven't attended a meeting since
4  2001, you say, correct?
5  A.  Correct.
6  Q.  You don't employ the services of any stock
7  broker or investment advisor?
8  A.  No.
9  Q.  And you did not at the time you purchased
10 Wave securities?
11 A.  No.
12 Q.  Have you ever offered investment advice to
13 other persons, other than in that group?
14 A.  No.
15 Q.  Do you want to take a break for a minute?
16 A.  Yeah.
17 Q.  I could use one, personally.
18       (Recess).
19 (Whereupon, Deposition Exhibit Number 7 was marked
20 by the reporter for identification.)
21 Q.  (BY MR. BLANCHARD) Ms. Brumbaugh, you
22 have Exhibit Number 7 before you?
23 A.  Uh-huh.
24 Q.  Do you recognize that document?
25 A.  Yes.

Page 47

1  Q.  What is that?
2  A.  I guess it's the form that I sent in,
3  showing when I had purchased the shares of Wave.
4  Q.  It's titled, "Certification of named
5  plaintiff pursuant to Federal securities laws,"
6  correct?
7  A.  Yes.
8  Q.  Is that your signature on the first page?
9  A.  Yes.
10 Q.  It's a two-page document, correct?
11 A.  Yes.
12 Q.  And the first page appears to be a form
13 that you filled in some blanks on?
14 A.  Yes.
15 Q.  And then the second page is an addendum,
16 correct --
17 A.  Yes.
18 Q.  -- of some sort?
19 A.  Yes.  Well, it's additions to the list
20 that didn't fit on that page.
21 Q.  An attached sheet?
22 A.  Yeah.
23 Q.  And that's the attached sheet that's
24 referred to on the first page, correct?
25 A.  Yes.

Page 48

1  Q.  Under Paragraph 4, that paragraph reads,
2  "Plaintiffs' transactions in the Wave Systems
3  Corporation (NASDAQ: WAVX) security that is the
4  subject of this action during the class period
5  is/are as follows," it has 1,700 shares purchased on
6  August 4th, of 2003, correct?
7  A.  Yes.
8  Q.  At $4.76 a share?
9  A.  Yes.
10 Q.  Another 3,300 purchased on August 4th at
11 $4.73 per share, correct?
12 A.  Yes.
13 Q.  Another 1,800 purchased on August 4th of
14 '03 at $4.62 per share, right?
15 A.  Yes.
16 Q.  Another 3,000 purchased on August 5th, of
17 '03 at $4.65 per share, correct?
18 A.  Yes.
19 Q.  And then it refers to an attached sheet.
20 The attached sheet refers to a purchase of 300
21 shares on August 4th at $4.61 per share, correct?
22 A.  Yes.
23 Q.  And another purchase on August 4th of 550
24 shares at $4.57 per share, correct?
25 A.  Yes.

Page 49

1  Q.  There is also purchases for, on August 6th
2  for 2,000 shares at $3.78 a share?
3  A.  Yes.
4  Q.  And another purchase on August 6th of 750
5  shares at $3.92 per share?
6  A.  Yes.  And I should clarify.  I think these
7  shares doesn't mean that I made trades for that
8  amount.
9      What happens is sometimes you put it in
10 for a certain number of shares, and then the way
11 that they are put in the system, it does it in
12 little blocks like that.
13 Q.  Okay.
14 A.  It's not that I made three different
15 trades.
16 Q.  Uh-huh.
17 A.  I made one, and then that's how the system
18 processed it.
19 Q.  And I was going to ask you that.  So on
20 August 4th, did you put in a single order for Wave
21 stock?
22 A.  I'd have to look back at the trade
23 confirmation and see how it executed it.
24 Q.  And I think all I have, though, are the --
25 A.  I think that would be the case.

Jay E. Suddreth & Associates, Inc.
Registered Professional Reporters

Page 50

1  Q. That's your recollection?
2  A. Yeah. Usually you can tell on the trade
3  confirmation because they will only have a fee on
4  one of them and the rest will not have a fee.
5  Q. Uh-huh.
6  A. And so that's how I would go back and tell
7  for sure.
8  Q. Okay. Is it your recollection that that's
9  what you did?
10 A. I would think that that's what I would
11 have done.
12 Q. Is it your recollection that you made a
13 separate purchase on August 5th?
14 A. It appears that way.
15 Q. And you made a separate purchase on
16 August 6th?
17 A. It looks that way. I would have to go
18 back and look at the trade confirmations.
19 Q. Do you have the trade confirmations?
20 A. You might.
21    Well, I can't tell.
22 Q. For instance, if you go to Exhibit 2 --
23 A. I'm sure the other days were separate
24 trade confirmations. I couldn't say with any
25 certainty whether that was one on the 4th, but

Page 51

1  that's what I would assume it to be, because I mean
2  that's the way I would have done it.
3  Q. All right. Hang on. We'll just go off
4  the record for a minute.
5    (Off the record discussion.)
6  Q. (BY MR. BLANCHARD) Okay. During our
7  brief break, we -- well, you reviewed Exhibits 1
8  through 6, correct?
9  A. Yes.
10 Q. Okay. Exhibit 1 has a trade confirmation,
11 it was the last page, that's marked BRUM 0009.
12    MS. REILLY: Hold on one second.
13    MR. BLANCHARD: Sorry.
14 A. Okay.
15 Q. (BY MR. BLANCHARD) Can you tell me what
16 this trade confirmation tells us about your
17 purchasing in Wave?
18 A. Well, it looks -- is that 550 shares?
19 It's hard to read.
20 Q. Uh-huh. Purchased on what date?
21 A. On the 4th, August 4th of '03.
22 Q. Uh-huh.
23 A. And it looks like at a price of $4.57.
24 Q. Uh-huh. Okay. If we look at -- and
25 that's reflected on Exhibit 7, the certification you

Page 52

1  signed, correct? It's on the second page of Exhibit
2  7.
3    MS. REILLY: Is this it?
4  Q. (BY MR. BLANCHARD) It's the second entry
5  on the second page of Exhibit 7.
6  A. Yes, I suppose that's it.
7  Q. If you'll go to Exhibit 2, the trade
8  confirmation appears as the last page.
9  A. Uh-huh, yes.
10 Q. This reflects a purchase on August 4th,
11 correct?
12 A. Correct.
13 Q. As well. I believe it's 1,800 shares; is
14 that correct?
15 A. Well, you can't really tell from this
16 copy.
17 Q. It's difficult to read the copy. I'm
18 sorry.
19    MS. REILLY: It does look like $4.62.
20 A. It does. It looks consistent with what's
21 on the certification sheet.
22 Q. (BY MR. BLANCHARD) So if we go to Exhibit
23 7, the certification sheet, Exhibit 2 -- the trade
24 confirmation in Exhibit 2 reflects the purchase that
25 is the third entry on Exhibit 7, the first page,

Page 53

1  correct?
2  A. Yes.
3  Q. And that's for 1800 shares at $4.62 a
4  share, correct?
5  A. Yes, I think so.
6  Q. If we go to Exhibit 3, the confirmation
7  page is 0030, the last page of Exhibit 3. That
8  reflects 300 shares purchased, correct?
9  A. Yes, at a price of $4.61, right.
10 Q. Correct, and that appears on Exhibit 7,
11 the second page, the first entry, correct?
12 A. Yes.
13 Q. Exhibit 4, the last page also has a trade
14 confirmation, correct?
15 A. Yes.
16 Q. That reflects a purchase on August 4th,
17 correct?
18 A. Yes.
19 Q. It appears to say 200 shares; is that
20 correct?
21 A. It looks like that, uh-huh.
22 Q. At $4.62 per share, correct?
23 A. Uh-huh.
24 Q. I don't see that reflected on the
25 certification, do you?

Specializing in Complex Litigation Worldwide
Toll Free: (800) 466-2580  Local: (913) 492-0111 or (816) 471-2211

Jay E. Suddreth & Associates, Inc.
Registered Professional Reporters

Page 54

1   A.   No.
2   Q.   Any idea why that may be?
3   A.   Well, the only thing I can think is that
4   maybe that since Jim's Social Security number is the
5   main number for the account, that this is listed on
6   his, that maybe he has filled out his own form about
7   this. I mean we can't both claim it.
8        I guess it's part of the class action,
9   perhaps. I don't know. I'm guessing.
10  Q.   Jim is not a named plaintiff in this
11  action, is he, Jim Williams? Is he a plaintiff?
12  A.   Like a lead plaintiff?
13  Q.   Yes, like a lead plaintiff?
14  A.   No.
15  Q.   No. Could it just be an omission on your
16  part, an oversight?
17       MS. REILLY: Objection. Objection to
18  form.
19  Q.   (BY MR. BLANCHARD) You can answer the
20  question.
21  A.   Well, I'm not sure what you're asking.
22  Q.   I'm asking whether or not there could have
23  been a mistake.
24  A.   I suppose so. I mean I don't know.
25  Q.   Exhibit 4 is a document that you produced

Page 55

1   in this litigation, correct?
2   A.   I don't know if I produced it or you got
3   it, because you subpoenaed -- it looks like you got
4   this.
5   Q.   I can tell you that I did, but I didn't
6   redact anything, and the Bates Number is a number
7   indicating that it was produced in the litigation.
8   A.   Uh-huh.
9   Q.   So my understanding would be that this was
10  produced from your records.
11  A.   Well, I mean I guess I'd have to rely on
12  counsel, if that was an error.
13  Q.   Exhibit 5.
14  A.   Okay.
15  Q.   Exhibit 5 has a series of trade
16  confirmations, the last three pages of -- four pages
17  of the document. If you could turn to Bates Number
18  0014, do you see that page?
19  A.   Yes.
20  Q.   And that indicates a purchase on
21  August 6th, correct --
22  A.   Yes.
23  Q.   -- of 2,000 shares?
24  A.   Correct.
25  Q.   And that appears on Exhibit 7 as the third

Page 56

1   entry on the second page, correct?
2   A.   Yes.
3   Q.   Turning to 0015, that page indicates a
4   purchase on August 5th, correct --
5   A.   Correct.
6   Q.   -- of 3,000 shares, correct --
7   A.   Correct.
8   Q.   -- at $4.65 per share?
9   A.   Yes.
10  Q.   And that is reflected on the first page of
11  Exhibit 7, correct?
12  A.   Yes.
13  Q.   Turning to 0016, do you have 0016 before
14  you?
15  A.   Yes.
16  Q.   That indicates a trade on August 4th,
17  correct?
18  A.   Yes.
19  Q.   And that's a purchase of 3,300 shares,
20  correct --
21  A.   Yes.
22  Q.   -- at $4.73 per share?
23  A.   Yes.
24  Q.   And that's indicated on the second entry
25  on the first page of Exhibit 7, correct?

Page 57

1   A.   Yes.
2   Q.   And then turning to 0017, do you have that
3   before you?
4   A.   Yes.
5   Q.   That trade confirmation indicates a
6   purchase on August 4th, correct?
7   A.   Correct.
8   Q.   And the purchase was for $1,700 shares of
9   Wave, correct?
10  A.   Correct.
11  Q.   At $4.76 per share, correct?
12  A.   Correct.
13  Q.   That trade is reflected as the first entry
14  on the first page of Exhibit 7, correct?
15  A.   Yes.
16  Q.   Turning to Exhibit 6, the second page of
17  the exhibit is marked 0019, correct?
18  A.   Yes.
19  Q.   And that is a trade confirmation from
20  Scottrade, correct?
21  A.   Yes.
22  Q.   And that indicates a purchase of 750
23  shares of Wave, correct --
24  A.   Yes.
25  Q.   -- at $3.92 per share --

Specializing in Complex Litigation Worldwide
Toll Free: (800) 466-2580  Local: (913) 492-0111 or (816) 471-2211

Jay E. Suddreth & Associates, Inc.
Registered Professional Reporters

Page 58

1  A.  Correct.
2  Q.  -- on August 6th?
3  A.  Correct.
4  Q.  And that is indicated as the last entry on
5  the second page of Exhibit 7, correct?
6  A.  Correct.
7  Q.  From these trading records, these trade
8  confirmations, it appears that you purchased Wave
9  securities in increments on August 4th.  Would that
10  be a fair characterization?
11  A.  I don't think so.  I don't think I did.
12  Could I look at my statements that you have?
13  Q.  Which statements?
14  A.  I'm wondering if -- there's two things
15  that could have happened, because I don't know why I
16  would have bought them in increments and paid
17  charges for that, and I'm thinking either it's
18  possible if I saw that they charged me for each one
19  of those lots that they put through, that I would
20  have contacted them and had them refund those
21  charges, which may reflect on my statement, or I
22  didn't catch it, or I didn't bother with it, but it
23  wouldn't have been my nature to buy those in
24  separate lots.
25  Q.  Well, here's another theory.  If you look

Page 59

1  at Exhibits 1 through 6 they are for, I believe,
2  different accounts, correct?
3  A.  Some of them.
4  Q.  Right, some of them.  Is it possible that
5  the purchases are reflected as different purchases
6  because it's different accounts?
7  A.  Most of them, I think.  Was there one that
8  was two within the same account?
9  Q.  I think there were, yes.
10  A.  And I'm not -- I don't think those were
11  separate.  I think they just went through as
12  separate lots.  I don't think I initiated it that
13  way.
14  Q.  So your recollection is you purchased
15  one -- you put in an order for one lump-sum of
16  shares?
17  A.  Of each account.
18  Q.  Okay.
19  A.  To the best of my recollection.
20  Q.  Are you aware of purchasing Wave
21  securities, any other Wave securities other than the
22  ones reflected in the certification, and that one
23  account with Mr. Williams?
24  A.  No.
25  Q.  When you purchased your shares of Wave did

Page 60

1  you give any thought that you might be a plaintiff
2  in a lawsuit against Wave?
3  A.  No.
4  Q.  Have you ever kept a file on Wave?
5  A.  No.
6  Q.  Do you currently keep a file on Wave?
7  A.  No.
8  Q.  When did you first become aware that Wave
9  existed?
10  A.  Probably the month prior to when I made
11  the stock purchase, sometime in July.
12  Q.  How did you become aware of Wave?
13  A.  I think news releases.  I saw some news
14  releases on it.
15  Q.  Do you recall what you read in those news
16  releases?
17  A.  Uh-huh.  What I remember reading was that
18  they had partnered with several different big name
19  companies like Intel and National Semiconductor and
20  also that they were -- their encrypted system was
21  coming out on the Intel motherboards, and also that
22  they had a thing with IBM that they were going to --
23  that their software was going to be bundled with the
24  packages on their computer.
25  Q.  Do you recall how long it took you to

Page 61

1  acquire all of that information that you just
2  discussed?
3  A.  It takes seconds to acquire it.
4  Q.  Did you research them over a matter of
5  weeks or was it in an afternoon?  Do you recall?
6  A.  A matter of days.
7  Q.  A matter of days?
8  A.  Uh-huh.
9  Q.  Did those news releases or sources that
10  you relied on interest you in investing in Wave?
11  A.  Yes.
12  Q.  Did you review the company's SEC filings?
13  A.  No.
14  Q.  Did you contact anyone at the company at
15  the time?
16  A.  No.
17  Q.  Other than -- well, do you recall which
18  sources you relied upon when you were investigating
19  purchasing Wave?
20  A.  No.  I can just tell you that the
21  resources I went to were, you know, either Quicken
22  or Morningstar or Smart Money or within the
23  brokerage accounts.
24  Q.  Did you rely on any individual?
25  A.  No.

Specializing in Complex Litigation Worldwide
Toll Free:  (800) 466-2580   Local:  (913) 492-0111 or (816) 471-2211

Jay E. Suddreth & Associates, Inc.
Registered Professional Reporters

Page 62

1  Q.  Did you rely on any information obtained
2  from any source other than Quicken or Smart Money or
3  those other sources?
4  A.  No.
5  Q.  And why did you purchase Wave stock?
6  A.  I just felt like all their research and
7  development was finally going to start paying off in
8  the company, because the way I interpreted the
9  newsletters were that they were partnering with
10 these other companies, and we were going to start
11 seeing their software come out on computers.
12 (Whereupon, Deposition Exhibit Number 8 was marked
13 by the reporter for identification.)
14         MS. REILLY:  You don't have copies for
15 counsel of the exhibits, do you?
16         MR. BLANCHARD:  I don't.  I'm sorry.
17         MR. MOSSER:  Is that something we
18 produced?  Does it have a Bates Number?
19         MR. BLANCHARD:  No, this is a
20 printout.
21         MR. MOSSER:  Oh.
22 Q.  (BY MR. BLANCHARD) Ms. Brumbaugh, do you
23 have Exhibit Number 8 before you?
24 A.  Yes.
25 Q.  Could you take a moment to review it?

Page 63

1         MR. BLANCHARD:  Off the record.
2  (Off the record discussion.)
3  Q.  (BY MR. BLANCHARD) Have you had an
4  opportunity to review it?
5  A.  Yes.
6  Q.  The document is titled, "Wave Systems
7  Announcement," correct?
8  A.  Yes.
9  Q.  July 31, 2003, correct?
10 A.  Yes.
11 Q.  Do you recall ever seeing this document
12 before, not in this exact form, but the substance of
13 this document?
14 A.  Well, I mean some of the information on
15 here seems similar to some of the news releases that
16 I saw.
17 Q.  Now I'll make a representation that this
18 is Wave's press release on July 31, 2003 regarding
19 Intel.
20 A.  Okay.
21 Q.  Do you recall whether you read Wave's
22 actual press release regarding Intel?
23 A.  No, I don't recall.
24 Q.  Did any of the information in this press
25 release cause you to think either way about

Page 64

1  purchasing Wave securities?
2         MS. REILLY:  Objection to form.
3  Q.  (BY MR. BLANCHARD) You can answer the
4  question.
5  A.  Well, I'm not sure that -- do I need to
6  answer the question?
7  Q.  Yes, unless you can't.
8  A.  Well, what's the question again?
9  Q.  The question is -- well, here, let's back
10 up.  What information in this release do you recall
11 hearing about at the time you were looking at
12 purchasing Wave securities?
13         THE WITNESS:  Now when you say
14 "objection to form," does that have to do with the
15 way he asked the question?
16         MS. REILLY:  Yes, but you can still
17 answer the question.
18 A.  Okay.  Well, the part about the agreement
19 with Intel, and the company's accelerating the
20 development and deployment of trusted applications
21 on their computer platforms, the agreement enabling
22 Intel to bundle Wave software and services on the
23 future motherboards.  Those are the things I
24 remember.
25 Q.  In this press release you didn't see any

Page 65

1  information regarding the details of the agreement
2  with Intel, did you?
3  A.  No.
4  Q.  Do you recall seeing any information at
5  the time that you invested in Wave about the details
6  of the deal with Intel?
7  A.  No.
8  Q.  How important was the deal with Intel to
9  your decision to invest in Wave stock?
10 A.  Significant.
11 Q.  Is it fair to say, though, that you knew
12 nothing about the details of the deal with Intel at
13 the time?
14 A.  Other than what my understanding was of
15 this press release.
16 Q.  What was your understanding of the deal
17 with Intel at the time?
18 A.  Well, I interpreted it that their
19 software was going to be included with Intel's
20 motherboards.
21 Q.  Do you have experience in the software
22 industry?
23 A.  No.
24 Q.  Do you know much about the software
25 industry?

Specializing in Complex Litigation Worldwide
Toll Free:  (800) 466-2580   Local:  (913) 492-0111 or (816) 471-2211

Page 66

1   A.   No.
2   Q.   Do you know what the phrase "bundling"
3   means?
4   A.   Well, I would interpret it to mean like
5   when I buy a computer from Dell, it comes with
6   certain software on it.
7        Either it's there for the long haul, or
8   it's there for a short period of time, and then you
9   can make the decision whether you want to purchase
10  it yourself.
11  Q.   Uh-huh.
12  A.   And that's what I interpret it to mean.
13  Q.   Are you familiar with -- well, back up.
14       Did you consult any sources of information
15  regarding the software industry at the time before
16  making a decision to purchase Wave stock?
17  A.   Did I consult who?
18  Q.   Any information concerning how the
19  software industry works. Did you read up on it?
20  A.   No.
21  Q.   Did you talk to any people about it?
22  A.   No.
23  Q.   So your interpretation of this -- the
24  information provided at the time was just based on
25  your own understanding?

Page 67

1   A.   Yes.
2   Q.   Do you have experience in contract terms
3   in the software industry?
4   A.   No.
5   Q.   Do you have any -- have you pursued any
6   independent understanding of contract terms in the
7   software industry?
8   A.   No.
9   Q.   Have you read up on it at all?
10  A.   No.
11  Q.   Have you spoken with individuals about it
12  at all?
13  A.   About contract terms? No.
14  Q.   And in particular, contract terms in the
15  software industry?
16  A.   No; probably most people haven't.
17  Q.   You don't see in this press release any
18  information about the number of Intel computers that
19  would have Wave software on it, do you?
20  A.   No.
21  Q.   You don't see anything in this press
22  release concerning the amount of revenue that Wave
23  might earn based on its relationship with Intel, do
24  you?
25  A.   No. I think that's part of the problem.

Page 68

1   Q.   What was that?
2   A.   I think that's part of the problem.
3   Q.   That press release is dated July 31, 2003,
4   correct?
5   A.   Correct.
6   Q.   Do you recall reading about Wave prior to
7   July 31, 2003?
8   A.   I couldn't specifically say that I do.
9   Q.   You're telling me you can't recall?
10  A.   Right.
11  Q.   You can't recall?
12  A.   Yeah. To my knowledge, I don't remember
13  anything specific that I can tell you that I do.
14  (Whereupon, Deposition Exhibit Number 9 was marked
15  by the reporter for identification.)
16  Q.   (BY MR. BLANCHARD) Do you have Exhibit 9
17  before you?
18  A.   Yes.
19  Q.   Could you take a moment and review Exhibit
20  9?
21  A.   Okay.
22  Q.   Have you reviewed Exhibit 9?
23  A.   Yes.
24  Q.   Exhibit 9, I'll represent, is a printout
25  of Wave System's press release regarding the IBM

Page 69

1   deal. Exhibit 9 is dated August 4th, 2003, correct?
2   A.   Yes.
3   Q.   And it says, "Wave Systems makes
4   enterprise applications more secure than ever," at
5   the top, right?
6   A.   Yes.
7   Q.   "And IBM's independent software vendor
8   program helps Wave Systems create more secure
9   applications for the enterprise user."
10  A.   Yes.
11  Q.   Did you review Wave's press release about
12  IBM at the time?
13  A.   I don't know the source of the press
14  release that I reviewed on-line.
15  Q.   Uh-huh.
16  A.   I mean I know I got it through my
17  brokerage account or through Morningstar or Smart
18  Money, but I'm not sure, you know, whether the
19  source came from Wave or from, you know, one of the
20  news agencies.
21  Q.   So are you telling me you can't remember
22  whether you read Wave's press release, even if it's
23  just repeated somewhere, versus someone else's
24  write-up about Wave's press release; is that
25  correct?

Page 70

1  A. Correct. I'm not sure which I would have
2  read.
3  Q. Do you recall learning any of the
4  information that's in this Exhibit 9 at the time?
5  A. Yes.
6  Q. What do you recall?
7  A. Well, I remember they were talking about
8  the participation with IBM and their partnership. I
9  remember something about enabling IBM computers to
10 have this in their bundle, or whatever. I mean
11 that's the gist of what I remember.
12 Q. Do you recall learning anything else about
13 the IBM deal at the time?
14 A. No.
15 Q. This press release doesn't include any
16 information concerning financial terms of the deal,
17 does it?
18 A. No.
19 Q. And it does not include any information
20 concerning a commitment by IBM to use Wave software,
21 does it?
22 A. No, I guess not, although -- yeah. It
23 says, "This partnership is another example of IBM's
24 commitment to help independent software sales," so I
25 do take this as equipment by IBM.

Page 71

1  Q. You're reading the sentence that says:
2  "This partnership is another example of IBM's
3  commitment to help independent software vendors use
4  IBM's hardware and software-based security system to
5  make computing as secure as possible for the
6  end-user." Is that the sentence you were reading
7  from?
8  A. Yes.
9  Q. And what form of commitment do you
10 interpret -- I'll try to re-ask that.
11    What is it that IBM committed to in your
12 view based on that sentence?
13 A. Well, the subject of the sentence is,
14 "This partnership," and so that's what I thought
15 they were referring to.
16 Q. A commitment to a partnership?
17 A. They're talking about, "This partnership
18 is the compatibility of Wave's security software
19 applications." That was the subject of the sentence
20 before.
21 Q. Uh-huh.
22 A. So then when they say, "This partnership,"
23 then I interpret that to mean the subject from the
24 sentence before, which was Wave's security software,
25 application software.

Page 72

1  Q. Now this is dated August 4th, 2003. Your
2  first purchase of Wave securities was on August 4th,
3  2003, correct?
4  A. Correct.
5  Q. At the time that you made those first
6  purchases did you have any information about Wave
7  other than the information regarding the IBM deal
8  that we've discussed and the information regarding
9  the Intel deal that we've discussed?
10 A. No. I think it was this, coupled with the
11 information I had gotten a few days prior that
12 prompted me to go back and review the stock.
13 Q. Did you review any other press releases
14 about Wave prior to July 31, 2003?
15 A. Not that I remember. I don't think so.
16 Q. What about these two deals motivated you
17 to purchase Wave stock?
18 A. Well, I interpreted that their linking up
19 or partnering with these two -- three big-named
20 companies, that all the research and development
21 that they had been doing on this Trust Suite was
22 finally being put into motion and utilized, and so
23 it was kind of a turning point for them.
24 Q. Did you view there to be any risks in
25 investing, based on this information?

Page 73

1  A. I feel like there's risk with every stock.
2  I didn't think there were any -- no, I didn't think
3  there was any higher degree of risk than with any
4  other stocks that I've purchased.
5  Q. What risks did you view to be existent
6  concerning Wave at the time?
7     MS. REILLY: Objection to form. I'm
8  sorry.
9  A. No more than any other stock.
10    MS. REILLY: You can answer.
11 A. Well, no more than any other stock. It's
12 just like your risk going into surgery. There's a
13 certain degree of risk when you have anesthesia, and
14 that's the same thing with this stock. I saw it, as
15 with any stock, there's risk.
16 Q. (BY MR. BLANCHARD) Were you concerned
17 that there were no details of these deals
18 disclosed?
19 A. No, because what I read to me seemed
20 pretty significant, and I interpreted it apparently
21 to be more than it actually was. I don't usually
22 buy stocks with risks. If there's higher risk, I
23 usually shy away from it, and I just didn't see that
24 here.
25 Q. Did you have any anticipations of future

Specializing in Complex Litigation Worldwide
Toll Free: (800) 466-2580   Local: (913) 492-0111 or (816) 471-2211

Jay E. Suddreth & Associates, Inc.
Registered Professional Reporters

Page 74

1  revenues -- well, did you -- at the time you
2  purchased Wave stock, is it correct that you
3  believed the stock would appreciate in value?
4    A.   Yes.
5    Q.   And did you believe that the stock would
6  appreciate in value because the company would begin
7  to increase its revenues?
8    A.   Yes.
9    Q.   And what caused you to believe that the
10 company would begin to increase its revenues?
11   A.   Because I thought their product was coming
12 out on Intel motherboards and IBM computers.
13   Q.   Was there any other information that led
14 you to believe that the company would be increasing
15 its revenues?
16   A.   No.
17   Q.   Had you ever read any -- strike that.
18 Prior to purchasing your stock in Wave, had you ever
19 read the company's forecasts for revenues?
20   A.   No.
21   Q.   Had you ever heard of the company's
22 forecasts for revenues prior to your purchase of
23 stock in Wave?
24   A.   No.
25   Q.   All right. Exhibit 8, turning your

Page 75

1  attention back to Exhibit 8, do you view anything in
2  Exhibit 8 to be misleading?
3         MS. REILLY: Objection to form.
4    A.   At the time that I read this, before I
5  purchased the stock? No.
6    Q.   (BY MR. BLANCHARD) With the benefit of
7  hindsight, do you believe that the information
8  disclosed in Exhibit 8 is misleading?
9    A.   I think it has omissions, and yes, it is
10 misleading for that reason.
11   Q.   I think I heard you say that you believe
12 it has omissions, correct?
13   A.   Yes.
14   Q.   Okay. What omissions?
15   A.   Well, the same things that you asked me
16 about prior, what type of revenues they could expect
17 and just what the agreement was with Intel and IBM.
18   Q.   Were there any other omissions?
19   A.   I would have to rely on counsel and their
20 investigations to determine that.
21   Q.   So to be clear, you viewed the omissions
22 from Exhibit 8 to involve information concerning
23 projected revenues?
24        MS. REILLY: Objection to the form of
25 the question. The witness has provided her answer,

Page 76

1  and I object to your paraphrasing her responses,
2  giving it back to her.
3    Q.   (BY MR. BLANCHARD) You can answer.
4    A.   No. I've already answered it.
5    Q.   Okay. Your answer was, "The same things
6  that you asked me about prior, what type of revenues
7  they could expect, and just what the agreement was
8  with Intel and IBM."
9    A.   Correct.
10   Q.   Broken down, the first one is "what type
11 of revenues they could expect." What do you mean by
12 "what type of revenues they could expect"?
13   A.   What the agreement was with Intel or IBM.
14   Q.   Are revenues the same thing as agreements?
15        MS. REILLY: Objection to the form of
16 the question.
17   Q.   (BY MR. BLANCHARD) I'm not being funny.
18 I asked you what you mean by --
19   A.   Yeah, revenues are not the same.
20   Q.   All right. So when you say what type of
21 revenues they expect, what does that mean?
22   A.   How substantial their agreement was
23 with -- what were the, I guess, more the financial
24 particulars, or the extent that their services were
25 going to be used.

Page 77

1    Q.   What would the extent of services involve?
2    A.   Well, just what their arrangement was,
3  what the terms were for what their partnership was,
4  what it was going to consist of.
5    Q.   That seems to me, and you tell me if I'm
6  wrong, that seems to me to be more about what the
7  nature of the agreement was, correct?
8         MS. REILLY: Objection to the form of
9  the question.
10   Q.   (BY MR. BLANCHARD) I'll back up. I'm
11 just trying -- you seem to give a two-part answer,
12 and I'm just trying to understand what your view is
13 of each of those parts.
14        One of them was expected revenues, and the
15 other was the terms of the agreement.
16   A.   Okay, the terms of the agreement would be
17 what I meant.
18   Q.   Okay. So primarily, that the terms of the
19 agreement is what was omitted from the press
20 release?
21   A.   I think that could be one of the things,
22 yeah.
23   Q.   And the other thing could be what?
24   A.   You know, that's another thing I think I
25 would rely on counsel to do an investigation and

Specializing in Complex Litigation Worldwide
Toll Free: (800) 466-2580   Local: (913) 492-0111 or (816) 471-2211