Jay E. Suddreth & Associates, Inc.
Registered Professional Reporters

Page 78

1  determine.
2      Q.   Okay.  What about Exhibit 9, regarding
3  IBM?  Do you view anything to be misleading about
4  Exhibit 9?
5      A.   Yes.  Just even the sentence that you
6  highlighted to me, this partnership, meaning
7  something other than I interpret it to mean, makes
8  me think that it is misleading and the extent of the
9  agreement probably has been omitted.
10     Q.   What do you view as misleading about the
11 sentence concerning partnership?  And I believe that
12 sentence again is the second sentence in the second
13 paragraph.  Is that the sentence you're referring
14 to?
15     A.   Yes.
16     Q.   Okay.  I'm sorry, what do you view as
17 misleading about that sentence?
18     A.   Well, you indicated that the partnership
19 was not about Wave Systems, and I interpret it to be
20 Wave Systems.
21     Q.   I think when you're referring to me
22 indicating something, I think I was reading the
23 sentence at the time, and I could be wrong, so
24 please correct me.
25         I read the sentence as, "This partnership

Page 79

1  is another example of IBM's commitment to help
2  independent software vendors use IBM's hardware and
3  software-based security system to make computing as
4  secure as possible for the end-user."  Did I read
5  that correctly?
6      A.   Yes.
7      Q.   Is that what you're referring to when you
8  said I indicated something about the partnership
9  being other than with Wave?
10     A.   Yes.
11     Q.   You read the sentence that -- what did
12 this sentence mean to you at the time that you read
13 it, do you recall?
14         MS. REILLY:  Objection to form.
15     A.   I don't understand what you mean.
16     Q.   (BY MR. BLANCHARD)  Do you recall what the
17 sentence meant to you when you read it?
18         MS. REILLY:  Objection to the form,
19 asked and answered.  You can answer the question if
20 you can.
21     A.   Okay.  That their partnering with Wave
22 allowed them to offer Wave's software-based security
23 system to make computing as secure as possible for
24 the end-user.
25     Q.   Did this sentence indicate to you that

Page 80

1  Wave would be receiving revenue in the future
2  because of their relationship with IBM?
3      A.   I didn't read that into it.
4      Q.   Did you believe at the time you learned of
5  the IBM deal that Wave's revenue would increase
6  because of the IBM deal?
7      A.   Yes.  I thought it would be a lucrative
8  arrangement.
9      Q.   And why did you believe that?
10     A.   Because they were selling their services
11 to the company, their software.
12     Q.   Did you have any information concerning
13 how much services would be sold to IBM?
14     A.   No.
15     Q.   And what is it you believe is misleading
16 then again about Exhibit 9?
17     A.   Are you asking me to repeat the same thing
18 I already said?
19     Q.   No, I'm just trying to -- I'm exploring
20 your answer further.
21     A.   It led me to believe that Wave was
22 partnering with IBM, and that their security
23 software was going to help make IBM have a better
24 product to offer to their customers.
25     Q.   Earlier I think you spoke in terms of both

Page 81

1  press releases when you were talking about what was
2  omitted from them, and I'm just trying to get your
3  answer specific to the IBM deal.
4          Do you believe that there were omissions
5  with respect to the press release concerning IBM,
6  Exhibit 9?
7      A.   I think it's misleading and I would rely
8  on counsel for pointing out omissions.
9      Q.   Do you think it's misleading because of
10 omissions?
11     A.   It's misleading because of the way that
12 it's worded, and it could also be misleading because
13 of omissions.
14     Q.   But you would rely on counsel as to what
15 those omissions are?
16     A.   To point out the omissions.
17     Q.   Okay.
18 (Whereupon, Deposition Exhibit Number 10 was marked
19 by the reporter for identification.)
20     Q.   (BY MR. BLANCHARD)  Do you have Exhibit 10
21 before you?
22     A.   Yes.
23     Q.   Exhibit 10 is a printout of a New York
24 Times article from August 5th, 2003, correct?
25     A.   Yes.

Specializing in Complex Litigation Worldwide
Toll Free:  (800) 466-2580   Local:  (913) 492-0111 or (816) 471-2211

Jay E. Suddreth & Associates, Inc.
Registered Professional Reporters

Page 82

1    Q.    Do you recall reading this New York Times
2    article?
3    A.    Yes, it looks similar, if not what I read.
4    Q.    Okay.  So this is one of the articles that
5    you read at the time while you were making purchases
6    in Wave, correct?
7    A.    I believe so.
8    Q.    And this article came out after you had
9    initially already purchased shares in Wave, correct?
10   A.    It appears so, yes.
11   Q.    Is there anything misleading in your view
12   about this article?
13           MS. REILLY:  Objection to form.  You
14   can answer.
15   A.    Yes.  It seems to reaffirm the same things
16   that I thought of the other press releases.
17   Q.    (BY MR. BLANCHARD)  Now Wave did not write
18   this article to your knowledge, did they?
19           MS. REILLY:  Objection to form.  You
20   can answer.
21   A.    It appears that they're reporting on what
22   Wave announced the day before.
23   Q.    (BY MR. BLANCHARD)  Okay.  When you read
24   this article, did you go back and read any
25   information provided by Wave to the market?

Page 83

1    A.    I don't remember.
2    (Whereupon, Deposition Exhibit Number 11 was marked
3    by the reporter for identification.)
4    Q.    (BY MR. BLANCHARD)  Do you recognize
5    anything in Exhibit 11?
6    A.    No.
7    Q.    Okay.  It appears to be, or I'll tell you
8    it is a printout of Wave's Form S-3.  It's Amendment
9    Number 4 to Form S-3, and it is dated August 11,
10   2003 as indicated on the third page of the exhibit,
11   correct?
12   A.    Correct.
13   Q.    Did you ever review what is Exhibit 11,
14   Wave Form S-3?
15   A.    No.
16   Q.    Did you ever read reports about Wave's
17   Form S-3?
18   A.    Not that I remember.
19   Q.    Did you ever receive any information from
20   any source concerning Wave's Form S-3?
21   A.    Not that I recall.
22   Q.    Page 13 of Form S-3 which is Exhibit 11
23   has a section entitled, "Material changes."  Do you
24   see that section?
25   A.    Yes.

Page 84

1    Q.    And in that section there is information
2    concerning the Intel and IBM deals, correct?
3    A.    Uh-huh.
4    Q.    What is your understanding of what a
5    material change is?
6    A.    I don't have an understanding of what it
7    is.  You'll have to explain it to me.
8    Q.    Well, we can move on.
9    (Whereupon, Deposition Exhibit Number 12 was marked
10   by the reporter for identification.)
11   Q.    (BY MR. BLANCHARD)  You have a document
12   marked Exhibit Number 12 in front of you, correct?
13   A.    Yes.
14   Q.    Exhibit 12 is a transcript of a Wave
15   Systems Corporation earnings conference call dated
16   August 14th, 2003, correct?
17   A.    Yes.
18   Q.    Did you listen to that conference call?
19   A.    No.
20   Q.    Did you ever read a transcript of that
21   conference call?
22   A.    No.
23   Q.    You held Wave stock until sometime in
24   February of 2004, correct?
25   A.    Correct.

Page 85

1    Q.    The Intel deal was one of the factors that
2    caused you to purchase Wave stock; is that correct?
3    A.    Yes.
4    Q.    And it was your understanding that there
5    would be some future revenues to Wave based on the
6    Intel deal that made Wave stock attractive; is that
7    correct?
8    A.    It was my understanding that they had
9    partnered with Intel, and were going to be providing
10   their product to them, which I would assume would
11   generate income for the company.
12   Q.    Do you know what the term "exclusivity"
13   means in the software industry?
14   A.    No.  I wouldn't know specifically how it
15   relates to the software industry.
16   Q.    Uh-huh.  Was it your understanding that
17   there are any minimums, minimum purchases that Intel
18   had to make from Wave, as a result of that deal,
19   when you purchased Wave stock?
20   A.    Would you repeat it, please?
21   Q.    Sure.  When you purchased Wave stock, did
22   you have a belief that Intel was required, based on
23   the Intel deal with Wave, to purchase a minimum
24   number of software units?
25   A.    No, I didn't have any knowledge.

22 (Pages 82 to 85)

Jay E. Suddreth & Associates, Inc.
Registered Professional Reporters

Page 86

1  Q.  Did you have -- well, was that your belief
2  at the time?
3      MS. REILLY:  Objection to form.  You
4  can answer.
5  A.  No, I never thought about them having a
6  minimum.
7  Q.  (BY MR. BLANCHARD)  You never thought
8  about whether there was a minimum requirement in
9  that contract between Intel and Wave, correct?
10  A.  I had no knowledge of it.
11  Q.  I'm not asking you if you had direct
12  knowledge of it, but whether that was your
13  understanding at the time.
14      MS. REILLY:  Objection to form.  You
15  can answer if you understand the question.
16  A.  So you're asking me if I had any -- not if
17  I had any knowledge --
18      MS. REILLY:  If you don't understand
19  his question, don't try and make up a new question
20  for him.  Ask him to rephrase the question and he'll
21  be happy to help you out.
22  A.  Can you rephrase it again?
23  Q.  (BY MR. BLANCHARD)  When you purchased
24  Wave stock did you believe that Intel was required
25  to purchase some minimum number of user services

Page 87

1  from Wave?
2  A.  No.
3  Q.  You did not, correct?
4  A.  Correct.
5  Q.  When you purchased Wave stock did you
6  believe that Intel was required, based on its
7  agreement with Wave, to pay any money to Wave?
8  A.  Ask me again, because I'm not sure how to
9  answer that.
10  Q.  Do you want me to rephrase it?
11  A.  Maybe if that --
12  Q.  Well, I'll ask it again, and then if you
13  don't get it --
14  A.  Okay.
15  Q.  -- if I'm not making myself clear, I'll
16  rephrase it.  Okay?
17  A.  Okay.
18  Q.  When you purchased Wave stock did you
19  believe that Intel was required, based on its
20  agreement with Wave, to pay any money to Wave?
21  A.  I believed that Wave was providing their
22  product, and I assumed that there would be some kind
23  of monetary compensation for it.
24  Q.  Okay.  Was part of your assumption that
25  there was a requirement by contract between Intel

Page 88

1  and Wave that some money would be coming to Wave?
2  A.  I think it's customary in our culture that
3  when you provide a product or a service, that
4  there's some kind of monetary compensation for it.
5  Q.  Okay.
6  A.  So based on that.
7  Q.  At the time you purchased Wave stock did
8  you believe that because of the agreement between
9  Intel and Wave, Intel was required to purchase any
10  of Wave's products?
11  A.  I thought the agreement was that they were
12  planning to purchase their products.
13  Q.  I'm asking, and maybe the answer is no,
14  maybe it's not, you said you thought they were
15  planning on purchasing the products, but were they
16  contractually required to purchase their products?
17  A.  That's what I thought the agreement was.
18      MS. REILLY:  Objection to form.
19  A.  I thought the agreement was that they had
20  contracted to purchase it.
21  Q.  (BY MR. BLANCHARD)  Okay.  You thought the
22  agreement was that they had contracted to purchase
23  their products.
24  A.  (Witness nodding head affirmatively).
25  Q.  Did you learn any time during 2003 that,

Page 89

1  in fact, Intel was not required to purchase any of
2  Wave's products?
3  A.  Not that I recall.
4  Q.  Did you continue to monitor your
5  investment in Wave during 2003?
6  A.  To what degree -- I guess, I mean
7  somewhat, and to go back to 2003, whenever the
8  Notice came out that the SCC had filed, which I
9  think was December of '03, at that time it may have
10  been disclosed that their partnership with Intel was
11  not what they had appeared that it would be, that
12  there wasn't any concrete agreement for them to
13  purchase their product.
14      So at that time I would have become aware
15  that maybe things weren't going like I thought they
16  were.
17  Q.  But at no time prior did you become
18  aware?
19  A.  Well, obviously I was still optimistic,
20  because I didn't sell it until February.
21  Q.  Uh-huh.  I'm not being funny.  It may seem
22  obvious, but oftentimes people purchase and hold for
23  whatever reasons, so that's why I have to ask you
24  the questions, okay?
25  A.  Okay.

23 (Pages 86 to 89)

Jay E. Suddreth & Associates, Inc.
Registered Professional Reporters

Page 90

1    Q.    But at no time prior to the announcement
2  that the SEC had done some form of investigation did
3  you learn of any information that, you know, the
4  Intel deal was other than what you thought it was?
5    A.    No.
6    Q.    I was really waiting for an objection for
7  that one.  Okay.
8        MS. REILLY:  Do you want to take a
9  break?  Are you all right?
10       THE WITNESS:  Sure.
11       MR. BLANCHARD:  Are you sure?  Do you
12 want to take a break?
13       THE WITNESS:  Yeah.
14       MR. BLANCHARD:  Let's take a break.
15       (Recess)
16 (Whereupon, Deposition Exhibit Numbers 13, 14, 15
17 and 16 were marked by the reporter for
18 identification.)
19    Q.    (BY MR. BLANCHARD)  We're back on the
20 record.  Ms. Brumbaugh, do you recall how long you
21 held Wave stock for or when you sold it?
22    A.    It was in February of '04, and I don't
23 recall the specific date.  I'd have to look at the
24 training confirmation.
25    Q.    Okay.  Before you, you have Exhibits 13,

Page 91

1  14, 15, and 16 which are T.D. Waterhouse account
2  statements, correct?
3    A.    Yes.
4    Q.    Do these account statements reflect when
5  you sold Wave stock?
6    A.    Yes.
7    Q.    Okay.  Can you tell me from the account
8  statements by identifying them by exhibit when you
9  sold Wave stock precisely?
10    A.    Yes.  On Exhibit 13 --
11    Q.    Uh-huh.
12    A.    -- it was 2/26.
13    Q.    February 26th?
14    A.    Uh-huh.
15    Q.    2004?
16    A.    Correct.  On Exhibit 14 it was on
17 February 26th of '04, on Exhibit 15, February 26th
18 of '04, and on Exhibit 16 it was March 8th of '04.
19    Q.    Okay.
20        MS. REILLY:  Counselor, are you done
21 with these exhibits?
22        MR. BLANCHARD:  Yes.
23 (Whereupon, Deposition Exhibit Number 17 was marked
24 by the reporter for identification.)
25    Q.    (BY MR. BLANCHARD)  You have Exhibit 17

Page 92

1  before you?
2    A.    Yes.
3    Q.    If you'll turn to the third page, you'll
4  see it's a prospectus for Wave Systems Corp. dated
5  August 11th, 2003, correct?
6    A.    Yes.
7    Q.    Did you review this prospectus during the
8  last --
9    A.    Well, it was filed August 18th.  Is that
10 the one?
11    Q.    You know, you may be right.  Actually, I
12 think you're right.  It is filed August 18th.  Do
13 you recall reading the prospectus during that class
14 period?
15    A.    No.
16    Q.    I should ask you, what is the class
17 period?
18    A.    It is from July 31st of 2003 to
19 February, I'm thinking February, sometime in there,
20 '04.
21    Q.    Actually, I'll tell you in the complaint
22 the class period is through December 17th, 18th,
23 2003, I think.
24    A.    Okay.  Oh, when the SEC --
25    Q.    You're right, when the SEC --

Page 93

1    A.    I'm confusing it when I bought and sold
2  my --
3    Q.    Okay.  So you did not read this document
4  during that time; is that right?
5    A.    No.
6    Q.    Okay.  Before you is Exhibit 18.  18 is a
7  Form S-3 filed on behalf of Wave Systems.  I believe
8  it was filed on August 19th, 2003, correct --
9    A.    Yes.
10    Q.    -- per the second page.  Did you read this
11 Form S-3 during the class period?
12    A.    No.
13    Q.    Did you receive reports about it during
14 the class period?
15    A.    Not that I'm aware of.  Is it customary
16 for a company to file so many so close together?
17    Q.    You'd be surprised.
18 (Whereupon, Deposition Exhibit Number 19 was marked
19 by the reporter for identification.)
20    Q.    (BY MR. BLANCHARD)  Exhibit 19 is before
21 you, correct?
22    A.    Correct.
23    Q.    On the third page it indicates the
24 prospectus for $12,593,883 shares of Wave Systems
25 Corp. Class A common stock, correct?

Specializing in Complex Litigation Worldwide
Toll Free:  (800) 466-2580   Local:  (913) 492-0111 or (816) 471-2211

Jay E. Suddreth & Associates, Inc.
Registered Professional Reporters

Page 94

1    A.    Correct.
2    Q.    And I think almost in the middle of the
3  page it says the date of this prospectus is
4  August 22nd, 2003, correct?
5    A.    Yes.
6    Q.    Did you read this prospectus during the
7  class period?
8    A.    I don't think so.
9    Q.    Do you remember receiving any reports
10  about it?
11    A.    Not that I remember.
12  (Whereupon, Deposition Exhibit Number 20 was marked
13  by the reporter for identification.)
14    Q.    (BY MR. BLANCHARD)  You have Exhibit 20
15  before you.  Exhibit 20 is a printout of a "Wave
16  Systems Provides Update On Corporate Progress And
17  Reviews Q3/Nine Months Results," correct?
18    A.    Yes.
19    Q.    Did you read this document during the
20  class period?
21    A.    Not that I remember.
22    Q.    Do you remember seeing any reports about
23  it?
24    A.    Not that I remember.
25    Q.    Okay.

Page 95

1  (Whereupon, Deposition Exhibit Number 21 was marked
2  by the reporter for identification.)
3    Q.    (BY MR. BLANCHARD)  Do you have Exhibit 21
4  before you?
5    A.    Yes.
6    Q.    Exhibit 21 is a press release from Wave
7  dated December 18th, 2003, correct?
8    A.    Yes.
9    Q.    It is "Wave Systems Notified Of SEC's
10  Investigation," correct?
11    A.    Yes.  Well, I think they're announcing, it
12  looks like they're announcing that they were
13  notified of it.
14    Q.    Correct.  Did you read Wave's press
15  release about the SEC investigation on
16  December 28th, 2003?
17    A.    Not that I recall.
18    Q.    Did you read that press release, the same
19  press release any time thereafter?
20    A.    I don't know.  Not that I know of, not
21  that I remember specifically.
22    Q.    Did you hear about Wave being investigated
23  by the SEC at any time during 2003 or 2004?
24    A.    I don't remember if I did or not.
25    Q.    You don't remember if you --

Page 96

1    A.    I mean I can't with any certainty.  I mean
2  I'm thinking it would have come across my path, and
3  I would have been aware of it, but I can't say with
4  certainty when I would have heard it.
5    Q.    Were you monitoring your investments in
6  Wave in December of 2003?
7    A.    What constitutes "monitoring" to you?
8  Watching the price?
9    Q.    Sure.  Were you watching the price?
10    A.    Yes.
11    Q.    Were you looking at any press releases or
12  reports about Wave at that time?
13    A.    I can't say.  I'm so sporadic when I have
14  time to devote to, you know, following my stock
15  holdings.
16    Q.    Uh-huh.  We've established before that you
17  sold your Wave stock starting in February 26th,
18  2004, correct?
19    A.    Right.
20    Q.    What caused you to sell your Wave
21  holdings?
22    A.    I don't know specifically, other than
23  figuring it was time to cut my losses and get out
24  before it went any lower.
25    Q.    So you had learned that the stock price

Page 97

1  for Wave had gone down, is that correct?
2    A.    I knew it had.
3    Q.    You knew it had?
4    A.    I mean you get a statement every month and
5  you can see, or if you go in and check on a given
6  day.
7    Q.    Do you recall whether you were looking at
8  anything other than your account statement to
9  determine how Wave stock was doing at the time?
10    A.    I probably went in on occasion to get a
11  price quote off of either the brokerage account or
12  Morningstar or Smart Money.
13    Q.    Uh-huh.  Did you have a view at the time
14  you sold Wave stock that the information provided
15  about the Intel and IBM deals was not true?
16    A.    It's my habit either before I buy or
17  before I sell to go in and check the current news
18  just to see what's kind of going on with the
19  company, because I feel it's the most current,
20  up-to-date information that I have access to.
21        So I'm guessing before I would have made
22  that trade, I would have gone in and looked at any
23  news releases, and at that time I would have seen
24  the SEC filing.
25    Q.    What SEC filing?

Specializing in Complex Litigation Worldwide
Toll Free:  (800) 466-2580   Local:  (913) 492-0111 or (816) 471-2211

Jay E. Suddreth & Associates, Inc.
Registered Professional Reporters

Page 98

1    A.    The one that -- that one that we just
2  looked at saying that they were being investigated.
3    Q.    Oh, okay.
4    A.    So that would have come up in the news
5  that I would have looked at before making a decision
6  to sell.
7    Q.    This, going back to Exhibit 21, it
8  reads -- let's see, "Wave Systems Corp. today
9  reported that the Securities and Exchange Commission
10 has commenced a formal investigation into certain
11 matters relating to Wave.  The SEC's investigative
12 order received by Wave on December 17th, 2003
13 relates to certain public statements made by Wave
14 during and around August, 2003, as well as certain
15 trading in Wave securities during such time.  The
16 SEC has not concluded that there has been any
17 wrongdoing, and Wave is cooperating fully with the
18 SEC on this matter."
19        Did I read that correctly?
20   A.    Yes.
21   Q.    Does that press release mention anything
22 about Intel or IBM?
23   A.    No, but I'm not saying that I read this
24 press release either.  I'm saying -- in fact, I can
25 guarantee that on December 18th, that I wouldn't

Page 99

1  have had time to be following stocks.
2        And it would be fitting with how I do
3  things, that I would have gone in prior to selling
4  it and checked the news releases then, and saw
5  whatever information was out there that just didn't
6  sound good, and I would --
7    Q.    That's what I was getting at, was your
8  answer of that nature seemed to indicate to me that
9  you might have learned of this in February before
10 you made the decision.
11   A.    Yeah, and not even this specifically.
12   Q.    Uh-huh.
13   A.    But whatever other, you know, news report
14 was out there, because I doubt that it picked up
15 anything actually from Wave.
16        It would have picked up more somebody
17 reporting another news entity or financial entity
18 reporting.
19   Q.    Okay.  And do you recall the substance of
20 any of those reports?
21   A.    At that time, it may -- I don't know if
22 there would have been anything.  I can't say with
23 any accuracy exactly what I read.
24   Q.    Uh-huh.
25        MS. REILLY:  If you recall.

Page 100

1    A.    Yeah.
2    Q.    (BY MR. BLANCHARD)  Okay.  Would it be
3  fair to say that your decision to sell Wave stock
4  was based on a decline in stock price, and
5  before you made the actual sale, then you
6  learned additional information about the
7  company?
8        MS. REILLY:  Objection to the form of
9  the question.
10   A.    Well, for sure it was because the price
11 had not met my expectations, and two, because the
12 partnerships that I thought that they had with IBM
13 and Intel turned out to be not what I thought that
14 they were, and that's what prompted my decision.
15   Q.    (BY MR. BLANCHARD)  Now the Number 2 part
16 of your answer, where did you learn about how those
17 partnerships turned out to be not what you thought
18 they were?
19   A.    I think it was another news release that I
20 would have read at the time.
21   Q.    Do you recall reading a news release?
22   A.    I'm sure I did, yeah.
23   Q.    But you don't recall specifically?
24   A.    No.  It was still out there in cyberspace.
25        (Off the record discussion.)

Page 101

1  (Whereupon, Deposition Exhibit Numbers 22 and 23
2  were marked by the reporter for identification.)
3    Q.    (BY MR. BLANCHARD)  Do you have Exhibit 22
4  before you?
5    A.    Yes.
6    Q.    And have you ever seen Exhibit 22 before?
7    A.    It looks like something that possibly I
8  would have e-mailed just in following the case.
9    Q.    It's titled, "Plaintiffs' Response To
10 Defendants' First Set Of Interrogatories."
11   A.    Okay.
12   Q.    And it has the Wave caption there, Anne
13 Brumbaugh, which is your name, Gary Harmon and Randy
14 Griffin vs. Wave, right --
15   A.    Correct.
16   Q.    -- among other things.
17        Take a moment to review the answers to the
18 interrogatories.  Maybe your counsel can point out
19 the pertinent parts of the answers, not the
20 objections.
21        What I'd like you to do is just verify
22 that those were your complete and accurate answers.
23        Is that acceptable, Counsel?
24        MS. REILLY:  Are you going to be
25 asking us each one, or do you want us to just refer

26 (Pages 98 to 101)

Jay E. Suddreth & Associates, Inc.
Registered Professional Reporters

Page 102

1  to the one that we provided an answer to as to her
2  letter?
3         MR. BLANCHARD:  Basically because the
4  verification page didn't come with it, I'd just like
5  to get it verified now, so I don't have to get it
6  later.
7         So if she can verify that the information
8  provided in it is true and accurate to the best of
9  her knowledge, I'll be done with these.
10        MR. MOSSER:  Direct her to the answers
11  in the letter.
12        MR. BLANCHARD:  And then we'll go
13  through the letter, as well.
14        MS. REILLY:  These are all things --
15        MR. BLANCHARD:  We can go off the
16  record for a minute.
17        (Off the record discussion.)
18  (Whereupon, Deposition Exhibit Number 23 was marked
19  by the reporter for identification.)
20   Q.    (BY MR. BLANCHARD)  Do you have Exhibit 23
21  before you?
22   A.    Yes.
23   Q.    And that's a letter from Schiffrin &
24  Barroway to Michael Blanchard, that's me, right,
25  dated April 19th, 2006, correct?

Page 103

1   A.    Yes.
2   Q.    Can you turn to Page 3 of the letter,
3  please?
4   A.    Okay.
5   Q.    You're going to have to sort of read this
6  in tandem with Exhibit 22.  22 has the questions.
7   A.    Okay.
8   Q.    Okay.  The response to Interrogatory
9  Number 8 -- Interrogatory Number 8 appears on Page 9
10  of Exhibit 22, correct?
11   A.    Uh-huh.
12   Q.    That interrogatory is, "Describe in detail
13  the circumstances surrounding the first contact or
14  communication made between you or on your behalf and
15  your legal counsel in the above-captioned action,
16  including, without limitation, identification of who
17  initiated the first contact or communication, the
18  date of contact or communication, and the substance
19  of that contact or communication."  Did I read that
20  correctly?
21   A.    Uh-huh.
22   Q.    The answer provided in Exhibit 23, your
23  response to Interrogatory Number 8 says, "Plaintiffs
24  supplement their response to state that the first
25  contact I received from counsel was via mail notice

Page 104

1  of the pending class action against Wave.
2  Plaintiffs do not recall the date of the
3  communication."  Did I read that correctly?
4   A.    Correct.
5   Q.    Is that a correct answer on your behalf in
6  response to Interrogatory Number 8?
7   A.    Yes.
8   Q.    Okay.  The very first time you spoke to
9  counsel regarding this case was, or the very first
10  time you had a communication by counsel regarding
11  this case was a mailed notice to you; is that
12  correct?
13   A.    Yes, after this form, which was a pretty
14  generic form as far as if you were an owner of Wave
15  between this time, you know, and you're interested
16  in being part of the class action, list your shares
17  and when you purchased them, which is what this was
18  talking about, right?
19   Q.    I don't know.  I want to know the first
20  communication you had with --
21   A.    With Schiffrin & Barroway?
22   Q.    Yes.
23   A.    Okay.
24   Q.    Was it initiated by you or was it by
25  Schiffrin & Barroway?

Page 105

1   A.    Well, it was initiated when I sent in the
2  notice, and then they contacted me by e-mail.
3   Q.    What notice did you send in?
4   A.    That I had purchased stock between the
5  time frame of the class action suit.
6   Q.    Why did you send in such notice to
7  Schiffrin & Barroway?
8   A.    I don't know.  I just filled it out and
9  sent it in.
10   Q.    How did you learn that you could send a
11  notice of that type to Schiffrin & Barroway?
12   A.    I don't know.
13        MS. REILLY:  Do you understand the
14  question?
15        THE WITNESS:  No, because I mean these
16  are a common thing, that form, and I assumed --
17        MS. REILLY:  Wait.  Let's let him ask
18  another question if he's going to ask another
19  question.  Just answer what's asked.
20   Q.    (BY MR. BLANCHARD)  How did you learn that
21  you were to send a notice to Schiffrin & Barroway
22  regarding Wave?
23        MS. REILLY:  Objection to the form of
24  the question.  Are you asking if she received a
25  notice from the firm?

27 (Pages 102 to 105)

Jay E. Suddreth & Associates, Inc.
Registered Professional Reporters

Page 106

1    Q.    (BY MR. BLANCHARD)  No.  I'm asking -- I
2  just want to know how it is that contact was
3  initiated between you and Schiffrin & Barroway, and
4  I'm not certain that I'm asking questions in a clear
5  enough manner that you're giving me answers to.
6  Just tell me to start again.
7    A.    I guess I'm not clear on the first part of
8  this, as far as filling out a form for when I
9  purchased the stock.
10    Q.    But why did you fill out a form concerning
11  when you purchased Wave stock?
12    A.    Because it was one that notifies you that
13  they're -- I don't know if it's a pending class
14  action suit, or the possibility of one, and if you
15  would like to be a part of -- included in that, you
16  know, you fill out your information and send it in.
17    Q.    Okay.  So you received some form of notice
18  that there was a pending class action against Wave?
19    A.    Yes.
20    Q.    Do you have a copy of that notice?
21    A.    I don't think so, or was it that one
22  exhibit that I had written those things in, or is
23  that something different?
24    Q.    Maybe you're referring to Exhibit --
25      MS. REILLY:  I believe you're

Page 107

1  referring to your certification.
2    A.    Okay, that was different.
3    Q.    (BY MR. BLANCHARD)  Okay, yes.
4    A.    No, I don't -- I'm sure I don't have a
5  copy, because I don't have a file on anything from
6  Wave.
7    Q.    Did you receive the Notice in the mail?
8    A.    Uh-huh.
9    Q.    And the Notice was from Schiffrin &
10  Barroway?
11    A.    I couldn't say.  I don't know how I knew
12  where to send it.
13    Q.    You don't recall?
14    A.    No, and maybe I got more than one.
15      MS. REILLY:  Only answer if he has a
16  question.
17    A.    Okay.
18    Q.    (BY MR. BLANCHARD)  When did you decide to
19  be a plaintiff in this action?
20    A.    On either March 31st or April 1st I had an
21  e-mail from Schiffrin & Barroway, Darren Check,
22  responding to this notice that I had sent in, and
23  asking if I would consider being one of the lead
24  plaintiffs, and in that conversation I told him I
25  would, to the best that I can remember.

Page 108

1    Q.    You're aware that this is a class action?
2    A.    Yes.
3    Q.    What is your understanding of what a class
4  action is?
5    A.    It's where all the people that feel that
6  they suffered damages or losses in the time frame
7  kind of come together to present their case.
8    Q.    What is your understanding -- you
9  understand you're a lead plaintiff in this class
10  action?
11    A.    Yes.
12    Q.    What is your understanding of what a lead
13  plaintiff is?
14    A.    Someone who will take the time to review
15  the facts of the case, and work with counsel to try
16  to proceed and oversee different things about the
17  case, and just kind of ensure that everybody's
18  interests are represented.
19    Q.    Did you consider any alternatives to being
20  a lead plaintiff?
21    A.    No.
22      MS. REILLY:  Objection to the form of
23  the question.  You can answer.
24    A.    No.  Well, yes, I would have considered
25  just being a part of the class action, too.

Page 109

1    Q.    (BY MR. BLANCHARD)  Do you know what the
2  size of the class was in this case?
3    A.    How many people are involved?  No, I
4  don't.
5    Q.    Do you know if there's more than one class
6  involved in the case?
7    A.    Meaning?
8    Q.    Are there different classes in the case?
9    A.    Oh, I don't know.  You mean like
10  different -- other than just people that have bought
11  common stock in that time frame, you mean?
12    Q.    Any sort of different classes involved in
13  this case.
14    A.    I don't know.
15    Q.    Are you familiar with the requirements for
16  bringing a suit as a class action?
17    A.    I think so.
18    Q.    What are those requirements?
19    A.    Well, I think they have to prove
20  reasonable information that substantiates their
21  claim.
22    Q.    Have you discussed with anyone your
23  responsibilities as a lead plaintiff?
24    A.    No.
25    Q.    Have you discussed with anyone your

28 (Pages 106 to 109)

Jay E. Suddreth & Associates, Inc.
Registered Professional Reporters

Page 110

1   responsibilities as a class representative?
2       A.   No, other than counsel, no.
3       Q.   Are you aware that you are a
4   representative of the class?
5       A.   Yes.
6       Q.   What are your obligations in your view as
7   a class representative?
8       A.   To take the time to review the materials,
9   to take the time to appear in instances like this,
10  to look at various aspects of the case, and you
11  know, if it comes to some type of settlement, get
12  the different information that's involved as far as
13  fees and things like that, and just try to -- I
14  don't know, bring -- kind of work with the counsel
15  and bring forth the interests of the rest of the
16  class.
17      Q.   Are you willing to do those things?
18      A.   Yes.
19      Q.   Do you have any obligations to class
20  members as a class representative?
21      A.   Yes.
22           MS. REILLY:  Objection to the form.
23  You can answer.
24      A.   I mean, yeah, I think my actions need to
25  consider the whole class' interests.

Page 111

1       Q.   (BY MR. BLANCHARD)  Do you have any
2   financial obligations concerning this litigation?
3       A.   Well, like I said, I've had to confer with
4   counsel and find out if there was maybe something
5   that I'm not aware of right now.
6       Q.   What are you aware of right now as your
7   financial obligations?
8       A.   What it takes for me to fulfill my
9   commitments of time.
10      Q.   What about money?
11      A.   What are you asking me?
12      Q.   I'm asking you if you're aware of any
13  financial obligations, meaning you would have to pay
14  money in the pursuit of this litigation?
15      A.   No, I'm not aware of any.
16      Q.   You're not aware of that.  Is there a
17  written fee agreement between you and your counsel
18  for the pursuit of this litigation?
19      A.   It's on a contingency, and so that would
20  have to be discussed between my counsel and I.
21      Q.   Is it a written agreement?
22      A.   I don't recall for sure if I signed
23  anything in the past regarding that.
24      Q.   You don't recall whether you signed a
25  written fee agreement?

Page 112

1       A.   Yeah.
2       Q.   If there's a recovery in this case,
3   meaning if the class wins and you're awarded money,
4   are you aware of how that money will be distributed?
5       A.   I think I have a pretty general idea of
6   how.
7       Q.   And what's your general idea of how the
8   money will be distributed?
9       A.   Well, that counsel is going to have
10  certain fees and expenses that will come out, and
11  then what's left after that will be prorated between
12  the people of the class action suit.
13      Q.   Have you paid any money to your attorneys
14  yet for this representation?
15      A.   No.
16      Q.   Have you agreed to pay your lawyer's legal
17  fees for their work in connection with the lawsuit?
18      A.   Not that I know of.
19      Q.   Do you know whether you're going to have
20  to pay fees in connection with this lawsuit?
21           MS. REILLY:  Objection to the form of
22  the question.  Are you asking her outside of what
23  she's already testified to as contingency?
24           MR. BLANCHARD:  No.  I'm asking her
25  whether she knows if she's going to have to pay any

Page 113

1   fees, Counsel, in connection with the litigation.
2       A.   Do you mean personally or as a part of any
3   settlement?
4       Q.   (BY MR. BLANCHARD)  I mean personally out
5   of your own pocket.
6       A.   And you're asking me if I'm aware of any?
7       Q.   Yes.
8       A.   No, I'm not aware of any.
9       Q.   Have you agreed to pay any costs for
10  bringing this action?
11      A.   No.
12      Q.   If a class is certified -- well, are you
13  aware of what class certification means?
14      A.   For the most part.
15      Q.   And what does that mean?  What's your
16  understanding?
17      A.   Well, I mean that's why we're here today,
18  and that's what the meeting in June is, to get
19  certification, and that appoints me as a lead
20  plaintiff, and it appoints them as the counsel for
21  the plaintiffs, and then also appoints the liaison
22  counsel.  It's just another step in moving forward.
23      Q.   All right.  Are you aware of whether --
24  well, if a class is certified, are you aware of
25  whether that will be communicated to class members?

29 (Pages 110 to 113)

Jay E. Suddreth & Associates, Inc.
Registered Professional Reporters

Page 114

1    A.   I would think that it would, but I
2  couldn't say with any certainty.  That's something
3  that I would rely on counsel to do in their
4  customary form.
5    Q.   So you wouldn't know how it would be
6  communicated to class members either, correct?
7    A.   No.
8         MS. REILLY:  Objection to the form of
9  the question.
10    Q.   (BY MR. BLANCHARD)  Are you aware of the
11  costs for sending communications off to class
12  members?
13    A.   I used to work at the Post Office.
14    Q.   Is that a "yes"?
15    A.   Yes.
16    Q.   But you don't know how big the class is,
17  correct?
18    A.   Correct.
19    Q.   So you wouldn't be able to even estimate
20  the cost of postage?
21    A.   No, I wouldn't.
22    Q.   Correct?
23    A.   Correct.
24    Q.   Okay.  Do you have any understanding as to
25  who will bear the cost of sending notices to cost

Page 115

1  members?
2    A.   I think I do.
3    Q.   What's your understanding?
4    A.   That, well, if there is any type of
5  settlement, it will come out of that, and if not,
6  then that's part of the contingency agreement
7  between counsel and I.
8    Q.   In the event that -- let me back up.
9         In the event that the case produces no
10  recovery for the class, who will bear the cost of
11  sending notices to class members, the costs of
12  litigation?
13    A.   Well, I think that's covered under the
14  contingency between counsel.
15    Q.   What's your understanding of what a
16  contingency?
17    A.   That compensation is directly related to
18  any settlement.
19    Q.   And if there's no settlement, meaning
20  there's no dollar paid on behalf of Wave to the
21  class, there would be no contingency, correct, no
22  contingency fee?
23    A.   As far as I know, there's no fee to me
24  individually, if that should happen.  That's what I
25  understand contingency to mean.

Page 116

1    Q.   Is it your understanding that if there's
2  no recovery on behalf of the class, meaning there's
3  no settlement or no award of damages, that you will
4  have to pay nothing to your counsel?
5    A.   Yes, that's my understanding.
6    Q.   Do you know what the contingency fee is
7  that your counsel is going to charge in the event
8  that there is a settlement?
9    A.   No.
10    Q.   Could it be 50 percent?
11    A.   I don't know.  That would be between
12  counsel and I, to be discussed.
13    Q.   But that's not determined at this point?
14    A.   No.
15    Q.   And at this point you have paid nothing
16  for the pursuit of this litigation, correct?
17    A.   Correct.
18    Q.   I'm sorry, it's just not clear the way it
19  came out earlier.  This is a question that's kind of
20  bearing back on a question I asked a little while
21  ago.  Is it your understanding that if there is no
22  recovery on behalf of the class, you will not have
23  to pay your counsel anything?
24    A.   Yes.
25    Q.   If you are required -- if you were told

Page 117

1  that you had to pay the costs of the litigation, for
2  instance, sending notice to the class members, would
3  you be willing to do that?
4    A.   That's not part of our contingency
5  agreement.
6    Q.   But would you be willing to do that?
7    A.   I think it's irrelevant.
8    Q.   I'm not asking you what you think about
9  it.  I'm asking you if you would be willing to do
10  it.
11    A.   No.  I might not even have the resources
12  to do it.
13    Q.   Could you afford, for example, $20,000 in
14  costs?
15         MS. REILLY:  Objection to the form of
16  the question.
17    A.   Can you rephrase it?
18    Q.   (BY MR. BLANCHARD)  Could you pay $20,000
19  to your attorneys to pursue this litigation?
20    A.   Could I or would I?  What are you asking?
21    Q.   Could you pay $20,000 to your attorneys to
22  pursue this litigation?
23    A.   You mean do I have the means to do it
24  or --
25    Q.   Sure.  Do you have the means to do it?

30 (Pages 114 to 117)

Jay E. Suddreth & Associates, Inc.
Registered Professional Reporters

Page 118

1    A.    Without mortgaging my home?
2    Q.    Do you have the means, period? I mean --
3    A.    Yes, but it seems irrelevant to me.
4    Q.    So yes, you do have the means?
5    A.    Could I come up with $20,000 if I
6  absolutely had to?
7    Q.    Yeah.
8    A.    Sell my home, take my kids out of college,
9  yeah, I probably could.
10    Q.    Would you?
11    A.    No. I've already lost $30,000. Why would
12  I throw $20,000?
13    Q.    Got you. Has anyone promised you a
14  certain amount of money if the case settles?
15    A.    No.
16    Q.    What do you expect you would recover if
17  the case settles?
18    A.    I really would have absolutely no idea. I
19  would think it -- I have no idea.
20    Q.    Do you ever receive billing statements
21  from your attorney about the amount of fees being
22  incurred?
23    A.    No.
24    Q.    Do you ever get any indication as to how
25  much fees are being incurred as a result of this

Page 119

1  litigation?
2    A.    No, I haven't yet.
3    Q.    Do you expect to?
4    A.    At some point, probably.
5    Q.    Going back to how you became involved in
6  this litigation, I just want to get those steps here
7  again. Prior to ever hearing about Schiffrin &
8  Barroway had you thought about suing Wave?
9    A.    No. When I got the class action
10  information --
11    Q.    Well, wait. "No" will do it.
12        MS. REILLY: Just answer the question.
13    Q.    (BY MR. BLANCHARD) And I don't mean to
14  cut you off.
15    A.    You mean did I personally suing them?
16    Q.    Yeah, did you ever think about suing Wave
17  because you felt like you lost money on their stock,
18  and that upset you?
19    A.    Personally?
20    Q.    Yes.
21    A.    No.
22    Q.    And then what's the first you heard of
23  Schiffrin & Barroway?
24    A.    Well, I guess as far as I know, it was
25  when Darren Check had contacted me.

Page 120

1    Q.    And how did Darren Check contact you?
2    A.    By e-mail.
3    Q.    Do you have a copy of that e-mail?
4    A.    I think I do.
5    Q.    What did that e-mail say?
6        MS. REILLY: Objection. I direct her
7  not to answer. It's an attorney/client
8  communication.
9    Q.    (BY MR. BLANCHARD) Had you retained
10  Schiffrin & Barroway at the time that Darren Check
11  sent you an e-mail, and you had not yet responded?
12    A.    No.
13    Q.    Are you telling me that it's an
14  attorney/client communication when there was no
15  attorney/client relationship?
16        MS. REILLY: Well, under those
17  circumstances, then I would reconsider the request
18  for the document.
19    A.    Rephrase the question so I know what time
20  frame.
21        MS. REILLY: You just asked for a
22  document, and I said that given the response, then I
23  would reconsider your request for production of that
24  document.
25        MR. BLANCHARD: Can we go off the

Page 121

1  record for a second, unless you want to do this on
2  the record?
3        MS. REILLY: I don't know what else
4  needs to be said concerning --
5        MR. BLANCHARD: Well, I didn't ask --
6  can we go off the record for a second?
7        (Off the record discussion.)
8    Q.    (BY MR. BLANCHARD) Do you recall what the
9  substance of that e-mail was?
10    A.    It referred to that I had sent in the
11  information stating that I was a member of the -- to
12  whatever entities that went to.
13    Q.    I'm sorry, I'm sorry. I'm just missing
14  the chronology here, and I really hate to interrupt,
15  but I don't want to do this longer than we have to.
16        I think we're talking about the very first
17  e-mail.
18    A.    I think your brokerage firm must have sent
19  the form.
20        MS. REILLY: Wait, wait. Do you want
21  to take a break? He has a question out, so we're
22  not going to take a break.
23        You have to let him ask a question before
24  you make an answer, and then answer what he's asking
25  you only.

31 (Pages 118 to 121)

Specializing in Complex Litigation Worldwide
Toll Free: (800) 466-2580   Local: (913) 492-0111 or (816) 471-2211

Jay E. Suddreth & Associates, Inc.
Registered Professional Reporters

Page 122

1    THE WITNESS: Okay.
2    Q.    (BY MR. BLANCHARD) The very first e-mail
3 that you received from Schiffrin & Barroway, Darren
4 Check --
5    A.    Uh-huh.
6    Q.    -- I assuming that at that point, you had
7 not sent anything to Schiffrin & Barroway; is that
8 correct?
9    A.    Not that I was aware, yes.
10    MS. REILLY:  Objection to the form of
11 the question.
12    Q.    (BY MR. BLANCHARD) That very first e-mail
13 that you received from Darren Check, what did that
14 e-mail say?
15    A.    It said that -- asking if I would consider
16 being a lead plaintiff, I think, I'm not sure, I
17 don't have it, and to call, you know, the number to
18 visit with him about that possibility.
19    Q.    Okay.  And then after receiving that
20 e-mail what did you do?
21    A.    I called, and I remember at some point,
22 and I'm not sure when, but I remember researching on
23 line their firm and Millberg Weiss, and I'm not sure
24 why I had both companies that I was looking at and
25 evaluating.

Page 123

1    Q.    Uh-huh, okay.
2    A.    But then I think either -- I mean I can't
3 remember why those two companies came to my
4 attention.
5    Q.    Uh-huh.  This is a statement, and not a
6 question.  I do not want to ask you questions about
7 communications that you had with Schiffrin &
8 Barroway after they were retained as your counsel,
9 okay, because that would be attorney/client
10 privilege and I'm not seeking to invade that.
11    A.    Okay, well, after that first e-mail --
12    MS. REILLY:  Wait, wait, he's not
13 asking you a question.  He's making a statement, so
14 you need to wait until there's a question.
15    Q.    (BY MR. BLANCHARD) So the question is up
16 until the point that you retained Schiffrin &
17 Barroway, up until that point when they became your
18 attorney, just please describe the communications in
19 chronological order to the best of your
20 recollection.
21    A.    Well, it would have been that e-mail, and
22 then I called the number, and I had apparently
23 agreed at that time to be the lead plaintiff,
24 because I had an e-mail the next day confirming it.
25    Q.    Okay.  Are you related to anyone at Wave?

Page 124

1    A.    No.
2    Q.    Do you know if you are related to any of
3 the potential witnesses in this case?
4    A.    No.
5    Q.    Do you know who any of the potential
6 witnesses in this case would be?
7    A.    No.
8    Q.    Do you participate in any internet chat
9 rooms regarding Wave stock?
10    A.    No.
11    Q.    Have you ever?
12    A.    No.
13    Q.    Who is Steven Sprague?
14    A.    The CEO -- Jr.?  The CEO of Wave.
15    Q.    And do you think he'd be a potential
16 witness in this case?
17    A.    Yeah, possibly.
18    Q.    Is he a defendant in this case?
19    A.    Yes.
20    Q.    Do you know why he's a defendant in this
21 case?  I'll back up.
22    Do you know what causes of action are
23 being asserted against Steven Sprague?
24    A.    Yes.
25    Q.    What are they?

Page 125

1    A.    Giving false and misleading statements to
2 inflate the stock price.
3    Q.    Anything else?
4    A.    I'd rely on counsel for what other
5 findings they may have had in their investigation.
6    Q.    Okay.  So that's the extent of your
7 knowledge, are the causes of action being asserted
8 against him?
9    A.    With any clarity, yes, uh-huh.
10    Q.    I'm sorry, I don't know what you mean by,
11 "with any clarity."
12    A.    That I can sit here right now this minute
13 and say "yes."
14    Q.    Okay.
15    MS. REILLY:  Do you need a break or
16 anything?  Are you all right?
17    MR. BLANCHARD:  Can I just do one
18 more?
19    MS. REILLY:  Sure, sure.
20    Q.    (BY MR. BLANCHARD) Do you know who Gerard
21 Feeney is.
22    A.    The CFO of Wave.
23    Q.    Is he a defendant in this case?
24    A.    Yes.
25    Q.    And do you know what causes of action are

32 (Pages 122 to 125)

Jay E. Suddreth & Associates, Inc.
Registered Professional Reporters

Page 126

1  being asserted against Gerard Feeney?
2      A.   They're all named, the same charges or
3  accusations.
4      Q.   So you said before he made false and
5  misleading statements, correct?
6      A.   Either made them or was aware of them.
7      Q.   Okay.  And are there any other causes of
8  action being asserted against Gerard Feeney?
9      A.   I'm not sure right at this moment sitting
10  here before you.  If I read something differently,
11  it escapes me right now.  I couldn't articulate it.
12      Q.   Do you want to take a break now?
13         MS. REILLY:  Do you need a break?
14         THE WITNESS:  Uh-huh.
15            (Recess)
16      Q.   (BY MR. BLANCHARD)  Ms. Brumbaugh, do you
17  know who Brian Berger is?
18      A.   No.
19      Q.   Have you ever heard of a Brian Berger in
20  connection with this litigation?
21      A.   No.
22      Q.   Do you know who John Callahan is in
23  connection with this litigation?
24      A.   No.
25      Q.   Do you know who Lark Allen is in

Page 127

1  connection with this litigation?
2      A.   No.
3      Q.   Have you ever heard of a David Collins in
4  connection with this litigation?
5      A.   No.
6      Q.   How about a Bryce Anderson?
7      A.   No.
8      Q.   Clain Anderson?
9      A.   No.
10      Q.   Eric Auchard?
11      A.   No.
12      Q.   Now who do you think the potential
13  witnesses would be if this matter were to go to
14  trial?
15      A.   I don't think I could speculate.
16      Q.   You can't speculate who they would be?
17      A.   You know, other than the plaintiffs and
18  the defendants, you know, I don't know.
19      Q.   Okay.  Did you ever read or are you aware
20  that there's a Complaint filed in this matter?
21      A.   I'd have to, you know, rely on counsel.
22  I'm not sure about filings and how they're worded.
23      Q.   Okay, yeah.
24  (Whereupon, Deposition Exhibit Number 24 was marked
25  by the reporter for identification.)

Page 128

1      Q.   (BY MR. BLANCHARD)  Do you have Exhibit
2  Number 24 before you?
3      A.   Yes.
4      Q.   Do you see it says on the first page,
5  "Consolidated Amended Class Action Complaint For
6  Violations Of The Federal Securities Laws"?
7      A.   Okay.
8      Q.   Have you ever seen this document before?
9      A.   Well, it looks like something that
10  probably would have been passed on to me after, you
11  know, from my counsel.
12      Q.   Have you ever read it?
13      A.   I mean I would have, if I would have
14  received it.
15      Q.   Well, do you know?
16      A.   Let me look.  Yes, I think I have.
17      Q.   Did you read it cover to cover?
18      A.   I would have, uh-huh.
19      Q.   Do you agree with everything stated in it?
20         THE WITNESS:  Is this one that you
21  drafted?
22         MS. REILLY:  Yes.
23      A.   Yeah, yes, I do.
24      Q.   (BY MR. BLANCHARD)  Are you willing to
25  testify at trial if this matter goes to trial?

Page 129

1      A.   Yes.
2      Q.   Did you do anything to prepare for your
3  deposition today?
4      A.   Yes.
5      Q.   Other than conversations you had with
6  counsel, what did you do to prepare for your
7  deposition today?
8      A.   I reviewed any of the literature that I've
9  received from counsel in the past.
10      Q.   Do you know approximately how much
11  money -- well, first of all, did you lose money on
12  your investments in Wave?
13      A.   Yes.
14      Q.   Do you know approximately how much money
15  you lost?
16      A.   Including the accounts with the children,
17  close to $40,000.
18      Q.   I'd like to take a break for five minutes.
19         MS. REILLY:  Uh-huh.
20         MR. BLANCHARD:  I might actually be
21  done.
22            (Recess)
23      Q.   (BY MR. BLANCHARD)  Just a few more
24  questions, and thank you for your patience today.
25  Do you know what a private placement is?

33 (Pages 126 to 129)

Jay E. Suddreth & Associates, Inc.
Registered Professional Reporters

Page 130

1    A.   No.
2    Q.   Do you know anything about Wave having a
3  private placement of Series H stock and warrants in
4  April of 2003?
5    A.   I know they had them.
6    Q.   And do you know anything about what that
7  meant?
8    A.   I just know in retrospect in looking over
9  information that I've had after counsel did their
10 investigation that they existed.
11   Q.   Uh-huh.  But you don't know how they --
12 those warrants functioned, do you?
13   A.   Not really.  I don't have a very good
14 understanding of that, no.
15   Q.   And you don't know how private placement
16 functions, correct?
17   A.   No.
18   Q.   Do you know if there's a dividend rate
19 being paid to the purchasers of that April private
20 placement?
21   A.   It's my understanding from reading the
22 information from counsel's investigation that there
23 was to be a dividend paid at some point.
24   Q.   Do you know if that dividend was customary
25 in the industry?

Page 131

1    A.   I don't know.
2    Q.   Do you know what that dividend rate was?
3    A.   I think it was in there, but I don't
4  remember what it was.
5    Q.   Do you know whether it was high or low?
6    A.   No, I don't.
7    Q.   Are you familiar with the term "gross
8  margin contribution"?
9    A.   No.
10   Q.   Do you know if you have ever heard that
11 term before?
12   A.   I'm not aware, if I have.
13   Q.   And you don't know what that term means?
14   A.   No.
15   Q.   Are you aware that there is a confidential
16 witness discussed in the Complaint filed on your
17 behalf?
18   A.   I mean there's something in the
19 information that I have that makes reference to a
20 confidential witness, but that's all I know.
21   Q.   Do you know that confidential witness?
22   A.   No.
23   Q.   So you have no relationship with that
24 confidential witness?
25   A.   No.

Page 132

1    Q.   We discussed earlier when you told me, I
2  believe, and I'm paraphrasing here, I realize, that
3  Wave's statements about Intel and IBM were
4  misleading because they omitted some information.
5  Is that roughly accurate?
6    A.   Not misleading, because I mean in some
7  instances they were misleading, and after
8  investigation we realized that there were some
9  omissions, seemed to be.
10   Q.   Now the information that was omitted, was
11 that ever disclosed to the market?
12       MS. REILLY:  If you know.
13   A.   Yeah.  I'm thinking, you know, a lot of it
14 pertained to disclosing what the actual partnership
15 was between them and IBM and Intel.
16   Q.   (BY MR. BLANCHARD) Do you know when that
17 information was disclosed to the market?
18   A.   No.
19   Q.   Do you know if it was inside the class
20 period or outside the class period?
21   A.   I don't know.
22   Q.   Do you know if Wave's stock price declined
23 after that information was disclosed, whenever it
24 was?
25       MS. REILLY:  Objection to the form of

Page 133

1  the question.  Can you answer the question?
2    A.   I mean I don't know, I mean without
3  looking.  I know their price consistently declined
4  so --
5    Q.   (BY MR. BLANCHARD) But you are not aware
6  of any --
7    A.   You mean like that day, if it -- I don't
8  know.  Because I don't know when it was disclosed,
9  so I couldn't tell you if the market reacted to it.
10   Q.   Okay.  Do you know what a licensing
11 agreement is?
12   A.   Probably from a legal standpoint, not
13 entirely.  Just myself, I interpret it as an
14 agreement to use their name and product.
15   Q.   Uh-huh.  Okay.  I have nothing further.
16       MS. REILLY:  Are you sure you want to
17 leave?
18       MR. BLANCHARD:  I thank you very much
19 for your patience and your time today.  I don't know
20 if your counsel wants to ask you questions on the
21 record or not.
22       MS. REILLY:  No.
23       MR. BLANCHARD:  No?  Thank you very
24 much.
25       (Witness excused.)

34 (Pages 130 to 133)

Jay E. Suddreth & Associates, Inc.
Registered Professional Reporters

Page 134

1
2
3
4    _____.
5         ANNE BRUMBAUGH
6
7
8
9    STATE OF _____)
10                        ) SS:
11   COUNTY OF _____)
12
13
14         Subscribed and sworn to before me
15   this_____ day of_____, 2006.
16
17
18         _____ .
19              NOTARY PUBLIC
20
21   My Commission Expires: _____ .
22
23
24   In re:  Brumbaugh vs. Wave Systems Corporation
25

Page 135

1         C E R T I F I C A T E
2
3         I, PEGGY E. CORBETT, Certified Shorthand
4    Reporter within and for the State of Kansas, hereby
5    certify that the within-named witness was first duly
6    sworn to testify the truth, and that the deposition
7    by said witness was given in response to the
8    questions propounded, as herein set forth, was first
9    taken in machine shorthand by me and afterwards
10   reduced to writing under my direction and
11   supervision, and is a true and correct record of the
12   testimony given by the witness.
13         I further certify that I am not a relative or
14   employee or attorney or counsel of any of the
15   parties, or relative or employee of such attorneys
16   or counsel, or financially interested in the action.
17         WITNESS my hand and official seal at Overland
18   Park, Johnson County, Kansas, this 8th day of May,
19   2006.
20
21
22   _____
         PEGGY E. CORBETT, RDR, CSR, CRR
23       Certified Shorthand Reporter
24
25

Specializing in Complex Litigation Worldwide
Toll Free:  (800) 466-2580    Local:  (913) 492-0111 or (816) 471-2211