Page 1

```
 1              FOR THE DISTRICT OF MASSACHUSETTS

 2    ANNE BRUMBAUGH, GARY L. HARMON )

 3    and RANDY K. GRIFFIN,          )

 4                                   )

 5                 Plaintiffs,  ) Civil Action
                                ) No. 3:04-CV-30022(MAP)
 6    v.                        )
                                )
 7    WAVE SYSTEMS CORPORATION,       )
      JOHN E. BAGALAY, JR., STEVEN K.)
 8    SPRAGUE and GERARD T. FEENEY,  )
                                     )
 9                 Defendants.    )
      _____)
10                         DEPOSITION

11                            OF

12                   RANDY KEITH GRIFFIN

13         DATED:  MAY 9, 2006

14         TIME:   9:30 A.M.

15         PLACE:  Marriott Greensboro

16                 304 Green Street,

17                 Greensboro, North Carolina

18

19

20

21

22

23

24
```

Page 2

A P P E A R A N C E S

COUNSEL FOR THE PLAINTIFF:
    KAREN REILLY, ESQ.
    TODD M. MOSSER, ESQ.
    SCHIFFRIN & BARROWAY, LLP
    280 King of Prussia Road
    Radnor, PA  19087
    Telephone:  (610) 822-2212
    Facsimile:  (610) 667-7056
    kreilly@sbclasslaw.com
    tmosser@sbclasslaw.com
COUNSEL FOR THE DEFENDANT:
    SARA A. MARTIN, ESQ.
    BINGHAM McCUTCHEN, LLP
    150 Federal Street
    Boston, MA 02110-1726
    Telephone:  (617) 951-8653
    Facsimile:  (617) 951-8736
    sara.martin@bingham.com

Page 4

E X H I B I T S

EXHIBIT    DESCRIPTION                      PAGE
25      Plaintiffs' Response and Objections    42
        to Defendants' First Request for
        Production of Documents
26      TD Waterhouse Trade Confirmations      45
        for Randy Keith Griffin
27      TD Waterhouse Account Statement        47
        for Randy K. Griffin, II
28      Certification of Named Plaintiff       84
        Pursuant to Federal Securities Laws
        for Randy K. Griffin

*****

Page 3

C O N T E N T S

                                   PAGE
DIRECT EXAMINATION BY MS. MARTIN      5
CROSS-EXAMINATION BY MS. REILLY     109

Page 5

    On May 9, 2006, commencing at 9:30 a.m., the
deposition of RANDY KEITH GRIFFIN, was taken pursuant
to notice and according to the Massachusetts Rules of
Civil Procedure, on behalf of Defendants, at the
Marriott Greensboro Downtown, 304 Green Street,
Greensboro, North Carolina.
          P R O C E E D I N G S
        MS. MARTIN:  Could you please swear in
the witness.
    (WITNESS ADMINISTERED OATH BY THE STENOGRAPHER)
        MS. MARTIN:  Okay.  And the parties
have just stipulated that all objections except as to
form will be reserved until the time of trial and
that the witness is going to read and sign the
deposition and we'll make an effort to do so on an
expedited basis.
        MS. REILLY:  That's correct.
        DIRECT EXAMINATION
    (BY MS. MARTIN)
    Q.  Okay.  Good morning.  My name is Sara
Martin.
    A.  Good morning.
    Q.  And I represent the Defendants in this

MEDEIROS STENO & VIDEO GROUP          EAST COAST:  617.590.9767          WEST COAST:  415.652.9340
E-MAIL:  DEPO@GOMEDEIROS.COM                                            WWW.GOMEDEIROS.COM

fc455972-8130-4cd5-967e-287f1989649d

Page 6

1   case. Have we met before?
2       A.   No, ma'am.
3       Q.   Okay. And could you please state your full
4   name and address for the record, please?
5       A.   Randy Keith Griffin; 7524 Green Meadow
6   Drive, Tobaccoville, North Carolina.
7       Q.   Okay. And do you have any other
8   addresses --
9       A.   Yes.
10      Q.   -- other than that one?
11      A.   Yes.
12      Q.   What are your other addresses?
13      A.   Post Office Box 215, King, North Carolina.
14      Q.   Okay. And do you have any other homes?
15      A.   Not primary residence, no.
16      Q.   Okay. But do you have any other homes
17  where you have an address --
18      A.   No.
19      Q.   -- where you receive mail?
20      A.   No.
21      Q.   And have you ever had your deposition taken
22  before?
23      A.   No.
24      Q.   Okay. Well, let me give you a quick

Page 7

1   explanation of how the deposition process works.
2       I'm going to ask questions. Please listen
3   and answer carefully and truthfully. Everything you
4   say will be taken down by the court reporter; so if
5   you can limit your responses to verbal responses
6   versus --
7       A.   Um-hum.
8       Q.   -- hand gestures, nods, it will make a
9   cleaner record.
10      Please also wait until I'm finished asking
11  the question before you begin to answer.
12      A.   (Witness moves head up and down.)
13      Q.   And remember that your responses are given
14  under oath and have the same force and effect as if
15  sworn in a court of law before a judge.
16      A.   (Witness moves head up and down.)
17      Q.   If you don't understand a question that I
18  ask, please ask me to rephrase the question, let me
19  know that you don't understand it, and I'll try to
20  rephrase it so that you do understand it.
21      A.   (Witness moves head up and down.)
22      Q.   If you answer a question, I'll assume that
23  you understood it.
24      A.   Um-hum.

Page 8

1       Q.   If you need to take a break, please let me
2   know.
3       A.   (Witness moves head up and down.)
4       Q.   And are you taking any medications today
5   that would prevent you from hearing or understanding
6   or responding to questions?
7       A.   No.
8       Q.   Okay. What did you do to prepare for your
9   deposition today?
10      A.   All the information that I got from my
11  legal counsel, I've been reading it and studying the
12  case and, of course, looking back on any other
13  information I may have received.
14      Q.   Okay. Did you meet with your counsel --
15      A.   Yes.
16      Q.   -- in preparation for today?
17      A.   Yes.
18      Q.   And please wait until I'm finished after --
19      A.   I'm sorry.
20      Q.   Just a good reminder.
21      And on how many occasions did you meet with
22  your counsel prior to today to prepare for your
23  deposition?
24      A.   One.

Page 9

1       Q.   Okay. And was that yesterday?
2       A.   Yes.
3       Q.   Okay. And approximately how long did you
4   meet with your counsel yesterday?
5       A.   Two hours and 15 minutes.
6       Q.   Okay. And did you review any documents
7   during that meeting?
8       A.   Yes.
9       Q.   Which documents did you review?
10      A.   We looked back over several of them; the
11  complaints initial, and then, of course, all of the
12  paperwork that they've done during this period of
13  time.
14      Q.   Okay. When you say, "all of the paperwork
15  that they've done during this period of time," do you
16  remember specifically any of the documents that you
17  looked at?
18      A.   Well, mainly where the judge has let the
19  case go on. Not any specific that I can recall, but
20  I mean, certain ones.
21      Q.   Okay. So other than the complaint and
22  other documents that your attorneys prepared or filed
23  in this action, did you look at any other documents?
24      A.   No.

3 (Pages 6 to 9)

MEDEIROS STENO & VIDEO GROUP          EAST COAST: 617.590.9767          WEST COAST: 415.652.9340
E-MAIL: DEPO@GOMEDEIROS.COM                                              WWW.GOMEDEIROS.COM

fc455972-8130-4cd5-967e-287f1989649d

Page 10

1    Q.  Okay.  Could you -- oh, did you take any
2   notes during this session with your counsel?
3    A.  Yes.
4    Q.  Okay.  Do you have those notes with you
5   today?
6    A.  No.  I turned them over to my counsel.
7    Q.  Okay.
8        MS. MARTIN:  And do you have those
9   notes with you?
10       MS. REILLY:  Yes.  But they're
11  privileged.
12       MS. MARTIN:  The notes that he took
13  during your session?
14       MS. REILLY:  Yes, because they
15  represent conversations with counsel.
16   Q.  Okay.  Could you please state your date of
17  birth for the record, please?
18   A.  2-7-1952.
19   Q.  Okay.  And are you married, sir?
20   A.  Yes.
21   Q.  Okay.  And what's your wife's name?
22   A.  Norma Jean Griffin.
23   Q.  Okay.  And do you have any children?
24   A.  Yes.

Page 11

1    Q.  How many children do you have?
2    A.  Two.
3    Q.  And what are their names?
4    A.  Randy Keith and Michael Scott.
5    Q.  Okay.  And how old are Randy Keith and
6   Michael Scott?
7    A.  Thirty-four is Randy, and thirty is
8   Michael.
9    Q.  Okay.  And do you have any family members
10  who live in Massachusetts?
11   A.  No.
12   Q.  Okay.  Do you have any family members that
13  are affiliated in any way with Wave Systems?
14   A.  No.
15   Q.  Okay.  Are you in good health?
16   A.  Yes.
17   Q.  Okay.  And are your spouse or children in
18  the securities industry?
19   A.  No.
20   Q.  Okay.  Were they ever?
21   A.  No.
22   Q.  Are any of your family members in the
23  computer hardware or software industry?
24   A.  No.

Page 12

1    Q.  All right.  What do your children do?
2    A.  My oldest son is a insurance manager for
3   Progressive Insurance over adjusters.  And my
4   youngest son, he and his wife own their own beauty
5   supply business.
6    Q.  And is your wife employed?
7    A.  She's retired.
8    Q.  What did she do prior to retirement?
9    A.  She -- she was a teacher's aide.
10   Q.  Are you related to or have any acquaintance
11  with any of the lawyers involved in this case?
12   A.  No.
13   Q.  Okay.  And are you related to or have any
14  acquaintance with anyone from the law firms of
15  Schriffin & Barroway --
16       MS. REILLY:  Schiffrin & Barroway.
17   Q.  -- Schiffrin & Barroway or Gilman & Pastor?
18   A.  No.
19   Q.  Do you know who Steven Sprague is?
20   A.  Yes.
21   Q.  Who is Steven Sprague?
22   A.  He is a CEO of Wave.
23   Q.  Okay.  And do you know who Gerald Feeney
24  is?

Page 13

1    A.  CFO of Wave.
2    Q.  Okay.  Beginning with your graduation from
3   high school, could you please give me a brief
4   description of your educational background, please?
5    A.  Well, when I finished high school, I took
6   off a number of years and started college at the age
7   of 31 and graduated when I was 39.
8    Q.  And where did you attend college?
9    A.  It was a small Baptist college,
10  Gardner-Webb University in Boiling Springs, North
11  Carolina.
12   Q.  Okay.  And what was your major in college?
13   A.  I had an associate of computer science and
14  a major in business management.
15   Q.  Okay.  And did you graduate from college?
16   A.  Yes.
17   Q.  Okay.  And what year did you graduate?
18   A.  '91.
19   Q.  Okay.  And did you -- have you had any
20  graduate level education since then?
21   A.  No.
22   Q.  Okay.  And have you taken any courses since
23  you graduated from college?
24   A.  No.

4 (Pages 10 to 13)

Page 14

1    Q.   Okay.  Do you have any education in
2  securities analysis or training in evaluating
3  securities?
4    A.   No.
5    Q.   Okay.  And are you presently employed, sir?
6    A.   Yes.
7    Q.   And by whom are you employed?
8    A.   Norandex --
9    Q.   Okay.  How do you spell that?
10   A.   N-o-r-a-n-d-e-x slash Reynolds.
11   Q.   Okay.  And what kind of company is that?
12   A.   We are a manufacturer/distributor of vinyl
13 siding to the building industry, but we also
14 distribute other products.
15   Q.   Okay.  And what is your business address?
16   A.   200 North Star Drive, Rural Hall,
17 R-u-r-a-l, Hall, North Carolina, 27045.
18   Q.   Okay.  And what are your responsibilities
19 primarily?
20   A.   Outside salesman.
21   Q.   Okay.  And could you briefly describe your
22 employment history from college to the present?
23   A.   Well, I was employed while I was in college
24 at that age.  I worked for Westinghouse 23 years.

Page 15

1    Q.   Okay.  And what did you do at Westinghouse?
2    A.   Well, I was everything from working on the
3  manufacturing floor to a systems analyst.
4    Q.   Okay.
5    A.   And a computer operator.  And then we were
6  bought out in 1998 and I left.
7    Q.   Okay.
8    A.   And I had a short stint with RFMD, which is
9  here in Greensboro, for three months.
10   Q.   What is RFMD?
11   A.   Radio Frequency Micro Devices.
12   Q.   Okay.  And what did you do there?
13   A.   I actually manufactured wafers that goes --
14 they're used in cell phones.
15   Q.   So you have a little bit of a background
16 in -- in technology; is that correct?
17   A.   Not really because that wasn't needed.
18 People are trained there and they really don't have
19 to have any background.
20   Q.   Okay.  So you were involved in the
21 manufacture --
22   A.   Yes.
23   Q.   -- rather than sort of the design; is that
24 what you're saying?

Page 16

1    A.   Yes.  Strictly manufacturing.
2    Q.   Okay.
3    A.   And then I've been with Norandex/Reynolds
4  since then, up until present.
5    Q.   And do you hold any professional licenses?
6    A.   No.
7    Q.   Have you ever been a plaintiff in another
8  securities-related lawsuit?
9    A.   No.
10   Q.   Okay.  Has any corporate entity to which
11 you were affiliated ever been a plaintiff in a
12 securities-related lawsuit?
13   A.   No.
14   Q.   Okay.  Have you ever been involved in any
15 other civil, administrative or criminal action or
16 lawsuit, other than a securities-related action?
17   A.   No.
18   Q.   Okay.  Have you ever been the target of an
19 investigation by a grand jury, the SEC, or any other
20 government agency or self-regulatory agency?
21   A.   No.
22   Q.   Okay.  And I have to ask this:  Have you
23 ever been arrested or charged criminally?
24   A.   No.

Page 17

1    Q.   All right.  Do you currently own any stocks
2  or bonds?
3    A.   Yes.
4    Q.   Okay.  Do you have any other investments
5  other than stocks and bonds?
6    A.   Yes.
7    Q.   What are those other investments?
8    A.   Rental property.
9    Q.   Okay.  And where is this rental property
10 located?
11   A.   Winston-Salem, North Carolina.
12   Q.   Okay.
13   A.   And King, North Carolina.
14   Q.   Okay.  And approximately how many stocks or
15 bonds do you own?
16       MS. REILLY:  Objection to form.
17       Do you mean how many companies is he
18 invested in or bonds?
19   Q.   Well, let's start with companies.
20       How many different companies do you own
21 stock in?
22   A.   Approximately six.
23   Q.   Okay.  And do you know what those companies
24 are?

5 (Pages 14 to 17)

MEDEIROS STENO & VIDEO GROUP          EAST COAST: 617.590.9767          WEST COAST:  415.652.9340
E-MAIL:  DEPO@GOMEDEIROS.COM                                          WWW.GOMEDEIROS.COM

fc455972-8130-4cd5-967e-287f1989649d

Page 18

1    A.   Sure.
2    Q.   Who are they?
3    A.   Microsoft, RFMD, Lucent, Krispy Kreme.
4  Right now I can't recollect, but there's -- I'm
5  pretty sure there's a couple more.
6    Q.   Okay.  And do you know what the overall
7  value of your stock portfolio is right now?
8    A.   I need to ask you this question.  Is
9  this -- is this individual stocks that I may have
10  outside of a 401K?
11    Q.   Let's include your 401K as well, if you --
12  do you own stocks in your 401K?
13    A.   Yes.
14    Q.   Are they mutual funds?  Do you own mutual
15  funds?
16    A.   Mutual funds.
17    Q.   Okay.  Excluding your mutual funds, what's
18  the value of your stock portfolio?
19    A.   75,000.
20    Q.   Okay.  And if we were to include your 401K
21  and your mutual funds, what would -- do you know
22  what --
23    A.   75,000 in it, also.
24    Q.   So an additional --

Page 19

1    A.   It's 150 --
2    Q.   An additional 75?
3    A.   Yes.
4    Q.   And do you monitor the performance of your
5  stocks?
6    A.   Yes.
7    Q.   How do you monitor the performance of your
8  stocks?
9    A.   I'm an individual trader.  I deal with TD
10  Waterhouse.
11        So I get no professional financial advice.
12  And last night I went out and looked at them and seen
13  what they do daily.
14        Now, I mean, 80 percent of the time -- in
15  other words, one day a week -- I may not monitor.
16  But normally, every day I will go out and see what
17  the performance of your stock is doing.
18    Q.   Okay.  And how do you monitor them?  Is it
19  through the Internet?
20    A.   Well, yes.  Yes.
21    Q.   Okay.
22    A.   I actually pull it up and see if there's
23  any news coming out, so forth and so on.
24    Q.   And do you use any Internet monitoring

Page 20

1  systems?
2    A.   The only system I use is I -- I don't use a
3  BlackBerry or anything.  In other words, it's only
4  when I get home, I can call in and find out what a
5  stock is doing through the phone.
6    Q.   And who -- and who would you call, for
7  example?
8    A.   Well, again, TD Waterhouse does not offer
9  any professional advice.  It's strictly you buy and
10  sell yourself.  Now, they do have research out there
11  that you can take, but you do not deal with a broker.
12    Q.   Right.  So you do not have an investment --
13    A.   No.
14    Q.   -- advisor or broker --
15    A.   No.
16    Q.   -- today?
17    A.   No.  In either -- in either case, my 401K
18  is through my company and, of course, you make your
19  own choices.  And the same thing with this, I've
20  always --
21    Q.   Have you ever had an investment advisor or
22  a broker?
23    A.   I had a brokerage firm one time, but it was
24  only because I had to have one set up before I went

Page 21

1  to TD Waterhouse.  It was Cowen, I believe, and I
2  made one trade with them.
3    Q.   S. J. Cowen?
4    A.   Yes.
5    Q.   And do you know when that was?
6    A.   That was in the early '80s.
7    Q.   Okay.  Do you monitor the securities
8  markets in general or do you just monitor the
9  performance of your individual stocks?
10    A.   I monitor -- I monitor the overall market.
11    Q.   Okay.  And how do you do that?
12    A.   Again, I'll see what the Dow's done, what
13  the NASDAQ's done.  And, again, with TD Waterhouse,
14  they have many clips or clippings that are put out
15  there concerning various stocks, not just the ones I
16  have.
17    Q.   Okay.  So you go onto the TD Waterhouse
18  website and you read --
19    A.   Yes.
20    Q.   -- blurbs and articles that they have
21  posted there; is that correct?
22    A.   Yes.
23    Q.   Okay.  When did you start investing in
24  securities?

6 (Pages 18 to 21)

Page 22

1    A.  In the '70s.
2    Q.  Okay.  And how often have you invested in
3  securities since that time?
4    A.  I invest depending on the situation.  I
5  can't say every week.  I can't say every month.  But
6  it's -- it's active.
7    Q.  Okay.  Since your first purchase, has there
8  ever been a year period where you did not purchase or
9  sell securities?
10   A.  Yes.
11   Q.  And what year was that?
12   A.  Well, again, I can't recollect from the
13  '70s.  But, again, I had that Cowen one time for one
14  stock and that was it.  And that -- because all my
15  other monies, when I worked for Westinghouse, was
16  tied up through our 401Ks.
17   Q.  Okay.  But since you started investing in
18  the '70s -- in the 1970s, you have been regularly
19  purchasing and selling stock since that time; is that
20  correct?
21   A.  No.  Not from the -- not from the '70s.
22   Q.  Okay.
23   A.  I will have to say from the -- 1998.
24   Q.  Okay.  So from 1998 to the present, you've

Page 23

1  been regularly investing in stocks?
2    A.  Yes.
3    Q.  And during that period of time, has there
4  been a year in which you weren't -- you weren't
5  purchasing and selling stocks?
6    A.  No.
7    Q.  Okay.  Has there been a six-month period
8  where you didn't purchase and sell stocks?
9    A.  No.
10   Q.  Okay.  Has there been a three-month period?
11   A.  Possibly.
12   Q.  Okay.  But you're not certain one way or
13  the other?
14   A.  I'm not certain.
15   Q.  Okay.  As of today, can you estimate how
16  many times you've purchased and sold securities in
17  your lifetime?
18        MS. REILLY:  If you can.
19   A.  Estimated?  Seventy-five, a hundred.
20   Q.  Okay.  And that's total purchases and
21  sales?
22   A.  Yes.  Yes.  I -- I'm not a day trader.
23   Q.  Okay.  Have you ever purchased and sold a
24  security in the course of one day?

Page 24

1    A.  Yes.
2    Q.  Okay.  So you have day-traded before?
3    A.  I have done it, but not on a -- I would say
4  on a -- the basis of being called a day trader.  It
5  was only because that I felt like after I bought that
6  stock, it was a bad purchase.  But that is not --
7  I've only done that, as I recollect, one time or two
8  at the most.
9    Q.  Okay.  Have you ever owned stock in Global
10  Crossing?
11   A.  Yes.
12   Q.  Okay.  And what kind of company is Global
13  Crossing, do you know?
14   A.  Global Crossing was supposed to be a fiber
15  optic for communications that didn't work out.
16   Q.  Okay.  So I take it that you don't still
17  own your Global Crossing stock?
18   A.  No.
19   Q.  Okay.  And what -- do you know what
20  happened to it?
21   A.  I sold it before it finally went under.
22   Q.  Okay.  And did you sell it for a loss?
23   A.  Yes.
24   Q.  Do you know approximately how much

Page 25

1  your loss was for your Global Crossing stock?
2    A.  No, I don't.
3    Q.  Okay.  And have you ever -- oh, so I think
4  we talked about this before, that you have owned
5  stock in RF Micro Devices, Inc.?
6    A.  Yes.
7    Q.  And that's the company you formerly worked
8  for; is that correct?
9    A.  Yes.
10   Q.  And we also talked about what kind of
11  company RF Micro Devices, Inc. is, but could you tell
12  me again?
13   A.  They make microchips for telephones, for
14  Nokia, Ericsson.  That's -- that's what they are.
15  Analog chips.
16   Q.  And approximately how many shares of RF
17  Micro Devices, Inc., have you purchased?
18        [PAUSE.]
19   A.  Probably bought and sold 75,000 shares.
20   Q.  Okay.  And do you still own RF Micro
21  Devices, Inc., stock?
22   A.  Yes.
23   Q.  Approximately how many shares do you own?
24   A.  4,500.

MEDEIROS STENO & VIDEO GROUP        EAST COAST: 617.590.9767        WEST COAST:  415.652.9340
E-MAIL:  DEPO@GOMEDEIROS.COM                                        WWW.GOMEDEIROS.COM

fc455972-8130-4cd5-967e-287f1989649d

Page 26

1    Q.  Okay.  And do you know what the value of
2  that investment is?
3    A.  It's approximately 45,000.
4    Q.  Okay.  And when you purchase the stock of a
5  company, do you usually purchase large or small
6  positions?
7    A.  It can vary.  I've purchased as little as
8  100 shares and I've purchased as much as 10,000.
9    Q.  Okay.  And how do you make that decision?
10   A.  First, with how much money I have
11 available; second of all, of the price that it's
12 selling for; and third as to what I think it -- the
13 future of the company will be.
14   Q.  Okay.  And what is your investment
15 strategy?
16       MS. REILLY:  Objection to form.
17   Q.  You can go ahead and answer.
18   A.  I really look to invest for long term.
19   Q.  So you invest for long-term gains versus
20 short-term gains; is that what you're saying?
21   A.  I do.
22   Q.  Have you ever invested for short-term
23 gains?
24   A.  Yes.

Page 27

1    Q.  Okay.  And was your investment in Wave
2  Securities for a short-term -- I'm sorry -- for Wave
3  Systems for short-term gains?
4    A.  Not initially.  Not initially.
5    Q.  All right.  Can you explain what you mean
6  by that?
7    A.  Well, when it first came out, Wave was
8  under a dollar share.  So I watched it.  And then
9  when I made the first purchase, which was July 31st
10 of 2003, it had already gone like in the 2.25 range.
11 And I said -- I decided I will buy some.
12       By the time I bought it, it was already 4,
13 like in another day or two.  And I did sell it at
14 4.59.  And the reason being, again, was I didn't know
15 if this was going to be like some of the others that
16 I had bought in the past.
17       Because I kind of have a rule of thumb:  If
18 I make 10 percent in a short period of time, usually
19 that stock is going to fall back some.  It's kind of
20 a equation that I've come up on my own.  And if a
21 stock falls between 20 -- or below 20 percent of what
22 I've bought it for, I will sell it.
23   Q.  So do you make decisions to buy or sell
24 based on this sort of internal rule that you have --

Page 28

1    A.  Yes.
2    Q.  -- about 10 percent and 20 percent?
3    A.  Ten and twenty, yes.
4       [DISCUSSION OFF THE RECORD.]
5    Q.  Okay.  You mean $2.95; is that correct?
6    A.  Yes.
7       [DISCUSSION OFF THE RECORD.]
8    Q.  Okay.  So we talked about this before.
9  Have you ever bought or sold -- bought and sold stock
10 options, currencies or futures in the -- in the same
11 day?  That is, buy a position and sell the position
12 that same day?
13       MS. REILLY:  Objection to form of the
14 question.
15   A.  Again, I -- once or twice, I did buy a
16 stock that I felt after I had made the purchase that
17 it was not a good investment; but not over once or
18 twice, you know.  That is not a rule of thumb that I
19 do.
20   Q.  Okay.
21   A.  I usually hold the stocks.
22   Q.  And do you recall what those occasions
23 were?
24   A.  If I'm not mistaken, I did Wave Systems one

Page 29

1  time like that, but I'd have to look back on my
2  record.
3    Q.  Okay.  Other than Wave Systems, can you
4  recall any other stock that you might have
5  day-traded?
6    A.  The only other one may have been Global
7  Crossing.
8    Q.  Okay.  And what made you decide to
9  day-trade those stocks?
10   A.  Well, again, I felt like that the
11 investment -- either I had a 10 percent or I just
12 didn't feel good about the trade I had made after I
13 had already made it.
14   Q.  Okay.  Okay.  Have you ever invested in
15 commodities?
16   A.  No.
17   Q.  Okay.  Have you ever invested in limited
18 partnerships?
19   A.  No.
20   Q.  Have you ever invested in mortgage-backed
21 securities?
22   A.  No.
23   Q.  Have you ever purchased options?
24   A.  No.

MEDEIROS STENO & VIDEO GROUP        EAST COAST:  617.590.9767        WEST COAST:  415.652.9340
E-MAIL:  DEPO@GOMEDEIROS.COM                                             WWW.GOMEDEIROS.COM
                                                                      fc455972-8130-4cd5-967e-287f1989649d

Page 30

1   Q.   Ever purchased futures?
2   A.   No.
3   Q.   Okay.  Have you ever done puts?
4   A.   No.
5   Q.   Have you ever done calls?
6   A.   No.
7   Q.   Have you ever done short sales?
8   A.   No.
9   Q.   Okay.  Do you know what the current asset
10  allocation of your portfolio is in terms of, you
11  know, mutual funds, stocks, bonds?
12  A.   Yes.
13  Q.   Okay.  And what is that asset allocation?
14  A.   Well, again, if you go back to my 401K, 90
15  percent of it is mutual funds --
16  Q.   Okay.
17  A.   -- 10 percent is bonds.  And then in my own
18  IRA, it's 100 percent stocks.
19  Q.   Okay.  Do you recognize that investments in
20  stocks involve certain risks?
21  A.   Yes.
22  Q.   Okay.  And what do you understand those
23  risks to be, generally?
24  A.   Those risks could be that a company may not

Page 31

1   be able to meet their financial goals that they have
2   estimated, so there could be a loss.  It could be the
3   company goes out of business.
4   Q.   Any other risks other than -- than those
5   two?
6   A.   No.  No.
7   Q.   Okay.  What about the strength of the
8   economy?  Could the strength of the economy affect
9   whether a stock value goes up or down?
10  A.   Yes.
11  Q.   Okay.  So that's another risk; isn't that
12  correct?
13  A.   Yes.
14  Q.   Okay.  What about the performance of
15  competitors and the price of competitive products, is
16  that something that could cause the company's stock
17  to go up or down?
18  A.   Yes.
19  Q.   Okay.  So there are other risks in addition
20  to the ones that you mentioned; is that correct?
21  A.   Yes.
22  Q.   Okay.  What proportion of your annual
23  income is derived from earnings on investments and
24  securities?

Page 32

1   A.   Zero.
2   Q.   Okay.  What proportion of your net worth is
3   derived from earnings on securities?
4   A.   Twenty percent.
5   Q.   Okay.  And when you said that your -- that
6   0 percent of your annual income is derived from
7   earnings on investments and securities, is that
8   because you've been reporting a loss on your
9   securities investments?
10  A.   Well, I -- when I say that, I take nothing
11  out of them.  They're all in 401Ks, so I don't -- in
12  other words, I never get any proceedings out of it.
13  Q.   Okay.
14  A.   I don't have a separate account.  It's all
15  in IRA.
16  Q.   So you don't cash any of it in?
17  A.   No.
18  Q.   Is that what you're saying?
19  A.   No.  No.
20  Q.   Have you ever bought or sold securities to
21  achieve tax benefits?
22  A.   No.
23  Q.   To your knowledge, have you ever bought the
24  stocks or bonds of any companies in the digital

Page 33

1   securities industry, other than Wave Systems?
2   A.   Not as I recall.
3   Q.   What financial or business publications do
4   you read regularly, if any?
5   A.   None.
6   Q.   Okay.  So you don't get the Wall Street
7   Journal?
8   A.   No.
9   Q.   And do you invest online?
10  A.   Yes.
11  Q.   Okay.  What online brokerage accounts do
12  you have?
13  A.   TD Waterhouse.
14  Q.   Is that the only one?
15  A.   Our company has Fidelity.
16  Q.   I'm sorry?
17  A.   Our company, the company I work for with my
18  mutual funds, is Fidelity.
19  Q.   Okay.  So you can access your Fidelity
20  account --
21  A.   Yes.
22  Q.   -- online as well.
23  A.   Yes.
24  Q.   Is that correct?

9 (Pages 30 to 33)

Page 34

1     A.   Yes.
2     Q.   So other than TD Waterhouse and Fidelity,
3  are there any others?
4     A.   No.
5     Q.   Okay.  Okay.  When did you first start
6  using the Internet to research your investments?
7        MS. REILLY:  Objection to form.
8     Q.   Well, let me rephrase that.
9        Do you use the Internet to research your
10  investments?
11     A.   Yes.
12     Q.   Okay.  And when did you first start using
13  the Internet to research your investments?
14     A.   The year 2000.
15     Q.   And how did you research your investments
16  prior to that?
17     A.   Periodicals, Wall Street Journal.
18     Q.   Okay.  So going back to my previous
19  question, you used to read financial publications,
20  you just don't anymore?
21     A.   No.
22     Q.   Okay.  So which ones did you used to read?
23     A.   Wall Street Journal.
24     Q.   Okay.  Other than the Wall Street Journal?

Page 35

1     A.   Fortune.
2     Q.   Okay.  Other than the Wall Street Journal
3  and Fortune?
4     A.   Barron's.
5     Q.   Okay.  Let me go through a list and you can
6  tell me whether you've read them.
7     A.   Okay.
8     Q.   Smart Money?
9     A.   No.
10     Q.   Fortune?
11     A.   Yes.
12     Q.   Business Week?
13     A.   Sometimes.
14     Q.   Forbes?
15     A.   No.
16     Q.   Financial World?
17     A.   No.
18     Q.   Investors Daily?
19     A.   Yes.
20     Q.   Money Magazine?
21     A.   No.
22     Q.   Crain's?
23     A.   No.
24     Q.   Okay.  So does that -- does that sound like

Page 36

1  pretty much all of them that you've read?  Have I hit
2  them all?
3     A.   Yes.  The ones you've read there.
4     Q.   Okay.  And how frequently would you read
5  these publications prior to 2000?
6     A.   I normally would pick up a Wall Street
7  Journal once a week.  I did not take a subscription
8  except for 13 weeks, and then I didn't -- after then
9  I didn't.  And I've taken one or two of the magazines
10  for just a normal subscription to see if I liked it.
11  And after then, I didn't renew it.
12     Q.   Okay.  So beginning in around 2000, you
13  stopped reading all these periodicals?
14     A.   I did not subscribe to them.  Now, if there
15  was a copy laying somewheres or -- but -- or I may
16  pick up one at a newsstand, but not through a regular
17  subscription.
18     Q.   Okay.  And did you read anything about Wave
19  Systems in any of these periodicals?
20     A.   No.
21     Q.   Okay.  Okay.  And do you visit any inter --
22  investment-related chat rooms?
23     A.   No.
24     Q.   Do you watch any financial news programs

Page 37

1  regularly on television?
2     A.   Not on a regular basis.
3     Q.   Okay.  Which ones do you watch on an
4  irregular basis?
5     A.   If I'm able to watch it, I may catch Cramer
6  once in a while or CMBC.
7     Q.   Okay.  And do you ever solicit information
8  about companies directly from them before investing?
9     A.   No.
10     Q.   Prior to making investment decisions, do
11  you read trade publications?
12     A.   No.
13     Q.   Do you ever read brokerage firm or analyst
14  reports online or --
15     A.   Online, yes.
16     Q.   Okay.  Are there any particular brokerage
17  firm or analyst reports that you regularly read?
18     A.   Any that make -- TD Waterhouse has many
19  articles that may come from different brokerage
20  firms.
21     Q.   Okay.
22     A.   And I -- I'll read those like if it's
23  concerning stocks I have or, as I said, if it's
24  something I may have an interest in.

MEDEIROS STENO & VIDEO GROUP         EAST COAST:  617.590.9767         WEST COAST:  415.652.9340
E-MAIL:  DEPO@GOMEDEIROS.COM                                              WWW.GOMEDEIROS.COM
                                                            fc455972-8130-4cd5-967e-287f1989649d

Page 38

1    Q.   So, basically, if it's on the TD Waterhouse
2    website --
3    A.   That's --
4    Q.   -- you may read it?
5    A.   Yes.
6    Q.   But you don't read everything on the TD
7    Waterhouse website, do you?
8    A.   No.
9    Q.   Okay.
10   A.   No.
11   Q.   Do you read company prospectuses or
12   offering circulars?
13   A.   I have looked at some that come that stocks
14   that I currently hold and see what maybe that the
15   board of directors are proposing.  But to go out and
16   actually review one with the companies I want to
17   invest in, no.
18   Q.   Okay.  So you wouldn't read them before you
19   invest, but you might --
20   A.   Yes.
21   Q.   -- read them after you began investing; is
22   that correct?
23   A.   Yes.
24   Q.   And have you read any SEC filings or

Page 39

1    prospectuses or offering circulars for Wave Systems?
2    A.   No.
3    Q.   Okay.  Do you maintain files of investment
4    or financial information?
5    A.   The only information that I maintain is my
6    trading through TD Waterhouse or Fidelity.
7    Q.   Okay.
8    A.   Not any news reports or that type of
9    information.
10   Q.   Okay.  So do you print out your trading
11   records and put them physically in a file?
12   A.   I do if need be.  But, again, since it's
13   online now, I can go out and actually access it.  So
14   sometimes I do; sometimes I don't.  It just depends.
15   Q.   Do you know if you had any documents or
16   trade confirmations relating to Wave -- Wave Systems
17   in your files?
18   A.   Yes.
19   Q.   Okay.  And did you --
20   A.   Yes.
21   Q.   Okay.  And did you turn those documents
22   over to your attorneys in this case?
23   A.   Yes.
24   Q.   All of them?

Page 40

1    A.   Yes.
2    Q.   Okay.  Who do you discuss your purchases of
3    securities with?
4         MS. REILLY:  Objection to the form of
5    the question.
6    A.   My wife.
7    Q.   Okay.
8    A.   And I have discussed them with my brother
9    or people that -- just in a general conversation, but
10   not...
11   Q.   Do you ask any of these people for advice
12   regarding your investments?
13   A.   No.
14   Q.   Okay.  So it's really more of a --
15   A.   Individual.
16   Q.   -- this is what I've invested in,
17   informational --
18   A.   Um-hum.
19   Q.   -- discussions versus recommendations; is
20   that correct?
21   A.   Yes.
22   Q.   Okay.  Do you ever listen to investor
23   conference calls?
24   A.   I have.

Page 41

1    Q.   Okay.  For what companies have you listened
2    to investor conference calls?
3    A.   I have listened to RFMB.  Listened to that.
4    That's the only one.
5    Q.   Have you ever belonged to an investment
6    club?
7    A.   No.
8    Q.   Sounds fun, though, doesn't it?  Just
9    kidding.  You don't have to answer that.
10        Okay.  Do you have any other sources of
11   information about investments that we have not
12   covered today?
13   A.   No.
14        MS. MARTIN:  Do you mind if I take a
15   short break?  I'm just going to grab some coffee.
16        MS. REILLY:  Oh, sure.  Okay.
17        MS. MARTIN:  A quick break.  Go off
18   the record for a second.
19        [DISCUSSION OFF THE RECORD.]
20        [RECESS.]
21        MS. MARTIN:  Go back on the record,
22   please.
23        I'm going to mark as the next
24   exhibit -- I'm not sure what exhibit number that

11 (Pages 38 to 41)

MEDEIROS STENO & VIDEO GROUP          EAST COAST:  617.590.9767          WEST COAST:  415.652.9340
E-MAIL:  DEPO@GOMEDEIROS.COM                                              WWW.GOMEDEIROS.COM

fc455972-8130-4cd5-967e-287f1989649d

Page 42

1  is -- Plaintiffs' Response and Objections to
2  Defendant's First Request for Production of
3  Documents.
4        Do you know what the last exhibit
5  number was?
6        MS. REILLY:  Are you going to be
7  re-marking it for his deposition versus keeping a
8  running exhibit numbering?
9        MS. MARTIN:  I didn't think this had
10 been marked previously.  I thought just the
11 interrogatories had been marked, but maybe I'm wrong.
12       MR. MOSSER:  That's the document
13 request?  I think you're right.
14       MS. REILLY:  Those did get marked.
15       MR. MOSSER:  Yes.  We just did the
16 interrogatories on Friday.
17       MS. REILLY:  Yep.
18       MS. MARTIN:  Okay.  So it's number --
19       MR. MOSSER:  Is it No. 1 or No. 20 or
20 whatever?
21       MS. REILLY:  It will be 25.
22       MS. MARTIN:  Twenty-five.  Exhibit
23 No. 25.
24    [EXHIBIT NO. 25 MARKED FOR IDENTIFICATION.]

Page 43

1        BY MS. MARTIN:
2    Q.  Okay.  So, Mr. Griffin, please take a
3  second to review the document that's just been marked
4  Exhibit No. 25.
5        Have you seen this document before today?
6    A.  Yes.
7    Q.  Okay.  And what is that document?
8    A.  This is a civil action, class action
9  lawsuit by the three here, Anne Brumbaugh, Gary
10 Harmon and myself.  First request for production of
11 documents.
12   Q.  Okay.  So do you understand that to be your
13 response to Defendants' request for production of
14 documents?
15   A.  Yes.
16   Q.  Okay.  And when did you first see that
17 document?
18   A.  I can't recollect or recall the exact date,
19 but it was sent to me by my attorneys.  So I don't
20 know exactly the --
21   Q.  Do you know if you saw it before or after
22 it was filed in this lawsuit?
23   A.  I don't recall.
24   Q.  And could you look at -- just take a moment

Page 44

1  to sort of flip through the request.  Because what
2  I'm going to ask is whether you searched for
3  documents that were request for -- requested by the
4  Defendants in this action.
5        [PAUSE.]
6    A.  Could you ask the question, please, again?
7    Q.  Yes.  Did you search for the documents that
8  were requested by the Defendants in this action?
9    A.  Yes.
10   Q.  Okay.  And did you find any documents?
11   A.  Yes.
12   Q.  Okay.  And what documents did you find?
13   A.  My documents were the trades that I made,
14 Wave Securities.
15   Q.  Okay.  And where did you find those
16 documents?
17   A.  Went online and pulled them from TD
18 Waterhouse.
19   Q.  Okay.  So you pulled them offline, printed
20 them out, and gave them to your lawyers --
21   A.  Yes.
22   Q.  -- is that correct?
23   A.  Yes.
24   Q.  Okay.  Did you find anything other than

Page 45

1  those documents?
2    A.  No.
3        MS. MARTIN:  Okay.  And let me mark as
4  Exhibit 26 a document Bates stamped GRIF-1 through
5  16.
6    [EXHIBIT NO. 26 MARKED FOR IDENTIFICATION.]
7    Q.  Okay.  Mr. Griffin, is this a collection of
8  all the documents that you located in response to
9  Defendants' request for production?
10   A.  Yes.
11   Q.  And are you still a customer of TD
12 Waterhouse?
13   A.  Yes.
14   Q.  Okay.  And how many accounts do you have at
15 TD Waterhouse?
16   A.  I have two.
17   Q.  Okay.  And what are those two accounts?
18   A.  One is an IRA and one is an individual
19 small account that I can do trading, but there are so
20 few funds in there that I never -- I can't tell you
21 the last time I made a trade through it.
22   Q.  Okay.  And -- and do you know if you have a
23 rollover IRA --
24   A.  Yes.

MEDEIROS STENO & VIDEO GROUP        EAST COAST:  617.590.9767        WEST COAST:  415.652.9340
E-MAIL:  DEPO@GOMEDEIROS.COM                                        WWW.GOMEDEIROS.COM

fc455972-8130-4cd5-967e-287f1989649d

Page 46

1    Q.  -- at TD Waterhouse as well?
2    A.  Yeah.  It was rolled over from Westinghouse
3  when I was there and I rolled it over to TD
4  Waterhouse.
5    Q.  So is that the second account that you're
6  referring to or is that in addition to the two that
7  you just mentioned?
8    A.  No.  It's just -- it's those two that were
9  mentioned.
10    Q.  Okay.  So it's -- it's the IRA?
11    A.  This one is the IRA that we're --
12    Q.  Right.
13    A.  -- yes --
14    Q.  And then the --
15    A.  -- that we rolled over.
16    Q.  And then the rollover IRA?
17    A.  No.  This is the rollover.
18    Q.  Oh, you're certain -- you're certain that's
19  the rollover IRA?
20    A.  Yes.  From Westinghouse.  This is the
21  rollover.
22    Q.  Okay.  And then your other account that you
23  mentioned is...
24    A.  It's just a small funds out there probably

Page 47

1  worth $5,000 that I -- I can't tell you the last time
2  I made a trade in it.
3    Q.  Okay.
4    A.  I look at it because there's just a couple
5  stocks in it.  RFMD, there's a few shares.  But it's
6  not enough that I even --
7      MS. MARTIN:  Let's mark as Exhibit 27,
8  I believe, a statement dated 3-28-02 from TD
9  Waterhouse.
10    [EXHIBIT NO. 27 MARKED FOR IDENTIFICATION.]
11    Q.  Do you recognize this statement?
12    A.  Yes.
13    Q.  Okay.  Now, is this the same account?
14    A.  No.
15    Q.  Okay.  Which account is this?
16    A.  This is my son's account.
17    Q.  Okay.  Well, then, that solves that
18  question.  That was a mystery that needed to be
19  solved.
20      Okay.  So this account is not your account?
21    A.  No.  The --
22      MS. REILLY:  The second --
23    A.  The second is my son.
24    Q.  Okay.  Okay.  So you have two brokerage

Page 48

1  accounts and you produced -- you produced documents
2  in this case that relate to only one which is your
3  individual IRA; is that correct?
4    A.  Yes.
5    Q.  Okay.  And do you know what the account
6  number is for your individual IRA?
7      MS. REILLY:  If you know.
8    A.  44691607, if I recall -- recall correctly.
9    Q.  And who makes the trading decisions for
10  this account?
11    A.  Me.
12    Q.  Okay.  And only you?
13    A.  Only me.
14    Q.  Is this the only brokerage account that you
15  bought Wave stock in?
16    A.  Yes.
17    Q.  Okay.  And what is the address of record
18  for this account?
19      And you can look at the exhibit if that
20  will help.
21    A.  Okay.  It will.
22      MS. REILLY:  That's Exhibit 26, you're
23  referring to?
24      MS. MARTIN:  Yes.

Page 49

1    A.  PO Box 215, King, North Carolina.
2    Q.  Okay.  And why is the address a PO box?
3    A.  Why is it?  We lived in King for 25, 30
4  years.  And we have moved to Tobaccoville in the last
5  three or four years, so we kept a post office box for
6  all those years, just in case we needed it.  And also
7  for my son when he -- to get his mail there when he
8  was at college and different places, he would give
9  that address.
10    Q.  Okay.  Is that the address that you
11  currently use?
12    A.  I use both, depending.
13    Q.  Okay.  And do you know if your other TD
14  Waterhouse account has the same address of record?
15    A.  Yes.  It should, yes.
16    Q.  Okay.  When did you first become aware that
17  Wave Systems existed?
18    A.  I got a fax that came into my office at
19  home and it's a StockPick.com -- and I don't know if
20  that's specifically how it's worded -- report.  You
21  know, it came across.  It gives recommendations or --
22  I wouldn't say recommendations.  It gives stocks that
23  may be something to look at for the future.
24      And there was no specific company or, like

MEDEIROS STENO & VIDEO GROUP          EAST COAST:  617.590.9767          WEST COAST:  415.652.9340
E-MAIL:  DEPO@GOMEDEIROS.COM                                              WWW.GOMEDEIROS.COM
                                                                         fc455972-8130-4cd5-967e-287f1989649d

Page 50

1  I say, I do not know who writes this for these
2  people, giving financial advice. But I looked at it
3  and, of course, I went online to see if it was
4  something I might be interested in. And this was
5  around June of 2003. So I started watching it. And
6  it was in the 75 to 90 cents range. And that's when
7  I started watching the stock.
8      Q.  Okay. And you said it was called Stock
9  Pick?
10     A.  And, again, I -- I don't recall exactly.
11 Stock Pick report or it's -- like I say, it's -- I
12 don't know how those people get your -- but I -- I
13 receive once a week or once a month or whenever.
14     Q.  Okay. And is that through TD Waterhouse?
15     A.  No. No. It -- it's -- probably to me,
16 it's like these travel agencies sending you a cruise
17 for $99. So I really don't know where the origin is.
18     Q.  Okay.
19     A.  I don't know how they've gotten my fax
20 number.
21     Q.  So it's like an advertisement --
22     A.  Yes.
23     Q.  -- that you received --
24     A.  Yes.

Page 51

1      Q.  -- via e-mail; is that correct?
2      A.  No. Fax.
3      Q.  Oh, by fax?
4      A.  Yes.
5      Q.  All right. And is Stock Pick, is this the
6  only one that you receive or do you receive many of
7  these?
8      A.  No. It's just -- again...
9      Q.  Okay. And -- and Wave Systems appeared on
10 the Stock Pick?
11     A.  Yes.
12     Q.  Okay. And approximately when was this?
13     A.  It was approximately June of 2003.
14     Q.  Okay. And what did it say about Wave to
15 be --
16     A.  It was talking about -- excuse me.
17     Q.  That's all right.
18     A.  They were talking about the security
19 devices and -- and software that they were going
20 to -- that they were in and that they thought it may
21 be something to look at in the future.
22         Again, this is not by any financial advisor
23 or anything. It's whoever -- as I said, I don't know
24 where the origin is.

Page 52

1      Q.  And do you remember if it quoted anybody
2  who worked for Wave Systems?
3      A.  No.
4      Q.  Okay. No, it did not; or, no --
5      A.  It did not in that report.
6      Q.  Okay.
7      A.  No.
8      Q.  Do you have a copy of this fax?
9      A.  No.
10     Q.  What did you do with the fax?
11     A.  It's -- throw them in the trash can.
12     Q.  And do you assume that everything you read
13 in Stock Pick is correct?
14     A.  No.
15     Q.  Okay. And after you read Stock Pick, did
16 you do any additional research on Wave Systems?
17     A.  Yes.
18     Q.  Okay. And what -- what research did you
19 do?
20     A.  I went back, as I said, to TD Waterhouse
21 and I watched it until in July and see what it was
22 doing. And, of course, there was some information
23 coming out from -- again, I don't know where the
24 origin -- where TD Waterhouse gets their -- because

Page 53

1  Motley Fool, Cramer, there's so many.
2         And so, again, I was again with that
3  newsletter watching to see what the stock was -- what
4  it was doing.
5      Q.  Okay. And are you aware of any brokers
6  making any investigation of Wave or the digital
7  securities industry?
8      A.  No. Huh-uh.
9      Q.  And prior to your purchase, did you discuss
10 Wave or the digital securities product industry with
11 anyone?
12     A.  No.
13     Q.  Okay. What, if any, negative factors did
14 you perceive at the time you contemplated your
15 initial investment in Wave?
16     A.  None.
17     Q.  All right. And what positive factors did
18 you perceive?
19     A.  The positive, it was that it was so low in
20 price that if there was any investment made, yes, I
21 could stand to lose, but it would not be a
22 substantial amount of money.
23         But I was looking at the up-side based on
24 the information that was perceived from the comments

14 (Pages 50 to 53)

Page 54

1 that were being made on the web.
2     Q.  Okay.  And -- and what were those comments
3 to the extent that you remember?
4     A.  Well, again, it was talking about the
5 industry they were in and, of course, the futures of
6 what they were looking at.  And then, of course,
7 later on Mr. Sprague made some comments about Intel
8 and how that they may be bundling together.
9         And, of course, the stock made a
10 substantial -- when I did finally buy it, it had gone
11 from like .84, .85 or whatever it was, up to
12 $2-and-something in a day.
13        So that's when I tentatively started
14 watching this.  It just must be something that's
15 going to be a good stock to invest in because there's
16 good reports coming out and it's coming out from the
17 CEO.
18     Q.  Okay.  And what did you -- what do you
19 recall reading prior to purchasing Wave securities
20 about -- about Intel, if anything?
21     A.  Well, I've owned Intel in the past.  And,
22 of course, Intel may have three sheets on TD
23 Waterhouse or any news bulletin.  And, again, you
24 can't read every one of them.  So I did not see

Page 55

1 Intel -- any specifics.
2     Q.  Okay.  So you didn't know any specifics
3 about Intel and Wave or a relationship between the
4 two at the time you purchased Wave securities?
5     A.  No.
6     Q.  Was August 1st, 2003, the first time you
7 ever bought Wave stock?
8     A.  I think it was -- if I recall, it was July
9 31st or August 1st.
10     Q.  And you can look at --
11     A.  Okay.
12     Q.  -- Exhibit 26 to refresh your memory.
13     A.  Okay.  August 1st.
14     Q.  Okay.  So those are all your purchases and
15 sales of Wave securities?
16     A.  Yes.  Yes.
17     Q.  Okay.  And I notice on the far right of
18 Exhibit 26, there's a handwritten column; is that
19 your handwriting?
20     A.  Yes.
21     Q.  Okay.  And why did you hand-write those
22 dates in there?
23     A.  Because my printer was not set up properly
24 to print off the (gestures).

Page 56

1     Q.  Okay.  And do you verify that those are the
2 correct dates?
3     A.  Yes.
4     Q.  If you were to print it out again on a
5 different printer, do you think you would be able to
6 capture that column?
7     A.  Yes.
8     Q.  When -- I think we've asked that -- that
9 you would do that because --
10        MR. MOSSER:  I think we tried it
11 again, but the same thing happened, so we'll have to
12 make another attempt.
13        MS. MARTIN:  Okay.  It would just be
14 nice to have the actual record.
15        MR. MOSSER:  We'll get to it.
16        MS. MARTIN:  Thank you.
17        THE WITNESS:  Can we take a break
18 just -- do you want to answer -- do you want to step
19 out?
20        MS. REILLY:  If we can go off the
21 record for a moment?
22        MS. MARTIN:  Sure.
23        THE WITNESS:  Okay.
24        [DISCUSSION OFF THE RECORD.]

Page 57

1        THE WITNESS:  Thank you.
2        MS. REILLY:  We'll be able to provide
3 it.
4        MS. MARTIN:  Thank you.  We can go
5 back on the record.
6     BY MS. MARTIN:
7     Q.  Okay.  So did you purchase 10,000 shares of
8 Wave stock for $4 on August 1st, 2003?
9     A.  Yes.
10     Q.  Okay.  And what was the source of funds for
11 this purchase?
12     A.  Source of funds?  It was cash sitting in my
13 IRA.
14     Q.  Okay.  And this was your first purchase of
15 Wave Systems --
16     A.  Yes.
17     Q.  -- securities?
18     A.  Yes.
19     Q.  Okay.  And why did you purchase Wave stock
20 on August 1st, 2003?
21     A.  Well, as I previously said, I had gotten
22 this fax from whatever origin it was, and it was
23 talking about -- I would not say recommending, but
24 just talking about what Wave could be.  And at the

15 (Pages 54 to 57)

Page 58

1  time when I first started watching in July, it was
2  80 -- 70 or 89 cents.
3      And then it jumped to $2 and a quarter like
4  on July 31st, or somewhere about then.  And I said,
5  "Well, this information means the analysts have
6  picked up on it and undoubtedly it's going to be a
7  good stock to purchase."  And by the time I did get
8  it, it was already at 4.  So that's the reason I made
9  the purchase at 4.
10     Q.  And do you know why the stock price went up
11  on July 31st, 2003?
12     A.  The only thing that I can think of, going
13  back and looking at the articles that were online,
14  was what Mr. Sprague and anyone else for the company
15  that may have come out with the seemingly positive
16  outlook for Wave with their maybe joint venture with
17  Intel, IBM or some other software.
18     So I -- I'm assuming that the analysts and
19  other investors as myself were banking on this would
20  be a good stock since they were going to hook up with
21  such good companies with past histories.
22     Q.  Okay.  And that's your understanding
23  sitting here today; is that correct?
24     A.  Yes.

Page 59

1      Q.  Okay.  What about before, you know, when
2  you made the purchase?  Because I think we discussed
3  before I think your answer was that you weren't aware
4  of the Intel -- any relationship between Wave and
5  Intel at that time.
6          MS. REILLY:  Objection to the form of
7  the question.  If you could ask him a question versus
8  trying to rephrase his responses.
9      Q.  Did you under -- did you have an
10  understanding on August 1st, 2003, that there was
11  some sort of relationship between Wave and Intel?
12     A.  I don't recall exactly when Mr. Sprague
13  made his comments, but I -- I recall, to the best of
14  my ability, around July 31st or August 1st that --
15  somewhere in that period of time that these articles
16  had come out.  And that's the reason.  Up until then,
17  no.  Not until the articles appeared.
18     Q.  Okay.  So let's just make sure that the
19  record is clear on this.
20     When you made your first purchase, what had
21  you read about Wave Systems?
22     A.  I had read, again, that the CEO,
23  Mr. Sprague, a representative of the company -- there
24  was a couple articles out there that TD Waterhouse

Page 60

1  had published that a bundling of products with Intel,
2  it may be going under a platform for future
3  computers.  And that's what I based my decision to
4  buy on.
5      Q.  So you had read those materials prior to
6  August 1st, 2003?
7      A.  As I said, whatever the time period was
8  before I made my purchase, yes.
9      Q.  Were you aware of any of Wave's forecast
10  for revenue at the time of your August 1st purchase?
11     A.  No.
12     Q.  Okay.  Was it your understanding that Intel
13  was required to purchase a minimum number of software
14  units from Wave?
15     A.  Not as I recall.
16     Q.  Okay.  Do you know -- was it your
17  understanding that they had to purchase any from
18  Wave?
19     A.  No.  That they didn't have to purchase any.
20     Q.  Okay.  And is it your contention that the
21  price of Wave stock was artificially inflated on
22  August 1st, 2003?
23          MS. REILLY:  Objection to the form of
24  the question.

Page 61

1          Do you understand the question?
2      A.  She -- well, go ahead and let her -- re --
3  re -- go ahead and ask me again and we'll...
4      Q.  Okay.  Is it your contention in this
5  lawsuit that the price of Wave stock was artificially
6  inflated on August 1st, 2003?
7          MS. REILLY:  Do you understand the
8  question?
9          THE WITNESS:  Yes.
10         MS. REILLY:  Okay.
11     A.  And that's the reason I'm not answering.
12     Q.  Do you know whether it's your contention in
13  this lawsuit that the price of Wave stock was
14  artificially inflated on August 1st, 2003?
15         MS. REILLY:  And just answer the
16  question to the ability that you can without
17  divulging conversations with counsel, which would be
18  privileged.
19     A.  Yes.
20         [PAUSE.]
21     A.  Yes.
22     Q.  Okay.  And did you sell all 10,000 shares
23  of Wave stock that you purchased on August 1st, 2003,
24  three days later, on August 4th, 2003, for $4.59?

16 (Pages 58 to 61)

Page 62

1    A.   Yes.
2    Q.   Okay.  Why is it your contention that the
3  price of Wave stock was artificially inflated on
4  August 1st, 2003?  What's the basis of that
5  contention?
6    A.   At this point in time?
7    Q.   Yes.
8    A.   Based on since -- since then, there has
9  been no product delivered; other secondary offerings.
10  So I felt like that this was -- was not a bona fide
11  product or service.  And somehow, like I say, there
12  was information that was conveyed that caused this to
13  go from 84 cents to $5 a share ever before it --
14    Q.   Okay.
15    A.   -- before I sold it at 2 on 11-25.  As I
16  continued to watch the stock and reports that may
17  have come in --
18    Q.   Okay.  Well, let's go through each purchase
19  and sale separately.
20    A.   Okay.  Sure.
21    Q.   Why did you sell all 10,000 shares of Wave
22  stock on August 4th, 2003?
23    A.   Again, this was a -- not a concrete rule of
24  thumb, but I had used it at this time; 10 percent

Page 63

1  gain.  If you'll notice, it's a little more than 10
2  percent.
3    Q.   Okay.  So you followed your internal rule
4  and sold at a 10 percent gain; is that correct?
5    A.   Yes.
6    Q.   And what, if anything, new had you learned
7  or read about Wave at the time of this sale that you
8  didn't know at the time of your August 1st purchase?
9    A.   Best I recall, there was two articles came
10  out about Wave from Mr. Sprague.  And, of course, one
11  of them was Intel and the other one was positive,
12  too.  But I can't recall what the other one said.
13  But both of them were positive concerning the stock.
14    Q.   Okay.  Did these articles contribute to
15  your decision to sell?
16    A.   Well, again, I used my rule of thumb, 10
17  percent, on this one.
18    Q.   And you made a $5,900 profit from the sale
19  of those shares; is that correct?
20    A.   If calculating correctly, yes.
21    Q.   So you're not claiming that you were
22  damaged by the sale of the shares that you purchased
23  on August 1st, 2003, are you?
24    A.   Not by the first purchase.

Page 64

1    Q.   And was your next purchase of wave stock on
2  August 5th, 2003?
3    A.   August 5th, correct.
4    Q.   Okay.  And did you purchase 2000 shares at
5  $4.50?
6    A.   Yes.
7    Q.   And why did you purchase Wave only one day
8  after you had just sold off all your Wave holdings?
9    A.   Because it had gone back down and I felt
10  like this was a time to buy it again.
11    Q.   Okay.  What, if anything, new had you read
12  about Wave at the time of this purchase?
13    A.   Well, in two days, nothing had changed.
14    Q.   And were you aware of any of Wave's
15  forecasts for revenue at the time of this purchase?
16    A.   No.
17    Q.   Is there any other information that you
18  relied on to make this purchase, any recommendations
19  from anyone?
20    A.   No.
21    Q.   Is it your contention that the price of
22  Wave stock was artificially inflated on August 5th,
23  2003?
24    A.   Yes.

Page 65

1    Q.   Okay.  Is it also your contention that the
2  price of Wave stock was inflated on August 4th of
3  2003, when you sold 10,000 shares?
4    A.   Yes.
5    Q.   So now we're on to your second sale.  And
6  did you sell all 2000 shares -- I'm sorry -- 20,000
7  shares on September 4th, 2003, at $3.20?
8    A.   Yes.
9    Q.   Okay.  And what information did you rely on
10  to make this sale?
11    A.   Not only my 20 percent rule of thumb, but
12  there was no other forthcoming news on how things
13  were progressing.  And you can see that was about a
14  month later, so that is not a day-trade.
15    Q.   Okay.  So you hadn't read anything new
16  about Wave?
17    A.   Not as I recall.
18    Q.   Okay.  And what was your understanding of
19  why the price dropped $1.39 from August 4th, 2002, to
20  September 4th, 2000 -- I'm sorry -- August 4th, 2003,
21  to September 4th, 2003?
22    A.   Well, again, there was no forthcoming
23  articles.  And that's the reason, again, I was using
24  the rule of thumb, that:  Why was it dropping?

17 (Pages 62 to 65)

MEDEIROS STENO & VIDEO GROUP          EAST COAST: 617.590.9767          WEST COAST:  415.652.9340
E-MAIL:  DEPO@GOMEDEIROS.COM                                              WWW.GOMEDEIROS.COM

fc455972-8130-4cd5-967e-287f1989649d

DEPOSITION OF RANDY KEITH GRIFFIN                                    5/9/06

Page 66

1    Q.  So you based your decision to sell on the
2  fact that there was no news and that the price was
3  falling?
4    A.  Yes.
5    Q.  Are you claiming that you were damaged by
6  the sale of this stock because of the conduct of any
7  of the Defendants?
8    A.  Yes.
9    Q.  Okay.  What conduct was that?
10    A.  Misleading information.
11    Q.  And what misinformation -- what misleading
12  information in particular?
13    A.  Well, there was no contract or consortium
14  with Intel or any other software company for their
15  security to be put on their platform.  Misleading
16  information.
17    Q.  Okay.  And where had you read -- had you
18  read this misleading information prior to these
19  purchases that we've discussed already?
20        MS. REILLY:  Objection to the form of
21  the question.
22        MS. MARTIN:  Okay.
23    Q.  Let me try to restate that one.
24        On September 4th, 2003, did you have any

Page 67

1  understanding one way or another of whether there was
2  an agreement between Wave Systems and Intel or any
3  other company?
4        MS. REILLY:  Objection to the form of
5  the question.  Other than he's already testified to?
6        MS. MARTIN:  I'm not sure that he's
7  testified that there -- that he was aware of any
8  agreement.
9        MS. REILLY:  I believe he testified
10  that when he initially purchased, he understood that
11  the company had an agreement with Intel and the
12  bundling of the software on their platforms.
13    Q.  Well, is that -- is that correct, sir?
14    A.  Yes.
15    Q.  Were you concerned that Wave's price had
16  fallen approximately 30 percent from your first sale
17  to your second sale?
18    A.  Yes.
19    Q.  Okay.  And despite knowing that the price
20  had fallen 30 percent between your first and second
21  sale, you continued to purchase Wave securities; is
22  that correct?
23    A.  Yes.
24    Q.  Okay.  And why did you continue to purchase

Page 68

1  Wave securities?
2    A.  If you'll go back and look from September
3  the 4th when I made a sale of 20,000 to September the
4  17th, the stock stabilized, 3.20 to 3.30.  So again,
5  I made a -- a decision to buy it back forthcoming
6  that may be good news that this was a price point
7  that it could hold at until whatever was coming from
8  the company in the future.  So I went back and bought
9  15,000 shares on 9-17.
10    Q.  Okay.  But based on your previous knowledge
11  of the Wave price fluctuations, you understood that
12  this was a risky purchase, didn't you?
13        MS. REILLY:  Objection to the form of
14  the question.
15    A.  All stocks are risky purchases.
16    Q.  Did you believe that your purchase of Wave
17  securities on 9-17-03 was a risky purchase?
18        MS. REILLY:  Objection to the form of
19  the question.
20    A.  I did not have any doubt that the stock was
21  still a bona fide purchase, that the company still
22  may be in the future in a relationship with Intel or
23  whomever.  So at this point, as I said, the stock did
24  not drop substantially in 13 days there, just 10

Page 69

1  cents -- or risen 10 cents.
2    Q.  So is the real reason that you purchased
3  stock on 9-17-03 because of the price stabilization?
4    A.  Yes.
5        MS. REILLY:  Objection to the form of
6  the question.
7    Q.  Okay.  And were there any other reasons
8  that you purchased Wave stock on 9-17-03?
9    A.  No.
10    Q.  And did you sell all 15,000 shares of
11  stock -- Wave stock that you purchased on 9-17-03
12  later that same day for $3.49?
13    A.  Yes.
14    Q.  Okay.  So why did you day-trade Wave stock
15  on 9-17-03?
16    A.  If I calculate correctly here, to make
17  about $3,000.  So what I was trying to do was recover
18  some of my losses from a previous trade, if you'll go
19  back.
20    Q.  Okay.  So you made your decision to sell
21  based on the increase in price; is that correct?
22    A.  Um-hum.
23    Q.  Had you learned anything new about Wave
24  between the time that you purchased Wave and sold

18 (Pages 66 to 69)

Page 70

1  Wave on 9-17-03?
2      A.  Not as I recall.
3      Q.  And you made approximately, what, $2,800
4  from this purchase and sale?
5      A.  Approximately.
6      Q.  So you are not claiming that you were
7  damaged by this sale -- this purchase and sale, are
8  you?
9          MS. REILLY:  Objection to the form of
10  the question.
11     A.  From this sale?  No.
12     Q.  What about your purchase on 9-17-03?  Are
13  you claiming that you were damaged in any way from
14  that purchase?
15         MS. REILLY:  Objection to the form of
16  the question.
17     A.  No, I'm not -- not for that one purchase.
18     Q.  Okay.  So three days later, on 9-17-03, you
19  made two separate purchases of Wave; is that correct?
20     A.  On 9-19 or 9-17?
21     Q.  I'm sorry.  9-19-03.
22     A.  I made two separation purchases, yes.
23     Q.  Okay.  And why did you make two separate
24  purchases on 9-17 -- 9-19-03?

Page 71

1      A.  I don't recall why I made two separate
2  purchases.
3      Q.  Okay.  Is that normal for you to do?
4      A.  I've done it once or twice; but, no, it's
5  not normal.
6          THE WITNESS:  Can we have a break?
7          MS. MARTIN:  Do you want another
8  break?  We can go off the record for a moment and
9  take another break.  Thanks.
10         [RECESS.]
11         BY MS. MARTIN:
12     Q.  I think we were talking about your third
13  purchase of Wave on 9-17-03 and your third of sale of
14  Wave on 9-17-03 before the break.
15     A.  Um-hum.
16     Q.  And I think actually we had finished that.
17  So let's move on to the fourth purchase of Wave --
18  fourth and fifth purchase on 9-19-03.
19         What, if anything, new had you read or
20  learned about Wave between your 9-17 purchase and
21  sale and your 9-19 purchase?
22     A.  I don't recall reading any new information.
23     Q.  Okay.  And why did you make the 9-19-03
24  purchase?

Page 72

1      A.  Again, based on price strictly that had
2  fallen and, again, as an investment.
3      Q.  Okay.  And -- and why did you want to
4  purchase because the price had fallen?
5      A.  Well, I felt like it was still in the
6  trading range of the price that I thought that it
7  could stabilize at.  And that's the reason I -- it's
8  also called dollar cost averaging.
9      Q.  So you make a lot of your stock purchasing
10  and selling decisions based on price movements; is
11  that correct?
12         MS. REILLY:  Objection to the form of
13  the question.
14     A.  Not every time.
15     Q.  Okay.  But you did in the case of Wave on
16  the 9-19-03 purchase; is that correct?
17     A.  Yes.
18     Q.  And is it your contention that the price of
19  Wave was artificially inflated on 9-19-03?
20     A.  Yes.
21     Q.  Okay.  And what is the basis for that
22  contention?
23     A.  Well, again, the articles that were
24  previously put out by Mr. Sprague.

Page 73

1      Q.  And what was -- when -- when was the
2  information that was either misleading or omitted
3  from those statements eventually disclosed to the
4  market?
5      A.  I don't recall.
6      Q.  Okay.  Do you know if it's ever been
7  disclosed to the market?
8      A.  No, I don't.
9      Q.  Okay.  And did you sell all of the shares
10  that you bought on 9-19-03 at $2 -- on 10-13-03 at
11  $2.85?
12     A.  Yes.
13     Q.  And is this the second time that you had
14  bought and sold Wave stock for a loss?
15     A.  I believe that's correct, by our trade
16  here.
17     Q.  Okay.  And why was it -- what was your
18  understanding of why the stock price of Wave had
19  dropped nearly 37 percent from August 4th, 2003, to
20  October 13th, 2003?
21     A.  That they were -- there was no product, no
22  commitment with Intel.  But, again, none of this was
23  put out specifically.
24     Q.  So that -- that's your understanding

19 (Pages 70 to 73)

Page 74

1  sitting here today; is that correct?
2      A.   That?
3      Q.   That that's the reason why there was the
4  price drop?
5      A.   Yes.
6      Q.   What was your understanding at the time
7  that you made your fourth sale of Wave on October
8  13th, 2003, as to why the price was dropping?
9      A.   Again, I had no basis.
10     Q.   So you did not -- you had no understanding
11  as to why the stock price was dropping?
12     A.   No.
13     Q.   Did you make any effort to find out why the
14  stock price was dropping?
15     A.   Well, again, I -- I only rely on what news
16  bulletins come across from TD.  And, of course,
17  they've got research and if there's nothing listed
18  there, then I guess it's what I go by.
19     Q.   Okay.  So were you concerned at this time
20  about the drop in price of Wave securities?
21     A.   No.
22     Q.   And why weren't you concerned?
23     A.   Because, again, it was within a range of
24  approximately 20 percent that --

Page 75

1      Q.   I'm sorry.  What was in a range of
2  approximately 20 percent?
3      A.   Price fluctuations.
4      Q.   Okay.  I think that -- that between August
5  4th, 2003, and October 13th, 2003, it had dropped
6  approximately 37 percent?
7      A.   I'm sorry.  I was looking back from 9-19 to
8  10-13.  I apologize.
9      Q.   Okay.  Is -- is that the type of price drop
10  that would cause you concern, a 37 percent price
11  drop?
12     A.   Not with every stock.
13     Q.   Okay.  What about with this stock?
14     A.   At the time, I was not concerned.
15     Q.   Okay.  And how much money had you lost
16  buying and selling Wave stock on August -- I mean,
17  October 13th, 2003?  Do you know?
18     A.   I do not know.
19     Q.   Okay.  And three days later, on October
20  15th, 2003, is it correct that you purchased -- I'm
21  sorry -- that you sold your Wave stock -- I'm
22  sorry -- that you purchased another 5,000 shares of
23  Wave stock?
24     A.   Yes.

Page 76

1      Q.   And why did you purchase Wave stock on
2  October 15th, 2003?
3      A.   Again, it had gone 10 percent up.  So,
4  again, stabilization of pricing.
5      Q.   Okay.  So the main reason for purchasing
6  Wave stock on October 15, 2003, was a price movement?
7      A.   Yes.
8      Q.   Is there anything that you had learned or
9  read about Wave at this time that affected your
10  purchase?
11     A.   I don't recall.
12     Q.   Is it normal for you to continue buying a
13  stock after you had already lost a fair amount of
14  money buying and selling that same stock?
15         MS. REILLY:  Objection to the form of
16  the question.
17     A.   No, it is not normal.
18     Q.   Okay.  Would you consider $25,000 a fair
19  amount of money?
20     A.   Depending.
21     Q.   Is it normal for you to continue buying
22  stock after you've already lost $25,000 buying and
23  selling it?
24         MS. REILLY:  Objection to the form of

Page 77

1  the question.
2      A.   No.
3      Q.   And did you sell the 5,000 shares of Wave
4  stock that you purchased on October 15th, 2003, on
5  November 25th, 2003?
6      A.   Yes.
7      Q.   Okay.  And why did you sell all your Wave
8  shares on November 25th, 2003?
9      A.   Because they had dropped to $2 a share and
10  I felt like at this time that it had got to a price
11  point when I first bought it at $4, it was 50 percent
12  less than the initial investment, and I would hold to
13  watch any further actions by the company before
14  reinvesting, if I did at all.
15     Q.   Okay.  So is it fair to say that you sold
16  all your shares of Wave stock on November 25th, 2003,
17  because of a price movement?
18         MS. REILLY:  Objection to the form of
19  the question.  That's not what he just testified.
20     Q.   Can you answer my question?
21         THE WITNESS:  Can I rely on you for --
22         MS. REILLY:  Can you reask the
23  question, please?
24     Q.   Did you understand my question?

20 (Pages 74 to 77)

Page 78

1    A.  No.  Would you ask it again?
2    Q.  Okay.  Did you sell all of your shares, all
3    5,000 shares, of Wave stock on November 25th, 2003,
4    because of a price movement?
5    A.  Yes.
6    Q.  Okay.  And is it your contention that Wave
7    stock was artificially inflated on November 25th,
8    2003?
9    A.  Yes.
10   Q.  And did you make any purchases of Wave
11   stock after November 25th, 2003?
12   A.  No.
13   Q.  Okay.  And why did you believe that wave
14   stock was artificially inflated on November 25th,
15   2003?
16   A.  At the time, I didn't know it was
17   artificially inflated.  But looking back, I do.
18   That's the reason I was saying I was basing on
19   information that had come out through any sources
20   that I was getting and also from the statements that
21   were coming from the executives of Wave.
22   Q.  Okay.  And at the time you sold your stock
23   on November 25th, 2003, had any of the omitted
24   information or misleading information that your --

Page 79

1    that you've mentioned been disclosed to the market?
2    A.  Again, I don't recall.
3    Q.  Sitting here today, are you aware of any
4    information that was disclosed to the market prior to
5    November 25th, 2003, that you claim was either
6    misleading or omitted?
7    A.  I don't recall.
8    Q.  So the answer is, no, sitting here today,
9    you're not aware of any?
10   A.  Yes, that's correct.
11   Q.  And after you sold all of your Wave shares
12   on November 25th, 2003, did you purchase Wave again?
13   A.  No.
14   Q.  Okay.  So that was your last purchase of
15   Wave ever --
16   A.  Yes.
17   Q.  -- on October 15th, 2003?
18   A.  As I recall.
19   Q.  And your last sale of Wave ever on November
20   25th, 2003?
21   A.  As I recall.
22   Q.  Okay.  So you didn't own any shares of Wave
23   from October 26th, 2003, to the present; is that
24   correct?

Page 80

1    A.  As I recall, I don't.
2    Q.  So the -- is the answer no?
3    A.  No.
4    Q.  So you do not claim that any of your Wave
5    losses were caused by a drop in Wave stock price that
6    occurred on December 18th, 2003, do you?
7    A.  No.
8    Q.  Do you care if Wave's value, stock value,
9    goes down because of this lawsuit?
10   A.  I'm going to rely on my counsel for that.
11   Q.  Well, it's not a question for your counsel.
12   It's a question for you.
13       Do you care personally whether or not Wave
14   stock value goes down?
15       MS. REILLY:  You can answer.
16       THE WITNESS:  Can I answer?
17       MS. REILLY:  Yes.
18   A.  Okay.  At this point in time, no.
19   Q.  And is that because you no longer own any
20   Wave stock?
21   A.  That's correct.
22   Q.  And if you did own Wave stock, would you
23   care?
24   A.  Yes.

Page 81

1    Q.  Do you know if any of the other named
2    Plaintiffs in this case still own Wave stock?
3    A.  I do not know.
4    Q.  Do you know if any of the members of your
5    class that you are seeking to represent still own
6    Wave stock?
7    A.  I do not know.
8    Q.  Okay.  Okay.  Other than what we've
9    discussed, have you ever purchased and sold Wave
10   securities other than the purchase and sales that
11   we've gone through today and that appear on
12   Exhibit 26?
13   A.  No.
14   Q.  Okay.  When you purchased your Wave stock
15   shares, did you give any thought to the fact that you
16   might be a plaintiff in a lawsuit against Wave?
17   A.  No.
18   Q.  Prior to your first Wave purchase, did you
19   know anything about Wave having a private placement
20   of Series H stocks and warrants in April of '03?
21   A.  No.
22   Q.  Do you know anything about that today?
23   A.  I'll leave that to my counsel.
24   Q.  No.  Again, the question's for you.  If you

21 (Pages 78 to 81)

Page 82

1  don't know, just state on the record that you don't
2  know.
3          Are you aware of that?
4      A.  Yes.
5      Q.  Okay.  And -- and what are you aware of?
6      A.  That there was some warrants that was
7  available for stockholders in whatever period of time
8  before I ever become involved in it.
9      Q.  Okay.  And what do you understand the
10  relation between those stock warrants and your
11  lawsuit to be, if any?
12      A.  I don't.
13      Q.  Do you know what the term "gross margin
14  contribution" means?
15      A.  No.
16      Q.  When did you first consider bringing a
17  lawsuit against Wave?
18      A.  I was first contacted by Darren Cheek, and
19  that was 2004.  I believe that's when I first was
20  contacted by them.
21      Q.  Okay.  And who is Darren Cheek?
22      A.  He is a partner or part of Schiffrin &
23  Barroway.  I'm sorry if I mispronounce it, but...
24          MS. REILLY:  And for the record, it's

Page 83

1  Darren Check, C-h-e-c-k.
2      A.  Or Check.
3      Q.  And did Mr. Check --
4      A.  Check.
5      Q.  -- contact you or did you contact him?
6      A.  No.  He contacted me.
7      Q.  Okay.  And how did he contact you?
8      A.  It was a -- letter or a card or some type
9  of mail.
10      Q.  Okay.  And you received that via US mail?
11      A.  Yes.
12      Q.  At what address did you receive that?
13      A.  I'm -- I'm going to say my home address,
14  7524 Green Meadow Drive, Tobaccoville.
15      Q.  But you're not certain?
16      A.  I'm not certain.
17      Q.  And what did that mailing say?
18      A.  It was informing me of there may be a class
19  action lawsuit against Wave Systems.
20      Q.  And what did you do in response to
21  receiving that mailing?
22      A.  I agreed to be a participant of it.  And in
23  March of '04, I sent certification back to Mr. Check
24  with any documents that he may have been asking for

Page 84

1  at the time.
2      Q.  Okay.  And when you say you agreed to be a
3  plaintiff, you received the mailing, what did you do
4  next?
5      A.  Well, I don't know whether I called him.  I
6  don't know whether I sent back in -- again, it's been
7  two years ago.  I don't know what he was asking for
8  as far as do I check a block and send it back to him
9  to agree to be part of it or -- of the --
10      Q.  Okay.  Sitting here today, you don't
11  recall --
12      A.  I don't recall.
13      Q.  -- exactly what you did; is that correct?
14      A.  No.  That's correct.
15          MS. MARTIN:  I'm going to mark a
16  number of exhibits.
17          [EXHIBIT NO. 28 MARKED FOR IDENTIFICATION.]
18      Q.  I'm handing you Exhibit 28, Certification
19  of Named Plaintiff Pursuant to Federal Securities
20  Laws.
21          Do you recognize this document?
22      A.  Yes.
23      Q.  Okay.  Is this your certification in this
24  case?

Page 85

1      A.  Yes.
2      Q.  Okay.  And does this accurately reflect
3  your trading in Wave securities?
4      A.  Yes.
5      Q.  Okay.  And are all the statements set forth
6  in this certification correct?
7      A.  Yes.
8          MS. MARTIN:  I'm going to mark another
9  exhibit.  Actually, this one has already been marked.
10  It's the amended complaint.  It's been marked Exhibit
11  No. 24.
12      Q.  Mr. Griffin, have you seen this document
13  before?
14      A.  Yes.
15      Q.  Okay.  When did you first see this
16  document?
17      A.  It was around October or November of 2004.
18  Probably November.
19      Q.  Okay.  And did you see this document before
20  it was filed by your attorneys?
21      A.  I don't recall.
22      Q.  Do you remember reviewing this document to
23  ensure that the -- that you agreed with everything
24  that it contained?

22 (Pages 82 to 85)

Page 86

1    A.   Yes.
2    Q.   Okay.  And you don't know whether you did
3  that before or after it was filed by your attorneys?
4    A.   I did it before.
5    Q.   Okay.
6    A.   And, again, some of the dates may be not
7  correct.
8    Q.   And did you participate in the preparation
9  of this document, other than just reviewing what your
10  attorneys had already drafted?
11    A.   Along with my legal counsel, whatever
12  questions they may have asked me.  And, again, I
13  don't know if any of this was pertinent to this or
14  not.
15    Q.   Okay.  So in addition to reviewing this
16  document after it was drafted, you also responded to
17  questions from your counsel; is that correct?
18    A.   If it was pertaining to this, yes.
19    Q.   Do you know whether the court has issued
20  any rulings regarding this amended complaint?
21    A.   I know that this amended complaint, that it
22  has gone before the Judge Ponser.  So, yes.
23    Q.   Okay.  And -- and what is your
24  understanding of -- what has happened?

Page 87

1    A.   That he has denied the claim by Wave for
2  dismissal of this judgment against Wave.
3    Q.   Okay.  And do you know when that decision
4  was made?
5    A.   January of this year.
6    Q.   Okay.  And where did you get the
7  information that forms the basis of the allegations
8  that are contained in Exhibit 24?
9    A.   Again, I rely on my counsel to do all the
10  research.
11    Q.   Okay.  And what is the class period for the
12  class that you're seeking to represent?
13    A.   Class period?
14    Q.   Do you know what a class period is?
15    A.   No.
16    Q.   Okay.  Do you understand that you're
17  seeking to be a representative of a class of
18  individuals who purchased Wave stock?
19    A.   Yes.
20    Q.   Okay.  And do you understand that that
21  class of individuals is limited in time frame?
22    A.   No.
23    Q.   Okay.  Can you describe to me the
24  misrepresentations and omissions that you're alleging

Page 88

1  that the Defendants made?
2    A.   Yes.
3    Q.   Okay.  And what are those?
4    A.   Based on the information I received and,
5  again, e-mail from whatever source it was, that there
6  was no product at the time that was going to be
7  bundled with Intel's platforms or whom's ever --
8  whoever's.  And so it was -- false information was
9  being given out.
10    Q.   Okay.  So let me make sure I understand
11  what you're saying.
12        Are you saying that -- that the company
13  Wave said that they had a product that could be
14  bundled?
15    A.   Yes.
16    Q.   And that that product did not, in fact,
17  exist?
18    A.   It either did not exist or at the time was
19  not ready to be put to market with Intel or whomever.
20    Q.   Okay.  So the gist of the alleged
21  misrepresentation or omission is that the product was
22  not actually ready or did not exist --
23    A.   Yes.
24    Q.   -- and could not be bundled; is that

Page 89

1  correct?
2    A.   That's correct.
3    Q.   Okay.  And what do you base this
4  understanding on?
5    A.   I base it on what has happened to Wave
6  since 2003.  In other words, this lawsuit that has
7  forth come because of that, that there was no product
8  or services that was ever marketed to Intel or anyone
9  else.
10    Q.   Okay.  Other than the omissions and
11  misrepresentations that you've just identified for
12  me, are there any others that you understand or are
13  alleging in this case?
14    A.   No.
15    Q.   Okay.  Can we show the witness what's
16  previously been marked as Exhibit 8?
17    A.   May I go back and --
18    Q.   I'm sorry?
19    A.   You were talking about class period.  I do
20  know of what dates that this alleged happened from
21  July 31st of 2003 til December 18th of 2003.  When
22  you say "class period," I thought you were talking at
23  a time frame of -- sometimes in law terms of statute
24  of limitations --

23 (Pages 86 to 89)

Page 90

1    Q.   Okay.
2    A.   -- of the --
3    Q.   Okay.  So what --
4    A.   -- lawsuit.
5    Q.   What do you understand to be the relevance
6  of the -- the time period that you just described?
7    A.   Any trades that were made and any
8  information that came from any executives or anyone
9  that was representing the company during that period
10 of time in which the stock was traded.
11   Q.   Okay.  And -- and what was the end date
12 that you mentioned?
13   A.   December 18th.
14   Q.   Okay.  And what happened on December 18th,
15 2003?
16   A.   Well, again, I don't know because I stopped
17 on 11-25.  I believe that's right.  I have to go back
18 and look.  So I had not followed with -- followed it
19 after then.
20   Q.   Okay.  You had no reason to follow it
21 because you didn't own any Wave shares; is that
22 correct?
23   A.   No.  I didn't own -- I didn't own any.
24   Q.   Okay.  So let's look at Exhibit -- what's

Page 91

1  been previously marked Exhibit 8.
2       Do you recognize this document?
3    A.   Yes.
4    Q.   Okay.  When was the first time you saw this
5  document?
6    A.   I don't recall.  I honestly don't.
7    Q.   Had you seen this document before you made
8  purchases of Wave securities or after you had sold
9  all your Wave securities?
10   A.   Before I made purchases.
11   Q.   And are you alleging that this document
12 contains misrepresentations or omissions?
13   A.   Yes.
14   Q.   Okay.  And can you tell me what those are?
15   A.   If you'll look in paragraph 2, "The
16 agreement will enable Intel to bundle Wave's software
17 and services with a future Intel desktop,
18 motherboard, targeted for trusted computing
19 platforms."
20   Q.   And what is misleading or omitted from
21 that?
22   A.   That there is already an agreement and
23 there is already a software or service that's
24 available for them.  Future can be a week, a year,

Page 92

1  two years.  I don't think that's relevant as far as
2  the time period of "future."
3    Q.   Okay.
4    A.   But an inference is made here that there is
5  product and services available at the present time.
6    Q.   Okay.
7       MS. MARTIN:  Can we look at Exhibit --
8  I'm sorry.
9    Q.   Is there anything else about this document
10 that you allege is misleading or any other omissions?
11   A.   Well, next-to-the-last paragraph, they also
12 say that they've recently announced -- Wave has
13 recently announced a licensing agreement with
14 National Semiconductor.
15      So, again, I'm taking that there is a
16 product or service that is available to be able to
17 put on these platforms.
18   Q.   Okay.  So --
19   A.   So that's another -- yes.
20   Q.   Okay.  So you believe that the
21 second-to-last paragraph that begins with "Wave
22 recently announced a licensing agreement..." --
23   A.   Um-hum.
24   Q.   -- also contains a material omission; is

Page 93

1  that correct?
2    A.   Yes.
3    Q.   Okay.  And what is the material omission
4  again?
5    A.   The material omission is that there is a
6  product or service available to go ahead, again, if
7  it's a week or a month or a year, for National
8  Semiconductor's use.
9    Q.   Okay.  All right.  Let's take a look now at
10 what's been previously marked Exhibit No. 9.
11      Have you seen this document before today?
12   A.   Yes.
13   Q.   Okay.  And when did you see this -- when
14 did you first see this document?
15   A.   If I'm not mistaken -- that's the reason we
16 go back about those exact dates -- this was some of
17 the information that I was using that was online to
18 make my decisions.
19      Now, it may not have been entire --
20 entire -- that I'm pretty sure it was the entire
21 articles.  So I have seen some of this before.
22   Q.   Okay.  So you either saw this or some
23 version of this --
24   A.   Yes.

MEDEIROS STENO & VIDEO GROUP          EAST COAST:  617.590.9767          WEST COAST:  415.652.9340
E-MAIL:  DEPO@GOMEDEIROS.COM                                              WWW.GOMEDEIROS.COM
                                                                         fc455972-8130-4cd5-967e-287f1989649d

Page 94

1    Q.  -- on the TD Waterhouse website.
2    A.  Yes.
3    Q.  Is that correct?
4    A.  Yes.
5    Q.  Okay.  And when did -- when do you think
6  you first saw this?
7    A.  I saw it at approximately the same time
8  that I was going to make my purchase of Wave while I
9  was watching it progress from June until my first
10  purchase, I think we said was August 4th.
11    Q.  Okay.  And -- and did you read it at that
12  time?
13    A.  Yes.
14    Q.  Okay.  And are you claiming today that it
15  contains material omissions or misrepresentations?
16    A.  Yes.
17    Q.  Okay.  Can you identify those for me,
18  please?
19    A.  Paragraph 2, "The compatibility of the
20  Wave's security software applications with IBM's
21  hardware and software security solution is a result
22  of Wave's successful participation in IBM's
23  Independent Software Vendor program."
24    Q.  And what do you claim is -- well, first of

Page 95

1  all, do you -- do you claim that this is a
2  misrepresentation or that this contains a material
3  omission?
4    A.  Well, again, a misrepresentation because
5  the next sentence says, This partnership is another
6  example of IBM's commitment to help independent
7  software vendors to use IBM's hardware and software
8  base security system to make computing as secure as
9  possible for the end user.
10    Q.  And what's the misrepresentation?
11    A.  That there is a bona fide product or
12  service available in IBM along with Wave will be
13  joint partners and using this in IBM's platforms or
14  software.
15    Q.  Okay.  Is there anything else about this
16  Exhibit 9 that you think is misleading?
17    A.  Again, paragraph 4, it specifically names
18  Wave's Document Manager Vault Application.  And when
19  it does that, to me, again, that there is a product
20  or service out there that will be used by IBM, or
21  anyone else, as how it's used here to talk about
22  security and how it will help with that.
23    Q.  Okay.  So you're also alleging in this
24  lawsuit that paragraph No. 4 contains a material

Page 96

1  omission or misrepresentation?
2    A.  Yes.
3    Q.  Okay.  Anything else on Exhibit 9?
4    A.  No.
5    Q.  Okay.  Okay.  Can we show the witness
6  what's been previously marked as Exhibit 10?
7        Have you seen this document before today?
8    A.  I -- I don't recall seeing it.  But, again,
9  it could have been one of those --
10    Q.  Okay.  Do you claim that this document
11  marked Exhibit 10 contains any material omissions or
12  misrepresentations in your lawsuit?
13    A.  Yes.
14    Q.  Okay.  And -- and what are they?
15    A.  Paragraph 1, under the body.
16    Q.  Okay.  And what about that paragraph?
17    A.  Wave Systems Corporation said yesterday
18  that it had agreed to a -- agreed to a deal with IBM
19  to embed its security software inside selected IBM
20  notebook and desktop computers.
21    Q.  Okay.  And do you understand this to be a
22  statement from Wave?
23    A.  Yes.
24    Q.  Okay.  And did you -- I think you said

Page 97

1  before that you -- you haven't seen -- you didn't see
2  this document or you don't recall --
3    A.  I don't recall.
4    Q.  -- seeing this document before you made any
5  Wave purchases; is that correct?
6    A.  Yeah.  I don't recall.
7        MS. MARTIN:  Okay.  Can we show the
8  witness what's been previously marked as Exhibit 11.
9    Q.  Have you seen this document before?
10    A.  I don't recall.
11    Q.  Okay.  Do you know if you're claiming that
12  it contains any material omissions or
13  misrepresentations?
14    A.  I have to rely on counsel.  I do not know
15  the content of this document.
16    Q.  Okay.  So you -- you didn't rely on this
17  document to make any purchases or sales of Wave
18  stock; is that correct?
19    A.  No.
20        MS. MARTIN:  Okay.  Let's show the
21  witness what's been previously marked as Exhibit 11?
22  Oh, did I just do 11?
23        MS. REILLY:  Yes.
24        MS. MARTIN:  Twelve, please.

MEDEIROS STENO & VIDEO GROUP          EAST COAST:  617.590.9767          WEST COAST:  415.652.9340
E-MAIL:  DEPO@GOMEDEIROS.COM                                                WWW.GOMEDEIROS.COM

fc455972-8130-4cd5-967e-287f1989649d

Page 98

1    Q.  Have you seen this document before?
2    A.  No.
3    Q.  Okay.  I'll represent that this document is
4  a transcript of a conference call regarding Wave
5  Systems that occurred on August 14th, 2003.  Did you
6  ever hear or read -- I'm sorry.
7        Did you ever hear a recording of a
8  conference call --
9    A.  No.
10   Q.  Okay -- for Wave securities?
11   A.  No.
12   Q.  And did you ever read any transcript of any
13  conference calls for Wave securities?
14   A.  No.
15   Q.  Do you know if you're claiming that there
16  were any misrepresentations or material omissions in
17  this conference call?
18   A.  Again, I'll have to rely on counsel for
19  this research.
20   Q.  Okay.
21   A.  I would not know.
22   Q.  Thank you.
23        Okay.  Exhibit 18 -- 17, have you seen this
24  document before today?

Page 99

1    A.  No.
2    Q.  Okay.  And do you know if you're claiming
3  that it contains any material omissions or
4  misrepresentations?
5    A.  Again, I have -- have to rely on counsel
6  for the research.
7    Q.  Okay.  So you didn't rely on this
8  document --
9    A.  No.
10   Q.  -- in making any purchases?
11   A.  No.
12   Q.  Okay.  Thank you.
13        Exhibit 18, please.  Have you seen this
14  document before today?
15   A.  No.
16   Q.  Okay.  Do you know if you're alleging that
17  it contains any material omissions or
18  misrepresentations in this lawsuit?
19   A.  I did not base my purchase on this.  I rely
20  on counsel for research.
21   Q.  Okay.  So you don't know whether you're
22  claiming it contains any material --
23   A.  No.
24   Q.  -- misrepresentations or omissions?

Page 100

1    A.  No.
2    Q.  Okay.  The last one, I promise, Exhibit 19.
3  Have you seen this document before?
4    A.  No.
5    Q.  Okay.  Do you know if you're alleging that
6  it contains any material omissions or
7  misrepresentations?
8    A.  Again, no, because I've not read the
9  contents of it.
10   Q.  Okay.
11   A.  And I rely on counsel for research.
12   Q.  Okay.  So you did not base any of your
13  purchases --
14   A.  No.
15   Q.  -- of Wave securities on it?
16        Okay.  Did you discuss the possibility of
17  filing this lawsuit with any other shareholder of
18  Wave securities?
19   A.  No.
20   Q.  Did you discuss the possibility of filing
21  this lawsuit with any other person --
22   A.  No.
23   Q.  -- other than your counsel?
24   A.  No.

Page 101

1    Q.  Okay.  Have you ever discussed this lawsuit
2  with your wife?
3    A.  Yes.
4    Q.  Okay.  What -- what have you discussed with
5  your wife about the lawsuit?
6    A.  That I was coming here yesterday for a
7  deposition today.
8    Q.  Is that about it?
9    A.  That's it.
10   Q.  Okay.  What about your children?
11   A.  No.
12   Q.  Have you discussed the lawsuit with your
13  children?
14   A.  No.
15   Q.  Are they aware that you're seeking to be a
16  named plaintiff in a class action lawsuit?
17   A.  I mentioned it yesterday to my youngest
18  son.
19   Q.  Okay.  And what was the content of that
20  discussion?
21   A.  Really, he didn't take any credence to it
22  as far as what I was doing here.
23   Q.  Okay.  Have you ever spoken with anyone who
24  might be a witness in this action?

26 (Pages 98 to 101)

MEDEIROS STENO & VIDEO GROUP         EAST COAST:  617.590.9767        WEST COAST:  415.652.9340
E-MAIL:  DEPO@GOMEDEIROS.COM                                          WWW.GOMEDEIROS.COM

fc455972-8130-4cd5-967e-287f1989649d

Page 102

1    A.   No.
2    Q.   Do you know who any of the potential
3  witnesses in this action might be?
4    A.   No.
5    Q.   Do you have any idea whether Steven Sprague
6  may be a witness in this case?
7    A.   Yes.
8    Q.   Okay.  And do you think he would be a
9  witness?
10    A.   Yes.
11    Q.   Okay.  What about Gerald Feeney?
12    A.   Yes.
13    Q.   Other than Steven Sprague and Gerald
14  Feeney, do you know of anyone else that you think
15  might be a witness in this case?
16    A.   No.
17    Q.   How did you select the attorneys who are
18  representing you in this case?
19    A.   Again, I was contacted by their law firm.
20    Q.   Okay.  Did you consider any other law
21  firms?
22    A.   No.
23    Q.   Who was the first attorney that spoke to
24  you about bringing this lawsuit?  Was that Darren

Page 103

1  Check?
2    A.   Darren Check.
3    Q.   Okay.  And you spoke to him by telephone?
4    A.   I either spoke to him or, again, it was in
5  written form.
6    Q.   Okay.  You don't recall?
7    A.   But I'm pretty -- I am almost 100 percent
8  positive we did speak.  But, again, I can't recall
9  it.
10    Q.   Do you know any of your attorneys -- did
11  you know your attorneys prior to this first contact?
12    A.   No.
13    Q.   Approximately how many times have you met
14  with your counsel about this case?
15    A.   Once.
16    Q.   Okay.  And when was that -- when was that?
17    A.   Yesterday afternoon.
18    Q.   Okay.  Prior to yesterday afternoon, you've
19  never met with your counsel?
20    A.   No.
21    Q.   Okay.  And how many times have you spoken
22  with your counsel since this first contact?
23    A.   Approximately six.
24    Q.   Okay.  And do you recall when those

Page 104

1  occasions were?
2    A.   No.
3    Q.   Do you communicate with your counsel via
4  e-mail?
5    A.   Yes.
6    Q.   Okay.  How frequently do you communicate
7  via e-mail?
8    A.   When it's necessary, but we probably e-mail
9  six, half a dozen times.
10    Q.   How many times have you checked in with
11  your lawyers regarding the progress of this lawsuit?
12    A.   Personally, I've called them once.  But
13  most of the time, I did not have to because they are
14  keeping me informed of it.
15    Q.   Okay.  And how are they keeping you
16  informed?
17    A.   Through writing.
18    Q.   What is your understanding of what a class
19  action is?
20    A.   What it is is seeking a fair and adequate
21  settlement or -- for -- for all interest of the
22  claim --
23    Q.   Okay.
24    A.   -- of all parties.

Page 105

1    Q.   Is it your understanding that this class
2  action could go to a jury trial?
3    A.   Yes.
4    Q.   Okay.  And did you consider any
5  alternatives to bringing this case as a class action?
6    A.   No.
7    Q.   Okay.  And what are the total possible
8  damages that you're claiming in this class action?
9    A.   I've not computed in -- I'll leave that to
10  counsel.
11    Q.   Okay.  Are you familiar with the
12  requirements for bringing a suit as a class action?
13    A.   The only responsibility I know is that I
14  retained Schiffrin & Barroway as my counsel to
15  represent me in all matters with this.
16    Q.   Okay.  Other than your reliance on counsel,
17  are you aware of any responsibilities or obligations
18  that you have in connection with this lawsuit?
19    A.   The only -- if I have to go to a jury
20  trial, that I will have to be there in Springfield,
21  Massachusetts.
22    Q.   Okay.  Other than retaining counsel and
23  attending a possible trial, is there anything else?
24    A.   Not as I recall.

27 (Pages 102 to 105)

MEDEIROS STENO & VIDEO GROUP    EAST COAST:  617.590.9767    WEST COAST:  415.652.9340
E-MAIL:  DEPO@GOMEDEIROS.COM                                      WWW.GOMEDEIROS.COM

fc455972-8130-4cd5-967e-287f1989649d

Page 106

1    Q.   Okay.  Do you have a fee agreement with
2    counsel?
3    A.   No.
4    Q.   Okay.  How are your -- what's your
5    understanding of how your attorneys are going to be
6    paid?
7    A.   If there is a settlement, it will come --
8    be forthcoming from it.
9    Q.   So they'll get a percentage of any
10   recovery --
11   A.   Yes.
12   Q.   -- that you obtain in this action; is that
13   correct?
14   A.   That's correct.
15   Q.   What -- what happens if there is no
16   recovery in this action, who pays your -- your
17   counsel's fees and costs?
18   A.   They incur it upon themselves.
19   Q.   Okay.  Have you agreed to pay any costs for
20   bringing this action?
21   A.   None.
22   Q.   Would you be willing to pay any costs?
23   A.   No.
24   Q.   Has anyone promised you a certain amount of

Page 107

1    money if this case settles?
2    A.   No.
3    Q.   Has anyone suggested to you that you would
4    recover more than any other Plaintiff?
5    A.   No.
6          MS. MARTIN:  I'd like to take a short
7    break and then come back with maybe a couple
8    follow-up questions, and that should be it.
9          MS. REILLY:  Sure.
10         MS. MARTIN:  We're off the record.
11   [DISCUSSION OFF THE RECORD.]
12         [RECESS.]
13         MS. MARTIN:  We'll go back on the
14   record.
15         And could you show the witness what's
16   been previously marked as Exhibit 22?
17   BY MS. MARTIN:
18   Q.   Have you seen this document before?
19   A.   Yes.
20   Q.   Okay.  And what is this document?
21   A.   Plaintiff's Response to Defendants' First
22   Set of Inter -- Interrogatories.
23   Q.   You got it.
24         And did you review this document before

Page 108

1    your attorneys served it?
2    A.   How could I review it before my attorney
3    served it?
4    Q.   I'm sorry.
5    A.   You meant to the courts?
6    Q.   Yes.  Yes.
7    A.   Yes.
8    Q.   That's a legal term.
9    A.   Yes.
10   Q.   Did you review this document before March
11   31st, 2006?
12   A.   As I recall, I did.  But, again --
13   Q.   Take a -- take a second to look at it and
14   just make sure that this is what you reviewed.
15         [PAUSE.]
16   A.   I don't believe I did see it before they
17   presented it to the court, but I don't recall.
18   Sorry.
19   Q.   Okay.  So you don't recall one way or the
20   other --
21   A.   No.
22   Q.   -- whether you saw this before it was given
23   to the court?
24   A.   Huh-uh.

Page 109

1    Q.   Did you provide your attorneys with any
2    information regarding the interrogatories or
3    questions that appear in that document?
4    A.   Yes.
5    Q.   You specifically recall providing them with
6    information?
7    A.   Yes.
8    Q.   Okay.
9    A.   My trades or -- yes.
10   Q.   And are you related to anyone at Wave
11   securities?
12   A.   No.
13   Q.   Do you know personally or socially anyone
14   at Wave securities?
15   A.   No.
16         MS. MARTIN:  Okay.  I have no other
17   questions.
18         MS. REILLY:  Okay.  I have just one
19   question to ask the witness.
20         CROSS-EXAMINATION
21   (BY MS. REILLY)
22   Q.   Mr. Griffin, do you -- what do you
23   understand to be the duties and obligations of a lead
24   plaintiff for a class representative?

MEDEIROS STENO & VIDEO GROUP          EAST COAST:  617.590.9767          WEST COAST:  415.652.9340
E-MAIL:  DEPO@GOMEDEIROS.COM                                              WWW.GOMEDEIROS.COM

fc455972-8130-4cd5-967e-287f1989649d

Page 110

1    A.  Well, it's to represent each one that's in
2  the class action also -- lawsuit, again, fairly and
3  equally in all manners, to deal with counsel of any
4  of the research or any of the decisions that are made
5  in the class action lawsuit.
6        Also, to discuss with them what fees or
7  costs may be incurred that could happen in this
8  lawsuit if -- for settlement, if there is a
9  settlement, if it were a class action lawsuit.  And
10 then all responses to -- to oversee, to the best of
11 my ability, of -- of information that they may be
12 presenting be true and factual.
13       So, again, to be more involved in it as a
14 lead than just someone that's coming on as part of
15 the class action lawsuit.
16       MS. REILLY:  I have no other
17 questions.
18       MS. MARTIN:  Anyone else?
19       Okay.  I think that's it.  We're off
20 the record.
21       [SIGNATURE RESERVED.]
22       [DEPOSITION CONCLUDED AT 11:45 A.M.]
23
24

Page 112

TRANSCRIPTION CORRECTIONS

1
2  CASE NAME:  Anne Brumbaugh, Gary L. Harmon and Randy K.
3  Griffin V. Wave Systems Corporation, John E. Bagalay,
4  Jr., Steven K. Sprague and Gerard T. Feeney
5  CASE NO:  3:04-CV-30022(MAP)
6  WITNESS NAME:  RANDY KEITH GRIFFIN
7  DATE: _____
8  PAGE  LINE        READS          SHOULD READ
9  ____|____|_____|_____
10 ____|____|_____|_____
11 ____|____|_____|_____
12 ____|____|_____|_____
13 ____|____|_____|_____
14 ____|____|_____|_____
15 ____|____|_____|_____
16 ____|____|_____|_____
17 ____|____|_____|_____
18 ____|____|_____|_____
19 ____|____|_____|_____
20 ____|____|_____|_____
21 ____|____|_____|_____
22 ____|____|_____|_____
23 ____|____|_____|_____
24

Page 111

1
2  STATE OF NORTH CAROLINA  )
3  SS:                      )
4  COUNTY OF STOKES         )
5
6        I, RANDY KEITH GRIFFIN, declare under
7  the penalties of perjury under the State of North
8  Carolina that the foregoing is true and correct.
9        Executed on this _____ day of _____
10 2006, at _____, North Carolina.
11
12
13
14       _____
15            RANDY KEITH GRIFFIN
16
17 This deposition was signed in my presence by
18 _____, on the _____ day of
19 _____, 2006.
20
21
22       _____
23       Notary Public
24       My Commission Expires:

Page 113

1  STATE OF NORTH CAROLINA
2  COUNTY OF WAKE
3        C E R T I F I C A T E
4        I, RANAE McDERMOTT, RMR, CRR, a Notary Public
5  in and for the State of North Carolina, do hereby
6  certify that there came before me on May 9, 2006, the
7  person hereinbefore named, who had been previously
8  sworn to testify to the truth and nothing but the truth
9  of his knowledge concerning the matters in controversy
10 in this cause; that the witness was thereupon examined
11 under oath, the examination reduced to typewriting
12 under my direction; and the transcript is a true record
13 of the testimony given by the witness.
14       I further certify that I am neither attorney
15 or counsel for nor related to or employed by, any
16 attorney or counsel employed by the parties hereto or
17 financially interested in the action.
18       IN WITNESS WHEREOF, I have hereunto set my
19 hand and affixed my official seal, this the 11th day of
20 May, 2006.  _____
21
22       RANAE McDERMOTT, NOTARY PUBLIC
23       My Commission Expires:  4/28/07
24

29 (Pages 110 to 113)

MEDEIROS STENO & VIDEO GROUP        EAST COAST:  617.590.9767        WEST COAST:  415.652.9340
E-MAIL:  DEPO@GOMEDEIROS.COM                                         WWW.GOMEDEIROS.COM

fc455972-8130-4cd5-967e-287f1989649d