```
 1                FOR THE DISTRICT OF MASSACHUSETTS

 2

    ANNE BRUMBAUGH, GARY L. HARMON,  )
 3  and RANDY K. GRIFFIN,            )
                                     )
 4            Plaintiffs,            )     Civil Action
                                     )     No. 3:04-CV-30022
 5  v.                               )        (MAP)
                                     )
 6  WAVE SYSTEMS CORPORATION,        )
    JOHN E. BAGALAY, JR., STEVEN K.  )
 7  SPRAGUE and GERARD T. FEENEY,    )
                                     )
 8            Defendants.            )
                                     )

 9

10         Deposition of GARY L. HARMON, taken on behalf of

11  the Defendants, in the above-entitled action, on Friday,

12  May 26, 2006, at 8:45 a.m., at Omni Jacksonville Hotel,

13  245 Water Street, Jacksonville, Florida, before Teresa

14  S. DeCiancio, RDR, CRR, FPR, and Notary Public in and

15  for the State of Florida at Large.

16

17                         -  -  -
```

Page 2

```
 1            A P P E A R A N C E S
 2    COUNSEL FOR THE PLAINTIFFS:
 3         KAREN REILLY, ESQ.
 4         TODD M. MOSSER, ESQ.
 5         SCHIFFRIN & BARROWAY, LLP
 6         280 King of Prussia Road
 7         Randor, PA  19087
 8         Telephone:  (610) 822-2212
 9         Facsimile:  (610) 66-7056
10
11    COUNSEL FOR THE DEFENDANTS:
12         SARA A. MARTIN, ESQ.
13         BINGHAM McCUTCHEN, LLP
14         150 Federal Street
15         Boston, MA  02110-1726
16         Telephone:  (617) 951-8653
17         Facsimile:  (617) 951-8736
18         sara.martin@bingham.com
19
20
21
22
23                  - - -
24
```

Page 3

```
 1              I N D E X
 2    WITNESS
 3      GARY L. HARMON
 4        DIRECT EXAMINATION BY MS. MARTIN............... 3
 5
 6              E X H I B I T S
 7    FOR IDENTIFICATION
 8    BRUMBAUGH 25 (previously marked).................. 40
 9    HARMON EXHIBIT 29................................. 44
10    HARMON EXHIBIT 30................................. 48
11    HARMON EXHIBIT 31................................. 48
12    HARMON EXHIBIT 32................................. 87
13    BRUMBAUGH 24 (previously marked).................. 105
14    BRUMBAUGH 8 (previously marked)................... 108
15    BRUMBAUGH 9 (previously marked)................... 114
16    BRUMBAUGH 10 (previously marked).................. 116
17    BRUMBAUGH 11 (previously marked).................. 120
18    BRUMBAUGH 12 (previously marked).................. 120
19    BRUMBAUGH 17 (previously marked).................. 127
20    BRUMBAUGH 18 (previously marked).................. 128
21    BRUMBAUGH 19 (previously marked).................. 129
22
23    WITNESS REVIEW LETTER............................. 137
24    ERRATA SHEET...................................... 138
```

Page 4

```
 1             S T I P U L A T I O N
 2       It was stipulated and agreed by and between counsel
 3  for the respective parties, and the witness, that the
 4  reading and signing of the deposition by the witness be
 5  waived.
 6                       - - -
 7       (The witness was sworn by the court reporter.)
 8       MS. MARTIN:  And the parties have agreed that
 9  all objections except as to form will be reserved
10  until the time of trial and that the witness will
11  review and sign, and we'll attempt to do so on an
12  expedited basis given the current briefing schedule.
13                       - - -
14            GARY L. HARMON,
15  acknowledged having been duly sworn to tell the truth
16  and testified upon his oath as follows:
17       THE WITNESS:  I do.
18            DIRECT EXAMINATION
19  BY MS. MARTIN:
20   Q    Good morning, sir.
21   A    Good morning.
22   Q    My name is Sara Martin, and I represent the
23  defendants in this case.  Have we met before today?
24   A    We have not.
```

Page 5

```
 1   Q    Could you please state your full name for the
 2  record?
 3   A    Gary Lee Harmon.
 4   Q    And what is your current residential address?
 5   A    2815 Sylvan Lane North in Jacksonville,
 6  Florida.
 7   Q    And have you ever had your deposition taken
 8  before, sir?
 9   A    For this case?
10   Q    No, in any case.
11   A    In any case.  Yes, I've given depositions,
12  uh-huh.
13   Q    Okay.  And how many times have you given
14  depositions?
15   A    Two.
16   Q    And when was the first time you gave a
17  deposition?
18   A    Probably in 1971 maybe?  '70, '71.
19  Probably '71 --
20   Q    And where was --
21   A    -- or '72.
22   Q    -- the lawsuit?
23   A    It was here in Jacksonville, uh-huh.
24   Q    And what was the issue in the lawsuit?
```

Page 6

1  A  I think I was just named as a blanket party for
2  the university where I work, and the suit was about
3  someone wanting the job that I was granted.
4  Q  Okay. So were you a plaintiff or defendant in
5  that lawsuit?
6  A  I was a defendant, yeah.
7  Q  And is that case still pending, or has that
8  case been resolved?
9  A  No. It was washed out. Yeah, washed out.
10  Q  And when was the lawsuit resolved?
11  A  The last one was resolved probably a year and a
12  half ago.
13  Q  No, I'm sorry. I'm still talking about the
14  first lawsuit.
15  A  Oh, the first. Okay.
16  Q  Yeah. When was that first lawsuit resolved?
17  A  Oh, I think probably right there in -- almost
18  as soon as it got started in '71 or '72.
19  Q  Okay. And now let's talk about the second
20  lawsuit --
21  A  Uh-huh.
22  Q  -- that you were involved in that you gave a
23  deposition in. When was that lawsuit?
24  A  That was two years ago, two or -- excuse me.

Page 7

1  It was three years ago. And it concerns a professor who
2  went up for full professor, and I was on the tenure
3  committee, one of the professors reviewing her -- her
4  file. So it was a discrimination case. And that was
5  settled -- oh, I think that was settled a year ago.
6  Yeah.
7  Q  Okay.
8  A  Uh-huh, at least a year, maybe a year and a
9  half.
10  Q  Were you either a plaintiff or defendant in
11  that lawsuit?
12  A  I think I was sort of blanketed. I never saw
13  the actual written document, but I assume because I was
14  brought in to give a deposition that I was one of the
15  people who -- everybody practically who had any
16  connection with this person was depositioned.
17  Q  And was that lawsuit settled?
18  A  Yes.
19  Q  And it was settled, I think you said, three
20  years ago or -- no?
21  A  No. It started three years ago. About a year
22  and a half, I think.
23  Q  Okay.
24  A  Yeah.

Page 8

1  Q  So have you ever had your deposition taken in a
2  securities lawsuit before?
3  A  No.
4  Q  Well, let me give you a quick refresher of how
5  the deposition process works. I'm going to ask
6  questions today.
7  A  Uh-huh.
8  Q  I'd ask that you listen and answer each
9  question truthfully and completely. Everything you say
10  will be taken by the court reporter, so please give oral
11  responses as opposed to verbal ges- -- I mean gestures
12  such as nodding your head or shaking your head.
13  A  Right.
14  Q  Please wait until I'm finished asking the
15  question before you begin your answer. And remember
16  that your responses are given under oath and have the
17  same force and effect as those sworn in a court of law
18  before a judge.
19      If you don't understand one of the questions
20  that I'm asking, please ask me to rephrase the question.
21  If you answer a question, I will assume that you
22  understood the question.
23      If you need to take a break, please let me
24  know.

Page 9

1      Do you have a clear understanding of how this
2  process will work?
3  A  I do, uh-huh.
4  Q  Are you taking any medications today that would
5  prevent you from hearing, understanding or responding to
6  my questions?
7  A  No.
8  Q  What did you do to prepare for your deposition
9  today?
10  A  Well, I looked over the documents that I had
11  been sent from the law firm, Schiffrin, and by Karen
12  Reilly, I believe. And then -- and then yesterday we
13  refreshed my memory of the events that gone along the
14  way.
15  Q  Can you tell me which documents were sent to
16  you by Ms. Reilly that you reviewed?
17  A  Well, all the court filings. I believe that
18  really covers it, all the court filings that they were
19  preparing.
20  Q  Did you review any of the Wave press releases?
21  A  Well, I --
22      MR. MOSSER: I object to that question.
23      MS. MARTIN: To the form of the question?
24      MR. MOSSER: And if you're asking what we

Page 10

1   reviewed together yesterday, that would be
2   privileged.
3       MS. MARTIN: I don't believe that is
4   privileged. What the witness looked at is not a
5   privileged communication.
6       MR. MOSSER: Well, I don't understand the
7   question. Could you perhaps restate it?
8       MS. MARTIN: Sure.
9   A   You mean when I was buying the stock?
10  Q   No, no, in preparation for your deposition --
11  A   Oh.
12  Q   -- did you review Wave press releases?
13  A   Well, there -- I think that he is correct,
14  that --
15      MR. MOSSER: Yeah.
16  A   -- this is -- I did not before yesterday review
17  any of the press review.
18  Q   Okay. And did you review any SEC filings that
19  were filed by Wave Systems?
20  A   Did I review them? No.
21  Q   In preparation for your deposition today, did
22  you review any SEC filings?
23  A   Not -- no.
24  Q   And did you take any notes when you met with

Page 11

1   your attorneys yesterday?
2   A   Yes.
3   Q   Okay. And do you have those notes with you
4   today?
5   A   No.
6   Q   And how long approximately did you meet with
7   your attorneys yesterday?
8   A   Three hours.
9   Q   Other than meeting with your attorneys
10  yesterday and reviewing materials that were sent to you
11  by Ms. Reilly, did you do anything else to prepare for
12  your deposition today?
13  A   Not really.
14  Q   And when you say not really, does that mean no?
15  A   You mean in the last few days?
16  Q   I mean to prepare for your deposition in
17  general.
18  A   Well, I've collected materials over a period of
19  the last couple of years -- two or three years, or two
20  years or so.
21  Q   And what materials have you collected over the
22  last few years?
23  A   All of the filings that the -- Karen Reilly and
24  Todd had prepared for the case to present to the judge.

Page 12

1   Q   And you reviewed all of those filings?
2   A   I said I collected them. I mean, that was
3   preparation. That's my preparation. I collect them
4   and -- what do you mean read them when they are given to
5   me?
6   Q   I guess I'm trying to understand what you mean
7   by collected materials. Did you collect materials to
8   give to your attorneys to produce in this case? Is that
9   what you're referring to?
10  A   No, no.
11  Q   Okay.
12  A   I'm just saying that to prepare for this case
13  my answer is that I collected the materials, okay, that
14  were all of the court filings and that's all. I've read
15  them, of course.
16  Q   Well, that was my follow-up questions. So
17  you've --
18  A   Oh, sure.
19  Q   -- read all the filings in this case?
20  A   As they came to me, uh-huh.
21  Q   And what is your date of birth, sir?
22  A   August 16, 1935.
23  Q   And are you married?
24  A   Yes.

Page 13

1   Q   Okay. What's your wife's name?
2   A   Deborah.
3   Q   Okay. And do you have any children?
4   A   Yes.
5   Q   How many children do you have?
6   A   Three boys.
7   Q   And how old are your three boys?
8   A   Well, one is about 39, and then my middle son
9   is 36, and the youngest is -- let's see. He must be 31.
10  Q   Are any of your sons in the securities
11  industry?
12  A   No.
13  Q   Okay. Is your wife in the securities industry?
14  A   No.
15  Q   Do you have any family members in
16  Massachusetts?
17  A   No.
18  Q   Do you have any family members that are
19  affiliated with Wave Systems?
20  A   No.
21  Q   Are you generally in good health?
22  A   Generally, yeah.
23  Q   Okay.
24  A   Uh-huh.

Page 14

1   Q   Are any of your family members in the computer
2   hardware or software industries?
3   A   No.
4   Q   Are you related to any of the lawyers involved
5   in this case?
6   A   No.
7   Q   Do you know who Steven Sprague is?
8   A   Yes.
9   Q   Who is Steven Sprague?
10  A   Well, he's the CEO of Wave Systems.
11  Q   Do you know who Gerald [sic] Feeney is?
12  A   Yes.
13  Q   Who is Gerald Feeney?
14  A   Well, he's the CFO of Wave Systems.
15  Q   And beginning with your graduation from high
16  school, could you give me a short synopsis of your
17  educational background, please?
18  A   Well, I attended college for four years in
19  Nebraska and earned a BA, and then I left immediately to
20  go to Indiana University where I -- over the period of
21  the next four years, from '60 to '64, I earned two
22  Master's Degrees. And then I taught for a couple of
23  years and then studied and returned to Indiana
24  University where I earned a Ph.D. in the next two years.

Page 15

1   Q   Okay. And what were the subjects of your
2   Master Degrees?
3   A   Well, one was on college counseling behavior,
4   and the dissertation probably -- I didn't write a
5   thesis for one of those degrees -- and the other one is
6   attitudes among men in dormitories. But the
7   dissertation was on decision making in higher education
8   institutions, academic decision make.
9   Q   And you mentioned that you also were teaching
10  during this period. What courses did you teach?
11  A   Yes. Well, freshman English, and, during that
12  period, let's see -- and American literature, history of
13  the novel, drama, poetry.
14  Q   Have you ever taught any business-related
15  courses such as accounting, business administration,
16  tax?
17  A   No, never.
18  Q   Have you ever taken any business courses such
19  as accounting, business administration or tax?
20  A   When I was a freshman I took accounting and
21  found I was allergic to it, so that ended the business
22  major.
23  Q   Other than what we've discussed --
24  A   Uh-huh.

Page 16

1   Q   -- do you have any education in securities
2   analysis or training in evaluating securities?
3   A   No training.
4   Q   And are you presently employed?
5   A   I am.
6   Q   And by whom are you employed?
7   A   University of North Florida.
8   Q   What's your business address?
9   A   That is the Department of World Languages at
10  the University of North Florida in Jacksonville,
11  Florida.
12  Q   What is your title at the University of
13  Florida?
14  A   I'm chairman of that department.
15  Q   And what department is that again?
16  A   The Department of World Languages.
17  Q   Okay. Approximately how many hours per week do
18  you work at the University of Florida?
19  A   Only about 30.
20  Q   Do you have the summers off?
21  A   No.
22  Q   So do you teach summer courses as well?
23  A   No. I'm not a teacher. I'm just the chairman
24  of the department. I retired as a professor three years

Page 17

1   ago.
2   Q   Okay. So let's do a brief synopsis of your
3   employment history, then, starting from, you mentioned
4   earlier, some early teaching positions.
5   A   Well, I taught as a graduate assistant at
6   Indiana University in 1960- -- actually, 1959 and '60.
7   Then I taught in a community college in Michigan from
8   1964 to '66. And then in 1960- -- let's see. How did
9   that work? '66, '67 I chaired a division at a state
10  university in Kentucky. And then -- I was there for
11  four years. And then in 1971 I came to the University
12  of North Florida where I became chairman of the
13  Department of Languages and Literature and was a
14  professor of literature for the next 32 years, I think.
15      Then I retired as a professor in 2003, and then
16  became -- I went back -- they hired me as the chairman
17  of the World Languages Department. So I'm simply a
18  part-time administrator.
19  Q   Have you ever been a plaintiff in another
20  securities-related lawsuit?
21  A   Plaintiff, no.
22  Q   Have you ever been a defendant in another
23  securities-related lawsuit?
24  A   No.

Page 18

1  Q   Have you ever been otherwise involved as a
2  witness or --
3  A   I was a witness.
4  Q   Okay. In a securities-related lawsuit?
5  A   Yes.
6  Q   And when was that?
7  A   Let's see. It was -- it was in the 1990s, late
8  1990s, and it involved --
9      MR. MOSSER: Just answer the question.
10     THE WITNESS: Okay. Okay. Yes. Thank you.
11 Q   And where was this lawsuit filed?
12 A   Well, with the SEC in New York City.
13 Q   And who was the defendant in the lawsuit?
14 A   You know, I can't quite remember. I think it
15 started with an H, Hunaman -- Huniman -- Huntingman
16 (phonetic) maybe? I'm not sure just who the defendant
17 was.
18 Q   Do you know what kind of company the defend- --
19 was the defendant a company or an individual?
20 A   Individual.
21 Q   Oh. And what type of employment was that
22 individual in?
23 A   He published magazines. I don't know whether
24 he still publishes magazines, but, anyway, that's what

Page 19

1  he did.
2  Q   And how was it a securities-related lawsuit?
3  A   He had been a client of these brokers, and he
4  was suing them because they made about a $250,000
5  purchase without his permission.
6  Q   And what was your role in the case?
7  A   I had been treated likewise, so I was selected
8  by a lawyer, his attorney, to testify about how I was
9  treated and my account was handled.
10 Q   And you -- and from your description it sounds
11 like you did not become a plaintiff in that lawsuit --
12 A   No.
13 Q   -- is that correct?
14 A   That's correct.
15 Q   Why did you choose not to become a plaintiff in
16 that lawsuit?
17     MR. MOSSER: Objection to the form of the
18     question.
19 Q   You can answer.
20 A   Well, I don't know that I had a choice. Oh,
21 probably because I didn't have enough money, how about
22 that? You know.
23     MR. MOSSER: Try not to guess.
24 Q   Do you know -- sitting here today, do you know

Page 20

1  why you didn't become a plaintiff in that lawsuit, or
2  are you merely speculating?
3  A   I'm just saying that it would have -- it would
4  not have occurred to me because I didn't have enough
5  money to carry forward such a lawsuit.
6  Q   And why did you agree to be a witness in that
7  case?
8  A   Well, I was upset at the way I was treated. It
9  was illegal, I knew.
10 Q   And was this individual Hunaman, who was the
11 defendant, or whoever -- whatever -- whoever the
12 defendant was, was that your broker as well?
13 A   Yes. Yeah, that was the point that we had
14 shared this broker.
15 Q   Okay. And the lawsuit was brought by the SEC?
16 A   No. The SEC heard the case.
17 Q   I see.
18 A   Yeah, the lawyer took it to the SEC.
19 Q   Okay. And did you give a deposition in that
20 case?
21 A   Incidentally, the SEC closed down the company,
22 so...
23     MR. MOSSER: Answer the question.
24     THE WITNESS: Okay.

Page 21

1  A   What?
2  Q   Did you give a deposition in that case?
3  A   Yes. Not a deposition, no. I was just a
4  witness.
5  Q   So you were a witness at a hearing; is that
6  correct?
7  A   Yes.
8  Q   And do you have a transcript from that hearing?
9  A   No.
10 Q   Did you ever receive a transcript of that
11 hearing?
12 A   No, uh-uh.
13 Q   Wait 'til I finish the question just so we
14 can -- I know the court reporter is going to have a hard
15 time making a clear record.
16 A   All right.
17 Q   And do you know if the -- was it a class-action
18 lawsuit?
19 A   No.
20 Q   And did you have legal representation?
21 A   Define -- did I have legal representation, that
22 is, do I have to purchase -- I mean, you know, pay for
23 representation? Is that the --
24 Q   That's the question, yes.

Page 22

1  A  No.
2  Q  And who was the law firm -- what law firm was
3  representing the plaintiffs in that case?
4  A  Oh, I don't remember the law firm in that case
5  or the lawyer. Well, yes, I do, but I don't know the
6  law firm.
7  Q  Okay. What was the name of the lawyer?
8  A  Marty Siegel.
9  Q  And how do you spell that last name, if you
10 know?
11 A  S-i-e-g-a-l or e-l. It's been a long time.
12 Q  And was he based in New York City?
13 A  Yes.
14 Q  And is that lawsuit concluded?
15 A  Yes.
16 Q  And how did that lawsuit end?
17 A  The conclusion was that he didn't have the
18 proper legal basis for getting, what do you call it --
19 recompense, I guess.
20 Q  So is it your understanding the lawsuit was
21 dismissed?
22 A  Yeah, that would be -- uh-huh.
23 Q  Okay. Other than the case we just discussed,
24 have you ever been involved in any other --

Page 23

1  A  Yes.
2  Q  -- securities-related lawsuits?
3  A  Yes.
4  Q  Wait until I finish the question.
5  A  Really, am I getting ahead?
6  Q  Yeah, you're getting ahead. Thank you.
7  A  Okay. Thank you.
8  Q  Have you ever been the target of an
9  investigation by a Grand Jury, the SEC or any other
10 government agency or self-regulatory organization?
11 A  No.
12 Q  Have you -- and I have to ask this. Have you
13 ever been arrested or charged criminally?
14 A  Gee, traffic ticket.
15 Q  Other than a minor traffic ticket violation?
16 A  No.
17 Q  And have you ever been the subject of an
18 investigative or disciplinary proceeding by a state
19 licensing board?
20 A  No.
21 Q  And do you understand that you have filed a
22 class-action lawsuit?
23 A  Correct, yes.
24 Q  Against whom?

Page 24

1  A  Well, against Steven Sprague and Mr. Feeney.
2  Q  Anyone else?
3  A  Well, there was originally another defendant,
4  but that person is -- was eliminated from the target.
5  Q  Do you know if Wave Systems is a defendant in
6  this lawsuit?
7  A  And Wave Systems, yes.
8  Q  And what is a class-action lawsuit?
9  A  Well, it means that all of the persons in the
10 class defined by their purchasing Wave stock during the
11 certain -- the period in question become a class, and
12 there -- because they were damaged by information --
13 misinformation.
14 Q  And what is the size of the purported class in
15 this case?
16 A  I don't know the exact size.
17    MR. MOSSER: If you don't know, you don't know.
18 That's fine.
19 A  Yeah.
20 Q  And what are the parameters of the class? Do
21 you know what the class period is?
22 A  Well, it would have started, I believe, July
23 31st, as I recall. That's when that news came through
24 various means. I picked up on it probably -- well,

Page 25

1  anyway, the class -- legally I think that July 31st
2  starting date when the news was published, or the news
3  release was published, I think, widely. And then the
4  court, let's see, I think in December then -- I think it
5  might have been December 18th that the court then -- the
6  news came that a court had -- had said that there was an
7  investigation into the -- maybe the manipulation of
8  information. I think there was a question of
9  wrongdoing.
10 Q  Okay. You mentioned two dates. You mentioned
11 July 31st and December 18th.
12 A  Yeah.
13 Q  What year were you referring to?
14 A  Of 2003.
15 Q  And what happened on July 31st, 2003?
16 A  Well, there was a publication -- Wave Systems
17 made a public announcement; that is, their spokesperson
18 had created a document that was sent to -- was available
19 on their Web site, I guess, and was sent to various
20 media outlets. And then, of course, that was picked up
21 and repeated in various locations.
22 Q  Okay. And what happened on December 18th,
23 2003?
24 A  Well, I don't know the precise legal definition

Page 26

1  or description of what happened, but I know that the
2  court stepped in and said that there were questions
3  about the legality of the -- well, the information that
4  was given.
5      Q   Okay. And what court was this that stepped in?
6      A   That is in -- the court is in Springfield,
7  Massachusetts.
8      Q   And do you know what the total possible damages
9  for your class are?
10     A   I don't know for a fact.
11         MR. MOSSER: If you don't know, don't guess.
12     Q   Is the answer, no, you don't know?
13     A   Not really.
14     Q   And who are your attorneys in this case?
15     A   Well, Todd Mosser here and Karen Reilly. And
16  then there's a liaison counsel up in Springfield, and
17  that's David Pastor.
18     Q   And did you select these attorneys to represent
19  you in this case?
20     A   Define select.
21     Q   How did it come to pass that these are your
22  attorneys in this case?
23     A   All right. Well, they volunteered by calling
24  me. And then, let's see, I filled out a sheet of paper,

Page 27

1  I think, early on. I got something in the mail, filled
2  out a sheet of paper saying, yes, I was willing to join
3  in a suit. And --
4      Q   Okay. I'm sorry. Finish your answer.
5      A   And then sometime later I got a phone call from
6  a person at the law firm Schiffrin asking me whether I
7  would be willing to be a lead plaintiff. And everything
8  sounded correct and professional, and so I said yes.
9      Q   You mentioned a notice that you received in the
10  mail. When did you receive a notice in the mail?
11     A   Well, I would say it would be in -- well, it
12  was in early 2004. It might have been February or
13  March.
14     Q   And who did you receive the notice from?
15     A   From the law firm of Schiffrin. Do I remember
16  the person who signed the name at the bottom of the -- I
17  don't remember exactly that name. Darren, I think, was
18  the first name.
19         MR. MOSSER: Only answer the questions she's
20     asking --
21         THE WITNESS: Okay.
22         MR. MOSSER: -- and, again, don't guess.
23         THE WITNESS: Okay.
24     Q   And do you recall the substance of that notice?

Page 28

1      A   Generally.
2      Q   Generally what did the notice say?
3      A   Well, the notice itemized a set of arguments
4  that -- about the case that would make an argument for
5  wrong doing and did I -- and then asked me to approve
6  it, and I did.
7      Q   Okay. So you approved it, and then you
8  returned it to the law firm of Schiffrin and Barroway by
9  mail; is that correct?
10     A   By fax.
11     Q   Okay. And when approximately did you fax your
12  notice in?
13     A   April, April 1st.
14     Q   To whom did you fax your notice?
15         MR. MOSSER: If you know. If you don't know --
16         THE WITNESS: I'm not sure whether it was to
17     you, Todd, or to Karen.
18         MR. MOSSER: If you're not sure --
19     A   Yeah, I don't know. I'm not sure.
20     Q   And was that your first contact with the law
21  firm of Schiffrin and Barroway?
22     A   First contact was the mailing asking me whether
23  I was willing to do it, and then I filled out a little
24  slip of paper. I think that might have been in March.

Page 29

1      Q   Had you spoken with any attorneys on the
2  telephone or by e-mail at this point in time?
3      A   Somewhere along in there, yes, one of the
4  attorneys called me; uh-huh.
5      Q   And do you recall who it was that called you?
6      A   Not absolutely certain. It might have been
7  this Darren Clark or maybe Karen Reilly. I'm not sure
8  just which one.
9          MR. MOSSER: Again, if you don't know, don't
10     speculate.
11         THE WITNESS: Okay. Well --
12     Q   And do you know if you received this phone call
13  before you faxed back your notice or after you faxed
14  back your notice?
15     A   Before.
16     Q   And --
17     A   And we're talking about the April 1st fax,
18  yeah, where I affirmed the arguments of the case.
19     Q   Correct, your response.
20     A   Yeah, my response was, "Yes, I approve."
21     Q   So you spoke to an attorney from Schiffrin and
22  Barroway after you received the notice but before you
23  faxed back your response; is that correct?
24     A   I think it was before. I don't know for sure.

Page 30

1  MR. MOSSER: Okay. If you don't know for sure,
2  then don't guess.
3  A  It was around that period, yeah.
4  Q  Had you considered bringing a lawsuit against
5  Wave before you received a notice or a telephone call
6  from Schiffrin and Barroway?
7  A  Well, considered. I certainly felt strongly
8  that the information that I was given was very
9  misleading and I was angry about it. And I would like
10 to -- I bet -- I'm sure I thought I would like to figure
11 out how to -- to get some justice because I felt that
12 was wrong. But that was just a feeling.
13     MR. MOSSER: Just answer the questions that are
14 asked, please.
15     THE WITNESS: Okay.
16 BY MS. MARTIN:
17 Q  And have you discussed the possibility of
18 filing a lawsuit against Wave or any of the other
19 defendants with any other shareholder of Wave?
20 A  No. Considered is, you know, in a -- more or
21 less a fantasy because I don't have the means to do a
22 lawsuit.
23 Q  And approximately how many times have you met
24 with your counsel about this case?

Page 31

1  A  Met personally face-to-face?
2  Q  Yes.
3  A  Once.
4  Q  Was that yesterday?
5  A  Yes.
6  Q  And did you consider any other law firms or
7  lawyers to represent you in this case?
8  A  No.
9  Q  And why not?
10 A  Well, I was very pleased with the explanations
11 I got and the plan of action, and so I was -- felt very
12 fortunate to be represented by this company, this firm.
13 Q  And how many times have you communicated with
14 your lawyers regarding the progress of this lawsuit?
15 A  Well, a guess, close guess, maybe ten times.
16 Q  And how do you normally communicate with them?
17 A  By phone.
18 Q  And do you phone them, or do they phone you?
19 A  I wait until there's -- information comes to
20 me. So that each time the occasion is one that only the
21 lawyers will know when things are developing, so then
22 they can call me.
23 Q  And have you discussed this case with any other
24 lawyers --

Page 32

1  A  No.
2  Q  -- other than your attorneys in this case?
3  A  (Shakes head.)
4  Q  Have you discussed this case with anyone other
5  than your lawyers?
6  A  You know, not really, not even my wife, I don't
7  think, uh-uh.
8  Q  Is your wife aware that you're involved in a
9  lawsuit?
10 A  That's all, uh-huh.
11 Q  And what about your children, are they aware --
12 A  No.
13 Q  -- that you're a plaintiff in a lawsuit?
14 A  No.
15 Q  Okay. And do you have a broker or investment
16 advisor?
17 A  I have an investment advisor.
18 Q  Okay. Who is your investment advisor?
19 A  Well, it's a gentleman at a little firm called
20 Bid to Ask.
21 Q  And what's his name?
22 A  Oh, Charles -- my goodness. All of a sudden
23 I've dropped his last name. Irish name. I don't know
24 why I dropped it.

Page 33

1  MR. MOSSER: If you can't recall, that's fine.
2  A  Yeah. Anyway, it's Charles to me. There were
3  two Charles, in fact. I don't remember their last
4  names.
5  Q  And do you have any reason to believe that your
6  broker has any relationship with plaintiffs' counsel?
7  A  Oh, not at all. He's not a broker.
8  Q  Okay. Your investment advisor?
9  A  Right. Yeah, it's not a financial advisor.
10 He's a person who -- Bid to Ask is an e-mail firm. That
11 is the way they do business, that and the phone, to
12 recommend stocks for me to purchase.
13 Q  But he's not a broker?
14 A  No, they were brokers.
15 Q  Do you know what licenses he has?
16 A  No. They probably have brokers' licenses, I
17 would guess.
18 Q  So you don't know whether or not he's a
19 licensed broker or not?
20 A  They have been, I know. I just -- you'd have
21 to answer me to -- you'd have to answer the question,
22 once a licensed broker, always a licensed broker?
23 If they -- I know they were licensed brokers.
24 Q  But you don't know, sitting here today, whether

Page 34

1  they are currently licensed?
2     A    No. That's not a question for me.
3     Q    And how often do you communicate with Charles
4  or anyone else at Bid to Ask?
5     A    Maybe once a month, maybe, or two months or
6  three. It depends. It sort of varies.
7     Q    And how do you communicate?
8     A    By phone.
9     Q    And do they call you, or do you call them?
10    A    I'll call them.
11    Q    Is it ever the other way around?
12    A    On occasion; rarely.
13    Q    And do you have any reason to believe that
14 Charles or anyone else from Bid to Ask has ever
15 communicated with your counsel in this case?
16    A    I'm absolutely certain that they haven't.
17    Q    And are you aware -- I'm sorry. Are you
18 familiar with the requirements for bringing a suit as a
19 class action?
20    A    The requirements.
21       MR. MOSSER: Do you understand the question?
22       THE WITNESS: No.
23 BY MS. MARTIN:
24    Q    Are you aware that there are certain

Page 35

1  requirements that must be fulfilled in order to bring a
2  lawsuit as a class action?
3     A    I would assume. That makes sense.
4     Q    Okay. But you don't know specifically what
5  those requirements are?
6     A    I'm not a lawyer.
7     Q    So is the answer, no, you don't know what they
8  are?
9     A    No.
10       MS. REILLY: Objection.
11    Q    And do you know what it means to be a class
12 representative?
13    A    Yeah, I think so.
14    Q    And what's your understanding of what it means
15 to be a class representative?
16    A    Well, I represent all those people who were
17 damaged by the misinformation.
18    Q    And what do you understand to be your
19 responsibilities as a class representative?
20    A    Well, I review all of the filings that they
21 prepare and look those over. I'll get back on the phone
22 and comment, ask questions. So I read all of the -- do
23 you call these things briefs or -- okay. I read all of
24 that material and ask questions about it and just follow

Page 36

1  the case, and, basically, when I have a chance to act,
2  to act on behalf of the larger group that is in
3  question.
4     Q    And do you understand that you may have to
5  testify at trial if this matter goes to trial?
6     A    I do understand that.
7     Q    And are you willing to do so?
8     A    I am.
9     Q    And how are you compensated for your time and
10 efforts expended serving as class representative?
11       MR. MOSSER: Object to the form of the
12 question.
13    Q    Are you compensated in any way for the time
14 and effort that you expend serving as a class
15 representative?
16    A    No.
17    Q    And do you have a fee agreement with counsel?
18    A    Agreement about what?
19    Q    About how their fees are going to be paid in
20 connection with this lawsuit?
21    A    Yes, I understand how they're going to be paid.
22    Q    Okay. And is that agreement in writing?
23       MR. MOSSER: Objection. I don't think he said
24 that there's an agreement in writing.

Page 37

1        MS. MARTIN: No. I'm asking him if there's an
2  agreement in writing.
3        MR. MOSSER: I'm just --
4        MS. MARTIN: He said that -- he actually
5  said that --
6        MR. MOSSER: I'm just objecting to your
7  paraphrasing, and so I'm not sure you're correct in
8  paraphrasing the answer.
9        MS. MARTIN: I'm not sure that I did paraphrase
10 it.
11 BY MS. MARTIN:
12    Q    Do you have a fee agreement with counsel?
13    A    I know what I have agreed to, yes.
14    Q    And do you have any fee agreement in writing?
15    A    I don't recall that I do.
16    Q    So you've never reviewed any agreement --
17 written agreement with your counsel involving the
18 payment of fees --
19       MR. MOSSER: Objection.
20    Q    -- is that correct?
21       MR. MOSSER: Object to the form of the
22 question.
23    Q    You can answer it.
24    A    No.

Page 38

1  Q    And what is your understanding of what your fee
2  agreement is with counsel?
3  A    Well --
4      MR. MOSSER: Objection.
5      MS. REILLY: Objection. He's testified that he
6  doesn't recall having a fee agreement with counsel,
7  and you're asking questions --
8      MR. MOSSER: And you're asking --
9      THE COURT REPORTER: Excuse me. You crossed
10 over.
11     MR. MOSSER: The objection is you're -- he's
12 stated that he doesn't know if there's a fee
13 agreement and we don't have a fee agreement, and
14 you're asking him about a fee agreement that we
15 don't have.
16     MS. MARTIN: All right. Well, I understood
17 his testimony to be that he believes there is an
18 agreement with counsel regarding the fees --
19     MR. MOSSER: That's not what he said.
20     MS. MARTIN: -- but that there's nothing in
21 writing.
22     MS. REILLY: He testified he understands how
23 his counsel is going to be paid.
24 BY MS. MARTIN:

Page 39

1  Q    Okay. Well, then how do you understand your
2  counsel is going to be paid?
3  A    Well, it would be a con- -- it's a contingency.
4  If indeed there -- the judge finds that there is damage,
5  then there will be a determination as to the amount of
6  that damage. And then there will be some discussion as
7  to how that contingency -- that they would get a
8  percentage of the -- of the amount that is -- the
9  judgment.
10 Q    And what percentage would they receive?
11 A    That's not known and probably isn't knowable at
12 this point.
13 Q    So you have no idea what percentage of any
14 potential recovery would go to your lawyers in this
15 case?
16 A    No, no. That's something that has to be
17 determined at the time of the judgment.
18 Q    And have you paid any money to your lawyers for
19 their representation of you in this case to date?
20 A    No.
21 Q    And what did you do to negotiate, if anything?
22 Did you negotiate this payment arrangement with your
23 counsel?
24 A    No. It was offered and I thought it was fair.

Page 40

1  Q    And what did you do to evaluate the fairness?
2  A    Well, what did I do? You mean what did I think
3  about, what considerations; is that what you mean?
4  Q    Okay. What considerations --
5  A    I didn't do anything.
6  Q    Okay. What considerations did you have?
7  A    All right. Well, they're investing their time
8  in this and resources in this case, and they're the ones
9  with the skill to proceed, and thus they need to be
10 rewarded for their investment, if it turns out there is
11 a reward to -- in the form of a judgment, to -- to
12 distribute. And so I think that's fair.
13 Q    And is it your understanding that the court
14 will determine what percentage of any potential recovery
15 that your attorneys get?
16 A    Yes, with input, I would understand, from the
17 plaintiffs.
18 Q    And when you say input from the plaintiffs, you
19 mean you and the other named class representatives?
20 A    I would think we would have a -- we would be
21 asked to give our ideas, uh-huh.
22 Q    And sitting here today, do you have any general
23 sense of what percentage you think would be fair?
24 A    Not really. I would listen -- first we have to

Page 41

1  get there, then that's the time to think about that, so,
2  no. Do I have a fixed percentage? No, I don't.
3  Q    Do you think 80 percent would be fair?
4  A    Well, no.
5  Q    Do you think 50 percent would be fair?
6  A    That would be closer. Somewhere between 20 and
7  40, I would think.
8  Q    And have you agreed to pay any costs for
9  bringing this action?
10 A    No.
11 Q    Do you know how costs associated with this
12 action are paid?
13 A    Not really.
14 Q    And has anyone promised you a certain amount of
15 money if the case settles?
16 A    No.
17 Q    Has anyone suggested to you that you would
18 recover more than any other plaintiff in this lawsuit?
19 A    No.
20 Q    I'd like to show the witness what's been
21 previously marked as Exhibit 25.
22     MR. MOSSER: Before we get to that, can we take
23 a break, a five-minute break?
24     MS. MARTIN: Oh, sure.

Page 42

1    (Break taken.)
2    MS. MARTIN: I'm just going to ask for the next
3    portion of the deposition that we have, either
4    one -- one of you objecting instead of two.
5    MS. REILLY: Oh, that's fine.
6    MS. MARTIN: Okay. Thank you.
7    MS. REILLY: I just got a little enthusiastic.
8    (Brumbaugh Exhibit 25, previously marked, was
9    referred to.)
10   BY MS. MARTIN:
11   Q   Okay. I'd like to show the witness what's been
12   previously marked as Exhibit 25, which is Plaintiffs'
13   Response to Defendants' First Request For the Production
14   of Documents dated March 31st, 2006.
15   MR. MOSSER: I don't think we have 25 there.
16   24 -- we have up to 24, it looks like.
17   MS. MARTIN: Okay. 25.
18   A   Oh, yeah. Okay. Uh-huh. Uh-huh.
19   Q   And have you seen this document before, sir?
20   A   I have.
21   Q   Okay. When did you see this document?
22   A   Oh, gosh. Well, let's see, just recently, so
23   sometime in March, I think. Yeah.
24   Q   Do you know if you saw it before or after it

Page 43

1    was filed with the court?
2    A   I saw it before.
3    Q   And did you read and review it before --
4    A   I did.
5    Q   -- it was filed?
6    A   Uh-huh, yes. Then we had a phone convers- --
7    oh, excuse me.
8    Q   Please wait for me to --
9    A   Yeah.
10   Q   -- finish the question.
11   A   I'm thinking. Right. Sorry.
12   Q   And did -- so did you read and review this
13   document before --
14   A   Yes.
15   Q   -- it was filed?
16   A   Yes.
17   MR. MOSSER: Wait until she finishes the
18   question.
19   Q   And did you search for documents that were
20   asked for in this request?
21   A   Search for -- excuse -- search -- did I search
22   for documents? Oh, oh -- oh, that were asked for. Yes,
23   I think this is the one.
24   MR. MOSSER: Do you understand the question?

Page 44

1    THE WITNESS: Not -- maybe not.
2    MR. MOSSER: If you don't understand the
3    question, then don't answer a question you don't
4    understand.
5    A   I'm not absolutely certain which -- which one
6    of these things -- I know that one of the -- I'm going
7    to have to read to see what this -- which one -- which
8    document this is.
9    Q   Sure. Take a moment to review the document.
10   A   Okay. Request number 1 refers to documents
11   evidencing or relating to any purchase, sale or other
12   transaction.
13   MR. MOSSER: Just read to yourself.
14   THE WITNESS: Oh, okay.
15   A   So, yes, I went to produce the documents
16   relating to the purchase of Wave Systems.
17   Q   And where did you search for documents?
18   A   On the TD Waterhouse Web site.
19   Q   Did you look anywhere else for documents?
20   A   No.
21   Q   And when did you do that search?
22   A   When I was reading this in -- probably at the
23   end of March.
24   Q   And what did you find?

Page 45

1    A   I found a record of my purchases, and then I
2    found also the page that demonstrates that I still own
3    Wave Systems. And I -- that's what I found.
4    Q   Okay. So when you say you found records of
5    your purchases, you mean your purchases of Wave Systems
6    stock?
7    A   Correct. Correct. Yes.
8    Q   And what did you do with these documents after
9    you found them?
10   A   Made copies and faxed them to Todd Mosser.
11   Q   Have you ever kept a file on Wave Securities?
12   A   No. Wait a minute. Kept a file? What do you
13   mean?
14   Q   Do you have a file at home where you keep
15   documents related to Wave Securities?
16   A   It's really just in a pile.
17   Q   Okay. And what documents are in that pile?
18   A   All of the filings.
19   Q   Okay. Other than the filings in this lawsuit,
20   did you have a file on Wave Systems stocks prior to the
21   lawsuit?
22   A   No.
23   MS. MARTIN: I'd like to mark as Exhibit 29, I
24   believe, documents Bates stamped HARM 1 and 2.

12 (Pages 42 to 45)

Page 46

1    (Harmon Exhibit Number 29 was marked for
2 identification.)
3 BY MS. MARTIN:
4    Q    And do you recognize these documents?
5    A    I do.
6    Q    And what are these documents?
7    A    They are the photocopies of the web pages that
8 I printed out from TD Waterhouse.
9    Q    So these are the documents you were just
10 describing to us a few seconds ago?
11   A    Yes.
12   Q    Okay.
13   A    Well, that's one of them.
14   Q    Were there other documents that you printed out
15 and sent to your attorneys that do not appear here?
16   A    As I mentioned, I sent two pages, this page
17 where the purchasers are indicated --
18   Q    And that's the page stamped HARM 1?
19   A    Okay. Uh-huh. Yes. And I sent another page
20 that simply is a -- shows that I still own Wave stock,
21 Wave Systems stock.
22   Q    And is that other page that you're describing,
23 that does not appear here, also printed out from the TD
24 Waterhouse Web site?

Page 47

1    A    Yes, that's right.
2    Q    And whose handwriting appears on these two
3 pages?
4    A    Mine.
5    Q    And what is the significance of the handwritten
6 notations, if we go through them one by one?
7    A    It's redundant identification.
8    Q    Okay. Well, what's the -- let's start with the
9 first one that says, "Note." Why did you circle
10 12/31/03 and mark it "Note"?
11   A    Just that I thought whomever was looking at
12 this would want to know that this came as a year -- this
13 is a year-end listing of my purchases.
14   Q    If we go to the bottom of the page where it
15 says, "WAVX" --
16   A    Uh-huh.
17   Q    -- "here in 2003," what was the significance of
18 that handwritten notation?
19   A    It's sort of neon writing that "Here it is" --
20   Q    Okay.
21   A    -- "just in case you miss it." I do that.
22   Q    And were you aware that these documents were
23 being produced to the defendants in this case?
24   A    Yes, I guess so.

Page 48

1    Q    And do you have any other documents related to
2 Wave in your possession other than the filings related
3 to this lawsuit that you described earlier?
4    A    Any other -- I'm not aware of any.
5    Q    And do these documents reflect all of your
6 trading in Wave stock?
7    A    They do.
8    Q    Okay. And that is true even outside of 2003?
9    A    Correct.
10   Q    And are you still a customer of TD Waterhouse?
11   A    Yes.
12   Q    I don't believe they're called TD Waterhouse
13 anymore.
14   A    That's right.
15   Q    I think it's TD Ameri- -- Ameritrade or
16 something, isn't it?
17   A    That's correct. They've changed their name,
18 but I'm still --
19   Q    Okay.
20   A    Same old, same old. That's what they say
21 anyway.
22   Q    And how many accounts do you have at TD -- what
23 used to be TD Waterhouse?
24   A    Two accounts.

Page 49

1    Q    And what are those two accounts?
2    A    Well, there's -- well, both -- let's see. One
3 is a rollover account, and the other one is -- I think
4 it's just a regular account.
5    Q    And when did you set up the rollover account?
6    A    You know, I don't recall. It's been some
7 years, maybe.
8        MR. MOSSER: If you don't recall, don't guess.
9    A    I don't really.
10   Q    Is it an IRA rollover account?
11   A    Yes.
12   Q    And was it a 401K plan that you had somewhere
13 else that you rolled over TD Waterhouse?
14   A    I think that's what it was. Sounds right.
15   Q    And do you know the account numbers of your two
16 TD Waterhouse accounts?
17   A    I know one.
18   Q    And what is it?
19   A    1738432442-08.
20   Q    And is that your IRA rollover account number?
21   A    No.
22   Q    So that's the account number for the other --
23   A    Yes --
24   Q    -- account --

Page 50

1  A  -- regular.
2  Q  -- that you mentioned?
3  A  Uh-huh.
4  Q  Okay.
5     MS. MARTIN:  I'd like to mark as Exhibits 30
6  and 31 --
7     MR. MOSSER:  Do you want 29 back?
8     MS. MARTIN:  Sure.
9     MR. MOSSER:  You want 25 back too, I guess.
10    MS. MARTIN:  Thanks.
11    (Harmon Exhibit Numbers 30 and 31 were marked
12 for identification.)
13 BY MS. MARTIN:
14 Q  So Exhibit 30 is an account statement from TD
15 Waterhouse dated 8/29/2003 for account Number
16 38432442-1-5 --
17 A  What's this?
18 Q  -- and Exhibit 31 is an account statement from
19 TD Waterhouse dated 8/29/03 for account 384906-13-1-6.
20    And do Exhibits 30 and 31 reflect your two
21 accounts at TD Waterhouse?
22 A  Yes.
23 Q  And why do you have two separate accounts at TD
24 Waterhouse?

Page 51

1  A  One held some stock that I had had for some
2  time, and it was a regular trading account.  And the
3  other, the rollover, I created -- now I recall.  I
4  created it in 2003 when I received a payment from the
5  State of Florida upon my retirement.  And so I put that
6  in a rollover.
7  Q  Okay.  So I think it's -- Exhibit 30 is -- for
8  the Gary Harmon Revokable Trust, is the older account --
9  A  Yes.
10 Q  -- is that correct?
11 A  That's correct.
12 Q  And do you know when that account was set up?
13 A  That I can't recall.  It's sometime ago in
14 the '90s.
15 Q  And why was this account set up?
16 A  For me to trade stocks by -- electronically.
17 Q  And what is the Gary Harmon Revokable Trust?
18 A  It's just the account that -- or -- that I
19 created to put this money in, you know, that's all.
20 Q  And do you place all the trades for both of
21 these accounts?
22 A  Yes.
23 Q  Okay.  Does anyone else other than you --
24 A  No.

Page 52

1  Q  -- have discretion for either of these
2  accounts?
3  A  No.
4  Q  Does anyone other than you make any trading
5  decisions for these accounts?
6  A  No.
7  Q  And do you have different trading strategies
8  for each of these accounts?
9     MR. MOSSER:  Object to the form of the
10    question.
11 Q  You can answer it if you understand the
12 question.
13 A  I wouldn't say so, no.
14 Q  Let's start with the trust account.  What's
15 your trading strategy for that account?
16    MR. MOSSER:  Objection.  He testified that he
17    had no strategy.
18 A  I don't think I really make any difference.
19 It's just wherever the money is available and I want to
20 make a trade I will do it in that account.
21 Q  Do you have an investment strategy for the
22 trust account?
23 A  Well, yeah, maybe they're about the same, which
24 is to -- these days, probably for the last three or

Page 53

1  four years, three years or so, I have subscribed to a
2  Bid-To-Ask firm that gives me advice on particular
3  stocks to buy that may be short-term, profitable --
4  short-term, profitable kinds of stocks.  So I pretty
5  much follow their -- their recommendation.
6  Q  Okay.  So you've been trading -- for at least
7  the last three years trading in both of these
8  accounts --
9  A  Both of these accounts, uh-huh.
10 Q  -- to make short-term gains?
11 A  Yes.  That's the theory.
12 Q  Thank you.
13    And you use information that you get from Bid
14 to Ask to make these trading decisions --
15 A  Yes.
16 Q  -- is that correct?
17 A  Yes.
18 Q  Are all of your trading decisions based on
19 information from Bid to Ask?
20 A  Let's see.  Well, in the last three years or
21 two, two or three years, yes.
22 Q  In 2003 were all your trading decisions made
23 based on information that you gained from Bid to Ask?
24 A  As I recall, yes.

Page 54

1  Q  Do you have any other joint, individual or
2  trust accounts at any other brokerage firms?
3  A  There are some shards of accounts that I've
4  sort of let lapse and have not closed them out. They
5  may have, you know, 30 cents in one.
6  Q  Okay. And where are those accounts?
7  A  Oh, I don't know. I couldn't even name them.
8  It's been so long ago that I invested -- I don't even
9  think of them as existing.
10 Q  And were these accounts with banks or brokerage
11 firms?
12 A  Brokerage firms.
13 Q  And you don't recall the names of the brokerage
14 firms?
15 A  No, not really. There are about three or four.
16 I really pay no attention to them whatsoever. It's like
17 they don't exist.
18 Q  Okay. So you haven't traded in them for the
19 last three years --
20 A  Oh.
21 Q  -- is that correct?
22 A  Last 10 or 20 -- 10 -- at least 10 years.
23 Q  Okay. So if we go back to what was previously
24 marked as Exhibit, I believe, 29 --

Page 55

1  A  Uh-huh. Okay.
2  Q  -- is it fair to say that the documents you
3  produced in this case only relate to one of your
4  brokerage accounts?
5  A  Number 29?
6  Q  Yes.
7  A  This is in one account, yes.
8  Q  Okay. And which account is that?
9  A  Must be the rollover account. I don't see the
10 number here, but I think it's the rollover. Oh, there
11 it is, the IRA rollover account, yeah.
12 Q  So was the IRA rollover account the only
13 account in which you purchased Wave Systems stock?
14 A  That's correct, yes.
15 Q  Mr. Harmon, do you currently own stocks or
16 bonds?
17 A  Yes.
18 Q  Okay. Do you know which stocks you own?
19 A  Yes.
20 Q  And which stocks are those?
21 A  Well, the WAVX, and I think you have a list of
22 some of them here. I know that Surebeam is -- still
23 exists in my account. Let's see, Avaya, Lucent, BCSI.
24 Q  Is BCSI Boston Capital Securities? What

Page 56

1  company is BCSI?
2  A  No, it's not Boston Capital Securities, no.
3  It's -- it's an electronics -- you know, it's a computer
4  device firm. I bought a thousand shares not too long
5  ago. You know, I can't remember exactly all of the
6  names of the stocks. They're sort of -- must be a half
7  dozen that I really watch.
8  Q  Are they mostly tax stocks?
9  A  Tax stocks.
10 Q  Are they all tax stocks?
11 A  I'm not certain that they are, but I think so
12 probably.
13 Q  And are all the stocks you own today stocks
14 that you learned about through Bid to Ask?
15 A  Yes, except for the earlier ones, which is Wave
16 Systems. I bought that some years ago. Well, I bought
17 it in -- when did I buy that -- well, in 2003. That's
18 not a Bid-to-Ask purchase. Yeah, they did not recommend
19 that one. That's -- that came about in a different way.
20    So I do have some stocks that I bought with
21 another strategy before I got on to Bid to Ask -- I was
22 a client of Bid to Ask.
23    MR. MOSSER: Just stick to answering the
24    questions.

Page 57

1     THE WITNESS: Okay.
2  A  So I realized that I misstated an earlier --
3  Q  Okay. So -- and I think you stated earlier
4  that you thought that, to the best of your
5  recollection --
6  A  Uh-huh.
7  Q  -- that all of your purchases --
8  A  Yeah.
9  Q  -- since 2003 --
10 A  Yeah.
11 Q  -- were through Bid to Ask?
12 A  And that's not correct. I had bought several
13 things, Pacific Internet, Limited, Wave Systems -- well,
14 those were purchased with a different strategy in mind,
15 and they were before Bid to Ask came along.
16 Q  Okay. What strategy did you have in mind when
17 you purchased Pacific Internet, Limited, stock?
18 A  Well, to describe the strategy, I would first
19 have to mention that I have a friend who was formerly a
20 stockbroker for a couple years. He's an old school chum
21 of mine. He's moved down to Florida and retired here.
22 So when I retired, even just before I retired, I was
23 starting to study stocks, and he helped me with this.
24    So he had a method. I read a book that he gave

Page 58

me on buying stocks in order to make money. And he and I discussed various stocks that would show up in the New York Times or the Wall Street Journal, I forget exactly which, that -- or the top-ten volume or -- yeah, the top-ten-volume stocks, trading volume stocks.

And so we would look at these stocks, first for their price. We wanted a low-price stock, at least I did. And so he and I would -- when I bought WAVX, we had a list of stocks that we were looking at. And then we would read up as much as we could. We'd try to find information about them and then make purchases.

He made more purchases than I did. He also bought some of the WAVX stock on the basis of a little article we found in the New York Times where they -- the article basically -- to us it explained why the volume was increasing so rapidly.

So that was the kind of thing we did to identify some stocks on this list from the New York Times, and then from that make some selections owing to or on the basis of their low price and their possibility for -- of short-term, quick rise.

Q  Okay. So you mentioned -- I think the original question was: Why did you purchase --
A  Yeah.

Page 59

Q  -- what was your strategy when you purchased Pacific Internet, Limited?
A  Yes.
Q  Is this the same strategy that you used when you purchased Wave Systems stock?
A  Yes, same strategy.
Q  And you mentioned a friend who's in the securities industry who you were working with; is that correct?
    MR. MOSSER: Objection.
A  Well, he had been a stockbroker.
Q  And what is this individual's name?
A  His name is Scott Rickard.
Q  And what is his experience in the securities industry?
A  He was a broker for two or three years in the 1990s.
Q  And what brokerage firm did he work for, if you --
A  Oh --
Q  -- know?
A  -- I don't know.
Q  Wait until I finish the question again.
A  I don't know. Okay.

Page 60

Q  It's for the purposes of the record.
A  Okay.
Q  And how do you know Scott Rickter?
A  Rickard. He was a graduate school chum of mine back in the 1960s.
Q  And have you stayed in touch with him since that time?
A  Sporadically.
Q  And how did you and he decide to pursue this investment strategy together?
A  Well, he had been studying various strategies, and so -- recommended that -- one strategy that was represented in a particular book on how to buy stocks and to make money. And -- and so I decided that that made sense.

So I read the book, and then there was an occasion for us to talk about stocks and which ones might make good purchases.
Q  Okay. And what was the title of the book?
A  Oh, gosh. I knew you'd ask me that. It was some stock -- stock title like "How to Buy Stocks and Get Rich" or something like that.
Q  And do you remember who the author of that book was?

Page 61

A  Oh, you know, not now. It was some years ago.
Q  So you do not -- sitting here today, you do not recall the --
A  Not --
Q  -- author of the article --
A  No.
Q  -- of the book? I'm sorry.
A  Not now.
Q  But at some point in time, you did know the name of the author?
A  Yes, sure.
Q  And can you describe for me, as best you can, your understanding of what the strategy for buying stocks was that was contained in the book?
A  Well, the idea is to go to the New York Times and -- or the Wall Street Journal and identify stocks that have been increasing in volume and come on to this top-ten list over a period of days and -- and then try to find out as much information as we could about them, their ratings, their dividends, what they make, why it might be a -- a likely stock that would cause people to buy it and run up the price.
Q  And I think you also said earlier that you were mainly interested in obtaining short-term gains in these

Page 62

1  stocks --
2  A  Correct.
3  Q  -- is that correct?
4  A  Yes.
5  Q  How much time do you currently spend monitoring
6  your investments?
7  A  Not very much.
8  Q  Do you monitor the performance of your
9  investments?
10  A  Yes.
11  Q  Okay. And how do you do that?
12  A  By computer. I just have the -- I have all my
13  stocks in a -- what, in a window, and I just bring them
14  up. It's America On-Line. And so there is the stock
15  page where I have all my stocks listed, and I sort of
16  slide that over to the side of my computer screen. And
17  so there it is, and I can look at it at any time of the
18  day.
19  Q  And approximately how often do you do that?
20  A  Each day.
21  Q  Okay. So you check the performance of your
22  stock -- your investments every day?
23  A  Yes.
24  Q  Okay. Do you ever check more than once a day?

Page 63

1  A  Occasionally, sure.
2  Q  And have you always monitored the performance
3  of your investments this way, or has it changed over
4  time?
5  A  Well, it's changed since I had a computer to
6  use for that purpose.
7  Q  And what did you do before you had a computer?
8  A  Oh, then -- that was years back, and I had a
9  broker. And then I would have to go to the newspaper
10  and find out each day what the stock was doing.
11  Q  So how long have you been monitoring your
12  investments on-line on a computer?
13  A  10 or 12 years, probably 12 years.
14  Q  And is that the only way that you've done it
15  over the last 10 or 12 years?
16  A  Just for checking the prices, yeah, sure.
17  Q  And do you have any investments other than
18  stocks?
19  A  Yes.
20  Q  And what are those?
21  A  Well, I am a partner in a real estate
22  construction plan up in Huntersville, North Carolina,
23  with my son and another partner.
24  Q  Okay. And what's the business plan or business

Page 64

1  model of that partnership?
2  A  We own eight acres of land in a little town of
3  Huntersville, and our plan is to develop that land and
4  build about 24 houses on it.
5  Q  And is that a business plan that's still in
6  progress?
7  A  Yes, it is.
8  Q  And what stage of development are you currently
9  at?
10  A  We're about ready to get approval for our
11  pending -- what do you call that -- you've got to get
12  a -- I'm drawing a blank here. Permit. We're in permit
13  hell at the moment.
14  Q  And when did you start investing in stocks?
15  A  When I bought my first stocks. Probably in the
16  1960s.
17  Q  And have you been consistently investing in
18  stocks since that time?
19  A  No.
20  Q  Have you been consistently investing in stocks
21  for the last ten years?
22  A  Yes, I would say; uh-huh.
23  Q  Okay. Over the last three years has there been
24  a six-month period where you didn't purchase or sell a

Page 65

1  stock?
2  A  Yes.
3  Q  And when was that?
4  A  Oh, my. I really don't know. It's three
5  years, and I know there was probably close to a year
6  where I just didn't purchase anything, somewhere in
7  there.
8  Q  What about for the last year? Have you been
9  consistently purchasing and selling stocks the last
10  year?
11  A  Occasionally, yeah. When you use the word
12  consistently, like weekly -- there was a period where I
13  would indeed buy something maybe biweekly, but, no, I
14  don't purchase much; just sporadically, occasionally.
15  Q  Is there any particular size of position that
16  you usually purchase? I mean, do you usually purchase
17  large or small positions?
18  A  When I first had money to invest, I made a big
19  mistake by making large purchases because of the method,
20  the strategy I was using with my friend. And I stopped
21  doing that when I went with Bid to Ask. So I would buy
22  maybe 10- or $15,000 worth of stock at a time, like a
23  thousand shares of something.
24  Q  Okay. Let's make sure we have the time frame

17 (Pages 62 to 65)

eec05367-5564-41fa-818b-238437c59e9a

Page 66

1  right here. When you say you were initially making
2  larger purchases when you were investing with your
3  friend with the strategy --
4      A   Uh-huh.
5      Q   -- what time period was that?
6      A   Oh, gosh. Well, I would say since July 2003,
7  along in there. That's when I first had money to
8  invest, and that's when I worked with him for a while.
9  Now, when did I stop that? It might have been -- it was
10 certainly six months that I tried that strategy, but
11 I -- after that I don't recall when I really stopped and
12 started moving toward the Bid to Ask. You have to look
13 at the stock statements for that.
14      But it was clear definition. I just stopped
15 all together doing that. And then when I found Bid to
16 Ask, then I realized I needed to rely on somebody else's
17 expertise to identify stocks and not my own or his
18 judgment.
19     Q   Okay. And did he -- I think before -- I asked
20 a question before about does anyone else make investment
21 decisions on your account --
22     A   Uh-huh. Uh-huh. Right.
23     Q   -- and the answer was no.
24     A   Correct.

Page 67

1      Q   Is it fair to say that Scott never made any
2  investment decisions on your accounts?
3      A   Oh, no, uh-uh. There would be several stocks
4  that we were looking at, and I didn't know always what
5  he bought, nor did he know what I bought.
6      Q   Is it also fair to say that Scott influenced
7  his opinions about stocks -- influenced some of your
8  purchase decisions?
9      A   Yes.
10     Q   And did his opinion influence your purchase of
11 Wave Systems?
12     A   Yes.
13     Q   Okay. And what did he tell you about Wave
14 Systems?
15     A   Well, we were both reading the New York Times,
16 and we found this little article on Wave -- WAVX. And
17 both of us were pretty astounded by that information.
18 And that information -- the embedding the -- the Wave
19 Securities -- security device on Intel and on -- what's
20 the other company -- IBM was that these two contracts
21 should yield enormous income for WAVX. It would be
22 revolutionary. It might even -- they wouldn't be the
23 next Microsoft, but they would be right up there. It
24 would just make a small company a huge company.

Page 68

1  So both of us were convinced when we sort of
2  calculated the number of computers that -- where this
3  would be embedded and realized that this would be an
4  enormous increase in resources. And that explained why
5  people were -- other people who had earlier seen the
6  information were purchasing this stock. So then I
7  thought that was a -- that was the compelling reason to
8  purchase the stock.
9      Q   Did the article say that this was
10 revolutionary, or was that your or Scott's
11 interpretation?
12     A   No. Did I use the word revolutionary?
13     Q   Yes, you did.
14     A   Well, it would be revolutionary for WAVX
15 because they would go to a whole new level. That's what
16 I meant, that WAVX would all of a sudden go to a --
17     Q   Right. But my question --
18     A   -- the sky.
19     Q   -- is, did the article say that this was going
20 to be revolutionary --
21     A   Oh, no.
22     Q   -- for Wave --
23     A   Just --
24     Q   -- or was that just your interpretation?

Page 69

1      A   Just my interpretation of what would happen to
2  WAVX stock, not about the security device.
3      Q   And what was Scott's view of what would happen
4  to Wave stock based on that article?
5          MR. MOSSER: If you know.
6          THE WITNESS: Yeah, right.
7      A   I don't know for sure, of course, but I know
8  that he was very impressed. I think he was like
9  thousands of other investors. Reading this information
10 you'd have to conclude that this was stunning for WAVX,
11 that it would -- and I'm sure he -- he felt that. In
12 fact, I do remember one statement. He said, "This
13 should go to $10 a share."
14     Q   And do you respect Scott's -- or at the time
15 did you --
16     A   At the time I did.
17     Q   -- respect Scott's opinions about stocks?
18     A   At the time I did --
19     Q   Okay.
20     A   -- yes.
21     Q   And since that time have you lost some faith in
22 Scott's stock picks?
23     A   I have.
24     Q   Okay. You mentioned that -- and I don't mean

18 (Pages 66 to 69)

Page 70

1  to pry, but you mentioned that around this time you had
2  some money to invest.
3    A   Uh-huh.
4    Q   Where did this money come from?
5    A   That came as a result of my retiring from -- in
6  the state system in Florida.
7    Q   Okay.
8    A   And I was on a drop plan, and that money came
9  to me on the day of my retirement.
10   Q   And approximately how much money did you obtain
11 from that that you were going to use to invest?
12   A   About $161,000.
13   Q   Okay. You also mentioned that you initially
14 started making large purchases of stocks and based on
15 your experience decided to switch your strategy
16 eventually. How much -- did you lose a lot of money
17 making these large purchases of stock initially?
18   A   Well, not really. The Pacific Internet,
19 Limited, that I bought -- I see I have 5,000 shares
20 there -- that was a -- that turned out to be very
21 lucrative. I had to wait a little longer than I wanted
22 to, but, yes. And then E-Loan was another stock I
23 bought -- must have had -- I don't remember exactly --
24 maybe 5,000 shares of that. And that I took a loss on,

Page 71

1  about 15,000, I believe, finally.
2        And then Wave Systems, though, was the largest.
3  That I was the most convinced because of the news
4  article. Frankly, that was the -- the fact that it was
5  going to bundle or, you know, embed the device in the
6  Intel computers made it a sure bet.
7    Q   Do you recall all the companies whose stock you
8  invested in under this strategy when you were working
9  with Scott?
10   A   I've just named three, and there might have
11 been another one.
12   Q   Okay. And do you recall how many of those
13 resulted in losses and how many resulted in gains?
14   A   Well, now I'm thinking of -- oh, I'm thinking
15 of two more, China something or other, and I made about
16 a thousand dollars on that, and then there was another
17 one, STST -- now I'm starting to remember -- and I made
18 about a thousand dollars on that. And on Clean
19 Harbors -- no, excuse me, on Pacific Internet, I must
20 have made 9,000 on that. So I was -- come to think of
21 it, I was really making some good purchases.
22   Q   So which ones were the ones that you lost money
23 on under that strategy?
24   A   Define loss.

Page 72

1    Q   Your current portfolio value for that issue is
2  lower than the purchase price.
3    A   All right. And that's Wave Systems.
4    Q   Okay. Is that the only one?
5    A   It's the only one I can recall right now.
6    Q   What about E-Trade? I thought you mentioned
7  E-Trade.
8    A   E-Trade. Oh, yes, of course. Yes, I did lose
9  on that one.
10   Q   So why did you decide to change strategies?
11   A   Bid to Ask came along, and I thought that was a
12 good way to go, where somebody else, an expert in
13 securities, would be identifying stocks. And I didn't
14 want to spend a lot of time, as I was doing with Scott,
15 studying and finding news articles and getting the
16 newspaper every day. That was simply too time consuming
17 and chancier than I wanted to be.
18   Q   And when did you -- if you could approximate
19 the date of this strategy switch, could you do that?
20   A   There's no precise date to it. You know, it
21 might have been like six months to try that, might have
22 been seven or eight months. I wouldn't be able to
23 identify a specific date. But if we looked through my
24 stock accounts, we could identify the last purchase that

Page 73

1  we made with his -- you know, that I made in tandem with
2  him.
3    Q   Okay. Now, you know I'm going to ask you to do
4  that.
5    A   Okay. That would be fairly easy to do.
6    Q   Would it be easier to do looking at your trust
7  records or your IRA records?
8    A   Probably the -- probably the IRA records.
9    Q   Okay.
10   A   Yeah. And for a little while -- because both
11 of these strategies sort of overlapped, see, so it's not
12 quite that simple. I started investing in Bid-To-Ask
13 recommendations while I was still talking with him
14 about, you know, these stocks that we found in the New
15 York Times. So they sort of overlap.
16       So I was -- there's a bridge period. I suppose
17 we could say there are three periods: Periods when I
18 was just working with this strategy, and that includes
19 the Pacific Internet and E-Loan and Wave Systems, STST,
20 and whatever the other one was that I mentioned. And
21 then there are several -- simultaneously I picked up on
22 another method, and then I started investing in it. And
23 as I got more confident with it, then I entered into:
24 I'm not looking at the New York Times any longer, and

Page 74

1  whatever he does -- his purposes were different. His
2  size of purchases were different.
3      MR. MOSSER: Just stick to --
4  A  I had to realize all of those things.
5  Q  And when you say his -- his purposes were
6  different, you're talking about Scott?
7  A  Yes, yes.
8  Q  And how were his purposes different from yours?
9  A  He bought larger costs. He liked to buy
10 20-dollar stocks that were going to go to 30. And he
11 bought -- he would buy several thousand shares each
12 time, so I really wasn't in that category. And I soon
13 realized that I really wasn't that kind of an investor.
14 So this was not any longer for me.
15 Q  Okay. And I think we'll hold off on going
16 through those records for now, but we may go back to
17 them later.
18     Do you ever day-trade?
19 A  No.
20 Q  Do you know what day-trading is?
21 A  Yes.
22 Q  Okay. Have you ever bought a position and sold
23 that same position in the same day?
24 A  Gosh, maybe once or twice.

Page 75

1  Q  And do you recall having done it once or twice?
2  A  Not -- and I don't remember the specific stock,
3  but I -- I don't actually remember it. It might have
4  been the next day. It was so close that I was sort of
5  astonished when I did it. So it could have been the
6  same day, probably was the next day. I'm sort of
7  guessing.
8  Q  And why would you do that?
9  A  Well, the stock rose. That's what Bid to Ask
10 does. It identifies the stock that's been crushed, then
11 it needs to work its way back up; been oversold, and
12 then people realize it's a bargain and then it rises.
13 Sometimes it rises over three weeks, sometimes a day,
14 sometimes two or three days.
15 Q  Does Bid to Ask tell you when to buy and when
16 to sell?
17 A  Yes.
18 Q  And do you follow bid to ask's advice?
19 A  Yes. When I buy something, yes, pay attention;
20 yeah.
21 Q  Have you purchased any options?
22 A  Yes.
23 Q  Okay. What options have you purchased, if you
24 recall?

Page 76

1  A  I don't recall any specific option. Dozens of
2  them back in the 19- -- yeah.
3  Q  I'm sorry? Finish your answer.
4  A  Oh, I can't even remember the era. Must have
5  been in the 1980s.
6  Q  And why were you purchasing options?
7  A  Trying to make money.
8  Q  Did it work?
9  A  I made a lot of money, lost a lot of money.
10 The net -- I might have come out -- you know, I think
11 I -- finally it was a net loss, so...
12 Q  What about futures? Have you ever --
13 A  No.
14 Q  -- bought futures?
15 A  Oh, I bought one future one time, and that's
16 the end of that.
17 Q  And you took a loss on that?
18 A  Took a loss on that.
19 Q  Do you know how large that loss was?
20 A  $800.
21 Q  Did you ever trade puts or calls on Wave?
22 A  No.
23 Q  Have you traded puts or calls on other stocks?
24 A  Yes, years ago.

Page 77

1  Q  Do you ever short-sell?
2  A  No.
3  Q  Do you make purchases on margin?
4  A  I did.
5  Q  And what -- and during what time period did you
6  make purchases on margin?
7  A  Early '90 -- early 2000s.
8  Q  And did you have a margin account at TD
9  Waterhouse?
10 A  Yes.
11 Q  And do you know what the terms of that margin
12 arrangement were?
13 A  Terms meaning -- well, yes, I think I know what
14 you mean.
15     MR. MOSSER: If you don't understand the
16 question, don't answer it.
17     THE WITNESS: Yeah, okay, then.
18 A  What do you mean?
19 Q  Do you know how much -- how much you could
20 purchase on margin?
21 A  Oh, I think it was roughly 50 percent, but it
22 seemed to change. These margin requirements changed
23 over time with TD Waterhouse.
24 Q  And have you stopped making purchases on