Page 78

1  margin?
2  A  Yes.
3  Q  And was that a decision that you made?
4  A  Yes.
5  Q  And why did you make that decision?
6  A  It was too risky.
7  Q  And what do you mean by too risky, if you
8  can --
9  A  Well --
10 Q  -- explain what you mean by that to me?
11 A  Well, I had purchased -- in the early 2000s I
12 had purchased stock on margin and then got margin costs,
13 and enough said. I didn't like that experience.
14 Q  And do you know what the current value of your
15 portfolio is?
16 A  Yes.
17 Q  And what is it?
18 A  Now, after the week? Probably about 110,000.
19 Q  Oh, and I'm sorry. I forgot to ask this. Did
20 you ever make any purchases of Wave on margin?
21 A  No, I don't think so; uh-uh.
22 Q  How much has the value of your portfolio
23 fluctuated over the last three years?
24 A  By about probably $70,000.

Page 79

1  Q  And has it gone up or down?
2  A  Down.
3  Q  And do you recognize that investments and
4  stocks involve risks?
5  A  Yes.
6  Q  Okay. And what are some of those risks?
7  A  The earth could go up in flames. That would be
8  the big one; earthquakes. I own some Sirius stock.
9  Their satellite could fall to the earth and burn up and
10 then they're out of business. In other words,
11 catastrophes, economic debacles, crooked CEOs, fickle
12 buying public could affect the stock.
13 Q  So you understand that a company's stock can go
14 up or down based on forces --
15 A  Sure.
16 Q  -- outside the control of the company?
17 A  Absolutely.
18 Q  Are some companies riskier stock purchases than
19 others?
20 A  Yeah, certainly.
21 Q  What types of companies are riskier stock
22 purchases?
23 A  Well, companies that are -- that lack backup
24 funding supportive of funding or resources for the long

Page 80

1  haul; companies that are in a new market. And so it's
2  relatively untested, unknown what those -- what the
3  product will do in that market, that sort of thing.
4  Q  And did you understand Wave Systems to be one
5  of those types of companies when you purchased the
6  stock?
7  A  Well, I knew that -- the product that they were
8  selling was a Wave Securities system that would be
9  installed in the -- embedded in the -- what do you call
10 it, the Intel computers. So you -- the risk is or the
11 bet is that because the stock -- because the securities
12 system is embedded, people will, as they have done with
13 Microsoft products, Internet Explorer and so on -- they
14 will have it to purchase. It's right there for them.
15      So the gamble or the risk is that they might
16 not; people might not. We felt, of course, that --
17 Q  And did you understand this to be a new market?
18 A  Yes.
19 Q  And do you recognize that a company's revenue
20 varies quarter to quarter?
21 A  Sure.
22 Q  And do you recognize that a company's quarterly
23 revenues depend on or can depend on a variety of market
24 forces beyond its control?

Page 81

1  A  Yes.
2  Q  Have you ever bought or sold a security to
3  achieve a tax benefit?
4  A  Security. I'm not aware of that. I have
5  bought one thing that I know of for a tax benefit, and
6  it was not a security.
7  Q  And what was that?
8  A  Boston Capital.
9  Q  Okay. So was it a DPP, a direct participation
10 program?
11 A  Yeah, a partnership.
12 Q  Is that right?
13 A  Right.
14 Q  You bought a tax credit fund?
15 A  Yes.
16 Q  Have you ever bought the stocks or bonds of any
17 other companies other than Wave that are in the digital
18 security industry?
19 A  Digital security. Digital security industry.
20 No, I don't think so.
21 Q  Do you read any financial or business
22 publications regularly?
23 A  No.
24 Q  Do you have a subscription to the Wall Street

Page 82

1  Journal?
2    A  No. I use my friends.
3    Q  Did you used to have a subscription to the Wall
4  Street Journal?
5    A  No, no.
6    Q  What about the New York Times?
7    A  Same.
8    Q  Okay. I'm just going to go through a short
9  list. Baron's?
10   A  No.
11   Q  Smart Money?
12   A  No.
13   Q  Fortune?
14   A  I've just seen an occasional magazine. Never
15 subscribed.
16   Q  So I could go through a long list.
17   A  Yeah.
18   Q  You don't subscribe to any --
19   A  No.
20   Q  -- business publications?
21   A  Years ago I subscribed to Money.
22   Q  Okay. And when did your subscription to money
23 expire?
24   A  Oh, gosh, probably 1995, you know, mid '90s.

Page 83

1    Q  Do you research your investments on-line?
2    A  On occasion.
3    Q  Other than Bid to Ask, do you research
4  investments still?
5    A  Still. No.
6    Q  Prior to Bid to Ask did you research your
7  investments --
8    A  Yes.
9    Q  -- on-line?
10   A  Yes.
11   Q  Okay. And how did you do that?
12   A  Well, I can go to the web page of the firm
13 itself, and America on-line has ways to, you know, click
14 on the web links. And then you can pick up the news
15 and -- well, let's see. I've even had New York Times.
16 And I've subscribed to that "Let Know" -- what is it? I
17 can ask for certain topics to be researched, and then
18 they would send me e-mails of press releases. That's
19 about it.
20   Q  Okay. And did you ever go to the Wave Systems
21 Web site?
22   A  We never did.
23   Q  So sitting here today, you've never been on the
24 Wave Systems Web site?

Page 84

1    A  No. No.
2    Q  Do you ever visit any investment-related chat
3  rooms?
4    A  I read the Sirius chat room. That's about it.
5    Q  How do you spell that?
6    A  S-i-r-i-u-s.
7    Q  And what kind of chat room is that?
8    A  It's on the AOL page for Sirius Radio, and you
9  can just click on e-mails. What is it? I've forgotten
10 what you click on, but it's just e-mails or commentary
11 or whatever it is. And then it just lists all of the
12 e-mails that people have sent in. Some of it is, you
13 know, information. That's where I would hope to find
14 some information, but it's --
15   Q  Is it investment-related information?
16   A  Yeah.
17   Q  Okay. Do you ever post e-mails on there?
18   A  No, never have. It's entertainment.
19   Q  Did you ever read anything about --
20   A  Not to be -- not to be taken --
21       MR. MOSSER: Wait --
22   A  -- "seriously." I'm -- I was finishing up.
23 Sorry.
24       MR. MOSSER: Okay.

Page 85

1    A  Not to be taken seriously. I've got to get
2  that pun in.
3    Q  Oh, I see.
4       Did you ever read anything about Wave Systems
5  on the Sirius Web site?
6    A  No.
7    Q  Do you regularly watch any financial news
8  programs on television?
9    A  No.
10      MR. MOSSER: How soon do you think we can take
11 a bathroom break?
12      MS. MARTIN: We can take one in about five
13 minutes. Does that work?
14      MR. MOSSER: Cool.
15 BY MS. MARTIN:
16   Q  Do you ever solicit information directly from
17 companies about their stock?
18   A  No.
19   Q  Do you read trade publications?
20   A  What's a trade publication?
21   Q  I'm imaging that a trade publication would be
22 like a newsletter about the -- like, for example, the
23 digital security industry.
24   A  No.

22 (Pages 82 to 85)

Page 86

1  Q  Do you ever read brokerage firm or analyst
2  reports?
3  A  On occasion, if it's a web link on a -- like
4  Sirius, somebody will send in a web link to an analyst,
5  opinions about the stock.
6  Q  Did you ever read any analyst opinions on Wave
7  Systems?
8  A  No.
9  Q  Do you read SEC filings prospectuses --
10  A  No.
11  Q  -- that type of thing?  Did you ever read an
12  SEC filing or prospectus for Wave Systems?
13  A  No.
14  Q  Do you have any other sources of information
15  about investments that we haven't covered today?
16  A  Sources of information.  How about quarterly
17  reports or those things they mail to you?
18  Q  Okay.  So a company-issued quarterly report?
19  A  Company-issued quarterly report.
20  Q  And do you receive and review those for the
21  companies that you invest in?
22  A  Not much.
23  Q  Do you receive them?
24  A  I receive them.  I'll go through them.  And

Page 87

1  they'll ask for voting on the issues before the board,
2  and I frequently vote on those.
3  Q  Did you ever review a quarterly report for Wave
4  Systems that you received?
5  A  No.  I'm not sure I received one.  I don't
6  recall it.
7  Q  So you don't recall receiving or --
8  A  Uh-uh.
9  Q  -- reviewing --
10  A  Don't --
11  Q  -- a Wave Systems quarterly report?
12  A  Don't recall it, no.
13  Q  Could you identify all the individuals with
14  whom you discussed your purchases of securities?
15  A  I don't really discuss them with much of
16  anyone, just my friend Scott.  And I have discussed them
17  with Charles at the Bid to Ask.
18  Q  Did you discuss your Wave purchase with anyone
19  other than Scott?
20  A  No.
21  Q  You did discuss it with Scott, though, correct?
22  A  Yes.  Yes.  We both had the same article.
23  Q  Do you ever listen to investor conference
24  calls?

Page 88

1  A  No.
2  Q  Have you ever listened to an investor
3  conference call?
4  A  I don't think so.
5  Q  Have you ever read the transcript of an
6  investor conference call?
7  A  I don't recall that I've done that.  I would
8  think that would be --
9  Q  Have you ever belonged to an investment club?
10  A  No.
11     MS. MARTIN:  All right.  Now's a good time for
12  a break.
13     (Break taken.)
14     MS. MARTIN:  Back on the record.
15  BY MS. MARTIN:
16  Q  Mr. Harmon, when did you first become aware
17  that Wave Systems existed?
18  A  Well, it would be in -- when the news was
19  announced and was published in the New York Times.  That
20  would be July or July 31st or August 2nd.  It's right in
21  there.  I learned about it soon after that announcement.
22  Q  Did you learn about Wave Systems through the
23  New York Times article?
24  A  First we noticed it was up in volume.  Might

Page 89

1  have been before that.  Might have been just a few days
2  before that when it hit the list of the top-traded
3  stocks.  So we were looking at a list of stocks.  WAVX
4  was one of them.  And it was a good price.  And so then
5  I think that preceded -- I'm sure that that preceded the
6  news announcement.  So we had it on a list, and then the
7  news announcement came.  And then that confirmed -- or
8  not confirmed, but it shed light on why this was a good
9  investment.
10  Q  And the list that you keep referring to is the
11  Wall Street Journal high-volume list; is that correct?
12  A  I think that's it, yes.
13  Q  Okay.
14  A  Yes.
15  Q  And, to the best of your recollection, what
16  companies appear on that list?
17  A  Those whose stocks are trading with what --
18  who's -- the volume has gone up steeply, and that's what
19  puts them on the list.
20  Q  And do you know what number Wave Systems was on
21  that list?
22  A  No, uh-uh.  It was -- I know it was down -- I
23  mean, it's a list of 15 or so, I believe, and it was
24  kind of like maybe the tenth slot.  It was in there

Page 90

1  someplace, but not at the top, not at the bottom.
2  Q   And do you still have that list, that --
3  A   Oh, no. I don't keep --
4  Q   -- list in your possession?
5  A   I don't keep such material.
6  Q   And what about the New York Times article that
7  you referred to? Did you keep a copy of the New York
8  Times article?
9  A   No. No. It was --
10 Q   Do you remember reading the entire New York
11 Times article at the time you saw it?
12 A   Yes.
13 Q   And prior to your first purchase, were you
14 aware of any revenue projections or expectations for
15 Wave?
16 A   No.
17 Q   Prior to your first purchase of Wave stock, did
18 you do any research about Wave or the digital securities
19 products that you haven't already mentioned?
20 A   Not that I'm aware; not that I recall.
21 Q   Did any broker, investment advisor or your
22 friend Scott make any investigation of Wave or the
23 digital securities products industry other than what
24 you've already described?

Page 91

1  A   No broker certainly. Scott might have looked
2  up other information, but I'm not aware of what that
3  would be, if he did.
4  Q   Do you think he did or --
5  A   I really don't know.
6      MS. MARTIN: I'd like to mark as Exhibit 32
7  Certification of Named Plaintiff Pursuant to Federal
8  Securities Laws, Gary L. Harmon.
9      (Harmon Exhibit Number 32 was marked for
10 identification.)
11 A   What's this? Oh.
12     MR. MOSSER: Thanks.
13 BY MS. MARTIN:
14 Q   Do you recognize this document?
15 A   Yes.
16 Q   And what is this document?
17 A   Well, it is the sheet I filled out in response
18 to the original mailing that I received from Schiffrin.
19 Q   And does this accurately reflect your trading
20 in Wave Securities to this date?
21 A   Well, I think these are correct. They would be
22 the figures I took from my Waterhouse account, and they
23 would be -- I hope I copied them correctly, yes.
24 Q   And do you know if your Waterhouse account

Page 92

1  reflects the settlement date or the actual trade date?
2  A   There's a T date on the list, and I take it the
3  T stands for trade.
4  Q   And is that the date you used to fill out this
5  certification? Was it the trade date?
6  A   Yes.
7  Q   Or the -- I'm sorry, it was the T date?
8  A   T date.
9  Q   Thank you.
10 A   Right.
11 Q   And do these -- to the best of your
12 recollection, are these the days that you purchased --
13 A   Yes.
14 Q   -- Wave stock on?
15 A   Yes, correct.
16 Q   So you purchased 5,000 shares of Wave stock for
17 $5.19 on August 5th, 2003; is that correct?
18 A   That's correct.
19 Q   Okay. And what was the source of funds you
20 used to purchase that stock?
21 A   The TD Waterhouse rollover account.
22 Q   And approximately what time of day did you make
23 that trade, if you recall?
24 A   No, I don't.

Page 93

1  Q   And why did you purchase Wave stock on August
2  5th, 2003?
3  A   Because I felt certain that the Wave security
4  device that was to be embedded on the Intel computers
5  would produce a tremendous income source for Wave
6  Systems.
7  Q   Did a broker or anyone else recommend to you
8  that you buy Wave stock on August 5th, 2003?
9  A   Did a broker or anyone? No, not really. My
10 friend Scott certainly thought it would be okay, but,
11 then, I considered that with -- basically it's the
12 information that we found in the New York Times --
13 Q   I'm sorry. Go ahead.
14 A   -- about the embedding of the security device.
15 Q   Did Scott also make a purchase on August 5th,
16 2003, if you know?
17 A   He made a purchase. I don't know on what day.
18 Q   And what was the size of the purchase that he
19 made?
20 A   We didn't discuss that. That's his business.
21 Q   Okay. So as of your first purchase of Wave on
22 August 5th, 2003, what, if anything, had you read about
23 Wave?
24 A   Just the article in the New York Times and the

Page 94

1 listing on the top 15-volume stocks --
2    Q   And --
3    A   -- trade.
4    Q   I'm sorry?
5    A   The top volume in trading stocks.
6    Q   And were you aware of any forecast for revenue
7 at the time of this purchase?
8    A   Whose forecast?
9    Q   Wave's forecast for revenue.
10   A   Well, they certainly -- they were forecasting,
11 you know, a great increase in their revenue, yes. I
12 mean, that was the idea. If they had this product, then
13 they would have a great income.
14   Q   Was everything that you understood about Wave
15 Systems's revenue forecasting coming from the New York
16 Times article?
17   A   Yes.
18   Q   So you weren't aware of any particular forecast
19 of a number?
20   A   Oh, no.
21   Q   What was your understanding of the relationship
22 between Intel and Wave Systems at the time of your first
23 purchase?
24   A   My understanding was that Wave Systems and

Page 95

1 Intel had a contract whereby Wave Systems would supply a
2 Wave security device, system, software, whatever it is,
3 that would be embedded or implanted in the Intel
4 computers that people would buy.
5    Q   And was it your understanding that Intel was
6 required to purchase a minimum number of software units
7 from Wave Systems to embed?
8    A   I don't recall that.
9    Q   Was it your understanding that they were
10 required to purchase any of these security systems?
11   A   That was the understanding, that -- that they
12 would be -- that they would be installed in the
13 computers. Of course they'd have to buy them to do
14 that.
15   Q   And where did this understanding come from?
16   A   From the news article.
17   Q   When you say the news article, the New York
18 Times article?
19   A   New York times article, correct.
20   Q   Okay. And what was your understanding of how
21 much money Intel would have to pay Wave?
22   A   There's no precise number that I was aware of.
23   Q   Is it your contention in this lawsuit that the
24 price of Wave stock was artificially inflated on August

Page 96

1 5th, 2003, at the time of your first purchase?
2    A   Okay. That the inflation of the price
3 occurred --
4        MR. MOSSER: Do you understand the question?
5        THE WITNESS: I'm not absolutely certain.
6    A   That's why I'm really kind of putting it back
7 to you, the question, here.
8    Q   Sure. Let me -- do you know what the phrase
9 artificially inflated means?
10   A   Artificially inflated? Yes, define that.
11 What's that about?
12   Q   Okay. I guess if you don't understand what
13 that phrase means, I might not ask the question. Do you
14 understand what the phrase artificial inflation means?
15   A   Does it mean pumping up the stock by giving the
16 public an impression that is not quite true?
17   Q   That's a fair description, okay. So assuming
18 that that's the definition, is it your contention that
19 the price of Wave stock was pumped up on August 5th,
20 2003?
21   A   That's my impression.
22   Q   Is it your contention in this lawsuit?
23   A   Yes.
24   Q   And was your next purchase of Wave stock later

Page 97

1 that same day on August 5th, 2003?
2    A   Yes.
3    Q   And did you purchase an additional 5,000 shares
4 of Wave stock at $5.03 per share?
5    A   Yes.
6    Q   And what was the source of funds for that
7 purchase?
8    A   The rollover account at TD Waterhouse.
9    Q   Approximately what time of day did you make
10 that purchase?
11   A   I don't know.
12   Q   Well, can you give me an estimate, because this
13 is kind of important? Do you know how long after the
14 first purchase you made the second purchase?
15   A   You know, I can't recall that.
16       MR. MOSSER: If you can't recall, don't guess.
17       THE WITNESS: Okay.
18   A   It was just a period of time. I don't know.
19 Enough to watch the stock.
20   Q   Why did you make two separate purchases of Wave
21 on August 5th, 2003?
22   A   Because I didn't make the total purchase to
23 begin with, so I divided -- I thought I will try just
24 5,000 to start with and see what happens to the price.

Page 98

1  And the price came down, so I thought, Well, it's
2  probably -- it's a better price so I will try to average
3  down.
4     Q   Did a broker or anyone else, including Scott,
5  recommend that you make the second purchase?
6     A   No.  The -- no.
7     Q   Had you read anything new about Wave at the
8  time of your second purchase?
9     A   No.
10    Q   Had you learned anything new about Wave other
11 than the price of the stock?
12    A   No.  All the purchases were based upon the
13 information that I've described, article.
14    Q   And what was your understanding of why the
15 price had dropped from $5.19 to $5.03 during the day of
16 August 5th, 2003?
17    A   My understanding was that people were buying
18 and selling, and there were some sales that brought the
19 price down.
20    Q   And what is that understanding based upon?
21    A   Experience with the market.  People buy and
22 sell, and so the stock rises and it falls according to
23 the rhythm of the volume of buys and sells.
24    Q   So you didn't have any specific information --

Page 99

1     A   No.
2     Q   -- indicating that that was the reason the
3  price had dropped; is that correct?
4     A   That's correct.
5     Q   And did you purchase an additional 1,100 shares
6  of Wave again on August 6th, 2003, for $3.23?
7     A   That's correct.
8     Q   And what was your understanding as to why the
9  stock price had dropped almost $2 from the previous day
10 when you made your first purchase of Wave stock?
11    A   People were taking profits.
12    Q   And what is this understanding based upon?
13    A   Market experience.
14    Q   So you didn't have any specific information at
15 this time?
16    A   No.
17    Q   And what time of day did you make this
18 purchase, if you can recall?
19    A   I can't recall at all.
20    Q   Did a broker or Scott or anyone else recommend
21 that you make this purchase on August 6, 2003?
22    A   No.
23    Q   And what, if anything new, had you read or
24 learned about Wave at the time of this purchase?

Page 100

1     A   Nothing.
2     Q   And later that same day you made another
3  purchase of Wave, and you purchased 1900 shares at
4  $3.24; is that correct?
5     A   That is correct.
6     Q   And do you recall what time of day you made
7  this purchase?
8     A   No.
9     Q   And why did you make a second purchase of Wave
10 on August 6, 2003?
11    A   I was still considering it, and I thought that
12 I needed to shore up my investment, average down the
13 price a little more, and so I put in another buy order.
14    Q   Did a broker or Scott or anyone else recommend
15 that you make this purchase?
16    A   No.
17    Q   What, if anything new, had you learned about
18 Wave at the time of this purchase?
19    A   Nothing.
20    Q   Were you aware of any Wave's forecast for
21 revenue at the time of this purchase?
22    A   Nothing new.
23    Q   Okay.  Any other information that you haven't
24 described that you relied on to make these purchases?

Page 101

1     A   No.  Same -- the same information as before.
2     Q   Now, have you ever purchased or sold any Wave
3  security other than what you've just described?
4     A   No.
5     Q   So you still own 30,000 shares of Wave; is that
6  correct?
7     A   13,000.
8     Q   I'm sorry, 13,000.
9     A   Yes.
10    Q   And, approximately, in total, do you know how
11 much you paid for those shares?
12    A   It would be about 63,000.
13    Q   And do you know what the current market price
14 of those shares is?
15    A   Yes.
16    Q   And what is the current market price?
17    A   About 80 cents.
18    Q   So your current -- the current value of your
19 Wave stock positions is approximately 24,000; is that
20 right?
21    A   No.
22    Q   No?
23    A   Be more like 10,000, if that.
24    Q   So it's 13,000 times .08, right?  Okay.

Page 102

1  So are you concerned that the stock price of
2  Wave may continue to drop further than it already has
3  since your original purchases?
4  A   That seems to be a bottom. Well, it can go
5  down into the 60s, as I've seen. There seems to be a
6  limit bottom, bedrock or something. I certainly hope it
7  won't go off the map.
8  Q   Had you ever thought about whether the value of
9  Wave stock may go down because of this lawsuit?
10 A   It's already gone down. I think it's taken the
11 hit.
12 Q   Have you -- I guess could you answer my
13 question: Have you thought about before today --
14 A   Oh, have I thought about it?
15 Q   -- whether the value could go down because of
16 this lawsuit?
17 A   I've thought about it briefly.
18 Q   And what was the conclusion that you came to?
19 A   It's already taken its hit.
20 Q   But it could go down further, could it not?
21 A   Might go back down into the 60s.
22 Q   But you hope that doesn't happen; is that
23 right?
24 A   One can hope always.

Page 103

1  Q   So is that a, yes, you hope it doesn't go down
2  further?
3  A   That's correct.
4  Q   Do you know if any of the other class members
5  still own shares of Wave stock?
6  A   I don't know that.
7  Q   Do you know if Scott is a member of the class,
8  your friend Scott?
9  A   Scott would be a member of the class, yes.
10 Q   Have you discussed this lawsuit with Scott?
11 A   No. He knows about it. I just said that I am
12 a lead plaintiff in this suit, and he said, "Oh." And
13 so that's it.
14 Q   Is that all that you and Scott discussed about
15 this lawsuit?
16 A   Correct.
17 Q   Do you know if he had any interest in being a
18 named plaintiff in this lawsuit?
19 A   I don't know.
20 Q   Do you know if he took a loss from his Wave
21 stock?
22 A   He did.
23 Q   Do you know how much of a loss he took?
24 A   No.

Page 104

1  Q   Do you know if he's upset because of that loss?
2  A   He -- I'm sure he was at the time because he
3  doesn't like to lose, but he -- he's moved on.
4  Q   What do you mean by that?
5  A   He's gotten out of buying stocks and has bought
6  a mutual fund that's paying very well. He goes out and
7  plays golf.
8  Q   A hedge fund? Is he a hedge fund advisor? Is
9  that --
10 A   It could be.
11 Q   -- what he does?
12 A   It could be. I'm not sure. It might be
13 T. Rowe Price or any fund. I don't know. He did tell
14 me once. It's with Charles Schwab, I can tell you that.
15 Q   Do you know if any of your family members own
16 Wave stock?
17 A   No.
18 Q   Does any business --
19 A   Wait a minute. Wait a minute.
20 Q   Go ahead.
21 A   Any of my family members?
22 Q   Yes.
23 A   Let me see. My wife, three sons. Yes, I do.
24 They don't own anything.

Page 105

1  Q   Okay.
2  A   Of course.
3  Q   Okay. Do any businesses in which you or a
4  family member have an interest own Wave stock?
5  A   No.
6  Q   So your partnership doesn't own any Wave stock?
7  A   No, absolutely not.
8  Q   And did you purchase Wave stock in 2003 in
9  order to make a short-term profit?
10 A   Well, I purchased it to make a profit. I
11 didn't know whether it would be short-term or not. I
12 hoped it would be short term, but I knew that it might
13 be a long-term.
14 Q   Do you still have hopes or expectations that
15 the stock price would go up?
16 A   I'm a hopeful individual.
17 Q   Is that a yes?
18 A   I continue to be hopeful, yes.
19 Q   Have you continued to follow the price and --
20 A   Yes.
21 Q   -- information -- I'm sorry. Let me finish the
22 question.
23 A   Yeah.
24 Q   Have you continued to follow the price of Wave

Page 106

1  stock?
2  A  Yes.
3  Q  Have you continued to follow the information
4  released by Wave regarding its products and --
5  A  Other information, no; uh-uh.
6  Q  So you --
7  A  I haven't followed it.
8  Q  Have you read any articles about Wave since --
9  A  I may have.
10  Q  -- since the New York Times article?
11  A  I may have, but I don't recall what they would
12  be.  I may have, because I read a lot of stuff.
13  Q  Do you have any understanding about how you
14  expect Wave stock to do in the future?
15  A  No, I don't.
16  Q  Do you know what the term gross margin
17  contribution means?
18  A  No.
19  Q  When did you first consider bringing a lawsuit
20  against Wave?
21  A  When I received in the mail the -- I received
22  the mail from -- I think it was from Darren Clark, from
23  Schiffrin, to say that there is a lawsuit going forward
24  and would I like to be a part of it.

Page 107

1  Q  Let me just go back a second.  I think I -- I
2  need to ask one more question.
3     Prior to your first purchase of Wave, did you
4  know anything about Wave having a private placement of
5  series H stocks and warrants in April of 2003?
6  A  I did not.
7  Q  Are you aware of that today?
8  A  I am today.
9  Q  Okay.  What is your understanding of what that
10  was about?
11  A  To explain it, I'm not an explainer of that.
12  I've read about it in the brief, I believe, but to try
13  to explain it myself, it's not something that I
14  committed to memory.
15  Q  Do you know what relation, if any, it has to
16  your lawsuit?
17  A  I think it demonstrates the financial situation
18  the Wave Systems executives found themselves in and from
19  which they needed to extricate themselves.
20  Q  Can you explain what you mean by that, or is
21  that sort of -- is that the extent of your
22  understanding?
23  A  That's -- I'm really very general about that,
24  yes.  Like -- I suspect I'm just like anybody else.  I

Page 108

1  really don't follow the stock -- these details that
2  closely.
3  Q  Okay.  So now let's jump ahead again.  And I
4  asked you when did you first consider bringing a lawsuit
5  against Wave.  What was the nature of the claim that you
6  thought that you had?
7  A  Well, that was in -- by the way, I didn't name
8  the date.  I think it was in March of 2004.
9  Q  Okay.
10  A  And the nature of the claim is that the public
11  or -- publicly disseminated statements from Wave Systems
12  Corporation offered information about the embedding of
13  the Wave security device or software that was false,
14  that the -- that, in fact, the software was not going to
15  be embedded, and the company knew that.  And even though
16  they knew that nevertheless put that information out to
17  the public.
18  Q  Okay.
19  A  And that's a violation of security law.
20  Q  So is it your understanding that Wave said that
21  the security software would be embedded and, in fact, it
22  was not going to be embedded?
23  A  That's -- well, that's the way it's turning
24  out, that the statement was published that we depended

Page 109

1  upon, that it was embedded -- to be embedded, and that,
2  upon review and further scrutiny by the SEC, they found
3  that that was not a true statement.
4  Q  And when you say that was not a true statement,
5  what statement are you referring to?  I just want to
6  make sure the record's clear.
7  A  The embedment -- the embedding statement, the
8  statement that the Wave security system -- security
9  device was to be embedded in Intel computers.
10     (Brumbaugh Exhibit 24, previously marked, was
11  referred to.)
12  BY MS. MARTIN:
13  Q  Okay.  I'm going to mark -- actually, I'm going
14  to show you what's been previously marked as Exhibit 24
15  as the amended complaint.
16     MR. MOSSER:  Are we done with --
17     MS. MARTIN:  Yes.
18     MR. MOSSER:  -- 29 and 30 --
19     MS. MARTIN:  Uh-huh.
20     MR. MOSSER:  -- and 32 and -- actually, I think
21  one of those is my copy.
22     THE WITNESS:  Oops.
23     MR. MOSSER:  Thanks.
24     THE WITNESS:  24?

28 (Pages 106 to 109)

Page 110

1    MR. MOSSER: Yes.
2    MS. MARTIN: Are we missing 31? Oh, here it
3  is.
4  BY MS. MARTIN:
5    Q   Okay. Have you seen this document before?
6    A   Yes, I have.
7    Q   Okay. And what is this document?
8    A   Well, this is the class -- this was an amended
9  class-action complaint for -- about the violations of
10 the federal security law.
11   Q   When did you first see this document?
12   A   When did I see it? Let's see. The amended
13 one? Well, it would have been last fall -- I mean, the
14 fall of 2004. Yeah. Is that 2004? It would be --
15   Q   Do you know if you saw this document before it
16 was filed?
17   A   Oh, absolutely. All these documents were sent
18 to me so that I could see what the case was and how it
19 was presented and then comment on that, as I -- as I
20 could. And then I had a conversation -- phone
21 conversation with -- okay.
22   Q   Don't tell me what -- you don't have to tell me
23 what you said in the conversation --
24   A   Yes.

Page 111

1    Q   -- but you reviewed it before it was filed?
2    A   That's correct.
3    Q   Did you participate in the preparation of this
4  document?
5    A   I did not.
6    Q   Can you describe in general terms any
7  differences between the claims asserted in the original
8  complaint and the amended complaint?
9    A   I certainly -- if I saw those differences, I
10 certainly would erase them from my memory.
11   Q   So the answer --
12   A   No.
13   Q   -- is, no, you cannot?
14   A   No.
15   Q   Do you know whether the court has issued any
16 ruling regarding the amended complaint?
17   A   Yes.
18   Q   And what was that ruling?
19   A   It sustained the complaint.
20   Q   Is -- are the allegations contained in the
21 amended complaint based on any information that came
22 from you?
23   A   That came from -- no, not that came from --
24 well, I don't think so.

Page 112

1    Q   That you provided to your attorneys?
2    MR. MOSSER: Objection. Objection. Don't
3  answer -- don't answer that.
4    Q   Did you provide information to your attorneys
5  for preparation of the amended complaint?
6    A   Not that -- I don't believe so. No.
7    Q   And can you describe to me each
8  misrepresentation or omission that you're alleging the
9  defendants in this case made?
10   A   No, I don't commit these things to memory. I
11 know it's in the document. Once I read it and I'm
12 assured that it's in there -- I mean, that really is
13 what -- I have the attorneys to do this, so I depend
14 upon them to itemize these things. I've reviewed it,
15 and then I see, oh, that -- of course, there's a lot
16 more information than I was ever aware of. But I
17 couldn't -- I, myself, itemize it. I don't carry these
18 things around in my head, no.
19   Q   I'd like to -- actually, I'll take that back,
20 24 back. Thanks.
21   A   Uh-huh.
22       (Off-the-record discussion.)
23       (Brumbaugh exhibit 8, previously marked, was
24 referred to.)

Page 113

1  BY MS. MARTIN:
2    Q   I'd like to show the witness what was
3  previously marked as Exhibit 8, the Wave Systems
4  announcement.
5    MR. MOSSER: 8 was over here somewhere.
6    MS. MARTIN: Am I wrong on 8?
7    MR. MOSSER: I got it.
8    MS. MARTIN: Okay.
9    MR. MOSSER: Are you going to 9 next?
10   MS. MARTIN: Yes.
11   MR. MOSSER: All right.
12 BY MS. MARTIN:
13   Q   Have you seen this document before today?
14   A   Yes.
15   Q   Okay. When did you first see this document?
16   A   This is yesterday's --
17   MR. MOSSER: Objection.
18   Q   You can answer the question. Was it --
19 yesterday the first day that you saw this document?
20   A   Yeah. This specific document? Yesterday.
21   Q   Okay.
22   A   Uh-huh.
23   Q   And did you read it in its entirety yesterday,
24 or did you just skim it?

Page 114

1    MR. MOSSER: Objection. Don't answer that.
2    MS. MARTIN: I don't understand the basis of
3    the objection. Whether he read this document
4    yesterday or not is not privileged.
5    MR. MOSSER: He's answered -- he's answered
6    that he read the document yesterday.
7    MS. MARTIN: I can ask him whether he read it
8    in its entirety or he just skimmed it.
9    BY MS. MARTIN:
10   Q   Did you read it in its entirety, or did you
11   just skim it?
12   A   I skimmed it and read specific passages very
13   closely.
14   Q   Okay. Do you know whether or not you're
15   claiming that this document contains any
16   misrepresentations or material omissions in this
17   lawsuit?
18   A   Yes.
19   Q   And are you?
20   A   Yes.
21   Q   Okay. And what are those material omissions
22   or --
23   A   Well, the statement that --
24   Q   I'm sorry. Let me finish the question.

Page 115

1    A   Oh, excuse me.
2    Q   Can you tell me what material omissions or
3    misrepresentations you're alleging are contained in this
4    document, please?
5    A   A misrepresentation is that the agreement
6    that -- second paragraph, "The agreement will enable
7    Intel to bundle Wave's software and services for the
8    future Intel desktop motherboard targeted for
9    trusting -- trusted computing platforms."
10   Q   And what is misrepresented in that statement?
11   A   Well, bundling is not what actually was the
12   agreement.
13   Q   And what was -- what is your understanding of
14   what the agreement actually was?
15   A   I don't know what the agreement actually was.
16   We only know that this was not the agreement.
17   Q   It says here that the agreement will enable
18   Intel to bundle Wave software and services.
19   A   Uh-huh.
20   Q   Does that statement indicate to you that Intel
21   is obligated to bundle?
22   A   There'd be no point to tell that information
23   otherwise.
24   Q   So it is your understanding that -- from this

Page 116

1    statement that Intel is obligated to bundle Wave
2    software and services with its --
3    A   Well, that's what it looks like, yes.
4    Otherwise, why even announce it, unless you were going
5    to say that it would be bundled.
6    Q   Well, isn't it possible that they were making
7    the announcement because they licensed to Intel the
8    ability to bundle?
9    A   It doesn't say that.
10   Q   Well, it says the agreement will enable Intel
11   to bundle. It doesn't say that the agreement will
12   obligate Intel to bundle --
13   MR. MOSSER: Objection.
14   Q   -- isn't that correct?
15   A   I don't think that's the way a reasonable
16   person would interpret that.
17   Q   Okay.
18   A   I think most people would read it as they're
19   going to bundle Wave's software into the Intel
20   computers. I think that -- that obviously a great many
21   people read it that way.
22   Q   And why -- and why do you say a great many
23   people read it that way?
24   A   Because they bought the stock based on this,

Page 117

1    I'll bet you.
2    Q   Well, you don't know for a fact whether or not
3    they did, do you?
4    A   Well, I can't ask all those people.
5    MR. MOSSER: Objection.
6    Q   Okay.
7    A   Yeah.
8    Q   Is there anything else, any other material
9    misrepresentations or omissions that you are alleging
10   are contained in what's been previously been marked as
11   Exhibit 8?
12   A   I'm looking for something here. Well, there's
13   another statement that there was a further -- and, of
14   course, that could be true, indeed, that Wave recently
15   announced a licensing agreement with National
16   Semiconductor to bundle Wave's EMBASSY Trust Suite with
17   the other trusted platform module.
18       I don't know whether that's true or not, but
19   the Intel bundling turned out for sure not to be true.
20   And it may be -- I can't recall whether it was also a
21   problem with the national -- the language there being
22   used to bundle Wave's software into the National
23   Semiconductor modules. So that was yet another --
24   another problem.

Page 118

1    But basically it's the Intel.
2        MR. MOSSER: I think you've answered the
3    question.
4        THE WITNESS: Yeah.
5    Q   When was the information that was
6    misrepresented in -- or that you're alleging was
7    misrepresented in Exhibit 8 eventually disclosed? Do
8    you understand the question?
9    A   No.
10   Q   Okay. Is it your contention that the market is
11   now aware that this statement --
12   A   Oh.
13   Q   -- was untrue?
14   A   I -- I would think that the market became aware
15   of the untruth of that statement when the SEC said it
16   was going to investigate. And that was in December of
17   2003.
18   Q   Okay. Did you rely on -- on this document to
19   make any of your purchases in Wave stock?
20   A   Not this specific document.
21   Q   Okay. Do you see any information in this
22   document regarding the specific terms of an agreement
23   with Intel?
24   A   Is there information on the specific --

Page 119

1    specific agreement?
2    Q   The terms of an agreement.
3    A   The terms of an agreement? Yeah. I don't
4    think so. It's a general statement: They're working
5    closely with Intel.
6    Q   Okay. I'll take that back.
7        (Brumbaugh Exhibit 9, previously marked, was
8    referred to.)
9    BY MS. MARTIN:
10   Q   Please show the witness the document that's
11   been previously marked as Exhibit 9, which is an August
12   4th, 2003, announcement.
13       Have you seen this document before today?
14   A   I don't think so, no.
15   Q   So this isn't one of the documents that you
16   reviewed yesterday?
17       MR. MOSSER: Objection.
18   Q   Did you review this document before today?
19   Have you looked at this document before today?
20   A   I don't recognize it. We may have seen it.
21       MR. MOSSER: Only answer if you know.
22       THE WITNESS: Yeah.
23       MR. MOSSER: Don't speculate.
24       THE WITNESS: Okay.

Page 120

1    A   Don't recall seeing it, no.
2    Q   Do you know if you're claiming that this
3    document contains any material omissions or
4    misrepresentations in this lawsuit?
5    A   I think this is one of the documents that was
6    referenced in the brief that was filed.
7    Q   And do you know -- can you identify what the
8    material omissions or misrepresentations are that you're
9    alleging?
10   A   I'd have to read through it.
11   Q   Go ahead and take a moment to look through it.
12   A   Uh-huh. I'm not as familiar with this
13   document, and so I -- my comments would be speculative
14   about how it's going to be used in the lawsuit, and --
15   as I don't recall exactly how it's represented in the
16   brief.
17       So I would think that the -- well, I would be
18   speculating there. I'm not supposed to speculate.
19   Q   Did you rely on this document to make any
20   purchases or sales of Wave stock?
21   A   No.
22   Q   Okay. All right. I'll take that one back.
23       MR. MOSSER: This is ours.
24       MS. MARTIN: Oh.

Page 121

1        THE WITNESS: Yeah.
2        MS. MARTIN: I'm not taking it back.
3        All right. Please show the witness what's
4    previously been marked as Exhibit 10, which is a
5    copy of a New York Times article dated August 5th,
6    2003.
7        (Brumbaugh Exhibit 10, previously marked, was
8    referred to.)
9    BY MS. MARTIN:
10   Q   Have you seen this document before?
11   A   Well, I haven't seen this document, this sheet
12   of paper, no.
13   Q   Is this the New York Times article that you
14   were referring to earlier today?
15   A   This seems like it is. You know, it's
16   different from the New York Times article which was, you
17   know, a little thing about like that, you know, four or
18   five-inches long, in a newspaper column, and so this is
19   a different form. But this is the information that I
20   recall from the -- you know, I recognize it as what I
21   have read.
22   Q   Okay. So this in addition to the chart that
23   appeared in the Wall Street Journal --
24   A   Yes.

Page 122

1  Q  -- are the two pieces of information about Wave
2  that you recall --
3  A  Yeah.
4  Q  -- reviewing before your purchases; is that
5  correct?
6  A  Yeah, sure. Yes.
7  Q  Okay. And do you know if you're claiming this
8  document contains any material omissions or
9  misrepresentations?
10  A  Yes.
11  Q  Okay. Could you identify those for me?
12  A  Well, the first line, of course, says it.
13  That's the key, that the Wave Systems Corporation has
14  announced that they have a deal with IBM to embed its
15  security software system inside selected IBM notebook
16  computers.
17  Q  And, just for the record, the witness is
18  paraphrasing the sentence. That wasn't an exact --
19  A  Yeah.
20  Q  -- read of the sentence.
21  A  I'm quoting some of it. "... to a deal with
22  IBM to embed its security software inside selected IBM
23  notebook and desktop computers," is an exact quote.
24      So that is indeed what I -- what I remember

Page 123

1  exactly.
2  Q  Okay. And are you alleging that that is a
3  misrepresentation or a material omission?
4  A  That --
5      MR. MOSSER: Object to the form.
6  Q  Do you know whether you're alleging it's a
7  misrepresentation or a material omission?
8  A  It's a misrepresentation, in my opinion.
9  Q  And what is misrepresented in that sentence?
10  A  To embed the -- the embedment of the security
11  software. It was not going to be embedded. And down
12  below, "Wave announced a deal with Intel to embed its
13  software inside some internal computer chassis built by
14  Intel." And I'm quoting there.
15      And my impression is that they were not indeed
16  going to embed software.
17  Q  And --
18  A  That was not the deal.
19  Q  Is it your understanding that the correct
20  information has now been disclosed to the market?
21  A  I think it's under investigation. I think that
22  the SEC has investigated them.
23  Q  Let me rephrase the question.
24      Is it your understanding that the market is

Page 124

1  aware that this information is not true?
2  A  I think that -- I think that investors have
3  figured that this is not true. They've concluded from
4  these -- these public statements and remarks that the
5  original assertion was not true.
6  Q  And when did the market investors become aware
7  that these statements were not true?
8  A  Well, they would, in general, have become aware
9  when the SEC filed its securities case against Wave in
10  December of 2003.
11  Q  Is it your understanding that they became aware
12  any time before that?
13  A  Well, they may have. The stock was beginning
14  to show serious deterioration, and so lots of people may
15  have become aware before people like me became aware.
16  Q  Do you know what contention you're making in
17  this lawsuit as to when this information was disclosed
18  to the market as being untrue?
19  A  I don't recall specifically.
20  Q  And did you rely upon this document or the
21  information in this document to make purchases of Wave
22  stock?
23  A  Certainly, uh-huh.
24  Q  Did you rely on it to make all of your

Page 125

1  purchases?
2  A  Yes, right. You could treat all of those
3  purchases as one, really.
4  Q  Okay. Next we'll show the witness what's been
5  previously marked as Exhibit 11.
6      (Brumbaugh Exhibit 11, previously marked, was
7  referred to.)
8  BY MS. MARTIN:
9  Q  Have you seen this document before today?
10  A  I have seen this.
11  Q  When did you first see this document?
12  A  Yesterday.
13  Q  Okay. Do you know if you're claiming that this
14  document contains any material omissions or
15  misrepresentations?
16  A  No, I don't.
17  Q  Okay. Did you rely upon this document to make
18  any purchases or sales of Wave stock?
19  A  No, I did not.
20      (Brumbaugh Exhibit 12, previously marked, was
21  referred to.)
22  BY MS. MARTIN:
23  Q  Okay. All right. Take that one back.
24      Show the witness what's been previously marked

Page 126

1  as Exhibit 12, which is a transcript dated August 14th,
2  2003.
3     A   Okay.
4         MR. MOSSER: Wait until she has a question.
5     Q   Have you seen this document before today?
6     A   If I did I don't recall it.
7     Q   Do you know whether or not you're claiming
8  this document contains any material omissions or
9  misrepresentations in this lawsuit?
10    A   I don't recall that.
11    Q   Did you rely upon the information in this
12 document to make any purchases or sales of Wave stock?
13    A   No.
14    Q   Okay. Will you turn to Page 6 of this
15 document?
16    A   Uh-huh.
17    Q   And in the middle of the page there's a
18 question from someone named John Lewis --
19    A   Right.
20    Q   -- which starts with "Could you touch on." And
21 the question is, "Could you touch on -- did you give any
22 color on the Intel deal and what that could mean for
23 revenues?"
24        Could you read out loud the response by Steven

Page 127

1  Sprague?
2     A   Yes. He says, "I haven't been really specific
3  on the numbers for that. And what I can say is" --
4     Q   I'm sorry. I think you're reading the wrong --
5     A   Oh.
6     Q   -- paragraph.
7     A   Oh.
8     Q   It's the paragraph below. It begins with "So
9  Intel."
10    A   Oh. Sprague says, "So Intel hasn't been
11 specific about what their volumes are in the market, and
12 I'll let Intel answer ultimately that volume question.
13 We receive a fee on a per-motherboard basis. There are
14 no minimums in the contract, and there are no maximums
15 in the contract. They decide what products they put it
16 on and how many products they put it on, and we
17 ultimately believe that trusted computing is a very
18 important space for them and for others, so as long as
19 we do a good job and we deliver our product and it works
20 and it's a quality product and delivered on time" --
21 multiple speakers -- "broadened out across their
22 platform. So it's just premature to answer the
23 question" -- multiple speakers -- "in that when they
24 start shipping next month's numbers next month's numbers

Page 128

1  hopefully will be larger than the previous month's
2  numbers."
3     Q   And is it clear from Mr. Sprague's response
4  that the relationship with Intel does not require Intel
5  to purchase any minimum or maximum --
6     A   Well, this is --
7     Q   -- products from --
8     A   This is --
9     Q   -- Wave?
10    A   Excuse me.
11    Q   Any minimum or maximum number of products from
12 Wave?
13    A   That seems clear after the fact.
14    Q   And could you turn to -- let's see. The next
15 question from Mr. Lewis is, "Got it. Is it an exclusive
16 with Intel?" Could you read Mr. Sprague's response?
17    A   "No, it's not an exclusive with Intel. We are
18 a supplier to them. It's a very standard PC OEM
19 industry contract. We built something they think is
20 currently cool. They can replace it when they decide
21 they want to replace it with something else. They can
22 use it as broadly as they want or as little as they
23 want."
24    Q   And is it clear from Mr. Sprague's response

Page 129

1  that Wave did not have an exclusive deal with Intel and
2  that Intel was not required to bundle any Wave services
3  on Intel motherboards?
4         MR. MOSSER: Objection to the form of the
5         question. There's two or three questions.
6     Q   All right. Let's start with the first
7  question.
8         Is it clear from Mr. Sprague's response that
9  Wave did not have an exclusive deal with Intel?
10    A   That's clear.
11    Q   Okay. Is it clear from Mr. Sprague's response
12 that Intel was not required to bundle any services on
13 Intel motherboards, any particular number of Wave
14 products on Intel motherboards?
15    A   That is too -- that too is clear.
16    Q   Okay.
17    A   And the date of this is August 14th, I see.
18        MR. MOSSER: No.
19        THE WITNESS: Okay.
20        MS. REILLY: Let me just ask a question off the
21        record.
22        (Off-the-record discussion.)
23 BY MS. MARTIN:
24    Q   And, let's see. Can you look at the bottom of

**Page 130**

1  that Page 6? The question is from John Lewis.
2  A  Uh-huh.
3  Q  "Can you give any color on the IBM deal in
4  terms of what that means for revenues?"
5      MR. MOSSER: Hold on. Where are we, Counsel?
6  Okay. I'm sorry.
7      MS. MARTIN: At the bottom of the page.
8      MR. MOSSER: Okay. I gotcha.
9  Q  Can you read Mr. Sprague's response?
10 A  "IBM shipped multiple millions of units of TPM
11 platforms in the market, and what we've done is we've
12 certified our technology in a manner that it works
13 against their independent software program. And we're
14 now engaged with them to develop those programs with
15 them to reach out and offer this type of application
16 base to their customers which -- do independently and we
17 can do jointly with them."
18 Q  Okay. And then Mr. Lewis asks, "Is theirs
19 similar to the Intel deal in that you can work with them
20 but it's open if you wanted?" Multiple speakers. And
21 could you read Mr. Sprague's response?
22 A  Yeah. Sprague's response: "In some ways it's
23 very different. Intel is a customer who's purchased a
24 license to certain software that they have a right to

**Page 131**

1  bundle, and they can decide what platforms it goes on
2  and what specific services they want to bundle or not
3  bundle.
4      In the case of IBM it's an independent software
5  vendor program where what we have done is certify.
6  They've taken our software, tested it, said, Yes, this
7  does what it does. It uses a TPM properly. It works
8  with the IBM platform. So we can go offer it as an
9  approved supplier to IBM to customers who've purchased
10 TPM platforms, both IBM platforms, although ultimately
11 this will work on any of the TPM platforms."
12 Q  And is it clear to you from Mr. Sprague's
13 response that Wave did not have a contract with IBM that
14 required IBM to bundle any Intel products?
15 A  It says that Intel is a customer that has
16 purchased a license to certain software that they have
17 the right to bundle and they get to decide.
18 Q  Okay. I'm sorry. I was asking actually about
19 IBM.
20 A  Oh, the --
21 Q  Is it clear from Mr. Sprague's response that
22 Wave didn't have a contract with IBM that required IBM
23 to bundle any of its services?
24 A  Well, they have the right to bundle. That's

**Page 132**

1  all it says there. They can decide -- IBM can decide
2  what they bundle or not.
3  Q  Okay. All right. Let's turn to what's been
4  previously marked as Exhibit 18, I believe, or am I on
5  17?
6      MR. MOSSER: My next one is 17.
7      MS. MARTIN: Okay.
8      MR. MOSSER: We're done with 12?
9      MS. MARTIN: Yes.
10     (Brumbaugh Exhibit 17, previously marked, was
11 referred to.)
12     MR. MOSSER: So we're at 17?
13     MS. MARTIN: Yeah.
14     THE WITNESS: Uh-huh.
15 BY MS. MARTIN:
16 Q  Have you seen this document before today?
17 A  I probably have.
18 Q  Do you know when you first saw this document?
19 A  Yesterday.
20 Q  Okay. Did you read this document yesterday?
21 A  No.
22 Q  Did you even skim this document yesterday?
23 A  No.
24 Q  Okay. Do you know whether you're claiming this

**Page 133**

1  document contains any material misrepresentations or
2  omissions?
3  A  I'm assuming that we are.
4      MR. MOSSER: Don't assume.
5      THE WITNESS: Okay.
6      MR. MOSSER: It's yes or no.
7  A  I don't know for sure.
8  Q  Okay.
9  A  No.
10 Q  And did you rely on this document in making any
11 purchases --
12 A  No.
13 Q  -- or sales of Wave Securities?
14 A  No.
15 Q  All right. Let's move on to Exhibit 18.
16     (Brumbaugh Exhibit 18, previously marked, was
17 referred to.)
18 BY MS. MARTIN:
19 Q  Have you seen this document before today?
20 A  Yes, very likely in a stack of other documents.
21 Q  And do you know when you would have first seen
22 this document?
23 A  Yesterday.
24 Q  Okay. And did you read this document

Page 134

1  yesterday?
2    A  No.
3    Q  Did you skim this document yesterday?
4    A  No.
5    Q  Do you know whether or not you're claiming this
6  document contains any material misrepresentations or
7  omissions?
8    A  Don't know for sure.
9    Q  Did you rely on this document to make any
10 purchases or sales of Wave stock?
11   A  No.
12   Q  All right. Let's move on to Exhibit 19.
13      (Brumbaugh Exhibit 19, previously marked, was
14 referred to.)
15 BY MS. MARTIN:
16   Q  Have you seen this document before today?
17   A  Yeah.
18   Q  And when did you first see this document?
19   A  Yesterday.
20   Q  And did you read this document yesterday?
21   A  No.
22   Q  Did you review this document yesterday?
23   A  No.
24   Q  Do you know if you claim that this document

Page 135

1  contains any material misrepresentations or omissions in
2  this lawsuit?
3    A  Don't know for sure.
4    Q  Did you rely on this document to make any
5  purchases or sales of Wave stock?
6    A  No.
7    Q  Okay. Do you know what claims you've brought
8  against Steven Sprague?
9    A  Generally, yes.
10   Q  What is the conduct that you claim Steven
11 Sprague engaged in which was improper?
12   A  Well, Steven Sprague authorized his
13 spokesperson and for -- and the corporation to
14 communicate to the general public in news announcements
15 that the Wave Securities software was to be bundled in
16 the Intel and IBM machines that were sold -- that IBM
17 and Intel sold to the public.
18   Q  Do you know -- are you alleging in this lawsuit
19 that Gerald Feeney conducted or engaged in any improper
20 activity?
21   A  The improper activity? Yes, the improper
22 activity is that he too authorized the promulgation of
23 false information to the public which led the public
24 to -- like me and the class I represent to purchase the

Page 136

1  Wave Systems stock.
2    Q  Other than the authorization that you just
3  described, are you alleging that Steven Sprague
4  conducted any other improper activities?
5    A  I could not -- I can't detail those, whether
6  there are occasions when he misspoke or misrepresented;
7  other occasions, there may be. I'm just aware of the --
8  the bundling assertion that he and Feeney authorized.
9       MS. MARTIN: Okay. I'm going to take a short
10      break, see if I have one or two follow-up questions,
11      and then that will be it.
12      MR. MOSSER: Okay.
13      (Break taken.)
14      MS. MARTIN: We'll go back on the record.
15      THE WITNESS: Okay.
16 BY MS. MARTIN:
17   Q  Mr. Harmon, you mentioned earlier today another
18 securities lawsuit where you were a witness but not a
19 plaintiff or defendant.
20   A  Yes.
21   Q  Did you receive any compensation for being a
22 witness in that case?
23   A  No.
24   Q  Did you consider any alternatives to bringing

Page 137

1  this lawsuit as a class-action lawsuit?
2    A  No.
3    Q  And why not?
4    A  The attorneys and the firm seemed up on
5  everything, seemed to be preparing a very strong case,
6  and good researchers, good control of language, good
7  reasoning, and I'm really satisfied with them.
8    Q  Let me rephrase the question. Did you ever
9  consider suing Wave Securities or any of the other
10 defendants individually as opposed to as a class?
11   A  No.
12   Q  And why not?
13   A  I don't have enough money or time or interest.
14   Q  How much time do you think it's going to take,
15 require of you, to be a lead representative in this
16 class?
17   A  Well, I don't know for sure, but I assume that
18 it will take several days of time, if I'm to testify.
19   Q  Would you be willing to expend more than that,
20 if necessary?
21   A  If necessary, depending on when it happened.
22   Q  Would you be willing to incur any costs
23 yourself for this -- for the prosecution of this action?
24   A  A reasonable amount, yes.

Page 138

1  Q  And what would be a reasonable amount?
2  A  Airfare and motel.
3  Q  So a couple thousand dollars?
4  A  I would think so.
5  Q  About the limit of what you'd be willing to
6  spend?
7  A  I would think so.
8  Q  What is your current relationship with Scott
9  Rickter?
10 A  Rickard.
11 Q  Rickart.
12 A  Uh-huh, Rickard, with a D.
13    THE COURT REPORTER: Could you spell that,
14 please?
15    THE WITNESS: Yes. R-i-c-k-a-r-d.
16 BY MS. MARTIN:
17 Q  What is your current --
18 A  He's a friend, golfing friend, and -- well, we
19 go to the symphony together with his -- our wives and
20 couples. So we go to the symphony, we'll go out for
21 dinner on occasion, maybe a movie. We've had them up
22 to -- we rent a condo -- I mean, a home every once in a
23 while in Hilton Head or Highlands and have them there.
24 They're just good friends.

Page 139

1  Q  So they remain close social friends --
2  A  Social.
3  Q  -- is that correct?
4  A  Uh-huh, that's fair.
5  Q  And other than this approximately six-month
6  period where you and Scott did some investing together,
7  have you ever done any other business with Scott outside
8  of that?
9  A  No.
10 Q  And was that the only period of time where you
11 were involved with Scott in terms of investing?
12 A  Correct, yes.
13 Q  And has he ever indicated to you whether or not
14 he agrees with the allegations in this lawsuit?
15 A  We've never discussed it.
16    MS. MARTIN: That's all I have.
17    Thank you very much.
18    THE WITNESS: Okay.
19    (Witness excused.)
20    (The deposition was concluded at 12:32 p.m.)
21
22
23
24

Page 140

1           CERTIFICATE OF OATH
2
3  STATE OF FLORIDA)
4  COUNTY OF DUVAL )
5
6    I, the undersigned authority, certify that GARY
7  L. HARMON personally appeared before me on May 26, 2006,
8  and was duly sworn.
9    WITNESS my hand and official seal this 1st day
10 of June, 2006.
11
12
13
14
15
16
17
18    Teresa S. DeCiancio, RDR, CRR, FPR
      Notary Public - State of Florida
19    My Commission expires: July 17, 2009
      My Commission No. DD 033075
20
21
22
23
24

Page 141

1           REPORTER'S CERTIFICATE
2
3  STATE OF FLORIDA)
4  COUNTY OF DUVAL )
5
6    I, Teresa S. DeCiancio, RDR, CRR, FPR, certify
7  that I was authorized to and did stenographically report
8  the deposition of GARY L. HARMON; that a review of the
9  transcript was requested; and that the transcript is a
10 true and complete record of my stenographic notes.
11   I further certify that I am not a relative,
12 employee, attorney, or counsel of any of the parties,
13 nor am I a relative or employee of any of the parties'
14 attorney or counsel connected with the action, nor am I
15 financially interested in the action.
16
17   DATED this 1st day of June, 2006.
18
19
      Teresa S. DeCiancio, RDR, CRR, FPR
20
21
22
23
24

Page 142

```
 1      FOR THE DISTRICT OF MASSACHUSETTS
 2
        ANNE BRUMBAUGH, GARY L. HARMON, )
 3      and RANDY K. GRIFFIN,           )
                                        )
 4          Plaintiffs,      ) Civil Action
                             ) No. 3:04-CV-30022
 5      v.                   )    (MAP)
                             )
 6      WAVE SYSTEMS CORPORATION,     )
        JOHN E. BAGALAY, JR., STEVEN K. )
 7      SPRAGUE and GERARD T. FEENEY,  )
                                       )
 8          Defendants.      )
                             )
 9      IN RE: DEPOSITION OF GARY L. HARMON
        TAKEN - 5/26/06  DATE SENT TO WITNESS: 6/1/06
10
        TO: Gary L. Harmon
11         2815 Sylvan Lane North
           Jacksonville, Florida 32257
12
           The referenced transcript has been completed and
13      awaits reading and signing. Please arrange to stop by
        our office at 345 East Forsyth Street, Jacksonville,
14      Florida, 32202, to read and sign the transcript. Office
        hours are from 9:00 a.m. to 4:00 p.m., Monday through
15      Friday. The transcript is 138 pages long, and you
        should allow yourself sufficient time.
16         Please complete by July 1, 2006.
           The original of this deposition has been forwarded to
17      the ordering party, and your errata, once received, will
        be forwarded to all ordering parties as listed below.
18         Thank you.
19
20         Teresa S. DeCiancio, RDR, CRR, FPR
21
        cc: Todd M. Mosser, Esquire
22          Sara A. Martin, Esquire
23
24
```

Page 143

```
 1              E R R A T A   S H E E T
           DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES
 2
        IN RE: ANNE BRUMBAUGH, GARY L. HARMON,
 3      and RANDY K. GRIFFIN vs. WAVE SYSTEMS CORPORATION, et
        al. Civil Action No. 3:04-CV-30022 (MAP)
 4      Gary L. Harmon - 5/26/06
 5      PAGE NUMBER  LINE NUMBER   SUGGESTION/REASON
 6
 7
 8
 9
10
11
12
13
14
15
16      Under penalties of perjury, I declare that I have read
17      the foregoing document and that the facts stated in it
18      are true.
19
20
21
        DATE                        GARY L. HARMON
22
23      Cc: Teresa S. DeCiancio
            Todd M. Mosser, Esquire
24          Sara A. Martin, Esquire
```