

Not Reported in F.Supp.2d                                                                    Page 1

Not Reported in F.Supp.2d, 2005 WL 102966 (D.Mass.), 2005-1 Trade Cases P 74,695
**(Cite as: Not Reported in F.Supp.2d)**

**H**
Briefs and Other Related Documents

United States District Court,D. Massachusetts.
In re CARBON BLACK ANTITRUST
LITIGATION
**No. Civ.A.03-10191-DPW, MDL NO. 1543.**

Jan. 18, 2005.

Bonny E. Sweeney, Christopher M. Burke, Leonard B. Simon, William J. Doyle, II, Lerach Coughlin Stoia Geller Rudman & Robbins LLP, David W. Mitchell, Milberg Weiss Bershad & Schulman LLP, San Diego, CA, Bruce G. Hearey, Speith, Bell, Mccurdy & Newell, Cleveland, OH, Charles E. Tompkins, Stewart M. Weltman, Cohen Milstein Hausfeld & Toll, PLLC, Washington, DC, David B. Anziska, Anziska, Martin I. Twersky, H. Laddie Montague, Jr., Ruthanne Gordon, Berger & Montague, Philadelphia, PA, David Randell Scott, Scott & Scott LLC, Colchester, CT, Edmund W. Searby, Scott & Scott, LLC, Chagrin Falls, OH, Jack Landskroner, Landskroner-Grieco, Ltd., Mark E. Porter, McDonald Hopkins Haber & Burke, Cleveland, OH, Kevin B. Love, Hanzman & Criden, P.A., Coral Gables, FL, Nancy F. Gans, Moulton & Gans, PC, Theodore M. Hess-Mahan, Thomas G. Shapiro, Shapiro Haber & Urmy LLP, Alan L. Kovacs, Law Office of Alan L. Kovacs, Boston, MA, Joseph M. Barton, Gold, Bennet, Cera & Sidener LLP, San Francisco, CA, Douglas A. Millen, Steven A. Kanner, Much, Shelist, Freed, Denenberg, Ament, Bell & Rubenstein, Mary Jane Fait, Wolf Handenstein Adler Freeman & Hertz LLC, Chicago, IL, Jason A. Zweig, Kaplan Fox & Kilsheimer LLP, New York, NY, Lynn Lincoln Sarko, Mark A. Griffin, Raymond J. Farrow, Keller Rohrback, LLP, Seattle, WA, Richard J. Kilsheimer , Robert N. Kaplan, Kaplan, Fox & Kilsheimer LLP, New York, NY, for Plaintiffs.
C. Scott Toomey, Campbell Campbell Edwards & Conroy PC, Woodbury, NJ, Jennifer L. Merzon,

John M. Majoras, Jonathan B. Berman, Montgomery N. Kosma, Rebecca L. Egeland, Jones Day, Neil K. Gilman, Richard G. Parker, Richard G. Parker, Laura Kam, O'Melveny & Myers, Washington, DC, Jeremy P. Cole, Tina M. Tabacchi , Jones Day, Christopher P. Tompkins, Norman M. Hirsch, Jenner & Block, Michael R. Blankshain, Michael Lee McCluggage, Wildman, Harrold, Allen & Dixon, Chicago, IL, Melissa J. Nandi, Jones Day, Kyle B. Fleming, Baker & Hostetler, E. John Brzytwa, Jr., Brzytwa, Quick & McCrystal, Cleveland, OH, Melvin Greenberg, Greenberg, Dauber, Epstein & Tucker PC, Newark, NJ, William H. Kettlewell, Dwyer & Collora, LLP, Mark A. Berthiaume, Seyfarth Shaw, Amber R. Anderson, Bernard J. Bonn, III, Dechert LLP, Nicholas Joseph Walsh, Dwyer & Collora, LLP, Boston, MA, Gary W. Kubek, Kyra K. Bromley, Robert H. Chandler, Debevoise & Plimpton, New York, NY, Michelle Hart Yeary, Dechert Price & Rhoads, Princeton, NJ, Sophie M. Evans, Tara K. Kelly, Dechert Price & Rhoads, Princeton, NJ, for Defendants.
Richard Alan Arnold, William Blechman, Kenny Nachwalter, P.A., Miami, FL, Scott C. Ford, Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, PC, Boston, MA, for Intervenor.

*MEMORANDUM AND ORDER*
WOODLOCK, J.
**\*1** The plaintiffs Alco Industries, Inc. ("Alco"), Cardinal Color, Inc. ("Cardinal"), Ceradyne Corporation ("Ceradyne"), Parker Hannifin Corporation ("Parker"), Polymerics ("Polymerics"), Schlegel Corporation ("Schlegel"), and Technical Industries, Inc. ("Technical") bring this action on their own behalf and as a class action of purchasers against defendants Cabot Corporation ("Cabot"), Columbian Chemicals Company ("Columbian"), Degussa Engineered Carbons, LP ("DEC"), Degussa AG, and Degussa Corporation ("Degussa") for violation of the Sherman Act, 15 U.S.C. § 1, based upon alleged price-fixing in the carbon black market. Before me are defendants' motion to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 2

Not Reported in F.Supp.2d, 2005 WL 102966 (D.Mass.), 2005-1 Trade Cases P 74,695
(Cite as: Not Reported in F.Supp.2d)

dismiss and plaintiffs' motion for class certification.

## I. BACKGROUND

Carbon black is used in the manufacturing of many products, including tires, rubber hoses, inks, and paints.[FN1] (Compl. ¶ 18 .) The defendants manufacture and sell carbon black, (Compl.¶¶ 3-7.), and, at times relevant to this action, the plaintiffs purchased Carbon Black from one or more of the defendants. (Compl.¶¶ 8-14.) The plaintiffs seek to represent a class comprising over five hundred members who purchased carbon black from the defendants.[FN2] (Compl.¶¶ 21-22.)

> FN1. Except where otherwise noted, the following facts are taken from the First Amended Consolidated Class Action Complaint. The factual allegations found there are assumed true for purposes of this motion.

> FN2. The plaintiffs define the class as:
> All persons or entities who purchased Carbon Black from Defendants or their co-conspirators, in the United States between January 1, 1999 to the present (the "Class period"). Excluded from the class are (1) Defendants and their affiliates, subsidiaries and co-conspirators and (2) any federal, state and local government purchasers. (Compl.¶ 21.)

According to the plaintiffs, one must consider conditions in the carbon black market going back to the mid-1980's in order to understand the alleged collusion in this case. (Compl.¶ 32.) It was at that time that the industry began to consolidate in the face of decreasing demand for their products. (Comp.¶¶ 33-34.) Two proposed acquisitions-one by Columbian and the other by Cabot-were opposed by the government and enjoined by Judge White of the Northern District of Ohio. (Compl.¶¶ 36-38.) The acquisitions were prevented because the carbon black industry was relatively concentrated and carbon black was deemed by Judge White to be a

homogeneous product without practical substitutes having a national market evidencing uniform price movements. (Compl.¶¶ 38a-c, f.) In addition, Judge White noted the longstanding use of price listing in the carbon black industry. (Compl.¶ 38d.) Those qualities eased coordination between companies producing and selling carbon black. (Compl.¶ 38e.) Judge White also referenced the relatively inelastic demand for carbon black and the apparent industry effort to implement discipline in the pricing of the product. (Compl.¶ 38g, h.) Further consolidation would therefore have increased the incentives and ability to collude. (Compl.¶ 38g.) Finally, he found that prices for carbon black had increased and stabilized as of 1984. (Compl.¶ 38i.) In the wake of Judge White's decision, prices dropped. (Compl.¶ 39.)

The plaintiffs allege that the defendants began colluding in or about late 1992, resulting in a substantial price increase. (Compl.¶ 32, 40.) Although the defendants claimed the price change was necessary due to increased costs and demand as well as the need for capital investments, the plaintiffs allege that none of these things occurred at the time. (Compl.¶ 40.) Despite consistent market conditions, defendants Cabot and Columbian " announced basically identical price increases effective January 1993." (Compl.¶ 41.) The collusion allegedly continued at industry conferences held annually beginning in February of 1993. (Compl.¶ 42.) Communication was also maintained by use of third-party conduits. (Compl. ¶ 44.) Efforts to increase prices by closing down two plants during the class period are alleged to be circumstantial evidence of collusion. (Compl.¶ 43.) In sum, as costs remained steady, the prices charged for carbon black rose considerably during 1992-1996, a phenomenon the plaintiffs assert can only be explained by collusive conduct by the defendants. (Compl.¶ 47-48.) The plaintiffs also point to coordination of contractual terms with certain categories of buyers. For instance, they allege that the defendants all began to use similar long-term contracts for their larger buyers, (Compl. ¶ 53.), and all significantly overcharged their smaller buyers. (Compl.¶ 54.)

*2 This was all possible due to the overarching

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                Page 3

Not Reported in F.Supp.2d, 2005 WL 102966 (D.Mass.), 2005-1 Trade Cases P 74,695
**(Cite as: Not Reported in F.Supp.2d)**

market conditions, claim the plaintiffs. They emphasize that carbon black is a unique product with no practical substitutes; that demand for the product is relatively inelastic; that the market is highly consolidated and has significant barriers to entry; and that the defendants had a controlling share of the market for carbon black in the United States.[FN3] (Compl.¶¶ 56-59.)

> FN3. The plaintiffs allege additional facts regarding the market that they believe made it easier for the defendants to collude such as the periodic, predictable nature of sales and the economic forces that affect them. As will be noted below, these conditions also could explain uniformity of price in the absence of collusion. For the purposes of the pending motion to dismiss, however, I draw inferences in favor of the non-moving party, here, the plaintiffs.

The effect of this collusive conduct has been a series of coordinated price increases since 1992, resulting in the maintenance of supra-competitive prices in the carbon black market. (Compl.¶¶ 61-65.) The plaintiffs offer as examples of coordinated price increases the following: (1) Cabot and Columbian announced "substantially identical price increases" in late 1992 and ECI followed suit; (2) the defendants all raised their prices in 1994 by approximately 6%; (3) then, in February of 1995, all the defendants announced that they would be changing the terms under which carbon black would be sold, resulting in price increases; (4) an announcement of "nearly identical price increases" by all defendants was made in June of 2000; (5) this was followed by announcements by all defendants over a two-week period at the beginning of 2002 that they were raising prices by 5%, eliminating energy surcharges, and increasing the premiums on packaging; (6) yet another price increase, this time of approximately 10%, was announced in November of 2002; and (7) in February of 2003, the defendants announced an increase in price of roughly 19%.

The plaintiffs are not the only ones who have taken an interest in possible price-fixing agreements by

one of the defendants, Degussa. In or around November of 2002, American and European officials began a joint investigation into the conduct of defendants in the carbon black market. (Compl.¶ 73.) The investigation resulted in surprise raids by European investigators. (Compl. ¶ 73 .) The conspiracy alleged by the plaintiffs overlapped in time with four other conspiracies in which defendant Degussa was allegedly involved. (Compl. ¶ 48.) European and American antitrust authorities have been investigating Degussa for alleged price-fixing agreements in other product markets, which has led to admissions and proof of participation in certain agreements. (Compl.¶ 48.)

## II. MOTION TO DISMISS

### A. Statute of Limitations

The defendants contend that even assuming that the alleged facts were adequate to state a claim, the claim would be barred by the statute of limitations. The purpose of a limitations period is to provide a measure of repose; and, "[r]epose is especially valuable in antitrust, where tests of legality are often rather vague, where many business practices can be simultaneously efficient and beneficial to consumers but also challengeable as antitrust violations, where liability doctrines change and expand, where damages are punitively trebled, and where duplicate treble damages for the same offense may be threatened." 2 P. Areeda & H. Hovenkamp, Antitrust Law ¶ 320a (2002) (hereafter Areeda). The Clayton Act provides that any action brought to enforce the antitrust laws " shall be forever barred unless commenced within four years after the cause of action accrued." 15 U.S.C. § 15b. The plaintiffs claim that the alleged conspiracy in this case dates back to 1992. The initial complaint, however, was not filed until January 30, 2003. The defendants assert that the unlawful acts alleged by the plaintiffs occurred before January 30, 1999 and, therefore, their claim is time-barred.

*3 This case, however, involves a claim that the defendants took part in an ongoing price-fixing

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 102966 (D.Mass.), 2005-1 Trade Cases P 74,695
**(Cite as: Not Reported in F.Supp.2d)**

conspiracy. As the Supreme Court has observed:
Antitrust law provides that, in the case of a " continuing violation," say, a price-fixing conspiracy that brings about a series of unlawfully high priced sales over a period of years, "each overt act that is part of the violation and that injures the plaintiff," *e.g.,* each sale to the plaintiff, "starts the statutory period running again, regardless of the plaintiff's knowledge of the alleged illegality at much earlier times."

*Klehr v. A.O. Smith Corp.,* 521 U.S. 179, 189, 117 S.Ct. 1984, 138 L.Ed.2d 373 (1997) (quoting 2 P. Areeda & H. Hovenkamp, Antitrust Law ¶ 338b, at 145 (rev. ed.1995)); *see* 2 Areeda ¶ 320b & c; *see also Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 338, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971) ("In the context of a continuing conspiracy to violate the antitrust laws ... each time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover damages caused by that act and ... as to those damages, the statute of limitations runs from the commission of the act."); *Hanover Shoe, Inc. v. United Shoe Mach. Corp.,* 392 U.S. 481, 502 n. 15, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968) (where the Court permitted the plaintiffs to recover despite the fact that the conspiracy began long before the applicable statute of limitations because the "conduct ... constituted a continuing violation of the Sherman Act and ... inflicted continuing and accumulating harm").[FN4]

> FN4. The entire footnote is informative: United has also advanced the argument that because the earliest impact on Hanover of United's lease only policy occurred in 1912, Hanover's cause of action arose during that year and is now barred by the applicable Pennsylvania statute of limitations.... We are not dealing with a violation which, if it occurs at all, must occur within some specific and limited time span. Rather, we are dealing with conduct which constituted a continuing violation of the Sherman Act and which inflicted continuing and accumulating harm on Hanover. Although Hanover could have sued in 1912 for the

injury then being inflicted, it was equally entitled to sue in 1955.
*Hanover Shoe, Inc. v. United Shoe Mach. Corp.,* 392 U.S. 481, 502 n. 15, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968) (citation omitted).

As Professors Areeda and Hovenkamp observe, " [t]he continuing violation issue arises only when the initial act violating the antitrust laws (a) has not been improperly concealed *and* (b) causes sufficient injury early on." 2 Areeda ¶ 320c (emphasis in original). Both elements are present here.

The plaintiffs apparently no longer claim that the statute of limitations should be tolled due to fraudulent concealment in this case. In fact, plaintiffs did not respond to the statute of limitations issue raised in the Defendant's Reply. The plaintiffs raised the issue of fraudulent concealment in their original complaint, (*see* Consolidated Class Action Compl. ¶ 25(F) ( " Questions of law and fact common to the class include: ... (F) Whether Defendants and their co-conspirators fraudulently concealed the contract, combination or conspiracy."), but have apparently abandoned it in their amended complaint. They conceivably could have argued that the defendants fraudulently concealed the nature and extent of the conspiracy and that they did not know and had no reason to know of the conspiracy, thereby tolling the statute of limitations. In fact, "courts often toll the limitation period in the case of secret conspiracies." 2 Areeda ¶ 320e. On the other hand, from the facts pled, ultimately they may be deemed to have had reason to know or at least adequate suspicion to warrant further inquiry.

In any event, the plaintiffs would be required to plead: "(1) wrongful concealment of their actions by the defendants; (2) failure of the plaintiff to discover the operative facts that are the basis of his cause of action within the limitations period; and (3) plaintiff's due diligence until discovery of the facts." *Berkson v. Del Monte Corp.,* 743 F.2d 53, 55 (1st Cir.1984) (citations and internal quotation marks omitted). They have not pled those elements and "the burden rests squarely on the party pleading fraudulent concealment." *Id.; see Grand Rapids*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 102966 (D.Mass.), 2005-1 Trade Cases P 74,695
**(Cite as: Not Reported in F.Supp.2d)**

*Plastics, Inc. v. Lakian,* 188 F.3d 401, 406 (6th Cir.1999) (finding that it is upon plaintiff as "the party seeking to avoid the statute of limitations [to] bear[ ] the burden of proof."); *In re Compact Disc Minimum Advertised Price Antitrust Litigation,* 138 F.Supp.2d 25, 28-29 (D.Me.2001) (stating that the " heightened requirements of Rule 9(b) do apply" to a claim of fraudulent concealment and thus must be pled with particularity); 2 Areeda ¶ 320e (commenting on fraudulent concealment doctrine that "[b]ecause of its exceptional character, the plaintiff has the burden of establishing the requisite elements of the doctrine"); *see also Akron Presform Mold Co. v. McNeil Corp.,* 496 F.2d 230, 233 (6th Cir.1974) ( "All presumptions are against [the party seeking the benefit of exceptions to the statute of limitations], since [their] claim to exemption is against the current of the law and is founded on exceptions.").

*\*4* Nor is this a scenario-such as that described in *Zenith*-where the injury caused by the unlawful acts would not be felt for some time or "is excessively speculative in the early years." 2 Areeda ¶ 320c. Therefore, the plaintiffs must be able to demonstrate that there exist "predicate acts" substantiating their conspiracy claim occurring after January 30, 1999. *Id.* ("The idea of the continuing conspiracy or violation is that the defendant continues to commit acts in furtherance of the violation and each of these additional acts causes additional injury. The statute is said to be tolled as long as such qualifying acts continue to be committed.")

The defendants claim that "virtually all of [the plaintiff's] factual allegations involve events well outside the statute of limitations period," citing the plaintiff's opposition memorandum. That, however, is not the case. The plaintiffs plead in their complaint that there were coordinated price increases in June 2000, January 2002, November 2002, and February of 2003. The plaintiffs also refer to trade association meetings where the agreement was facilitated that began in 1993 and " were held on an annual basis thereafter." (Compl.¶ 42.) In addition, the plaintiffs allege that the defendants used third-party conduits to maintain the conspiracy, (Compl.¶ 44), which along with the

claims of coordinated price increases after January 30, 1999 can be read to allege that the practice continued after that date.

With each agreed-upon, coordinated price increase, the defendants would have violated the Sherman Act anew and, consequently, kept "the cause of action alive for those injuries that occur within four years prior to the filing of an antitrust complaint." 2 Areeda ¶ 320c2. Therefore, the alleged unlawful acts occurring prior to January 30, 1999, while probative of the conspiracy, may not form the basis of recovery. *See Klehr,* 521 U.S. at 189 ("[T]he commission of a separate new overt act generally does not permit the plaintiff to recover for the injury caused by old overt acts outside the limitations period.") (collecting cases). That, however, does not prevent the plaintiffs from bringing a claim for damages incurred from unlawful acts taken by the defendants after January 30, 1999. Whether the plaintiffs have pled sufficient facts to raise a claim that the defendants were engaged in an ongoing antitrust conspiracy is a separate question that I take up in the next section.

### B. Failure to State a Claim

#### 1. Standard of Review

In considering a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), a court must take well-pled factual allegations in the complaint as true and must make all reasonable inferences in favor of the plaintiff. *Watterson v. Page,* 987 F.2d 1, 3 (1st Cir.1993). The court, however, need not credit " bald assertions, unsupportable conclusions, or opprobrious epithets." *Chongris v. Bd. of Appeals,* 811 F.2d 36, 37 (1st Cir.1987). Dismissal under Rule 12(b)(6) is only appropriate if the complaint, so viewed, presents no set of facts justifying recovery. *Cooperman v. Individual, Inc.,* 171 F.3d 43, 46 (1st Cir.1999).

*\*5* In an antitrust action, a court, in deciding a motion to dismiss, applies no special pleading requirements. *See New York Airlines, Inc. v. Dukes County,* 623 F.Supp. 1435, 1451 n. 14

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 102966 (D.Mass.), 2005-1 Trade Cases P 74,695
**(Cite as: Not Reported in F.Supp.2d)**

(D.Mass.1985) (citing *Corey v. Look,* 641 F.2d 32, 38 (1st Cir.1981)). Nevertheless, "plaintiff must do more than assert conclusory allegations." *CCBN.Com, Inc. v. Thomson Financial, Inc. .,* 270 F. Supp 2d 146, 154 (D.Mass.2003). "[I]t is not enough merely to state that a conspiracy has taken place." *The Estate Constr. Co. v. Miller & Smith Holding Co.,* 14 F.3d 213, 220-21 (4th Cir.1994); *see Eastern Food Services, Inc. v. Pontifical Catholic Univ. Services Assoc., Inc.,* 357 F.3d 1, 9 (1st Cir.2004) ("[T]he cases ... say that it is not enough merely to allege a violation in conclusory terms, that the complaint must make out the rudiments of a valid claim, and that discovery is not for fishing expeditions."); *Car Carriers, Inc. v. Ford Motor Co.,* 745 F.2d 1101, 1110 (7th Cir.1984) ( "[I]nvocation of antitrust terms of art does not confer immunity from a motion to dismiss." ); *see also Boston & Maine Corp. v. Town of Hampton,* 987 F.2d 855, 863 (1st Cir.1993); *New York Airlines,* 623 F.Supp. at 1451 n. 14. Therefore, "when the requisite elements are lacking, the costs of modern federal antitrust litigation and the increasing caseload of the federal courts counsel against sending the parties into discovery when there is no reasonable likelihood that the plaintiffs can construct a claim from the events related in the complaint." *Car Carriers, Inc.,* 745 F.2d at 1106. With that said, a complaint should be dismissed only if it appears "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *see Hospital Building Co. v. Trustees of Rex Hosp.,* 425 U.S. 738, 746, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976) ("[I]n antitrust cases where ' the proof is largely in the hands of the alleged conspirators,' dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly.") (quoting *Poller v. Columbia Broadcasting,* 368 U.S. 464, 473, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962)).

## 2. Discussion

Section 1 of the Sherman Act prohibits "every contract, combination ... or conspiracy in restraint of trade or commerce." 15 U.S.C. § 1. In order to state a claim under Section 1, the plaintiffs must allege (1) the existence of a contract, combination, or conspiracy (2) that unreasonably restrains trade either per se or under the rule of reason and (3) that effects interstate trade or commerce. *See Lee v. Life Ins. Co. of N. Am.,* 829 F.Supp. 529, 535 (D.R.I.1993), *aff'd* 23 F.3d 14 (1st Cir.1994). Section 1 prohibits unreasonably anti-competitive agreements and, therefore, absent such an agreement, there can be no violation of the section. [FN5] Certain agreements-such as the price-fixing agreement alleged here-are considered per se unlawful.[FN6] *See Eastern Food,* 357 F.3d at 4 (noting that "[a]lmost the only important categories of agreements that reliably deserve this label today are those among competitors that amount to 'naked' price fixing", among others). The question before me, then, is whether the plaintiffs have sufficiently alleged, for purposes of rebutting a motion to dismiss, that the defendants took part in an agreement to fix prices in violation of Section 1 of the Sherman Act. *See DM Research, Inc. v. Coll. of Am. Pathologists,* 170 F.3d 53, 55 (1st Cir.1999) (" The issue is whether the complaint states a claim under the Sherman Act, assuming the factual allegations to be true and indulging to a reasonable degree a plaintiff who has not yet had an opportunity to conduct discovery."); *Compact Disc,* 138 F.Supp.2d at 26 (answering the question: "How much evidence of an illegal agreement must antitrust plaintiffs plead to avoid dismissal for failure to state a claim?").

> FN5. Anti-competitive behavior in the absence of an agreement-depending on its nature-may fall under Section 2 of the Sherman Act, which provides that "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations shall be deemed guilty of a felony...." 15 U.S.C. § 2.

> FN6. "There is a closely related but analytically distinct type of claim, also based on § 1 of the Sherman Act, where

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 102966 (D.Mass.), 2005-1 Trade Cases P 74,695
**(Cite as: Not Reported in F.Supp.2d)**

the violation lies in the information exchange itself-as opposed to using the information exchange as evidence upon which to infer a price-fixing agreement. This exchange of information is not illegal *per se,* but can be found unlawful under a rule of reason analysis." *Todd v. Exxon Corp.,* 275 F.3d 191, 198 (2d Cir.2001). The plaintiffs, however, have not pled an " information exchange" violation of the Sherman Act.

**\*6** Simply claiming a conspiracy by pointing to parallel conduct, is not sufficient to plead a Section 1 case. Parallel conduct "is a common and often legitimate phenomenon," *see Twombly v. Bell Atlantic Corp.,* 313 F.Supp.2d 174, 179 (S.D.N.Y.2003), and, consequently, the plaintiffs must plead some facts that would substantiate their claim that an unlawful agreement exists between the defendants. *See DM Research,* 170 F.3d at 56 (noting that pleading a "conspiracy" or "agreement" "might well be sufficient in conjunction with a more specific allegation-for example, identifying a written agreement or even a basis for inferring a tacit agreement-but a court is not required to accept such terms as a sufficient basis for a complaint") (internal citation to *Interstate Circuit v. United States,* 306 U.S. 208, 221-25, 59 S.Ct. 467, 83 L.Ed. 610 (1939) omitted). They must provide the court with something "more than unlikely speculations," *DM Research,* 170 F.3d at 56, with something that would make its claim of "conspiracy more plausible." *Id.* at 56-57.

The hurdle at the motion to dismiss stage in a notice pleading setting such as this is relatively low, because there exist later mechanisms for determining factual disputes: "[C]laims lacking merit may be dealt with through summary judgment under Rule 56. The liberal notice pleading of Rule 8(a) is the starting point of a simplified pleading system, which was adopted to focus litigation on the merits of a claim." *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 515, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) (holding that an employment discrimination claim, governed by Rule 8(a), is not subject to a heightened pleading requirement). The plaintiffs have so focused the litigation.

Here, as in *Compact Disc,*
the conclusory allegations do not stand alone; a factual predicate is provided. When a plaintiff's case depends upon inference, the test is " 'when the suggested inferences rise to what experience indicates is an acceptable level of probability." ' *Cooperman,* 171 F.3d at 47-48 (quoting *Dartmouth Review v. Dartmouth Coll.,* 889 F.2d 13, 16 (1st Cir.1989) in a securities case). Although the alleged agreements here do rest largely on inference, the pattern of activity alleged meets the "acceptable level of probability" test at this pleading stage.

138 F.Supp.2d at 28 (footnote omitted). For instance, the plaintiffs allege (1) a series of coordinated price increases not tied to changes in input costs beginning in 1992 and continuing through the Class Period; (2) the beginning of annual conferences where the plaintiffs contend the collusion was aided; (3) the coordinated tightening of supply through the closing of two North American plants; (4) the use of third party conduits to share pricing information; (5) defendant Cabot's use of such conduits and other forms of signaling to maintain the pricing agreements; (6) the defendants' use of long-term contracts for their largest buyers in an attempt to aid in that collusion; (7) that the smaller volume buyers were charged such inflated prices that nothing but collusion could account for them; (8) that carbon black is a standardized product; (9) that carbon black is a unique product with no readily available substitutes; (10) that demand for carbon black is relatively inelastic; (11) that the market for carbon black is highly consolidated with high barriers to entry; (12) that the defendants control a majority of the market; and (13) that maintenance of the agreement is facilitated by the facts that (a) "anticipated sales to major accounts were established annually" (Compl.¶ 60(a).), (b) carbon black is not sold in tandem with other products, and (c) price changes depend on certain known economic events.

**\*7** The defendants contend that the plaintiffs' pleadings do not supply a sufficient basis to justify a reasonable inference of an unlawful agreement. In essence, the defendants claim that the circumstances described by the plaintiffs could just as likely be present in a lawful setting and that the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                              Page 8

Not Reported in F.Supp.2d, 2005 WL 102966 (D.Mass.), 2005-1 Trade Cases P 74,695
**(Cite as: Not Reported in F.Supp.2d)**

substantiating facts presented by the plaintiffs are not relevant "plus factors." In addition, the defendants insist that the plaintiffs have offered no factual underpinnings to their claim, describing the plaintiffs offerings as "conclusory assertions." That is not an accurate depiction. The defendants, in essence, are contesting the inferences to be drawn from the circumstances and events described by the plaintiffs.[FN7] At this stage of the proceedings, however, drawing inferences in favor of the plaintiffs, it seems quite clear that the plaintiffs have presented a number of circumstances and events that, especially when looked at in sum, can lead to a reasonable inference of collusion.

> FN7. In so doing, the defendants cite the Third Circuit opinion in *In re Baby Food Antitrust Litig.,* where the court applied the Supreme Court holding "that conduct as consistent with permissible competition as with illegal conspiracy, does not, standing alone, support an inference of antitrust conspiracy." 166 F.3d 112, 124 (3d Cir.1999) (quoting *Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 588, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). Even assuming *Baby Food* is persuasive, the defendants fail to note that the *Baby Food* court was reviewing the lower court's decision at the motion for summary judgment stage. The obstacles facing the nonmoving party at summary judgment are of a different dimension. Accordingly, here I rely for the most part on decisions dealing with the core question before me, "[h]ow much evidence of an illegal agreement must antitrust plaintiffs plead to avoid dismissal for failure to state a claim?" *In re Compact Disc Minimum Advertised Price Antitrust Litigation,* 138 F.Supp.2d 25, 26 (D.Me.2001). The answer is certainly some quantum less than will be required at later stages of this litigation.

The complaint undeniably relies on circumstantial evidence, but to the extent the defendants' argument is based on the notion that circumstantial evidence is an insufficient basis for pleading a Section 1 claim, it is unpersuasive. Courts have recognized that it would be unfair to require direct evidence because it "is often impossible to obtain ... and so an illegal agreement must often be inferred from circumstantial evidence, including public conduct and 'business behavior' of competitors, as well as market facts." *Twombly,* 313 F.Supp.2d at 179 (citing *Theatre Enterprises, Inc. v. Paramount Film Distrib. Corp.,* 346 U.S. 537, 540, 74 S.Ct. 257, 98 L.Ed. 273 (1954)); *see also In re Commercial Explosives Litigation,* 945 F.Supp. 1489, 1492 (D.Utah 1996) ("Requiring detailed facts at the pleading stage is 'contrary to the substantive law of antitrust conspiracy' because 'conspiracy may be proven by circumstantial evidence." ') (quoting *Monument Builders v. Amer. Cemetary Ass'n,* 891 F.2d 1473, 1481 (10th Cir.1989)).

The defendants are in essence arguing that the plaintiffs fail to prove the antitrust claims they bring, rather than contending that they fail to put the defendants on notice of a claim based on reasonable inferences to be drawn from a series of observed actions, business practices, and market conditions. *See Swierkiewicz,* 534 U.S. at 515 (" 'Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test." ' ) (quoting *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)).

The defendants argue that dismissal is warranted because the plaintiffs have already had ample discovery in this case, which mitigates any unfairness that would result from dismissing a case at this stage. Lack of discovery plainly informs the decisions of courts denying motions to dismiss in antitrust cases. *See, e.g., Compact Disc,* 138 F.Supp.2d at 27 (concluding that liberal notice pleading applies after noting that "[t]hese still are motions to dismiss at the beginning of discovery"); *Commercial Explosives,* 945 F.Supp. at 1492 (permitting a complaint to survive motion to dismiss despite its lack of detailed facts partly because " many of the facts to support a claim of conspiracy may be unknown to plaintiffs until they have an opportunity to conduct some discovery"). I cannot find at this stage of the litigation that the plaintiffs have had sufficient opportunity to conduct

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 102966 (D.Mass.), 2005-1 Trade Cases P 74,695
**(Cite as: Not Reported in F.Supp.2d)**

discovery. Although the defendants claim they have produced "a significant amount of documents, data, and information to Plaintiffs (including a combined total of approximately three million pages of documents, the majority in an electronically searchable form)", full discovery will likely be quite extensive and it would be premature to conclude that sufficient discovery-for that matter, to conclude how much discovery-has occurred to warrant more specificity in the pleadings. The plaintiffs are only required to provide the defendants with sufficient notice through their complaint; they need not provide exquisite detail.

**\*8** The defendants claim that the purpose of the motion to dismiss is to save them the need to go through needless discovery. They make this contention, while also pointing to the voluminous discovery already conducted, as a reason to dismiss the claim. To the extent discovery has already occurred, it actually makes the survival of the claim less burdensome on the defendants. They are simply that much closer to the next step in the process.

The standards at this stage are intended to prevent " fishing expeditions." *Eastern Food,* 357 F.3d at 9. It cannot be said, however, that "no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984). The plaintiffs have provided sufficient circumstantial evidence to put the defendant on notice of their claims and to permit me to find that there is a plausible set of facts under which they could prove their case. Discovery will not require plaintiffs to search for grounds on which to rest their claim; it is rather for substantiation for the grounds they have already presented. That type of information is of the sort, unlike "information about market definition," *Eastern Food,* 357 F.3d at 9, which is only available to the plaintiffs through such discovery. In sum, the defendants' contention that the facts could also easily describe lawful activity is not dispositive at this stage of the proceedings.

In fact, the plaintiffs describe a relatively straightforward price-fixing agreement, one which courts have addressed in the context of Sherman Act cases for many decades. Whether the record will substantiate the plaintiffs' contentions after being supplemented by more complete discovery, one cannot say. But that is a question for a later date and, if appropriate, can be resolved at that time on a more developed factual record. At present, I must draw inferences in favor of the plaintiffs. They have alleged that price increases were coordinated through unlawful communication via a third-party conduit and at trade association meetings. In addition, the plaintiffs allege that the defendants agreed to limit supply through the closing of plants in order to raise prices in the industry, while also instituting uniform contractual practices by agreement. The plaintiffs have alleged information regarding market conditions that would facilitate the maintenance of the alleged agreement. All these allegations may not be borne out in the end, but they are pled, are plausible and, if believed, would form the basis of a valid Section 1 claim. I therefore will deny the defendants' motion to dismiss the complaint.

### III. MOTION FOR CLASS CERTIFICATION

The plaintiffs seek to represent a class comprising All persons or entities who purchased Carbon Black directly from Defendants or their co-conspirators in the United States between January 1, 1999 [FN8] and the present (the "Class Period"). Excluded from the class are (1) Defendants and their affiliates, subsidiaries and co-conspirators and (2) any federal, state, and local government purchasers.

> FN8. For the reasons stated above, only purchasers of carbon black after January 30, 1999 may recover as members of the class.

**\*9** Pursuant to Section (a) of Fed.R.Civ.P. 23, a representative may sue on behalf of a class if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 102966 (D.Mass.), 2005-1 Trade Cases P 74,695
**(Cite as: Not Reported in F.Supp.2d)**

representative parties will fairly and adequately protect the interests of the class.

In addition to the numerosity, commonality, typicality, and adequacy requirements, the class must also fall within one of the Rule 23(b) subsections. The plaintiffs here contend that their claim satisfies the "predominance" and "superiority" requirements of 23(b)(3).[FN9] The burden of proof on these questions rests squarely on the plaintiffs. *See Smilow v. Southwestern Bell Mobile Systems, Inc.,* 323 F.3d 32, 38 (1st Cir.2003) "( [T]he plaintiff must establish the ... elements...."); *In re Relafen Antitrust Litigation,* 218 F.R.D. 337, 341 (D.Mass.2003); *Guckenberger v. Boston Univ.,* 957 F.Supp. 306, 325 (D.Mass.1997).

> FN9. Rule 23(b)(3) provides:
> (b) ... An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:
> (3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.
> Fed.R.Civ.P. 23(b)(3).

When deciding a motion for class certification, "[a] district court must conduct a rigorous analysis of the prerequisites established by Rule 23 before certifying a class." *Smilow,* 323 F.3d at 38.[FN10] Therefore, although the defendants challenge

certification only on the basis of a failure to meet the requirements of 23(a)(4) and (b)(3), I will analyze all the requirements of 23(a) in turn. *See McLaughlin v. Liberty Mutual Ins. Co.,* 224 F.R.D. 304, 307 (D.Mass.2004) (addressing each requirement in turn even though the defendant only challenged certification on two grounds); *see also McAdams v. Mass. Mut. Life Ins. Co.,* 99-30284, 2002 WL 1067449, at *3 (D.Mass. May 15, 2002) ( "Although the defendants do not challenge the numerosity requirement, 'the Court must consider each factor.' ") (quoting *In re Cardizem CD Antitrust Litig.,* 200 F.R.D. 297, 303 (E.D.Mich.2001)).

> FN10. There is an open question, however, regarding to what extent courts may examine the merits of the plaintiffs' claim and make factual inquiries when deciding a motion to certify a class. The Second Circuit, for instance, does not permit its district courts to look further than the allegations presented in the complaint. *See Caridad v. Metro-North Commuter R.R.,* 191 F.3d 283, 291-93 (2d Cir.1999). The Third, Fourth, and Seventh Circuits, on the other hand, "require a district court to make factual and legal inquiries beyond the allegations in the complaint if such inquiries are necessary to an informed ruling on class certification." *In re Polymedica Corp. Securities Litig.,* 224 F.R.D. 27, 35 (D.Mass.2004). Recently, in a securities case, Judge Keeton observed that while "[t]he First Circuit has not addressed the issue squarely ... it appears to favor a more searching inquiry." *Id.* at 34. In any event, all courts seem to agree that whatever the inquiry, it may only go so far as necessary to resolve the questions raised by the Rule 23 requirements. It is not entirely clear, therefore, where the lines of the debate are actually drawn. For present purposes, I assess the allegations in the complaint in light of the entire record presented to me on the motion for class certification. Therefore, while the plaintiffs' allegations and expert opinions

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d    Page 11

Not Reported in F.Supp.2d, 2005 WL 102966 (D.Mass.), 2005-1 Trade Cases P 74,695
**(Cite as: Not Reported in F.Supp.2d)**

will be given considerable weight and will benefit from reasonable inferences, my conclusions are informed by the record submissions of the defendants as well.

I will do so recognizing the interplay between the policy objectives of both the antitrust provisions and of class certification. The allowance for treble damages in antitrust actions "was designed to encourage private enforcement of the antitrust laws by offering generous recompense to those harmed by the proscribed conduct and simultaneously to erect a deterrent to those contemplating similar conduct in the future." *In re Vitamins Antitrust Litig.,* 209 F.R.D. 251, 258 (D.D.C.2002). Courts have noted that class actions are a particularly appropriate mechanism for achieving such enforcement, *see id.* (collecting cases), and, therefore, "courts resolve doubts in favor of certifying the class." *In re Playmobil Antitrust Litig.,* 35 F.Supp.2d 231, 238 (E.D.N.Y.1998).

### A. Rule 23(a) Requirements

#### (1) *Numerosity*

The numerosity requirement boils down to a question of practicability of joinder. *See McLaughlin,* 224 F.R.D. at 307 ("The first requirement of Rule 23(a)(1) is often referred to as ' numerosity,' but it might more properly be called the 'impracticability' requirement, because the inquiry called for by Rule 23(a)(1) often involves more than merely counting noses."). Although courts may consider a number of factors in deciding whether 23(a)(1) has been satisfied, class size is " [t]he most obvious consideration." 7A Wright, Miller & Kane, Federal Practice and Procedure § 1762 (2004). "The numerosity requirement of Rule 23(a), moreover, 'is not a difficult burden to satisfy.. ..' ' *McAdams,* 2002 WL 1067449, at \*3 (quoting *In re Cardizem,* 200 F.R.D. at 303).

**\*10** The plaintiffs do not yet know the exact size of their proposed class. That, however, does not prevent the numerosity prong from being satisfied. " Although the party instituting the action need not

show the exact number of potential members in order to satisfy this prerequisite, he does bear the burden of showing impracticability and mere speculation as to the number of parties involved is not sufficient to satisfy Rule 23(a)(1)." 7A Wright & Miller § 1762. The plaintiffs attempt to represent "[a]ll persons or entities who purchased Carbon Black directly from Defendants or their co-conspirators in the United States between January 1, 1999 and the present," estimating that group to contain "approximately five hundred geographically dispersed Class members."

Whether the plaintiffs' proposed class satisfies the other class certification requirements will be addressed below,[FN11] but for purposes of the numerosity requirement, it is obvious that hundreds of purchasers throughout the country could not be practicably joined in this action. *See Relafen,* 218 F.R.D. at 342 (noting that a class of 40 claimants is "generally found to establish numerosity"); *see also McAdams,* 2002 WL 1067449, at \*3 (finding that it would be impracticable to join 117 geographically diverse claimants); *Guckenberger,* 957 F.Supp. at 325 (coming to the same conclusion in regard to 480 students enrolled at the same university).

FN11. The size of the class will be relevant to the remaining analysis:
The interrelationship of the numerosity prerequisite and some of the other class action requirements should be noted. For example, the requirement in subdivision (a)(4) that the representatives adequately protect the interests of all members of the class is a peculiarly significant requirement when the class is very large. Furthermore, because of the mandatory notice requirement applicable in actions brought under Rule 23(b)(3) and the binding effect of the judgment on all class members, a few courts have suggested that concerns about size may have increased importance. Again, however, the concern these courts are expressing is not whether Rule 23(a)(1) has been satisfied but whether it is proper to bind all members of the class and whether it is feasible to give them all

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 102966 (D.Mass.), 2005-1 Trade Cases P 74,695
**(Cite as: Not Reported in F.Supp.2d)**

proper notice.
7A Wright, Miller & Kane, Federal Practice and Procedure § 1762 (2004) (footnotes omitted).

The impracticability of joinder is exacerbated by the geographic diversity of the class. *See Andrews v. Bechtel Power Corp.,* 780 F.2d 124, 131-32 (1st Cir.1985) ("Joinder is considered more practicable when all members of the class are from the same geographic area."). Courts also consider whether the members of the class are easily identifiable, because when they are, "joinder is more likely to be practicable." *Andrews,* 780 F.2d at 132. Here, one would assume, the members of the class would be relatively easy to identify. But, the large numbers and geographic diversity of the class would outweigh this consideration. Therefore, I find that the first requirement of Rule 23 has been met in this case.

### (2) Commonality

To satisfy the second requirement under 23(a), the plaintiffs must show that the class members' claims share common questions of law or fact. The plaintiffs are not required, however, to demonstrate strict uniformity. *See In re Polymedica Corp. Securities Litig.,* 224 F.R.D. 27, 35 (D.Mass.2004) (noting that while class members must share common questions, not every question must be common); *McAdams,* 2002 WL 1067449, at *3 (" The presence of some factual differences in the claims of the class ... does not preclude a finding of commonality.") (citing 5 Moore's Federal Practice § 23.23[2], at 23-77). In fact, courts have even found that "[t]he commonality test is met when there is at least one issue, the resolution of which will affect all or a significant number of the putative class members." *Lightbourn v. County of El Paso,* 118 F.3d 421, 426 (5th Cir.1997); *Coleman v. Pension Benefit Guar. Corp.,* 196 F.R.D. 193, 198 (D.D.C.2000) (quoting *Lightbourn* ). It is not surprising, therefore, that "[t]he commonality requirement is often easily met." *Vitamins,* 209 F.R.D. at 259; *see In re Linerboard Antitrust Litig.,* 203 F.R.D. 197, 205 (E.D.Pa.2001) (noting that the commonality "requirement is easily met because it

may be fulfilled by a single common issue").

**\*11** All the class members here will have to prove a violation of Section 1 of the Sherman Act and will do so referencing an alleged conspiracy by the defendants. The plaintiffs identify "numerous major issues common to the Class." These include (1) whether the defendants conspired to fix prices; (2) the duration and extent of that scheme; (3) whether the scheme was successful; (4) what its impact was; (5) the appropriate damages; and (5) whether injunctive relief will be required.

Likewise, the plaintiffs in *Vitamins* identified common issues that included, among others, whether the defendants conspired to fix prices; the duration of any horizontal agreements; whether the named defendants took part in the conspiracy; whether the conspiracy injured the plaintiffs; the appropriate measure of damages; and whether the plaintiffs were entitled to injunctive relief. The *Vitamins* court concluded that the plaintiffs had satisfied the commonality requirement, noting that " [s]imilar issues have been found to satisfy the commonality requirement in other antitrust cases." 209 F.R.D. at 259 (citing *In re Lorazepam & Clorazepate Antitrust Litig.,* 202 F.R.D. 12, 27 (D.D.C.2001); *In re Ampicillin Antitrust Litig.,* 55 F.R.D. 269, 273 (D.D.C.1972); and *In re NASDAQ Market-Makers Antitrust Litig.,* 169 F.R.D. 493, 510 (S.D.N.Y.1996)); *see In re Auction Houses Antitrust Litig.,* 193 F.R.D. 162, 164 (S.D.N.Y.2000) ("The issues of the existence and scope of a price fixing conspiracy frequently have been held to satisfy the requirement of common questions."); *see also In re Flat Glass Antitrust Litig.,* 191 F.R.D. 472, 478 (W.D.Pa.1999) (citing 4 Hubert Newberg and Alba Conte, Newberg on Class Actions § 18.05, at 18:15 (3d ed.1992)). The plaintiffs have sufficiently demonstrated at this stage.-and the defendants do not directly contest-that there exist common questions of law and fact in this case.[FN12]

> FN12. That does not, however, resolve the question under 23(b)(3) whether these common issues predominate; the defendants contend they do not. That

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 102966 (D.Mass.), 2005-1 Trade Cases P 74,695
**(Cite as: Not Reported in F.Supp.2d)**

question will be addressed below.

### (3) Typicality

In order to permit a class action to proceed, Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." The typicality element is an unstable one, 7A Wright & Miller § 1764 ("There is some doubt about the exact meaning of the ' typicality' requirement."), principally because it tends to intertwine with other Rule 23 requirements, such as commonality, *see Martens v. Smith Barney, Inc.,* 181 F.R.D. 243, 258 (S.D.N.Y.1998) (" Commonality and typicality 'tend to merge into one another, so that similar considerations animate analysis." ') (quoting *Marisol A. v. Guiliani,* 126 F.3d 372, 376 (2d Cir.1997)); *Guckenberger,* 957 F.Supp. at 325 (describing typicality as being " [c]losely related to commonality"), and adequacy. *See Meredith v. Mid-Atlantic Coca-Cola Bottling Co.,* 129 F.R.D. 130, 133 (E.D.Va.1989) (finding that typicality may be found "so long as the claims are based on the same legal or remedial theory and no conflict of interest exists between the named plaintiff and the class members").

**\*12** As a general proposition, however, a representative's claim will be deemed typical when its "injuries arise from the same events or course of conduct as do the injuries that form the basis of the class claims" and "are based on the same legal theory" as those of the absent class members. *In re Bank of Boston,* 762 F.Supp. 1525, 1532 (D.Mass.1991); *see also Auction Houses,* 193 F.R.D. at 164-65 (asking "whether other members of the class have the same or similar injury, whether the action is based on conduct not special or unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct"); *Davis v. Northside Realty Assoc., Inc.,* 95 F.R.D. 39, 43 (N.D.Ga.1982); *see also Linerboard,* 203 F.R.D. at 207 ("A finding of typicality will generally not be precluded even if there are 'pronounced factual differences' where there is a strong similarity of legal theories.").

The typicality requirement is satisfied here. The plaintiffs claim, as purchasers of carbon black from

the defendants, that they were injured due to artificial price increases caused by the defendants' unlawful price-fixing agreement. The "course of conduct" pled in this case is the agreement to fix prices and the legal theory will be a Section 1 violation for all class members.

In arguing that 23(b)(3) requirements are not met, the defendants contend that the class members are diverse in size and that they paid for diverse products pursuant to a variety of different agreements. The contention arguably speaks to typicality also, because the plaintiffs may not have purchased carbon black pursuant to the same terms or in the same volumes as other members of the class. That, however, is not sufficient to deny certification on the typicality prong:

[T]he named class members' claims, as well as the claims of the proposed classes, arise from the alleged price-fixing scheme perpetrated by defendants. The overarching scheme is the linchpin of plaintiffs' amended complaint, regardless of the product purchased, the market involved or the price ultimately paid. Furthermore, the various products purchased and the different amount of damage sustained by individual plaintiffs do not negate a finding of typicality, provided the cause of those injuries arises from a common wrong.

*Flat Glass,* 191 F.R.D. at 480; *see Vitamins,* 209 F.R.D. at 261 ("The typicality requirement does not mandate that products purchased, methods of purchase, or even damages of the named plaintiffs must be the same as those of the absent class members."); *In re Catfish Antitrust Litig.,* 826 F.Supp. 1019, 1035 (N.D.Miss.1993) ("[I]n instances wherein it is alleged that the defendants engaged in a common scheme relative to all members of the class, there is a strong assumption that the claims of the representative parties will be typical of the absent class members."); *see also* 1 ABA Section of Antitrust Law, Antitrust Law Developments 932 (5th ed.2002) (noting that typicality is normally satisfied in price-fixing conspiracy claims "even though the plaintiff followed different purchasing procedures, purchased in different quantities or at different prices, or purchased a different mix of products than did the members of the class").[FN13] So too

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 102966 (D.Mass.), 2005-1 Trade Cases P 74,695
**(Cite as: Not Reported in F.Supp.2d)**

here. The representative plaintiffs seek only to represent others who bought carbon black at artificially inflated prices as a result of a coordinated price-fixing agreement by the named defendants. The fact that in certain regards their claims may have distinctions does not make them atypical. I therefore find that the requirements of 23(a)(3) have been met.

> FN13. *See also In re Catfish Antitrust Litig.,* 826 F.Supp. 1019, 1036 (N.D.Miss.1993):
> [T]here is nothing in Rule 23(a)(3) which requires the named plaintiffs to be clones of each other or clones of other class members. The diversity of named plaintiffs who differ in their methods of operation and conduct is often cited by defendants as an impediment to class certification. However, as long as the substance of the claim is the same as it would be for other class members, then the claims of the named plaintiffs are not atypical.

### (4) Adequacy

*13 In order to satisfy the 23(a)(4) requirement, the plaintiffs "must show first that the interests of the representative party will not conflict with the interests of any of the class members, and second, that counsel chosen by the representative party is qualified, experienced and able to vigorously conduct the proposed litigation." *Andrews,* 780 F.2d at 130; *see Relafen,* 218 F.R.D. at 343 (quoting *Andrews* ); *Bank of Boston,* 762 F.Supp. at 1534 (describing the relevant adequacy inquiries as "whether any potential conflicts exist between the named plaintiffs and the prospective class members" and "whether the named plaintiffs and their counsel will prosecute their case vigorously.") I take up this analysis in light of the fact that, unlike in regard to the first three elements of 23(a), the defendants explicitly argue that the adequacy requirement has not been satisfied.[FN14]

> FN14. The defendants, however, do not concede that the other elements of 23(a)

have been met. Rather, they emphasize correctly that it is the plaintiff's burden to make an adequate showing on each of the pertinent Rule 23(a) and (b) requirements.

Aware of the potential due process concerns inherent in a class action, I note that
[u]nless the relief sought by the particular plaintiffs who bring the suit can be thought to be what would be desired by the other members of the class, it would be inequitable to recognize plaintiffs as representative, and a violation of due process to permit them to obtain a judgment binding absent plaintiffs.

*Dierks v. Thompson,* 414 F.2d 453, 456 (1st Cir.1969); *see also* 7A Wright & Miller § 1765 ("If the absent members are to be conclusively bound by the result of an action prosecuted or defended by a party alleged to represent their interests, basic notions of fairness and justice demand that the representation they receive be adequate."). The defendants contend-without offering any case law in support of their adequacy arguments-that is what is happening here, arguing:The named Plaintiffs will have a clear interest in arguing that the effect of the alleged conspiracy was to impose higher prices on them, while the largest purchasers protected themselves through the exercise of their countervailing negotiating leverage. The unrepresented tire companies, on the other hand, would have the opposite interest in arguing that, absent the alleged conspiracy, they would have used their negotiating leverage to obtain even lower prices, and thus should receive the bulk of the damages.

Even if this is true, however, it does not provide a sufficient basis to find that the representative parties will not "fairly and adequately protect the interests of the class" in this case. Fed.R.Civ.P. 23(a)(4).

The antagonism described by the defendants might raise adequacy concerns in a case where there was a limited fund available for divvying up. *See* 1 Antitrust Law Developments (Fifth) 935 ("A plaintiff may not be able to adequately represent a class of its competitors where the nature of the violation alleged is such that the amount of damages

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 102966 (D.Mass.), 2005-1 Trade Cases P 74,695
**(Cite as: Not Reported in F.Supp.2d)**

available to the class is limited and conflicts could develop as to the allocation of those damages between the plaintiff and the other class members.") That is not this case. To the extent there is a dispute about the extent of the overcharge for different sized class members, the problem is simply one of the calculation of damages as to each, not a zero sum game requiring a comparable subtraction from the damages of other class members.

**\*14** The overarching question here is the conduct of the defendants, not the specific damage calculation or relevant bargaining power among the plaintiffs. Therefore, the named plaintiffs and their counsel have the same core objectives as would absent class members. *See Fears v. Wilhemina Model Agency, Inc.,* No. 02 Civ. 4911, 2003 U.S. Dist. LEXIS 11897, at \*18 (S.D.N.Y. July 15, 2003) (noting when addressing the adequacy requirement that " [a]ll the class members share a common interest in proving the existence, scope and effect of defendants' ongoing price fixing"); *Vitamins,* 209 F.R.D. at 262 ("[B]ecause the plaintiffs have alleged an overarching single conspiracy ... all named plaintiffs will have the same incentive to the case as an absentee class member. This incentive is in no way diminished by the fact that ... the named representatives may have used different methods of purchase."); *see also Hedges Enterprises, Inc. v. Continental Group, Inc.,* 81 F.R.D. 461, 466 (E.D.Pa.1979) (recognizing that the "mere fact that a representative plaintiff stands in a different factual posture" does not warrant denial of certification; rather, the "atypicality or conflict must be clear and must be such that the plaintiff's interests are placed in significant jeopardy") (quoting *Sley v. Jamaica Water & Util., Inc.,* 77 F.R.D. 391, 394 (E.D.Pa.1977)).

Moreover, the plaintiff representatives need not have purchased products from all or most of the defendants in order to be adequate representatives. As the *Linerboard* court pointed out, "because antitrust law 'provides for joint and several liability of co-conspirators, each Plaintiff will have an equal incentive to generally prove the Defendants' participation in the alleged conspiracy." ' 203 F.R.D. at 208 (quoting *NASDAQ,* 169 F.R.D. at 519). I find that "the antagonism postulated here

appears ... more speculative than realistic." *Paper Systems Inc. v. Mitsubishi Corp.,* 193 F.R.D. 601, 607 (E.D.Wis.2000). In the event that such speculation is borne out, there are mechanisms are available to address any such conflicts.

With respect to the representative plaintiffs' knowledge of the case, all that is required is " [g]eneral knowledge and a participation in discovery ". *Kriendler v. Chemical Waste Management, Inc.,* 877 F.Supp. 1140, 1159 (N.D.Ill.1995); *see also Vitamins,* 209 F.R.D. at 262 ("Class representatives are not required to have detailed understanding of the nature and facts of their case, rather they must be willing and able 'to vigorously prosecute the interests of the class through qualified counsel." ') (quoting *Nat'l Ass'n of Reg'l Med. Programs, Inc. v. Mathews,* 551 F.2d 340, 345 (D.C.Cir.1976)).

Finally, the defendants do not contend that the plaintiffs' counsel are not capable advocates for their clients. There is no indication that class counsel are not competent and willing to represent the entire class with vigor. Therefore, I find that the representatives and their counsel have satisfied the adequacy requirement. If conflicts develop or come to the attention of the court, remedies exist. " Adequacy of representation issues implicate due process, and may be addressed throughout the litigation." *Lyons v. Georgia-Pacific Corp. Salaried Employees Ret. Plan,* 221 F.3d 1235, 1253 n. 32 (11th Cir.2000) (internal citations omitted) (citing 7A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1765, at 293 (2d ed. 1986): "[A] favorable decision under Rule 23(a)(4) is not immutable. If later events demonstrate that the representatives are not adequately protecting the absentees, the court may take whatever steps it thinks necessary under Rule 23(c) or Rule 23(d) at that time.")

### B. Rule 23(b)(3) Requirements

**\*15** While the plaintiffs have sufficiently shown that they have met the requirements of Rule 23(a), they must also satisfy the requirements of Rule 23(b) . The plaintiffs attempt to bring this claim under Rule 23(b)(3)-pursuant to which "[m]ost class

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 102966 (D.Mass.), 2005-1 Trade Cases P 74,695
**(Cite as: Not Reported in F.Supp.2d)**

action damage suits are filed," 2 Areeda ¶ 331a-which provides in pertinent part that "[a]n action may be maintained as a class action if .... (3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." FN15 These " predominance" and "superiority" requirements will be taken up in turn.

> FN15. The Rule continues:
> The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.
> Fed.R.Civ.P. 23(b)(3).

### (1) Predominance

The plaintiffs, in order to recover on their price-fixing conspiracy claim, "will have to prove the existence of the alleged price-fixing conspiracy, that the members of the class were injured in their business or property by reason of that conspiracy (the 'impact' question), and the amount of their damages." *Auction Houses,* 193 F.R.D. at 165-66. The first requirement is met here. In fact, it has been noted that the common question of the existence of a horizontal price-fixing conspiracy has almost invariably been found to satisfy Rule 23(b)(3). *See NASDAQ,* 169 F.R.D. at 517 ("Courts repeatedly have held that the existence of a conspiracy is the predominant issue in price fixing cases, warranting certification of the class even where significant issues are present."); 4 Newberg on Class Actions § 18:25 ("The [23(b)(3) ] requirement has been met with relative ease by the great majority of antitrust class action plaintiffs.

Although the Committee seems to suggest a case-by-case analysis ..., common liability issues such as conspiracy or monopolization have, almost invariably, been held to predominate over individual issues."); 7B Wright & Miller § 1781 (" In short, whether a conspiracy exists is a common question that is thought to predominate over the other issues in the case and has the effect of satisfying the first prerequisite in Rule 23(b)(3).").

Nevertheless, the defendants contend that the questions of impact and damages are too individualized to warrant class certification in this case. Courts have generally found, however, that " [p]rice fixing conspiracies, at least to the extent they succeed in fixing prices, almost invariably injure everyone who purchases the relevant goods or services." FN16 *Auction Houses,* 193 F.R.D. at 166 . I see no reason to find otherwise in this case.

> FN16. A different approach taken by courts on the question of impact was summarized by the court in *In re Industrial Diamonds Antitrust Litig.,* 167 F.R.D. 374 (S.D.N.Y.1996):
> Some courts have held that common questions predominate because "as a general rule, an illegal price-fixing scheme presumptively impacts upon all purchasers of a price-fixed product in a conspiratorially affected market." Other courts have stressed the need for a careful examination of the facts of each case in order to determine whether common proof of impact is possible. As the *Bogosian* court put it:
> [W]hen an antitrust violation impacts upon a class of persons ..., there is no reason in doctrine why proof of the impact cannot be made on a common basis so long as the common proof adequately demonstrates some damage to each individual. Whether or not [impact] can be proven on a common basis therefore depends upon the circumstances of each case.
> As a practical matter, it often makes little difference which view the court espouses. The presumption [that a price-fixing

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 102966 (D.Mass.), 2005-1 Trade Cases P 74,695
**(Cite as: Not Reported in F.Supp.2d)**

scheme impacts all purchasers] ... is, at most, a general rule. Antitrust defendants are free to argue, as many of them do, that their cases are exceptional because too many variables enter into setting prices in their industries to permit common proof of impact.

*Id.* at 382 (citations and footnote omitted). In this case, I do not apply an automatic presumption, but the reasoning behind its application by some courts-namely, that an overarching price-fixing conspiracy likely has an impact on all purchasers-informs the analysis of the Rule 23(b)(3) requirement.

### a. *Impact*

The plaintiffs' expert, Dr. John C. Beyer, contends " that the alleged conspiracy would have impacted all members of the proposed Class through the payment of higher prices for carbon black than would have otherwise prevailed in the marketplace." (Beyer Aff. ¶ 8.) Dr. Beyer came to this conclusion by assessing the effect of such a conspiracy in the carbon black market,[FN17] considering, for example, the concentration in and high barriers to entry into the carbon black market. [FN18] The defendants claim that Dr. Beyer simply assumed impact here. As already noted, in a price-fixing conspiracy case, that is often a fair assumption.

FN17. (*See* 9/02/04 Beyer Dep., at 177-78: I'm taking the conspiracy as alleged by the Plaintiffs as true. But the causal relationship between the conspiracy and the behavior of prices is outside the realm of examining the question would all customers be affected if this conspiracy were true. The cause-actual causal relationship between the conspiracy, if it existed, and prices that would be different in that condition than they actually were is something to be examined later. And the question that you've posed would probably be an important question to be addressed. But I-it is not necessary to address that

question to arrive at an answer that seems to me relevant with respect to impact, namely, have all consumers of carbon black been adversely affected by-or would they be by this conspiracy as alleged. And I set you the reasons in my report of why I believe-and the whole source of consideration-economic theory from the Defendants about the purchasers and from the transaction database why I believe that to be the case.)

FN18. "This conclusion is based on the following economic considerations:
A. The Defendants jointly enjoy market power, thus preventing purchasers of carbon black from avoiding the effect of coordinated pricing.
- The Defendants jointly control a substantial portion of both the production capacity and total sales of carbon black in the U.S.
- There are significant barriers to new firms entering the market to produce carbon black.
- There are no substitutes for carbon black. Hence the demand for carbon black is price inelastic.
B. Carbon black is a commodity-like product. In economic terms, carbon black is an undifferentiated product, and hence price is the principal basis on which Class members make their decisions concerning the suppliers from which to purchase carbon black.
C. The commodity nature of carbon black is reinforced by a formal grading system for rubber-grade and industry ' cross-walks' for industrial grade carbon black.
D. All Defendants make and sell most grades of carbon black, or have the capacity to do so. The degree of product overlap means Class members would have benefited from more active price competition in the absence of the alleged coordinated price behavior.
E. All Defendants sell carbon black throughout the United States. This

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 102966 (D.Mass.), 2005-1 Trade Cases P 74,695
**(Cite as: Not Reported in F.Supp.2d)**

geographic reach and overlap means all Class members would have benefited from more active price competition in the absence of the alleged coordinated price behavior.
F. During the period of the alleged conspiracy, the carbon black industry was operating with excess capacity. The existence of excess capacity implies that, in the absence of the alleged coordinated price behavior, Class members would have benefited from more competitive pricing.
G. My empirical analysis of Defendants' sales transactions indicates a similarity in movement of carbon black prices over time. This demonstrates that carbon black prices are affected by similar forces, such as the alleged coordinate price behavior of the Defendants."
(Beyer Aff. ¶ 8A-G.)

**\*16** The defendants, through their expert, contest this by pointing to the diversity in products and in volumes and prices paid for them by the class members, implying that some may not have been impacted. That argument, however, is best saved for their damages contentions, because, for purposes of the impact determination, "[t]he allegedly agreed rate schedules probably raised the base from which the negotiations began and may well have resulted in individually negotiated buyer's premiums, to the extent they existed, higher than would have been agreed upon in the absence of the conspiracy." FN19 *Auction Houses,* 193 F.R.D. at 166.

> FN19. The court later added that it could not
> exclude the possibility that there will be some individualized questions pertaining to impact. It perhaps even is likely that the prices paid by some class members will have to be compared to a construct of the prices that would have prevailed absent the alleged conspiracy in order to determine whether they in fact were injured by it. But the Court is persuaded, at least on the present record, that the impact question is quite predominantly a common question.

*Auction Houses,* 193 F.R.D. 167.

The defendants disagree, contending that "[c]ourts have not found predominance of common issues where, as here, the products are not fungible and their prices and manner of purchase vary from customer to customer." (Def.'s Opp., at 11 (citing *Dry Cleaning & Laundry Inst. of Detroit v. Flom's Corp.,* No. 91-CV-76072, 1993 WL 527928, at \*3 (E.D.Mich. Oct.19, 1993); *Burkhalter Travel Agency v. MacFarms Int'l, Inc.,* 141 F.R.D. 144, 154 (N.D.Cal.1991); *Moore v. Southeast Toyota Dist., Inc.,* 1982 U.S. Dist. LEXIS 12790, at \*11 (N.D.Ala., Feb. 4, 1982)). In *Dry Cleaning,* for example, where the plaintiffs alleged price-fixing by the defendants in relation to three separate products, "thousands of transactions were involved over many years; each transaction was different; various plaintiffs may have purchased the dry cleaning supplies, which vary by brand and type, at different prices and varying quantities, in different ways under different credit terms." *Id.* at \*4. The court, therefore, declined to certify the proposed class. Likewise, in *Burkhalter,* the court would not find that the predominance requirement had been met in a situation where "there are significant differences between the markets for macadamia nuts on Hawaii and on the mainland, between large and small purchasers, and between bulk and retail purchasers." 141 F.R.D. at 154. Individualized negotiations and a diversity of prices paid, however, do not automatically foreclose class action treatment. *NASDAQ,* 169 F.R.D. at 523 ("Neither a variety of prices nor negotiated prices is an impediment to class certification if it appears that plaintiffs may be able to prove at trial that, as here, the price range was affected generally."); *see also Fears,* 2003 U.S. Dist. LEXIS 11897, at \*22 (quoting *NASDAQ* ).

The plaintiffs have alleged an overarching conspiracy to fix prices and have sufficiently shown for present purposes that-assuming the conspiracy took place-generalized impact would have been felt by all those taking part in the market. It seems fair, especially at this stage of this proceeding, to find that if the plaintiffs "prove that the alleged conspiracy resulted in artificially inflated list prices, a jury could reasonably conclude that each purchaser who negotiated an individual price

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 102966 (D.Mass.), 2005-1 Trade Cases P 74,695
**(Cite as: Not Reported in F.Supp.2d)**

suffered some injury." *See In re Industrial Diamonds Antitrust Litig.,* 167 F.R.D. 374, 383 (S.D.N.Y.1996); *In re Glassine and Greaseproof Paper Antitrust Litig.,* 88 F.R.D. 302, 305 (E.D.Pa.1980) (finding no "significance in the fact that plaintiffs purchased at list prices, whereas volume buyers negotiated their prices" because the " market conditions" created by the alleged conspiracy "would affect the prices paid by both type of purchasers"). In sum, the need for individualized assessments of how much each member was impacted does not warrant an automatic finding that there was no class wide impact.

**\*17** Finding that class wide impact is sufficiently generalized despite many individualized negotiations and contractual provisions regarding different carbon black products does not end the inquiry. While the plaintiffs have sufficiently shown at this state that negotiated prices were impacted by list prices in a manner susceptible to common proof, the showing does not necessarily reach the question of those carbon black products that were not included on the price lists. The defendants correctly point out that courts have required that the plaintiffs at least demonstrate that the prices paid depended in some way on the price-fixed list prices. *See, e.g., In re Polypropylene Carpet Antitrust Litig.,* 996 F.Supp. 18, 25 (N.D.Ga.1997) (finding that because there were "price lists for custom-made carpet containing nylon fiber" but not for custom-made carpet containing polypropylene, only the evidence regarding the former satisfies the predominance requirement); *Industrial Diamonds,* 167 F.R.D. at 383 (finding "that despite the wide range of products and prices involved, common proof of impact is possible on behalf of purchasers who bought list-price products" but "is not possible ... on behalf of those ... who bought non-list price products"). As already noted, this is relatively easy to do at the class certification stage for products appearing on price lists subjected to the alleged collusion.

But for those not on the price lists, the plaintiffs would arguably have to prove individually how each product was bought and any impact of possible collusion. The plaintiffs' expert, Dr. Beyer, claims

that there is sufficient evidence in the record to find common impact in this case. The defendants' expert, Mr. Kaplan, draws the opposite conclusion from his analysis of the carbon black market. Although I have considered these divergent views [FN20] when discussing the defendants' contentions, "[t]o the extent that this discussion involves a battle of experts, it [is] not appropriate for the Court to determine which expert is more credible at this time. " *Linerboard,* 203 F.R.D. at 217 n. 13 (proceeding to discuss *In re Visa Check/Mastermoney Antitrust Litig.,* 192 F.R.D. 68 (E.D.N.Y.2000), *aff'd* 280 F.3d 124 (2d Cir.2001), where the court found that an expert report should not be excluded at the motion for class certification stage unless the " opinion is the kind of 'junk science' that a *Daubert* inquiry at this preliminary stage ought to screen"). As in *Linerboard,* "[n]o limiting motions were filed in the present case although the parties have raised questions about the opposing experts. On the present state of the record, the Court, where appropriate, will use plaintiffs' experts' reports to support the allegations contained in plaintiffs' class certification motion." *Id.* This is appropriate, because the question before me "is whether plaintiffs' expert evidence is sufficient to demonstrate common questions of law and fact warranting certification of the proposed class, not whether the evidence will ultimately be persuasive." *In re Visa Check/MasterMoney Antitrust Litig.,* 280 F.3d 124, 135 (2d Cir.2001) (2-1 decision).

> FN20. The plaintiffs' expert, Dr. Beyer, submitted an affidavit as well as a reply affidavit. Mr. Kaplan, the defendants' expert, also submitted an initial affidavit as well as an affidavit filed with the defendants' sur-reply.

**\*18** Dr. Beyer, in his reply affidavit, correctly contends that discovery is not complete and that more price lists might be found. Dr. Beyer also contends that the " 'off-list price' products identified by [the defendants' expert] Mr. Kaplan account for ... an insignificant portion of the overall volume of products sold." Nevertheless, the issue is worth addressing in the event there exist purchasers whose sole purchases of carbon black in the class

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 20

Not Reported in F.Supp.2d, 2005 WL 102966 (D.Mass.), 2005-1 Trade Cases P 74,695
**(Cite as: Not Reported in F.Supp.2d)**

period were products not appearing on any price lists.

Dr. Beyer first points out that the price of at least one product not on a price list was contractually tied to the price of a product on a price list. Such contractual ties are sufficient to bring a purchase into the ambit of generalized impact. Dr. Beyer, however, also attempts to include those products not appearing on price lists but deemed comparable pursuant to "comparator" charts or "crosswalks" produced by defendants. While it may be true that such products are comparable and that, as Dr. Beyer asserts, they have similar pricing trends, the impact of such purchases is not so clearly susceptible to common proof. It could be argued that after the conspiracy portion of the case is tried and the impact proof regarding the effect on list prices is presented, each purchaser of such non-list price products not tied in some documented way to a price list would have to present the comparison charts and other evidence in order to prove that it was impacted as to the specific product that it bought. Otherwise, there would be no clear connection-unlike those who purchased products on the price lists, subject to discounts and negotiations off the price lists, or pursuant to contractual provisions or formulas explicitly tied to price lists-between the alleged conspiracy and its impact on these purchasers. Each purchaser would, in essence, have an additional step to make a showing that its product is comparable for pricing purposes with list price products. This argument, however, takes what is in essence a damages argument and turns it into one regarding impact.

The plaintiffs have alleged that the list price increases inflated the prices paid by all purchasers of carbon black. Through reference to list price changes, to contract provisions tied to such list prices, to comparison charts produced by the defendants, and the opinion of their expert regarding the overall pricing structure of similar grades of carbon black, the plaintiffs have sufficiently demonstrated a common impact on purchasers of carbon black who purchased carbon black products tied in one of the above mentioned ways to list prices during the class period. Certainly questions of scale will be individualized, but that

may be addressed at the damages stage. In addition, as discovery progresses, it may become apparent that further refinements of the class will be necessary, including potentially severing the impact and damages determinations from the overall liability portion of the litigation.

**\*19** In sum, while I recognize that the class may ultimately only comprise those purchasers who purchased products that depended in some way on the list prices,[FN21] I do not think this requires drawing at this time what would amount to an artificial line between those products that appeared on a price list and those that did not. For present purposes, the plaintiffs have sufficiently shown that those who purchased products that appeared on a price list-whether by contractual provision or not-were impacted generally by the alleged conspiracy. In addition, the plaintiffs proffer that since many products were comparable, as delineated by charts drafted by the defendants, price lists would and did impact the prices of comparable products. This is based on the plaintiffs' contention that carbon black is a commodity-like product and that the price-fixing permeated all aspects of pricing. To the extent class members purchased products comparable to those on a price list, but not actually on one, the fact of impact would still be amenable to common proof, even if each class member's damages are not.

FN21. Excluded under this scenario would be those who purchased non-list price products that were neither deemed comparable by reference to one of the defendant's comparison charts nor were tied to the price of a list price product pursuant to a contractual provision or formula.

b. *Damages*

A finding of overarching impact on the class, however, does not resolve the question of how much each class member was impacted. On that issue, the defendants also argue that because many purchasers negotiated their own prices and purchased different products in varying volumes,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 21

Not Reported in F.Supp.2d, 2005 WL 102966 (D.Mass.), 2005-1 Trade Cases P 74,695
**(Cite as: Not Reported in F.Supp.2d)**

the damages calculations will be too individualized. "Courts have routinely held, however, that the need for individualized determinations of the putative class members' damages does not, without more, preclude certification of a class under Rule 23(b)(3). " *Industrial Diamonds,* 167 F.R.D. at 382 (so finding in a case where one of the defendants " offered more than 8000 distinct industrial diamond products" and "individual customers negotiated a variety of discounts, rebates, credits or special service arrangements").

Nevertheless, it is worth asking whether there is a class-wide, manageable method of proving the damage amounts. In addressing that question, it should be remembered that "[n]o precise damage formula is needed at the certification stage of an antitrust action; the court's inquiry is limited to whether the proposed methods are so unsubstantial as to amount to no method at all." *Paper Systems Inc. v. Mitsubishi Corp.,* 193 F.R.D. 601, 615 (E.D.Wis.2000) (citing *In re Potash Antitrust Litig.,* 159 F.R.D. 682, 697 (D. Minn.1995, and *In re Indus. Gas Antitrust Litig.,* 100 F.R.D. 280, 306 (N.D.Ill.1983)). In *Paper Systems,* the defendants contended that "[t]he price charged in each sale ... was set by an individualized bargain...." *Id.* at 612-13. In addition, the defendants argued that large volume buyers were able to negotiate larger discounts, creating a situation where the "plaintiffs' proof of injury would necessarily require determining whether each of thousands of different sales over the class period was affected by the conspiracy." *Id.* at 613. This factual situation, as already noted, is not sufficient to deny certification. Consequently, the *Paper Systems* court took a thorough look at the methods proposed for proving damages offered by the plaintiffs' expert, and found that "[i]f accepted by the factfinder at the appropriate stage of litigation, the methodology promises to provide precisely the kind of single mathematical formula which can establish each class member's damages." [FN22] *Id.* at 616.

> FN22. The expert in *Paper Systems* applied an econometric regression technique, "a commonly accepted tool to make [assessments regarding whether

prices were higher than they otherwise would have been] and to evaluate whether there is common impact from an alleged price-fixing conspiracy." *Id.* at 615.

*20 The same could be said here. Dr. Beyer applies what he terms a "before-during-after" approach to assessing damages, and proposes to calculate damages for tire and non-tire customers separately. (Beyer Aff. ¶ 44. ("[T]ire manufacturers, because of the volume and frequency of purchases, may have been damaged to a different degree than non-tire manufacturers.")) Dr. Beyer's method involves calculating a "benchmark" price drawn from "the period before, after, or both before and after the conspiracy period," which is then compared to prices during the conspiracy period to come to the "percentage overcharge." (*Id.* ¶ 42.) The "percentage overcharge" is then applied to each of the Class members' purchases during the Class period. (*Id.* ¶ 46.) "This will provide a dollar estimate of the amount by which each Class member was overcharged for carbon black." (*Id.*) One of the challenges in applying such a method is the calculation of the benchmark price, according to Dr. Beyer. (*Id.* ¶ 47.) He asserts that "[t]he availability of data sufficient to calculate an appropriate benchmark often cannot be determined until after full discovery of Defendants has occurred. " (*Id.*) Dr. Beyer adds that "other factors affecting the price of carbon black, such as changes in the costs of inputs or changes in demand, can be accounted for using multiple regression analysis." (Beyer Aff. ¶ 48.)

There is no requirement that the plaintiffs choose one method now, as long as they offer a methodology that is generally accepted. *See Linerboard,* 203 F.R.D. at 217-18 (E.D.Pa.2001). " Plaintiffs' expert, Dr. Beyer, has presented two possible means of assessing impact on a class wide basis-multiple regression analysis, and the benchmark or yardstick approach ..., which are methods of showing 'antitrust impact by generalized proof.' " *Id.* at 218 (citing *In re Plastic Cutlery Antitrust Litig.,* No. 96-CV-728, 1998 WL 135703, at *7 (E.D.Pa. March 20, 1998), and *Flat Glass,* 191 F.R.D. at 485-86).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 102966 (D.Mass.), 2005-1 Trade Cases P 74,695
**(Cite as: Not Reported in F.Supp.2d)**

Even if the damage assessments end up being too individualized to resolve as a class, that does not warrant denial of the plaintiffs' motion at this stage. The purpose of class actions is to resolve such disputes in the most efficient, manageable way. Resolving the common legal question (*i.e.,* the nature and extent of the alleged conspiracy) and the resulting overarching impact on the class of purchasers lends itself to class-wide resolution and saves the judicial system the strain of numerous actions addressing identical questions. *See* 7B Wright & Miller § 1781 ("Since antitrust actions typically present many complicated issues, the courts should utilize these provisions to settle the common issues on a representational basis to avoid congesting the courts with separate actions requiring the repetitive adjudication of the same matters.").

If the damage calculations end up not lending themselves to resolution in this manner, appropriate alternatives exist. As noted already, diversity in damages suffered does not itself render the certification of a class unwarranted. To address that problem,
**\*21** the question of damages can be severed from that of liability and tried on an individual basis. Allowing split proceedings furthers the Rule 23 purpose of promoting judicial economy since the main issue will be tried only once, rather than for each class member, and damage claims only need be determined in the event liability is found.

7B Wright & Miller § 1781 (internal footnotes omitted). The prospect of doing so at some later date does not itself mean the common questions do not predominate. "Although calculating damages will require some individualized determinations, it appears that virtually every issue prior to damages is a common issue." *Bertulli v. Indep. Ass'n of Cont'l Pilots,* 242 F.3d 290, 298 (5th Cir.2001); *see* Fed.R.Civ.P. 23(b)(3) advisory committee's notes to 1966 Amendments ("[A] fraud perpetuated on numerous persons by the use of similar misrepresentations may be an appealing situation for a class action, and it may remain so despite the need, if liability is found, for separate determinations of the damages suffered by individuals within the class.").

I find that the common issues of law and fact in this case predominate. To find that they do not due to individualized damage assessments would mark the end of almost all antitrust class actions. *See Visa Check/MasterMoney,* 280 F.3d at 139-40 (quoting *In re Alcoholic Beverages Litig.,* 95 F.R.D. 321, 327-28 (E.D.N.Y.1982), and citing *Catfish,* 826 F.Supp. at 1044, and *In re Fine Paper Antitrust Litig.,* 82 F.R.D. 143, 154 (E.D.Pa.1979)).

### (2) *Superiority*

Many of the considerations already addressed also warrant a finding that a class action is a superior mechanism for resolving this case. For that reason, " [i]f common questions are found to predominate, then courts also generally have ruled that the second prerequisite of Rule 23(b)(3)-that the class suit be superior to any other available means of settling the controversy-is satisfied in the context of an antitrust action." 7B Wright & Miller § 1781. In this case, there has yet to be-to the court's knowledge-any attempt by other potential class members fully to represent their own interests in this case.[FN23] *See In re Bromine Antitrust Litig.,* 203 F.R.D. 403, 415-16 (S.D.Ind.2001) (considering that the defendant "offered no argument that the class members are interested in controlling litigation separately, and no other class members have filed related suits"). A showing of such an interest, in any event, would not automatically preclude certification. The *Vitamins* court found a class action superior in a case where "numerous actions are already pending;" there was a "desire of some class members to control the prosecution of the case individually;" and there was a "need for 'mini-trials ' " to resolve questions of impact and damages. *Vitamins,* 209 F.R.D. at 270.

> FN23. I do note, however, that on May 5, 2004 I permitted one tire manufacturer, Goodyear Tire and Rubber, to intervene for the limited purposes of gaining access to discovery. To date, Goodyear has sought no broader intervention.

As already noted, the size of the class and the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 23

Not Reported in F.Supp.2d, 2005 WL 102966 (D.Mass.), 2005-1 Trade Cases P 74,695
**(Cite as: Not Reported in F.Supp.2d)**

predominance of common questions of law and fact warrant class action treatment at this stage. At least as to resolving the question of liability, a class action seems the most efficient, manageable method. *See Paper Systems,* 193 F.R.D. at 616 (concluding that a class action satisfies the superiority requirement because "[r]epeatedly litigating the same issues in individual suits, if certification were denied, would consume many more judicial resources than addressing them at a single blow in these consolidated actions").

**\*22** The superiority of a class action here is further substantiated by the many relatively small purchasers that will be a part of this class. Antitrust class actions are expensive endeavors and joining forces with other similarly situated plaintiffs is often the only way to effectuate a case. *See Bromine,* 203 F.R.D. at 416 (noting that many of the class members' "minor stakes make the case especially suitable for class proceedings") (citing *Alexander v. Q.T.S. Corp.,* 1999 WL 573358, at \*13 (N.D.Ill. July 30, 1999) ("In light of the great costs of discovery and trial, class certification is particularly important where many small and medium sized claimants are involved who would not otherwise be able to secure relief.")).

Here, as in *Auction Houses,*
This case appears at this stage to involve large numbers of defendants' customers who allegedly were overcharged pursuant to a common scheme and mechanism and who have relatively small stakes. "Multiple lawsuits would be costly and inefficient, and the exclusion of class members who cannot afford separate representation would be neither 'fair' nor an 'adjudication' of their claims." The superiority of the class action device in such circumstances is clear. Indeed, defendants do not seriously dispute this. [The defendant] rests its contention that a class action would not be a superior means of resolving this controversy solely on the premise that individual issues relating to impact would predominate over common issues, a premise that the Court rejects.

193 F.R.D. at 168 (quoting *NASDAQ,* 169 F.R.D. at 527).

Due to the size of the class, the common issues involved, and the fact that none of the class members have attempted separately to represent their own interests as yet, I find that a class action will provide a superior mechanism for adjudicating the issues in this case. Again, if this finding comes into question at a later date, appropriate measures may be taken pursuant to Rule 23(c).

### IV. CONCLUSION

For the reasons set forth more fully above, the motion to dismiss is hereby DENIED.

The plaintiffs have at this stage satisfied the class certification requirements. Therefore, their motion for class certification is GRANTED. I emphasize, the certification of a class is not a final order "and may be altered or amended before the decision on the merits." Fed.R.Civ.P. 23(c)(2). As this case proceeds, I will make any necessary modifications to the class if they become necessary. For present purposes, however, I certify a class comprising:
All persons or entities who purchased carbon black products from Defendants or their co-conspirators in the United States between January 30, 1999 and the present (the "Class Period"). Excluded from the class are (1) Defendants and their affiliates, subsidiaries and co-conspirators and (2) any federal, state, and local government purchasers.

D.Mass.,2005.
In re Carbon Black Antitrust Litigation
Not Reported in F.Supp.2d, 2005 WL 102966 (D.Mass.), 2005-1 Trade Cases P 74,695

Briefs and Other Related Documents (Back to top)

• 2006 WL 900614 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Motion for Protective Order and Return of Privileged Document (Mar. 23, 2006) Original Image of this Document (PDF)
• 2006 WL 900613 (Trial Motion, Memorandum and Affidavit) defendants' Opposition to Plaintiffs'

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 102966 (D.Mass.), 2005-1 Trade Cases P 74,695
**(Cite as: Not Reported in F.Supp.2d)**

Motion for A Protective Order (Mar. 17, 2006) Original Image of this Document (PDF)
• 2006 WL 690419 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Memorandum in Support of Motion for a Protective Order Against Discovery under the Untimely and Prejudicial Subpoenas Served by Defendants (Feb. 28, 2006) Original Image of this Document (PDF)
• 2006 WL 466531 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Defendants' Motion to Compel Plaintiffs to Answer Certain of Defendants' Third Set of Written Interrogatories Addressed to Plaintiffs (Feb. 8, 2006) Original Image of this Document (PDF)
• 2005 WL 3534309 (Trial Pleading) Defendant Degussa Corporation's Defendant Degussa Engineered Carbons Lp's and Defendant Degussa Ag's Answer and Affirmative Defenses to Complaint (Nov. 9, 2005) Original Image of this Document (PDF)
• 2005 WL 3725852 (Trial Pleading) Defendant Degussa Corporation's, Defendant Degussa Engineered Carbons LP's, and Defendant Degussa Ag's Answer and Affirmative Defenses to Complaint (Nov. 9, 2005) Original Image of this Document (PDF)
• 2005 WL 3725850 (Trial Pleading) Answer of Defendant Columbian Chemicals Company (Nov. 8, 2005) Original Image of this Document (PDF)
• 2005 WL 3725851 (Trial Pleading) Answer and Additional Defenses of Defendant Cabot Corporation to Plaintiffs' Complaint (Nov. 8, 2005) Original Image of this Document (PDF)
• 2005 WL 3725900 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Memorandum in Opposition to Defendants' Joint Motion to Amend Answers to the First Amended Consolidated Class Action Complaint (Jul. 18, 2005) Original Image of this Document (PDF)
• 2005 WL 3725899 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Defendants' Joint Motion to Amend Answers to First Amended Consolidated Class Action Complaint to Reflect Closure of U.S. Department of Justice Inquiry and European Commission Investigation of Carbon Black Industry (Jul. 6, 2005) Original Image of this Document (PDF)
• 2005 WL 3725849 (Trial Pleading) Answer of Defendant Columbian Chemicals Company to First

Amended Consolidated Class Action Complaint (Feb. 18, 2005) Original Image of this Document (PDF)
• 2005 WL 3752868 (Trial Motion, Memorandum and Affidavit) Defendant Degussa Corporation's, Defendant Degussa Engineered Carbons Lp's, and Defendant Degussa Ag's Answer and Affirmative Defenses to First Amended Consolidated Class Action Complaint and Jury Demand (Feb. 18, 2005) Original Image of this Document (PDF)
• 2004 WL 2648894 (Trial Motion, Memorandum and Affidavit) Defendants' Reply Brief in Support of Defendants' Motion to Dismiss (Aug. 5, 2004) Original Image of this Document (PDF)
• 2004 WL 3682603 (Trial Motion, Memorandum and Affidavit) Defendants' Reply Brief in Support of Defendants' Motion to Dismiss (Aug. 5, 2004) Original Image of this Document (PDF)
• 2004 WL 3682602 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Opposition to Defendants' Motion to Dismiss (Jul. 19, 2004) Original Image of this Document (PDF)
• 2004 WL 2648888 (Trial Motion, Memorandum and Affidavit) Defendants' Memorandum in Support of Motion to Dismiss First Amended Consolidated Class Action Complaint (Jun. 18, 2004) Original Image of this Document (PDF)
• 2004 WL 3682601 (Trial Motion, Memorandum and Affidavit) Defendants' Memorandum in Support of Motion to Dismiss First Amended Consolidated Class Action Complaint (Jun. 18, 2004) Original Image of this Document (PDF)
• 2004 WL 2648875 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Defendants' Motion to Compel Plaintiffs to Answer Defendants' First Written Interrogatory Addressed to Plaintiffs (Apr. 6, 2004) Original Image of this Document (PDF)
• 2004 WL 3682600 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Defendants' Motion to Compel Plaintiffs to Answer Defendants' First Written Interrogatory Addressed to Plaintiffs (Apr. 6, 2004) Original Image of this Document (PDF)
• 2004 WL 2648858 (Trial Motion, Memorandum and Affidavit) (Substituted) Response to Plaintiff's Motion to Compel Discovery (Mar. 18, 2004) Original Image of this Document (PDF)
• 2004 WL 2648845 (Trial Motion, Memorandum

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 102966 (D.Mass.), 2005-1 Trade Cases P 74,695
**(Cite as: Not Reported in F.Supp.2d)**

and Affidavit) Response to Plaintiff's Motion to Compel Discovery (Mar. 17, 2004) Original Image of this Document (PDF)
• 2003 WL 23885471 (Trial Pleading) Answer and Additional Defenses of Defendant Cabot Corporation to Plaintiffs' Consolidated Class Action Complaint (Dec. 15, 2003) Original Image of this Document (PDF)
• 2003 WL 23885485 (Trial Pleading) Defendant Degussa Ag's Answer to Consolidated Class Action Complaint (Dec. 15, 2003) Original Image of this Document (PDF)
• 2003 WL 23885506 (Trial Pleading) Defendant Degussa Corporation's and Defendant Degussa Engineered Carbons' Answer to Consolidated Class Action Complaint (Dec. 15, 2003) Original Image of this Document (PDF)
• 2003 WL 23885523 (Trial Pleading) Answer of Defendant Columbian Chemicals Company to Consolidated Class Action Complaint (Dec. 15, 2003) Original Image of this Document (PDF)
• 2003 WL 23885447 (Trial Pleading) Consolidated Class Action Complaint (Nov. 14, 2003) Original Image of this Document (PDF)
• 2003 WL 23885433 (Trial Motion, Memorandum and Affidavit) Parker Hannifin's Response to Certain Plaintiffs' Proposed Schedule (Sep. 25, 2003) Original Image of this Document (PDF)
• 2003 WL 23885420 (Trial Motion, Memorandum and Affidavit) Memorandum in Opposition to Parker Hannifin's Motion for Entry of %ADProposed%BD Order Approving Parker Hannifin's Selection of Lead Counsel for the Consolidated Actions and in Support of the Massachusetts Plaintiffs' Motion for Entry of Proposed Cas e Management Order (Sep. 9, 2003) Original Image of this Document (PDF)
• 2003 WL 24251807 (Trial Motion, Memorandum and Affidavit) Memorandum in Opposition to Parker Hannifin's Motion for Entry of Ÿproposed¨ Order Approving Parker Hannifin's Selection of Lead Counsel for the Consolidated Actions and in Support of the Massachusetts Plaintiffs' Motion for Entry of Proposed Case Ma nagement Order (Sep. 9, 2003) Original Image of this Document (PDF)
• 2003 WL 23885396 (Trial Motion, Memorandum and Affidavit) Parker Hannifin's Opposition to Plaintiffs' %ADProposed%BD Case Management Order and Memorandum in Support of

%ADProposed%BD Order Approving Parker Hannifin's Selection of Lead Counsel for the Consolidated Actions (Aug. 26, 2003) Original Image of this Document (PDF)
• 2003 WL 23885379 (Trial Motion, Memorandum and Affidavit) Reply Memorandum in Support of Defendant Phelps Dodge Corporation's Motion to Dismiss the Complaint (Jun. 25, 2003) Original Image of this Document (PDF)
• 2003 WL 23885367 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Opposition to Defendant Phelps Dodge Corporations' Motion to Dismiss the Complaint (Jun. 10, 2003) Original Image of this Document (PDF)
• 2003 WL 23887273 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Opposition to Defendant Phelps Dodge Corporations' Motion to Dismiss the Complaint (Jun. 10, 2003) Original Image of this Document (PDF)
• 2003 WL 24251806 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Opposition to Defendant Phelps Dodge Corporations' Motion to Dismiss the Complaint (Jun. 10, 2003) Original Image of this Document (PDF)
• 2003 WL 23884943 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Opposition to Defendants' Motion to Stay All Proceedings (Jun. 6, 2003) Original Image of this Document with Appendix (PDF)
• 2003 WL 23885357 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Opposition to Defendants' Motion to Stay all Proceedings (Jun. 6, 2003) Original Image of this Document with Appendix (PDF)
• 2003 WL 23885350 (Trial Pleading) Defendant Degussa AG's Answer to Class Action Complaint (May 26, 2003) Original Image of this Document (PDF)
• 2003 WL 23885326 (Trial Pleading) Defendant Degussa Corporation's & Defendant Degussa Engineered Carbon's Answer to Class Action Complaint (May 2, 2003) Original Image of this Document (PDF)
• 2003 WL 23885337 (Trial Pleading) Answer of Defendant Columbian Chemicals Company to Class Action Complaint (May 2, 2003) Original Image of this Document (PDF)
• 2003 WL 23885317 (Trial Pleading) Answer and Additional Defenses of Defendant Cabot

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 26

Not Reported in F.Supp.2d, 2005 WL 102966 (D.Mass.), 2005-1 Trade Cases P 74,695
**(Cite as: Not Reported in F.Supp.2d)**


Corporation to Plaintiff's Class Action Complaint
(May 1, 2003) Original Image of this Document
(PDF)
• 2003 WL 23885301 (Trial Pleading) Class Action
Complaint (Jan. 30, 2003) Original Image of this
Document (PDF)
• 2003 WL 24251773 (Trial Pleading) Class Action
Complaint (Jan. 30, 2003) Original Image of this
Document (PDF)
• 1:03cv10191 (Docket) (Jan. 30, 2003)
• 2003 WL 24291260 (Trial Motion, Memorandum
and Affidavit) Motion to Quash the Subpoena and
Subpoena Duces Tecum Served by Defendant
Cabot Corporation on Unnamed Class Member
Michelin North America, Inc. (2003) Original
Image of this Document (PDF)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.