

Not Reported in F.Supp.2d, 2003 WL 22118979 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

**H**
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
Dr. Stanley C. GRANDON, for himself and the
Grandon Family Irrevocable Trust, and Michael
Cafferty, as Trustee for the Grandon Family
Irrevocable Trust, on behalf of themselves and all
others similarly situated, Plaintiffs,
v.
MERRILL LYNCH AND CO., INC., and Merrill
Lynch, Pierce, Fenner & Smith, Inc., Defendants.
**No. 95 Civ. 10742(SWK).**

Sept. 11, 2003.

Upon motion for certification of putative class in
action against nationwide broker-dealer for
violations of Section 10(b) and Rule 10b-5 and
breach of fiduciary duties based on allegations that
broker-dealer charged undisclosed, excessive
markups on purchases of municipal securities by
public, retail customers, the District Court, Kram,
J., held that class action was not an appropriate
vehicle since determination of excessiveness would
require individualized assessment of the
circumstances surrounding each transaction, and
there was no showing that claims for equitable relief
predominated over the claims for monetary relief.

Motion denied.

West Headnotes

**Federal Civil Procedure 170A ☞187**

170A Federal Civil Procedure
    170AII Parties
        170AII(D) Class Actions
            170AII(D)3 Particular Classes Represented
                170Ak187 k. Stockholders, Investors,
and Depositors. Most Cited Cases
Class action was not an appropriate vehicle for
bringing action against nationwide broker-dealer for

violations of Section 10(b) and Rule 10b-5 and
breach of fiduciary duties based on allegations that
broker-dealer charged undisclosed, excessive
markups on purchases of municipal securities by
public, retail customers; determination of
excessiveness would require individualized
assessment of the circumstances surrounding each
transaction, and there was no showing that claims
for equitable relief predominated over the claims
for monetary relief. Fed.Rules Civ.Proc.Rule 23,
28 U.S.C.A.(b)(2),(3).

Lovell Stewart Halebian LLP, New York, New
York, By: Christopher Lovell, Gary S. Jacobson,
Jonathan Kord Lagemann, New York, New York,
Louis F. Burke P.C., New York, New York, for
Plaintiffs.
Sidley Austin Brown & Wood LLP, New York,
New York, By: A. Robert Pietrzak, for Defendants.

*OPINION AND ORDER*
KRAM, J.
*1 Before the Court is Plaintiffs' motion for
certification of the class pursuant to Federal Rule of
Civil Procedure 23(b)(2) and (3). For the reasons
set forth below, the motion for class certification is
denied.

BACKGROUND [FN1]

FN1. As indicated below, the facts of this
long-standing litigation were set forth in
several previous opinions. Familiarity with
these decisions, the procedural history of
this matter, and the facts of the case are
presumed. Only those facts necessary to
this decision are included.

I. Factual Background

Merrill Lynch and Co., Inc. is the New York-based

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2003 WL 22118979 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 2

parent company of Merrill, Lynch, Pierce, Fenner & Smith, Inc., (collectively, "Merrill Lynch") a registered broker-dealer with offices throughout the United States. *See* Second Amended Complaint (" Compl.") ¶¶ 7-10. Plaintiffs Dr. Stanley Grandon ("Grandon") and Michael Cafferty, trustee for the Grandon Family Irrevocable Trust (the "Trust"), purchased municipal securities from Merrill Lynch. Com pl. ¶¶ 5-6.

On November 22, 1994, Merrill Lynch sold Grandon 90,000 municipal bonds at a price listed as 92.47, totaling $83,223.00, and 30,000 municipal bonds at a price listed as 92.47, totaling $27,741.30. Compl. ¶ 48(a). These bonds were described as "Michigan Public Power Agency Rev Ref Belle River PJ-A OID Mar 93, 5.2%, Jan 1 04 bonds." *Id.* Grandon alleges that the price charged was approximately 4.6% above the true market price of the bonds. Compl. ¶ 48(b).

On January 19, 1995, Grandon and the Trust purchased 60,000 municipal bonds from Merrill Lynch at a price listed as 87.04, totaling $52,227.00. Compl. ¶ 45(a). These bonds bore the notation "Southfield MI Pub Ses Facs Nov 93, 4.25%, May 1 04." *Id.* Grandon alleges that the price charged for these bonds was approximately 3.0% to 6.3% above the true market price. Compl. ¶ 45(a).

On August 25, 1995, Grandon purchased 45,000 municipal bonds from Merrill Lynch at a price listed as 97.414, totaling $44,246.78. Compl. ¶ 41(a). These bonds bore the description "Garden City MI Sew Disp Sys Ser B LT MBIA July 95, 5.5%, Nov. 1 11, Interest from 7/1/95, First Coupon 11/1/95" (the "Garden City Bonds"). *Id.* Grandon alleges that the price Merrill Lynch charged for these bonds was approximately 3.7% to 9.74% above the true market price. Compl. ¶ 41(b). Interest rates declined between Grandon's August 25, 1995 purchase and the August 31, 1995 month-end statement. Compl. ¶ 43(a). Plaintiffs claim that as a result of the interest rate decline, the price of the Garden City Bonds should have increased, and that because the price Merrill Lynch charged Grandon bore no reasonable relation to the true market price, the price of the Garden City

Bonds was reported by Merrill Lynch as 88.78 on August 31, 1995. *Id.* Plaintiffs also claim that the fees and markups on the sale of the Garden City Bonds to Grandon were approximately three times larger than fees charged for comparable equity transactions. Compl. ¶¶ 23, 26(b), 27(b). Plaintiffs also claim that Merrill Lynch sent them confirmation statements, yet failed to disclose any of the aforementioned markups. Compl. ¶ 28.

## II. Procedural Background

On July 22, 1997, this Court dismissed Plaintiffs' First Amended Class Action Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), on the grounds that Merrill Lynch was under no statutory or regulatory duty to disclose markups on municipal securities. *See Grandon v. Merrill Lynch & Co.,* No. 95 Civ. 10742, 1997 WL 411924, *5-7 (S.D.N.Y. July 22, 1997) ("*Grandon I*"). On June 19, 1998, the Second Circuit vacated *Grandon I,* and held, *inter alia,* that "there exists an implied duty to disclose markups on municipal securities when those markups are excessive." *Grandon v. Merrill Lynch & Co.,* 147 F.3d 184, 193 (2d Cir.1998) ("*Grandon II*"). The Second Circuit left it to this Court to determine whether the previous complaint stated a claim for fraudulent undisclosed markups under Section 10(b) and Rule 10b-5. By opinion dated November 1, 1999, this Court again dismissed the previous complaint, on the grounds that "plaintiffs fail[ed] to state a claim for fraudulent undisclosed markups." *Grandon v. Merrill Lynch & Co.,* No. 95 Civ. 10742, 1999 WL 993653, *4 (S.D.N.Y. Nov.1, 1999) ("*Grandon III*" ). This Court, however, allowed Plaintiffs to file a second amended complaint in order to conform to the standards set forth in *Grandon II.*

**\*2** On November 17, 1999, Plaintiffs submitted the Second Amended Complaint, which contained three causes of action. In the first cause of action, Plaintiffs alleged that Merrill Lynch committed securities fraud by charging hidden, excessive markups on municipal bond transactions, in violation of Section 10(b) and Rule 10b-5. *See* Compl. ¶¶ 57-60. In the second cause of action, Plaintiffs alleged that Merrill Lynch misrepresented

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2003 WL 22118979 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

the markups by disclosing a $4.85 "Processing Fee" while simultaneously leaving blank a box on the confirmation statements marked " Markup/Markdown," thereby implying that the only compensation Merrill Lynch received was the $4.85 fee. *See* Compl. ¶¶ 27-29, 62(a). In the third cause of action, Plaintiffs alleged two claims arising under state law, breach of contract and breach of fiduciary duty. *See* Compl. ¶¶ 64-68.

Merrill Lynch moved to dismiss the Second Amended Complaint, and by opinion dated July 18, 2001, this Court dismissed only the second cause of action and the breach of contract portion of the third cause of action. *See Grandon v. Merrill Lynch & Co.,* No. 95 Civ. 10742, 2001 WL 826092 (S.D.N.Y. July 20, 2001) (*"Grandon IV"* ). Therefore, the surviving causes of action currently before the Court are Section 10(b) and Rule 10b-5 claims, and a breach of fiduciary duty claim, each premised on the allegation that Merrill Lynch charged undisclosed, excessive markups on Plaintiffs' municipal bond purchases.

Plaintiffs now seek certification of "a class of persons who were public, retail customers of [ ] Merrill Lynch who purchased Class Bonds through or from [Merrill Lynch] between July 22, 1994, and December 20, 1995, inclusive." [FN2] Pls.' Mem. in Support of Mot. for Class Certification, dated November 12, 2002, at 1. ("Pls.' Mem."). Class Bonds are defined as municipal bonds which

> FN2. In the Second Amended Complaint, Plaintiffs reserved their right to amend the class definition in connection with their motion for class certification.

"(1) are subject to the rules of the Municipal Securities Rulemaking Board, (2) are interest paying non-accretion bonds (i.e., bonds which pay interest and are not "zero coupon bonds"), (3) are AA- or higher rated (by Standard & Poors Corp.) or are insured municipal bonds, (4) have not been deeply discounted (i.e., trade at $80.00 per bond or more, (5) have recently been issued (i.e., within two years of the transaction), (6) were publicly issued in a total face amount of $7,500,000 or greater in cost..

..
Compl. ¶ 39. Furthermore, the definition includes only retail customer transactions involving a par value of $20,000 or more. *See* Pls.' Mem. at 1, n. 1.

### DISCUSSION

### I. Standard of Law

Federal Rule 23 of Civil Procedure sets forth the requirements for bringing and maintaining a class action in federal court. "In determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met." *In re Check/MasterMoney Antitrust Litig.,* 280 F.3d 124, 133 (2d Cir.2001) (quoting *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 178, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974)). The Second Circuit has directed district courts to liberally interpret Rule 23, *see Korn v. Franchard Corp.,* 456 F.2d 1206, 1208-09 (2d Cir.1972), however, a court may not grant certification unless it is satisfied, after " rigorous analysis," that the Rule 23 criteria have been met. *See Dodge v. County of Orange,* 208 F.R.D. 79, 87 (S.D.N.Y.2002) (quoting *General Tel. Co. v. Falcon,* 457 U.S. 147, 161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982)). Plaintiffs bear the burden of establishing each requirement for class certification. *See Pecere v. Empire Blue Cross and Blue Shield,* 194 F.R.D. 66, 69 (E.D.N.Y.2000).

**\*3** The district court must accept all of the allegations in the pleadings as true on a motion for class certification, *see Shetter Realty Corp. Allied Maint. Corp.,* 574 F.2d 656, 661 n. 15 (2d Cir.1978) , and avoid conducting a preliminary inquiry into the merits. *See In re Indep. Energy Holdings PLC Sec. Litig.,* No. 00 Civ. 6689, 2002 WL 1059086, \*1, n. 5 (S.D.N.Y. May 28, 2002) (citations omitted). Nonetheless, the decision whether to certify a class "may involve some considerations related to the factual and legal issues that comprise the plaintiff's cause of action." *Pecere,* 194 F.R.D. at 69 (quoting *D'Alauro v. GC Servs. Ltd.,* 168 F.R.D. 451, 454 (E.D.N.Y.1996)); *see also Daniels*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2003 WL 22118979 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

*v. City of New York,* 198 F.R.D. 409, 413, n. 5 (S.D.N.Y.2001) (the court need not rely on bare allegations but "may consider the range of proof necessary to support class certification").

In order to qualify for class certification, a plaintiff must first satisfy the four requirements of Rule 23(a): (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation. *Moore v. PaineWebber, Inc.,* 306 F.3d 1247, 1252 (2d Cir.2002). Additionally, a plaintiff must also demonstrate that the class fits under at least one of the three subdivisions of Rule 23(b). *See Visa Check,* 280 F.3d at 133.

For purposes of this motion, the Court assumes without deciding that the requirements of Rule 23(a) are satisfied. *See In re Rezulin Prods. Liab. Litig.,* 210 F.R.D. 61, 66 (S.D.N.Y.2002). Nevertheless, it is clear for the reasons set forth below that certification of this case under either Rule 23(b)(2) or Rule 23(b)(3) is inappropriate.

## II. Analysis

### A. Rule 23(b)(3)

Rule 23(b)(3) requires "that the questions of law or fact common to the members predominate over any questions affecting only individual members, and that a class action is superior to other methods for the fair and efficient adjudication of the controversy."

### 1. Predominance

"The Rule 23(b)(3) predominance inquiry tests whether classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 623, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). "In order to meet the predominance requirement of Rule 23(b)(3), a plaintiff must establish that the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, ... predominate over those issues that are subject only to

individualized proof." *Visa Check,* 280 F.3d at 136 (internal quotation marks omitted). "Because Rule 23(b)(3) requires that common issues predominate, courts deny certification where individual issues of fact abound." *Dunnigan v. Metro. Life Ins. Co.,* 214 F.R.D. 125, 139 (S.D.N.Y.2003) (citations omitted).

Plaintiffs' burden on this motion is to establish that common proof will predominate at trial with respect to the essential elements of liability of the underlying causes of action. *See Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 259 F.3d 154, 172 (3d Cir.2001) (determining whether putative class should be certified requires examination of underlying cause of action); *see also In re NASDAQ Market-Makers Antitrust Litig.,* 169 F.R.D. 493, 517 (S.D.N.Y.1996). Frequently, the predominance requirement is not met where the resolution of individual claims for relief would require individualized inquiries. *See, e.g., Newton,* 259 F.3d at 172 (affirming denial of class certification where individual issues predominate in securities litigation under Section 10(b) and Rule 10b-5); *Binder v. Gillespie,* 184 F.3d 1059, 1063-66 (9th Cir.1999) (upholding class decertification where presumption of reliance and loss unavailable), *cert. denied,* 528 U.S. 1154, 120 S.Ct. 1158, 145 L.Ed.2d 1070 (2000); *Dunnigan,* 214 F.R.D. at 139 (finding individualized proof of liability in ERISA litigation predominates because of need to individually evaluate whether defendant's delay in making benefit determination was unreasonable); *Augustin v. Jablonsky,* No. 99 Civ. 3126, 2001 WL 770839, *13 (E.D.N.Y. Mar.8, 2001) (finding individualized issues of proximate causation predominate despite plaintiffs' showing of commonality under Rule 23(a)(2)); *Martin v. Shell Oil Co.,* 198 F.R.D. 580, 592-93 (D.Conn.2000) (finding individualized proof of breach, causation, and trespass predominate where commonality was not contested).

#### a. Section 10(b) Claim

**\*4** To establish liability under Section 10(b) and Rule 10b-5, "[a] plaintiff must allege 'that in connection with the purchase or sale of securities, the defendant, acting with scienter, made a false

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2003 WL 22118979 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

material representation or omitted to disclose material information and that plaintiff's reliance on defendant's conduct caused [plaintiff] injury." ' *Caiola v. Citibank,* 295 F.3d 312, 321 (2d Cir.2002) (alteration in original) (quoting *In re Time Warner Inc. Sec. Litig.,* 9 F.3d 259, 264 (2d Cir.1993)). Here, Plaintiffs claim that in violation of Section 10(b) and Rule 10b-5, Merrill Lynch charged undisclosed, excessive markups on purchases of Class Bonds by public, retail customers.

In *Grandon II,* the Second Circuit held that "a private action under the antifraud provision of Section 10(b) and Rule 10b-5 exists against broker-dealers who charge undisclosed, excessive markups on municipal bonds." *Grandon II,* 147 F.3d at 193. Therefore, an implied duty to disclose markups on municipal securities exists when those markups are "excessive." *Id.* "The markup on a security is the difference between the price charged to the customer and the prevailing market price." *Grandon II,* 147 F.3d at 189 (quoting *S.E.C. v. First Jersey Sec., Inc.,* 101 F.3d 1450, 1469 (2d Cir.1996)). In general, a markup is excessive "when it bears no reasonable relation to the prevailing market price." *Grandon II,* 147 F.3d at 190 (quoting *Bank of Lexington & Trust Co. v. Vining Sparks Sec., Inc.,* 959 F.2d 606, 613 (6th Cir.1992)).

There are no fixed categories or numeric standards used by Courts determine whether any particular markup is excessive. *See id.* Indeed, the Municipal Securities Rule Making Board ("MSRB") [FN3] " expressly refused to adopt a specific percentage guideline for a reasonable markup, 'in view of the heterogenous nature of municipal securities transactions and municipal securities dealers." ' *Id.* (quoting MSRB Interpretations of Rule G-30, " Report on Pricing," (Sept. 26, 1980), MSRB Manual (CCH) ¶ 3646, at 5158) ("MSRB 'Report on Pricing' ")); *see also Press v. Chemical Inv. Servs. Co.,* 166 F.3d 529, 535 (2d Cir.1999) (" *Press II"* ) (the SEC "advocates not setting bright-line markup thresholds, but, rather, considering each transaction individually, in light of all relevant circumstances"). Instead, "[w]hether a markup is excessive must be determined on a case-by-case basis." *Grandon II,* 147 F.3d at 190 (citing *Banca Cremi, S.A. v. Alex. Brown & Sons,*

*Inc.,* 132 F.3d 1017, 1033 (4th Cir.1997)). Such a determination "begin[s] with the factors set forth under MSRB Rule G-30." *Id.* This rule requires that the retail prices charged for municipal securities-including any markdown or markup-be " fair and reasonable, taking into consideration all relevant factors." *Id.* (quoting MSRB Rule G-30, MSRB Manual (CCH) ¶ 3646, at 5157). The MSRB factors to consider are:

> FN3. The MSRB is a self-regulating organization created by Congress in 1975, and supervised by the Securities Exchange Commission ("SEC"). *See Grandon II,* 147 F.3d at 190. The MSRB is the primary regulatory authority in the municipal securities market. *See id.*

**\*5** (1) the best judgment of the broker, dealer or municipal securities dealer as to the fair market value of the securities at the time of the transaction; (2) the expense involved in effecting the transaction; (3) the fact that the broker, dealer, or municipal securities dealer is entitled to a profit; (4) the total dollar amount of the transaction; (5) the availability of the security in the market; (6) the price or yield of the security; and (7) the nature of the professional's business.
*Id.* (quotations omitted); *see also Press II,* 166 F.3d at 535.

In *Sloan v. C.C. Collings & Co.,* No. 85 Civ. 3315, 1986 WL 8829 (E.D.Pa. Aug.13, 1986), where the plaintiffs alleged that they were charged excessive markups and markdowns on their purchases and sales of municipal securities, the district court denied class certification under Rule 23(b)(3). The court found that deciding whether the prices charged were excessive "must proceed in an individual basis for each municipal security purchased by each proposed class member at each specific point in time." *Sloan,* 1986 WL 8829, at \*1.

Each class member in the instant action must prove that the markup charged by Merrill Lynch on their purchase of a Class Bond was excessive. Such a determination, beginning with the MSRB factors, will turn on an individualized assessment of the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2003 WL 22118979 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 6

circumstances surrounding each transaction.

First, the prevailing market price of each Class Bond at the time it was purchased must be determined. The prevailing market price "generally means 'the price at which dealers trade with one another, i.e., the current inter-dealer market.' ' *Grandon II,* 147 F.3d at 189 (quoting *Alstead, Dempsey & Co., Inc.,* Exchange Act Release No. 34-20825, 47 S.E.C. 1034, 1035, 1984 WL 50800, *1 (Apr. 5, 1984)). As indicated above, the markup on a security is the difference between the price charged to the customer and the prevailing market price. Therefore, prevailing market price is a central component for determining whether the markup was excessive. *See id.* ("key issue" in markup cases "has always been how to determine 'prevailing market price' ").

"In defining the prevailing market price of a security for purposes of calculating a dealer's markup, the SEC distinguishes between dealers who are market makers [FN4] and those who are not, between markets that are competitive and those that are not, and between controlling dealers that make significant purchases in the interdealer market and those that do not." *First Jersey,* 101 F.3d at 1469. To evaluate the purchase of a Class Bond in such a fashion requires an individualized assessment of each bond purchase at the time it occurred.

> FN4. A market maker is a dealer "who with respect to a security holds himself out ... as being willing to buy and sell such security for his own account on a regular or continuous basis." 15 U.S.C. § 78c(a)(38).

For example, if a dealer is a market maker for a particular municipal bond, markups on such a security "may be computed on the basis of the contemporaneous prices charged by the firm or other market makers in actual sales to other dealers or, if no such prices are available on the basis of representative asked quotations." *Id.* (quotation omitted). However, if a dealer is not a market maker at the time of purchase, and absent countervailing evidence, the SEC has announced that

*6 a dealer's contemporaneous cost is the best evidence of the current market. That standard, which has received judicial approval, reflects the fact that prices paid for a security by a dealer in actual transactions closely related in time to his retail sales are normally a highly reliable indication of prevailing market price.

*Grandon II,* 147 F.3d at 189 (quotation omitted). If there are no contemporaneous purchases by the dealer, other contemporaneous inter-dealer transactions are examined as evidence of the prevailing market price. *See In re Application of First Honolulu Sec., Inc.,* Exchange Act Release No. 34-32933, 51 S.E.C. 695, 1993 WL 380039, *2 (Sept. 21, 1993).

Second, the yield on each Class Bond must be calculated in order to demonstrate the excessiveness of a markup because yield "is the 'most important' factor in determining whether the price (including the markup) of a municipal security is fair and reasonable." *Grandon II,* 147 F.3d at 190 (quotation omitted). The yield is first calculated, and then assessed against the yields of municipal securities with similar characteristics trading at the time. *See In re Mark David Anderson,* SEC Release No. ID-203, 2002 WL 771432, *18 (SEC ALJ Apr. 30, 2002). The yield on a Class Bond should be " comparable to the yield on other securities of comparable quality, maturity, coupon rate, and block size then available in the market." *Grandon II,* 147 F.3d at 190 (quoting MSRB "Report on Pricing " at 5160). This analysis requires an individualized assessment of each Class Bond purchased by a class member.

Plaintiffs contend that they do not require yield information to compute markups, and instead would use that information to check for anomalies in the computed results. *See* Affidavit of Robert W. Lowry, dated November 12, 2002, at ¶ 32. However, as stated above, yield is the most important factor in determining whether the price charged by Merrill Lynch for a class member's purchase of a Class Bond was fair and reasonable. *Grandon II,* 147 F.3d at 190.

Plaintiffs alternatively claim that they will be able

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                     Page 7

Not Reported in F.Supp.2d, 2003 WL 22118979 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

to compute yields from the class wide database they will develop. *See* Declaration of Professor Michael J. Barclay, dated January 21, 2003, at ¶ 18. Plaintiffs fail to address if and whether the database will compare the yield on each Class Bond to the yields of similar municipal securities. Such a comparison, which requires an individualized inquiry, is crucial to determining whether a markup is either fair and reasonable or excessive.

Third, the existence of a variety of maturity dates for municipal bonds also requires an individualized assessment of each Class Bond purchase. The usual practice is for the markup to be greater on a bond with a longer maturity than on a bond with a shorter maturity, "because the markup does not affect the yield on the longer-term bond as it does not short-term bond." *Mark David Anderson,* 2002 WL 771432 at *10. As a result, the same markup for two municipal bonds with different maturities could result in the markup for the longer-term bond being viewed as fair and reasonable while the markup for the shorter-term bond being deemed excessive.

*7 Furthermore, if a municipal bond has a call feature,[FN5] the maturity date will be uncertain, which affects the pricing. The MSRB has reminded dealers to consider call features in pricing municipal bonds:

> FN5. A call feature on a municipal bond gives the issuer the right to redeem the bonds at face value before the stated maturity date.

[A] municipal securities dealer in pricing securities on the basis of yield to a specific call feature should take into account the possibility that the call feature may not be exercised. Accordingly, the price to be paid by a customer should reflect this possibility and the resulting yield to maturity should bear a reasonable relationship to yields on securities of similar quality and maturity.
MSRB, *Interpretive Notice on Pricing of Callable Securities* (Aug. 10, 1979), MSRB Manual (CCH) ¶ 3646 at 5158.

Fourth, the total dollar amount of the transaction

needs to be considered because broker profits and transaction costs can be spread over a purchase of a larger number of bonds. The general practice is the lower the dollar amount of the trade, the higher the percent of a reasonable markup. *See Banca Cremi, S.A. v. Alex. Brown & Sons, Inc.,* 955 F.Supp. 499, 519 (D.Md.1997) (dealer properly charged lowest markups on highest dollar volume transactions), *aff'd,* 132 F.3d 1017 (4th Cir.1997).

Plaintiffs argue that the class definition, which only includes Class Bond transactions of $20,000 or more, permits a generalized assessment of the markup charged on each purchase. However, this does not render all Class Bond transactions homogeneous for purposes of the MSRB rules. In a regulatory proceeding, an NASD Panel rejected an expert witness' opinion that the maximum allowable markdown would be the same whether a transaction involved $25,000 or $1 million in bonds. *See Dep't of Enforcement v. McLaughlin, Piven, Vogel Secs., Inc.,* No. C02980073, 1999 WL 33261821 (NASD Hearing Panel Sept. 1, 1999). The Panel found the opinion of the expert witness "patently at odds" with Rule G-30, which lists the total amount of the transaction as a relevant factor in determining a fair and reasonable markdown. *Id.* Accordingly, the total dollar amount of the transaction also requires the individual assessment of each class member's purchase of a Class Bond.

Fifth, the services rendered by Merrill Lynch to its customers and the fact that Merrill Lynch is entitled to earn a reasonable profit also require an individualized assessment of each purchase.
[M]unicipal securities dealers often expend considerable time, effort, and money providing services to a customer, and this ought to be taken into account in considering the fairness and reasonableness of prices in given transactions. These services include researching credits, maintaining markets in, and current information about issues previously sold to customers, and other similar activities.

MSRB "Report on Pricing" at 5161. Determining whether the markup charged on a transaction is excessive necessitates a careful review of the work performed by the professional on behalf of a client.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2003 WL 22118979 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

*See Press II,* 166 F.3d at 535 ("This was not a complex transaction, yet there were efforts expended on the part of appellees. They had to ... identify the appropriate instrument to purchase, transfer the instrument to Press, and complete corresponding paperwork.").

**\*8** Plaintiffs contend that individual questions do not predominate, and whether Merrill Lynch charged undisclosed, excessive markups on Class Bond transactions is subject to generalized proof, thus satisfying their burden under Rule 23(b)(3). Instead of addressing the individual MSRB factors, Plaintiffs argue that whether Merrill Lynch charged undisclosed, excessive markups can be proven by simply comparing those markups with the markups Merrill Lynch charged on equity transactions of similar size and value.

Plaintiffs claim that Merrill Lynch followed a firm-wide systematic policy to charge higher markups for Class Bonds than it charged for equity transactions of similar dollar amount. *See* Pls.' Mem. at 12. This policy allegedly violated regulatory and industry standards that mandate markups on municipal bonds be significantly lower than markups on equity securities. *See id.* at 11; *see also* Pls.' Reply Mem., dated Jan. 22, 2003, at 3. Therefore, Plaintiffs argue that "[i]n order to show that the markups are excessive, Plaintiffs will have to show that the markups taken by Merrill Lynch on Class Bonds are greater than those taken on equity transactions of comparable value. This comparison will be made from class members' markups calculated from the data in Defendants' equity transaction databases and will involve straightforward comparisons." Reply Affidavit of Robert W. Lowry, dated January 22, 2003 ("Lowry Reply Aff."), at ¶ 14.

Whether a markup on a municipal bond is excessive cannot be determined *solely* by comparing it with markups on an equity transactions of similar value and size. Instead, courts have repeatedly stated that determining whether markups charged on municipal bond transactions are excessive or reasonable is accomplished by analyzing the circumstances surrounding the transaction using the MSRB factors. *See, e.g., Press II,* 166 F.3d at 535;

*Grandon II,* 147 F.3d at 190-91; *Banca Cremi,* 132 F.3d at 1033; *Bank of Lexington,* 959 F.2d at 613; *S.E.C. v. Rauscher Pierce Refsnes, Inc.,* 17 F.Supp.2d 985, 997 (D.Az.1998); *S.E.C. v. Feminella,* 947 F.Supp. 722, 729 (S.D.N.Y.1996). Because municipal bonds are not homogenous, such an inquiry requires an individualized assessment of each purchase.

Even if the excessiveness of a markup could be determined solely by comparison with equity transactions of similar size and value, such a comparison would still require an individualized inquiry. In *Grandon II,* the Second Circuit noted that "[i]t [ ] seems to be accepted that proper markups for municipal bonds are 'significantly lower than those for equity securities.' ' *Id.* at 191 (quoting *In re Staten Sec. Corp.,* Exchange Release Act No. 34-18628, 47 S .E.C. 766, 1982 WL 32504, \*1 (Apr. 9, 1982)). However, it is not a per se rule that markups for municipal bonds are *always* significantly lower than markups for equity securities. Instead, courts and the SEC have repeatedly used words such as "generally," " customary" or "usually" to describe this policy. *See, e.g* ., *Feminella,* 947 F.Supp. at 728-29 (noting proper markups on municipal debt securities " usually are smaller than those on equity securities"); *First Honolulu,* 1993 WL 380039 at \*2 ("It is well-recognized that a significantly lower markup is customarily charged in the sale of debt securities than in transactions of the same size involving common stock...."); *In re Powell & Assoc., Inc.,* Exchange Act Release No. 34-18577, 47 S.E.C. 746, 1982 WL 32339, \*1 (Mar. 22, 1982) (" [m]arkups on municipal bonds are generally a good deal lower" than markups on equity securities); *In re Edward J. Blumenfeld,* Exchange Act Release No. 34-16437, 18 S.E.C. 1379, 1979 WL 169982, \*2 (Dec. 19, 1979) ("Markups on municipal bonds are generally lower than those for equity securities." ). Therefore, a situation could arise where a markup on a municipal bond transaction is not lower than the markup on an equity transaction of similar size and value but is, under the circumstances, not excessive.

**\*9** Plaintiffs rely on three cases to support their contention that certification is proper for actions

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2003 WL 22118979 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

involving markups on securities. *See Hoxworth v. Blinder, Robinson & Co., Inc.,* 980 F.2d 912 (3d Cir.1992); *Farley v. Baird, Patrick & Co., Inc.,* No. 90 Civ. 2168, 1992 WL 321632 (S.D.N.Y. Oct. 28, 1992); *Ettinger v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 122 F.R.D. 177 (E.D.Pa.1988). All three cases are inapposite to the situation at hand because none involve certification of a class who purchased municipal bonds.

Both *Hoxworth* and *Farley* considered certification of a class of individuals who had purchased and sold equity securities. The process of determining whether a markup for a transaction involving equity securities is excessive is entirely different from making such a determination as to municipal bonds. Markups for equity securities generally should not exceed five percent of the prevailing market price. *See Grandon II,* 147 F.3d at 191. However, the SEC has categorically stated that this "five-percent policy does not apply to municipal securities." *Id.* (quoting *In re Staten Sec. Corp.,* 1982 WL 32504, at *1, n. 7). Instead, whether a markup on a municipal bond is excessive is determined by looking at all surrounding circumstances, including, but not limited to, the customary practice that markups on municipal bonds are significantly lower than those for equity securities.

*Ettinger* is also distinguishable. That case involved only one type of security, a zero-coupon bond, and the defendant was the issuer. *See Ettinger,* 122 F.R.D. at 179. Here, the purported class are individuals who purchased a wide array of municipal bonds. Moreover, Merrill Lynch was not the issuer of any such bonds.

Deciding whether the markups charged by Merrill Lynch on purchases of Class Bonds by class members requires an individualized assessment of each transaction. Accordingly, the Court finds that with regard to the Section 10(b) and Rule 10b-5 claims, individual fact issues will predominate over the common issues and class certification is therefore inappropriate.

b. Fiduciary Duty Claim

To the extent that the state law claims for breach of fiduciary duty are premised on the same excessive markup theory as the federal securities claims, those claims also do not satisfy the predominance requirement.

"A federal court sitting in diversity or adjudicating state law claims that are pendent to a federal claim must apply the choice of law rules of the forum state." *Rogers v. Grimaldi,* 875 F.2d 994, 1002 (2d Cir.1989). Accordingly, New York's choice of law rules govern the claim for breach of fiduciary duty, which is premised on diversity and supplemental jurisdiction. "In tort cases ... New York applies the law of the state with the most significant interest in the litigation." *Lee v. Bankers Trust Co.,* 166 F.3d 540, 545 (2d Cir.1999) (citation omitted). The purpose of this "interest analysis" is "to determine which of two competing jurisdictions has the greater interest in having its laws applied in the litigation." *Padula v. Lilarn Prop. Corp.,* 84 N.Y.2d 519, 521, 620 N.Y.S.2d 310, 644 N.E.2d 1001 (N.Y.1994). When plaintiffs and defendants are domiciled in different states, as invariably would be the case in a purported nationwide class action, the state in which the tort allegedly took place has the greatest interest, and its law is usually applied. *See Lee,* 166 F.3d at 545 (conduct regulating rules usually require application of law of place of tort).

*\*10* The fiduciary duties of securities brokers are materially different in each of the fifty states. *See, e.g., Patsos v.. First Albany Corp.,* 433 Mass. 323, 330-336, 741 N.E.2d 841, 848-851 (Mass.2001); *Carr v. CIGNA Secs.,* 95 F.3d 544, 547 (7th Cir.1996); *Marchese v. Nelson,* 809 F.Supp. 880, 893-94 (D.Ut.1993). This variation and lack of uniformity indicate that a uniform substantive law for breach of fiduciary duty cannot be applied to the claims of this purported class. "Because these claims must be adjudicated under the law of so many jurisdictions, a single nationwide class is not manageable," and common issues of law do not predominate over those affecting individual members of the class. *In re Bridgestone/Firestone, Inc.,* 288 F.3d 1012, 1019 (7th Cir.2002). Courts have refused to certify class actions where the substantive law of multiple states must be applied, and nothing in this case compels a different result.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2003 WL 22118979 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

*See, e.g., Kaczmarek v. Int'l Bus. Machs. Corp.,* 186 F.R.D. 307, 312-13 (S.D.N.Y.1999). Therefore, individual fact issues will predominate over the common issues with respect to the claim for breach of fiduciary duty. Accordingly, Plaintiffs have failed to satisfy the predominance requirement of Rule 23(b)(3).

### 2. Superiority

Rule 23(b)(3) also requires Plaintiffs to demonstrate that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed.R.Civ.P. 23(b)(3). If a class were to be certified here, the Court would be required to conduct a series of mini-trials in order to determine, for each retail customer of Merrill Lynch who purchased a Class Bond, whether Merrill Lynch charged an undisclosed, excessive markup. "Under these circumstances, a class action is not a feasible, let alone superior, method for the fair, efficient, and manageable adjudication of the putative class's claims." *Dunnigan,* 214 F.R.D. at 142 (citation omitted). Accordingly, the Court finds that Plaintiffs have failed to satisfy their burden of demonstrating that a class action is superior to other methods of adjudication.

### B. Rule 23(b)(2)

Plaintiffs also seek class certification under Rule 23(b)(2), which requires that "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief with respect to the class as a whole." Where a plaintiff seeks monetary damages along with injunctive or declaratory relief, certification is appropriate when the equitable relief sought predominates over the claims for monetary relief. *See Parker v. Time Warner Entm't Co.,* 331 F.3d 13, 20 (2d Cir.2003) (citing *Robinson v. Metro-North Commuter R.R. Co.,* 267 F.3d 147, 164 (2d Cir.2001)); *see also* Fed.R.Civ.P. 23(b)(2) advisory committee's note (explaining that this subdivision "does not extend to cases in which the appropriate final relief relates exclusively or predominantly to money damages").

*11 To evaluate whether injunctive or declaratory relief predominates, the Second Circuit requires the district court to conduct an ad-hoc determination. *See Robinson,* 267 F.3d at 164. Before certifying the class under Rule 23(b)(2), the Court "should, at a minimum, satisfy itself [that] (1) even in the absence of a possible monetary recovery, reasonable plaintiffs would bring the suit to obtain the injunctive or declaratory relief sought; and (2) the injunctive or declaratory relief sought would be both reasonably necessary and appropriate were the plaintiffs to succeed on the merits." *Id.* The Second Circuit has also warned that "insignificant or sham requests for injunctive relief should not provide cover for (b)(2) certification of claims that are brought essentially for monetary relief." *Id.*

In support of class certification under Rule 23(b)(2) Plaintiffs only argue that in the Second Amended Complaint they "sought declaratory relief as well as damages." [FN6] Pls. Mem. at 21. That by itself does not demonstrate that the claim for equitable relief predominates over the claim for monetary relief. Accordingly the Court declines to certify the putative class under Rule 23(b)(2).

> FN6. Plaintiffs make no reference to class certification under Rule 23(b)(2) in their reply memorandum.

### CONCLUSION

For the reasons set forth above, Plaintiffs' motion for class certification is denied. The parties are hereby ordered to appear for a pre-trial conference on October 1, 2003 at 10:30 a.m.

SO ORDERED.

S.D.N.Y.,2003.
Grandon v. Merrill Lynch and Co., Inc.
Not Reported in F.Supp.2d, 2003 WL 22118979 (S.D.N.Y.)

Briefs and Other Related Documents (Back to top)

• 2002 WL 32595526 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Memorandum in Support

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2003 WL 22118979 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

of Their Motion for Class Certification (Nov. 12, 2002)
• 2002 WL 32595523 (Trial Motion, Memorandum and Affidavit) Defendants' Memorandum of Law in Support of Motion for Leave to Amend Answer (Sep. 18, 2002)
• 2001 WL 34611473 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Opposition to Plaintiffs' Motion for Reconsideration (Aug. 20, 2001)
• 2001 WL 34611471 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Memorandum in Support of Their Motion for Reconsideration of That Portion of the Memorandum Decision and Order Dated July 20, 2001 Which Dismissed Certain Omission and Artifice Claims in Plaintiffs' Second Cause of Action (Aug. 03, 2001)
• 2000 WL 34403285 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Memorandum in Opposition to the Defendants' Motion to Dismiss the Second Amended Class Action Complaint (Jul. 12, 2000)
• 2000 WL 34403281 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Defendants' Motion to Dismiss the Second Amended Class Action Complaint (Apr. 10, 2000)
• 1999 WL 33885530 (Trial Motion, Memorandum and Affidavit) Defendants' Memorandum in Opposition to Plaintiffs' Motion for Reconsideration (Nov. 24, 1999)
• 1999 WL 33885529 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Memorandum in Support of Their Protective Motion for Reconsideration of a Portion of the Memorandum Decision and Order Dismissing the Amended Class Action Complaint (Nov. 09, 1999)
• 1998 WL 34279896 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Memorandum in Further Opposition to Defendants' Supplemental Memorandum in Support of their Motion to Dismiss the Amended Class Action Complaint (Dec. 22, 1998)
• 1998 WL 34279895 (Trial Motion, Memorandum and Affidavit) Supplemental Memorandum of Law in Support of Defendants' Motion to Dismiss the Amended Class Action Complaint (Sep. 25, 1998)
• 1996 WL 33649667 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss the

Amended Class Action Complaint (Nov. 26, 1996)
• 1996 WL 33649666 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Defendants' Motion to Dismiss the Amended Class Action Complaint (Jul. 15, 1996)
• 1:95cv10742 (Docket) (Dec. 20, 1995)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.