

976 F.2d 738 Page 1

976 F.2d 738, 1992 WL 231098 (C.A.9 (Cal.))
**(Cite as: 976 F.2d 738)**

C
NOTICE: THIS IS AN UNPUBLISHED OPINION.(The Court's decision is referenced in a " Table of Decisions Without Reported Opinions" appearing in the Federal Reporter. Use FI CTA9 Rule 36-3 for rules regarding the citation of unpublished opinions.)

United States Court of Appeals, Ninth Circuit.
Paul SOLOMON; Alan R. Plapinger; Gene Hart, Plaintiffs-Appellants,
v.
PEAT, MARWICK, MAIN & CO., a Partnership; Donaldson Lufkin & Jenrette Securities Corporation; Robertson & Stephens, Defendants-Appellees.
No. 91-55453.

Argued and Submitted July 8, 1992.
Decided Sept. 21, 1992.

Appeal from the United States District Court for the Central District of California, No. CV-90-0791-R; Manuel L. Real, District Judge, Presiding.
C.D.Cal.

AFFIRMED.

Before FARRIS, WIGGINS and FERNANDEZ, Circuit Judges.

MEMORANDUM [FN*]

*OVERVIEW*

*1 This is a securities fraud case in which appellants Paul Solomon, Alan Plapinger and Gene Hart appeal the district court's grant of summary judgment against them and in favor of appellee Peat Marwick Main & Co. (PMM). Appellants claim that PMM fraudulently withheld or misrepresented information about United Education & Software, Inc. (UES), so as to inflate artificially the price of UES stock in violation of Section 10(b) of the Securities Exchange Act of 1934 and Securities and Exchange Commission Rule 10(b)(5). Appellants claim to represent a class of investors who purchased the stock between March 23, 1988 and August 22, 1988 and lost money as a result of PMM's fraud. The district court had jurisdiction pursuant to 28 U.S.C. § 1291. We affirm.

*Statement of Facts*

UES is a company which in 1987 was engaged in operating accredited career and trade schools and in servicing guaranteed student loans for banks and other institutions. UES's parent company, UES, Inc., was traded on NASDAQ.

UES serviced guaranteed student loans primarily for the California Student Loan Finance Corporation (CSLFC). In February 1988, UES, Inc. announced that UES had entered a ten-year servicing agreement with CSLFC and that UES expected a favorable earnings report. On March 23, 1988, UES, Inc. released favorable financial information about the previous fiscal year and announced a 3 for 2 stock split. Appellant Plapinger purchased UES, Inc. stock on March 24, 1988.

In April and May 1988, UES, Inc. filed a registration statement, draft prospectus and a final prospectus for the sale of $1.8 million shares of its common stock in a public offering. Appellant Solomon purchased UES, Inc. stock on April 19, 1988, and sold it six days later after the price dropped 2-/4 points.

On May 2, 1988, UES, Inc. filed a Form 10-K for the fiscal year ending January 31, 1988. The Form 10-K includes the company's financial statement for the year as well as PMM's report.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

976 F.2d 738                                                                                                                           Page 2

976 F.2d 738, 1992 WL 231098 (C.A.9 (Cal.))
**(Cite as: 976 F.2d 738)**

In August, 1988, UES, Inc. made two separate announcements about two separate investigations. On August 2, the company announced that its student loan servicing business was the subject of a joint review by the U.S. Department of Education, the Higher Education Assistance Foundation and the California Student Aid Commission. On August 10, it announced the preliminary results of a different investigation by the California Student Aid Commission of UES's career and trade schools.

Appellant Hart purchased his shares of UES, Inc. stock on August 12, 1988, under the mistaken impression that the August 10 release contained results of the investigation announced on August 2. Serious deficiencies in UES's student loan servicing division were reported on August 22.

Appellants claim that PMM made or assisted in making misrepresentations about UES-that it was a company with great growth potential when in fact it had an inadequate computer system. Appellants also claims that, along with others, PMM made several material omissions. First, PMM did not disclose that the loan servicing facilities were inadequate and that the loans were not being properly serviced. Second, appellants allege that UES's financial statements were not in accordance with generally accepted auditing standards. Third, appellants allege that PMM's audit of UES, Inc.'s financial statements for the fiscal year ending January 31, 1988 was not conducted according to generally accepted accounting principles.

*2 The district court entered summary judgment against Solomon on September 28, 1990 and against Plapinger and Hart on February 25, 1991.

*Discussion*

A grant of summary judgment is reviewed de novo. *In re Apple Computer Securities Litigation,* 886 F.2d 1109. 1112 (9th Cir.1989), *cert. denied,* 494 U.S. 943 (1990).

I. Plapinger and Transaction Causation

In an action under Rule 10(b)-5 for material omissions or misstatements, "the plaintiff must prove both transaction causation, that the violations in question caused the plaintiff to engage in the transaction, and loss causation, that the misrepresentation or omissions caused the harm." *Hatrock v. Edward D. Jones & Co.,* 750 F.2d 767, 773 (9th Cir.1984).

The district court found no transaction causation because Plapinger "made his sole purchase of UES shares before PMM is alleged to have made any public representation regarding UES...." Appellant argues that this finding is erroneous for four reasons. First, appellant argues that UES's March 23, 1988 press release included the company's financial statement which was audited by PMM. Second, appellant argues that PMM had a duty to disclose UES's problems even without having made a public representation. Third, appellant claims that PMM is liable for the actions and statements of its coconspirator, UES, in furtherance of a single scheme to defraud investors. Finally, appellant claims PMM is liable for aiding and abetting the fraud by UES.

There is no evidence that PMM had anything to do with UES's March 23, 1988 press release. Plapinger claims that because the financial information disclosed in the release includes the legend "audited," PMM is responsible for the information. However, as PMM notes, this legend does not mean that the information was audited by PMM. Furthermore, a simple label of "audited" is not a recognized form for an auditor's report under the public standards governing the auditing profession. *See* 1 AICPA Professional Standards U.S. Auditing Standards (setting the proper methods of issuing and labelling audited documents). Therefore, the district court properly found that PMM did not have anything to do with the March 23 report.

Appellant further argues that because a March 25, 1988, PMM report appeared to confirm the financial information in the March 23 press release, PMM is liable for that misleading information. But, as PMM points out, the date of an independent auditor's report on financial statements refers to the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

976 F.2d 738                                                                                                           Page 3
976 F.2d 738, 1992 WL 231098 (C.A.9 (Cal.))
**(Cite as: 976 F.2d 738)**

completion of field work and not the date the opinion is signed and issued. *See* 1 AICPA Professional Standards U.S. Auditing Standards, AU § 530.01 at p. 771. The March 25, 1988 report simply marked the end of field work. The report itself was not issued publicly until May 2, 1988, with UES, Inc.'s filing of its SEC Form 10(K). Thus, we again find that the district court was correct in concluding that PMM made no statements upon which appellant could have relied before he made his purchase on March 24, 1988, and that therefore appellant failed to establish transaction causation.

*3 Next, Plapinger claims that he is entitled to recover from PMM because of PMM's duty under Section 10(b) and Rule 10(b)-5 to speak the full truth if one chooses to speak at all.[FN1] Appellant's argument is that the March 23 press release was an incomplete and misleading statement because it failed to disclose the fraud. By speaking through the press release, PMM thus acquired a duty to disclose all relevant information-in this case the fraud. This argument fails because PMM did not "speak" until May.

Appellant contends, however, that even if PMM did not "speak" through the March 23 release, it knew that the release was false and misleading. Thus, appellant claims, PMM had an affirmative duty to reveal the fraud. Generally, duty to speak cases deal with parties which choose to speak and thus acquire the responsibility to speak completely and honestly. "In discussing the duty to disclose, we have said that there must be a legal duty to speak, and that state law will generally be the source of this duty." *Robin v. Arthur Young & Co.,* 915 F.2d 1120, 1124-25 (7th Cir.1990), *cert. denied,* 111 S.Ct. 1317 (1991). Appellant has cited no state law on which to base his allegation that PMM had a duty to disclose. Instead, he alleges that there is a general federal securities law duty to disclose. This argument is inapposite. "General duties to speak do not find their source in securities law, *Basic Inc. v. Levinson,* 485 U.S. 224, 239 & n. 17 (1988), but instead 'must come from a fiduciary relation outside securities law.' " *Robin,* 915 F.2d at 1125 (quoting *Barker v. Henderson, Franklin, Starnes & Holt,* 797 F.2d 490, 496 (7th Cir.1986). "

Neither lawyers nor accountants are required to tattle on their clients in the absence of some duty to disclose." *Barker,* 797 F.2d at 497. Appellant cites *Rudolph v. Arthur Anderson & Co.,* 800 F.2d 1040 (11th Cir.1986), *cert. denied,* 480 U.S. 946 (1987) for the proposition that accountants "have a duty to take reasonable steps to correct misstatements they have discovered in previous financial statements on which they know the public is relying." What appellant fails to note is the context of this quotation taken from a Second Circuit case, *IIT v. Cornfeld,* 619 F.2d 909 (2d Cir.1980). In *IIT,* the court said that the accountants would only have a duty to correct those parts (of the financial statements) which it prepared if they were erroneous. *IIT,* 619 F.2d at 927. In other words, the duty to speak arises from a party's previous decision to speak. The cases discussing this principle simply refer to an auditor's " continuing duty to disclose." *Rudolph,* 800 F.2d at 1044. The cases do not create a broad duty to correct statements made by other parties before the accountant has even spoken himself.

Closely related to this alleged duty to disclose is appellant's last theory of recovery-that PMM is liable for UES's statements and fraud as a coconspirator or as an aider and abettor of the fraud. Under these theories, appellant would hold PMM liable for acts furthering the fraud even before PMM spoke itself.

*4 The coconspirator theory fails because Plapinger has presented no specific evidence of a conspiracy. To prove a civil conspiracy, he must present evidence of " 'a unity of purpose or a common design and understanding, or a meeting of the minds in an unlawful arrangement.' " *Vieux v. East Bay Regional Park Dist.,* 906 F.2d 1330, 1343 (9th Cir.), *cert. denied,* 111 S.Ct. 430 (1990) (quoting *Transgo, Inc. v. Ajac Transmission Parts Corp.,* 768 F.2d 1001, 1020 (9th Cir.1985), *cert. denied,* 474 U.S. 1059 (1986)). In *Schowengerdt v. United States,* 944 F.2d 483, 489 (9th Cir.1991), *cert. denied,* 112 S.Ct. 1514 (1992), this court upheld the grant of summary judgment because the plaintiff was unable to provide specific evidence that the defendants agreed among themselves to act against the plaintiff for an unlawful purpose. In its brief,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

976 F.2d 738                                                                                                                              Page 4

976 F.2d 738, 1992 WL 231098 (C.A.9 (Cal.))
**(Cite as: 976 F.2d 738)**

appellant just makes general assertions that PMM's preparation of audited financials (apparently the figures UES released in the March 23 press release) and
its subsequent *unqualified* opinion regarding the financial well-being of UES published to the public with the April 7, 1988 draft prospectus for the May 5, 1988 sale of 1.8 million shares of UES stock, leaves no doubt that PMM was a willing participant throughout. At the time of the unqualified opinion PMM had documented 'data base problems' and 'system flaws' and determined the 'MIS structure to be inadequate,' yet issued an *unqualified opinion* to the public.

These general assertions do not establish that there was an agreement between the parties or that PMM knew that UES was affirmatively hiding information from the public. We find that the district court did not err in granting summary judgment as appellant did not provide the evidence of a "unity of purpose or a common design and understanding, or a meeting of the minds in an unlawful arrangement" necessary to prove a civil conspiracy.

To establish aiding and abetting liability, appellant needed to present evidence showing:
(1) the existence of a securities law violation by the primary (as opposed to the aiding and abetting) party;
(2) "knowledge" of this violation on the part of the aider and abettor; and
(3) "substantial assistance" by the aider and abettor in the achievement of the primary violation.

*IIT,* 619 F.2d at 922.

Plapinger did present evidence of the first requirement, but not of the second requirement. Recklessness satisfies the scienter requirement. In *S.E.C. v. Seaboard Corp.,* 677 F.2d 1301, 1312 (9th Cir.1982), this court said that, "An accountant may be held liable if it knows, or is reckless in not knowing, that its client has committed a primary violation, and it substantially aids the client in the overall enterprise." Appellant has failed to show recklessness on PMM's part in failing to discover the alleged fraud. In the record, appellant did offer some exhibits attached to witness statements showing that in February 1988, UES employed PMM to review possible accounting problems in the computer software. As a result of that review, UES employed PMM to rewrite its software in March of 1988. However, appellant offered no evidence to show that by improving UES's accounting software, PMM should have became aware of UES's fraud.
Appellants characterize PMM's job as "providing management consulting services." Appellant alleges that PMM managed and ran the loan servicing division during the relevant period, when in fact PMM was simply part of a team which was attempting to solve UES's software problems, as they were known at the time.[FN2] There is no evidence indicating PMM's role was other than re-writing the accounting software for UES.[FN3]

*5 Appellant further argues that this issue is a factual one and therefore inappropriate for summary judgment. Numerous cases, however, have affirmed summary judgment on aiding and abetting claims. *See, e.g., Orloff v. Allman,* 819 F.2d 904, 905 (9th Cir.1987) ("Summary judgment is appropriate if, after sufficient time for discovery, a party fails to make a showing sufficient to 'establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial.' " *Id.,* (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986))). Appellant has not argued that discovery was insufficient, and his general allegations that PMM must have known of the fraud and agreed to it if they prepared UES's financial statements after the March 23 release are not sufficient evidence to overcome summary judgment.

We affirm the grant of summary judgment on the basis that plaintiff failed to show evidence sufficient to establish the second part of the test.

*II. Solomon and Loss Causation*

Solomon must prove transaction causation-that the misrepresentation or omission caused him to make the purchase-and loss causation-that the misrepresentation or omission caused the loss or harm. *Hatrock v. Edward D. Jones & Co.,* 750

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

976 F.2d 738                                                                                                                           Page 5

976 F.2d 738, 1992 WL 231098 (C.A.9 (Cal.))
**(Cite as: 976 F.2d 738)**

F.2d at 773.

Solomon bought 100 shares of UES, Inc. stock on April 19, 1988. On April 25, 1988, *Barron's* magazine published an article discussing problems with UES, Inc.'s career and trade school division. As a result of this article, the price of the stock fell, and Solomon immediately sold his shares for a loss, at a price which was 2 3/4 points down. He incurred a loss of $275.

Solomon is an "in-and-out trader", one who purchased after the alleged misrepresentation but sold before the corrective disclosure. In order to recover, Solomon must show a link between the alleged fraud and his loss.[FN4] The fraud in which PMM was allegedly involved was not disclosed until August 1988. The fall in price is not attributable to the fraud in which PMM allegedly participated and attempted to conceal. Because Solomon has failed to offer evidence of a link between the fraud and his loss, summary judgment in favor of PMM and against Solomon was proper.

### III. Hart and Transaction Causation

The district court granted summary judgment against Hart on the ground that he did not establish transaction causation-that he could not show that the misrepresentation or omission on PMM's part caused him to invest. *Hatrock,* 750 F.2d at 773. The district court apparently based its summary judgment on a finding that full disclosure had entered the marketplace by the time Hart purchased his stock. We affirm.

On August 2, 1988, UES, Inc. announced that its student loan servicing business was the subject of a government investigation. In a press release on that day, UES, Inc. admitted it had servicing problems with CSLFC loans caused by computer hardware and software. Hart admitted that he reviewed this release and was aware of problems with the loan servicing division.

*6 On August 10, UES, Inc. issued another press release which reported the results of the investigation into the trade and career schools (the investigation discussed in the April 25 *Barron's* issue). As a result of the investigation, the release reported, UES, Inc. would be liable for about $450,000. Hart said he took "comfort" from the second release, apparently confusing the two investigations and believing that the investigation of the loan servicing division had been settled. This was Hart's mistake, and he should have known the problems with the loan servicing division were still pending.

Another fact supporting the district court's grant of summary judgment is Hart's statement that he bought stock in UES, Inc. because he heard a rumor that the company was going to buy his employer, Careercom. As Hart did not demonstrate that he relied on the alleged misrepresentation and as he did rely on other information in electing to buy the UES stock, the district court did not err in finding there was no transaction causation.

### IV. Plapinger and Hart and Fraud on the Market Theory

Plapinger and Hart argue that they can satisfy the transaction causation requirement by using the fraud on the market theory. "Under the fraud on the market theory, the plaintiff has the benefit of a presumption that he has indirectly relied on the alleged misstatement, by relying on the integrity of the stock price established by the market." *In re Apple Computer Securities Litigation,* 886 F.2d at 1113-14.

Plapinger cannot rely on this theory because, as discussed above, PMM's alleged misrepresentations in its financial statements were not made until after he bought his stock. Thus, PMM could not have been responsible for fraudulently affecting the price of the stock in the market.

We also find that Hart's case based on this theory fails. Hart did purchase after PMM's alleged misstatements in UES, Inc.'s 1988 Form 10-K were released publicly. But, his purchase also came after the August 10, 1988 release, which the district court found to be a full disclosure of the fraud. After there has been full disclosure in the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

976 F.2d 738                          Page 6
976 F.2d 738, 1992 WL 231098 (C.A.9 (Cal.))
**(Cite as: 976 F.2d 738)**

marketplace, Hart can no longer rely on a fraud on the market theory. The fraud has been corrected.

Hart testified that he was purchasing because he thought UES, Inc. was going to buy his employer, which would then push up the market price of UES stock. This fact prevents Hart from relying on the fraud on the market theory because his decision to buy was "extrinsic to market factors." Because Hart relied on facts extrinsic to market factors, he may not rely on the fraud-on-the-market theory. Summary judgment against him was appropriate.

*V. Appellant's Pendent State Law Claims*

Because appellants' may not rely on the fraud-on-the-market theory, their state law claims also fail. The district court properly granted summary judgment on the state claims.

AFFIRMED.

FN* This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3.

FN1. A party who chooses to speak is bound "not only to state the truth but also not to suppress or conceal any facts within his knowledge which will materially qualify those stated; if he speaks at all, he must make a full and fair disclosure." *First Virginia Bankshares v. Benson,* 559 F.2d 1307, 1313 (5th Cir.1977), *cert. denied,* 435 U.S. 952 (1978).

FN2. To support this statement, appellant offers as evidence UES's statement in its crossclaim complaint (against PMM) that PMM was effectively managing the loan servicing division by May 1988. But this is not evidence; it is a self-serving statement by the party alleged to be primarily responsible for the fraud in the first place.

FN3. Appellant attempts to find knowledge of fraud based on the fact that PMM knew there were problems with the loan servicing software, which PMM was re-writing, and yet PMM continued to release audited financial information in April, May and at later dates, which did not disclose the problems. But such facts do not show that PMM knew of UES's fraud, that UES had false and inadequate documentation in thousands of student loan files.

FN4. Appellant cites *Wool v. Tandem Computers, Inc.,* 818 F.2d 1433 (9th Cir.1987), for the proposition that an in and out trader may be harmed by the fraud even if he sells before disclosure. But Solomon has presented no evidence indicating how he might have been harmed in this case as a result of PMM's alleged fraud.

C.A.9 (Cal.),1992.
Solomon v. Peat, Marwick, Main & Co.
976 F.2d 738, 1992 WL 231098 (C.A.9 (Cal.))

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.