## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ANNE BRUMBAUGH, GARY L. HARMON and RANDY K. GRIFFIN,<br>Plaintiffs,<br><br>v.<br><br>WAVE SYSTEMS CORPORATION, STEVEN K. SPRAGUE and GERARD T. FEENEY,<br><br>Defendants. | CIVIL ACTION<br>NO. 04-30022-MAP |

## DECLARATION OF KAY E. SICKLES IN SUPPORT OF CLASS ACTION SETTLEMENT, PLAN OF ALLOCATION, AND THE APPLICATION FOR AN AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES AND REIMBURSEMENT AWARD FOR LEAD PLAINTIFFS

I, KAY E. SICKLES, respectfully submit this declaration (the "Declaration" or "Sickles Decl."), pursuant to Federal Rule of Civil Procedure 23(e), in support of: (i) the Court's final approval of the settlement of this class action and plan of allocation, which the Court preliminarily approved by order dated October 24, 2006; (ii) the application of Lead Counsel for attorneys' fees and reimbursement of expenses; and (iii) the application of the Lead Plaintiffs for award for reimbursement of time and expenses (including lost wages) incurred in furtherance of the litigation.

### INTRODUCTION

1.      I am a partner of the law firm of Schiffrin Barroway Topaz & Kessler, LLP ("Schiffrin & Barroway"), Lead Counsel for Lead Plaintiffs Anne Braumbaugh, Gary L. Harmon

and Randy K. Griffin (collectively "Lead Plaintiffs") and the Class (as defined below) in the above-captioned action (the "Action"). I have been personally involved in all aspects of the litigation and settlement of the Action. I also have been kept informed of developments in the Action by attorneys working under my direction. The information set forth in this Declaration is based on the personal knowledge I gained during the course of the Action and the settlement negotiations, as well as through the information communicated to me by attorneys working under my direction.

2.      This Declaration is submitted in support of the Court's consideration of: (i) the fairness, reasonableness and adequacy of the settlement of the Action (the "Settlement") and the proposed Plan of Allocation, on the terms and conditions reflected in the Stipulation and Agreement of Settlement, dated October 3, 2006 (the "Stipulation")[1]; (ii) the application of Lead Counsel for an award of attorneys' fees and reimbursement of expenses; and (iii) the application of Lead Plaintiffs for reimbursement of their reasonable costs and expenses (including lost wages) directly relating to their representation of the Class. Because this Declaration is submitted in support of a settlement, it is therefore privileged and inadmissible in any subsequent proceeding, other than in connection with the Settlement. This Declaration and the statements contained herein are without prejudice to Lead Plaintiffs' position on the merits in the event that the Settlement is not approved by the Court.

**Terms of the Settlement**

3.      The Settlement provides for the payment of One Million Seven Hundred and Fifty Thousand Dollars ($1,750,000) on behalf of the Defendants (as defined below). Pursuant to the Stipulation and an Escrow Agreement, which was executed by the parties to the Stipulation and

---

[1]      Unless otherwise noted, capitalized terms shall have those meanings contained in the Stipulation.

dated as of October 2, 2006, the sum of $1,750,000 was funded by Defendant's insurers on November 22, 2006 and has earned $6,100.41 in interest.

4.    The terms of the Settlement are fully set forth in the Stipulation and in the Notice of Proposed Settlement of Class Action, Motion for Attorneys' Fees and Settlement Fairness Hearing (the "Notice"), which was mailed to 20,684 potential Class Members pursuant to the Court's Preliminary Order in Connection with Settlement Proceedings ("Preliminary Approval Order"). *See* ¶ 9 of the Affidavit of Jose C. Fraga of The Garden City Group, Inc. ("GCG"), the Claims Administrator in this Action (the "GCG Affidavit" or "GCG Aff.").[2]

5.    The Notice advised all recipients that Class Members who do not wish to participate in the Settlement may exclude themselves from the Class. Class Members who do not believe that all aspects of the Settlement, including the Plan of Allocation, the request for an award of attorneys' fees and reimbursement of expenses and the request for reimbursement awards for Lead Plaintiffs, are fair, reasonable and adequate, have been notified of the right to object to any or all of the foregoing. As of the filing of this Declaration, not a single Class Member has objected to the Settlement or the request for attorney's fees. Only two Class Members have requested to be excluded from the Class, and one objection to the Plan of Allocation has been received. Upon approval of the Settlement, the Action shall be dismissed with prejudice, subject to the terms of the Stipulation and Order and Final Judgment. For the reasons set forth below, I believe that the terms of the Settlement and Plan of Allocation are fair, reasonable and adequate in all respects and, pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, should be approved by this Court.

---

[2]  The Notice is attached as Exhibit A to the GCG Aff., which is attached hereto as Exhibit 1.

**Background Regarding the Parties
and Claims Asserted**

6.    The Class is defined as all persons who purchased or otherwise acquired Wave Systems Corporation ("Wave" or the "Company") common stock during the period from July 31, 2003 through December 18, 2003, inclusive.  Excluded from this Class are Defendants, the officers and directors of Wave, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.  Also excluded from the Class are any Class Members who timely and validly request exclusion from the Class pursuant to the Notice.

7.    Defendant Wave is a Delaware corporation with its principal offices at 480 Pleasant Street, Lee, Massachusetts.  During the Class Period, Wave represented itself as a developer, producer and marketer of hardware and software based digital security products for the Internet – a highly competitive, evolving and yet to be defined marketplace.  Also named as defendants in this Action are (i) Steven K. Sprague, the Company's President and Chief Executive Officer ("CEO") and (ii) Gerard T. Feeney, the Company's Senior Vice President, Chief Financial Officer ("CFO") and Secretary (the "Individual Defendants") (collectively with Wave, the "Defendants").

8.    Lead Plaintiffs alleged that Defendants violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10-b(5) promulgated thereunder by the Securities and Exchange Commission ("SEC").  Lead Plaintiffs alleged that Defendants mislead investors by making material misrepresentations and omissions concerning the financial condition and operations of the Company.  More specifically, Lead Plaintiffs asserted that Defendants, faced with Wave's unfavorable financial situation – no significant revenue stream, very little working capital and the inability to pay preferred shareholder dividends or redeem

preferred stock, devised a plan to artificially and materially inflate the Company's stock price in the short term by priming the market to expect unprecedented revenue growth through statements regarding Wave's business prospects and issuing statements that materially misled investors about: (i) the profitability and nature of Wave's purported licensing agreement with Intel Corporation; (ii) the nature and the profitability of its purported partnership with IBM; and (iii) the Company's ability to generate profits and positive cash flow from these deals. Lead Plaintiffs further asserted that as a consequence of Defendants' alleged conduct, the value of Wave common stock was inflated artificially, causing damage to Lead Plaintiffs and the other Class Members.

### History of the Action

9.      On or after February 4, 2004, the following eight securities action complaints were filed against Wave and certain of Wave's present or former officers in the United States District Court for the District of Massachusetts:

> *Sousa v. Wave Systems Corp. et al*, C.A. 04-30022-MAP; *Streicher v. Wave Systems, Corp.*, C.A. 04-30026-MAP; *Dawod v. Wave Systems Corp.*, C.A. 04-30029-MAP; *Chess v. Wave Systems Corp.*, C.A. 04-30037-MAP; *Vicker v. Wave Systems Corp.*, C.A. 04-30040-MAP; *Bohman v. Wave Systems Corp.*, C.A. 04-30041-MAP; *Suo v. Wave Systems Corp.*, C.A. 04-30042-MAP; and *Schulman v. Wave Systems Corp.*, C.A. 04-30043-MAP.

An additional lawsuit, *Trebitsch v. Wave Systems* (No. 04-00266) (the "Trebitsch Action") was filed against the Defendants in the United States District Court for the District of New Jersey.

10.      By order dated September 3, 2004, the Honorable Michael A. Ponsor consolidated the eight above-captioned securities actions filed in the District of Massachusetts, and ordered that the Trebitsch Action be consolidated if the case were transferred to the District of Massachusetts. By the same order, the Court appointed Anne Braumbaugh, Gary L. Harman and

Randy K. Griffin as Lead Plaintiffs and approved Schiffrin & Barroway as Lead Counsel and Gilman & Pastor, LLP ("Gilman & Pastor") as Liaison Counsel.[3]

11.    On April 12, 2004, the United States District Court for the District of New Jersey transferred the Trebitsch Action to the United States District Court for the District of Massachusetts.

12.    On October 22, 2004, Lead Plaintiffs filed their Consolidated Amended Class Action Complaint for Violations of the Federal Securities Laws (the "CAC"). On December 14, 2004, Defendants moved to dismiss the CAC, contending, *inter alia*, that the alleged statements were not false and misleading, were forward-looking and protected by the statutory safe harbor and were not made with the requisite knowing or reckless state of mind. Lead Plaintiffs filed their opposition to Defendants' motion to dismiss on March 4, 2005, and Defendants filed their reply memorandum on March 22, 2005. Lead Plaintiffs filed supplemental authority in opposition to Defendants' motion on May 25, 2005, and on March 30, 2005, the Parties appeared before the Court for oral argument. On January 11, 2006, the Court issued a Memorandum and Order denying in part, and granting in part Defendants' motion, dismissing Lead Plaintiffs' allegations with respect to two of nine false statements alleged.

13.    On February 9, 2006, Defendants filed their Answer and Affirmative Defenses to the CAC denying the substance of these allegations.

14.    On March 31, 2006, Lead Plaintiffs filed a motion for class certification. Thereafter, Defendants served Lead Plaintiffs with class related discovery, in the form of document requests and deposition notices. Lead Plaintiffs prepared responses to these discovery requests and subsequently sat for depositions in May 2006. On June 6, 2006, Defendants filed a

---

3  As of January 1, 2007, the name of the firm was changed to Schiffrin Barroway Topaz & Kessler, LLP.

memorandum in opposition to Lead Plaintiffs' motion for class certification, and on June 28, 2006, Lead Plaintiffs filed a reply memorandum. Defendants filed a sur-reply on July 5, 2006.

15.    In the midst of this motion practice, Lead Plaintiffs, through Lead Counsel, and Defendants (the "Parties") began discussing a possible resolution of the Action in late February 2006. These settlement discussions continued through numerous telephonic negotiations over the course of the next five months, leading to a decision to participate in formal mediation. On July 7, 2006, the Parties participated in a full-day mediation session with the assistance of the Honorable Nicholas H. Politan (Ret.), United States District Judge for the District of New Jersey, and reached a tentative resolution of the Action at this mediation. In advance of this formal mediation session, the Parties prepared detailed mediation statement's for Judge Politan's review. During the mediation, the Parties presented their respective views regarding the merits of the Action as well as their views concerning available defenses, the evidence and damages analyses. The Parties notified the Court that they had reached a settlement of the Action on July 10, 2006, while Lead Plaintiffs' motion for class certification was still pending.

16.    Once the tentative resolution of the Action was reached, Lead Plaintiffs and Defendants negotiated the details of a settlement and drafted the relevant settlement papers. Based upon Lead Plaintiffs' and Lead Counsel's belief that the terms of the Settlement were fair, reasonable and adequate, Lead Plaintiffs and Defendants finalized the papers supporting the Settlement, executed the Stipulation and filed these documents with the Court on October 4, 2006.

17.    On October 24, 2006, this Court signed the Preliminary Approval Order, preliminarily approving the Settlement as set forth in the Stipulation. Pursuant to the Preliminary Approval Order, dissemination of the Notice began on November 8, 2006 and was

mailed to more than 20,600 potential Class Members. GCG Aff. ¶¶ 3, 9. In addition, the Summary Notice of Pendency and Proposed Settlement of Class Action ("Summary Notice") was published in *Investor's Business Daily* on November 15, 2006. GCG Aff. ¶ 6.

### Lead Plaintiffs' Factual Investigation

18.    Lead Counsel conducted a thorough investigation and analysis of the claims of the Class prior to the Parties' agreement to settle the Action, including: (i) review of Wave's public filings, annual reports and other public statements; (ii) review of reports about Wave by securities analysts, rating agencies and news services; (iii) consultations with a damage expert; (iv) interviews and follow-up with confidential witnesses; (v) review of documents produced by third-parties; (vi) research of the applicable law with respect to the claims asserted in the Action and Defendants' potential defenses thereto; and (vii) review of information concerning Wave's financial condition and the availability of insurance coverage.

19.    Lead Counsel also undertook substantial efforts during the prosecution of this Action which further added to its knowledge regarding the merits of Lead Plaintiffs' claims. These efforts included, *inter alia*, drafting an extensive detailed amended complaint, fully briefing Defendants' motion to dismiss, drafting and fully briefing a motion for class certification, responding to Defendants' class related discovery demands and preparing for the depositions of Lead Plaintiffs. Lead Counsel also drafted a detailed mediation statement and engaged in lengthy and hard-fought settlement negotiations with Defendants, as described in more detail below.

20.    As a result of the thorough investigation and substantial efforts detailed above, Lead Counsel and Lead Plaintiffs have an in-depth knowledge of the strengths and weaknesses of their case to consider fully and evaluate the fairness of the Settlement to the Class.

8

## The Financial Circumstances of Wave

21.    Lead Counsel recognized early in this Action that Wave was in financial distress and thus, that its financial condition could adversely affect any recovery by the Class. Later, during settlement negotiations, it became clear that it was entirely possible Lead Plaintiffs could litigate the Action through a trial on the merits and fail to recover an amount greater than the instant Settlement, or worse, fail to achieve any recovery at all from Defendants. Therefore, Lead Counsel's foremost considerations for entering into the Settlement was Wave's poor financial condition, the availability of only limited insurance proceeds to fund a settlement or satisfy a judgment, and the risk generated by these realities.

22.    When the Parties began their settlement discussions in February 2006, not only was Wave's financial situation negative, but it was continuing to decline. In its quarterly financial statement filed with the SEC on Form 10-Q for the quarter ended March 31, 2006, Wave reported a decrease in cash and cash equivalents – reporting $1.6 million (down from $2 million for the fiscal year end 2005, and $5.8 million for the fiscal year end 2004), an increase in accumulated deficit to approximately $290 million (up from $285 million for fiscal year end 2005), and an increase in negative working capital to $1.4 million (up from $1.1 million for fiscal year end 2005).

23.    The Company's performance in the marketplace did not appear to be building a foundation that would turnaround the company's prospects in the short-term. As stated in the Company's Form 10-Q for the quarter ended March 31, 2006:

> Wave has begun market introduction of its security and broadband media distributions software products and has signed initial distribution contracts for these applications. However, due to the early stage nature of this market, it is unlikely that Wave will generate sufficient revenue to cover all of its cash flow needs to fund its operating requirements for the twelve months ending March 31, 2007. . . .Because Wave does not have sufficient cash to fund operations for the

twelve months ending March 31, 2007; and given the uncertainties described above with respect to Wave's revenue outlook for 2006, Wave has been and will continue to be actively engaged in financing activities in order to generate additional funding to cover its operating costs for the twelve months ending March 31, 2007.

***

If we do not succeed in these objectives, we will not generate revenues; hence, our business will not be sustainable. . . .We may not be able to fund our operations and continue as a going concern . . .Wave is uncertain as to the availability of financing from other sources to fund any cash deficiencies. Even if we are successful in achieving our objectives, a positive cash flow from operations may not ultimately be realized unless we are able to sell our products and services at a profit. Given the early stage nature of the markets for our products and services, considerable uncertainty exists as to whether or not Wave's business model is viable. . . .We may be unable to raise the $12 million of additional cash flow, which is necessary to continue as a going concern for the next twelve months.

In addition, although Wave's most recent financial statement, the 10-Q for the quarter ended September 30, 2006, indicates that it received financing to continue operating to June 2007 instead of March 2007, it does not appear as though its overall outlook has changed.

24.    The limited amount of insurance proceeds available to either fund a settlement or satisfy a future judgment also supports Lead Counsel's concerns. At the time the Parties reached the Settlement, Wave had a $5 million dollar wasting directors' and officers' insurance policy which was being used to fund defense costs in this Action, and had also been used to fund defense costs in a derivative action, which was dismissed shortly before the Parties negotiated the Settlement. As of the time of the mediation, $1 million of the policy had already been spent for defense costs. Continuing litigation, through document discovery, depositions, and expert discovery, surely would have further depleted the policy by at least another $1 million or more. Furthermore, as the SEC investigation continues, Wave is sure to continue to incur large legal fees associated with that investigation. Thus, it is unlikely that enough of the policy would have

remained by the time of a trial in this Action to fund a judgment for an amount significantly greater than the Settlement.

25.    Lead Counsel also weighed the opportunity presented by the Settlement against the prospect of obtaining cash contributions from the Individual Defendants.  Obtaining cash contributions from individual defendants is rare in the context of securities litigation.  While the Individual Defendant's personal assets could have been sought to satisfy a judgment, in entering into the Settlement, Lead Counsel and Lead Plaintiffs weighed this prospect against: (i) the likelihood that the Individual Defendants would personally be found liable; (ii) the ease with which the material assets belonging to them could be readily attached; (iii) the experience of Lead Counsel that especially in circumstances such as this, where the corporate defendant is in dire financial straits, individual defendants do not contribute to class-wide settlements out of their own pockets until, if ever, trial and its attendant costs and risks are upon them; and (iv) the experience of Lead Counsel that it is not possible to fund a settlement with insurance proceeds and then continue to prosecute individual defendants if the insurer wants a global release for all individuals and entities covered under the policy at issue.  Lead Counsel reached the conclusion that it would not be beneficial to the Class to forego the Settlement to continue to prosecute the Individual Defendants in the hopes of obtaining a greater recovery from their personal assets.

## The Factors Affecting Settlement

26.    The Settlement is the result of extensive negotiations over the course of almost six months between experienced counsel who have concluded that the Settlement is fair, reasonable and adequate and should be approved by the Court.  Lead Counsel's foremost consideration for entering into this Settlement was Wave's poor financial condition and the availability of only limited insurance proceeds to fund a settlement or satisfy a judgment.  The Settlement at this

time avoids the risks associated with Wave's financial circumstances and the possibility that, after further litigation, little or no monies would be available to fund a settlement or satisfy a judgment and that Lead Plaintiffs and the other Class Members would not be able to recover anything from the Defendants. As set forth in further detail below, Lead Counsel has concluded that: (i) the Settlement described herein confers a substantial benefit upon the Class; (ii) success is not assured, and in the event of a verdict in Lead Plaintiffs' favor, it is unlikely that a sum greater than the Settlement would be available to satisfy a judgment; and (iii) the rather small chance that a greater amount could be recovered for Lead Plaintiffs and the Class does not outweigh the risk, expense and delay that would be involved in prosecuting this Action to trial.

27.    The First Circuit employs a fair, adequate, and reasonable standard when reviewing a class action settlement. Although the First Circuit has not identified a particular set of factors to consider when deciding whether to approve a proposed class action settlement, district courts in this jurisdiction have recently applied the following criteria:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*See e.g. In re Relafen Antitrust Litig.*, 231 F.R.D. 52, 58 (D. Mass. 2005) (internal citations omitted). Based on an analysis of these factors, the terms of the Settlement and Plan of Allocation before the Court are fair, reasonable and adequate and should be approved.

28.    An analysis of the seventh factor listed above, Defendants' ability to withstand a greater judgment, was the foremost consideration in Lead Counsel's decision to resolve this Action. The Company was in deep financial trouble and demonstrated that it would run out of

working capital in the near future without a resolution of the Action. Since its founding more than 16 years ago, Wave has failed to generate any meaningful revenue from the sales of its products or services and has incurred and operated at substantial losses. As set forth above in ¶¶ 21-24, no reasonable assessment could or can be made that the Company will experience a financial turnaround in the short-term and all of the information at Lead Counsel's disposal fully supports Lead Counsel's conclusion that Defendants could not withstand a greater judgment.

29.     Furthermore, limited insurance proceeds were available to either fund a settlement or satisfy a future judgment in this Action. At the time the Parties reached the Settlement, $1 million dollars of Wave's $5 million dollar wasting directors' and officers' insurance policy had already been spent for defense costs, which would continue to mount at an increasing rate as the Parties proceeded into full merits discovery, including expert discovery, and eventually trial. Lead Counsel therefore concluded that continuing to litigate would not enhance the opportunity to recover a substantial sum for Lead Plaintiffs and the Class and would in fact only place at risk the ability to recover from the insurance proceeds.

30.     The eighth and ninth factors, the range of reasonableness of the settlement fund in light of the best possible recovery and the attendant risks in litigation, also both support approval of the Settlement. The Settlement Fund represents a significant recovery for the Class both in absolute terms and when viewed in light of the risks of litigation. The greatest possible recovery for the Class falls in the range of $7 to $23 million. A significant proportion of the $23 million damage estimate, more than $16 million, may be attributable to losses suffered by in and out purchasers, *i.e.* purchasers who sold their shares of Wave common stock before the disclosure at the end of the Class Period. Under prevailing Supreme Court law, Defendants would present defenses to loss causation for these purchasers. Viewing any possible recovery in the context of

the risk that Defendants could prevail in this defense, this Settlement may be viewed as a recovery of 25% of estimated damages of $7 million.

31.    An analysis of this factor presents even greater support for approval of the Settlement when the Settlement is viewed in light of the risks created by Wave's financial circumstances and the availability of only limited insurance proceeds, as well as the other risks of litigation, detailed below in ¶¶ 33-34.    By settling at this point, Lead Plaintiffs have maximized the recovery for the Class, while minimizing costs and the risks.    Considering the time value of money, the certainty of many additional years of litigation and inevitable appeals in the absence of the Settlement, the risk of no recovery if the Company runs out of money or declares bankruptcy, and the limited insurance proceeds available to fund a settlement, this Settlement is well within the range of reasonableness against which settlements are measured.

32.    An analysis of the first factor, the complexity, expense, and likely duration of the litigation, also supports the Settlement.    Lead Plaintiffs' claims involve numerous complex legal, financial and factual issues that would have required Lead Plaintiffs to conduct voluminous paper discovery, take numerous depositions and engage in extensive expert discovery.    At the time this Settlement was reached, the Parties had not yet begun merits discovery, which would be very expensive and time consuming and would have undoubtedly added considerable expense and duration to the litigation.    Of course, expert discovery, summary judgment, and preparation for trial, let alone a trial itself, would also incur tremendous additional expenses and require many hours of the Court's time and resources.    In addition, if Lead Plaintiffs had proceeded with the Action, these additional expenses would also have been borne by Defendants, and taken a toll on an already financially troubled corporate defendant, as well as a limited insurance policy,

thus, increasing the possibility that Lead Plaintiffs may have been precluded from obtaining any relief at all.

33.    An analysis of factors four and five, the risks of proving liability and damages, also support the Court's approval of the Settlement.   Although the Court found that Lead Plaintiffs' pleadings were sufficient to state a claim, Lead Plaintiffs faced significant hurdles with respect to proving liability at trial.   The CAC alleged violations of Sections 10(b) and Rule 20(a) of the Exchange Act, and Rule 10b-5 promulgated thereunder.   To prevail under the Exchange Act, Lead Plaintiffs would be required to show that Defendants made misstatements or omissions of material fact with scienter in connection with the sale or purchase of securities.   As asserted in both their motion to dismiss and opposition to class certification, Defendants have maintained throughout the Action that Wave disclosed the "true facts" with respect to the nature of its business relationships with Intel and IBM to the market and that Lead Plaintiffs would ultimately be unable to meet their burdens of proof for two of the elements of Lead Plaintiffs' claims - that Defendants made misstatements of materials fact or that Defendants made these alleged misstatement with scienter.

34.    In addition to facing risks in proving liability, Lead Plaintiffs also faced significant risks in proving damages.   While Lead Plaintiffs believe they could prove damages at trial, success would hinge on the jury's acceptance of Lead Plaintiffs' damages theories.   As a result, Lead Counsel already knows that the Class would ultimately face a "battle of experts" on damages.   As stated above, Defendants would seek to minimize, if not eliminate Lead Plaintiffs' damages through a loss causation argument with respect to the in and out purchasers. Defendants would also argue that a cause other than the announcement regarding the SEC investigation of Wave's public statements during and around August 2003 was responsible for

the drop in the price of Wave common stock at the end of Class Period.  While Lead Counsel believe that reliable and convincing expert testimony can be provided to support Lead Plaintiffs' damage figure, and that a judgment could ultimately be obtained for the full amount of damages available under the law, the Class is by no means assured that the Court will permit its damage experts to testify, that a jury will find Lead Plaintiffs' expert more persuasive than Defendants' expert and, most importantly, that even if Lead Plaintiffs obtain a judgment for an amount greater than the Settlement, that Lead Plaintiffs will be able to collect on such a judgment.

35.    An analysis of the second factor, the reaction of the Class, also counsels in favor of the Settlement.  The reaction of the Class to the Settlement has been overwhelmingly supportive.  Members of the Class had until December 28, 2006, to file objections and to request exclusion.  As of the December 28, 2006 deadline, not a single Class Member has objected to the Settlement itself, and only two requests for exclusion from the Class have been submitted.  GCG Aff. ¶ 10.

36.    With respect to an analysis of the third factor, the stage of the proceedings and the amount of discovery completed, Lead Counsel has achieved a balance between gaining knowledge necessary to assess Lead Plaintiffs' case and Defendants' defenses, and settling at a point in the process which maximizes the recovery for the Class due to the financial condition of the Company.  Lead Plaintiffs drafted both an initial and an amended complaint, engaged in an extensive investigation of the Class' claims, consulted with a damage expert, fully briefed Defendants' motion to dismiss, fully briefed a motion for class certification, undertook class certification-related discovery, reviewed documents produced by third-parties, drafted a detailed mediation statement and engaged in protracted settlement discussions with Defendants, including participation in formal mediation.  On the one hand, by the time the Parties entered into the

Settlement, Lead Counsel had sufficient information in its possession, which allowed it to understand the issues and to evaluate the strengths and weaknesses of the claims of the Class, particularly in the area of damages and the potential for recovery of those damages due to Wave's financial condition. On the other hand, at the time the Parties reached the Settlement, the Parties had not yet undertaken the most expensive aspects of litigation - merits discovery, including numerous depositions, expert discovery, summary judgment and trial.

37.    Finally, an analysis of the sixth factor, the risks of maintaining the Class through trial, also supports the Settlement. Here, the Class as plead in this Action has only been certified for settlement purposes. The Defendants filed an opposition to Lead Plaintiffs' motion for class certification, as well as a sur-reply in opposition of the motion, and the motion for class certification was pending when the Parties reached the Settlement. But for the Settlement, Defendants would have continued to vigorously contest class certification and would have subsequently taken any opportunity to argue for decertification as the Action progressed.

## Class Certification

38.    As detailed previously, Lead Plaintiffs filed a motion for class certification on March 31, 2006. Defendants filed their opposition to Lead Plaintiffs' motion on June 6, 2006, Lead Plaintiffs filed a reply to Defendants' opposition on June 28, 2006 and Defendants filed a sur-reply on July 5, 2006. The Parties reached a tentative settlement of the Action while the motion for class certification was still pending before the Court.

39.    Lead Plaintiffs now seek final certification of the Class and appointment of the Lead Plaintiffs as class representatives. The Parties have agreed as a term of the Settlement to the certification of a Class consisting of all persons who purchased or otherwise acquired Wave common stock during the period from July 31, 2003 through December 18, 2003, inclusive. In

the Court's October 24, 2006 Preliminary Approval Order, the Court certified the proposed Class and certified Lead Plaintiffs as class representatives. The Class warrants final certification pursuant to Rule 23(a) and Rule 23(b)(3) of the Federal Rules of Civil Procedure because the proposed Class meets the pre-requisites for class certification.

40.     The Rule 23(a)(1) prerequisite that the class be so numerous that joinder is impracticable is easily satisfied here. Throughout the Class Period, Wave common stock was actively traded on the NASDAQ, and approximately 55,000,000 shares of Wave common stock were purchased during this time. Beneficial holders of Wave common stock are believed to number in the thousands and are geographically located throughout the United States, making joinder impracticable.

41.     This Action also satisfies the requirements of Rule 23(a)(2) and 23(b)(3) because common questions exist and predominate over questions affecting only individual class member. In this Action, Lead Plaintiffs have alleged that Defendants engaged in a common course of conduct by making substantially similar misrepresentations and omissions to the entire Class, and the questions of law and fact common to the Class include: (i) whether the federal securities laws were violated by Defendants' acts as alleged herein; (ii) whether the Company's publicly disseminated press releases and statements during the Class Period omitted and/or misrepresented material facts; (iii) whether defendants breached any duty to convey material facts or to correct material facts previously disseminated; (iv) whether Defendants participated in and pursued the fraudulent scheme or course of business complained of; (v) whether the Defendants acted willfully, with knowledge or recklessly, in omitting and/or misrepresenting material facts; (vi) whether the market price for Wave common stock during the Class Period was artificially inflated due to material non-disclosures and/or misrepresentations complained of

herein; and (vii) whether members of the Class have sustained damages and, if so, what is the appropriate measure of damages.

42.    Lead Plaintiffs' claims also satisfy the typicality requirement because Lead Plaintiffs' claims are the same as those claims of the other Class Members because they arise from the same course of conduct by Defendants, the same misrepresentations, and are based on the same legal theories as those of other Class Members who purchased or otherwise acquired Wave common stock during the Class Period at prices which were artificially inflated as a result of Defendants' conduct. The conduct at issue is the same throughout the Class Period.

43.    Similarly, Lead Plaintiffs satisfy Rule 24(a)(4) because they will fairly and adequately protect the interests of the Class. This Court has already designated the proposed class representatives as Lead Plaintiffs pursuant to the PSLRA, which provides that the Court "shall appoint as lead plaintiff the member or members of the plaintiff class that the court determines to be most capable of adequately representing the interest of class members." 15 U.S.C. § 78u-4(a)(3)(B)(i). The record demonstrates that Lead Plaintiffs have vigorously pursued the Class' interest in this Action. *See* ¶59 below. Furthermore, Lead Plaintiffs have retained highly competent counsel with extensive experience litigating complex securities class actions, which this Court has already approved. *See* the Biography of Schiffrin & Barroway attached as Exhibit 2. Lead Plaintiffs and their counsel have diligently advanced the best interests of the Class in the Action.

44.    The class action mechanism also meets the superiority requirement of Rule 23(b)(3). Here, the individual Class Members have relatively small claims that are economically impracticable to pursue in individual actions, and the members of the Class are so numerous that joinder of all members is impracticable

### The Plan of Allocation

45.    The proposed Plan of Allocation (the "Plan"), as set forth in the Notice, provides the manner in which the Gross Settlement Fund, less any cash used to pay fees and costs as may be awarded by the Court (collectively, the "Net Settlement Fund"), shall be distributed to Authorized Claimants.[4] Lead Counsel prepared the Plan of Allocation after careful consideration and detailed analysis, and with the assistance of Lead Counsel's damage expert.

46.    The Plan reflects the proposition that the price of Wave common stock was artificially inflated from the beginning of the Class Period on July 31, 2003 until the end of the Class Period on December 18, 2003, the last trading day before Wave announced that it was under formal investigation by the SEC for public statements it made regarding its business in and around August 2003.  More specifically, in response to the Company's disclosure, the price of Wave common stock declined by $0.31 per share.

47.    The Plan was fully disclosed in the Notice that was sent to more than 20,600 potential Class Members.  As of the filing of the instant motion, there has only been one objection to the Plan, as described below in ¶48.  Differences in treatment of Class Members are made only with respect to the timing of Class Members' purchases, acquisitions and sales of Wave common stock.  Overall, if the total recognized losses for all Authorized Claimants exceeds the Net Settlement Fund, each Authorized Claimants' share of the Net Settlement Fund will be determined based upon the percentage that his, her or its recognized loss bears to the total recognized losses for all Authorized Claimants.  Lead Counsel believes that this method of allocation is fair, reasonable and adequate and that the Plan should be approved.

---

[4] "Authorized Claimant" is defined in the Stipulation and Agreement of Settlement as means a Class Member who submits a timely and valid Proof of Claim and Release form ("Proof of Claim") to the Claims Administrator.

48.      One objection to the Plan, by Class Members Bill and Marlene Stewart, who purchased 2000 shares of Wave common stock during the Class Period and also sold the 2000 shares during the Class Period, has been filed to the Plan.  A copy of the Objection is attached hereto as Exhibit 4.  The Stewarts object to the provision of the Plan for a discounted recovery for Class Members who both purchased and sold their shares during the Class Period.  However, Lead Counsel prepared this Plan, providing for a discounted recovery for purchasers who sold their Wave common stock, after careful consideration of the prospects of these Class Members of a recovery in the actual litigation.  As set forth in Lead Plaintiffs' Memorandum in Support of Motion for Final Approval of the Settlement and Plan of Allocation ("Settlement Memorandum"), many courts have recognized that in and out purchasers have a significantly comprised opportunity for recovery and that it is appropriate to provide to them discounted recoveries under plans of allocation.

## Attorneys' Fees and Costs

49.      Lead Counsel respectfully requests an award of twenty-five percent (25%) from the Gross Settlement Fund and reimbursement of expenses in the amount of $55,357.65.  Lead Counsel believes that this request is consistent with established precedent in this District and throughout the First Circuit, as well as in federal courts throughout the country, as fees in the range of twenty-five (25%) have been consistently awarded in securities class actions to plaintiffs' counsel working on a contingent fee basis and obtaining a common fund for the benefit of the Class.  *See* §II(B)(7) of Memorandum of Law in Support of Motion for an Award of Attorneys' Fees, Reimbursement of Expenses and Reimbursement Awards to Lead Plaintiffs (the "Fee Memorandum"), submitted herewith.  In addition, a cross-check of the lodestar also supports the attorneys' fee request.  Lead Counsel and Liaison Counsel have collectively

incurred $650,859.25 in time in this Action through January 12, 2007.[5]   Thus, the requested fee

award of $437,500 represents a negative multiplier of 0.67 to the lodestar.

50.    In addition, while the First Circuit does not mandate the weighing of a specific set

of factors when assessing a request for attorneys' fees, factors typically considered include:

> (1) the size of the fund created and the number of persons benefited; (2) the
> presence or absence of substantial objections by members of the class to the
> settlement terms and/or fees requested by counsel; (3) the skill and efficiency of
> the attorneys involved; (4) the complexity and duration of the litigation; (5) the
> risk of nonpayment; (6) the amount of time devoted to the case by plaintiffs'
> counsel; and (7) the awards in similar cases.

*In re Relafen Antitrust Litig.*, 231 F.R.D. 52, 84-85 (D. Mass. 2005) (internal citations omitted).

An analysis of these criteria demonstrates that the requested fee is fair and reasonable.  *See also*

Fee Memorandum, §II(B).

51.    An analysis of the fifth factor, the risk of nonpayment, is significant in this Action

and militates strongly in favor of Lead Counsel's fee request.  Lead Counsel undertook the

Action on a wholly contingent basis and has borne all the financial risk.  This risk was

particularly acute in this Action due to the dire financial condition of Wave and the limited

insurance proceeds available to fund a settlement or satisfy a judgment against Defendants.

52.    An analysis of the first factor listed above, the size of the Settlement Fund and

number of persons who benefited, also weighs in favor of Lead Counsel's fee request.  There is

no question that the Class Members will benefit greatly from the Settlement Fund created in this

Action.  As stated above, the Settlement represents a substantial recovery evaluated both as a

---

5   The Lodestar and Expense Affidavits of David Kessler and David Pastor, on behalf of
Schiffrin & Barroway and Gilman and Pastor, respectively, are attached hereto as Exhibits 2-3.
These exhibits reflect the names of the attorneys and paralegals who worked on the Action, the
hourly rates currently chargeable by each such attorney and paralegal, the lodestar value of the
time expended by such attorneys and paralegals, the unreimbursed disbursements of Schiffrin &
Barroway and Gilman and Pastor, and the background and experience of both firms.

percentage of the greatest possible recovery and in the context of Defendants' financial condition and limited insurance proceeds available to either fund a settlement or satisfy a verdict. But for this Settlement, it is likely that the Class Members may have recovered nothing after years of further litigation.

53.     An analysis of the second factor, the presence or absence of substantial objections by members of the Class to the settlement terms and/or fees requested by counsel, also supports this Court's approval of Lead Counsel's request for attorneys' fees. Notice of this proposed Settlement, in the form approved by the Court, was mailed to more than 20,600 potential Class Members and published in the *Investor's Business Daily. See* GCG Aff. ¶¶ 6, 9. In addition to describing how to either exclude oneself or object to any aspect of the Settlement, the Notice further advised Class Members that Lead Counsel intended to apply for an award of attorneys' fees from the Gross Settlement Fund in an amount not greater than twenty-five (25%) of the Gross Settlement Fund and for reimbursement of their expenses up to a maximum amount of $80,000, plus interest on such amounts at the same rate as earned by the Gross Settlement Fund. Class Members had until December 28, 2006, to object. As of this deadline, *not a single recipient of the Notice has filed an objection to the attorneys' fees requested.*

54.     An analysis of the fourth factor listed above, the complexity and duration of the litigation, also weighs in favor of Lead Counsel's requested fee. As set forth above, the claims advanced by the Class involve complicated issues of law and fact, and many questions remained regarding the extent of Defendants' liability, the extent to which a jury might find Defendants liable and the true measure of the Class' damages. These issues would require extensive discovery, including numerous depositions as well as expert discovery and testimony. If the Parties had not reached the Settlement, the Action would have continued for at least an additional

2-3 years, through merits discovery, summary discovery, trial and the inevitable post trial appeals.

55.    An analysis of the third factor, the skill and efficiency of the attorneys involved, also supports the requested fees.    Lead Counsel, Schiffrin & Barroway, is extremely accomplished in the area of complex civil litigation, particularly in the area of securities class actions, and has successfully litigated these types of actions in courts throughout the United States. *See* Biography for Schiffrin Barroway attached as Exhibit 2.    Over the course of nearly three years, Lead Counsel familiarized itself with the complex claims alleged in the Action, vigorously prosecuted the Action against Defendants and obtained a substantial recovery for the Class.    More importantly, Lead Counsel engaged in a thorough analysis of the best possible recovery for the Class in light of Wave's poor financial situation and the availability of very limited insurance proceeds to fund a settlement or satisfy a judgment.    Liaison Counsel, Gilman and Pastor, is a similarly skilled complex litigation firm.    In addition, Lead Counsel faced formidable opposition from the nationally prominent law firm of Bingham McCutchen, LLP, and without the experience, skill and determination displayed by Lead Counsel during the prosecution of this Action and the intense arm's-length negotiations with the Defendant over the course of almost six months, such a favorable recovery for the Class would not have been attained.

56.    An analysis of the sixth factor, the amount of time devoted to the case by plaintiffs' counsel, also militates in favor of the fees requested.    Lead Counsel and Liaison Counsel devoted 1,587 hours to this Action.    As a result, the loadstar is $650,859.25, significantly more than the fee requested here.    The lodestar reflects years of hard work and dedication, as detailed above in ¶¶ 18-19.

57.    Finally, an analysis of the seventh factor, awards in similar cases, further supports Lead Counsel's request for attorneys' fees. The request for twenty-five percent (25%) of the Gross Settlement Fund is commensurate with the range of fees awarded in similar cases by courts within the First Circuit and elsewhere. *See* Fee Memorandum, §II(B)(7) for a full analysis of awards in similar cases. Slip opinions referenced therein are attached hereto as Exhibit 5.

58.    Lead Counsel also requests reimbursement of out-of-pocket expenses, in the amount of $55,357.65, incurred to date in connection with the prosecution of the Action, plus interest on such amount at the same rate as earned by the Gross Settlement Fund. These expenses include paying an investigator and a damages expert, photocopying of documents, on-line research, messenger services, postage, express mail and next day delivery, long distance telephone and facsimile expenses, transportation, meals, travel and other incidental expenses directly related to the prosecution of this Action. *See* Affidavit of David Kessler, attached hereto as Exhibit 2. No objections were received regarding this expense figure.

### Reimbursement Awards to Lead Plaintiffs

59.    Lead Plaintiffs respectfully request $5,000 be awarded to each Lead Plaintiff as reimbursement for time and expense (including lost wages) directly relating to their representation of the Class. All three Lead Plaintiffs were continuously involved and were in constant contact with Lead Counsel during all stages of this Action. As set forth in each of their declarations, attached hereto as Exhibit 6, Lead Plaintiffs reviewed and provided comments for all pleadings filed, including a complex amended complaint, the briefing in support of and in opposition to the motion to dismiss, and the briefing in support of and in opposition to class certification, gathered documents in response to Defendants' discovery demands, prepared and sat for depositions, kept themselves informed of all developments in the litigation through the

review of correspondence and regular telephone conferences with Lead Counsel, and were consulted by Lead Counsel with respect to all strategic decisions made in this Action. The Notice stated that Lead Plaintiffs would be moving the Court for an award of up to a total of $60,000 to the Lead Plaintiffs for their reasonable costs and expenses (including lost wages) directly relating to their representation of the Class. These individuals were devoted and attentive to the furtherance of this Action, and took time away from their respective professions to fulfill their duties as Lead Plaintiffs. Not a single objection was filed to this request and the application is in fact but a fraction of the $60,000 set forth in the Notice.

60.    I hereby declare that the foregoing is true and correct.


Dated: January 1, 2007

_Kay E. Sickles_
Kay E. Sickles